IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC. | ) | |
| | ) | C. A. No.: _____ |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | |
| IVANTIS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Sight Sciences, Inc., by and through its undersigned attorneys, brings this Complaint against defendant Ivantis, Inc. for patent infringement and alleges as follows:

## THE PARTIES

1.      Sight Sciences, Inc. ("Sight Sciences") is a corporation organized under the laws of Delaware with its corporate headquarters at 4040 Campbell Ave., Suite 100, Menlo Park, CA 94025.

2.      On information and belief, Ivantis, Inc. ("Ivantis") is a corporation organized under the laws of Delaware with its corporate headquarters at 201 Technology Dr., Irvine, CA 92618.

## JURISDICTION AND VENUE

3.      This is a civil action arising under the Patent Laws of the United States, 35 U.S.C. 35 U.S.C. § 100 *et. seq.*  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338.

4.      Venue is proper with respect to Ivantis in this Court pursuant to 28 U.S.C. § 1400(b), because Ivantis is incorporated in Delaware, and because Ivantis has committed acts of

1

infringement in Delaware by selling and/or offering to sell devices which infringe the asserted patents within this State.[1]

5.     This Court has general and specific personal jurisdiction over Ivantis because it is incorporated in Delaware and has had continuous, systematic, and substantial contacts with this judicial district.

## FACTUAL ALLEGATIONS

### I.   SIGHT SCIENCES IS A LEADER IN INNOVATING NEW GLAUCOMA TREATMENT DEVICES AND METHODS

6.     Glaucoma, a potentially blinding disease that affects over 60 million people worldwide, is a condition of the eye that is typically caused by excessive intraocular pressure, or IOP.  Human eyes contain a clear, colorless, and continuously replenished fluid known as "aqueous humor."  Aqueous humor is generated by the "ciliary body," a structure in the posterior chamber of the eye that lies beneath the iris. In a healthy, functioning eye, the aqueous humor generated by the ciliary body flows unobstructed through the pupil into the anterior chamber.  As this fluid is replenished, aqueous humor exits from the anterior chamber through the eye's natural drainage system, known as the trabeculocanalicular outflow pathway.  This drainage system comprises three distinct anatomies that are all necessary for natural and healthy aqueous drainage from the eye. The first component is the trabecular meshwork, where aqueous humor flows from the anterior chamber radially through a multi-layered network of cells, which extends circumferentially around the 360 degrees of the eye and is formed at the intersection between the peripheral iris or iris root, the anterior sclera (the white part of the eye), and the peripheral cornea.  The trabecular meshwork feeds outwardly into Schlemm's canal, which is the second component of the drainage system. Schlemm's canal is an oval-shaped, circumferential passageway generally surrounding the exterior

---

[1] *See, e.g.,* MIGS, https://eyeconsultantsde.com/delaware-cataracts-doctor/.

border of the trabecular meshwork.  The aqueous humor thus flows through the trabecular meshwork into Schlemm's canal and into the third component of the drainage system, the collector channels.  There are 30-40 collector or drainage channels distributed around the distal 360-degree circumference of Schlemm's canal.  These drainage channels connect directly to the venous system so that aqueous humor can flow into the bloodstream and leave the eye.  A cross-sectional diagram of a segment of the eye's natural outflow pathway showing the relative positions of many of the aforementioned components is provided below:



7.    In primary open-angle glaucoma ("POAG") patients, the outflow or drainage system of the eye can become obstructed.  As noted above, there are three potential sources of resistance in the conventional outflow pathway: 1) trabecular meshwork, 2) Schlemm's canal, and 3) collector channels.  If any or all of these anatomies are diseased and obstructed, aqueous humor accumulates and the fluid pressure inside the eye increases, which can cause damage to the optic nerve and lead to irreversible blindness if left untreated.  It is estimated that 50-70% of the

resistance to outflow in glaucoma resides proximally within diseased trabecular meshwork and 30-50% of resistance to outflow in glaucoma resides distally within a collapsed Schlemm's canal and obstructed collector channels.  Thus, treatments to reduce intraocular pressure in the eye are desirable for patients suffering from primary open-angle glaucoma.

