IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | C. A. No.:  21-1317-VAC-SRF |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | |
| IVANTIS, INC., ALCON RESEARCH LLC, | ) | |
| ALCON VISION, LLC and ALCON INC., | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Pursuant Fed. R. Civ. P. 15(a)(1)(B), Plaintiff Sight Sciences, Inc., by and through its undersigned attorneys, brings this Second Amended Complaint against defendants Ivantis, Inc., Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc. (collectively, "Defendants") for patent infringement and alleges as follows:

## THE PARTIES

1.      Sight Sciences, Inc. ("Sight Sciences") is a corporation organized under the laws of Delaware with its corporate headquarters at 4040 Campbell Ave., Suite 100, Menlo Park, CA 94025.

2.      Ivantis, Inc. ("Ivantis") is a corporation organized under the laws of Delaware with its corporate headquarters at 201 Technology Dr., Irvine, CA 92618.  On information and belief, Ivantis is a wholly owned subsidiary of Alcon Research LLC.

3.      Alcon Research LLC ("Alcon Research") is a limited liability company organized under the laws of Delaware with its principal place of business at 6201 South Freeway, Fort Worth, TX 76134.  On information and belief, Alcon Research is a wholly owned subsidiary of Alcon Inc.

4.      Alcon Vision, LLC ("Alcon Vision") is a limited liability company organized under the laws of Delaware with its principal place of business 6201 South Freeway, Fort Worth, TX 76134.  On information and belief, Alcon Vision is a wholly owned subsidiary of Alcon Inc.

5.      Alcon Inc. is a corporation organized under the laws of Switzerland with its principal offices at Rue Louis-d'Affry 6, 1701 Fribourg, Switzerland.  According to its Articles of Incorporation, Alcon Inc. is also registered under the corporate names Alcon SA and Alcon AG.

### JURISDICTION AND VENUE

6.      This is a civil action arising under the Patent Laws of the United States, 35 U.S.C. 35 U.S.C. § 100 *et. seq.*  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338.

7.      Venue is proper with respect to Ivantis in this Court pursuant to 28 U.S.C. § 1400(b), because Ivantis is incorporated in Delaware, and because Ivantis has committed acts of infringement in Delaware by selling and/or offering to sell devices which infringe the asserted patents within this State.[1]

8.      Venue is proper with respect to Alcon Research in this Court pursuant to 28 U.S.C. § 1400(b), because Alcon Research is a Delaware company.

9.      Venue is proper with respect to Alcon Vision in this Court pursuant to 28 U.S.C. § 1400(b), because Alcon Vision is a Delaware company, and because Alcon Vision has committed acts of infringement in Delaware by selling and/or offering to sell devices which infringe the asserted patents within this State.[2]

---

[1] *See, e.g.,* MIGS, https://eyeconsultantsde.com/delaware-cataracts-doctor/, *archived at* https://web.archive.org/web/20220608215752/https://eyeconsultantsde.com/delaware-cataracts-doctor/.

[2] *See, e.g.,* Paragraphs 88-90 below.

10.     Venue is proper with respect to Alcon Inc. in this Court pursuant to 28 U.S.C. § 1391(c)(3) because Alcon is a foreign corporation organized under the laws of Switzerland.

11.     This Court has general and specific personal jurisdiction over Ivantis because it is incorporated in Delaware and has had continuous, systematic, and substantial contacts with this judicial district.

12.     This Court has general and specific personal jurisdiction over Alcon Research because it is a Delaware company and, upon information and belief, has had continuous, systematic, and substantial contacts with this judicial district.

13.     This Court has general and specific personal jurisdiction over Alcon Vision because it is a Delaware company and, upon information and belief, has had continuous, systematic, and substantial contacts with this judicial district.

14.     This Court also has jurisdiction over Alcon Inc. pursuant to Fed. R. Civ. P. 4(k)(2), because Alcon Inc. is not subject to jurisdiction in any state's courts of general jurisdiction, and because Alcon Inc. has had ongoing contacts with, and has purposely availed itself of, the United States by, among other things, obtaining U.S. patents and enforcing them in the United States, including in this District,[3] selling securities through a U.S.-based stock exchange, participating in industry conferences and events in the United States, deliberately gaining control over commercial activities related to the Hydrus® Microstent in the United States, and marketing and offering to sell the Hydrus® Microstent in the United States.[4]

---

[3] *See Alcon Inc. v. AMO Dev., LLC*, C.A. No. 1:21-cv-01804-CFC (D. Del. Dec. 23, 2021) (D.I. 1) (Alcon Inc. is the plaintiff); *AMO Dev., LLC v. Alcon Lensx, Inc.*, C.A. No. 1:20-cv-00842-CFC-JLH (D. Del. Oct. 30, 2020) (D.I. 25) (Alcon Inc. is the counterclaim plaintiff).
[4] https://professional.myalcon.com/events/ascrs2022, *archived at* https://web.archive.org/web/20220608232528/https://professional.myalcon.com/events/ascrs2022.

**FACTUAL ALLEGATIONS**

I.  **SIGHT SCIENCES IS A LEADER IN INNOVATING NEW GLAUCOMA TREATMENT DEVICES AND METHODS**

15.    Glaucoma, a potentially blinding disease that affects over 60 million people worldwide, is a condition of the eye that is typically caused by excessive intraocular pressure, or IOP. Human eyes contain a clear, colorless, and continuously replenished fluid known as "aqueous humor." Aqueous humor is generated by the "ciliary body," a structure in the posterior chamber of the eye that lies beneath the iris. In a healthy, functioning eye, the aqueous humor generated by the ciliary body flows unobstructed through the pupil into the anterior chamber. As this fluid is replenished, aqueous humor exits from the anterior chamber through the eye's natural drainage system, known as the trabeculocanalicular outflow pathway. This drainage system comprises three distinct anatomies that are all necessary for natural and healthy aqueous drainage from the eye. The first component is the trabecular meshwork, where aqueous humor flows from the anterior chamber radially through a multi-layered network of cells, which extends circumferentially around the 360 degrees of the eye and is formed at the intersection between the peripheral iris or iris root, the anterior sclera (the white part of the eye), and the peripheral cornea. The trabecular meshwork feeds outwardly into Schlemm's canal, which is the second component of the drainage system. In a normal human eye, Schlemm's canal is an oval-shaped, circumferential passageway generally surrounding the exterior border of the trabecular meshwork.[5] The aqueous humor thus flows through the trabecular meshwork into Schlemm's canal and into the third component of the drainage system, the collector channels. There are 30-40 collector or drainage channels distributed around the distal 360-degree circumference of Schlemm's canal. These drainage channels connect

---

[5] *See, e.g.,* Exhibit A, Schlemm's canal 30 in U.S. Patent No. 8,287,482 at Figs. 1, 2, 4B, 12B, 12D, 12H.

directly to the venous system so that aqueous humor can flow into the bloodstream and leave the eye.  A cross-sectional diagram of a segment of the eye's natural outflow pathway showing the relative positions of many of the aforementioned components is provided below:



16.    In primary open-angle glaucoma ("POAG") patients, the outflow or drainage system of the eye can become obstructed.  As noted above, there are three potential sources of resistance in the conventional outflow pathway: 1) trabecular meshwork, 2) Schlemm's canal, and 3) collector channels.  If any or all of these anatomies are diseased and obstructed, aqueous humor accumulates and the fluid pressure inside the eye increases, which can cause damage to the optic nerve and lead to irreversible blindness if left untreated.  It is estimated that 50-70% of the resistance to outflow in glaucoma resides proximally within diseased trabecular meshwork and 30-50% of resistance to outflow in glaucoma resides distally within a collapsed Schlemm's canal and obstructed collector channels.  Thus, treatments to reduce intraocular pressure in the eye are desirable for patients suffering from primary open-angle glaucoma.

17.     Elevated IOP can be treated using multiple modalities, including medication, incisional surgery, laser surgery, or other forms of surgery.  Although medication is typically the first line of therapy used, medicinal therapy may not be sufficiently effective, requiring more invasive forms of surgery.  Prior to the inventions claimed in the Patents-in-Suit, a surgical procedure for reducing elevated IOP involved creating a new, artificial drainage site for aqueous humor.  New drainage pathways were created by removing a portion of the sclera and trabecular meshwork, and then creating a new reservoir, or "bleb," on the surface of the eye into which aqueous humor could drain.  However, invasive surgery of this nature carried numerous lifelong risks, including blockage of the surgically created opening, abnormally low IOP, infection, hemorrhage, or other complications.

