# EXHIBIT C

**Page 1**

```
          IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF DELAWARE

ICEUTICA PTY LTD., et al.,:
                           : No. 14-1515-SLR-SRF
       Plaintiffs,         :
                           :
   v.                      :
                           :
LUPIN LIMITED, et al.,     :
                           :
       Defendants.         :

              Monday, June 15, 2015
              10:00 a.m.

              Discovery Review Hearing
              Courtroom of Judge Sherry R. Fallon

              844 King Street
              Wilmington, Delaware

   BEFORE:    THE HONORABLE Sherry R. Fallon,
              United States District Court Magistrate

   APPEARANCES:

              FISH & RICHARDSON, P.C.
              BY:  ELIZABETH FLANAGAN, ESQ.
              BY:  CHAD SHEAR, ESQ.

                    On behalf of Plaintiffs
```

**Page 2**

```
APPEARANCES CONTINUED:

              PHILLIPS, GOLDMAN & SPENCE, P.A.
              BY:  DAVID BILSON, ESQ.

                      -and-

              KNOBBE MARTENS OLSEN & BEAR LLP
              BY:  CHRISTY LEA, ESQ.
              BY:  WILLIAM ZIMMERMAN, ESQ.

                    On behalf of Defendants




ALSO PRESENT:

      Martha Manning, Moji James and Stuart Moran,
         iCeutica Pty, Ltd. and Iroko representatives

      Mini Bhatt, Lupin Limited representative
```

**Page 3**

1       THE COURT: Good morning, everyone. Please be seated. Let's start with the introductions for the Plaintiff iCeutica and Iroko.

        MS. FLANAGAN: Good morning, Your Honor. Elizabeth Flanagan from Fish & Richardson on behalf of the Plaintiffs iCeutica and Iroko. With me today is my colleague Chad Shear.

        MR. SHEAR: Good afternoon, Your Honor.

        MS. FLANAGAN: And I have the pleasure to introduce several of our clients. We have Martha Manning who is general counsel for iCeutica. We have Moji James who is general counsel for Iroko Pharmaceuticals, and we have Stuart Maron who is assistant general counsel for Iroko Pharmaceuticals.

        THE COURT: Thank you. And for the Defendants Lupin?

        MR. BILSON: Good morning, Your Honor. David Bilson from Phillips, Goldman & Spence for Defendants Lupin. With me today at counsel table from Knobbe Martens is Christie

**Page 4**

Lea and also Bill Zimmerman. In the courtroom with us is Mini Bhatt from Lupin Pharmaceuticals.

        THE COURT: Good morning. All right. This was the time that I had scheduled for a discovery review conference. And for those of you and our corporate representatives here who have not previously attended a discovery review conference, it's simply an opportunity for me to touch base with the parties and with counsel to see how in general the fact discovery process is progressing, to address any discovery issues that may be percolating, and in this case we do have some discovery issues relating to the protective order which I will be addressing as we go along today, but also to make sure that the discovery in this ANDA case is proportional and that it's being exchanged in good faith and the parties are on target to meet the deadlines in the scheduling order.

        The intent is that I will work with both sides in making sure that discovery progresses in an appropriate fashion so it's not

```
                                       5
 1  to derail the case from meeting the deadlines in
 2  the scheduling order.  That's kind of the
 3  overarching intent.  So with that, do the
 4  parties have any -- I'm not sure the order, if
 5  you've discussed in advance of this hearing the
 6  order of what you want to address the discovery
 7  review or do you want to address the discovery
 8  issues related to the protective order first.
 9          Let me hear first from Plaintiffs
10  on that.
11          MR. SHEAR:  Your Honor, Chad
12  Shear.  We can handle those in any series that
13  is convenient with you.  On the discovery review
14  aspect, I can simply say the Defendant has
15  produced their core technical documents.  We
16  have produced infringement contentions.  I don't
17  think any of the parties have any concern with
18  those two issues.  So from our perspective the
19  only issue remaining to be discussed is the
20  protective order Your Honor mentioned.
21          THE COURT:  Okay.  Let me hear
22  from the Defendants as well.
23          MS. LEA:  Sure.  And you will have
24  to excuse me, Your Honor.  I have a little bit
```

```
                                       6
 1  of a cold.  So the Defendants do see it a little
 2  bit differently.  We are concerned that we are
 3  off to the wrong foot on discovery.  We have a
 4  couple of issues.  We did serve 10
 5  interrogatories on Plaintiffs.  None of which
 6  were substantively answered.
 7          For five of the interrogatories
 8  they relied on Rule 33(d), even though the
 9  interrogatories were at a minimal to a discovery
10  answer.  For example, Interrogatory 10 asked
11  them to explain the basis for their standing.
12  We do have two different parties here as
13  licensees.  Again, they just relied on Rule
14  33(d) With no documents produced, and of course,
15  no actual reference to any documents.
16          THE COURT:  All right.  Well, let
17  me just stop you there, Ms. Lea.  Why don't we
18  proceed this way:  Let me hear first from the
19  Plaintiffs.  I will hear a little bit of
20  background of the litigation.  We can address
21  the document discovery that's been exchanged,
22  any pending interrogatories, Requests For
23  Admissions, specific document requests that are
24  pending and how that's proceeding here.
```

```
                                       7
 1          I will hear from Defendants on
 2  those points as well.  Then we will take each
 3  issue that cropped up with regard to getting a
 4  protective order in place.
 5          MS. LEA:  Okay.  And we do have
 6  one more issue, Your Honor, if I may.
 7          THE COURT:  Go ahead.
 8          MS. LEA:  The inventors on the
 9  patents are Australian.  They are in Australia
10  and we have asked Plaintiffs repeatedly to tell
11  us whether they are going to bring them to the
12  United States or whether they will voluntarily
13  sit for deposition in Australa or whether we
14  will have to resort to The Hague, and we have
15  not gotten a definitive answer.
16          I was told on the phone that I
17  would not have to resort to The Hague and they
18  may voluntarily sit for deposition in
19  Australia.  But they have not been willing to
20  tell me whether they have control over the
21  inventors or they can either force them to come
22  to the United States or whether they will
23  voluntarily come to the United States.  And this
24  is something we have to work out quickly so that
```

```
                                       8
 1  if we need to resort to The Hague, we will need
 2  to get started.
 3          THE COURT:  Very well.
 4  Plaintiffs, Mr. Shear?
 5          MR. SHEAR:  Your Honor, on the
 6  discovery disputes we can handle that if you
 7  would like.  I understood from your order that
 8  those issues wouldn't be raised this morning,
 9  but we are perfectly prepared and willing to
10  discuss them if you'd like us to.
11          THE COURT:  I will tell counsel
12  that the only discovery disputes I'm going to
13  hear and make rulings on today are the issues in
14  the protective order concerning whether or not
15  Lupin's corporate legal representative in India
16  can have access to certain confidential
17  designated documents and the patent prosecution
18  bar.  Those are the two issues I will address
19  today.
20          Any further issues with regard to
21  discovery, what I'd like to hear today is just
22  the background of the case, what is prompting or
23  behind these other discovery disputes that may
24  be percolating and the parties' view on how we
```

