# EXHIBIT D

Case 1:21-cv-01317-GBW-SRF   Document 68-4   Filed 08/12/22   Page 2 of 14 PageID #: 1901

CondenseIt™                                                  October 16, 2002

## Page 1

```
         IN THE UNITED STATES DISTRICT COURT
         IN AND FOR THE DISTRICT OF DELAWARE

         - - -

MATSUSHITA ELECTRIC INDUSTRIAL  :   Civil Action
CO., LTD.,                      :
                                :
         Plaintiff,              :
                                :
    v.                          :
                                :
CINRAM INTERNATIONAL, INC.,     :
                                :
         Defendant.             :   No. 01-882 (SLR)

         - - -

                Wilmington, Delaware
                Wednesday, October 16, 2002
                4:30 p.m.
         - - -

BEFORE: HONORABLE SUE L. ROBINSON, Chief Judge

APPEARANCES:

    STEVEN J. BALICK, ESQ.
    Ashby & Geddes
         -and-
    JEFFREY L. KESSLER, ESQ., and
    DAVID L. YOHAI, ESQ.
    Weil, Gotshal & Manges LLP
    (New York, New York)

              Counsel for Plaintiff

    DONALD F. PARSONS, JR., ESQ.
    Morris, Nichols, Arsht & Tunnell
         -and-
    M. HOWARD MORSE, ESQ.
    Drinker Biddle & Reath (Washington, D.C.), and
    PAUL H. SAINT-ANTOINE, ESQ.
    Drinker Biddle & Reath (Philadelphia, PA)
         -and-
    IVAN S. KAVRUKOV, ESQ.
    Cooper & Dunham LLP
    (New York, New York)

              Counsel for Defendant
```

## Page 2

THE COURT: Good afternoon. I don't know what we have on the agenda besides the whole issue of the antitrust counterclaims and what we do with them. Why don't you make introductions of people, if you care to, and then we will get to the issues that we are supposed to be addressing today.

MR. BALICK: Good afternoon, Your Honor. I am local counsel for the plaintiff in this case. I would like to introduce Jeffrey Kessler and David Yohai from the Weil Gotshal firm in New York.

(Counsel respond "Good afternoon.")

THE COURT: Mr. Parsons.

MR. PARSONS: Yes, Your Honor. I am local counsel for the Cinram defendant. I will introduce first from the Drinker Biddle & Reath firm Howard Morse and Paul Saint-Antoine. Then Ivan Kavrukov of Cooper & Dunham in New York.

THE COURT: Good afternoon.

MR. PARSONS: Your Honor, for our side, depending on what issue we are talking about, Mr. Morse or Mr. Saint-Antoine will be doing the presentation.

THE COURT: All right. Well, I have reviewed two matters in preparation for today's conference. One was the motion to file an answer to the amended complaint and to amend the counterclaims. I have reviewed the response to that.

## Page 3

After reviewing the pleadings and the circumstances in which they were made, I truly see no prejudice to plaintiff. However, before I grant the motion on the record, if plaintiff's counsel would care to make a further argument, I am happy to hear it. If you can point me to where the prejudice lies, looking at the specific amendments, then I am happy to take a look at it. But I didn't see it. So if you want to add to the record, you may. Otherwise, we should move on to what we are doing with the antitrust counterclaims and the whole issue of phased discovery and staying, et cetera, et cetera.

Anything you want to add about the motion for leave to file an answer to the first amended complaint and third amended counterclaims?

MR. KESSLER: Your Honor, since Your Honor seems inclined to grant the motion, I don't think it's worth belaboring it. We do think that there are some problems. But it's probably best to address them in the context of the phased discovery motion. So if Your Honor feels inclined, we are not going to argue it any further.

THE COURT: All right. I appreciate that. For purposes of the record, then, I am granting Docket Item 56, I believe.

Let's get into this whole business of the antitrust counterclaims, if there are any efficiencies to be

## Page 4

had by how we pursue discovery.

MR. KESSLER: Thank you, Your Honor. I would like to address that. Would you prefer if I come up to the podium?

THE COURT: I don't really care, as long as I can hear you.

MR. KESSLER: Your Honor, we have submitted to the Court, as you suggested, a statement of the material issues for which we believe very limited discovery would show that there is no genuine issue in dispute.

Where we are now, which is a little bit different from where we were on the phone call with Your Honor, is that the defendant has now in its papers, I believe, agreed that some phased antitrust discovery would be appropriate. So what we are down to is debating what is the appropriate amount of phasing to do. We are glad that we have at least crossed over that rubicon, if you will.

So what I will direct my argument to, Your Honor, is what the differences are between what the defendant has proposed now as a counter for the phasing and why we have a problem with their proposal, in terms of our points.

The first issue, Your Honor, in our idea, as you know, is that we believe that there is a statute of limitations defense which applies to any of the conduct that occurred prior to March of 1998, which is four years before

Page 5

1  the counterclaim was filed. It is conceded now by the other
2  side that the portion of their complaint talking about the
3  standards that were set and the specifications that were set
4  clearly took place before that period of time.
5      What they say to the Court is that, well, they
6  are not challenging the standards themselves, is what they
7  are saying, or everyone's participation in it. But we
8  believe that is somewhat misleading, because in fact what
9  they are challenging and continue to challenge, even under
10 their amended complaint, which is why, Your Honor, I was
11 deferring my argument -- I don't think it helps move the ball
12 -- is they are challenging the behavior of Matsushita in
13 formulating those standards back in 1994, 1995, 1996,
14 claiming that there was some conduct incurred by Matsushita
15 with others to manipulate those standards so that it would
16 cover Matsushita patents and certain other patents in an
17 inappropriate way as part of an agreement in restraint of
18 trade at that time.
19     We believe that all of that behavior, whether
20 they call that just the standard-setting or whether they call
21 it the behavior surrounding the standard-setting, whatever
22 took place there is going to be barred by our statute of
23 limitations defense. Therefore, to allow discovery into that
24 and to proceed with that makes no sense.
25     In fact, I will give Your Honor an example. In

Page 6

1  the discovery which Cinram still wants to proceed with, even
2  offering their amendment, for example, Request No. 40 is all
3  documents that refer or relate to the DVD specifications and
4  one or more of the following topics: The reasons for the
5  adoption of the DVD specifications. The legality of the DVD
6  specifications. Alternative standards for DVDs not adopted
7  by the form at that time. The effects or potential effects
8  of the adoption of the DVD specifications.
9      On and on and on.
10     The same is true in Cinram Request 38, 78, 41.
11 These are all ones directed towards this very voluminous set
12 of meetings among people who established the DVD
13 specifications, who worked on the DVD form, all of which we
14 think is barred by the statute of limitations. So again,
15 there, Your Honor, we would believe that we should not have
16 to proceed with that until our statute motion is done.
17     That is really the first point of disagreement
18 that we have.
19     Now, what Cinram says is they are willing to
20 limit some of that discovery as it relates to the issue of
21 market power. The problem is, Your Honor, all of the
22 discovery we are concerned about in terms of volume and in
23 being in Japanese, which are the meetings to set up the
24 standards, the meetings to discuss it, all of which would
25 still be called for, it doesn't relate to, quote, market