8.      Elevated IOP can be treated using multiple modalities, including medication, incisional surgery, laser surgery, or other forms of surgery.  Although medication is typically the first line of therapy used, medicinal therapy may not be sufficiently effective, requiring more invasive forms of surgery.  Prior to the inventions claimed in the patents-in-suit, a surgical procedure for reducing elevated IOP involved creating a new, artificial drainage site for aqueous humor.  New drainage pathways were created by removing a portion of the sclera and trabecular meshwork, and then creating a new reservoir, or "bleb," on the surface of the eye into which aqueous humor could drain.  However, invasive surgery of this nature carried numerous lifelong risks, including blockage of the surgically created opening, abnormally low IOP, infection, hemorrhage, or other complications.

9.      Less invasive implants known as trabecular micro-bypass stents were also used to improve aqueous outflow.  Such micro-stents were inserted between the anterior chamber of the eye and Schlemm's canal, bypassing a small section of the diseased trabecular meshwork.  However, implantation of these stents was challenging, such stents could migrate or become clogged due to their small size and lose functionality over time, and these stents were limited in their drainage functionality.

10.     Against this backdrop, in 2004, Paul Badawi (co-founder and Chief Executive Officer of Sight Sciences) and his brother Dr. David Badawi (co-founder, Chief Technology Officer of Sight Sciences, and an ophthalmologist) began exploring new treatments for glaucoma

that would avoid the risks associated with invasive surgical procedures and the difficulties associated with bypass stents.

11.     Paul and David Badawi focused their early research on developing new forms of medical devices that could be implanted within Schlemm's canal to prop open the canal, helping restore the eye's natural drainage processes.  By mid-2006, the Badawi brothers' research and development efforts culminated in the filing of their first patent application, U.S. Appl. No. 11/475,523 ("the '523 application"), which eventually issued as U.S. Patent No. 7,909,789.

12.     As described in the '523 application, the Badawis' inventions included the development of new, more effective intraocular implant designs and methods of implantation.  The inventive devices and methods disclosed in the '523 application included an innovative canalicular scaffold design and placement, which helped maximize the outflow of aqueous humor through the trabecular meshwork, into and around a dilated and scaffolded Schlemm's canal, and out through the unobstructed distal collector channels, and viscodilation, or the injection of viscoelastic fluid, to dilate Schlemm's canal to assist in placement of the devices.

13.     On September 6, 2011, Sight Sciences was incorporated in California, and Paul and David Badawi assigned all right, title, and interest in the inventions they developed to the company.

14.     From 2011 until today, the Badawi brothers and Sight Sciences have continued to develop innovative, patent-protected inventions for treating primary open angle glaucoma, including the VISCO360® Viscosurgical System, the TRAB360® 360-degree Ab Interno Trabeculotomy System, and the OMNI® Surgical System, which offers surgeons the ability to perform canaloplasty and trabeculotomy with one system.

## II.   THE PATENTS-IN-SUIT

15.    The inventions that were described in the '523 patent application led to the filing and issuance of the patents-in-suit, including U.S. Patent No. 9,370,443, which is a divisional of the '789 patent, and U.S. Patent Nos. 10,314,742, 8,287,482, and 9,486,361, which are continuations of the '789 patent.

16.    U.S. Patent No. 8,287,482 was filed on January 27, 2010 and duly and legally issued by the U.S. Patent and Trademark Office on October 16, 2012.  Sight Sciences is the assignee of the '482 patent and holds all right, title, and interest in the patent, including all rights of enforcement.  The '482 patent, entitled "Intraocular Implants and Methods and Kits Therefor," is attached hereto as **Exhibit A**.

17.    U.S. Patent No. 9,370,443 was filed on February 10, 2011 and duly and legally issued by the U.S. Patent and Trademark Office on June 21, 2016.  Sight Sciences is the assignee of the '443 patent and holds all right, title, and interest in the patent, including all rights of enforcement.  The '443 patent, entitled "Intraocular Implants and Methods and Kits Therefor," is attached hereto as **Exhibit B**.

18.    U.S. Patent No. 9,486,361 was filed on April 12, 2012 and duly and legally issued by the U.S. Patent and Trademark Office on November 8, 2016.  Sight Sciences is the assignee of the '361 patent and holds all right, title, and interest in the patent, including all rights of enforcement.  The '361 patent, entitled "Intraocular Implants and Methods and Kits Therefor," is attached hereto as **Exhibit C**.

19.    U.S. Patent No. 10,314,742 was filed on June 14, 2016 and duly and legally issued by the U.S. Patent and Trademark Office on June 11, 2019.  Sight Sciences is the assignee of the '742 patent and holds all right, title, and interest in the patent, including all rights of enforcement.

The '742 patent, entitled "Intraocular Implants and Methods and Kits Therefor," is attached hereto as **Exhibit D**.