18.     Less invasive implants known as trabecular micro-bypass stents were also used to improve aqueous outflow.  Such micro-stents were inserted between the anterior chamber of the eye and Schlemm's canal, bypassing a small section of the diseased trabecular meshwork.  However, implantation of these stents was challenging, such stents could migrate or become clogged due to their small size and lose functionality over time, and these stents were limited in their drainage functionality.

19.     Against this backdrop, in 2004, Paul Badawi (co-founder and Chief Executive Officer of Sight Sciences) and his brother Dr. David Badawi (co-founder, Chief Technology Officer of Sight Sciences, and an ophthalmologist) began exploring new treatments for glaucoma that would avoid the risks associated with invasive surgical procedures and the difficulties associated with bypass stents.

20.     Paul and David Badawi focused their early research on developing new forms of medical devices that could be implanted within Schlemm's canal to prop open the canal, helping

restore the eye's natural drainage processes.  By mid-2006, the Badawi brothers' research and development efforts culminated in the filing of their first patent application, U.S. Appl. No. 11/475,523 ("the '523 application"), which eventually issued as U.S. Patent No. 7,909,789.

21.     As described in the '523 application, the Badawis' inventions included the development of new, more effective intraocular implant designs and methods of implantation.  The inventive devices and methods disclosed in the '523 application included an innovative canalicular scaffold design and placement, to maximize flow of aqueous humor into Schlemm's canal and eventually out of the canal.  The Badawis' inventions optimized the balance between maximized canal dilation with minimized wall contact to maximize aqueous outflow through the trabecular meshwork, into and around a dilated and scaffolded Schlemm's canal, and out through unobstructed distal collector channels, and also included viscodilation, or the injection of viscoelastic fluid, for therapeutic purposes and to dilate Schlemm's canal to assist in placement of the devices.

22.     On September 6, 2011, Sight Sciences was incorporated in California, and Paul and David Badawi assigned all right, title, and interest in the inventions they developed to the company.

23.     From 2011 until today, the Badawi brothers and Sight Sciences have continued to develop innovative, patent-protected inventions for treating primary open angle glaucoma, including the VISCO360® Viscosurgical System, the TRAB360® 360-degree Ab Interno Trabeculotomy System, and the OMNI® Surgical System, which offers surgeons the ability to perform canaloplasty and trabeculotomy with one system.

## II.   THE PATENTS-IN-SUIT

24.     The inventions that were described in the '523 patent application led to the filing and issuance of the Patents-in-Suit, including U.S. Patent No. 9,370,443, which is a divisional of the '789 patent, U.S. Patent No. 10,314,742, which is a continuation of the '443 patent, U.S. Pat.

No. 11,389,328, which is a continuation of the '742 patent, and U.S. Patent Nos. 8,287,482 and 9,486,361, which are continuations of the '789 patent.

25.     U.S. Patent No. 8,287,482 was filed on January 27, 2010 and duly and legally issued by the U.S. Patent and Trademark Office on October 16, 2012.  Sight Sciences is the assignee of the '482 patent and holds all right, title, and interest in the patent, including all rights of enforcement.  The '482 patent, entitled "Intraocular Implants and Methods and Kits Therefor," is attached hereto as **Exhibit A**.

26.     U.S. Patent No. 9,370,443 was filed on February 10, 2011 and duly and legally issued by the U.S. Patent and Trademark Office on June 21, 2016.  Sight Sciences is the assignee of the '443 patent and holds all right, title, and interest in the patent, including all rights of enforcement.  The '443 patent, entitled "Intraocular Implants and Methods and Kits Therefor," is attached hereto as **Exhibit B**.

27.     U.S. Patent No. 9,486,361 was filed on April 12, 2012 and duly and legally issued by the U.S. Patent and Trademark Office on November 8, 2016.  Sight Sciences is the assignee of the '361 patent and holds all right, title, and interest in the patent, including all rights of enforcement.  The '361 patent, entitled "Intraocular Implants and Methods and Kits Therefor," is attached hereto as **Exhibit C**.

28.     U.S. Patent No. 10,314,742 was filed on June 14, 2016 and duly and legally issued by the U.S. Patent and Trademark Office on June 11, 2019.  Sight Sciences is the assignee of the '742 patent and holds all right, title, and interest in the patent, including all rights of enforcement. The '742 patent, entitled "Intraocular Implants and Methods and Kits Therefor," is attached hereto as **Exhibit D**.

29.     U.S. Patent No. 11,389,328 was filed on May 15, 2019 and duly and legally issued by the U.S. Patent and Trademark Office on July 19, 2019.  Sight Sciences is the assignee of the '328 patent and holds all right, title, and interest in the patent, including all rights of enforcement. The '328 patent, entitled "Intraocular Implants and Methods and Kits Therefor," is attached hereto as **Exhibit E**.

III.     **IVANTIS ATTEMPTED TO PURCHASE, HAS REMAINED AWARE OF, AND WILLFULLY INFRINGES, SIGHT SCIENCE'S PATENTED TECHNOLOGY**

30.     On information and belief, Ivantis was founded in 2007 to design, develop, and commercialize technologies to treat diseases of the eye.  Ivantis was founded approximately one year after the Badawi brothers filed the '523 patent application.

31.     On December 27, 2007, the '523 patent application was published as U.S. Publ. No. 2007/0298068.

32.     On December 18, 2008, Jim Shay of the law firm Shay Glenn LLP sent an email to the Badawi brothers' patent prosecution counsel.  The email stated in relevant part:

> [O]ur client Ivantis (a Delphi company) forwarded a copy of US 2007/0298068 to me. … The folks at Ivantis asked me to reach out to you to see if I could initiate a conversation between Ivantis and the patent application owners.   Can you pass on contact information for the people or entity holding the rights to this application so that I can get the business people talking directly?

33.     Paul Badawi met with Doug Roeder, a member of the board of directors of Ivantis, and Mr. Roeder offered to purchase the Badawis' IP rights, including the '523 application that was published as US 2007/0298068.  Mr. Badawi immediately rejected the offer, noting that he was building a company around the intellectual property rights he and his brother had developed.  The '523 application issued as U.S. Pat. No. 7,909,789 on March 22, 2011.

34.     Ivantis competes with Sight Sciences in the market for minimally invasive surgical glaucoma therapies.  To maintain its competitive advantage and determine its freedom to operate,

Ivantis routinely monitors its competitors' intellectual property portfolios to remain apprised of any pending and newly issued patents that may be relevant to its business.  On information and belief, Ivantis further engages in concerted competitive intelligence efforts, including by regularly visiting competitor websites, attending scientific conferences to scout competitor offerings, attending competitor webinars, collecting and reviewing competitor documentation, collecting and reviewing third party industry reports and publications, collecting and reviewing scientific publications describing competitor products, and searching for information related to competitors online.  Ivantis has monitored Sight Sciences through each of these types of competitive intelligence efforts.

35.    As part of its competitive intelligence efforts, Ivantis has monitored the Badawis' and then Sight Sciences' patent portfolio ever since the 2008 meeting between Paul Badawi and Doug Roeder, was aware of the issuance of each of the Patents-in-Suit, and knew or recklessly disregarded an objectively high risk that its Hydrus® product and delivery methods infringed claims of each of the Patents-in-Suit.  As evidenced by Ivantis's recently issued patents, the law firm of Shay Glenn LLP ("Shay Glenn")—the same firm which contacted the Badawi brothers' patent counsel about purchasing the '523 application on Ivantis's behalf in 2008—has continued to serve as Ivantis's patent counsel since 2008.  Shay Glenn, on behalf of Ivantis, has continued to monitor Sight Sciences' patent portfolio ever since contacting the Badawi brothers' patent counsel in 2008 about purchasing the '523 application and related intellectual property.

36.    Shay Glenn's and Ivantis's continued monitoring of Sight Sciences' patent portfolio is evidenced, in part, by Ivantis's citation to Sight Sciences' patents and patent applications in its own patent applications.  For example, U.S. Patent No. 9,358,156, and U.S.

Patent No. 11,026,836, both of which are assigned to Ivantis, Inc.,[6] cite as prior art six and seven patent applications, respectively, for which the Badawi brothers are named inventors, and which were applied for by or have been assigned to Sight Sciences, Inc.  The '523 application, to which each of the Patents-in-Suit claims priority, is also cited by Ivantis's U.S. Patent Nos. 7,740,604, 8,337,509, 8,372,026, 8,425,449, 8,512,404, 8,663,150, 8,734,377, 8,961,447, 9,039,650, 9,050,169, 9,211,213, 9,226,852, 9,351,874, 9,402,767, 9,610,196, and 9,693,899.  Notably, Ivantis represents that the Hydrus Microstent embodies or practices each of these Ivantis patents.[7]

37.     Ivantis's knowledge of Sight Sciences' patents generally, and the Patents-in-Suit specifically, is further evidenced by Ivantis's PCT Application PCT/US2016/066957, a copy of which has been attached hereto as **Exhibit F**, which identifies the '482 Patent-in-Suit as prior art.