9

1  should go about addressing them.  I can set
2  another discovery conference, whether in person
3  or by teleconference at a future date.  But if
4  we're going to do that, I would like to hear
5  from both sides before I give the parties any
6  further indication of how that should proceed.
7          MR. SHEAR:  Sure.  Let me begin
8  with a small background or brief background of
9  the case.  So Iroko and iCeutica developed and
10 ultimately marketed a product called Zorvolex
11 which is a pain medication used predominantly
12 for immediate relief once pain onset has
13 occurred.  It could be post-surgical or a whole
14 variety of situations.
15         Lupin is a generic drug company
16 that has filed an abbreviated new drug
17 application seeking permission for all intents
18 and purposes to market a generic version of our
19 product.  So unlike typical patent litigation in
20 a Hatch-Waxman case, the roles are very much
21 reversed, wherein the Defendant is prepared
22 months and months in advance for the
23 litigation.  Whereas frankly on the Plaintiff's
24 side, it comes as a surprise as it did in this

10

1  case.
2          So once we received the Paragraph
3  IV letter, we did our initial due diligence on
4  that and filed suit here in Delaware and the
5  case has been progressing since.  The parties
6  have each served initial discovery, responded to
7  initial discovery and are working through the
8  various issues associated with document
9  production, document discovery, negotiation of
10 search terms, the myriad of things that happen
11 at the beginning of a lawsuit.
12         Now, on the specific issues that
13 counsel has raised, perhaps I can go at them in
14 reverse order.
15         THE COURT:  Okay.
16         MR. SHEAR:  Maybe that's easiest.
17 The last thing I believe she mentioned was
18 location of the depositions for the inventors.
19 There are five inventors on the patents.  One of
20 them is located here in the U.S., and obviously
21 the location for his deposition will be a
22 nonevent.  He's located in Philadelphia and that
23 will be currently easy and he's a current
24 employee of the parties.

11

1          The other four is a different
2  story.  None of them are employees.  They're all
3  third parties.  Three of the four we are in
4  contact with, but one inventor we've been unable
5  to locate.  So three of the four we are figuring
6  out, A, whether The Hague process is necessary
7  or, B, where the depositions will be taking
8  place.  As to The Hague, it's my understanding
9  The Hague won't be necessary.  They will agree
10 and have agreed to voluntarily sit for a
11 deposition.
12         THE COURT:  But where have they
13 agreed to voluntarily sit for --
14         MR. SHEAR:  Well, that's part of
15 the problem.
16         THE COURT:  Without giving any
17 type of preview on the ruling one way or the
18 other, it's typically been observed in this
19 District Court that if you are calling a witness
20 to trial in Delaware, you should conveniently
21 produce them for deposition if they are coming
22 to trial.  Again, I'm not making any ruling.  I
23 take these things on a case-by-case basis with
24 full understanding of the circumstances, and I

12

1  think this is the type of issue that will not
2  lend itself to a ruling today.
3          This is something I want to see
4  some papers on, have some argument on before
5  making a decision but I will give you the
6  practice as you probably are familiar with as
7  well just as a guidepost to figure this out.  If
8  we are going to keep on the scheduling order,
9  those decisions can't be left lingering.  You
10 have a five-day bench trial in about a
11 year-and-a-half or so, November 2016.  And those
12 decisions are going to need to be made,
13 particularly if it involves witnesses coming to
14 trial.
15         MR. SHEAR:  Absolutely.  And I
16 can't stand here today and tell you who we will
17 call or won't call at trial.
18         THE COURT:  You said three out of
19 four you have contact with even if they are no
20 longer current employees of the Plaintiffs.
21 What is the status with the fourth?
22         MR. SHEAR:  We are unable to
23 locate him.
24         THE COURT:  Okay.  All right.

13

1    MR. SHEAR:  So for the three that
2 we have been in contact with, as I said, they
3 will voluntarily sit for a deposition.  We have
4 no contractual ability to force these people to
5 the U.S.  They are former employees, not current
6 employees, and we don't have any contracts that
7 I'm aware of that will enable us to force them
8 to come here.
9    It seems to me that there are a
10 variety of ways to ameliorate the situation,
11 whether that's scheduling all of the depositions
12 back to back in the same time frame if we have
13 to go to Australia, whether that's doing the
14 depositions by video.  It seems to me there are
15 ways we can ameliorate the situation that will
16 address everyone's concerns.
17    THE COURT:  The discussion of
18 those alternate means of taking discovery, how
19 far into the discussions have you got, if any,
20 with the other side with the Defendants?
21    MR. SHEAR:  We haven't had a
22 chance to discuss this yet.  We are still
23 talking to the inventors to try to get a sense
24 of whether or not they will come to the U.S.  I

14

1 know for one of the inventors, specifically he
2 just started a new job in Australia and it will
3 be incredibly difficult for him to come here for
4 a deposition.  I don't have any information on
5 the other two.
6    THE COURT:  Unless you had more to
7 say regarding the depositions, do you want to
8 address the other issue raised with regard to
9 outstanding interrogatories, 10 interrogatories
10 and Defendants' preview that there may be a
11 discovery issue with regard to the sufficiency
12 of responses.
13    MR. SHEAR:  Sure.  In the first
14 instance, I will be surprised if there is a
15 dispute.  Obviously, if in the end our responses
16 are insufficient, then it's going to be us
17 that's hampered at trial.  Now, with that being
18 said, the way in which this came down, we
19 received a one-paragraph email generally stating
20 they had concerns with discovery, which is not
21 typical I think of how the practice operates.
22    Usually each side exchanges
23 lengthy letters and the parties get on the phone
24 and work things out.  We had a lengthy meet-and-

15

1 confer based on the one-paragraph email in which
2 every single Request For Production was gone
3 through on an itemized basis, and we are in the
4 process right now of addressing the concerns
5 that were raised at that meet-and-confer and we
6 promised to them a response in writing, and they
7 will have that letter this week.
8    So I think the dispute right now
9 is premature.  But if there's any specific
10 issues that need to be addressed, we are happy
11 to address them.
12    THE COURT:  All right.  Anything
13 further with regard to how fact discovery is
14 progressing in general?  You are beyond
15 production file history, Defendant's ANDA, the
16 initial infringement contentions.
17    MR. SHEAR:  We are.  And all of
18 those dates have been complied with.
19    THE COURT:  So no further issues
20 other than getting to the protective order
21 issue?  No further issues from Plaintiff this
22 second?
23    MR. SHEAR:  Not as far as I would
24 say.  I guess in general we are still in the