Page 7

1  power. It relates to conduct. It is the conduct that is
2  barred by the statute of limitations. So we don't believe,
3  Your Honor, that that portion of it should be allowed.
4      Now, the second portion, Your Honor, has to do
5  with our second summary judgment motion, because we concede
6  we have to prevail on both points to completely dispose of
7  the case. If we prevail on only one of our motions, it will
8  dispose of the case prior to the limitations. But there is
9  conduct they allege post limitations.
10     The conduct they allege since March of 1998 is
11 our participation in the DVD 6C patent pool. With respect to
12 that behavior, we believe that under authority, which the
13 leading case is a case called Buffalo Broadcasting in the
14 Second Circuit, but we have no reason to believe that the
15 Third Circuit would come out any differently -- it has never
16 squarely itself addressed this issue -- that when you are
17 dealing with a pool of rights, of intellectual property, a
18 patent pool or a copyright pool or any type of pool there,
19 that the first inquiry is is it a restraint at all.
20     Before you get to is it the rule of reason, is it
21 illegal, do you measure market power, competitive effects,
22 justification, before any of those issues, the first
23 question, as the Second Circuit interprets the Supreme
24 Court's Buffalo Broadcasting ASCAP case, is that is it a
25 restraint? And what the Second Circuit says, and a number of

Page 8

1  other courts have said, is that if the pool is, one,
2  nonexclusive, and, two, there are alternatives, and the words
3  they use are realistic alternatives, which I will get to in a
4  second, realistic alternatives to get those rights another
5  way, then the pool itself cannot be a restraint and the case
6  is over. We don't have to approach any other issue.
7      Well, we believe, as we set forth in our
8  statement of facts, we don't think there can be a dispute, we
9  are going to be on four squares with the Buffalo Broadcasting
10 case. And we are going to be able to show that there were
11 alternatives available to license individually. In fact, in
12 this case, it is going to be undisputed, we contractually
13 agreed to offer such alternatives. It is even worse -- it is
14 a fortiori Buffalo Broadcasting, because in Buffalo
15 Broadcasting what they found is in fact they were available.
16     Here we have contractually agreed that you can go
17 individually to the patent companies and get it. We said,
18 let's do discovery about our policies, about what patents we
19 have offered individually, what those terms are. We have no
20 problem about that. And we think on those undisputed facts,
21 the fact that the defendant never sought to obtain that
22 individual license, even though it could have done that,
23 never tried to negotiate, even though it was told of that
24 option repeatedly, we think that is all going to be
25 undisputed.

Page 9

  1   Now, the response here, on this issue, we get is,
  2   well, they want full licensing discovery, not on the
  3   realistic alternatives, which we have offered, which is our
  4   individual licensing, which is limited, they also want it on
  5   all of the other licensing policies and discussions regarding
  6   cross-licensing, regarding the initial formation of the pool,
  7   the purposes of the pool, the history of the pool.
  8   And what we would say there, Your Honor, if we
  9   are right about our legal arguments, which we believe we will
 10   be right, all of that discovery, which would be relevant if
 11   we get to the rule of reason, there is no question, if we get
 12   to the rule of reason and we don't win this restraint
 13   argument, then we are in full-blown discovery, that they are
 14   not entitled to get into that, the purpose of the pool, the
 15   discussions of the pool, the history, all of that, because we
 16   say just the availability of realistic alternatives solves
 17   this issue under the controlling law.
 18   Now, what we would say, Your Honor, they claim,
 19   well, the reason they want the cross-license, as they say, is
 20   they are going to argue that our prices are too high. And
 21   they are going to argue it's too high in two ways. One, they
 22   are going to say it is too high in comparison to the patent
 23   pool. And second, they are going to say it is too high in
 24   comparison to what has been available in other types of
 25   cross-licenses, that it's discriminatory.

Page 10

  1   I have two responses to that, without asking Your
  2   Honor to decide the law, but in terms of what should be done
  3   here.
  4   On the first issue, while Buffalo Broadcasting
  5   squarely rejected that argument, we don't have to resolve
  6   that today. I am quite confident, Your Honor, that the
  7   relationship between the individual pool price and the
  8   individual licensing price does not create an issue of fact.
  9   That was argued squarely in Buffalo Broadcasting and
 10   rejected. That was the very argument made by Buffalo
 11   Broadcasting, I am embarrassed to say, Your Honor, by my law
 12   firm, all those many years go, and not by me. We actually
 13   argued that point and we lost that in Buffalo Broadcasting.
 14   So it is not nice to hear it again from somebody else. But I
 15   don't believe it is the law of this country. It never was.
 16   We tried, but it didn't work out that way.
 17   In any event, we will give them discovery for
 18   that. They will get the price of the pool and they will get
 19   the price of our individual license. So we have no dispute.
 20   I think it's legally rejected and irrelevant, but we are not
 21   denying them discovery on that piece of it. They don't need
 22   discovery on the history of the licensing, all the meetings,
 23   all the cross-licenses that compare the price of the
 24   individual license versus the price of the pool license for
 25   the individual.

Page 11

  1   So that is number one.
  2   With the cross-license, we think that is even
  3   more irrelevant, because the test is, is there a realistic
  4   alternative available? Not is there yet some third
  5   alternative which they can or cannot get. But even there,
  6   Your Honor, Your Honor is not in a position now to resolve
  7   these issues legally. We will give them the terms of the
  8   cross-license so they can compare. They can make whatever
  9   legal argument they want. We will give to them the actual
 10   other licenses. What those are, so Your Honor knows, these
 11   are licenses that are not limited to these patents, but
 12   licenses in which broad technology is exchanged from both
 13   sides, totally non-comparable. We will show them what those
 14   are, to show Your Honor how dangerous it would be from a
 15   discovery standpoint to just say, let's do full discovery on
 16   that.
 17   One of those licenses, with Philips Company, was
 18   entered into in 1982. It is still in effect. It has been
 19   renewed ever since. It covers every type of audio-video
 20   product, not just the products in this case. It happens to
 21   cover the products in this case, but it covers hundreds of
 22   products besides that.
 23   The idea that we have to now go through the
 24   discovery, try to go back to 1982 -- it is renewed every five
 25   years, so every five years there was a license renewal

Page 12

  1   negotiation -- and have to go through and look for documents,
  2   of which all of ours are going to be in Japanese, you know,
  3   not what was exchanged with Philips, but our internal
  4   documents, and to try to go through that, when we believe
  5   this whole case gets disposed of on the availability of
  6   realistic alternatives, again, Your Honor, we see no possible
  7   basis for putting this into this.
  8   I guess in conclusion, I just say, Your Honor, I
  9   know Your Honor has great experience with these types of
 10   cases and antitrust cases, so many times I have been at the
 11   precipice on both sides of this, as plaintiff and defendant,
 12   where the Court on this type of issue, where the ability for
 13   a threshold issue to resolve this could literally save
 14   millions of dollars, and enormous burden on the parties and
 15   the Court, sometimes the courts say, let's just do all the
 16   discovery and I will sort it out later. And sometimes they
 17   get to that issue, and we may or may not be right. But if we
 18   are wrong, if we lose the summary judgment motion after the
 19   few months of discovery that we propose, then, Your Honor, we
 20   have plenty of time to do the rest of the discovery. It is
 21   no harm, no foul, to sort of come to the argument Your Honor
 22   made in allowing them to amend their motion.
 23   There is no harm to them if we spent the next
 24   three months just on five depositions each just on this
 25   discovery. We filed the motions. We either win or lose. I