### III.   IVANTIS AND ITS INFRINGING HYDRUS® STENT PRODUCT

20.    On information and belief, Ivantis is a privately held company that was founded in 2007 to design, develop, and commercialize technologies to treat diseases of the eye.  Ivantis was founded approximately one year after the Badawi brothers filed the '523 patent application.

21.    On December 27, 2007, the '523 patent application was published as U.S. Publ. No. 2007/0298068.

22.    On December 18, 2008, Jim Shay of the law firm Shay Glen LLP sent an email to the Badawi brothers' patent prosecution counsel.  The email stated in relevant part:

> our client Ivantis (a Delphi company) forwarded a copy of US 2007/0298068 to me. … The folks at Ivantis asked me to reach out to you to see if I could initiate a conversation between Ivantis and the patent application owners.   Can you pass on contact information for the people or entity holding the rights to this application so that I can get the business people talking directly?

23.    Paul Badawi met with Doug Roeder, a member of the board of directors of Ivantis, and Mr. Roeder offered to purchase the Badawis' IP rights, including the '523 application that was published as US 2007/0298068.  Mr. Badawi immediately rejected the offer, noting that he was building a company around the intellectual property rights he and his brother had developed.  The '523 application issued as U.S. Pat. No. 7,909,789 on March 22, 2011.  On information and belief, Ivantis has monitored Sight Sciences' patent portfolio ever since the 2008 meeting, was aware of the issuance of each of the patents-in-suit, and knew or recklessly disregarded an objectively high risk that its Hydrus® product and delivery methods infringed claims of each of the patents-in-suit.

24.    In January of 2012, Ivantis commenced the HORIZON study, a randomized controlled trial designed to evaluate the efficacy of what has now become Ivantis's chief product

offering: the Hydrus® Microstent.  The HORIZON study reached its primary endpoint in June of 2017.

25.     On or about August 10, 2018, the U.S. Food and Drug Administration ("FDA") approved Ivantis's premarket approval application for the Hydrus® Microstent for use in conjunction with cataract surgery for the reduction of intraocular pressure (IOP) in adult patients with mild to moderate primary open-angle glaucoma (POAG)[2], and Ivantis began selling it soon thereafter.

26.     As seen in the below figure, the Hydrus® Microstent is an arcuate (curved) device that comprises multiple fenestrations (windows)[3]:



*Figure 1: Hydrus Microstent Implant*

27.     The Hydrus® Microstent is designed to be implanted longitudinally within Schlemm's canal, using a hand-held delivery system that passes the microstent through a stainless-steel cannula into the target site.  The Hydrus® Microstent is delivered using an Ivantis-supplied delivery system.[4]

---

[2] https://www.accessdata.fda.gov/cdrh_docs/pdf17/P170034A.pdf.
[3] Hydrus® Microstent Instructions for Use (C00256 Rev A.1) (hereinafter "IFU") at 2.
[4] *See* IFU at 2-3.

28.     The Hydrus® Microstent is advanced from the stainless-steel cannula of the Microstent Delivery System using an interlock mechanism, as seen in the below image taken from an Ivantis animation video describing the Hydrus® Microstent[5]:



29.     When properly positioned, the Hydrus® Microstent is meant to reside longitudinally within the lumen (opening) of Schlemm's canal, along an arc comprising approximately 90 degrees of Schlemm's Canal, as seen in the below figures[6]:



*Figure 4: Preferred Position of Incisions and Target Placement of the Microstent*

---

[5] "IM-00 16-1-2 Rev B OUS Hydrus Microstent Animation (Full)", https://vimeo.com/510821860 (hereinafter "Hydrus Animation") at 3:51.
[6] IFU at 6, 8.

**Figure 5** shows the microstent positioned in Schlemm's canal with the proximal end (i.e., the inlet) protruding slightly into the anterior chamber for inflow of aqueous humor.

*Figure 5: Microstent in Schlemm's Canal*
**(Proximal end at right accessing aqueous humor from the anterior chamber)**

30.     As also reflected in the above figures, when properly positioned within Schlemm's Canal, the Hydrus® Microstent is intended to protrude from Schlemm's Canal, through the trabecular meshwork and into the anterior chamber.  This protrusion is made possible because the radius of curvature of the Hydrus® Microstent is intended to be smaller than that of the Schlemm's Canal in which it is disposed.  Screenshots taken from an Ivantis animation describing the Hydrus® Microstent further display the intended protrusion of the Hydrus® from Schlemm's Canal[7]:



---

[7] Hydrus Animation at 2:43, 5:32 (red boxes added for emphasis).