38.     Ivantis's knowledge of Sight Sciences' patent portfolio, including the Patents-in-Suit, extends to the highest levels of the company, including its Chief Executive Officer, Dave Van Meter, and its Vice President of Research & Development, Ken Galt, and the rest of Ivantis's executive team.  For example, both Mr. Van Meter and Mr. Galt are named inventors on Ivantis's PCT Application PCT/US2016/066957, which includes a Search Report citing the '482 Patent-in-Suit as prior art.

39.     Based on evidence of Ivantis's and Shay Glenn's continued monitoring of Sight Science's patent portfolio from 2008 through the present, including its regular citation of Sight Sciences' patents and applications in its own patents and applications (including the '523 application, which issued as the '789 parent patent to the Patents-in-Suit, as well as the '482 Patent-in-Suit), and further in view of Ivantis's determination in 2008 that it needed to purchase or license

---

[6] U.S. Patent No. 9,358,156 erroneously lists the current assignee as "Invantis, Inc."
[7] https://www.ivantisinc.com/patents/, *archived at*
https://web.archive.org/web/20220120071332/https://www.ivantisinc.com/patents/.

Sight Sciences' patent rights in and to the family of patents that comprises the Patents-in-Suit, Ivantis had knowledge of each of the Patents-in-Suit on or around its date of issuance.

40.     Based on all of the foregoing, Ivantis was aware of or was willfully blind to the existence of each of the Patents-in-Suit before the filing of this lawsuit.  It knew that making, using, selling, and offering for sale the Hydrus® Microstent infringed each Patent-in-Suit, and thus knowingly, intentionally, and willfully infringed and is infringing claims of each of the Patents-in-Suit through its commercialization of the Hydrus® product.

## IV.   IVANTIS DEVELOPED, MARKETED, AND SOLD ITS INFRINGING HYDRUS® PRODUCT KNOWING IT INFRINGED SIGHT SCIENCES' PATENTS

41.     In January of 2012, Ivantis commenced the HORIZON study, a randomized controlled trial designed to evaluate the efficacy of what has now become Ivantis's chief product offering: the Hydrus® Microstent.  The HORIZON study reached its primary endpoint in June of 2017.

42.     On or about August 10, 2018, after all but the '742 patent had issued, the U.S. Food and Drug Administration ("FDA") approved Ivantis's premarket approval application for the Hydrus® Microstent for use in conjunction with cataract surgery for the reduction of intraocular pressure (IOP) in adult patients with mild to moderate primary open-angle glaucoma (POAG)[8], and Ivantis began selling it soon thereafter.

43.     The Patents-in-Suit disclose and claim devices, referred to as "supports," that are "implantable circumferentially within Schlemm's canal" and "configured to maintain the patency of at least a portion of the canal."  (*See, e.g.,* '482 patent, 2:56-59; '443 patent, 2:59-61; '361 patent, 2:62-64; '742 patent, 2:62-64.)

---

[8] https://www.accessdata.fda.gov/cdrh_docs/pdf17/P170034A.pdf, *archived at* https://web.archive.org/web/20210412113158/https://www.accessdata.fda.gov/cdrh_docs/pdf17/P170034A.pdf.

44.     The Hydrus® Microstent is a "support" within the meaning of the Patents-in-Suit at least because it is a device implantable within Schlemm's canal that "dilates and scaffolds Schlemm's canal to augment outflow of aqueous humor from the anterior chamber,"[9] i.e. maintains patency of the canal.  Furthermore, according to its Instructions for Use, the Hydrus® Microstent includes "alternating 'spines' for structural support" of Schlemm's canal, is "designed to have adequate structural thickness to support the tissue of the canal," and is made from nitinol, a material Ivantis touts as having properties rendering it "suitable as a support structure in Schlemm's canal."[10]

45.     As seen in the below figure, the Hydrus® Microstent is an arcuate (curved) support that comprises multiple fenestrations (windows)[11]:



Figure 1: Hydrus Microstent Implant

---

[9] "Ivantis Announces Settlement of Glaukos Patent Litigation," https://www.ivantisinc.com/09-15-2021_ivantis_announces_settlement_of_glaukos_patent_litigation/, *archived at* https://web.archive.org/web/20220609004955/https://www.ivantisinc.com/09-15-2021_ivantis_announces_settlement_of_glaukos_patent_litigation/.

[10] Hydrus® Microstent Instructions for Use (C00256 Rev A.1) (hereinafter "IFU") at 1.

[11] IFU at 2.

46.     The Hydrus® Microstent is designed to be implanted longitudinally within Schlemm's canal, using a hand-held delivery system that passes the microstent through a stainless-steel cannula into the target site.  The Hydrus® Microstent is delivered using an Ivantis-supplied delivery system.[12]

47.     The Hydrus® Microstent is advanced from the stainless-steel cannula of the Microstent Delivery System using an interlock mechanism, as seen in the below image taken from an Ivantis animation video describing the Hydrus® Microstent[13]:



48.     When properly positioned, the Hydrus® Microstent is meant to reside longitudinally within the lumen (opening) of Schlemm's canal, along an arc comprising approximately 90 degrees of Schlemm's Canal, as seen in the below figures from the Hydrus Instructions for Use[14]:

---

[12] *See* IFU at 2-3.
[13] "IM-00   16-1-2   Rev   B   OUS   Hydrus   Microstent   Animation   (Full)," https://vimeo.com/510821860 (hereinafter "Hydrus Animation") at 3:51, *archived at* https://web.archive.org/web/20220609004518/https://vimeo.com/510821860.
[14] IFU at 6, 8.



*Figure 4:  Preferred Position of Incisions and Target Placement of the Microstent*

**Figure 5** shows the microstent positioned in Schlemm's canal with the proximal end (i.e., the inlet) protruding slightly into the anterior chamber for inflow of aqueous humor.

*Figure 5: Microstent in Schlemm's Canal*
**(Proximal end at right accessing aqueous humor from the anterior chamber)**

49.     As also reflected in the above figures, when properly positioned within Schlemm's Canal, the Hydrus® Microstent is intended to protrude from Schlemm's Canal, through the trabecular meshwork and into the anterior chamber.  This protrusion is made possible because the radius of curvature of the Hydrus® Microstent is intended to be smaller than that of the Schlemm's Canal in which it is disposed.  Screenshots taken from an Ivantis animation describing the Hydrus® Microstent further display the intended protrusion of the Hydrus® from Schlemm's Canal[15]:

---

[15] Hydrus Animation at 2:43, 5:32 (red boxes added for emphasis).





50.     The Hydrus® Microstent has a cross-sectional dimension sufficient to at least

partially prop open Schlemm's canal upon insertion into the canal, thereby maintaining the patency

of at least a portion of the canal so that fluid can traverse the canal without substantial interference

from the Hydrus® Microstent.  As the voiceover of the Hydrus® Animation explains:

> **The Hydrus® Microstent acts to bypass the obstructed trabecular meshwork**
> **by creating an optimal pathway for the aqueous to flow through Schlemm's**
> **canal**. Additionally, with its open scaffold design, the Microstent provides for a

gentle dilation of a potentially narrowing or collapsing Schlemm's canal. And because of its 8-millimeter length and approximate 90-degree span within Schlemm's canal, **the Hydrus® allows for enhanced access and unobstructed flow into the numerous collector channels and network of aqueous outflow veins**.[16]

51.     The intended operation of the Hydrus® Microstent to maintain the patency of Schlemm's Canal is also visualized by the same animation in which the transmural flow of aqueous humor in the eye is represented using blue arrows[17]:



52.     The flow of aqueous humor across Schlemm's canal and through the Hydrus Microstent, specifically through the fenestrations of the Hydrus, is also visualized using blue arrows in the following screenshots from another Ivantis animation describing the device[18]:

---

[16] Transcription of Hydrus Animation at 1:57-2:50 (emphasis added).
[17] Hydrus Animation at 2:52.
[18] "Hydrus Minimally Invasice [sic; "Invasive"] Glaucoma Surgery (MIGS)," https://vimeo.com/169867478, at 1:10, 1:50, 2:40, *archived at* https://web.archive.org/web/20220609004321/https://vimeo.com/169867478.