16

1 infancy of discovery and the parties are working
2 on search terms for those types of things, so it
3 would be unusual to expect in my experience a
4 precise response to interrogatories where Rule
5 33(d) would be permissible and appropriate to be
6 citing documents immediately.
7    We have already made one document
8 production and we will make further document
9 productions.  We are working on supplemental
10 interrogatories.  But all of those things will
11 generally flow in the normal course of
12 discovery.  The document production is set to be
13 over in almost four months so we are
14 progressing.
15    THE COURT:  Okay.  Very well.  Let
16 me hear from Lupin with regard to the discovery
17 and issues that the Court may have to address in
18 the future.
19    MS. LEA:  Sure.  Your Honor, first
20 of all, I will take his last statement.  We
21 disagree that Rule 33(d) is appropriate, and we
22 explained the basis for standing.  I'm sure
23 there are agreements involved, but just to point
24 to documents or even the specific agreements do

17

1  not explain their theory of standing which is
2  what we ask for.
3          On the inventors, Your Honor,
4  you're hearing what we've heard. But we
5  haven't -- it's just a matter of when will they
6  tell us. Can we have a date of when we're going
7  to know about whether the inventors are coming
8  to the United States, something in writing, if
9  they are or even if they are not, can they
10 voluntarily sit in Australia, so that we are not
11 sitting and wasting our time and not applying
12 under The Hague.
13         THE COURT: Well, it sounds like
14 you need to have a conversation with Plaintiffs
15 on those points. First, you're aware of my
16 comments and concerns down the line of who is
17 ultimately going to be here to testify at trial,
18 how do you get discovery from those
19 individuals. I think these are all issues that
20 need to be addressed.
21         Your first efforts at creating a
22 timeline or a date certain that you would like
23 should occur first with your opposing counsel on
24 those points before the Court needs to address

18

1  that. I would hope that these would be issues
2  that counsel can work out, at least as far as
3  taking the depositions and scheduling those
4  depositions and what's going to happen with
5  them.
6          MS. LEA: Just so Your Honor
7  knows, we have had multiple phone calls and
8  multiple emails on the inventors as well as the
9  interrogatory responses, we have had a very
10 lengthy meet-and-confer about the interrogatory
11 responses and the document production. Many of
12 the document production requests, they simply
13 answered they are not going to produce
14 documents.
15         And in the meet-and-confer, they
16 said, well, it will probably be covered by the
17 search terms. We finally do have their search
18 terms and we are reviewing them. It was a
19 little bit shocking to receive from them answers
20 to many of the document requests that they
21 simply would not produce documents.
22         THE COURT: It's my understanding
23 from what Mr. Shear just represented that you
24 will receive a response to the deficiency

19

1  notification that you sent to them this week, so
2  perhaps what you can do is wait to get that
3  response. We can set a date on the calendar if
4  counsel wants me to do that.
5          I'm willing to set a date on the
6  calendar to address both issues, both the
7  deposition issues and the sufficiency of
8  responses, but I'm not likely to be able to
9  accommodate that date in July. So if you want
10 to set something on the calendar for August, we
11 can do it. And that's why I asked counsel to
12 work it out as best you can in the interim.
13         MS. LEA: I would hope we can work
14 it out, but I do think, Your Honor, the way
15 things are going it would be helpful to have a
16 date set on the calendar.
17         THE COURT: I'm not sure if my law
18 clerk is able to provide a date. She will check
19 the calendar and I will discuss that later in
20 our hearing today. Why don't we move forward
21 then if there are discovery issues, in the sense
22 of giving me the overview of the discovery, how
23 it's progressed to date. We can work into the
24 protective order issues. I want to hear first

20

1  from Plaintiffs since they initiated the
2  briefing on the protective order issue.
3          Mr. Shear, let's take one issue at
4  a time. I have no preference as to how we
5  start.
6          MR. SHEAR: I don't either, Your
7  Honor. Perhaps we will start in the order the
8  parties briefed the issues.
9          THE COURT: Very well.
10         MR. SHEAR: So as I started at the
11 outset of the hearing noting that on the one
12 hand we have iCeutica and Iroko, branded drug
13 companies, who are in the business of making new
14 products, and on the other hand we have a
15 generic drug company making generic versions of
16 those products.
17         We have a directly competitive
18 issue. This is not a non-practicing entity
19 case. This is not one of those situations where
20 the parties are collaborating in a completely
21 different field. This is a situation where the
22 parties are in direct competition now and will
23 be for the foreseeable future.
24         So my client has a direct, very

21

immediate concern about generally producing all of its confidential highly proprietary business documents over to the other side without some measure of protection. Now, the parties universally agree that a protective order is appropriate here and the parties universally agree that inhouse counsel should have access under the protective order.

Obviously, where the dispute is, is whether someone who is not an attorney should have access to those same materials, and that's where we drew the line.

THE COURT: Well, your position would not be to oppose access by inhouse counsel even if that inhouse counsel was located overseas or in India if that person had an "inhouse designation," correct?

MR. SHEAR: Well, first, that is a licensed attorney and I think that presents a totally different situation and one that we think would be in a different strategic footing.

THE COURT: How is that different from a corporate representative who is bound and subject to the jurisdiction of this Court in the

22

event sanctions needed to be imposed as well as the fact that the party itself is here on subject to jurisdiction and potential sanctions from the Court if certain confidential information is misused in violation of the protective order?

I need to see what the nexus is, why inhouse is permissible, but someone who perhaps functions, so to speak, as inhouse counsel doesn't have that attorney license is any different?

MR. SHEAR: Sure. The difference is found in the essence of the licensure requirement that you just referenced. An attorney, whether that attorney is licensed here or somewhere else, is subject to an entire set of rules separate and apart from just submitting to the Court's jurisdiction of obligations of ethical conduct, obligations of duties to the Court, et cetera, et cetera.

An inhouse person who is not an attorney and just rather a business person isn't subject to those same standards. So in an effort to sort of ameliorate the situation and

23

put things on balance, we had proposed seven conditions that we thought would put this inhouse person under the same sort of duties of ethics and candor and all of those things that a licensed attorney would be.

And if you look at the seven things that are listed, No. 1 is they would have to agree to be bound by the Delaware Rules on professional conduct. We would like this person put into the same spot that inhouse counsel would find themselves. Now, all of this is complicated by the fact that this person is not in the U.S. That makes things much more difficult so we have added additional conditions that we have placed on in an effort to compromise and resolve this without having to go before Your Honor to do that.