### Page 13

1 believe we are going to win and we will save all this
2 burden. If I am wrong, then we will proceed to all of their
3 discovery and all the thousands of pages of Japanese
4 documents and all the boxes and everything else.
5     Your Honor, I believe this really does make sense
6 from the standpoint of judicial administration. Unless you
7 have any other questions, I think I have covered it all.
8     THE COURT: I don't at this point. I might after
9 I hear from your opposing counsel.
10     MR. KESSLER: Thank you, Your Honor.
11     MR. MORSE: Good afternoon, Your Honor. Howard
12 Morse of Drinker Biddle & Reath for Cinram.
13     I am not nearly as good as Mr. Kessler at being
14 bigger than life, so you will have to bear with my fumblings
15 through my attempt to make our arguments. Let me try and
16 make a couple of points for you.
17     First, I think for the record it ought to be
18 clear that we do not agree that phasing discovery in this
19 case is the best way of proceeding. We continue to believe
20 that the best approach would not include phasing of
21 discovery. But having said that, we have attempted to
22 present to the Court an option for phasing that we believe is
23 a workable option, because we do not believe that the option
24 presented by Matsushita is a workable approach to phasing of
25 discovery.

### Page 14

1     This is not the first time that we have discussed
2 the phasing issue. We tried to present our arguments
3 succinctly in the papers filed yesterday. Let me very
4 briefly try and summarize those, and then also address the
5 points that Mr. Kessler has made.
6     Phasing in a very narrow way, we believe, would
7 be misguided and unworkable, for all the reasons we have
8 previously articulated, but particularly because it wouldn't
9 allow Cinram to demonstrate that individual licensing is not
10 a realistically available alternative, as they define it. It
11 does not allow us to get into those issues to show that it is
12 not a realistic alternative, and to demonstrate that the
13 licenses available to Cinram are not unfair, reasonable, and
14 nondiscriminatory terms, which they have put into their
15 statement of facts.
16     We believe that we need discovery into issues to
17 demonstrate that the licenses that they are presenting, that
18 what they say is available to Cinram, is not fair, reasonable
19 and nondiscriminatory, because they are discriminating by
20 granting other people royalty-free cross-licenses while
21 entering into a pool and setting an agreed-upon price to
22 independent replicators.
23     Recognizing that phased discovery has some
24 appeal, we believe that a workable alternative, as having
25 merit as an approach in this case, so that we can position

### Page 15

1 the case for dispositive motions, including potentially a
2 crossmotion by Cinram for partial judgment, would be to focus
3 in on conduct issues, not try and say what conduct falls in
4 one category but you are not allowed to do this, but to put
5 off the market power issues.
6     Having practiced antitrust law for the last 20
7 years, I recognize that discovery issues in an antitrust case
8 relating to market power are huge, potentially burdensome.
9 As opposed to conduct, who did what, when, where, why, market
10 power issues require you to look at the market. What
11 competes with what. Define the product market. Define the
12 geographic market. It can be hugely invasive.
13     Our proposal is to defer market power questions
14 which we think are distinguishable, as well as the damages
15 question, and focus in on conduct, and not come before Your
16 Honor with discovery disputes as to whether this falls within
17 the category that I still haven't heard defined.
18     We also believe that five depositions on those
19 issues would hardly allow us to demonstrate whether the
20 alternatives are realistically available.
21     Let me try and address specifically some of the
22 questions that Mr. Kessler, some of the argument Mr. Kessler
23 has made.
24     With respect to standard-setting, we position
25 standard-setting as creating the market power which

### Page 16

1 Matsushita has abused through its licensing process. We are
2 prepared, therefore, to defer most of the discovery relating
3 to standard-setting.
4     However, simply because there were discussions
5 during the standard-setting process about how they would put
6 patents into the product and then license them, and license
7 them discriminatorily to prevent competition, there should
8 not be an arbitrary cutoff of four years in terms of
9 discovery. Statute of limitations does not go to the
10 question of what is reasonable discovery. We are not
11 asserting an independent claim that the standard-setting
12 violated the antitrust laws. And therefore, most of the
13 standard-setting discovery can be deferred.
14     We can meet and confer and narrow the scope of
15 some of the discovery requests that Mr. Kessler has
16 identified. But we don't believe it is appropriate to come
17 up with an arbitrary deadline and say something more than
18 four years old shouldn't be discoverable in this case. That
19 is not what the statute of limitations says.
20     We are not seeking damages more than four years
21 old. That is what the statute of limitations is about.
22     With respect to the Buffalo Broadcasting
23 argument -- and we are not here today to argue the ultimate
24 merits of these issues, so I don't want to go into this in
25 great detail. What we have argued is even accepting the

Page 17

1  Buffalo Broadcasting standard, we believe that we are
2  entitled to discovery to show that they are not realistically
3  available alternatives.
4       But I want to make sure that Your Honor
5  understands, there is a huge distinction between what was at
6  issue in Buffalo Broadcasting and what is at issue here.
7       That case was a blanket license to copyright.
8  The BMI case before the Supreme Court, the CBS versus ASCAP,
9  and then Buffalo Broadcasting versus ASCAP, those are blanket
10 licenses. You want to have a license so that you can play
11 any music whatsoever, you get a blanket license. You pay one
12 fee. You have an alternative out there of going to an
13 individual musician and getting a license from that musician
14 if you want to to play his music, and that musician has an
15 incentive to reach an agreement with you with respect to the
16 terms so that you will license his music instead of the
17 blanket license to all music. Okay. Reasonable available
18 alternative, makes perfect sense.
19      What we are dealing here with in this case is a
20 patent pool to put the patents together that are essential
21 for making DVD disks. And if you need all of those patents,
22 and the pool is offering it to you at a five-cent royalty for
23 which they are or were one of six when this was formed, and
24 they get some portion of that five cents, but then
25 individually they are offering to us a three-cent royalty,