31.     The Hydrus® Microstent has a cross-sectional dimension sufficient to at least partially prop open Schlemm's canal upon insertion into the canal, thereby maintaining the patency of at least a portion of the canal so that fluid can traverse the canal without substantial interference from the Hydrus® Microstent.  As the voiceover of the Hydrus® Animation explains:

> **The Hydrus® Microstent acts to bypass the obstructed trabecular meshwork by creating an optimal pathway for the aqueous to flow through Schlemm's canal**. Additionally, with its open scaffold design, the Microstent provides for a gentle dilation of a potentially narrowing or collapsing Schlemm's canal. And because of its 8-millimeter length and approximate 90-degree span within Schlemm's canal, **the Hydrus® allows for enhanced access and unobstructed flow into the numerous collector channels and network of aqueous outflow veins**.[8]

32.     The intended operation of the Hydrus® Microstent to maintain the patency of Schlemm's Canal is also visualized by the same animation in which the transmural flow of aqueous humor in the eye is represented using blue arrows[9]:

---

[8] Transcription of Hydrus Animation at 1:57-2:50 (emphasis added).
[9] Hydrus Animation at 2:52.



33.     The Hydrus® Microstent also makes discontinuous contact with Schlemm's canal along a perimeter of the canal, and on information and belief, contacts 30% or less of the surface area of the section of Schlemm's canal in which it is disposed.   By way of example, the discontinuous nature of Hydrus's contact with the outer perimeter of Schlemm's canal can be seen in the below screenshot from the Hydrus® Animation[10]:



Expands the natural diameter of Schlemm's canal to augment flow

---

[10] Hydrus Animation at 6:24.

34.     Furthermore, the Hydrus® IFU confirms that the dimensions of the Hydrus® Microstent are intended to minimize surface area contact with Schlemm's canal in order to provide maximum flow through the canal:

> The microstent is approximately 8mm in overall length with major and minor axes of 292μm and 185μm, respectively. The length and curvature of the implant are designed to occupy approximately 90° or 3 clock hours of Schlemm's canal. **The implant is designed to have adequate structural thickness to support the tissue of the canal while providing maximum open flow areas through the canal**, with the proximal portion of the implant exiting the canal through the trabecular meshwork to allow inflow of aqueous humor from the anterior chamber.[11]

35.     As previously noted, the Hydrus® Microstent is indicated for use in conjunction with cataract surgery for the reduction of IOP in adult patients with mild to moderate POAG.[12] Implantation of the Hydrus® Microstent is intended to occur after the completion of a cataract extraction procedure and the implantation of an intraocular lens.[13] Implantation of the Hydrus® Microstent involves first creating a clear corneal incision in the eye.  Ophthalmic viscoelastic is then injected in the anterior chamber of the eye, unless sufficient viscoelastic remains in the eye from the cataract extraction procedure.  The cannula of the Hydrus® Microstent's handheld delivery device is then inserted through the clear corneal incision of the eye, used to pierce the trabecular meshwork, and then advanced slightly into Schlemm's Canal.  With the cannula tip of the handheld delivery device in Schlemm's canal, the microstent is advanced from the cannula tip by rolling the tracking wheel of the delivery device.  If the device is positioned properly—i.e., if it is lodged within Schlemm's canal and neither in front of it (in the anterior chamber of the eye), or posterior to the canal, the wheel is advanced until a physical stop is felt and the interlock of the delivery device releases the microstent.  If the implantation is successful, the cannula tip is

---

[11] IFU at 1 (emphasis added).
[12] https://www.accessdata.fda.gov/cdrh_docs/pdf17/P170034A.pdf.
[13] *Id.*

removed from the eye, any viscoelastic in the anterior chamber is irrigated and aspirated, and the corneal incision is closed.

36.     The Hydrus® Microstent is not indicated for use in conjunction with viscodilation.

37.     However, on information and belief, Ivantis and its agents recently began promoting the Hydrus® Microstent for use in combination with certain viscoelastic delivery cannulas, with Ivantis sales representatives and agents providing instructions to surgeons and facilities to first perform viscoelastic delivery within Schlemm's canal, i.e., "canaloplasty," in advance of delivering the Hydrus® Microstent.  One such individual who has actively promoted this procedure is Andy Rivero, of Vero Beach, Florida.