53.     As reflected in the above figures, and further explained by the Asserted Patents, Schlemm's canal is depicted as a circular canal with a cylindrical lumen that circumferentially surrounds the trabecular meshwork.  (*See, e.g.,* '482 patent, 2:34-35, Figs. 4A, 4B, 12A, 12B.)

54.     The Patents-in-Suit further explain that the amount of surface area contact between a support and Schlemm's Canal can be estimated by viewing the inside of Schlemm's canal as a cylinder:

> The fraction of canal wall surface area in contact with a support can be estimated by viewing the inside of Schlemm's canal as a slightly arcuate cylinder C having length L, extending circumferentially from a first end $X_1$ to a second end $X_2$ of support 152, and inside radius $R_i$.

('482 patent, 11:16-20; '443 patent, 11:16-20; '361 patent, 11:29-33; '742 patent, 11:30-34.)

55.     According to the Hydrus® IFU, the Hydrus® Microstent "is approximately 8mm in overall length with major and minor axes of 292 μm and 185 μm, respectively."[19]  Of its 8 mm overall length, approximately 7 mm is designed to be disposed within Schlemm's canal, while the

---

[19] IFU at 1.

approximately 1 mm inlet portion is designed to prolapse at the site of the implantation through the trabecular meshwork and back into the anterior chamber, as seen in the below figure[20]:



56.     The approximately 7 mm portion of the Hydrus® Microstent that resides within Schlemm's canal once the device is implanted is comprised of three "regions": a "window" region, which contains the fenestrations of the device, a "spine" region, which connects the fenestrations together, and an inlet spine region, which connects the inlet to the first spine region.  The portion of the Hydrus® Microstent disposed within Schlemm's canal comprises three window regions, with a total length of approximately 3.3 mm, three spine regions, with a total length of 2.7 mm,

---

[20] Panagiotis Laspas & Norbert Pfeiifer, "Hydrus Microstent," MINIMALLY INVASIVE GLAUCOMA SURGERY, pp. 59-71.

and an inlet spine region measuring 1.1 mm.  These regions collectively span 7.1 mm.[21]  The design of the Hydrus, specifically the fenestrations and minimal surface-area spine regions, is intended to maximize aqueous flow into and out of the canal while providing structural support for the canal.

57.    As noted above, the Hydrus® Microstent has major and minor axes of 292 μm and 185 μm, respectively.  Upon insertion into Schlemm's canal, the Hydrus® Microstent dilates the canal in which it has been implanted to at least approximately a diameter of 292 μm. Thus, viewing Schlemm's canal as a cylinder in the manner taught by the Patents-in-Suit, a 7.1 mm (i.e., 7100 μm) portion of Schlemm's canal in which a Hydrus® Microstent has been implanted would have a diameter of at least about 292 μm and an interior wall surface area of at least approximately 6,513,150 μm$^2$.

58.    According to published data, the total surface area of all sides of the Hydrus® Microstent is approximately 5,700,000 μm$^2$,[22] but the surface area that is outwardly facing toward the wall of Schlemm's canal is approximately only about 1,793,871 μm$^2$,[23] and as explained below, substantially less than all of that area contacts the canal wall.  Based on these figures, the outwardly facing surface area of the Hydrus® Microstent, which is the maximum surface area that could

---

[21] Fan Yuan, et al., *Mathematical Modeling of Outflow Facility Increase With Trabecular Meshwork Bypass and Schlemm Canal Dilation*, J Glaucoma, 25(4):355-364 (April 2016).

[22] Srinidhi Nagaraja and Alan R. Pelton, *Corrosion resistance of a Nitinol ocular microstent: Implications on biocompatibility*, J. Biomed Mater Res., 108B:2681-2690 (2020).

[23] Using dimensions and surface area figures reported by Yuan, et al., and Nagaraja and Pelton, the surface area of the Hydrus Microstent that potentially might contact the interior wall of Schlemm's canal can be calculated as the total surface area (5,700,000 μm$^2$), minus area of the inlet portion that resides in the anterior chamber (60% of the lateral area of a cylinder with a radius of 146 μm and length of 900 μm), minus the outside edge area (60 μm * 16750μm,), minus window edge area (60 μm * 3 * circumference of an oval of length 1100 μm and height of 200 μm), minus the inlet spine second edge area (60 μm * 2200 μm), divided in half.

contact Schlemm's canal, is less than 30% of the internal wall surface area of a cylindrical lumen of the Schlemm's canal in which it is disposed.

59.    The actual area of contact between the Hydrus® Microstent and the internal wall surface area of a cylindrical section of a lumen of Schlemm's canal in which the device has been implanted is substantially less than the outer surface area of the device, as not all surfaces of the device contact the canal.

60.    The Hydrus® Microstent makes discontinuous contact with Schlemm's canal along an external perimeter of the canal, as is reflected in the below screenshot from the Hydrus® Animation[24]:



61.    Additionally, as a result of the radius of curvature of the Hydrus® Microstent, as well as the dimensions of its windowed portions relative to spine portions, less than the entire surface area of the Hydrus® Microstent is in contact with the internal surface wall of Schlemm's canal.  For example, below is a figure from Johnstone et al., *Effects of a Schlemm Canal Scaffold on Collector Channel Ostia in Human Anterior Segments*, showing a pictorial overlay (black solid

---

[24] Hydrus Animation at 6:24.

lines) of an 8 mm Hydrus® Microstent onto a scanning electron microscopy image of the indentation observed on the external wall of Schlemm's canal following removal of an 8mm Hydrus® Microstent.[25]   The study from which this image was taken was supported by Ivantis and co-authored by Andrew T. Schieber, who is affiliated with Ivantis.  The image shows a top-side view of the Hydrus® Microstent superimposed over an approximately 2.55 mm span of Schlemm's canal.  The position of the Hydrus® Microstent in the below image corresponds to the area it had been previously occupied, as evidenced by the indentations it left behind:



62.     The area of the above image corresponding to Schlemm's canal can be discerned with reference to the below image, which is identical to the above image except for the annotations. This image, taken from the same publication, identifies the diameter of Schlemm's canal with an arrow labeled "SCEW" ("Schlemm's canal external wall").  Using the scale provided in the below images, the diameter of this Schlemm's canal post-implantation was approximately 300 μm—or 8 μm larger than the major axis of the Hydrus® Microstent. The areas encircled with dotted lines correspond to the regions of the external wall of Schlemm's canal in which indentations were formed due to contact with the Hydrus® Microstent:

---

[25] Murray A. Johnstone, et al., *Effects of a Schlemm canal scaffold on collector channel ostia in human anterior segments*, 119 Experimental Eye Research 70 (2014).



63.    The following scaled image further illustrates that the Hydrus® Microstent expands

Schlemm's canal to a diameter greater than the major axis of the stent, as the SCEW value in this

image is again approximately 300 μm:[26]



[26] Saba Samet, et al., *Hydrus microstent implantation for surgical management of glaucoma: a review of design, efficacy and safety*, Eye and Vision, 6:32 (2019), available at https://eandv.biomedcentral.com/track/pdf/10.1186/s40662-019-0157-y.pdf (hereinafter "Samet"), *archived at* https://web.archive.org/web/20210512053721/https://eandv.biomedcentral.com/track/pdf/10.1186/s40662-019-0157-y.pdf.

64.    Substantial portions of the exterior surface of the Hydrus® Microstent do not contact the internal wall of the Schlemm's canal in which it is disposed because the canal diameter is larger than substantially all of the external surfaces of the Hydrus® Microstent, other than the tallest windowed regions.

65.    Areas of contact between the Hydrus® Microstent and Schlemm's Canal are discontinuous, and therefore reduced, in part because the taller window regions of the Hydrus® Microstent are primarily responsible for scaffolding and dilating the portion of Schlemm's canal in which the Hydrus® is implanted as compared to the shorter spine regions, which may have limited contact with the canal wall.   For example, the below image is a cross-section of a Schlemm's canal in which a Hydrus® Microstent has been implanted, taken at the midpoint of one of the device's window regions.[27]   As seen in the below image, the window regions of the device are responsible for scaffolding and dilating the canal:



---

[27] Samet.

66.     As can be seen in the above images, the height of Schlemm's canal does not vary significantly along the area implanted by Hydrus®, even though the height of the Hydrus® implant that had been removed does vary between the window regions and the spine regions.  These images demonstrate that substantial portions of the Hydrus® Microstent, including the tapered end portions of fenestrations and substantial portions of the spine regions between fenestrations, do not contact the Schlemm's canal in which the device has been disposed.