But what we are trying to basically seek is some measure of protection for our clients' interest for our confidential information, the same measure of protection that they are going to enjoy by the fact that all of the people that we want on the protective order are licensed attorneys.

24

And I should note that it isn't uncommon for a business person or scientist to have access to materials under a protective order. But that's when you have a two-tier system, and there's a second tier where things, although still confidential but not of the same nature of the other materials, and in that situation those business people may have access to certain limited subset information. But that is not what Lupin seeks.

Lupin seeks to have this nonattorney have the same rights and access to one that inhouse counsel might have.

THE COURT: Do you have any reason to believe that this representative designated by Lupin is involved is any competitive decision-making?

MR. SHEAR: The answer is, Your Honor, that I'm not sure. The Declaration that they submitted in support of their position is sore of scant when it comes to the details. But what Ms. Naidu does say is that she communicates with other groups about those litigations, she communicates with management and other groups

25

generally and provide updates about the litigation to management. So obviously, she will be updating people that are certainly involved in competitive decisions. Whether she herself is involved in those decisions, I'm not sure because I don't fully appreciate the nature of what her business responsibilities are.

And that I think, Your Honor, dovetails back to why we want this to be an inhouse counsel position. We all recognize that there are certain inhouse counsel that may be involved with business people involved in competitive decision circumstances, but because of the licensure requirements, because of the ethical obligations they have as attorneys, they are limited and they know what they can and cannot share with the business people in their organization with whom they might share information or who may be making those competitive decisions.

THE COURT: Would you have a level of comfort if you believed that Ms. Naidu not being bound by those ethical obligations, what if -- again, what if the Court would subject her

26

to the jurisdiction of this Court, require Lupin's counsel to so inform Ms. Naidu of what the ethical obligations would be if she had an attorney license?

Would those protections -- it sounds to me that your concern is about the ethical obligations that inhouse counsel are bound by because of their license. If Ms. Naidu was advised of these obligations and bound to conduct herself as if she were licensed under these obligations, would that create any difference? Would you have any problem with her reviewing the documents?

MR. SHEAR: I guess there are two issues. The answer to the first question, Your Honor, that would start us down the road that something we can certainly agree to. That was one of the first conditions we proposed, that she would be bound by the professional rules of conduct, which I think is in essence what Your Honor just suggested, that perhaps coming through Lupin's counsel as opposed to her independent review of the Rules. Either way that she becomes aware, it's fine with us.

27

The second concern that we have is our document production and certainly a subset of very sensitive information leaving the country and being sent to India wholesale to be reviewed by Lupin's inhouse business person. So those two concerns -- because you began by asking the question at the outset would it be different if it was inhouse counsel and I responded by saying it might be, not the circumstances --

THE COURT: Well, is that a real concern? We just spent some time in the issue before me talking about going to Australia for depositions with inventors who are no longer employed by the company. Is that not going to be a concern about taking sensitive information out of the country for purposes of direct and/or cross-examination for those inventors?

Where do we draw the line as to carving out when information can leave the country or not?

MR. SHEAR: The key distinction, Your Honor, the circumstance you just referenced to, it would be our confidential information

28

taken to Australia to share with our employees. The situation we're concerned about is our confidential information given to a direct competitor overseas.

At the end, Your Honor, the concern and I think the heart of this is if a disclosure takes place, that is, a breach of the protective order, whether inadvertent or not, how it happens doesn't matter, we have almost no recourse in India to kind of sort of put the cow back in the barn, so to speak. And that's really what we're worried about at the end of the day.

We don't have any problem with Lupin's counsel or outside counsel advising their client and talking to their client about confidential information, keeping her fully apprised of what's happening in the lawsuit. And I have been down this road before with Lupin in other cases with the very same situation. We don't have any problem with all of that information.

What we are trying to avoid is our confidential information to wholesale shipped to

29

1  India and reviewed by someone in India, so
2  that's why and how we crafted the seven things
3  we were hoping to try and balance the situation.
4         THE COURT:  All right.  And guide
5  me -- specifically as you see I have read the
6  protective order and flagged it and --
7         MR. SHEAR:  So the protective
8  order as it stands in front of you right now,
9  Your Honor, is where the parties ended up --
10 it's limited strictly to inhouse counsel.  The
11 seven provisions that I keep referencing --
12        THE COURT:  I thought it was
13 Paragraph 5.
14        MR. SHEAR:  It's actually Exhibit
15 B, Your Honor.  They are laid out in the
16 correspondence between the parties.  This is
17 what we sent to Lupin asking if you agree to
18 these conditions, we will agree to let Ms. Naidu
19 in the protective order.  Your Honor, it's my
20 understanding this whole issue that Lupin raised
21 with those conditions was the advanced
22 notification provision which is Item No. 5, that
23 the documents will leave the U.S. without prior
24 consent.

30

1         And let me explain, the concern
2  that Lupin raised was the fact that would
3  require them to share their work product with
4  us, and I completely understand it and
5  appreciate it.  I don't think that's what that
6  paragraph is aimed at.  The way that this is
7  operated and practiced when we used this before
8  is this is really aimed at briefs and
9  depositions and the kinds of things that are
10 going to the Court, and then a request comes in
11 and says, okay, I see you attached Exhibit C and
12 D which is marked as confidential, and we sent
13 those.  And nine times out of ten, it's not a
14 problem depending on what they are.  Usually,
15 it's not an issue.  In fact, in the last case I
16 dealt with this, I can't think of a single
17 instance where we said to Lupin that they
18 weren't allowed to share the materials under
19 that protective order under these conditions.
20        THE COURT:  Thank you.  Let me
21 hear from Lupin.
22        MS. LEA:  Well, Your Honor,
23 counsel is right, the standard is the same
24 whether it's an inhouse counsel or a nonattorney

31

1  employee, and the standard is whether they are
2  involved in competitive decision-making.  Here
3  the Plaintiff has the burden to show that a
4  protective order should be entered prohibiting
5  information to share with Ms. Naidu, and they
6  have not met that burden.  They have not shown
7  any evidence that she is involved in competitive
8  decision-making.
9         She has submitted a Declaration
10 explaining her tasks.  None of which involve
11 competitive decision-making.  And certainly,
12 having regular contact with other people, other
13 employees in the company, even executives who do
14 competitive decision-making is not enough to say
15 that the attorney or the nonattorney is involved
16 in competitive decision-making.  If that were
17 true, then all of the inhouse counsel would be
18 involved in competitive decision-making.  And
19 the agreed-upon protective order actually says
20 that, no, none of the inhouse or none of the
21 representatives can be involved in competitive
22 decision-making.
23        And, Your Honor, I do want to address
24 that there are actual adequate safeguards