Page 18

1  there are a couple of issues. One is, can we go to everyone
2  else and get all the other patents, so is it realistically
3  available? But the fact of the matter is, even if we could
4  get it for five cents individually, they are offering it to
5  other people for zero.
6       So the fact of the matter is, there is a huge
7  distinction between this case, which involves a patent pool
8  for essential patents for which you need every single patent
9  in the pool, and even if you go to the people individually
10 you need it, and a blanket license to copyrights in the cases
11 on which they are relying for which you don't need everything
12 and you can go and get individual licenses from certain
13 people.
14      So when he tells you that the issues relating to
15 rates and the amounts and the rate didn't matter, you have
16 got to understand the context of the cases.
17      As I said, I think we are going to be discussing
18 that issue further as the case goes forward.
19      But we believe that it is essential that we have
20 discovery that allows us to look at the realistic
21 alternatives and also discovery to show that they are
22 granting zero-royalty cross-licenses to some people so that
23 they are not, the licenses to us are not unfair, reasonable
24 and nondiscriminatory terms.
25      What he tells us is, well, we will give you a

Page 19

1  copy of the cross-license, but we are not going to give you
2  our internal memorandum that tells us why we are doing it.
3       We think that they are trying to very narrowly
4  and in not clear lines say, well, we are going to give you
5  some discovery into licensing practices but not other
6  discovery into licensing practices.
7       What we have tried to do is present an
8  alternative for the Court that will allow phasing of
9  discovery that draws a clear line. It says, put off the
10 market power, put off the damages questions, but allow
11 discovery into the conduct questions, which are the core
12 issues. And trying to carve those up, I fear we are just
13 going to be back before the Court every other day with
14 disputes. We don't have a clear line as to what would be
15 allowable or not allowable under their proposal.
16      THE COURT: Don't sit down yet. I have got a few
17 questions for you, and then I have some followup questions
18 for plaintiff's counsel.
19      Number one, I don't know whether this is at all
20 relevant. But just so I can set my framework correctly, can
21 you tell me how long Cinram has been in the market?
22      MR. MORSE: Your Honor, the DVDs really have
23 taken off in the last several years, as those of us who are
24 observers know. I can't answer precisely that question. I
25 believe that Cinram has been, any sales by Cinram of DVDs

Page 20

1  that were more than four years old would be minimal.
2       THE COURT: All right. As I have listened, and
3  after reviewing, I have a couple of thoughts. Number one,
4  with respect to the number of depositions, that is an easy
5  one to fix. So set that aside. That is the last thing to
6  talk about, is how to fix it.
7       The hard part is defining the scope. As I
8  understand the concerns of the plaintiff, one is the whole
9  business of going back to 1995 when the standards were set.
10 On the one hand, I hear you telling me that that is primarily
11 a market power issue, and therefore, we really don't need all
12 the discovery on that, but we do need some discovery.
13      Given the fact that you just argued that what you
14 are interested in, the way you prove your claims, is talk
15 about what is happening now, or what has happened since
16 Cinram has gotten in the market, I really don't understand
17 the relevance at all of what everyone had in mind back in
18 1995, because it really doesn't matter what they had in
19 mind. What is important and relevant is what they are doing
20 with it.
21      When plaintiff's counsel was addressing me, I
22 took notes, saying -- and the way I read your papers was, you
23 are not challenging the conduct in formulating, you are
24 challenging the conduct in enforcing.
25      So if you insist that discovery about conduct in

Page 21

1995 is relevant, you need to convince me, because I don't see the relevance right now, given the arguments you have made in your papers and the arguments you have made today.

MR. MORSE: Let me be clear. I don't think that much discovery is going to go back to that time frame. We are not interested here in the standard-setting questions relating to technical issues, for instance, how the DVD is created. We are interested — I don't believe there should be an arbitrary date cutoff relating to the question of strategy for putting together the patent pooling approach that has been taken here.

THE COURT: Tell me the relevance of that to the specific question that would need to be addressed in terms of the statute of limitations.

MR. MORSE: I don't see it as going to the statute of limitations question. We have said, and we firmly believe, the statute of limitations issue is a red herring. We have never questioned that the standard was created in 1995, and that's more than four years old. And we are not seeking damages for more than a four-year time frame based on enforcement.

I guess one point I want to make sure, antitrust law, I think, focuses both on purpose and effect. And in looking at and analyzing the questions which we are addressing here, which is, is this an anticompetitive

Page 22

practice, one has to look at both purpose and effect. To know whether it is a realistically available alternative, it helps to understand what their strategy was in creating the patent pool to exclude competition.

That's what we are looking at.

I think that's to some extent a diversion. I don't believe we are going to -- you know, it is a huge volume of documents relating to the standard-setting process. We are not interested in the standard-setting process. We are interested in the creation of the pool and the licensing strategies that are at issue here.

THE COURT: All right. If what we are trying to do is to -- I am not sure --

MR. MORSE: Let me offer one additional comment, Your Honor. What we have suggested is the initial focus should be on conduct questions and that what we should be deferring in terms of phasing is market power questions. I think the discussion we have just had comes up a little bit because someone says, ah, but standard-setting, isn't that conduct? And what we are saying is, no, standard-setting really goes to the market power question.

We are not interested in standard-setting as conduct. We are interested in licensing and creation of the pool as conduct.

THE COURT: But you are saying it's relevant to

Page 23

go back to '95 and get documents to see if their strategies discussed in '95 have played out. I am not sure that is relevant, at least if we are trying to at least get to a certain point before we explore the world here. If they didn't pan out, obviously, it is not relevant. If it did, probably in the limited time I am going to give you for trial, you will spend very little time on that because what you want to demonstrate is what they are doing.

I am just saying, if we are trying to find a compromise here and get through a certain amount of this discovery so that there is a possibility that we can narrow this further, then I am still not sure that conduct in '95, it's an arbitrary, whatever, but I am still not sure that conduct is going to advance the case right now.

In any event, I do certainly -- with respect to the second part, you want to know not only what is happening but why it's happening in terms of the cross-licensing, that's basically the flip-side of the coin. That's the strategy now, to some extent.

MR. MORSE: Yes, Your Honor. I don't see how we can take a deposition of an official involved in cross-licensing and be told, well, we can ask them what the agreement says and what it means but not why he did it. And what they are saying is, well, maybe you can depose someone on that, but we are not going to give you the documents. The

Page 24

only document we are going to give you is the actual agreement, when, you know, the essence of the issue here comes down to, you know, an allegation of royalty-free cross-licenses available to the members of the pool versus independent replicators, such as Cinram having to take a pool license at an agreed-upon price.

And they are saying, well, but we entered into an agreement when we entered this pool that says you can get an individual license from us, and therefore, this case goes away.

That is the essence of his argument.

We say we need to look at whether those are realistic alternatives, but also that it's not on fair, reasonable and nondiscriminatory terms.

They put that into their statement of facts five times, that they have agreed to do it on fair, reasonable and nondiscriminatory terms. Those words show up at least five or six times in their statement of facts. Now they are saying, but we don't want to allow you any discovery into whether it's fair, reasonable and nondiscriminatory.

THE COURT: Well, the danger that was pointed out by plaintiff's counsel was that some of these licenses apparently actually predate this whole 1995 standard-setting and that we are again talking about hundreds of thousands of pages of documents, many of which are in Japanese. The

Page 25

question again is, is there any reasonable way to focus the discovery so that we are talking about conduct that is relevant to the dilemma Cinram is facing today?