38.     Sight Sciences and Ivantis are direct competitors in the market for the treatment of primary open-angle glaucoma.  More specifically, Sight Sciences and Ivantis compete directly in the market for "minimally invasive glaucoma surgery," or "MIGS" treatments for primary open-angle glaucoma.

39.     Particularly in light of their status as direct competitors, Ivantis's infringing activities have caused and will continue to cause Sight Sciences harm for which there is no adequate remedy at law, including a loss of profits, price erosion, a loss of market share, and a loss of goodwill.

**FIRST CAUSE OF ACTION: INFRINGEMENT OF U.S. PAT. NO. 8,287,482**

40.     Sight Sciences re-alleges and incorporates by references the allegations contained in paragraphs 1-39 above.

41.     Ivantis infringes the '482 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(a), literally or under the doctrine of

equivalents, by making, using, offering to sell, and/or selling within the United States, or importing into the United States, the Hydrus® Microstent, in violation of Sight Science's patent rights.

42.     Ivantis further infringes the '482 patent, including but not limited to each and every element of exemplary claim 63, in violation of 35 U.S.C. § 271(b) by actively inducing infringement of the '482 patent, literally or under the doctrine of equivalents, by knowingly encouraging others, including but not limited to end users of Ivantis's products, to directly infringe the '482 patent with knowledge that such conduct infringes the '482 patent.  Specifically, Ivantis's Hydrus® marketing materials and Instructions For Use direct end users to use the Hydrus® Microstent in a manner that infringes at least one claim of the '482 patent.  Furthermore, on information and belief, Ivantis sales representatives, affiliates, and agents encourage at least Hydrus® end users to directly infringe the '482 patent with knowledge that such conduct infringes the '482 patent.

43.     Ivantis's infringement of the '482 patent is willful, because Ivantis is and has been aware of the '482 patent.  Specifically, Ivantis has been knowledgeable of the '523 patent application, from which the '482 patent is derived, since at least December 18, 2008.  Furthermore, on information and belief, Ivantis actively monitors Sight Science's patent portfolio and thus has been aware of the '482 patent at least since the time that the patent issued.

44.     Ivantis's infringement of the '482 patent has caused and will continue to cause Sight Sciences irreparable harm, including but not limited to a loss of market share, goodwill, and profits, unless and until Ivantis's infringing activities are enjoined by this court.

**SECOND CAUSE OF ACTION: INFRINGEMENT OF U.S. PAT. NO. 9,370,443**

45.     Sight Sciences re-alleges and incorporates by references the allegations contained in paragraphs 1-39 above.

46.     Ivantis infringes the '443 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, offering to sell, and/or selling within the United States, or importing into the United States, the Hydrus® Microstent, in violation of Sight Science's patent rights.

47.     Ivantis's infringement of the '443 patent is willful, because Ivantis is and has been aware of the '443 patent. Specifically, Ivantis has been knowledgeable of the '523 patent application, from which the '443 patent is derived, since at least December 18, 2008. Furthermore, on information and belief, Ivantis actively monitors Sight Science's patent portfolio and thus has been aware of the '443 patent at least since the time that the patent issued.

48.     Ivantis's infringement of the '443 patent has caused and will continue to cause Sight Sciences irreparable harm, including but not limited to a loss of market share, goodwill, and profits, unless and until Ivantis's infringing activities are enjoined by this court.

**THIRD CAUSE OF ACTION: INFRINGEMENT OF U.S. PAT. NO. 9,486,361**

49.     Sight Sciences re-alleges and incorporates by references the allegations contained in paragraphs 1-39 above.

50.     Ivantis infringes the '361 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, offering to sell, and/or selling within the United States, or importing into the United States, the Hydrus® Microstent, in violation of Sight Science's patent rights.

51.     Ivantis further infringes the '361 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(b) by actively inducing infringement of the '361 patent, literally or under the doctrine of equivalents, by knowingly encouraging others, including but not limited to end users of Ivantis's products, to directly infringe the '361 patent with

knowledge that such conduct infringes the '361 patent.  Specifically, Ivantis's Hydrus® marketing materials and Instructions For Use direct end users to use the Hydrus® Microstent in a manner that infringes at least one claim of the '361 patent.  Furthermore, on information and belief, Ivantis sales representatives, affiliates, and agents encourage at least Hydrus® end users to directly infringe the '361 patent with Ivantis's knowledge that such conduct infringes the '361 patent.