67.     The Hydrus® Microstent was specifically designed to minimize the amount of surface area contact between the device and the internal wall of the lumen of the Schlemm's canal in which the device has been implanted.  For example, Ivantis chose to commercialize the current design of Accused Product over an earlier design that spanned 15 mm instead of 8 mm, at least in part because the 8 mm design contacted substantially less surface area of the internal wall of the lumen of Schlemm's canal in which it was disposed than did the 15 mm design.[28]

68.     The Hydrus® IFU further confirms that the Hydrus® Microstent "is designed to have adequate structural thickness to support the tissue of the canal while providing maximum open flow areas through the canal," i.e., by minimizing surface area contact with the interior wall of the canal.

69.     As noted above, a "window" region of a Hydrus® Microstent spans approximately 1.1 mm, and a "spine" region of a Hydrus® Microstent spans approximately 0.9 mm. Using these dimensions, the scale of an image depicting the Hydrus® Microstent, such as the below image,

---

[28] Samet (explaining that the 8mm stent had lower potential for collector channel disruption due to reduced contact with the canal wall).

can be determined in order to approximate the surface area of the device potentially in contact with an interior wall surface area of Schlemm's canal:



70.     On information and belief, using the dimensions provided by Ivantis to scale the above image, the approximate surface area of the top half of the portion of the device that is disposed within Schlemm's canal and potentially in contact with an interior surface of Schlemm's canal can be calculated as approximately 917,243 $\mu m^2$.  The top and bottom outer surface area of the Hydrus® Microstent that can potentially contact the internal wall of Schlemm's canal can thus be calculated as approximately 1,834,486 $\mu m^2$, or approximately 27%-28% of the internal wall surface area, assuming that the canal diameter is between 292-300μm.

71.     For the foregoing reasons, and on information and belief, the Hydrus® Microstent contacts less than 30% of the internal wall surface area of a cylindrical section of the lumen of the Schlemm's canal in which it disposed.

72.     As previously noted, the Hydrus® Microstent is indicated for use in conjunction with cataract surgery for the reduction of IOP in adult patients with mild to moderate POAG.[29] Implantation of the Hydrus® Microstent is intended to occur after the completion of a cataract extraction procedure and the implantation of an intraocular lens.[30] Implantation of the Hydrus®

---

[29]      https://www.accessdata.fda.gov/cdrh_docs/pdf17/P170034A.pdf, *archived at* https://web.archive.org/web/20210412113158/https://www.accessdata.fda.gov/cdrh_docs/pdf17/P170034A.pdf.
[30] *Id*.

Microstent involves first creating a clear corneal incision in the eye.  Ophthalmic viscoelastic is then injected in the anterior chamber of the eye, unless sufficient viscoelastic remains in the eye from the cataract extraction procedure.  The cannula of the Hydrus® Microstent's handheld delivery device is then inserted through the clear corneal incision of the eye, used to pierce the trabecular meshwork, and then advanced slightly into Schlemm's Canal.  With the cannula tip of the handheld delivery device in Schlemm's canal, the microstent is advanced from the cannula tip by rolling the tracking wheel of the delivery device.  If the device is positioned properly—i.e., if it is lodged within Schlemm's canal and neither in front of it (in the anterior chamber of the eye), or posterior to the canal, the wheel is advanced until a physical stop is felt and the interlock of the delivery device releases the microstent.  If the implantation is successful, the cannula tip is removed from the eye, any viscoelastic in the anterior chamber is irrigated and aspirated, and the corneal incision is closed.

73.    The Hydrus® Microstent is not indicated for use in conjunction with viscodilation.

74.    However, on information and belief, Ivantis and its agents recently began promoting the Hydrus® Microstent for use in combination with certain viscoelastic delivery cannulas, with Ivantis sales representatives and agents providing instructions to surgeons and facilities to first perform viscoelastic delivery within Schlemm's canal, i.e., "canaloplasty," in advance of delivering the Hydrus® Microstent.  One such individual who has actively promoted this procedure is Andy Rivero, of Vero Beach, Florida.

75.    Sight Sciences and Ivantis are direct competitors in the market for the treatment of primary open-angle glaucoma.  More specifically, Sight Sciences and Ivantis compete directly in the market for "minimally invasive glaucoma surgery," or "MIGS" treatments for primary open-angle glaucoma.

76.     Particularly in light of their status as direct competitors, Ivantis's infringing activities have caused and will continue to cause Sight Sciences harm for which there is no adequate remedy at law, including a loss of profits, price erosion, a loss of market share, and a loss of goodwill.

## V.   ALCON ACQUIRED IVANTIS AND ITS INFRINGING HYDRUS® PRODUCT WITH NOTICE OF THIS LAWSUIT, AND NOW IS INVOLVED IN THE INFRINGING PRODUCTION, MARKETING, AND SALE OF THE HYDRUS® MICROSTENT

### A.   ALCON ACQUIRED IVANTIS WITH KNOWLEDGE OF THIS LAWSUIT

77.     On or around November 9, 2018, Alcon Research (at that time operating under the name Alcon Research Ltd.), Ithaca Merger Sub, Inc. ("Ithaca Merger Sub"), and Ivantis entered into an Option Agreement and Plan of Merger which, among other things, provided Alcon Research the option to acquire Ivantis (the "Option"). An Amendment to the Option Agreement and Plan of Merger was entered into by the same entities on or around December 16, 2019. Ithaca Merger Sub is a wholly owned subsidiary of Alcon Research, which in turn is a wholly owned subsidiary of Alcon Inc.

78.     On or around November 5, 2021, Alcon Inc., by and through its subsidiary Alcon Research, exercised the Option to acquire 100% of the outstanding shares and equity of Ivantis, Inc.[31] Alcon Inc.'s acquisition of Ivantis closed on January 7, 2022. Alcon Inc., through its subsidiary Alcon Research, paid $475 million in cash for the acquisition of Ivantis, net of cash

---

[31] Alcon 2021 Annual Report, https://s1.q4cdn.com/963204942/files/doc_financials/2021/ar/Alcon-2021-Annual-Report.pdf, at 27, 140-41, *archived at* https://web.archive.org/web/20220609003953/https://s1.q4cdn.com/963204942/files/doc_financials/2021/ar/Alcon-2021-Annual-Report.pdf.

acquired as a result of the acquisition.[32]  Upon closing, Ivantis became a wholly owned subsidiary of Alcon Research LLC, which is in turn a wholly owned subsidiary of Alcon Inc.[33]

79.     On information and belief, Alcon Inc. and its managers, executives, and board members were involved in the negotiation of the Option Agreement and Plan of Merger, the Amendment thereto, and the decision to exercise the Option in November 2021.  On information and belief, Alcon Inc.'s consent was required before Alcon Research could exercise the Option.

80.     Alcon Inc. announced the completion of its acquisition of Ivantis, Inc. on January 10, 2022.[34]  Alcon Inc.'s press release stated that the acquisition would "bring[] Hydrus Microstent into [Alcon's] global surgical portfolio," and that "Ivantis associates, including manufacturing and sales" would be "immediately integrated into Alcon to ensure continuity for new and existing customers."[35]  Alcon Inc. also highlighted its intention to "pursue stand-alone surgery indications for Hydrus Microstent in the U.S. with clinical trials underway" and also hinted that "potential expansion plans will be provided in the future."[36]

81.     In the same press release, Alcon Inc.'s CEO David Endicott was quoted as saying: "We believe this transaction will further strengthen our global surgical portfolio and help provide a platform for more growth in the glaucoma space . . . .  As we welcome Ivantis associates into

---

[32] *Id.*

[33] *Id.* at 71, 140-41.

[34] https://investor.alcon.com/news-and-events/press-releases/news-details/2022/Alcon-Completes-Acquisition-of-Ivantis-Inc.-Bringing-Hydrus-Microstent-into-Its-Global-Surgical-Portfolio/default.aspx, *archived at* https://web.archive.org/web/20220110061447/https://investor.alcon.com/news-and-events/press-releases/news-details/2022/Alcon-Completes-Acquisition-of-Ivantis-Inc.-Bringing-Hydrus-Microstent-into-Its-Global-Surgical-Portfolio/default.aspx.

[35] *Id.*

[36] *Id.*

Alcon, we look forward to introducing Hydrus Microstent on a broader, global scale in the near future to help even more patients see brilliantly."[37]

82.     In a January 12, 2022 presentation at the JP Morgan Healthcare Conference, Alcon Inc.'s CEO Mr. Endicott commented that the company was "very pleased" about the "integration" of the Hydrus Microstent into the Alcon portfolio.[38]   An excerpt of the transcript of Alcon Inc.'s presentation is attached as **Exhibit G**.