32

1  already in the protective order.  During the
2  action and 10 months after, none of the inhouse
3  counsel or the representatives can participate
4  in prosecuting patent claims relating to
5  Zorvolex or the generic or even formulations
6  involving Diclofenac acid.  They cannot
7  participate in submissions to the FDA or the
8  U.S. Pharmacopeia and they cannot participate in
9  business decision-making with respect to
10 Zorvolex or generic Diclofenac.  They're all
11 required to institute a written acknowlegement
12 and will submit to the personal jurisdiction of
13 the Court.
14        And, Your Honor, we know that
15 Judge Robinson has stated on the record that it
16 is this Court's practice to allow at least one
17 employee from the company to have access to
18 confidential information, and that is in the
19 Autozone case, and I do have a copy of that
20 transcript if Your Honor would like it.  And the
21 simple fact of the matter is that Lupin Limited
22 does not have an IP inhouse counsel.  That job
23 is of Ms. Naidu.  I speak with her on a daily
24 basis or communicate with her on a daily basis,

33

1  either by email or by phone.
2          She reviews every single filing
3  that is submitted to the Court.  And if she did
4  not have access to confidential information, it
5  would impede her ability to manage outside
6  counsel and for her ability to advise the
7  executives on the litigation.  We have a
8  situation where already the Plaintiffs are
9  overdesignating.  They designated their entire
10 interrogatory response which had no substantive
11 information and no confidential information as
12 highly confidential, so we are in a situation
13 that we have to go back and ask them to
14 redesignate.
15         They designated their entire
16 infringement claim charts as highly
17 confidential.  And I said is this because of our
18 information.  And they said, no, we are citing
19 to our own confidential information.  So we had
20 to wait for a redacted copy of the infringement
21 claim charts before I could even send it to
22 Lupin's representative Ms. Naidu.
23         THE COURT:  Why don't we address
24 some of the protections that might address both

34

1  parties' concerns.  I think what I'm hearing is
2  you want to be sure your representative can have
3  access to the confidential information.  Are you
4  willing to have her informed by inhouse counsel
5  as to what the professional rules of conduct
6  ethically require that she observe as if she
7  were inhouse counsel?  Is that an issue?
8          I'm trying to get to what number
9  of these seven conditions suggested by
10 Plaintiffs would be just opposed by the
11 Defendants.  And I think maybe it just does
12 involve really No. 5.  Unless you tell me
13 otherwise, I can't fathom a situation in which a
14 Defendant would object to someone being bound by
15 a professional code of conduct, someone being
16 bound by ethics and someone submitting to
17 jurisdiction to this Court of enforcement of
18 those types of conditions.
19         So how do we work around
20 Plaintiffs' concern about documents leaving the
21 United States?
22         MS. LEA:  So we do have no
23 objection to Conditions 1 and 2.  Three and
24 four, those are contract terms, irreparable

35

1  harm, jointly and severally liable.  And if we
2  want to turn it into a contract, we all can
3  agree to be bound by that contract.  But
4  Plaintiffs themselves said in Paragraph 21 which
5  says this is not a contract.  And then Condition
6  5, we see that as two issues with that, number
7  one, it's unworkable.  Ms. Naidu is in India so
8  she's not going to be in our office to see the
9  confidential information our office.
10         We also see it as infringing upon
11 our work product and attorney-client
12 communication, so to the extent every time we
13 communicate a piece of confidential information
14 to Ms. Naidu, we have to first disclose to
15 Plaintiff that we intend to do so and get their
16 permission to do so, and that goes for 5, 6 and
17 7.
18         THE COURT:  How about, and maybe I
19 should ask this to Mr. Shear.  How about a
20 situation where -- well, I'm not sure if it will
21 work.  If you're saying the Plaintiffs are
22 overdesignating confidential materials, I was
23 wondering rather than Lupin advising of every
24 piece of information that leaves the United

36

1  States, Plaintiffs indicating which documents
2  under which circumstances should not leave the
3  United States rather than making a blanket
4  prohibition and just having the Court address
5  them if the parties can't agree?
6          MS. LEA:  That might be more
7  helpful.  I'm still not sure how I see the
8  difference here between Ms. Naidu as an IP
9  manager than an attorney.  That's not how the
10 cases deal with this issue.  It all comes down
11 to whether the nonattorney representative is
12 involved in competitive decision-making and
13 she's not.  She's managing the litigation and
14 reporting on it.
15         And as a practical matter, of
16 course we do not plan to ship all of their
17 documents to India.  I don't believe that any
18 inhouse representative is sitting around
19 reviewing documents.  What we plan to do is send
20 the infringement claimant charts they sent us
21 where they cite to their confidential
22 information.  We plan to send that to Ms. Naidu
23 so that she can advise us on the infringement
24 contentions that are at issue in the case.

37

And in any briefing that might have a quote or something else from their confidential information, that's what we intend to share with Ms. Naidu. And I will say, Your Honor, we did cite to one protective order where Ms. Naidu has previously been granted attorney-level access and there hasn't been any issues in that case. I'm not sure what the Plaintiffs are referring to when they say they have dealt with Lupin on protective order issues. I'm not aware of those. They didn't disclose those during any kind of meet-and-confer.

But I have to come back to the point that IP management is not competitive decision-making. That is in the case law that we've cited, and they simply have not met the burden to question her role in the litigation, her ability to adhere to the protective order, and they haven't made a showing about any confidential information. Their product is public. We have already released our generic product.

I'm not sure what they're

38

concerned about, about their historical development documents or their historical development information. They haven't made any type of showing or even tried to.

THE COURT: Thank you. Anything further in rebuttal, Mr. Shear?

MR. SHEAR: Just briefly, Your Honor, a couple of quick points. Counsel noted all these other cases that talk about competitive decision-making, however, with the exception of maybe one that counsel cited, they are all talking about counsel, not business people. As to the overdesignation, there have been two things that have been designated so far.

One we designated highly confidential because it contains Lupin's highly confidential information as well as ours. The other one is an oversight which we've corrected. They brought it to our attention Friday night and we fixed the problem Sunday morning. So I don't think there's really much of an issue there.

And then lastly and sort of

39

importantly, the exact kind of thing that counsel just was talking about with respect to the types of materials they want to share with Ms. Naidu is exactly the kind of thing that I said at the outset, the kind of thing that we would be willing to agree to on a case-by-case basis, which is what Condition No. 5 is really aimed at.