I am not confident that either party is really focused on those kinds of compromises. Because I am not privy to all that you know, I am not sure whether it's possible to accept their offer and get a copy of all the cross-licenses, and I don't know what you are looking for. But to pick ten out of -- how many cross-licenses are we talking about? Hundreds? Are we talking about a handful?

MR. MORSE: I think they have given us a list in the answers to interrogatories.

MR. KESSLER: Your Honor, when we are talking about the licenses that involve things other than just the DVD patents, we are talking less than five licenses.

Our point simply was as follows.

We believe the cross-licenses are totally legally irrelevant to this narrow issue of realistic alternatives, so therefore, Your Honor should be very cautious in allowing this discovery at all.

But to the extent that Your Honor does not want to resolve that issue today -- and I understand that because we haven't briefed and argued it -- as to whether it has any relevance, their point that there are other licenses with other terms, okay, other technology, they will see the

Page 26

terms. What I can represent to Your Honor is that all the terms of the cross-licenses are written in the cross-licenses.

So they want to argue, someone got a lower royalty or a no royalty in exchange for something those parties have given. That is all going to be in the terms of the licenses. If they can convince Your Honor that the existence of those licenses means that we don't prevail on the realistic alternative test under a summary judgment motion, then we will go into full discovery and then they can get focused discovery, they can make us go through all the documents and everything else.

But Your Honor is right. If we get to the rule of reason, they need all of that narrow focused discovery. But under the rule of reason, under the argument we are advancing, not the rule of reason -- and the Buffalo Broadcasting, again, specifically addressed this. There, the parties said, well, what about the fact that the license is not necessary or is not reasonable. The Court said, if it is not a restraint, we don't have to reach any other issue.

So on that issue, it's realistic alternative, we agree, they should have discovery on realistic alternatives.

THE COURT: So the answer was 15. Okay.

MR. MORSE: If I can just make one point in response. Paragraph 21 of their statement of facts says that

Page 27

Matsushita has been willing to negotiate broader individual licenses with non-6C pool members that include DVD patents on terms individually negotiated between the parties, and they cite some agreement dated June of 2002. They don't attach that, although they have attached a lot of other documents. But they are telling us that they will give us a copy of that agreement. But despite the fact that they are saying an undisputed fact is they are willing to negotiate broader cross-licenses on terms individually negotiated, they are not going to let us look at the negotiations.

So they are asserting something as an undisputed fact, and then saying, but the only thing we are going to give you is the copy of the agreement.

That is the kind of issue we are talking about.

I don't anticipate, Your Honor, getting reams of discovery of what happened 20 years ago. I don't believe that Mr. Kessler doesn't have document destruction policy, document retention policy within his client that there are no documents that exist from back then other than the agreement.

But if you look at what they have asserted in their -- one of the problems we are dealing with here is we have got a statement of facts, but we don't have a description from Matsushita of what the scope of discovery really is going to be around those facts. We think that it creates the problems of bleeding into other areas other than

Page 28

the standard that we have suggested as an alternative approach to phasing.

THE COURT: All right. Thank you. Let me ask my questions of plaintiff's counsel.

MR. KESSLER: Yes, Your Honor.

THE COURT: First of all, based on the representations by counsel, is there really a statute of limitations issue, if they said they are not going to pursue damages past whatever, four years from the date of suit?

MR. KESSLER: This is a little bit of a constantly changing target here. But as I still heard them say, maybe we can work this out with a stipulation before the Court, that they still, for example, want to show that Matsushita, in setting the standard, had some plan with others at that time to manipulate what would go into the standard, so that years later it could be used with respect to patent pooling in some kind of anticompetitive way.

We believe all of that conduct that they are looking to investigate, and he calls, the conduct part of this, not the market power issue, we don't have a problem that they can take the DVD specs and argue with an expert, it gives us market power or doesn't give us market power, that is an expert issue, anyway. It is not a fact issue. I heard him say he will defer that. He deferred all the expert issues. Market power and damages. That is basically not our

### Page 29

1   document burden. That is essentially our expert burden on
2   both of those issues.
3         THE COURT: Based on documents. I thought that
4   statute of limitations prevented a party from recovering,
5   from getting any benefit for conduct that took place before a
6   certain time. But I never believed that it prevented conduct
7   that happened before to be relevant in some fashion.
8         Is that what you are arguing to me now?
9         MR. KESSLER: No, I am not, Your Honor. What I
10   am arguing is if we win on both of these narrow motions --
11         THE COURT: I am not sure there is a statute of
12   limitations problem. What I am saying is, I am not sure you
13   need to file a motion for statute of limitations.
14         MR. KESSLER: If the other side will stipulate
15   that they are not seeking damages for any conduct that
16   occurred prior to four years before the filing of this, then
17   we don't have to file a statute of limitations motion,
18   because that would be the equivalent -- what I hear them
19   saying is that they believe some of that conduct that
20   occurred before is having effects now so that they think they
21   still can claim the damages in the last four years for the
22   conduct that occurred prior to the limitations period. And I
23   think that's completely wrong. But there is a lot of case
24   law on this, in the antitrust area. There is something
25   called the Finite Act Doctrine. There is a lot of different

### Page 30

1   cases about that.
2         If they will stipulate that they are not seeking
3   any damages for conduct before the four-year statute, then
4   you are right, we don't have to move that motion.
5         But then, the reason we don't want to do the
6   earlier discovery is not because it's irrelevant to the rule
7   of reason. I agree with Mr. Morse that if we don't win on my
8   narrow issue of no restraint because of realistic
9   alternatives available, then earlier, some earlier discovery
10   about the purposes of the pool might well be appropriate even
11   if it goes back into the limitations period, because Your
12   Honor is correct. It could be relevant even if it predates
13   the statute of limitations.
14         It is not relevant to my restraint threshold
15   issue, which the courts have said that if there is a
16   realistic alternative you don't get into purpose and effect
17   of the pool, you don't get into the what the original
18   objectives were, you don't get into any of that complicated,
19   intensive antitrust discovery.
20         One of the problems is, Your Honor, Mr. Morse
21   makes it sound so easy: Well, just give me the documents
22   that talk about the purpose of it so it will be very narrow.
23   I don't want a lot of discovery from that period.
24         Well, Your Honor knows I am going to have and I
25   know I have thousands and thousands of pages of documents for

### Page 31

1   which he is not going to let me decide, oh -- and he
2   shouldn't -- that this is the relevant one. He is going to
3   want, give me everything that discusses the negotiation,
4   because he will decide whether it's helpful to him or not.
5   And I have to go through and translate it and find it. And
6   none of that is relevant to this narrow restraint issue.
7         So what I would suggest, Your Honor, is the
8   following as a workable compromise. We get a stipulation
9   from the other side that they are not seeking any damages for
10   conduct before the limitations period. That eliminates the
11   need for that motion and even any discovery on that issue.
12         Second, we proceed just on the issue of realistic
13   alternatives, and then the only dispute that I hear Mr. Morse
14   and I have is whether or not, with respect to the
15   cross-licenses, these other licenses that were available,
16   whether that discovery can be limited just to the licenses
17   themselves, which we believe shows him whatever he wants in
18   terms of the terms. And I am also willing, because I don't
19   want to have disputes, Your Honor, if we bring in a witness,
20   he could ask that witness anything he wants. By the way, if
21   we go to full discovery; if I lose my motion, we will have
22   that witness deposed again. I am not going to say that
23   because he was deposed in this limited discovery that if for
24   some reason he has to be called back because they didn't get
25   further documents and it is a different phase of the case,