52.     Ivantis further infringes the '361 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(c) by contributing to infringement of the '361 patent, literally or under the doctrine of equivalents, by among other things selling or offering to sell the Hydrus® Microstent or components thereof with knowledge of the '361 patent and knowing that such products and/or components are especially made or especially adapted for use in the infringement of the '361 patent, are a material part of the invention, and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

53.     Ivantis's infringement of the '361 patent is willful, because Ivantis is and has been aware of the '361 patent.  Specifically, Ivantis has been knowledgeable of the '523 patent application, from which the '361 patent is derived, since at least December 18, 2008.  Furthermore, on information and belief, Ivantis actively monitors Sight Science's patent portfolio and thus has been aware of the '361 patent at least since the time that the patent issued.

54.     Ivantis's infringement of the '361 patent has caused and will continue to cause Sight Sciences irreparable harm, including but not limited to a loss of market share, goodwill, and profits, unless and until Ivantis's infringing activities are enjoined by this court.

**FOURTH CAUSE OF ACTION: INFRINGEMENT OF U.S. PAT. NO. 10,314,742**

55.     Sight Sciences re-alleges and incorporates by references the allegations contained in paragraphs 1-39 above.

56.     Ivantis infringes the '742 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, offering to sell, and/or selling within the United States, or importing into the United States, the Hydrus® Microstent.

57.     Ivantis further infringes the '742 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(b) by actively inducing infringement of the '742 patent, literally or under the doctrine of equivalents, by knowing encouraging others, including but not limited to end users of Ivantis's products, to directly infringe the '742 patent with knowledge that such conduct infringes the '742 patent.  Specifically, Ivantis's Hydrus® marketing materials and Instructions For Use direct end users to use the Hydrus® Microstent in a manner that infringes at least one claim of the '742 patent.  Furthermore, on information and belief, Ivantis sales representatives, affiliates, and agents encourage at least Hydrus® end users to directly infringe the '742'742 patent with Ivantis's knowledge that such conduct infringes the '742 patent.

58.     Ivantis's infringement of the '742 patent is willful, because Ivantis is and has been aware of the '742 patent.  Specifically, Ivantis has been knowledgeable of the '523 patent application, from which the '742 patent is derived, since at least December 18, 2008.  Furthermore, on information and belief, Ivantis actively monitors Sight Science's patent portfolio and thus has been aware of the '742 patent at least since the time that the patent issued.

59.     Ivantis's infringement of the '742 patent has caused and will continue to cause Sight Sciences irreparable harm, including but not limited to a loss of market share, goodwill, and profits, unless and until Ivantis's infringing activities are enjoined by this court.

## PRAYER FOR RELIEF

WHEREFORE, Sight Sciences respectfully requests entry of judgment in its favor and against Defendant as follows:

A.      An adjudication that Ivantis has infringed one or more claims of the '482 patent, '443 patent, '361 patent, and/or the '742 patent, directly and/or indirectly and literally and/or through equivalents;

B.      An award of damages to Sight Sciences adequate to compensate it for Ivantis's past infringement, together with pre-judgment and post-judgment interest, as well as damages adequate to compensate Sight Sciences for any continuing or future infringement, including costs, expenses, and an accounting for all infringing acts, including such acts that may transpire through any trial and/or the conclusion of any appeal(s);

C.      A preliminary and/or permanent injunction per 35 U.S.C. § 283, enjoining Ivantis, including its officers, directors, agents, affiliates, employees, and all others acting in concert or participation with Ivantis, from making, using, selling, offering to sell in the United States, or importing into the United States, any systems or methods that infringe any of the Patents-in-Suit, directly or indirectly and literally or through equivalents;

D.      A finding that Ivantis's infringement has been and continues to be willful, and an award of enhanced damages, up to and including treble damages per 35 U.S.C. § 284;

E.      A finding that this case is exceptional and an award of Plaintiff's reasonable attorney fees pursuant to 35 U.S.C. § 285; and

F.      Any such other and further relief as this Court deems necessary and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff Sight Sciences respectfully requests a trial by jury on each of its claims so triable.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com

COOLEY LLP
Michelle S. Rhyu*
David Murdter*
3175 Hanover Street
Palo Alto, CA  94304-1130
(650) 843-5000

Orion Armon*
1144 15th Street, Suite 2300
Denver, CO  80202-2686
(720) 566-4000

*Pro hac vice* admission pending

Dated:  September 16, 2021        *Attorneys for Sight Sciences, Inc.*

28613593.1