83.     Sight Sciences sued Ivantis for patent infringement on September 16, 2021 and filed an amended complaint on December 15, 2021.  Sight Sciences' lawsuit against Ivantis was initiated nearly three years after Alcon Inc. obtained the option to acquire Ivantis, but before Alcon Inc. had exercised the option to do so.  On information and belief, Alcon Inc., Alcon Vision, and Alcon Research were aware of this lawsuit and of Sight Sciences' claims of patent infringement against Ivantis prior to closing their acquisition of Ivantis, and chose to proceed with the acquisition knowing that the post-closing manufacture, import, export, use, sale, and offer for sale of Hydrus would infringe the Patents-in-Suit.

84.     Alcon Inc., Alcon Vision, and Alcon Research were further aware, by virtue of their knowledge of this lawsuit, that Jim Shay and Doug Roeder had unsuccessfully attempted to purchase the Badawis' rights to the patent application to which the Patents-in-Suit claim priority, and that Ivantis was aware of the Patents-in-Suit and Ivantis's infringement before the filing of this lawsuit.  Despite having this knowledge, Alcon Inc., by and through its subsidiary Alcon Research, acquired Ivantis and knowingly and intentionally continues selling and promoting the Hydrus® Microstent in deliberate and intentional disregard of Sight Sciences' patent rights.

---

[37] *Id.*
[38] Alcon AG at JPMorgan Healthcare Conference (Jan. 12, 2022) at 5.

**B. SINCE ACQUIRING IVANTIS, ALCON AND ITS SUBSIDIARIES HAVE ENGAGED IN INFRINGING ACTS KNOWING THAT SUCH ACTS CONSTITUTE INFRINGEMENT OF THE PATENTS-IN-SUIT**

85.     Since closing its acquisition of Ivantis, Inc., Alcon Inc., Alcon Research LLC, and Alcon Vision, LLC have been directly and actively involved in making, selling, and offering to sell the infringing Hydrus® Microstent in the United States with knowledge of Sight Sciences' infringement allegations and this lawsuit and intent to induce others to infringe the Patents-in-Suit.

**i. ALCON RESEARCH**

86.     On information and belief, Alcon Research intentionally acquired Ivantis in order to gain control over the commercialization of the Hydrus® Microstent – Ivantis's only product – and to effectuate its goal of making, using, and selling the infringing Hydrus® Microstent in Delaware and throughout the United States. Alcon Research committed an intentional act expressly aimed at this forum by acquiring Ivantis, a Delaware corporation, knowing that its acquisition and continued manufacture, promotion, sale, use and importation or exportation of the Hydrus® Microstent would harm Sight Sciences in Delaware, where Sight is incorporated. Specifically, for the reasons set forth herein, Alcon Research was aware of the Patents-in-Suit as well as Sight Sciences' lawsuit against Ivantis prior to its acquisition of Ivantis, but nevertheless acquired Ivantis and has continued to knowingly and intentionally make, use, sell, offer for sale, import and export the infringing Hydrus® Microstent in the United States, knowing and intending that its acquisition of Ivantis and its infringement of the Patents-in-Suit would harm Sight Sciences' business.  On information and belief, since the acquisition of Ivantis closed, Alcon Research and its employees have carried out their plan of acquiring Ivantis with an intent to infringe and to induce others to infringe by continuing to manufacture, market, use, sell, offer to sell and import or export the infringing Hydrus® Microstent device.

87.     For example, Alcon Research is identified as a Collaborator for a clinical trial involving the Hydrus Microstent entitled "Visual Outcomes With a Trifocal IOL in Subjects with Open-angle Glaucoma."[39]  The intervention of the clinical trial involves "[c]ataract surgery with implantation of the PanOptix IOL combined with minimally invasive glaucoma surgery utilizing the Hydrus Microstent."[40]  The estimated enrollment for the trial is 25 patients.[41]

ii.   ALCON VISION

88.     On information and belief, Alcon Vision and its employees have contributed to the manufacture, marketing, sale, and offer to sell the infringing Hydrus® Microstent device.

89.     For example, on or around February 26, 2022, Alcon's Vice President of Global Glaucoma Cari Stone gave an interview in which she described Alcon's plans for the Hydrus® Microstent.  During that interview, Ms. Stone stated that Ivantis would not retain an identity independent from Alcon.[42]  Ms. Stone further stated that Alcon "will be putting the Alcon branding on everything Ivantis, and the Hydrus® Microstent will be sold under the Alcon umbrella going – going forward."[43]  On information and belief, Ms. Stone is an employee of Alcon Vision.[44]

---

[39] https://clinicaltrials.gov/ct2/show/NCT04619654?term=hydrus&spons=alcon&draw=2&rank=1, *archived at* https://web.archive.org/web/20220609000831/https://clinicaltrials.gov/ct2/show/NCT04619654?term=hydrus&spons=alcon&draw=2&rank=1.

[40] *Id.*

[41] *Id.*

[42] "How the Hydrus Microstent could change the world of glaucoma care," (Feb. 26, 2022) https://www.youtube.com/watch?v=ceATDdE5g8Q, at 2:16 – 2:39, *archived at* https://web.archive.org/web/20220609005845/https://www.youtube.com/watch?v=ceATDdE5g8Q.

[43] *Id.*

[44] *See* "Glaucoma 360: New Horizons Forum Agenda," (Feb. 11, 2022) https://avenue.live/grf/assets/pdf/NH%202022%20Prelim%20Agenda%20-%20EXTERNAL%20(12.15.2021).pdf, at 3, *archived at* https://web.archive.org/web/20220609000303/https://avenue.live/grf/assets/pdf/NH%202022%20Prelim%20Agenda%20-%20EXTERNAL%20%2812.15.2021%29.pdf.

90.     Employees of Alcon Vision in addition to Ms. Stone have infringed the Patents-in-Suit by promoting, marketing, and selling or offering for sale the Hydrus® Microstent in the United States, as evidenced by their LinkedIn profiles, which describe selling the Hydrus® Microstent in this country as part of their job responsibilities.[45]

### iii.   ALCON INC.

91.     On information and belief, Alcon Inc., by and through its subsidiary Alcon Research, intentionally acquired Ivantis in order to gain control over the commercialization of the Hydrus® Microstent – Ivantis's only product – and to effectuate its goal of making, using, and selling the infringing Hydrus® Microstent in Delaware and throughout the United States.

92.     Since the acquisition of Ivantis closed, Alcon Inc. and its employees and agents have infringed the Patents-in-Suit by manufacturing, marketing, selling, offering to sell and importing or exporting the infringing Hydrus® Microstent device or by inducing others to infringe by using the Hydrus® Microstent device.  For example, Alcon Inc. recently published a Hydrus® Microstent Coding and Billing Guide that describes the stent's approved indication and use and instructs physicians how to code and bill Hydrus® Microstent implantation procedures.[46] Alcon Inc.'s infringement has been knowing, intentional, and willful as evidenced at least by the statements of Alcon Inc. noted above relating to its acquisition of Ivantis.

---

[45] *See, e.g.*, Dan Preast (Hydrus Microstent sales at Alcon), LinkedIn, https://www.linkedin.com/in/danpreast/ (last visited June 9, 2022), *archived at* https://ia902509.us.archive.org/4/items/linkedin-in-danpreast-2022-06-08-17_56_00/linkedin-in-danpreast-2022-06-08-17_56_00.pdf; Carter Holland (Surgical Glaucoma Manager (Hydrus Microstent) at Alcon), LinkedIn, https://www.linkedin.com/in/carter-holland-7b27294b/ (last visited June 9, 2022), *archived at* https://ia902509.us.archive.org/17/items/linkedin-in-carter-holland-7b27294b-2022-06-08-17_54_01/linkedin-in-carter-holland-7b27294b-2022-06-08-17_54_01.pdf.

[46] https://professional.myalcon.com/sites/g/files/rbvwei1041/files/2022-05/Hydrus%20Coding%20and%20Billing%20Guide%20%281%29.pdf, *archived at* https://web.archive.org/web/20220609003758/https://professional.myalcon.com/sites/g/files/rbvwei1041/files/2022-05/Hydrus%20Coding%20and%20Billing%20Guide%20%281%29.pdf.

93.     In addition, on or around February 9 – 12, 2022, Alcon Inc. infringed the Patents-in-Suit by marketing the Hydrus® Microstent at the Cataract Surgery Telling It Like It Is conference in Orlando, Florida. On information and belief, Alcon induced infringement of the Patents-in-Suit at this conference by knowingly and intentionally encouraging physicians to prescribe and implant Hydrus® Microstents. Alcon's booth at that conference presented the Hydrus® Microstent under Alcon's branding, as seen in the below images.  The Alcon trademark and associated trade dress is owned and controlled by Alcon Inc., so infringing marketing and sales of the Hydrus® Microstent under Alcon's branding is attributable to Alcon Inc. The Trademark Electronic Search System results for "Alcon," which confirm ownership by Alcon Inc., are attached as **Exhibits H and I**.