I don't think at the end of the day that we will have a concern with Ms. Naidu reading our infringement contentions, validity contentions, the kinds of things she really needs to review to work with counsel. And notably, we don't have a problem with counsel talking about all of these things. So --

THE COURT: But isn't that an intrusion on counsel's ability to conduct the litigation if they basically have to check in with you, the opposing side, every time they want to have a communication with the client representative about a confidential document? Would you want them knowing every time you're having an inhouse conference with your inhouse people?

40

MR. SHEAR: Of course, we agree with that. But with respect, I don't think that's what we are trying to achieve. I don't think that we're trying to achieve a situation where Ms. Lea isn't free to discuss with her client anything she wants to discuss. She of course is. It's the providing of our materials outside of the U.S. that causes us concern, and it's just really that in a nutshell.

THE COURT: Anything further on this point?

MR. SHEAR: No, Your Honor. Do you want me to move to the IPR?

THE COURT: I tend to rule on these issues one at a time. So having heard the arguments of counsel and having reviewed the authorities that give some guidance on this point, a primary consideration and this is from the U.S. Steel Corp. case, a primary consideration whether to permit inhouse legal representatives to have access to opposing party's confidential information is whether that representative is involved in competitive decision-making, and that involves a degree into

41

the factual circumstances surrounding each individual counsel's activities, association, relationship with a party which must govern any concern for inadvertent or accidental disclosure.

And I can understand Plaintiffs' concerns that once inadvertent or accidental disclosure gets out of the box, so to speak, it's hard to stuff it back into that box or cower the horse back into the barn, to use counsel's analogy. I do understand the concerns about not having that occurrence happen. ==On the other hand, in terms of something this restrictive, the Plaintiff does really bear the burden of having these restrictions set in a protective order.==

And I think the seven conditions that I've read in Exhibit B to the submission of Plaintiffs are overly restrictive in a sense in which they would impede Defense counsel's ability to litigate the case and go forward with their litigation strategy and have conversations with a corporate representative in a fashion and in a way that they would be meaningful to

42

preparing the defense.

So with that, I am going to allow Ms. Naidu to have access pursuant to the protective order. I will include the condition that she subject herself to this Court's jurisdiction, that she agree to all of the confidential obligations that she is required to adhere to if she is going to have access to that information.

I will also include, if not already included by the formal representations, that she will sign onto to protect confidential information, just to make it clear, that she is bound by Conditions 1 and 2 of the Plaintiffs' proposals in Exhibit B of that submission. And that is, that she agree to be bound by Delaware lawyers rules of professional conduct and that she agrees to submit to the jurisdiction of the Court's enforcement of the protective order.

So having said that, if there is a concern somewhere down the line during the course of the litigation that an inadvertent disclosure is more likely than not to happen because of the discovery exchanges or if there

43

is a particular document or collection of documents or collection of materials in discovery that Plaintiffs have particular concerns about leaving the country, the Court is certainly open to hearing any discrete and specific instances so that I can weigh in as necessary or as appropriate before the odds are stacked that make it more likely than not that an inadvertent or unexpected disclosure of information will occur.

But I think that we live in a global world. We have litigation of two parties that have connections outside of the United States, and there is a need on both sides to have information go out of the United States. But nonetheless, there are very distinct and specific concerns about keeping such information confidential. And I think and expect that the parties will see that as paramount, that information designated confidential stay confidential and that the risks are minimized to avoid any inadvertent disclosures whatsoever.

Like I said, if there are particular concerns that come up during the

44

course of the exchange of information between the parties, I will try to address those before there is an issue with the cat out of the bag, so to speak, and we will have to do something to address that situation which is more difficult than not getting it out of the bag at all.

And with regard to the rulings that I'm making today on these discovery issues, it is my practice and I think counsel here are all familiar with it, but I will repeat it just in case, this transcript will serve as my ruling. I will not be issuing a written order. Since we are dealing with a draft protective order, once you have my rulings today, I would ask the parties to meet and confer and that one side or the other take the lead in getting a revised protective order to my chambers so that I can enter it on the docket that incorporates a protective order that incorporates the rulings that I'm making here today.

With that, we can proceed to the next issue which is the issue relating to the prosecution bar, and specifically, as it relates to post-grant activities.

45

MR. SHEAR: Thank you, Your Honor. I think I'm first on that one as well.

THE COURT: Okay.

MR. SHEAR: So again, this is a fairly focused issue. The parties obviously agree to a protective order. They agree that a prosecution bar is appropriate. Where we disagree is the scope of that prosecution bar, and specifically, whether or not someone who has access to materials under the protective order should also be allowed to participate in post-grant.

THE COURT: Let me give you a little guidance here because I have thought a lot about this issue in advance of our hearing today, and I have read both Kenexa and Versata, and admittedly there's contention between the two. And these issues have to be addressed fact specific on a case-by-case basis.

So tell me what about the prosecution bar to put it in the Kenexa camp or Versata camp, where are we from Plaintiffs' perspective on the conflict of the two decisions?

46

MR. SHEAR: I think they are actually more in line than what we may think. So on balance, the focus of this issue is on the one hand we want to be in a position where we wouldn't be forced to potentially inadvertently take inconsistent positions in both places which is what Versata is addressing and to a lesser extent but also what Kenexa is addressing. The balance against Lupin's concern is that we cannot use any of their confidential information in front of the Patent Office.

Now, the post-grant procedure as it exists today, it wasn't always this way, but as it exists today you can't broaden the claims. It's incredibly difficult to amend them, so the likelihood that an inadvertent use of confidential information is very, very small. But I think that if you look at the Versata decision and you want to try to square Versata with Kenexa, Versata is aimed at balance that I just talked about between one side's desire not to take inconsistent positions and the other side's desire that their information not be used.

47

And in that case because of the balance issue, specifically the source code, was a very easy line to draw. Because on a typical litigation team, the source code is so dense and not everyone uses or even looks at the source code. It's too much, so it was easy to identify a couple of attorneys. They could operate both points.

THE COURT: How do you address on that point Lupin's argument that Lupin's formulation is analogous to source code material?

MR. SHEAR: Sure, and I think it's a fair statement, but I think the key difference is that we're trying to meet and give them the same protection Versata gave the Defendant in that case by saying that the litigation counsel will play no part whatsoever in amending or drafting of any claims. So to the extent the claims are going to change at all, litigation counsel will not play any part in that.

Instead, while we might help patent prosec -- to the extent by the way, this is all hypothetical. There hasn't been an IPR

48

filed --

THE COURT: I was going to ask that question, but --

MR. SHEAR: I should have led with that.

THE COURT: -- thank you.