### Page 32

1   they can have that witness a second time.
2         My point is, Your Honor, we shouldn't have to
3   do -- the real burden here is the enormity of the document
4   review. And that is what I am trying to avoid, in terms of
5   this. And if we could dispose of it just on realistic
6   alternatives, I think the only issues are going to be, did we
7   offer alternatives? Under what terms did we offer them to
8   them? What efforts did Cinram make to secure such terms?
9   And we will allow full discovery on that. What efforts did
10   other people make to secure such terms and what licenses have
11   they granted?
12         And I believe on those facts alone, Your Honor,
13   under Buffalo Broadcasting, at least as we view the case and
14   as we think it is totally on point -- I am not going to
15   debate that now -- that is going to be the end of this and we
16   can decide this in a few months.
17         If there is an issue that they need seven
18   depositions instead of five, I don't know who they think they
19   are going to depose here. I am more interested in narrowing
20   the scope of the discovery. If they can show me there are
21   more people, I will not say it must be five. It could be
22   seven. It could be ten. I can't imagine there are more than
23   five people who are going to be necessary on this issue of
24   realistic alternatives.
25         We had essentially two or three people who did



Page 33

1  all the licensing. So those are going to be the witnesses
2  they are going to want as to what was offered as to realistic
3  alternatives.
4       THE COURT: All right. Let me go back to
5  defendant's counsel.
6       With respect to the statute of limitations, I am
7  not exactly sure where you all are on that. I do believe
8  that the discovery, that our focus should be on realistic
9  alternatives. And the only question is, what is reasonable
10 in terms of allowing full discovery on that issue, so it can
11 be addressed fairly, fully, equitably, if we are going to
12 phase discovery.
13      Now, I am not exactly sure where we are on that.
14 I certainly know where plaintiff stands on that.
15      Let's go back to defendant. Let me try to get a
16 very practical view on what the defendant would be looking
17 for in terms of that discovery. I believe that discovery
18 with respect to the standard-setting, including the
19 strategies that were discussed back then, does not need to be
20 addressed when we are talking about realistic alternatives
21 now.
22      So with that in mind, tell me exactly what
23 discovery defendant would want to pursue to make sure that it
24 has a fair opportunity to defend or to present a summary
25 judgment motion.

Page 34

1       MR. MORSE: First, Your Honor, we believe that we
2  need to demonstrate that the licenses available are not on
3  unfair, reasonable and nondiscriminatory terms.
4       THE COURT: What does that mean, in terms of what
5  we are looking for?
6       Although I hate to do this, that is why I am not
7  a lawyer anymore, get down to the specific discovery requests
8  that are in dispute, is that where we need to go?
9       MR. MORSE: I assume, Your Honor, if you give us
10 some guidance, we will be able to sit down, hopefully,
11 between counsel, and work something out. And you should not
12 have to get into the minutae. We may need some guidance.
13 But I think reasonable people can try and reach some
14 agreement.
15      So the first question to my mind is that our
16 discovery needs to be able to examine whether the
17 alternatives are fair, reasonable and nondiscriminatory.
18      I think that that means looking at the licensing
19 conduct, the conduct of the pool. I think it means looking
20 at licensing negotiations, the formation of the pool, the
21 operation of the pool, the allocation of royalties under the
22 pool, what is their share versus the share of others, what
23 were the representations made before the Department of
24 Justice as to how the pool would work.
25      That goes centrally to the question of fair,

Page 35

1  reasonable and nondiscriminatory.
2       THE COURT: Well, you went back to the
3  formulation of the pool. You keep going back to 1995. I
4  truly don't understand, if we are going to go back, we might
5  as well just forget this whole thing, as far as I am
6  concerned, because that -- I mean, I don't know what is out
7  there. But it seems to me as though that is more or less --
8  we haven't made progress. It isn't moving the case forward.
9       I have already said that I don't really think
10 what anyone talked about in 1995 is particularly relevant to
11 what is happening today, with the obstacles that Cinram is
12 saying they are facing.
13      So skip the formulation for a minute. Again, I
14 am not sure what representations were made to the Department
15 of Justice in terms of talking about what the conduct is. I
16 don't really know that the representations made to the
17 Department of Justice is really relevant to the conduct that
18 is actually taking place.
19      So what I understand you are saying is that you
20 want documents and access to depositions perhaps about what
21 everyone in the pool is doing in terms of the licensing, what
22 everyone is doing in the pool in terms of allocation of these
23 licenses, and the actual negotiations of the licenses.
24      Is there something else besides representations
25 to the DOJ and the formulation of the pool that I missed?

Page 36

1       You are basically saying the licensing conduct of
2  the pool. And that means the negotiations, the allocation,
3  and the end products. Is there something else in there?
4       MR. MORSE: No, Your Honor. I mean, there are
5  not other things that I can think of at the moment without
6  consulting with my co-counsel, off the top of my head. My
7  problem is I don't know when I see the documents that they
8  produced to us whether some question that we want to ask at a
9  deposition is going to fall within -- and we are going to
10 have an argument as to whether it falls within, you know,
11 certain words regarding what is allowable. And that's our
12 problem. Obviously, we will accept the approach, Your Honor,
13 if that is how you think it works best. But we tried to come
14 up with an alternative phasing approach of defining what
15 would be put off, rather than what would be included, because
16 we thought that was a much more workable approach to the
17 matter.
18      THE COURT: Right. I understand the problems
19 here. Frankly, I have never had success, and I have
20 inherited cases where judges have tried and not had success
21 with phasing cases. It seems to me it always drags it out
22 much longer.
23      I have to try it myself every once in a while so
24 I can go back and say to everyone, this never works, so don't
25 even bring it to me. So I am at that stage where I need to



CondenseIt™  October 16, 2002

### Page 37

1  do it myself. I understand that there might be questions
2  that arise because of the documents you have and because of
3  the questions.
4      What I want you all to do, if I allow this to go
5  forward this way, is for you to ask the question at
6  deposition, for you to note those documents, and we will have
7  a discovery conference someplace in the middle here. And if
8  I am convinced, because I have something concrete in front of
9  me, that this is really so intertwined and I can't separate
10 the formulation from the enforcement, which I think is
11 defendant's whole point, which plaintiff disagrees with, then
12 we will start back.
13     But I feel like I want to give this a try,
14 because we are getting more and more antitrust
15 counterclaims. I think it's important to try to figure out
16 whether there is a more efficient way of doing it.
17     What we are going to do is, I think we are going
18 to proceed with the following discovery. And we need to talk
19 about timing. It's not going to be the discovery that the
20 plaintiff wanted and it's not going to be the discovery the
21 defendant wanted. It's going to be something in between,
22 which may or may not be workable.
23     That is, we are not going to have discovery on
24 the formulation of the standards. But we are going to have
25 more full discovery about the present licensing conduct. And