94.     Alcon Inc.'s booth at the Cataract Surgery Telling It Like It Is conference was staffed at least by Alcon Inc.'s agents Carrie Lennart, Surgical Glaucoma Manager at Alcon, and Theresa Klinge, Surgical Glaucoma Specialist at Alcon.  According to their LinkedIn profiles, Ms. Lennart and Ms. Klinge were former employees of Ivantis, Inc.[47]   Additional Alcon employees

---

[47] Carrie (Carrie Dan) Lennart (Surgical Glaucoma Manager, Alcon), LinkedIn, https://www.linkedin.com/in/carrielennart/ (last visited June 9, 2022), *archived at* https://ia601401.us.archive.org/3/items/linkedin-carrielennart/linkedin-carrielennart.pdf; Theresa Klinge, OD (Surgical Glaucoma Specialist, Alcon), LinkedIn, https://www.linkedin.com/in/theresaklingeod/ (last visited on June 9, 2022), *archived at* https://ia601401.us.archive.org/13/items/linkedin-in-theresaklingeod/linkedin-in-theresaklingeod.pdf.

and agents involved in the marketing and sale of the Hydrus® Microstent include at least Dan Preast, Brooke Riddhagni Park, and Carter Holland.  According to their LinkedIn profiles, Mr. Preast, Ms. Park, and Mr. Holland were all formerly employees of Ivantis, Inc.[48]

95.    On information and belief, Alcon Inc. employees and agents in addition to the ones identified in the preceding paragraph have contributed to the manufacture, marketing, sale, and offer to sale of the Hydrus® Microstent.

96.    Additionally, Alcon Inc. and its agents infringed the Patents-in-Suit by marketing the Hydrus® Microstent at the ASCRS Annual Meeting in Washington, D.C. on or about April 23, 2022, and by sponsoring a presentation titled "Your MIGS Choice Matters: A Hydrus® Microstent Discussion."[49]  On information and belief, Alcon induced infringement of the Patents-in-Suit by using ASCRS and this presentation to knowingly and intentionally encourage physicians to implant Hydrus® Microstents. A printout from Alcon's "MyAlconProfessionals" website marketing the Hydrus® Microstent and describing this presentation is attached hereto as **Exhibit J**.  The "MyAlconProfessionals" website, excerpts of which are shown below, is attributed to

---

[48] *See, e.g.*, Dan Preast (Hydrus Microstent sales at Alcon), LinkedIn, https://www.linkedin.com/in/danpreast/ (last visited June 9, 2022), *archived at* https://ia902509.us.archive.org/4/items/linkedin-in-danpreast-2022-06-08-17_56_00/linkedin-in-danpreast-2022-06-08-17_56_00.pdf; Brooke (Riddhagni) Park (Surgical Glaucoma Manager at Alcon), LinkedIn, https://www.linkedin.com/in/brooke-riddhagni-park-16a49126/ (last visited June 9, 2022), *archived at* https://ia601405.us.archive.org/29/items/linkedin-brooke-riddhagni-park-16a49126/linkedin-brooke-riddhagni-park-16a49126.pdf; Carter Holland (Surgical Glaucoma Manager (Hydrus Microstent) at Alcon), LinkedIn, https://www.linkedin.com/in/carter-holland-7b27294b/ (last visited June 9, 2022), *archived at* https://ia902509.us.archive.org/17/items/linkedin-in-carter-holland-7b27294b-2022-06-08-17_54_01/linkedin-in-carter-holland-7b27294b-2022-06-08-17_54_01.pdf.

[49] https://professional.myalcon.com/events/ascrs2022/ (attributed to Alcon Inc.), *archived at* https://web.archive.org/web/20220608232528/https://professional.myalcon.com/events/ascrs2022.

Case 1:21-cv-01317-GBW-SRF   Document 59   Filed 08/01/22   Page 38 of 49 PageID #: 1391

Alcon Inc.[50] and uses the "Alcon" and "Alcon See Brilliantly" trademarks, which are owned by

Alcon Inc.   A copy of the Trademark Electronic Search System result for "See Brilliantly" is

attached as **Exhibit K**.

---

[50] *See, e.g.*, https://professional.myalcon.com/cataract-surgery/cataract-equipment/ (attributed to
Alcon Inc.), *archived at*
https://web.archive.org/web/20220418235647/https://professional.myalcon.com/cataract-
surgery/cataract-equipment/.

38



### Your MIGS Choice Matters:
A Hydrus® Microstent Discussion

### SATURDAY, APRIL 23, 2022
Walter E. Washington Convention Center, Salon GHI

**Registration:** 5:00 P.M.
**Program:** 5:30 P.M. – 6:30 P.M.
*This program is non-CME.*

  

**MODERATOR**



Leon Herndon, MD
Durham, NC

**FACULTY**

  

Nathan Radcliffe, MD      Zarmeena Vendal, MD      William Wiley, MD
New York NY              Austin, TX               Cleveland, OH

Sponsored by

**Alcon**

*All faculty and moderators are paid consultants of Alcon.*



97.    Alcon Inc.'s knowing and intentional inducement of infringement was additionally shown on the ASCRS EyeWorld Corporate Events website, where Alcon Inc. acknowledges paying the moderator and speakers to advocate the infringing use of the Hydrus Microstent during the "Your MIGS Choice Matters: A Hydrus Microstent Discussion."[51]  The faculty of this event were Alcon Inc.'s agents and their inducement of infringement is attributable to Alcon Inc.

---

[51] https://meetings.eyeworld.org/educational-events/hydrus/, *archived at* https://web.archive.org/web/20220609003217/https://meetings.eyeworld.org/educational-events/hydrus/.



98.     As evidenced by these examples, Alcon Inc. has knowingly, intentionally, and willfully infringed claims of the Patents-in-Suit and/or induced others to infringe in the United States directly and through its agents.

**C. DEFENDANTS' INFRINGEMENT OF SIGHT SCIENCES' NEWLY ISSUED PATENT WILL BE WILLFUL**

99.     Ivantis was aware of the '482, '443, '361, and '742 patents at or near the time those patents issued, but still decided to make, use, offer to sell, sell and import the Hydrus® Microstent. Ivantis continued its infringement and its inducement of infringement by others after Sight Sciences filed its Complaint and First Amended Complaint.

100.     Alcon Inc., Alcon Research, and Alcon Vision were aware of this lawsuit and of Sight Sciences' infringement allegations, but still decided to acquire Ivantis and to make, use, offer

to sell, sell and import the Hydrus® Microstent, knowing that doing so would constitute infringement of the '482, '443, '361, and '742 patents.

101.    In light of each defendant's awareness and willful infringement of the '482, '443, '361, and '742 patents, each defendant will, on information and belief, knowingly encourage others, including but not limited to end users of the Hydrus® Microstent, to directly infringe the '328 patent with knowledge that such conduct infringes the '328 patent.  Furthermore, on information and belief, Defendants' sales representatives, affiliates, and agents will encourage at least Hydrus® end users to directly infringe the '328 patent with Defendants' knowledge that such conduct infringes the '328 patent.  Defendants will therefore knowingly, intentionally, and willfully infringe claims of the '328 patent through their commercialization of the Hydrus® product by following the same course of willfully infringing conduct that they have followed with respect to the '482, '443, '361, and '742 patents.

## FIRST CAUSE OF ACTION: INFRINGEMENT OF U.S. PAT. NO. 8,287,482

102.    Sight Sciences re-alleges and incorporates by references the allegations contained in Paragraphs 1-101 above.

103.    Defendants infringe the '482 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, offering to sell, and/or selling within the United States, or importing into the United States, the Hydrus® Microstent, in violation of Sight Sciences' patent rights.

104.    Defendants further infringe the '482 patent, including but not limited to each and every element of exemplary claim 63, in violation of 35 U.S.C. § 271(b) by actively inducing infringement of the '482 patent, literally or under the doctrine of equivalents, by knowingly encouraging others, including but not limited to end users of the Accused Product, to directly

infringe the '482 patent with knowledge that such conduct infringes the '482 patent.  Specifically, the Hydrus® marketing materials and Instructions For Use direct end users to use the Hydrus® Microstent in a manner that infringes at least one claim of the '482 patent.  Furthermore, on information and belief, Defendants' sales representatives, affiliates, and agents encourage at least Hydrus® end users to directly infringe the '482 patent with knowledge that such conduct infringes the '482 patent.