MR. SHEAR: But to the extent that an IPR was ever instituted, what litigation counsel might discuss with prosecution counsel -- I'm not even sure it's fair to call them prosecution counsel based on the way recent decisions have described it as an adjudicatory proceeding as opposed to true prosecution, but to the extent that we would have those conversations, we might talk about positions to take vis-à-vis the publicly available prior art, those kinds of things.

But what we wouldn't do is be involved in any way in the changing of claim scope. The claims from our perspective will be as they are today, and that will give them the same measure of protection of Versata, because that's really what Versata was aimed at. They didn't want litigators changing the scope of the

49

1  claims.  And we would agree not to change the
2  scope of the claims after having access to their
3  confidential information.
4           THE COURT:  All right.  Let me
5  hear from Lupin.
6           MS. LEA:  So the prosecution bar
7  in Versata was not limited to claim amendments.
8  It was a complete prosecution bar for any type
9  of post-grant proceeding including
10 re-examination and IPR.  And the way I would
11 distinguish Versata and Kenexa, Your Honor, is
12 the difference in time.  There's somewhat of a
13 trend in this District for the more complete
14 prosecution bar, and that started occurring
15 after the Federal Circuit issued its decision in
16 May 2010, In re Deutsche.
17          There the Federal Circuit put the
18 burden on the parties seeking the exemption.
19 The burden is on the Plaintiff here to show that
20 their representation before the Patent Office is
21 not likely to implicate competitive
22 decision-making.  I think what he stood here and
23 said what they want to be able to do is exactly
24 that, competitive decision-making.

50

1           They want to be able to structure
2  their validity argument in a way that will not
3  harm their infringement argument in the District
4  Court.  And this is a situation, Your Honor,
5  where the ANDA formulation for Lupin is
6  different than the Zorvolex formulation that
7  Plaintiffs have.  If their prosecutors were to
8  know that formula, that could affect their
9  arguments in the Patent Office, even in
10 post-grant proceedings.
11          THE COURT:  I'm sorry.  I'm
12 looking at Versata.  It says parties seeking to
13 include a protective order, a provision
14 affecting a prosecution bar has the burden of
15 showing good cause for its inclusion.  That's
16 from the Deutsche Bank case.  I'm sorry.  I'm
17 not following your argument on burden.
18          MS. LEA:  Right.  So the party
19 seeking a prosecution bar has the burden to show
20 good cause, but the parties here have an
21 agreed-upon prosecution bar so that burden has
22 been satisfied.  Now, if a party wants an
23 exemption, they want to carve some prosecution,
24 like re-examination or IPR, then it's their

51

1  burden to show that exemption.  And that's what
2  In re Deutsche said.
3           Also, Inventor Holdings out of
4  this District in 2014 says the same thing.  In
5  that case, this Court did not do a carve-out.
6  They said, no, a prosecution bar is going to
7  include re-exam and IPR just like in Versata.
8  And, Your Honor, I did want to make one
9  correction.  There's somewhat of a misstatement
10 in Plaintiffs' letter that we did not catch.
11 And I would just like to point it out.
12          They cited to two sample
13 protective orders from other districts that they
14 say include a limited prosecution bar that
15 carves out re-exam and IPR, and that's not
16 correct.  The Northern District of California
17 order, that's Exhibit E.  That one --
18          THE COURT:  Hang on.  Let me take
19 a look at it.  Okay.
20          MS. LEA:  Exhibit E, Paragraph 8.
21          THE COURT:  I have it.
22          MS. LEA:  So we have a prosecution
23 bar set forth in Paragraph 8.  It includes a
24 complete prosecution bar.  And then it says, and

52

1  I'm at Line 9, to avoid any doubt prosecution as
2  used in this paragraph does not include
3  representing a party challenging a patent before
4  a domestic or foreign agency, including but not
5  limited to a reissue protest, ex parte
6  re-examination or inter partes re-examination.
7  So it's only the party that's challenging the
8  patent that may participate.
9           THE COURT:  Okay.
10          MS. LEA:  Again, Your Honor, I
11 come back to Versata and that our formulation as
12 they admit is like the source code.  It's the
13 big secret here that their clients do not know.
14 And that if their prosecutors were to know,
15 could affect their prosecution including their
16 post-grant strategy.  And that is taken, Your
17 Honor, from the Patent Case Management Judicial
18 Guide.
19          And I will say since this lawsuit
20 has started, they have had two patents issued
21 that they have added to the lawsuit they are
22 continuing to actively prosecute.  They have
23 four more applications they received a Notice of
24 Allowance on.

## 53

1    THE COURT: All right. Mr. Shear?
2    MR. SHEAR: Just two brief points,
3 Your Honor. First of all, yes, we have more
4 patents coming out. That's prosecution. We are
5 not talking about prosecution bars here.
6    THE COURT: Post-grant review.
7    MR. SHEAR: Correct. Now, counsel
8 referenced the In re Deutsche Bank case.
9 Specifically, I will read the quote from the
10 case. The quote is, strategically amending or
11 surrendering the claim scope during prosecution
12 to constitute competitive decision-making. And
13 that's exactly what we're saying we will not do
14 here. We won't be involved in change of claim
15 scope in any way, shape or form and that is
16 written in the protective order as it stands.
17    So I disagree with counsel's
18 characterization that this is about timing and
19 scope. At the end of the day, it does come down
20 to competitive decision-making as it affects the
21 claim scope, and that is what we are saying we
22 will not be involved in. Thank you.
23    THE COURT: All right. The
24 parties have agreed to a prosecution bar in this

## 54

1 case. The issue is whether to include
2 Plaintiffs' proposal which is set forth at
3 various portions of the draft protective order.
4 But to generalize, Plaintiffs' proposal includes
5 a carve-out from the prosecution bar which would
6 not preclude outside counsel from participating
7 in post-grant review types of proceedings to
8 challenge or defend the validity of any patent,
9 but outside counsel may not participate in the
10 drafting or amending patent claims in any such
11 proceedings.
12    I've spent some time reviewing
13 Judge Robinson's opinions, both in the Kenexa
14 case and in the Versata case and recognized that
15 these decisions have to be made on a
16 case-by-case basis. There's no general blanket
17 rule that can be applied other than the
18 standards and putting in place protections which
19 would, as Judge Robinson said in Kenexa,
20 protections such that no party should use
21 confidential information to obtain additional
22 rights for itself, but they should be able to
23 use it to divest each other of their respective
24 rights.