### Page 38

1  that means that we are going to have discovery about the
2  actual licenses that are issued, cross-licenses and licenses
3  under the pool. We are going to have discovery about the
4  allocation of the royalties under all of those licenses. And
5  we are going to have discovery about the negotiations leading
6  up to, the why, despite plaintiff's belief that that is
7  irrelevant under Buffalo Broadcasting.
8      We are going to try it. And I am going to let
9  you all work out -- I don't know that five depositions is
10 realistic. I think we are going to start with seven. We are
11 going to schedule a discovery conference. Of course, my
12 computer isn't up. But I will just tell you that somewhere
13 within, midway through this discovery process, you call my
14 office, when you decide what the discovery process is, unless
15 we need to talk about that today, which I am happy to do, you
16 schedule an in-person discovery conference. And we will see
17 how it is going. If we are really not advancing anything,
18 and we are not creating efficiencies in the process, then we
19 will re-think it.
20     On the other hand, if, in fact, we are advancing
21 the case and creating some efficiencies, then we will
22 continue. All right?
23     MR. MORSE: I think we will sit down and work
24 from that, Your Honor, and find an approach that works.
25     I do think there is one issue. Most of the

### Page 39

1  discovery disputes to date I don't think are ripe. We have
2  provided a letter raising questions regarding their
3  objections. I think they are going to be providing us a
4  letter and we are going to meet and confer on those issues.
5      I think that there is an issue with respect to
6  scope of protective order in which guidance from Your Honor
7  would be helpful. On that, if I can turn things over to my
8  colleague, Mr. Saint-Antoine, to address.
9      MR. KESSLER: Before we go to that, if we can
10 just spend a minute or two more, I just want to ask some
11 questions which I think will help give a little more guidance
12 on that, if that is all right. I think I understand Your
13 Honor's ruling. I want to make sure.
14     The category, Your Honor, I understand, is
15 current licensing practices of the 6C pool. I understand
16 that fully is covered, including negotiations that were had
17 with respect to the general pool licenses. That is one
18 category. Then there are the individual licenses, because
19 that is the alternative that 6C pool members could do. We
20 obviously will give full discovery on our individual
21 negotiation. Third parties may or may not object, Your
22 Honor. We don't have any control over that. But we will
23 provide what we have on that issue.
24     Where I guess my concern is, on what I will call
25 the cross-license issue, which are these much broader

### Page 40

1  licenses that go back, Your Honor, in many cases, as I said,
2  many years before the pool. I am assuming Your Honor is not
3  saying that that is the current practices of the pool. At
4  least with respect to licenses, let's say, the
5  cross-licenses, there, can we agree, Your Honor, that we will
6  provide the terms of the licenses in the first instance. We
7  will let them depose the negotiators about those licenses.
8  And then, Your Honor, if they think there is a basis to argue
9  as to why they would need further discovery pouring
10 through -- because as Your Honor can imagine, if we are
11 negotiating a license, for example, involving hundreds of
12 products, most of the files that we would be reviewing there
13 are going to be about, it may not even mention a word of
14 these specific products. They happen to be covered in this.
15     The idea to go through that every five years when
16 those renewals were done, since 1982, and say, okay, here are
17 the disputes about fax machines in that license and we have
18 to translate that in Japanese, I don't think that should be
19 part of this.
20     With that one change, let us give them the
21 cross-licenses, let them have the deposition of the people
22 who currently have negotiated that, to the extent that they
23 are still around, because the older people might not be
24 around then, before having to go through the negotiation
25 files of those licenses, I think, Your Honor, makes sense.

Page 41

1  I am sure, Your Honor, the third parties, when
2  they come in, are probably going to make the same type of
3  arguments to Your Honor because they are not even defendants
4  in this case and they are going to have the same type of
5  burdens if they did a cross-license ten years ago. They are
6  going to say, what am I doing with that?
7      I would suggest that one additional change. If
8  it doesn't work out, Your Honor, we could revisit it at the
9  mid-discovery conference with respect to that.
10     I also think, Your Honor, we should set a
11 timetable to do this, when we have to file a motion by, at
12 least initially. If it doesn't work, then we really will be
13 moving the case along. I am willing to agree to a
14 three-month period for this or something like that to make
15 sure the case is moving along or four-month period, whatever
16 the other side thinks is reasonable. Then we will file our
17 motions and see where we are.
18     THE COURT: Well, as I said; I am happy to talk
19 about it. There obviously needs to be a timetable.
20 Otherwise, we are wasting our time here. I am happy to talk
21 about that today, unless you all think you can come to some
22 closure on that without my help, because I frankly don't care
23 what you all do.
24     Two questions. Number one, should we talk a
25 timetable or do you think you all can work that out? I think

Page 42

1  we had in mind three or four months. This is a substantial
2  amount of discovery to do in three or four months. But if we
3  don't do it expeditiously, then we might as well not be doing
4  this.
5      Is the discovery outstanding or do you need to
6  start over again with the -- is it just narrowing down the
7  discovery requests that fit within the scope of what I am
8  doing now?
9      MR. MORSE: I think we are still awaiting the
10 discovery from Matsushita. We had a discussion on the
11 telephone conference of deferring it until after today. But
12 they would take the steps necessary so that we would get it
13 soon afterwards. In terms of time frame going forward, it
14 depends on that question. Although I don't want to pass over
15 Mr. Kessler's sort of restatement of Your Honor's scope of
16 what would be included, which I found troubling.
17     THE COURT: Well, hearing it without seeing,
18 without knowing anything about these, the way he describes
19 it, where the technology that is at issue in this case is one
20 of hundreds of products, what he suggests makes some sense to
21 me, which is you get the licenses, you talk to the people who
22 negotiate. It is like the 30(b)(6) depositions that you get
23 in patent cases to find out what documents are relevant, then
24 you ask for those documents.
25     So that doesn't sound unreasonable to me. But

Page 43

1  maybe you know something I don't know as to why it is an
2  unreasonable way of doing it.
3      It seems to me, if I were doing this, and we are
4  setting up a three to four-month discovery phase, I would say
5  that, essentially, because I have given you discovery, you
6  all better start looking for documents that are relevant to
7  the scope that I have set forth, and that with respect to the
8  cross-licenses, the plaintiff needs to identify the people
9  who negotiated those cross-licenses, so that the defendant
10 can take their depositions and find out whether in fact there
11 are documents that pertain to this technology and the why of
12 this patent, of this cross-license. Just like we do in the
13 regular patent discovery. When you have got document
14 production, you don't have any depositions except 30(b)(6)
15 depositions. Then we have a document production cutoff and
16 we have a discovery conference. And then we have the
17 depositions that aren't 30(b)(6) depositions. And then we
18 have a motion for summary judgment filed.
19     That is how I would do it.
20     MR. MORSE: Certainly with respect to scheduling,
21 Your Honor, I assume we can sit down and work out a
22 schedule.
23     MR. KESSLER: I think with that guidance, Your
24 Honor, we can try to agree on deadlines. What we should try
25 to do is, we will go do the document requests, agree which