105.    A claim chart setting forth the manner in which Defendants infringe exemplary claims 1 and 63 of the '482 patent is attached hereto as **Exhibit L**.

106.    Defendants' infringement of the '482 patent is willful, because Defendants are and have been aware of their infringement, or were willfully blind to their infringement, of the '482 patent for at least all of the reasons described in Paragraphs 29-101 above.

107.    Defendants' infringement of the '482 patent has caused and will continue to cause Sight Sciences irreparable harm, including but not limited to a loss of market share, goodwill, and profits, unless and until Defendants' infringing activities are enjoined by this court.

## SECOND CAUSE OF ACTION: INFRINGEMENT OF U.S. PAT. NO. 9,370,443

108.    Sight Sciences re-alleges and incorporates by references the allegations contained in Paragraphs 1-101 above.

109.    Defendants infringe the '443 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, offering to sell, and/or selling within the United States, or importing into the United States, the Hydrus® Microstent, in violation of Sight Sciences' patent rights.

110.    A claim chart setting forth the manner in which Defendants infringe exemplary claim 1 of the '443 patent is attached hereto as **Exhibit M**.

111.    Defendants' infringement of the '443 patent is willful, because Defendants are and have been aware of their infringement, or were willfully blind to their infringement, of the '443 patent for at least all of the reasons described in Paragraphs 29-101 above.

112.    Defendants' infringement of the '443 patent has caused and will continue to cause Sight Sciences irreparable harm, including but not limited to a loss of market share, goodwill, and profits, unless and until Defendants' infringing activities are enjoined by this court.

### THIRD CAUSE OF ACTION: INFRINGEMENT OF U.S. PAT. NO. 9,486,361

113.    Sight Sciences re-alleges and incorporates by references the allegations contained in Paragraphs 1-101 above.

114.    Defendants infringe the '361 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, offering to sell, and/or selling within the United States, or importing into the United States, the Hydrus® Microstent, in violation of Sight Sciences' patent rights.

115.    Defendants further infringe the '361 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(b) by actively inducing infringement of the '361 patent, literally or under the doctrine of equivalents, by knowingly encouraging others, including but not limited to end users of the Accused Product, to directly infringe the '361 patent with knowledge that such conduct infringes the '361 patent.  Specifically, Defendants' Hydrus® marketing materials and Instructions For Use direct end users to use the Hydrus® Microstent in a manner that infringes at least one claim of the '361 patent.  Furthermore, on information and belief, Defendants' sales representatives, affiliates, and agents encourage at least Hydrus® end users to directly infringe the '361 patent with Defendants' knowledge that such conduct infringes the '361 patent.

116.     Defendants further infringe the '361 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(c) by contributing to infringement of the '361 patent, literally or under the doctrine of equivalents, by among other things selling or offering to sell the Hydrus® Microstent or components thereof with knowledge of the '361 patent and knowing that such products and/or components are especially made or especially adapted for use in the infringement of the '361 patent, are a material part of the invention, and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

117.     A claim chart setting forth the manner in which Defendants infringe exemplary claim 1 of the '361 patent is attached hereto as **Exhibit N**.

118.     Defendants' infringement of the '361 patent is willful, because Defendants are and have been aware of their infringement of the '361 patent, or were willfully blind to its infringement, for at least all of the reasons described in Paragraphs 29-101 above.

119.     Defendants' infringement of the '361 patent has caused and will continue to cause Sight Sciences irreparable harm, including but not limited to a loss of market share, goodwill, and profits, unless and until Defendants' infringing activities are enjoined by this court.

## FOURTH CAUSE OF ACTION: INFRINGEMENT OF U.S. PAT. NO. 10,314,742

120.     Sight Sciences re-alleges and incorporates by references the allegations contained in Paragraphs 1-101 above.

121.     Defendants infringe the '742 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, offering to sell, and/or selling within the United States, or importing into the United States, the Hydrus® Microstent.

122.    Defendants further infringe the '742 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(b) by actively inducing infringement of the '742 patent, literally or under the doctrine of equivalents, by knowingly encouraging others, including but not limited to end users of the Accused Product, to directly infringe the '742 patent with knowledge that such conduct infringes the '742 patent.  Specifically, Defendants' Hydrus® marketing materials and Instructions For Use direct end users to use the Hydrus® Microstent in a manner that infringes at least one claim of the '742 patent.  Furthermore, on information and belief, Defendants' sales representatives, affiliates, and agents encourage at least Hydrus® end users to directly infringe the '742 patent with Defendants' knowledge that such conduct infringes the '742 patent.

123.    A claim chart setting forth the manner in which Defendants infringe exemplary claim 1 of the '742 patent is attached hereto as **Exhibit O**.

124.    Defendants' infringement of the '742 patent is willful, because Defendants are and have been aware of their infringement of the '742 patent, or were willfully blind to their infringement, for at least all of the reasons described in Paragraphs 29-101 above.

125.    Defendants' infringement of the '742 patent has caused and will continue to cause Sight Sciences irreparable harm, including but not limited to a loss of market share, goodwill, and profits, unless and until Defendants' infringing activities are enjoined by this court.

## FIFTH CAUSE OF ACTION: INFRINGEMENT OF U.S. PAT. NO. 11,389,328

126.    Sight Sciences re-alleges and incorporates by references the allegations contained in Paragraphs 1-101 above.

127.    Defendants infringe the '328 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(a), literally or under the doctrine of

equivalents, by making, using, offering to sell, and/or selling within the United States, or importing into the United States, the Hydrus® Microstent.

128.   Defendants further infringe the '328 patent, including but not limited to each and every element of exemplary claim 1, in violation of 35 U.S.C. § 271(b) by actively inducing infringement of the '328 patent, literally or under the doctrine of equivalents, by knowingly encouraging others, including but not limited to end users of the Accused Product, to directly infringe the '328 patent with knowledge that such conduct infringes the '328 patent.  Specifically, Defendants' Hydrus® marketing materials and Instructions For Use direct end users to use the Hydrus® Microstent in a manner that infringes at least one claim of the '328 patent.  Furthermore, on information and belief, Defendants' sales representatives, affiliates, and agents encourage at least Hydrus® end users to directly infringe the '328 patent with Defendants' knowledge that such conduct infringes the '328 patent.

129.   A claim chart setting forth the manner in which Defendants infringe exemplary claim 1 of the '328 patent is attached hereto as **Exhibit P**.

130.   Defendants' infringement of the '328 patent is willful, because Defendants are and have been aware of their infringement of the '328 patent, or were willfully blind to their infringement, for at least all of the reasons described in Paragraphs 29-101 above.

131.   Defendants' infringement of the '328 patent has caused and will continue to cause Sight Sciences irreparable harm, including but not limited to a loss of market share, goodwill, and profits, unless and until Defendants' infringing activities are enjoined by this court.

## PRAYER FOR RELIEF

WHEREFORE, Sight Sciences respectfully requests entry of judgment in its favor and against Defendant as follows:

A.     An adjudication that Defendants have infringed one or more claims of the '482 patent, '443 patent, '361 patent, the '742 patent, and/or the '328 patent, directly and/or indirectly and literally and/or through equivalents;

B.     An award of damages to Sight Sciences adequate to compensate it for Defendants' past infringement, together with pre-judgment and post-judgment interest, as well as damages adequate to compensate Sight Sciences for any continuing or future infringement, including costs, expenses, and an accounting for all infringing acts, including such acts that may transpire through any trial and/or the conclusion of any appeal(s);

C.     A preliminary and/or permanent injunction per 35 U.S.C. § 283, enjoining Defendants, including their officers, directors, agents, affiliates, employees, and all others acting in concert or participation with Defendants, from making, using, selling, offering to sell in the United States, or importing into the United States, any systems or methods that infringe any of the Patents-in-Suit, directly or indirectly and literally or through equivalents;

D.     A finding that Defendants' infringement has been and continues to be willful, and an award of enhanced damages, up to and including treble damages per 35 U.S.C. § 284;

E.     A finding that this case is exceptional and an award of Plaintiff's reasonable attorney fees pursuant to 35 U.S.C. § 285; and

F.     Any such other and further relief as this Court deems necessary and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff Sight Sciences respectfully requests a trial by jury on each of its claims so triable.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

COOLEY LLP
Michelle S. Rhyu
David Murdter
Deepa Kannappan
Emily M. Ross
Benjamin S. Lin
3175 Hanover Street
Palo Alto, CA  94304-1130
(650) 843-5000

Orion Armon
1144 15th Street, Suite 2300
Denver, CO  80202-2686
(720) 566-4000

Dated:  July 29, 2022         *Attorneys for Sight Sciences, Inc.*