## 55

1    And as she noted in the Kenexa
2 case, the scope of claims cannot be enlarged by
3 amendment in a re-examination because the
4 re-examination involves only the patent and the
5 prior art, Defendant's confidential information
6 is basically irrelevant to the re-examination.
7 I realize that in Versata that she reached a
8 different conclusion and was more restrictive
9 about a patent prosecution bar which prohibited
10 any attorney, consultant, witness or other
11 person who used highly confidential source
12 code. It was source code in the Versata case at
13 issue. She precluded those individuals from
14 participating in any patent application,
15 prosecution or any post-grant review proceeding
16 for the particular technology field at issue
17 in the patents-in-suit, and further prohibited
18 them from consulting with the attorneys or
19 experts participating in any such prosecution or
20 post-grant proceeding.
21    In this instance, I'm going to
22 allow the Plaintiffs to include the carve-out
23 language that they have suggested. Having
24 reviewed both decisions and considered the

## 56

1 arguments in this case and the fact that
2 presently there are not any post-grant review
3 proceedings taking place, not that that would
4 alter the outcome in and of itself if there
5 were, but I'm not convinced that in this
6 instance the level of protection or concerns
7 raised by Lupin rise to the level of those
8 concerns in Versata with regard to use of source
9 code in an inappropriate way that might
10 implicate competitive decision-making.
11    So I'm going to, as I said, permit
12 the language proposed in Plaintiffs' version of
13 the protective order. There are several
14 instances where that language was inserted. I'm
15 not sure if I marked out all of them. Just for
16 purposes of the record, the ones that I've
17 flagged are at Page 7 and 8 and 10 and maybe
18 elsewhere throughout the protective order, but
19 those are the ones I've caught.
20    If there are any other locations
21 where that language needs to be revised or
22 incorporated in the protective order, then I
23 will expect, again, that the parties will get
24 together and one side or the other will send to

57

my chambers a revised protective order consistent with the rulings that I've made.

In the event that there are certain post-grant review proceedings initiated and there is a concern by the Defendants about access and use of confidential information in those proceedings, again, these rulings are without prejudice for the Defendants to bring to the attention of the Court anything preemptively that I can address before the cat is out of the bag, so to speak. I hate to use that analogy, but this is a safe way of putting it. And I will consider specific and discrete instances at that time and address them.

But viewing these things in general, I try to make decisions that afford the protections that the parties are seeking while not tying the hands of either side, retained counsel or inhouse counsel or the parties themselves from pursuing certain litigation strategy, developing litigation strategy and going forward using the materials that are produced in discovery in a manner consistent with their objective in the litigation.

58

So I try and balance all of those things in making these rulings so there is a sense of fairness and predictability, and also so the parties are aware that the Court share the concern and recognize the concerns about protecting confidential information but also protecting each party's rights to litigate as they feel is appropriate and consistent with the objectives of each party.

So having said that, as all of you know these are nondispositive rulings. So under Rule 72, should either side object to any of the rulings today, you can take it up with the District Judge. The District Judge in this case can consider timely objections and modify or set aside any part of the order that is clearly erroneous or contrary to law.

And again, this transcript will serve as the order. I will not be issuing a written order on either of these issues relative to the discovery order. We will set a time in August for hearing any additional discovery disputes along the lines of what we discussed today about depositions outside of the United

59

States with the inventors or inside the United States with the inventors, and with regard to the sufficiency of responses to the Defendant's interrogatories that were served on the Plaintiff as well as any other issues that might crop up in the interim.

I have a date that I can give the parties, August 13th. And since I am the Criminal Duty Judge on that date, we would have to start the hearing after 3:30 p.m. So I guess tentatively I will set it for 3:30 on August 13th. And if, for example, my criminal calendar might run over that timeline, you might have to wait a bit. But usually, the criminal calendar is concluded by 3:00 so I'm comfortable with setting a time at 3:30.

I'm happy to do it in person if that's what the parties wish. If it's more convenient if the parties wish and agree to proceed by teleconference, we can do it by teleconference. I have no strong preference and I leave it to both sides on how to conduct that hearing, in person or by phone. So get back to my courtroom deputy Larisha Hicks on that,

60

confirm the date and confirm when you want to start.

And then as the date approaches, submit your letter briefs as you did in this instance, limited to four pages, addressing the discovery issues. If there are going to be more than the two issues we've talked about, that is, the depositions and the sufficiency of Plaintiffs' responses to Defendants' interrogatories, please alert my courtroom deputy Larisha Hicks to that fact as well.

Going into these hearings, I like to know how much time to set aside for them, and also, I like to know in advance just how many submissions I'm going to be getting from each side. If both sides are responding to the other side, if the other party needs multiple submissions and if there is a way to streamline that, giving extra pages will reduce the number of submissions.

But for right now, just proceed with the briefing guidelines that are posted on the website. And if the necessity of the number of motions compel the parties to want to seek to

```
                                                    61
 1  alter that or seek a different briefing
 2  schedule, then just make sure you make my
 3  chambers aware of that in plenty of time for me
 4  to take a look at it and give you some guidance
 5  on how you draft your submissions.
 6          With that, is there anything
 7  further from the Plaintiffs today?
 8          MR. SHEAR:  No, Your Honor.
 9          THE COURT:  Anything further from
10  the Defendants?
11          MS. LEA:  No, Your Honor.
12          THE COURT:  Thank you.  And again,
13  I thank the party representatives for being
14  here.  My purpose in asking for your attendance
15  in the discovery review conferences is so that
16  you are invested from the start in the discovery
17  that your counsel is engaging in so that you're
18  aware of how I view the process of fact
19  discovery and so that you know that the Court is
20  monitoring the case and seeing that the
21  discovery is proceeding in accordance so that
22  all of you get to your trial date on target and
23  so that you all of you know that you have a
24  forum to come back to if there are any disputes
```

```
                                                    62
 1  or issues that will help facilitate the progress
 2  of the litigation.
 3          I realize you've traveled a
 4  distance to be here and it's not a very long
 5  hearing and you may go back and think why does
 6  the Judge want me here, but I really do
 7  appreciate you being here and becoming invested
 8  in the process from the start.  Thank you.  We
 9  are adjourned.
10          MS. LEA:  Thank you, Your Honor.
11          MR. SHEAR:  Thank you, Your Honor.
12          (The proceedings concluded at
13  11:35 a.m.)
14
15
16
17
18
19
20
21
22
23
24
```

```
                                                    63
 1            C E R T I F I C A T I O N
 2
 3          I, Taneha Carroll, Professional
 4  Court Reporter, certify that the foregoing is a
 5  true and accurate transcript of the foregoing
 6  proceeding.
 7          I further certify that I am neither
 8  attorney nor counsel for, nor related to nor
 9  employed by any of the parties to the action in
10  which this proceeding was taken; further, that I am
11  not a relative or employee of any attorney or
12  counsel employed in this case, nor am I financially
13  interested in this action.
14
15
16           /s/Taneha Carroll
17           Taneha Carroll
18           Professional Reporter and Notary Public
```