Page 44

1  ones are responsive under Your Honor's scope as set forth,
2  agree on a period that we will produce those documents by,
3  then talk about a deposition schedule. I think that makes
4  the most sense.
5      MR. MORSE: My understanding, then, is that those
6  licenses that deal with DVDs, we will get the backup
7  materials, cross-licenses. It is only those that are very
8  broad that may include DVDs but don't address DVDs that we
9  are talking about, the 20-year-old license that we are
10 talking about.
11     MR. KESSLER: Again, without getting into this,
12 what plaintiff is going to find is that there is no such
13 license that he seems to think exists. I will tell the Court
14 now, so that plaintiffs know, every so-called cross-license
15 involves technology flowing in both directions, in a
16 completely non-comparable basis. No one has been given the
17 licenses that are in the 6C pool and said he has a different
18 rate, you know, than anyone else can get and that's all you
19 do is pay cash.
20     So they are all different. There is no such
21 license that he is talking about. So my point is, in each of
22 the licenses, what I suggest we do is we will give you the
23 licenses, you will take a look at them, and then let's see
24 after you do the deposition whether you think you have a
25 basis to focus just on the issue of realistic alternatives,

Page 45

1  which I think is the only issue this discovery is directed
2  to, whether you have a basis to ask for further discovery on
3  that point.
4       I have no question that if we don't win our
5  realistic alternatives motion that there will be additional
6  documents regarding those negotiations that you might be
7  entitled to on relevance. But I think that's going to be the
8  issue in terms of this.
9       THE COURT: Okay. I am happy to do this. I am
10 happy, after the licenses are produced, to have a discovery
11 conference then, so that we have -- we are talking in theory
12 with one party having all the knowledge and the rest of us
13 kind of sitting in the dark. So if, in fact, you can't reach
14 agreement on how to get the discovery you think you need
15 based on the licenses, call my office, my law clerk will
16 remind me that I said you can do this, and we will have
17 another discovery conference, with the actual licenses in
18 place, so that I am actually as fully informed as you are.
19      Again, we will see where we are going.
20      So I think we addressed that.
21      Protective order, scope of protective order,
22 let's hear a few minutes on that.
23      MR. SAINT-ANTOINE: Your Honor, if I might, Paul
24 Saint-Antoine from Drinker Biddle & Reath on behalf of
25 Cinram. The Court has been very patient with counsel on both

Page 46

1  sides, so I will try to be brief.
2       Fortunately, there is only one issue left in
3  terms of negotiating a stipulated protective order. That
4  concerns access to highly confidential information. We had
5  originally proposed a simple one-level designation and the
6  other side wanted two-tier, and we agreed to that. We also
7  agreed to a somewhat broader definition of what will be
8  highly confidential information, and we are comfortable with
9  that. But with that said, Your Honor, we do want the
10 opportunity to be able to share even highly confidential
11 information with a limited number of people within Cinram.
12      Our specific proposal to the plaintiff is that we
13 each designate two people within the company that can have
14 access simply for purposes of the litigation to highly
15 confidential information. We think that strikes the right
16 balance between the needs of confidentiality and the needs of
17 the parties in the litigation.
18      This is a complicated product in a complicated
19 industry. I think this conference has demonstrated some of
20 the complicated issues. And in order to be able to fairly
21 develop our claims and our defenses, we think we at least
22 need that, limited access to the client on the highly
23 confidential documents.
24      The protections that we are agreeable to would be
25 to designate two, to provide the other side with the names of

Page 47

1  those two, and to have those individuals sign a written
2  agreement that they would be bound by the terms of the
3  protective order. And again, Your Honor, we think that
4  strikes the right balance.
5       THE COURT: So we are not talking about a dispute
6  over who has access. The plaintiff doesn't want any in-house
7  people to have access.
8       MR. SAINT-ANTOINE: Correct, Your Honor.
9       THE COURT: Well, it has been my practice that we
10 try to find at least one. I think it's real important for
11 clients to have some access, because they are paying for the
12 litigation.
13      MR. YOHAI: David Yohai for the plaintiff on this
14 issue.
15      Your Honor, the Local Rule in Delaware recognizes
16 that there should be an attorneys' eyes only category.
17 Indeed, until we agree upon a protective order, the Local
18 Rule states that all the documentation is attorneys' eyes
19 only.
20      The point of having a two-tier order, Your Honor,
21 was to limit the top category, the most highly confidential
22 category, which would include sensitive patent information,
23 development documents, and the most sensitive commercial
24 information. Most of the documents are going to be in the
25 confidential category, which all of their officers and

Page 48

1  employees will have access to.
2       There is no reason for anyone, either party to
3  have access, other than the lawyers, of course, to the most
4  sensitive information. Indeed, that is the point of the
5  highest category. That was our whole approach to this. It
6  is not a lot of information. It is the most highly sensitive
7  information. And in addition to that, of course, the experts
8  would have the ability to analyze that information.
9       So as the Local Rule reflects and as we think,
10 only that top category, we would limit that to attorneys'
11 eyes only. I think the law recognizes that. That was the
12 purpose of the category.
13      THE COURT: Well, it has been my practice to
14 allow -- the Local Rule is put in place so that while you all
15 are fighting about what should be happening something is
16 being protected.
17      So the Local Rule is really irrelevant to the
18 argument. I don't generally allow two. I generally allow
19 one. The only question is who. Now, my practice -- again,
20 after ten years, I am actually learning something -- is that
21 if you can't decide, and if there are disputes about who you
22 choose, which can't be anyone who prosecutes patents, can't
23 be anyone who makes decisions about the business aspects,
24 can't be anyone who is actively involved in inventing, then I
25 have actually had a very good experience with a little

1  mini-trial. The party brought in their expert that they
2  wanted to have access and we had examination and
3  cross-examination. And I decided that despite what was in
4  the papers you shouldn't have access.
5       So if you can't agree on a person -- and it
6  should be both ways -- then we will simply have that little
7  hour hearing. It doesn't take long. It's very revealing.
8  The more I am in this business, the more I find that I
9  distrust affidavits. I want the people on the stand, and I
10 want to see their demeanor, and I want opposing counsel to
11 have the opportunity to ask real questions.
12      So that is the way I generally approach things.
13 One person, if you can't agree, we have a little hearing so
14 that I can really tell whether this person should have access
15 to the most confidential, I am very aware of the issues.
16 Again, these folks are paying millions of dollars for this
17 litigation. I think it's truly unfair for someone in house
18 not to have access to everything.
19      All right. Anything else?
20      MR. YOHAI: That is all.
21      THE COURT: Counsel, thank you very much. You
22 will be in touch with my staff about one or two discovery
23 conferences.
24      (Counsel respond "Thank you.")
25      (Conference concluded at 5:45 p.m.)