IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **Redacted - Public Version** |
| | ) | |
| v. | ) | C.A. No. 21-1317-GBW-SRF |
| | ) | |
| IVANTIS, INC., ALCON RESEARCH LLC, ALCON VISION, LLC, and ALCON INC., | ) ) ) ) | ▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| | ) | |
| Defendants. | ) | |

## LETTER TO THE HONORABLE JUDGE SHERRY R. FALLON
## FROM KAREN E. KELLER

OF COUNSEL:
Gregg LoCascio
Sean McEldowney
Justin Bova
Steven Dirks
Socrates L. Boutsikaris
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

Jeanne M. Heffernan
Kat Li
Austin C. Teng
Ryan J. Melde
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
(512) 678-9100

Ryan Kane
Nathaniel DeLucia
Laura Zhu
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants*

Brian A. Verbus
Jacob Rambeau
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000

Noah Frank
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Dated: June 27, 2023

Dear Judge Fallon:

Defendants Ivantis, Inc., Alcon Research LLC, Alcon Vision LLC, and Alcon, Inc. ("Defendants") respectfully request the Court grant Defendants' motions to (1) compel Plaintiff to present its 30(b)(6) witness, Paul Badawi, for a total of 14 hours of deposition, and (2) partially extend the case schedule to accommodate depositions occurring after the close of fact discovery.

## I.     Additional deposition time is required to fairly examine Paul Badawi.

Paul Badawi is Sight Sciences' ("Sight") CEO, co-founder, a named inventor on all five Asserted Patents, and designee on twenty-four 30(b)(6) topics spanning every aspect of the case.[1] Ex. 9 (June 15, 2023 Email from A. Wood); Ex. 3 (Defendants' First 30(b)(6) Notice) (conception, prosecution, and development of the alleged inventions; Sight's awareness of Hydrus, Ivantis, and Ivantis' alleged infringement; Sight's decision to file this case; any alleged irreparable harm). Given the broad subject matter on which Mr. Badawi was designated, and the importance of his testimony to the case, Defendants sought additional time to depose Mr. Badawi, asking that he be made available for an additional 7 hours. Plaintiff refused. After the parties met and conferred on June 19, 2023, Plaintiff offered to make Mr. Badawi available for an additional three hours. Ex. 10 (June 20, 2023 email from M. Rhyu). In hopes of avoiding motion practice, Defendants proposed a compromise of extending Mr. Badawi's deposition by 5.5 hours, *id*. (June 21, 2023 email from N. Frank), but Plaintiff rejected this too, stating it would "consider whether it is appropriate to provide Mr. Badawi for additional time" after 10 hours on the record. *Id*. (June 21, 2023 email from M. Rhyu).[2]

Under Fed. R. Civ. P. 30(d)(1), "[t]he court must allow additional time consistent with Rule 26(b)(1) and (2) if needed to fairly examine the deponent or if the deponent … impedes or delays the examination." Although a party "seeking a court order to extend [an] examination . . . is expected to show good cause," Fed. R. Civ. P. 30(d) Advisory Committee Notes to the 2000 Amendment, "[t]he determination of whether good cause exists is fact specific," and courts consider a variety of factors. *Servis One, Inc. v. OKS Grp. Int'l Pvt. Ltd.*, 2022 WL 605439, at *3, *6 (E.D. Pa. Feb. 28, 2022). Additional time is justified "[i]f the examination will cover events occurring over a long period of time." Fed. R. Civ. P. 30(d) Advisory Committee Notes to the 2000 Amendment. Courts also regularly grant additional time when the witness is "a central witness to the case" whose testimony "involve[s] a large volume of documentary evidence." *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 2015 WL 4458903, at *4 (S.D. Ind. July 21, 2015); *see also*, *Arista Recs. LLC v. Lime Grp. LLC*, 2008 WL 1752254 at *2 (S.D.N.Y. Apr. 16, 2008) (granting additional half day ***to an already 14-hour***

---

[1]   Mr. Badawi was also noticed in his individual capacity. Ex. 6 (Defendants' 30(b)(1) Notice of Deposition of Paul Badawi).

[2]   With only twenty-four minutes remaining on the record, Plaintiff offered to extend Mr. Badawi's deposition by an additional hour. Ex. 8 (P. Badawi Rough Dep. Tr. II) at 105:8-106:11. This offer was made without notice, and, in any event, that limited amount of additional time would not have been sufficient.

***deposition*** where the witness was "a significant executive of the defendant company and [was] . . . a very significant witness in the case").

Good cause exists to extend Mr. Badawi's deposition. As co-founder and CEO, as well as one of two named inventors of all Asserted Patents, Mr. Badawi is a central witness to this case with ***over 17 years*** of involvement. And Sight agrees: Sight designated Mr. Badawi as its corporate representative on 24 of 56 topics in Defendants' First Rule 30(b)(6) Notice, identified him in its initial disclosures as knowledgeable about the conception and reduction to practice of the inventions disclosed by the Asserted Patents, Sight's business (including sales, revenues, profits, the market in which Sight competes, alleged harm from infringement), Ivantis's alleged efforts to purchase intellectual property owned by Paul and David Badawi, and as the individual most knowledgeable in response to seven separate interrogatories. Ex. 2 (Plaintiff's Initial Disclosures); Ex. 3 (Defendants' First 30(b)(6) Notice); Ex. 9 (June 15, 2023 Email from A. Wood); Exs. 4 & 5 (Pl.'s Resps. & Objs. to Interrog. Nos. 8-11, 13, 15, and 18). It is thus undisputed that Mr. Badawi has unique knowledge pertaining to the claims and defenses in this case not held by other witnesses. Indeed, Sight's witnesses frequently disclaimed knowledge, instead pointing to Mr. Badawi as knowledgeable. *E.g.*, Ex. 12 (O'Keefe Dep. Tr.) at 16:14-24 ("Q: And how did you hear about that potential plan to sue Ivantis? A: I recall having a conversation with Paul Badawi about it."); Ex. 13 (Selnick Dep. Tr.) at 49:2-4 ("Q: Who would make the decision at Sight Sciences where the R&D money went? A: Ultimately it would be Paul Badawi); Ex. 14 (Rodberg Dep. Tr.) at 75:14-19 ("Q: Who would be in charge of putting together materials for [the June 14, 2023 open WPS meeting]? A: Paul Badawi.").

Further, during his first 10 hours on the record, Mr. Badawi was uncooperative, responding with minutes-long, nonresponsive narratives to yes-or-no questions that wasted record time, such that Defendants were unable to explore several issues important to the case. *See, e.g.*, Ex. 7 (P. Badawi Rough Dep. Tr. I) at 41:5-42:4 (speech in response to Q: Were you communicating by email?), 56:2-58:8 (providing nonresponsive testimony to Q: Were you and your brother the first to come up with the idea of inserting an implant into Schlemm's canal?), 94:14-95:7 (18-line answer to Q: did I read that incorrectly?), 96:22-97:19 (20-line answer to Q: It would have been a good thing for you and your brother if you could have attracted investment at the time, right?); 97:21-98:14 (18-line answer to Q; Did you consider seeking an investment from 3i?), 104:18-105:23 (providing nonresponsive testimony to Q: [W]hat happened at the meeting, did you discuss with Doug Roeder, the possibility of investing in the work that you and your brother were doing?), 109:16-110:4 (speech in response to Q: Just because you apply for a patent doesn't mean you're going to get one, right? You know that.), 134:5-135:2 (18-line answer to Q: So as of the time of this application, fair to say Sight Sciences did not yet have proof of the efficacy of the Helix in reducing intraocular pressure?), 160:2-161:2 (23-line answer to Q: You don't recall that your year two budget was for 18 months?), 168:8-20 (10-line nonresponsive answer to Q: And then you answer that question in the next paragraph, right?), 216:23-217:14 (14-line nonresponsive answer to Q: ██████████████████████████████████ ██████████████████████████████████████████ Ex. 8 (P. Badawi Rough Dep. Tr. II) at 16:17-17:2 (nonresponsive answer to Q: did you have Hydrus in mind when Sight Sciences was drafting the claims of the 482 patent?).

On the first day of his deposition, Mr. Badawi also brought with him several documents that had not been produced, one of which included R&D costs information for a particular product, in direct contradiction to Sight's 30(b)(6) witness on financial topics, who testified that product-level R&D costs were not possible to break out. *See* Ex. 7 (P. Badawi Rough Dep. Tr. I) at 9:5-21 (discussing documents); Ex. 14 (Rodberg Dep. Tr.) at 55:14-56:2 ███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████ "); Ex. 8 (P. Badawi Rough Dep. Tr. II) at 24:11-33:2 (discussing P. Badawi Dep. Exs. 15 and 16).

Given that Mr. Badawi was testifying in his personal capacity and on behalf of Sight for nearly half of the topics identified in Defendants' First 30(b)(6) Notice, that Mr. Badawi has unique knowledge about numerous yet distinct core topics ranging from technical to financial and beyond, and that many of his answers were non-responsive or evasive, good cause exists to extend Mr. Badawi's deposition for an additional 4 hours. *See* Fed. R. Civ. P. 30(d)(1); *Sabre v. First Dominion Cap., LLC*, 2001 WL 1590544, at *1 (S.D.N.Y. Dec. 12, 2001); *see also* Fed. R. Civ. P. 30(d)(2)(1) & 2000 Advisory Committee Notes ("For purposes of this durational limit, the deposition of each person designated under Rule 30(b)(6) should be considered a separate deposition."). Thus, Defendants request the Court grant their motion to compel Plaintiff to produce Mr. Badawi for a total of 14 hours of deposition time and to order Mr. Badawi to be responsive.

## II. Good cause exists to amend the Scheduling Order.

The parties are likewise at an impasse as to whether the schedule should be amended to account for the depositions currently scheduled to occur after the close of fact discovery. On June 14, 2023, in its revisions to a proposed joint stipulation to allow for taking the depositions of witnesses following the close of fact discovery, Plaintiff included an amendment allowing for Plaintiff to supplement its opening expert report regarding damages, but not otherwise changing the dates of expert reports, *Daubert*, or dispositive motions. *See* Ex. 11 (June 12, 2023 email from B. Verbus). Rather than engage in an additional round of expert reports, prejudicing Defendants' ability to prepare rebuttal reports, Defendants proposed modifying the case schedule to adjust the expert discovery dates to account for the out-of-time depositions while still allowing the parties to complete briefing dispositive and *Daubert* motions by the currently scheduled date, November 16, 2023. *See id.* Plaintiff did not agree to this compromise, nor did it explain why the parties should engage in unnecessary supplementation rather than a minor change in the schedule.

Fact discovery in this case is currently set to close on June 29, 2023. D.I. 93. The parties have noticed or subpoenaed over 30 witnesses for deposition. *See* Ex. 11 (April 17, 2023 email from O. Armon). Defendants have been diligent to schedule and take these depositions during the fact discovery period; however, due to witness scheduling conflicts, the parties have agreed to dates for the depositions of Mike Chodzko (Head of Surgical Glaucoma Marketing at Ivantis), Mark Papini (Head of Surgical Glaucoma Sales at Sight Sciences), Steve McAuley (Former Ivantis in-house/outside counsel), Andy Rivero (former Ivantis Consultant), and Arsham Sheybani (Wash U Professor of Ophthalmology and Alcon consultant) after the current close of discovery. *See id.* (June 6, 2023 email from B. Verbus); *id.* (June 7, 2023 email from L. Strosnick); *id.* (June 8, 2023 email from B. Verbus); *id.* (June 15, 2023 email from B. Verbus).

In particular, Messrs. Chodzko's and Papini's depositions will be taken on or after the deadline for opening expert reports, currently set for July 13, 2023. D.I. 93. Because Messrs. Chodzko and Papini are designated on several of the parties' 30(b)(6) topics, it is likely that their testimony will be relevant to opening expert reports, and the parties may need additional time to resolve issues arising out of the depositions sufficiently in advance of opening expert reports. Indeed, even Plaintiff recognizes the potential impact to expert reports given its request to supplement opening expert reports to include deposition testimony taken after the close of fact discovery. *See* Ex. 11 (June 15, 2023 email from B. Verbus).

Further, Defendants timely served additional 30(b)(1) notices for Sabrina Katz and Sloan Marcus and a second 30(b)(6) notice to Sight Sciences, over which Plaintiff is now moving for a protective order. *See* Ex. 16 (Defendants' 30(b)(1) Notice of Sabrina Katz); Ex. 17 (Defendants' 30(b)(1) Notice of Sloan Marcus); Ex. 15 (Defendants' Second 30(b)(6) Notice). These notices were timely served and the depositions should go forward. These additional depositions would likewise take place following the current close of fact discovery.

Ongoing discovery disputes also necessitate extending the case schedule. For example, Plaintiff has produced only 14,887 documents in this case. Several hundred of these documents are missing family members or attachments due to Sight's decision to produce only the latest-in-time emails, which calls into question the reasonableness of Sight's document collection, review, and production to date. Ex. 18 (June 23, 2023 email from A. Teng); *see In re Actos Antitrust Litig.*, 340 F.R.D. 549, 552 (S.D.N.Y. 2022) (requiring the production of all responsive ESI, including "earlier-in-time" emails after defendants' email threading resulted in dropping metadata for "earlier-in-time" emails). Defendants have, for months now, requested these additional attachments. Plaintiff continues to refuse to review its own production to identify and produce these missing attachments, instead forcing Defendants to identify individual missing attachments by combing through Plaintiff's production, flipping the burden to comply with its discovery obligations onto Defendants. *See id.* Further, of these 14,887 documents, all but roughly 1,200 are dated after 2017, calling into question Sight's document preservation, despite believing since 2008–09 that Ivantis' Hydrus falls within the scope of its inventions and issued claims. *See generally* Ex. 7 (P. Badawi Rough Dep. Tr. I) at 81:5-10 (stating it was around 2008-2009 that Mr. Badawi came to the conclusion that Hydrus was covered by the claims). Indeed, Mr. Badawi in 2012 referred to the just-issued '482 Patent, asserted here, as the █████████ ████████████████████████████████████████████████████████████. Ex. 19 (SGHT0131933); Ex. 7 (P. Badawi Rough Dep. Tr. I) at 203:3-19 (Mr. Badawi stating that he believed Hydrus infringed Sight's patents at the time of its launch in 2018), 216:18-219:24 (discussing ████████████████████████████████); Ex. 13 (Selnick Dep. Tr.) at 57:8-60:18 (discussing Sight's belief that Hydrus infringed its IP in 2018). Yet few documents from 2006–2017 have been produced.

In light of ongoing discovery issues, and to avoid the need for inefficient supplementation of expert reports, Defendants request a reasonable accommodation to the case schedule. Defendants propose an amended schedule as laid out in Exhibit 1 to this letter, which adjusts the expert discovery dates to account for remaining depositions while allowing the parties to complete briefing dispositive and *Daubert* motions by the current deadline of November 16, 2023.

Respectfully submitted,

*/s/ Karen E. Keller*

Karen E. Keller (No. 4489)

cc:    Clerk of Court (by CM/ECF & Hand Delivery)
        All Counsel of Record (by CM/ECF & Email)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1317-GBW-SRF |
| | ) | |
| IVANTIS, INC., ALCON RESEARCH | ) | |
| LLC, ALCON VISION, LLC, and ALCON | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

## [PROPOSED] ORDER GRANTING DEFENDANTS' MOTIONS TO COMPEL AND TO EXTEND THE CASE SCHEDULE

Upon consideration of Defendants' Motion to Compel and Defendants' Motion to Extend the Case Schedule, Defendants' Motions are **GRANTED**.

The Court therefore **ORDERS** as follows:

1.      Plaintiff shall present its 30(b)(6) and 30(b)(1) witness Paul Badawi for an additional 4 hours of deposition time, for a total of 14 hours of deposition time; and

2.      The Court amends the case schedule as set forth below. All unexpired deadlines in the Second Amended Scheduling Order (ECF No. 093) are hereby **VACATED** and replaced as set forth herein.

The parties shall adhere to the following schedule:

| Event | Current Deadline | Revised Deadline |
|---|---|---|
| **Disclosure of Expert Testimony:** For the party who has the initial burden of proof on the subject matter, the initial Federal Rule 26(a)(2) disclosure of expert testimony is due on or before this date | July 13, 2023 | July 20, 2023 |

| | | |
|---|---|---|
| **Disclosure of Expert Testimony:** The supplemental disclosure to contradict or rebut evidence on the same matter identified by another party is due on or before this date | August 17, 2023 | August 24, 2023 |
| **Disclosure of Expert Testimony:** Reply expert reports from the party with the initial burden of proof are due on or before this date | September 7, 2023 | September 14, 2023 |
| **Close of Expert Discovery:** All expert discovery in this case shall be initiated so that it will be completed on or before this date | September 28, 2023 | October 5, 2023 |
| **Dispositive Motions / *Daubert* Motions:** All case dispositive motions, an opening brief, and affidavits, if any, in support of the motion shall be served and filed on or before this date | October 12, 2023 | October 17, 2023 |
| **Dispositive Motions / *Daubert* Motions:** Opposition briefs for case dispositive and *Daubert* motions shall be served and filed on or before this date | November 2, 2023 | November 3, 2023 |
| **Dispositive Motions / *Daubert* Motions:** Reply briefs for case dispositive and *Daubert* motions shall be served and filed on or before this date | November 16, 2023 | November 16, 2023 (unchanged) |

SO ORDERED this _____ day of _____, 2023.

                                                  _____

United States Magistrate District Judge

EXHIBIT 1

## [PROPOSED] THIRD AMENDED CASE SCHEDULE

| Event | Current Deadline | Revised Deadline |
|---|---|---|
| **Disclosure of Expert Testimony:** For the party who has the initial burden of proof on the subject matter, the initial Federal Rule 26(a)(2) disclosure of expert testimony is due on or before this date | July 13, 2023 | July 20, 2023 |
| **Disclosure of Expert Testimony:** The supplemental disclosure to contradict or rebut evidence on the same matter identified by another party is due on or before this date | August 17, 2023 | August 24, 2023 |
| **Disclosure of Expert Testimony:** Reply expert reports from the party with the initial burden of proof are due on or before this date | September 7, 2023 | September 14, 2023 |
| **Close of Expert Discovery:** All expert discovery in this case shall be initiated so that it will be completed on or before this date | September 28, 2023 | October 5, 2023 |
| **Dispositive Motions / *Daubert* Motions:** All case dispositive motions, an opening brief, and affidavits, if any, in support of the motion shall be served and filed on or before this date | October 12, 2023 | October 17, 2023 |
| **Dispositive Motions / *Daubert* Motions:** Opposition briefs for case dispositive and *Daubert* motions shall be served and filed on or before this date | November 2, 2023 | November 3, 2023 |
| **Dispositive Motions / *Daubert* Motions:** Reply briefs for case dispositive and *Daubert* motions shall be served and filed on or before this date | November 16, 2023 | November 16, 2023 (unchanged) |

EXHIBIT 2
(excerpted)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | C.A. No.:  21-1317-VAC-SRF |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | |
| IVANTIS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF SIGHT SCIENCES, INC.'S INITIAL RULE 26(A)(1) DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26(a)(1), Plaintiff Sight Sciences, Inc. ("Sight Sciences"), by its attorneys, hereby submits these Initial Disclosures ("Disclosures").  Sight Sciences makes these disclosures based on its current understanding of the issues in the case and the information reasonably available at the time of these disclosures.  Sight Sciences' investigations are continuing and Sight Sciences expressly reserves the right to amend, modify, or supplement these disclosures based on additional information obtained through continued formal discovery from Defendant Ivantis, Inc. ("Ivantis") or through any other means.  By making these disclosures, Sight Sciences does not waive its right to object to the admissibility of information contained in these disclosures on any applicable basis.

## A.    INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION

Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(i), Sight Sciences discloses the name and, if known, the address and telephone number of each individual likely to have discoverable information that Sight Sciences may use to support its claims or defenses, unless solely for impeachment.  To the extent that Sight Sciences intends to rely on expert witnesses, it will identify those individuals in accordance with the schedule set by the Court.  Sight Sciences does not consent to or authorize any communications by Ivantis with Sight Sciences' employees,

whether formerly or presently associated with or employed by Sight Sciences, and does not consent to or authorize any communication otherwise prohibited by all applicable rules of professional conduct.

Sight Sciences reserves the right to add or remove individuals from its disclosures and to object to the deposition or trial testimony of any individual identified in its disclosures, and to otherwise supplement its disclosures through the course of discovery.  Accordingly, Sight Sciences identifies the following:

| Name | Address and Telephone | Subject Matter |
|---|---|---|
| David Y. Badawi<br><br>*Named inventor of the Patents-in-Suit; founder and CTO of Sight Sciences* | c/o Cooley LLP<br>3175 Hanover Street<br>Palo Alto, CA  94304 | Knowledge regarding the conception and reduction to practice of the inventions disclosed by the Patents-in-Suit (as identified in Sight Sciences' operative Complaint). Knowledge of Ivantis's efforts to purchase intellectual property owned by Paul and David Badawi, including U.S. Pub. No. 2007/0298068. |
| Paul Badawi<br><br>*Named inventor of the Patents-in-Suit; founder and CEO of Sight Sciences* | c/o Cooley LLP<br>3175 Hanover Street<br>Palo Alto, CA  94304 | Knowledge regarding the conception and reduction to practice of the inventions disclosed by the Patents-in-Suit (as identified in Sight Sciences' operative Complaint). Knowledge regarding Sight Sciences' business, including Sight Sciences' sales, revenues, profits and the market in which Sight Sciences competes, including harm from infringement.  Knowledge of Ivantis's efforts to purchase intellectual property owned by Paul and David Badawi, including U.S. Pub. No. 2007/0298068. |
| Jesse Selnick<br><br>*CFO of Sight Sciences* | c/o Cooley LLP<br>3175 Hanover Street<br>Palo Alto, CA  94304 | Knowledge regarding Sight Sciences' business, including Sight Sciences' sales, revenues, profits and the market in which Sight Sciences competes, including harm from infringement. |

E.      **CONCLUSION**

These Disclosures are based on information reasonably available to Sight Sciences at this time, and by making these Disclosures: (i) Sight Sciences does not represent that it has identified every document, tangible thing, or witness possibly relevant to this lawsuit; (ii) Sight Sciences does not waive its right to object to the production of any document or tangible thing disclosed on the basis of privilege, the work-product doctrine, and/or any other valid objection; and (iii) Sight Sciences expressly reserves the right to amend, modify, or supplement these Disclosures as it learns new or different information.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*
_____
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

COOLEY LLP
Michelle S. Rhyu
David Murdter
Deepa Kannappan
3175 Hanover Street
Palo Alto, CA  94304-1130
(650) 843-5000

Orion Armon
1144 15th Street, Suite 2300
Denver, CO  80202-2686
(720) 566-4000

Dated:  May 24, 2022                    *Attorneys for Sight Sciences, Inc.*

# EXHIBIT 3
# (excerpted)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SIGHT SCIENCES, INC.,             )
                                      )
          Plaintiff,          )
                                      )
    v.                      )   C.A. No. 21-1317-GBW-SRF
                                      )
IVANTIS, INC., ALCON            )
RESEARCH LLC, ALCON          )
VISION, LLC, and ALCON INC.,   )
                                      )
          Defendants.       )

## DEFENDANTS' NOTICE OF DEPOSITION OF <br> PLAINTIFF PURSUANT TO FED. R. CIV. P. 30(b)(6)

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, counsel for Defendants Ivantis, Inc., Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc. (collectively, "Defendants") will take the deposition of Plaintiff Sight Sciences, Inc. ("Sight"). The deposition will take place at Kirkland & Ellis LLP, 1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004, on June 15, 2023, at 9 a.m. Eastern time, or at such other time and place as mutually agreed-upon, and will continue from day to day until completed.

Sight shall designate one or more of its officers, directors, managing agents, or other persons with knowledge of the matters set forth in Attachment A of this Notice to appear and testify on its behalf at the deposition. The Person(s) so designated shall testify as to matters known or reasonably available to Sight, including without limitation all matters known or reasonably available to individuals identified in Sight's initial disclosures in the above-captioned case.

The deposition will be before a Person authorized by law to administer oaths and will be recorded using the stenographic method, through the instant visual display of testimony, and will

1

also be recorded using audio and videotape technology. Testimony derived pursuant to this Notice of Deposition shall be used for any and all appropriate purposes. You are invited to attend and participate.

|  |  |
|---|---|
| | /s/ Kat Li |
| OF COUNSEL: | John W. Shaw (No. 3362) |
| Gregg LoCascio | Andrew E. Russell (No. 5382) |
| Justin Bova | Nathan Hoeschen (No. 6232) |
| Steven Dirks | SHAW KELLER LLP |
| Socrates L. Boutsikaris | I.M. Pei Building |
| KIRKLAND & ELLIS LLP | 1105 North Market Street, 12th Floor |
| 1301 Pennsylvania Avenue, N.W. | Wilmington, DE 19801 |
| Washington, DC 20004 | (302) 298-0700 |
| (202) 389-5000 | jshaw@shawkeller.com |
| | nhoeschen@shawkeller.com |
| Jeanne M. Heffernan | *Attorneys for Defendants* |
| Kat Li | |
| Austin Teng | |
| Ryan J. Melde | |
| KIRKLAND & ELLIS LLP | |
| 401 Congress Avenue | |
| Austin, TX  78701 | |
| (512) 678-9100 | |
| | |
| Ryan Kane | |
| Laura Zhu | |
| KIRKLAND & ELLIS LLP | |
| 601 Lexington Avenue | |
| New York, NY 10022 | |
| (212) 446-4800 | |
| | |
| Dated: May 3, 2023 | |

## <u>TOPICS FOR EXAMINATION</u>

1.      The conception, creation, design, and development of the inventions claimed in the Asserted Patents.

2.      Expenditures and costs for the conception, creation, research, design, and development of the inventions claimed in the Asserted Patents.

3.      Sight's analyses, estimations, or calculations of contact between a device and the internal wall of Schlemm's canal.

4.      Sight's testing, measurements, or analysis of (i) aqueous outflux a device permits after it is inserted into Schlemm's canal, (ii) intraocular pressure reduction after a device is inserted into Schlemm's canal, or the amount of interference a device makes with aqueous humor after it is inserted into Schlemm's canal.

5.      Sight's analyses, estimations, or calculations of the radius of curvature of an arcuate member compared to the radius of curvature of Schlemm's canal.

6.      Sight's promotion and/or marketing of any Sight Product, including OMNI, with a non-Sight product, including Hydrus.

7.      Sight's non-privileged communications and presentations regarding its patent portfolio, including to potential investors.

8.      Any valuations of Sight's intellectual property, including its patents.

9.      The facts and circumstances surrounding any communication or negotiation by Sight or its employees or agents thereof, regarding licensing or selling intellectual property or technology to any Person, including Ivantis or Alcon.

10.     The preparation and prosecution of the applications that issued as the Asserted Patents, including, but not limited to, all interviews with the USPTO, materials presented to the USPTO, and all affidavits, oaths, or declarations submitted to the USPTO.

11.     All research, development, testing, consideration, experimentation, analysis, and/or evaluation of supports that are tubular or supports that do not occupy at least a portion of the central core of Schlemm's canal.

12.     For any assertion of objective indicia of non-obviousness for any asserted claim of any Asserted Patent, the identification of which specific objective indicia Sight asserts applies to which specific asserted claim or claims, and the factual basis for Sight's assertion.

13.     For any assertion that a prior art reference teaches away from any claim of the Asserted Patents, the identification of the reference or prior art, the claim or claims to which it applies, and the factual basis for asserting that it teaches away.

14.     The factual bases for Sight's contention that Defendants infringe, induce the infringement of, and/or contribute to the infringement of each Asserted Claim, including, but not limited to, the contents of all documents relied upon in Sight's Infringement Contentions.

15.     The factual bases for Sight's contention that the Asserted Claims are not invalid under 35 U.S.C. §§ 102, 103, and/or 112, including, but not limited to, the identity and contents of any documents, analyses, reports, or opinions relied upon in support thereof.

16.     Sight's knowledge before September 16, 2021 of Hydrus.

17.     Sales forecasts, sales projections, or market analyses in Sight's possession or control concerning OMNI or MIGS.

18.     The sales, sales forecasts, costs, profits, profit forecasts, and market share data in Sight's possession or control for any product or method embraced by any claim in any patent-in-suit, such as those described in any business plans, communications, or documents.

19.     Promotional, sales, and marketing activities with respect to Sight Products, including, but not limited to, sampling, rebates, discounts, and/or other incentives offered for the use or

purchase of Sight Products, strategies for the promotion and marketing of Sight Products, and promotional and marketing budgets and/or expenditures.

20.     Profit and Loss Data for Sight Products showing each line item, including, but not limited to, COGS, SG&A, R&D, overhead, marketing, and any other costs.

21.     All information concerning any analysis, projection, or calculation of profits that Sight has made or will make for Sight Products.

22.     Competitors and competitive intelligence or analyses in Sight's possession or control for Sight Products.

23.     Market and financial analysis of Sight Products, including without limitation analysis of sales, costs, pricing, profits, market share, market definition, sales projections, and physician surveys.

24.     Marketing plans, business plans, advertising plans, sales plans, promotional plans, market studies, market research, market analyses, competitive research, advertisements, communications with doctors, or any other healthcare providers, patients, training and instruction of marketing personnel, and competitive analyses relating to any product that Sight contends embodies one or more claims of any patent-in-suit.

25.     Sight's efforts or attempts to obtain approval of any product that it contends practices any claim of the Asserted Patents.

26.     Analyses, research, or studies of pricing of Sight Products, including any analyses of Sight Products and any alleged competitive or alternative product in the US market, including iStent, Hydrus, or any MIGS product.

27.     By year, any R&D expenditure actually made by Sight in the development of OMNI.

28.     Any agreements, contracts, partnerships, or arrangements by Sight with any third party relating to the development, supply, manufacture, approval, distribution, promotion, marketing, and/or sale of any Sight Product.

29.     Any licensing by Sight, or those acting on its behalf, of any patent relating to OMNI.

30.     All communications, instructions, agreements, offers, and/or promotional incentives for healthcare providers, doctors, or any medical professional to switch, replace, or transition from iStent or Hydrus, and all documents reflecting same.

31.     The time and effort required to develop a medical device along with the necessary regulatory submissions, including with respect to ophthalmic medical devices.

32.     All facts and circumstances relating to whether the Hydrus or any other MIGS products compete with OMNI for customers, sales, or revenue, including any analyses of the financial impact of the introduction of Hydrus on Sight.

33.     Any efforts by Sight to market, advertise, or promote itself as similar to Alcon or Ivantis, or to promote OMNI as similar or complementary to Hydrus.

34.     Any analysis of Alcon's, Ivantis's or Sight's brand reputation, including but not limited to any evaluation of whether Alcon's brand influences prospective consumers to buy Alcon products, and/or any evaluation of whether Sight's brand influences prospective consumers to buy OMNI.

35.     Sight's awareness or knowledge of customer purchasing decisions for MIGS products, including decision-making factors, costs of switching products, and willingness to substitute one MIGS product with another.

36.     The factual basis for Sight's assertion that Defendants' alleged infringement resulted in lost sales of OMNI, including but not limited to the Persons that would have purchased OMNI but for the alleged infringement.

37.     Any analyses or comparisons between OMNI and Hydrus.

38.     All facts and circumstances concerning the market, demand, and any competition (with Defendants or any third party) for MIGS products, including all market studies, analyses, and reports commissioned or obtained by Sight concerning the OMNI, Hydrus, or any other competitor MIGS product.

39.     The full factual basis for any contention that Sight is entitled to injunctive relief, including (a) that Sight has suffered or will continue to suffer irreparable harm as a result of Defendants' conduct; (b) that remedies available at law, such as monetary damages, are inadequate to compensate for any such irreparable harm; (c) that a remedy in equity is warranted considering the balance of hardships between Sight and Defendants; and (d) that the public interest would not be disserved by a permanent injunction.

40.     All facts and circumstances when Sight first became aware of the alleged infringement of the Asserted Patents by any of Defendants' product or technology.

41.     What the inventors, applicants, or patentees considered to be the inventions disclosed in the Asserted Patents, their review of the application's disclosures and claims, and the reasons for when and how they chose to prosecute each Asserted Claim of the Asserted Patents.

42.     Sight's alleged priority date for each claim of the Asserted Patents and all factual support for those priority dates.

43.     The earliest embodiment of and any disclosure to any Person or entity, prior to the priority date of the Asserted Patents, of any aspect of the claimed subject matter of the Asserted Patents.

44.     Any notice of alleged infringement of any Asserted Patents Sight provided to Defendants prior to the filing of This Action.

45.     The facts underlying Sight's business decision to file This Case, including its timing and any Documents and communications considered by Sight before deciding to file This Case.

46.     All facts and circumstances related to the development of the Helix Microstent, including the origin of the idea for the Helix Microstent, the individuals involved in the conception, reduction to practice, and development of the Helix Microstent, and whether—and if so, why—Sight Sciences abandoned its development.

47.     Information related to any litigation funding offer that Sight solicited or received.

48.     Sight's financial liquidity and all facts related to Sight's financial resources prior to and after its initial public offering.

49.     Any opinion, assessment, or evaluation made by or on behalf of Sight regarding the patentability, enforceability, validity, and/or infringement of the Asserted Patents or related applications.

50.     Any presentation, communication, or correspondence to or from any third party regarding the Asserted Patents.

51.     Communications between Sight and doctor(s), distributor(s), or other customer(s) regarding the present lawsuit.

52.     Sight's capacity to manufacture, sell, and market Sight products and any Ivantis units Sight contends it would have sold but for the alleged infringement.

53.     Sight's contention that no non-infringing alternatives exist.

54.     Royalties received by Sight for the Asserted Patents or related patents and applications.

55.     Any offers to license the Asserted Patents or any other patents owned by Sight Sciences.

56.     Any offers to purchase Sight and/or the Asserted Patents, including the facts and circumstances to support Sight's allegations made in its Second Amended Complaint that "[Doug] Roeder offered to purchase the Badawis' IP rights."

EXHIBIT 4
(excerpted)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | C. A. No.: 21-1317-GBW-SRF |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | |
| IVANTIS, INC., ALCON RESEARCH LLC, | ) | |
| ALCON VISION, LLC AND ALCON INC., | ) | |
| | ) | |
| Defendants. | ) | |

**SIGHT SCIENCES, INC.'S RESPONSES AND OBJECTIONS
TO DEFENDANTS' SECOND SET OF INTERROGATORIES (NOS. 8-10)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Sight Sciences, Inc. ("Plaintiff" or "Sight Sciences") hereby responds to Defendants Ivantis, Inc., Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc.'s ("Defendants") Second Set of Interrogatories (the "Interrogatories"):

**GENERAL RESPONSES**

1.      Sight Sciences' response to the Interrogatories is made to the best of Sight Sciences' present knowledge, information, and belief. This response is at all times subject to such additional or different information that discovery or further investigation may disclose and, while based on the present state of Sight Sciences' recollection, is subject to such refreshing of recollection, and such additional knowledge of facts, as may result from Sight Sciences' further discovery or investigation.

2.      Sight Sciences reserves the right to make any use of, or to introduce at any hearing and at trial, information and/or documents responsive to the Interrogatories but discovered subsequent to the date of this response, including, but not limited to, any such information or documents obtained in discovery in this action.

Interrogatory according to its ordinary meaning, without reference to Defendants' usage statements.

### SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

Without waiving or limiting in any manner any of the foregoing General Objections, but rather incorporating them into each of the following responses to the extent applicable, Sight Sciences responds to the specific Interrogatories in Defendants' Second Set of Interrogatories as follows:

### INTERROGATORY NO. 8:

Describe in detail Your contention that the Asserted Patents are novel and/or non-obvious under 35 U.S.C. §§ 102 and 103 on a claim-by-claim basis, in light of Defendants' invalidity contentions, including by identifying each element of each asserted claim that You contend is not disclosed or practiced by each Prior Art reference identified by Defendants and why You contend such element is not satisfied, describing the basis of any contentions that a person of ordinary skill in the art would not combine the cited Prior Art, and the ordinary level of skill in the art, describing the basis of any contentions that the cited Prior Art is not enabled or does not constitute Prior Art. Your answer should also include an Identification of the Person(s) most knowledgeable about Your answer and an Identification of Documents that relate to or support Your answer.

### RESPONSE TO INTERROGATORY NO. 8:

Sight Sciences incorporates by reference its General Responses and Objections.

Sight Sciences objects to this Interrogatory as a premature contention interrogatory. According to the Scheduling Order, parties who do not carry the burden of proof on a claim or defense need not respond to a contention interrogatory until 30 days after the deadline for the substantial completion of document production, i.e., April 10, 2023. Scheduling Order, D.I. 93, ¶ 2(f); *see also Novanta Corp. v. Iradion Laser, Inc.*, No. 15-1033-SLR-SRF, 2016 WL 4987110, at *7-8 (D. Del. Sept. 16, 2016) (collecting cases holding that "courts tend to deny contention

interrogatories filed before substantial discovery has taken place" and "[are] premature when filed before substantial documentary or testimonial discovery ha[s] been completed," concluding that "[i]t would be premature to require [a party] to detail with specificity and finality the factual and legal bases for its claims in the early stages of discovery" and ordering supplementation of responses to contention interrogatories in accordance with Rule 26(e) and the Scheduling Order). Sight Sciences will provide a complete response to this interrogatory in accordance with Rule 26(e) and the Scheduling Order, to the extent that it is able to do so in light of Defendants' failure to specifically identify and chart complete anticipation or obviousness proofs.

Sight Sciences objects to this Interrogatory as premature because Defendants' invalidity contentions are contingent upon entry of a claim construction order, which has not yet occurred, and thus the scope of the Asserted Claims is not yet defined. Sight Sciences further objects to this Interrogatory to the extent that Defendants' invalidity contentions relating to anticipation, obviousness, the priority date of the patents-in-suit, alleged failures to further limit dependent claims, and issues of alleged invalidity under 35 U.S.C. § 112 raise issues of claim construction that were not timely included in the Joint Claim Construction Chart and therefore were waived.

Sight Sciences objects to this Interrogatory as prematurely seeking expert testimony, which Sight Sciences will disclose in accordance with the Scheduling Order.

Sight Sciences objects to this Interrogatory as premature to the extent that Defendants' Invalidity Contentions purport to incorporate by reference Defendants' petitions for *inter partes* review. Sight Sciences will respond to Defendants' petitions for *inter partes* review in accordance with the Patent Act and regulations governing *inter partes* review proceedings.

Sight Sciences objects to this Interrogatory to the extent it attempts to shift the burden of proving validity in this case to Sight Sciences.  The Asserted Patents are presumed valid and

Defendants at all times bear the burden of proving invalidity.

Sight Sciences objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection from discovery, or to the extent it seeks a legal conclusion or legal analysis and would implicate the mental impressions of counsel to provide a proper response.

Sight Sciences objects to this interrogatory on the grounds that it is vague and ambiguous to the extent that Defendants' invalidity contentions purport to identify "exemplary" evidence of invalidity and to the extent Defendants' identified prior art is uncharted. Defendants waived invalidity contentions concerning prior art that was not cited and concerning prior art references that were not charted in invalidity claim charts.

Sight Sciences objects that this interrogatory is compound and consists of multiple sub-parts, and Sight Sciences reserves the right to object to this and future interrogatories on the ground that Defendants have exceeded the permissible number of interrogatories.

Subject to the foregoing general and specific objections, Sight Sciences responds as follows:

A. **Level of Ordinary Skill in the Art**

Sight Sciences contends that a person of ordinary skill in the art ("POSA") relating to the subject matter of the Asserted Patents would be a person with an M.D., residency training in ophthalmology, and at least two years of surgical experience treating glaucoma, or a Bachelor of Science degree in biomedical engineering plus at least three to five years of related professional experience in the field of intraocular implants for the treatment of elevated intraocular pressure. (Opening Claim Constr. Br. at 4; Downs Decl., Ex. 19, ¶12.) A POSA would be experienced in the study, investigation, or design of devices that are implanted in Schlemm's canal for the treatment of pre-glaucoma, glaucoma, or ocular hypertension. (*Id*.)

B.  **Priority Date of the Patents-in-Suit**

Each asserted claim of U.S. Patent Nos. 8,287,482; 9,370,443; 9,486,361; 10,314,742; and 11,389,328 is entitled to a priority date of June 26, 2006, because Sight constructively reduced to practice the invention of each asserted claim by filing Application No. 11/475,523 with the Patent Office. *See* Sight Sciences' Supplemental Responses and Objections to Ivantis Interrogatory No. 3.

Defendants' assertions regarding the proper construction of the claim term "support" and the related contention that any claim of the patents-in-suit that does not require a support to occupy at least a portion of a central core of Schlemm's canal is invalid for introducing new matter is mistaken. The specifications and file histories of the patents-in-suit demonstrate that the inventors possessed and enabled patent claims covering supports that do not at least partially occupy a central core of Schlemm's canal. *See, e.g.*, '443 patent Fig. 6A and 6B, elements 89, 95, 96, and 97; *see also* '443 patent at 7:48-8:3 (describing that claimed supports may be longitudinal, open-ended, and tubular and describing the benefits of promoting transmural as well as longitudinal flow of aqueous humor); '443 patent at 9:25-39 (explaining that support elements can be "hollow" or "open"); '443 patent at 10:30-60 (explaining that support elements may be "a unitary structure of fixed or variable length," with a "sinusoidal or zig-zag configuration," "fluted edges," or "fenestrations"); *see also* Sight Sciences' Opening Brief on Claim Construction at pp. 4-6. The foregoing evidence demonstrates that the inventors contemplated and disclosed supports comprising luminal elements that would achieve the intended benefits of the claimed inventions without necessarily occupying a central core of Schlemm's canal. Additionally, the U.S. Patent Office examined and allowed claims to issue in each of the patents-in-suit that do not recite a limitation requiring the claimed supports to occupy at least a portion of the central core of Schlemm's canal. The Patent Office's determination that

no § 112 rejection was warranted confirms that the shared specification of the patents-in-suit discloses embodiments that do not at least partially occupy the central core of Schlemm's canal and is entitled to deference.

For these reasons, each alleged prior art reference or product identified in Defendants' Invalidity Contentions that post-dates the priority date of the patents-in-suit, including all of the alleged Ivantis prior art described on pages 11-14 of Defendants' Amended Invalidity Contentions, is not prior art.

C.  **Patent Validity – Defendants' §§ 102 and 103 Contentions**

The prior art cited in Defendants' Invalidity Contentions fails to anticipate or render obvious any asserted claim of the patents-in-suit because it fails to teach or suggest every limitation of any asserted claim, including for at least the following principal reasons:

First, Defendants' Invalidity Contentions fail to properly identify or support their purported anticipation and obviousness theories. The Invalidity Contentions purport to identify patent claims that are anticipated, but the accompanying claim charts allege that many claim elements are obvious in light of the allegedly anticipating prior art and/or impermissibly mix and match disclosures from different embodiments. Additionally, the Invalidity Contentions purport to identify numerous possible obviousness combinations but fail to include claim charts that identify specific combinations of prior art. Relatedly, the Invalidity Contentions address alleged obviousness to combine in general terms, without specifically addressing any particular, charted combination of prior art. As a result of these deficiencies, Defendants' Invalidity Contentions fail to put Sight Sciences on notice of their anticipation and obviousness defenses and fail to make a *prima facie* showing of invalidity for any asserted patent claim. Sight Sciences' response is therefore limited based on its current understanding, if any, of Defendants' invalidity positions expressed in Defendants' Initial Invalidity Contentions served on September 1, 2022,

supplemented on September 22, 2022, and further corrected on October 6, 2022 (collectively, "Defendants' Invalidity Contentions").

Second, Defendants' Invalidity Contentions fail to provide calculations or measurements to prove that the prior art teaches a device that is a support (i.e., that props open Schlemm's canal) and that, when the support is disposed within a cylindrical section of the lumen of the canal having an internal wall surface area C, the support contacts less than 30% of C. Defendants' Invalidity Contentions appear to suggest that the "less than 30%" limitation is met by supports with designs or dimensions that would <u>not</u> prop open Schlemm's canal in a manner that satisfies all of the limitations of the asserted claims and promotes enhanced transmural flow. For example, Defendants' Invalidity Contentions fail to provide the dimensions of prior art supports, to calculate the surface area of prior art supports, to calculate the degree of surface area contact between prior art supports and the internal wall surface of Schlemm's canal, or to calculate the internal wall surface area of Schlemm's canal after the support is inserted in relation to the size of the support, which must prop open the canal. As a result, the Invalidity Contentions fail to make a *prima facie* showing of invalidity for any claim of the patents-in-suit that includes these limitations.

Third, Defendants' Invalidity Contentions fail to show that the prior art teaches a support that comprises an arcuate member, wherein at least a portion of the arcuate member has a radius of curvature smaller than the radius of curvature of Schlemm's canal so that at least a portion of the arcuate member is configured to extend out of Schlemm's canal and into the trabecular meshwork. This limitation requires an arced structure that props open Schlemm's canal and that has a defined radius of curvature that causes the support to extend out of the canal into the meshwork. Defendants' Invalidity Contentions fail to show that prior art devices' arced regions

constitute supports when inside Schlemm's canal and fail to provide measurements proving that the arced regions have the required radii of curvature prior to implantation. Furthermore, to the extent that Defendants' Invalidity Contentions rely upon prior art that teaches *ab externo* delivery, Defendants additionally fail to show that a support comprising the claimed arcuate member could be delivered *ab externo*. As a result, the Invalidity Contentions fail to make a *prima facie* showing of invalidity for any claim of the patents-in-suit that includes these limitations.

Fourth, Defendants' Invalidity Contentions rely on prior art devices that are inoperative for their intended purposes of lowering intraocular pressure (and would fail to satisfy the requirements of the claims of the patents-in-suit requiring longitudinal insertion (*see e.g.*, asserted claims of the '482, '742, '361, and '328 patents)). Claims of the foregoing patents require supports with dimensions large-enough to prop open Schlemm's canal and must be longitudinally insertable without cutting or tearing the trabecular meshwork that must hold the support in place (if inserted *ab interno*) or without undue damage to the sclera and collector channels (if inserted *ab externo*). Defendants' Invalidity Contentions improperly rely upon prior art device architectures with "T," "Y" or similar shapes that could not be longitudinally inserted into Schlemm's canal in a manner that would be medically acceptable or effective for their intended purposes of lowering intraocular pressure if those devices were large-enough to prop open the canal. Relatedly, Defendants' invalidity contentions fail to show these prior art structures could be implanted in Schlemm's canal using a tubular cannula or introducer. As a result, the Invalidity Contentions fail to make a *prima facie* showing of invalidity for any claim of the patents-in-suit that relies upon prior art structures with these or similar designs.

Fifth, Defendants' Invalidity Contentions fail to establish the invalidity of any claim

14

because they are based on prior art that is the same or highly similar prior art to the art considered by the U.S. Patent Office during prosecution. As an illustrative example, the '328 patent issued over: 14 references to Tu, a reference to Burns, 6 references to Smedley, 3 references to Gharib, 10 references to Lynch, 1 reference to Porteous, 5 references to Grieshaber, 14 references to Bergheim, 1 reference to Hill, 2 references to Shadduck, 8 references to Stegmann, 1 reference to Neuhann, and dozens of similar prior art references.  *See* '328 patent References Cited. Defendants' Invalidity Contentions fail to identify any error by the U.S. Patent Office in issuing the patents-in-suit over the same or similar art, from the same prior art authors, that Defendants now rely upon.

Sixth, Ivantis tacitly acknowledged the validity of the patents-in-suit when Ivantis's patent attorney, Jim Shay, offered to purchase the patent family that comprises the patents-in-suit. *See* Sight Sciences' Second Amended Complaint at ¶¶30-33; Defendants' Supplemental Response to Sight Sciences' First Set of Interrogatories, Interrogatory No. 2 at pp. 6-7. Defendants' Invalidity Contentions fail to address Ivantis's tacit admission of validity.

Seventh, the Asserted Patents are presumed valid and Defendants bear the burden to prove invalidity by clear and convincing evidence.  *See* 35 U.S.C. § 282(a); *SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1089 (Fed. Cir. 2014) (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2242 (2011)); *see also Anvik Corp. v. Nikon Precision, Inc.*, 519 F. App'x 1019, 1025 (Fed. Cir. 2013) (noting the "high burden of proof requiring the defendants to produce clear and convincing evidence of facts invalidating the asserted claims"). For each of the foregoing reasons, Defendants' Invalidity Contentions fail to make a *prima facie* showing of invalidity of any asserted claim of the patents-in-suit.

D.  **Identification of the Person(s) Most Knowledgeable**

Persons most knowledgeable of facts relating to the inventions claimed in the patents-in-

suit include co-inventors Paul Badawi and David Badawi.  Sight Sciences additionally reserves the right to rely upon the opinion testimony of one or more lay or expert witnesses.

### E.  **Identification of Documents**

The documents cited in this response, including the patents-in-suit and file histories for the patents-in-suit, support Sight Sciences' response to this interrogatory.

### F.  **Reservation of Right to Further Supplement**

Discovery is ongoing and Sight Sciences reserves the right to amend, supplement or otherwise change its response to this Interrogatory, including by asserting additional theories, arguments, contentions, or other evidence uncovered during fact and expert discovery in accordance with the deadlines in the Scheduling Order and Rule 26(e).

**INTERROGATORY NO. 9:**

If You contend that the Asserted Patents comply with 35 U.S.C. § 112, First Paragraph, explain the complete basis for Your contention on a claim-by-claim basis, including an identification of all portions of the specification that You contend provide alleged written description support (including all citations to relevant specifications and figures) and all bases for Your contention that any such patent claim is allegedly enabled. Your answer should also include an Identification of the Person(s) most knowledgeable about Your answer and an Identification of Documents that relate to or support Your answer.

**RESPONSE TO INTERROGATORY NO. 9:**

Sight Sciences incorporates by reference its General Responses and Objections.

Sight Sciences objects to this Interrogatory as a premature contention interrogatory. According to the Scheduling Order, parties who do not carry the burden of proof on a claim or defense need not respond to a contention interrogatory until 30 days after the deadline for the substantial completion of document production, i.e., April 10, 2023. Scheduling Order, D.I. 93, ¶

2(f); *see also Novanta Corp. v. Iradion Laser, Inc.*, No. 15-1033-SLR-SRF, 2016 WL 4987110, at *7-8 (D. Del. Sept. 16, 2016) (collecting cases holding that "courts tend to deny contention interrogatories filed before substantial discovery has taken place" and "[are] premature when filed before substantial documentary or testimonial discovery ha[s] been completed," concluding that "[i]t would be premature to require [a party] to detail with specificity and finality the factual and legal bases for its claims in the early stages of discovery" and ordering supplementation of responses to contention interrogatories in accordance with Rule 26(e) and the Scheduling Order). Sight Sciences will provide a complete response to this interrogatory in accordance with Rule 26(e) and the Scheduling Order, to the extent that it is able to do so in light of the deficiencies in Defendants' disclosure of their invalidity contentions relating to written description and enablement. To date, Defendants have served only conclusory Invalidity Contentions, which are deficient and incomplete as related to Defendants' contentions that the Asserted Patents allegedly fail to comply with 35 U.S.C. § 112.  For example, Defendants' Initial Invalidity Contentions provide only terse, conclusory assertions and do not provide any citations to supporting evidence from the intrinsic or extrinsic record.  Defendants' Initial Invalidity Contentions also fail to address each element of the tests for proving invalidity based on an alleged lack of written description or enablement. Sight Sciences' response is therefore limited based on its current understanding, if any, of Defendants' invalidity positions expressed in Defendants' Initial Invalidity Contentions served on September 1, 2022, supplemented on September 22, 2022, and further corrected on October 6, 2022 (collectively, "Defendants' Invalidity Contentions").  Sight Sciences reserves the right to amend, supplement or otherwise change its response to this Interrogatory, including by asserting additional theories, arguments, contentions, or other evidence uncovered during fact and expert discovery, if and/or when Defendants provide more

fulsome Invalidity Contentions.

Sight Sciences objects to this Interrogatory as premature to the extent that it seeks Sight Sciences' legal conclusions and/or calls for expert analysis before the Court has entered an order on claim construction. Discovery is at its early stages and claim construction exchanges have just begun. Defendants have failed to incorporate their proposed claim constructions into their Initial Invalidity Contentions. To the extent Defendants later attempt to raise a claim construction dispute or issue not timely identified and raised during the claim construction process required by the Scheduling Order, Defendants' have waived. Sight Sciences continues to reserve the right to modify and/or supplement this response, including to include additional argument in view of the parties' claim construction arguments and evidence.

Sight Sciences objects to this Interrogatory as prematurely seeking information that is more properly the subject of expert testimony, which Sight Sciences will likewise disclose in accordance with the operative Scheduling Order.

Sight Sciences objects to this Interrogatory to the extent it attempts to shift the burden of proving invalidity in this case to Sight Sciences. The Asserted Patents are presumed valid and Defendants at all times bear the burden of proving invalidity.

Sight Sciences objects to this Interrogatory on the grounds that it is compound and consists of multiple sub-parts and as a result, Sight Sciences reserves the right to object to this and future interrogatories on the ground that Defendants have exceeded the permissible number of interrogatories.

Sight Sciences further objects to this Interrogatory to the extent it seeks a legal conclusion or legal analysis and would implicate the mental impressions of counsel to provide a proper response.

Subject to the foregoing general and specific objections, Sight Sciences responds as follows:

All claim elements of Sight Science's Asserted Claims of the Asserted Patents satisfy the written description and enablement requirements of 35 U.S.C. § 112, First Paragraph. Defendants' Invalidity Contentions purport to identify at Section VI various claim elements of the Asserted Patents that allegedly fail to either (1) objectively demonstrate to a POSA that the patent applicant possessed the claimed subject matter when the patent application was filed, and/or (2) teach a POSA how to make and use the claimed invention without undue experimentation. Sight Sciences identifies the following non-limiting disclosures from the Asserted Patents and prosecution histories that indicate the specifications provide sufficient description to support that the inventors possessed the claimed subject matter and/or teach a POSA how to make and use the claimed invention:

### A. "wherein at least a portion of the arcuate member has a radius of curvature smaller than the radius of curvature of curvature of Schlemm's canal…"

The limitation "wherein at least a portion of the arcuate member has a radius of curvature smaller than the radius of curvature of curvature of Schlemm's canal…" is enabled and has sufficient written description support. For example, the '443 patent[1] discloses that "[t]he support may comprise a stiff arcuate member having a radius of curvature smaller or larger than that of Schlemm's canal." ('443 patent, 4:13-15). Similarly, "FIGS. 11A-B and D illustrate configurations of supports having a smaller radius of curvature then Schlemm's canal. Figure 11C shows a support having a larger radius of curvature than Schlemm's canal." (*Id.* at Figs. 11A-D, 5:53-56; *see also id.* at 8:12-21, 11:60-12:22.) *See also* '443 File History: 2015-02-23

---

[1] Sight Sciences cites to portions of the '443 patent, but because all five Asserted Patents share substantially identical specifications, citations to disclosures from one patent encompass the parallel citations in the other Asserted Patents that contain this claim limitation or a limitation

Examiner Response at 2-4; 2015-06-23 Applicant Arguments at 11-17; 2015-07-10 Non-Final Rejection at 3-6; 2015-12-03 Applicant Initiated Interview Summary; 2016-01-11 Applicant Arguments/Remarks Made in an Amendment at 15-16; 2016-03-01 Notice of Allowance). The '742 patent file history provides further support. (*See* '742 File History: 2018-08-09 Non-Final Rejection at 3-4; 2018-12-10 Applicant Remarks at 1, 9-10.) Sight Sciences incorporates herein by reference its claim construction briefing and all evidence offered in support.

### B.  "a method for treating an eye condition"

The phrase "a method for treating an eye condition" appears in the preamble of the '742 patent, claim 1.  Defendants failed to raise any argument concerning the preamble of the '742 patent during claim construction. As such, this argument has been waived.

### C.  "wherein the support has a cross-sectional diameter"

The limitation "wherein the support has a cross-sectional diameter" is enabled and has sufficient written description support.  This limitation appears in the following Asserted Patent(s) and claims: '443 patent, claims 54 and 55.  To date, Defendants' § 112 invalidity arguments related to this claim term are unintelligible and deficient.  Defendants have served only conclusory Invalidity Contentions that do not provide any citations to supporting evidence from the intrinsic or extrinsic record.  Defendants' Initial Invalidity Contentions also fail to address each element of the tests for proving invalidity based on insufficient written description or enablement.  Accordingly, Sight Sciences is unable to provide a complete response for this limitation. However, to the extent Sight Sciences is able to understand Defendants' argument, Sight Sciences identifies the following exemplary disclosures from the specification and file history of the '443 patent that support § 112 validity: '443 patent at 2:35-39, 8:42-9:10, 11:60-12:22, Fig. 5B, Figs. 11A-D.

---

substantially similar.

### D.   "support"

The "support" limitation is enabled and has sufficient written description support.  This

limitation appears in the following Asserted Patent(s) and claims: '482 patent, claims 1, 32, 63;

'443 patent, claims 1 and 58; '361 patent, claim 1; '742 patent, claim 1; '328 patent, claim 1.

This term is the subject of the parties' current claim construction briefing. As such, Sight

Sciences incorporates by reference its Opening Claim Construction brief and supporting

Declaration of Dr. Crawford Downs into this response as though fully set forth herein, along

with all other claim construction arguments and evidence Sight Sciences submits to the Court.

Sight Sciences further identifies the following disclosures from the Asserted Patents that provide

written description and enablement support: '482 Patent at 2:55-65, 7:23-28, 7:48-8:3, 8:4-6,

8:31- 9:9, 15:5-15, 17:2-8, Figs. 5A-5C, Figs. 8A- 8H, Figs. 9A-9B, Figs. 10A-10C, Figs. 11A-

11C, Figs. 12A-12H; '443 Patent at Fig. 11D. The prosecution histories of the Asserted Patents

provides further § 112 support. (*See* '789 File History: 2006-06-26 Claims; 2009-11-09

Amendment to the Claims; 2010-09-02 Amendment in Response to Non-Final Office Action;

2010-12-22 Amendment under 37 C.F.R. § 1.114; 2011-02-02 Notice of Allowance, including p.

2; '482 File History: 2012-01-26 Non-Final Rejection, including pp. 4-5; 2012-06-11 Notice of

Allowance, including p. 2; '443 File History: 2011-02-10 Original Claims; 2014-08-22

Amendment to the Claims; 2015-01-13 Amendment to the Claims, including Claims 1, 14, 15;

2015-02-23 Non-Final rejection, including pp. 1-16; 2015-06-23 Response to Office Action,

Claims, and Applicant Remarks, including pp. 1-19; 2015-07-10 Non-final Rejection, including

pp. 1-15; 2015-12-03 Applicant Initiated Interview Summary; 2016-01-11 Response to Office

Action, Claims, and Applicant Arguments/Remarks Made in Amendment,  including pp. 1-22;

2016-03-01 Notice of Allowance; '361 File History: 2012-04-12 Original Claims; 2015-08-03

Amendment Response to Non-Final Office Action; 2015-08-19 Final Rejection, including p. 3;

2015-11-19 Applicant Remarks, including pp. 5-7; 2015-12-14 Non-Final Rejection, including p. 3; 2016-06-14 Amendment to the Claims, including Claim 10; 2016-07-13 Notice of Allowance, including pp. 1-3; '328 File History: 2019-05-15 Original claims in parent application; 2019-10-24 Preliminary Amendment to the Claims filed in Continuation application; 2022-04-26 Non-final Rejection; 2022-06-08 Notice of Allowance; '742 File History: 2016-06-14 Original claims in parent application; 2016-12-07 Preliminary Amendment to the Claims filed in Continuation application; 2018-08-09 Non-final Rejection; 2019-02-06 Notice of Allowance.)

### E. "wherein the support has a first shape prior to insertion within Schlemm's canal and a second shape after insertion"

The limitation "wherein the support has a first shape prior to insertion within Schlemm's canal and a second shape after insertion" is enabled and has sufficient written description support.  This limitation appears in the following Asserted Patents and claims: '328 patent, claim 26.  There is written description and enablement support for this claim limitation in the disclosures of the Asserted Patents.  For example, the '328 patent discloses that "[i]n some variations, at least a portion of the support is made from a shape memory material…. If shape memory material is used, the support can have a compressed state prior to and during implantation into Schlemm's canal, and an expanded state following implantation to open the canal." ('328 patent, 3:6-18; *see also* 11:56-12:10; 13:7-14:3; 14:36-59; 18:8-27; Figs. 8C-D; Figs. 10B-C).

To the extent Defendants' written description and/or enablement arguments overlap with any aspect of their indefiniteness allegations, Sight Sciences incorporates its response to Interrogatory No. 10 as though fully set forth herein.

The Asserted Patents are presumed valid and Defendants bear the burden to prove invalidity by clear and convincing evidence.  *See* 35 U.S.C. § 282(a); *SSL Servs., LLC v. Citrix*

*Sys., Inc.*, 769 F.3d 1073, 1089 (Fed. Cir. 2014) (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2242 (2011)); *see also Anvik Corp. v. Nikon Precision, Inc.*, 519 F. App'x 1019, 1025 (Fed. Cir. 2013) (noting the "high burden of proof requiring the defendants to produce clear and convincing evidence of facts invalidating the asserted claims"). Defendants' Invalidity Contentions fail to meet this high burden.

### F.  Identification of the Person(s) Most Knowledgeable

Persons knowledgeable of facts relating to the inventors' possession and enablement of the inventions claimed in the patents-in-suit include co-inventor Paul Badawi.  Sight Sciences additionally reserves the right to rely upon the opinion testimony of one or more lay or expert witnesses.

### G.  Identification of Documents

The documents cited in this response, including the patents-in-suit and file histories for the patents-in-suit, support Sight Sciences' response to this interrogatory.

### H.  Reservation of Right to Further Supplement

Discovery is in its early stages and ongoing, and Sight Sciences reserves the right to amend, supplement or otherwise change its response to this Interrogatory, including by asserting additional theories, arguments, contentions, or other evidence uncovered during fact and expert discovery.

**INTERROGATORY NO. 10:**

If You contend that the Asserted Patents comply with 35 U.S.C. § 112, Second Paragraph, explain the complete basis for Your contention on a claim-by-claim basis, including an identification of all portions of the specification and file histories that You contend provide alleged reasonable certainty about the scope of the invention (including all citations to any relevant portions of the specifications and file histories). Your answer should also include an Identification of the Person(s)

most knowledgeable about Your answer and an Identification of Documents that relate to or support Your answer.

**RESPONSE TO INTERROGATORY NO. 10:**

Sight Sciences incorporates by reference its General Responses and Objections.

Sight Sciences objects to this Interrogatory as a premature contention interrogatory. According to the Scheduling Order, parties who do not carry the burden of proof on a claim or defense need not respond to a contention interrogatory until 30 days after the deadline for the substantial completion of document production, i.e., April 10, 2023. Scheduling Order § 2(f); *see also Novanta Corp. v. Iradion Laser, Inc.*, No. 15-1033-SLR-SRF, 2016 WL 4987110, at *7-8 (D. Del. Sept. 16, 2016) (collecting cases holding that "courts tend to deny contention interrogatories filed before substantial discovery has taken place" and "[are] premature when filed before substantial documentary or testimonial discovery ha[s] been completed," concluding that "[i]t would be premature to require [a party] to detail with specificity and finality the factual and legal bases for its claims in the early stages of discovery" and ordering supplementation of responses to contention interrogatories in accordance with Rule 26(e) and the Scheduling Order). Sight Sciences will respond to this interrogatory in accordance with Rule 26(e) and the Scheduling Order.

Sight Sciences objects that this Interrogatory is vague and ambiguous because Defendants' Initial Invalidity Contentions provide only terse, conclusory assertions and do not provide any citations to supporting evidence from the intrinsic or extrinsic record.  Sight Sciences reserves the right to amend, supplement or otherwise change its response to this Interrogatory, including by asserting additional theories, arguments, contentions, or other evidence uncovered during fact and expert discovery, if and/or when Defendants provide more fulsome Invalidity Contentions.

Sight Sciences objects to this Interrogatory as premature to the extent that it conflicts with the Court ordered deadlines for claim construction exchanges in this case (*see* D.I. 93), which will address the parties' indefiniteness disputes, and to the extent that it seeks Sight Sciences' legal conclusions and/or calls for expert analysis before the Court has entered an order on claim construction. Discovery is at its early stages and claim construction exchanges have just begun. Defendants have not yet served their responsive claim construction brief and any evidence allegedly supporting their indefiniteness arguments. To the extent Defendants later attempt to raise a claim construction dispute, including any new indefiniteness disputes not addressed during the allotted time for claim construction, Defendants' arguments will have been waived. Sight Sciences continues to reserve the right to modify and/or supplement this response, including to include additional argument in view of Defendants' arguments during claim construction.

Sight Sciences objects to this Interrogatory as prematurely seeking information that is more properly the subject of expert testimony, which Sight Sciences will likewise disclose in accordance with the operative Scheduling Order.

Sight Sciences objects to this Interrogatory to the extent it attempts to shift the burden of proving invalidity in this case to Sight Sciences. The Asserted Patents are presumed valid and Defendants at all times bear the burden of proving invalidity.

Sight Sciences objects to this Interrogatory to the extent it seeks a legal conclusion or legal analysis and would implicate the mental impressions of counsel to provide a proper response.

Subject to the foregoing general and specific objections, Sight Sciences responds as follows:

## A.  Incorporation by Reference of Claim Construction Proceedings

All claim elements of Sight Science's Asserted Claims of the Asserted Patents are definite. Defendants' Invalidity Contentions purport to identify at Section V claim elements of the Asserted Patents that allegedly fail to inform a POSITA of the scope of the invention(s) with reasonable certainty and thus allegedly violate 35 U.S.C. § 112, Second Paragraph. Similarly, Defendants have identified at least six overlapping claim terms as allegedly indefinite in its Identification of Claim Terms Needing Construction, served on October 6, 2022.

Sight Sciences has provided its positions related to Defendants' indefiniteness allegations in its opening claim construction brief and supporting declaration from Sight Science's expert, Dr. Crawford Downs. As such, Sight Sciences incorporates its Opening Claim Construction brief and supporting Declaration of Dr. Crawford Downs into this response as though fully set forth herein, along with all other argument and evidence that it submits to the Court.  Sight Sciences has not yet received Defendants' Responsive Claim Construction brief. To the extent Defendants' Responsive Claim Construction brief identifies new and/or different indefiniteness arguments than those articulated in Defendants' Invalidity Contentions, Sight Sciences will respond to those new and/or different arguments in accordance with the schedule for claim construction briefing and/or any other briefing ordered by the Court in this case. To the extent Defendants later attempt to raise any new indefiniteness dispute not addressed during the allotted time for claim construction, Defendants' arguments will have been waived.

The Asserted Patents are presumed valid and Defendants bear the burden to prove invalidity by clear and convincing evidence.  *See* 35 U.S.C. § 282(a); *SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1089 (Fed. Cir. 2014) (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2242 (2011)); *see also Anvik Corp. v. Nikon Precision, Inc.*, 519 F. App'x 1019, 1025 (Fed. Cir. 2013) (noting the "high burden of proof requiring the defendants to produce clear

and convincing evidence of facts invalidating the asserted claims"). Defendants' Invalidity Contentions fail to meet this high burden.

### B.   Identification of the Person(s) Most Knowledgeable

Persons knowledgeable of facts relating to the definiteness of the claimed inventions in the patents-in-suit include co-inventor Paul Badawi. Sight Sciences additionally reserves the right to rely upon the opinion testimony of one or more lay or expert witnesses.

### C.   Identification of Documents

The documents cited in this response, including the patents-in-suit and file histories for the patents-in-suit, support Sight Sciences' response to this interrogatory.

### D.   Reservation of Right to Further Supplement

Discovery is in its early stages and ongoing, and Sight Sciences reserves the right to amend, supplement or otherwise change its response to this Interrogatory, including by asserting additional theories, arguments, contentions, or other evidence uncovered during fact and expert discovery.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

COOLEY LLP
Michelle S. Rhyu
David Murdter
Deepa Kannappan
Emily M. Ross
Benjamin S. Lin
Priyamvada Arora
Lauren Strosnick
3175 Hanover Street
Palo Alto, CA  94304-1130
(650) 843-5000

Orion Armon
1144 15th Street, Suite 2300
Denver, CO  80202-2686
(720) 566-4000

*Attorneys for Sight Sciences, Inc.*

Dated:  December 1, 2022

EXHIBIT 5
(excerpted)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | C. A. No.:  21-1317-GBW-SRF |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | **HIGHLY CONFIDENTIAL –** |
| IVANTIS, INC., ALCON RESEARCH LLC, | ) | **OUTSIDE ATTORNEYS' EYES** |
| ALCON VISION, LLC AND ALCON INC., | ) | **ONLY** |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF SIGHT SCIENCES, INC.'S OBJECTIONS AND RESPONSES
TO DEFENDANTS' THIRD SET OF INTERROGATORIES (NOS. 11-18)**

Pursuant to Rule 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of this Judicial District, Plaintiff Sight Sciences, Inc. ("Sight Sciences") hereby responds to Defendants Ivantis, Inc., Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc.'s ("Defendants") Third Set of Interrogatories (Nos. 11-18), dated March 31, 2023.

**GENERAL RESPONSES**

1.      Sight Sciences' response to the Interrogatories is made to the best of Sight Sciences' present knowledge, information, and belief. This response is at all times subject to such additional or different information that discovery or further investigation may disclose and, while based on the present state of Sight Sciences' recollection, is subject to such refreshing of recollection, and such additional knowledge of facts, as may result from Sight Sciences' further discovery or investigation.

2.      Sight Sciences reserves the right to make any use of, or to introduce at any hearing and at trial, information and/or documents responsive to the Interrogatories but discovered subsequent to the date of this response, including, but not limited to, any such information or documents obtained in discovery in this action.

1

Sight Sciences will respond to each Interrogatory according to its ordinary meaning, without reference to Defendants' usage statements.

### <u>SPECIFIC OBJECTIONS AND RESPONSES</u>

Without waiving or limiting in any manner any of the foregoing General Objections, but rather incorporating them into each of the following responses to the extent applicable, Sight Sciences responds to the specific Interrogatories in Defendants' Third Set of Interrogatories as follows:

**INTERROGATORY NO. 11:**

In light of Your response to Defendants' Interrogatory Number 4 stating that "Ivantis's infringement began as of the date of the first commercial offer for sale of the Accused Product" for the '482, '443, and '361 patents and "as of the date of issuance of the '742 patent" for the '742 patent, explain in detail why Sight Sciences, Inc. did not file this case until September 16, 2021 against Ivantis, Inc. for alleged infringement of the '482, '443, '361, and '742 patents. Your answer should also include an Identification of the Person(s) most knowledgeable about Your answer and an Identification of Documents that relate to or support Your answer.

**RESPONSE TO INTERROGATORY NO. 11:**

Sight Sciences incorporates by reference its General Responses and Objections.  Sight Sciences further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or protection from discovery, or to the extent it seeks a legal conclusion or legal analysis and would implicate the mental impressions of counsel to provide a proper response.

Subject to the foregoing general and specific objections, Sight Sciences responds as follows:

Sight Sciences made an initial public offering ("IPO") of stock in mid-July, 2021. ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████ *See*, *e.g.*, *Genzyme Corp. v. Atrium Med. Corp.*, C.A. No. 00-958-MPT, 2003 U.S. Dist. LEXIS 12784, at *23, *17 (D. Del. July 22, 2003) (finding that plaintiff's "delay in bringing suit was not unreasonable or inexcusable" based on "ample evidence that [plaintiff] waited for the matter to be economically justified prior to filing suit," when plaintiff waited 4.5 years to file suit for patent infringement); *see also Power Integrations, Inc. v. BCD Semiconductor Corp.*, C.A. No. 07-633-JJF-LPS, 2008 U.S. Dist. LEXIS 108333, at *41 (D. Del. Nov. 4, 2008) (noting that "a showing of irreparable harm is not precluded by a delay in moving for a preliminary injunction"); *see also Butamax Advanced Biofuels LLC v. Gevo, Inc.*, 868 F. Supp. 2d 359, 374 (D. Del. 2012) ("[D]irect competition in a marketplace weighs heavily in favor of a finding of irreparable injury.") (internal quotation marks omitted).  Paul Badawi is the person most knowledgeable about Sight's answer to this Interrogatory.  Pursuant to Federal Rule of Civil Procedure 33(d), Sight Sciences further identifies the following documents from which information responsive to this Interrogatory may be ascertained:  SGHT0155149-SGHT0155174; SGHT0155183; SGHT0155894-SGHT0155898; SGHT0155899-SGHT0155905; SGHT0155910-SGHT0155912; SGHT0155906-SGHT0155909; SGHT0156635-SGHT0156649; SGHT0154841-SGHT0155148; SGHT0159226-SGHT0159228; SGHT0159218-SGHT0159219; SGHT0159212-SGHT0159214; SGHT0159215-SGHT0159217; SGHT0159248-SGHT0159250; SGHT0159220-SGHT0159222; SGHT0159223-SGHT0159225; SGHT0159229-SGHT0159231; SGHT0159232-SGHT0159234; SGHT0159235-SGHT0159237; SGHT0159238-SGHT0159240; SGHT0159241-SGHT0159243; SGHT0159244-SGHT0159247; SGHT0159251;      SGHT0159874-SGHT0160169;      SGHT0159252;      SGHT0159254-SGHT0159256;   SGHT0159257;   SGHT0159253;   SGHT0159258;   SGHT0159259; SGHT0159260-SGHT0159261; SGHT0159262-SGHT0159275; SGHT0159276-SGHT0159283; SGHT0159284;      SGHT0157356-SGHT0157365;      SGHT0159285;      SGHT0159286-SGHT0159287;   SGHT0159291;   SGHT0159293;   SGHT0159289;   SGHT0159290; SGHT0159288;      SGHT0159292;      SGHT0155175;      SGHT0159294-SGHT0159296; SGHT0159297;      SGHT0154655-SGHT0154840;      SGHT0159300;      SGHT0159298-

SGHT0159299; SGHT0159301; SGHT0159302-SGHT0159304; SGHT0155176-SGHT0155179; SGHT0155180-SGHT0155182; SGHT0155184-SGHT0155185; SGHT0155186-SGHT0155188; SGHT0155189-SGHT0155190; SGHT0155191-SGHT0155797; SGHT0155798-SGHT0155831; SGHT0155832-SGHT0155836; SGHT0155837-SGHT0155875; SGHT0155876-SGHT0155887; SGHT0155888-SGHT0155893; SGHT0155913-SGHT0155915; SGHT0155916-SGHT0155918; SGHT0155919-SGHT0155970; SGHT0155971-SGHT0156013; SGHT0156014-SGHT0156156; SGHT0156157-SGHT0156164; SGHT0156165-SGHT0156169; SGHT0156170-SGHT0156171; SGHT0156172-SGHT0156173; SGHT0156174-SGHT0156175; SGHT0156176-SGHT0156177; SGHT0156178-SGHT0156179; SGHT0156180-SGHT0156181; SGHT0156182-SGHT0156444; SGHT0156445-SGHT0156560; SGHT0156561-SGHT0156569; SGHT0156570; SGHT0156571-SGHT0156573; SGHT0156574-SGHT0156576; SGHT0156577-SGHT0156581; SGHT0156582-SGHT0156586; SGHT0156587-SGHT0156602; SGHT0156603-SGHT0156607; SGHT0156608-SGHT0156612; SGHT0156613-SGHT0156614; SGHT0156615-SGHT0156616; SGHT0156617-SGHT0156618; SGHT0156619-SGHT0156620; SGHT0156621-SGHT0156622; SGHT0156623-SGHT0156624; SGHT0156625-SGHT0156626; SGHT0156627-SGHT0156628; SGHT0156629-SGHT0156630; SGHT0156631-SGHT0156632; SGHT0156633; SGHT0156634; SGHT0156650; SGHT0156651-SGHT0156958; SGHT0156959-SGHT0157254; SGHT0157255-SGHT0157256; SGHT0157257-SGHT0157274; SGHT0157275-SGHT0157277; SGHT0157278-SGHT0157279; SGHT0157280-SGHT0157281; SGHT0157282-SGHT0157284; SGHT0157285-SGHT0157289; SGHT0157290; SGHT0157291-SGHT0157292; SGHT0157293-SGHT0157294; SGHT0157295-SGHT0157296; SGHT0157297-SGHT0157298; SGHT0157299-SGHT0157344; SGHT0157345-SGHT0157355; SGHT0157366-SGHT0157367; SGHT0157368-SGHT0158147; SGHT0158148-SGHT0158149; SGHT0158150-SGHT0158151; SGHT0158152-SGHT0158337; SGHT0158338-SGHT0158387; SGHT0158388-SGHT0159115; SGHT0159116-SGHT0159120; SGHT0159121-SGHT0159125; SGHT0159126-SGHT0159164; SGHT0159165-SGHT0159167; SGHT0159168-SGHT0159177; SGHT0159178-SGHT0159179; SGHT0159305-SGHT0159307; SGHT0159308-SGHT0159310;

SGHT0159313-SGHT0159314;      SGHT0159315;      SGHT0159316;      SGHT0159312;
SGHT0159317-SGHT0159367; SGHT0159368-SGHT0159376; SGHT0159377-SGHT0159414;
SGHT0159311;      SGHT0159415;      SGHT0159462-SGHT0159470;      SGHT0159416-
SGHT0159461;      SGHT0159471;      SGHT0159472;      SGHT0159473;      SGHT0159474;
SGHT0159475;      SGHT0159476-SGHT0159515;      SGHT0159516;      SGHT0159517-
SGHT0159520;      SGHT0159521-SGHT0159527;      SGHT0159533-SGHT0159547;
SGHT0159528-SGHT0159532; SGHT0159548-SGHT0159557; SGHT0159558-SGHT0159711;
SGHT0159813-SGHT0159826;      SGHT0159712-SGHT0159812;      SGHT0159827;
SGHT0159828;      SGHT0159829;      SGHT0159831;      SGHT0159830;      SGHT0159832-
SGHT0159870; SGHT0159871-SGHT0159873; SGHT0159180-SGHT0159211.

Discovery is ongoing and Sight Sciences reserves the right to amend, supplement or otherwise change its response to this Interrogatory, including by asserting additional theories, arguments, contentions, or other evidence uncovered during fact and expert discovery.

**INTERROGATORY NO. 12:**

Describe in detail the complete factual and legal bases for any equitable relief You contend You are entitled to, including Your request for a "preliminary and/or permanent injunction per 35 U.S.C. § 283" on page 48 of Your Second Amended Complaint.

**RESPONSE TO INTERROGATORY NO. 12:**

Sight Sciences incorporates by reference its General Responses and Objections.  Sight Sciences further objects to this Interrogatory to the extent it prematurely seeks expert testimony, which Sight Sciences will disclose in accordance with the Scheduling Order. Sight Sciences objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection from discovery, or to the extent it seeks a legal conclusion or legal analysis and would implicate the mental impressions of counsel to provide a proper response.

Subject to the foregoing general and specific objections, Sight Sciences responds as follows:

combination with cataract surgery. *See* https://www.accessdata.fda.gov/cdrh_docs/pdf20/K202678.pdf. The OMNI Surgical System's indication encompasses that of the Hydrus Microstent, which is indicated in conjunction with cataract surgery to reduce intraocular pressure ("IOP") in patients with mild to moderate glaucoma. *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPMA/pma.cfm?id=P170034. Relevant data shows that the OMNI Surgical System is more efficacious than the Hydrus Microstent and that Sight had (and has) the capacity to serve every Hydrus patient, (*see, e.g.*, SGHT0154465; IVANTIS_SS_00148281), such that enjoining Defendants' infringing activities would have no detrimental effect on patients both with respect to the availability and the effectiveness of treatment.

Moreover, there exists a strong public interest in the protection of intellectual property and enforcement of patent rights for inventive technologies. *Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013). The public interest thus weighs in favor of protecting the patent rights that Sight Sciences secured in the Asserted Patents.

Discovery is ongoing and Sight Sciences reserves the right to amend, supplement or otherwise change its response to this Interrogatory, including by asserting additional theories, arguments, contentions, or other evidence uncovered during fact and expert discovery.

**INTERROGATORY NO. 13:**

Describe in detail your development of the Helix Microstent, including the origin of the idea for the Helix Microstent, the individuals involved in the conception, reduction to practice, and testing of the Helix Microstent and whether Sight Sciences abandoned its development.

**RESPONSE TO INTERROGATORY NO. 13:**

Sight Sciences incorporates by reference its General Responses and Objections. Sight Sciences further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or protection from discovery, or to the extent it seeks a legal conclusion or legal analysis and would implicate the mental impressions of counsel to provide a proper response. Sight further objects to

the extent it seeks to apply a legal definition of "conception" or "reduction to practice."

Subject to the foregoing general and specific objections, Sight Sciences responds as follows:

In the late 2005 or early 2006 time frame, Paul Badawi, an experienced venture capital investor specializing in medical devices, and Dr. David Badawi, an ophthalmologist, decided to co-found a company to bring new innovations in glaucoma therapy to people who suffer from potentially blinding glaucoma disease.  Dr. Badawi is an eye surgeon and cornea specialist. He was trained at Georgetown University (1991-1995), attended an ophthalmology residency program at the Jules Stein Eye Institute at UCLA (1996-1999), engaged in corneal transplantation training at Emory University (1999-2000), was appointed an Assistant Professor of Ophthalmology at University of Illinois (2001-2010), and is in private practice. Paul Badawi has a background in healthcare venture capital and biochemistry research and healthcare startup operations. He worked at 3i Group, a global private equity firm (2004-2009) where he was a partner and head of 3i's US healthcare venture capital practice, where he made ten early, mid, and late stage medical device investments totaling $120MM, engaged in founder-level work in three medical device start-ups, and held active or observer roles on at least eight boards of directors, including at IntelliDx, NeoGuide, OmniGuide, Transmedics, Triage Wireless, Ulthera, Xthetix, and Zonare. Prior to his work at 3i, Paul Badawi worked at CW Group and Delta Opportunity Fund (1999-2002), was Vice President of Strategy at Medrium, and a Research Fellow at The National Institutes of Health (1995-1998). Paul Badawi holds an MBA from UCLA and an BS Biological Sciences from the University of Chicago.

Relying upon their combined business and medical knowledge and expertise, the Badawi brothers conceived of new methods and devices that would lower intraocular pressure more effectively than then-existing bypass stents and that were less-invasive than then-existing treatment options such as trabeculectomy and ab externo canaloplasty.  As explained in the specification and recited in the asserted claims of the Asserted Patents, the Badawi brothers concluded that intraocular supports could more effectively target the primary source of outflow

resistance in the trabecular meshwork if they were designed to maximize patency while minimizing obstruction by propping Schlemm's canal in a manner that promoted increased transmural flow across the trabecular meshwork and increased transluminal flow around and across the canal.  Paul and David Badawi conceived of the support designs that are disclosed and claimed in the Asserted Patents during the first half of 2006 during in-person and remote collaboration sessions that culminated in an invention disclosure that was filed as Patent Application No. 12/695,053 on June 26, 2006.

Paul and David Badawi self-funded much of their early work, but eventually obtained outside funding that enabled them increase the pace of development towards commercializing a support.  Sight Sciences used the term "Helix" to refer to a series of prototype supports. Prototype designs included ███████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████. ████████

████████  ████████  ████████  ████████  ████████

████████████████  ███████████████████████████

█████████████████████  █████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

The Sight Sciences individuals materially involved in these efforts were Paul Badawi, David Badawi, and Dan O'Keeffe.

Pursuant to Federal Rule of Civil Procedure 33(d), Sight Sciences further identifies the following exemplary documents from which information responsive to this Interrogatory may be ascertained:    SGHT0008228-265; SGHT0024384-433; SGHT0032673-702; SGHT0135731; SGHT0024316-333;    SGHT0024334-383;    SGHT0131937-981;    SGHT0131989-039; SGHT0132041-090;    SGHT0132125-174;    SGHT0135732-782;    SGHT0022881-883; SGHT0026411-414; SGHT0160170-SGHT0161677.

Discovery is ongoing and Sight Sciences reserves the right to amend, supplement or otherwise change its response to this Interrogatory, including by asserting additional theories, arguments, contentions, or other evidence uncovered during fact and expert discovery.

**INTERROGATORY NO. 14:**

Explain in detail all of Your factual and legal bases for why You contend the Helix Microstent is a Covered Product, describing your contention for each Asserted Claim on a claim-by-claim and element-by-element basis.

**RESPONSE TO INTERROGATORY NO. 14:**

Sight Sciences incorporates by reference its General Responses and Objections.  Sight Sciences further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or protection from discovery, or to the extent it seeks a legal conclusion or legal analysis and would implicate the mental impressions of counsel to provide a proper response.  Sight Sciences further objects that this Interrogatory seeks information that is irrelevant to the claims and defenses at issue in this case.  Sight Sciences further objects that this Interrogatory is overbroad, unduly

20

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

Discovery is ongoing and Sight Sciences reserves the right to amend, supplement or otherwise change its response to this Interrogatory as the company's stent development process continues.

**INTERROGATORY NO. 15:**

Describe in detail Your licensing policy/policies or marketing program(s) concerning the Asserted Patents, including, for example, documents, reports, or presentations that outline the circumstances under which you license Your Intellectual Property. Your answer should also include an Identification of the Person(s) most knowledgeable about Your answer and an Identification of Documents that relate to or support Your answer.

**RESPONSE TO INTERROGATORY NO. 15:**

Sight Sciences objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection from discovery, or to the extent it seeks a legal conclusion or legal analysis and would implicate the mental impressions of counsel to provide a proper response.

Sight Sciences objects to this Interrogatory on the grounds that it is vague and ambiguous to the extent that Defendants' invalidity contentions purport to identify "exemplary" evidence of its licensing policy/policies or marketing program(s).

Sight Sciences objects that this Interrogatory is compound and consists of multiple subparts, and Sight Sciences reserves the right to object to this and future interrogatories on the ground that Defendants have exceeded the permissible number of interrogatories.

Subject to the foregoing general and specific objections, Sight Sciences responds as follows:

██████████████████████████████████████████

████████████████████████████████████████ Paul Badawi is the person most knowledgeable about the non-existence of any Sight Sciences patent licensing or marketing program or policy.

Discovery is ongoing and Sight Sciences reserves the right to amend, supplement or otherwise change its response to this Interrogatory, including by asserting additional theories, arguments, contentions, or other evidence uncovered during fact and expert discovery.

**INTERROGATORY NO. 16:**

Describe any license agreement(s) You contend relate to the technology in the Asserted Patents or a comparable technology, including the name, parties, date, amount and form of payments associated with or pursuant to the license, licensed technology, and comparability (economic and technical) of the agreements. Your answer should also include an Identification of the Person(s) most knowledgeable about Your answer and an Identification of Documents that relate to or support Your answer.

**RESPONSE TO INTERROGATORY NO. 16:**

Sight Sciences incorporates by reference its General Responses and Objections.  Sight Sciences further objects to this Interrogatory as prematurely seeking expert testimony, which Sight Sciences will disclose in accordance with the Scheduling Order.

Sight Sciences objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection from discovery, or to the extent it seeks a legal conclusion or legal analysis and would implicate the mental impressions of counsel to provide a proper response.

Sight Sciences objects that this Interrogatory is compound and consists of multiple subparts, and Sight Sciences reserves the right to object to this and future interrogatories on the ground that Defendants have exceeded the permissible number of interrogatories.

Subject to the foregoing general and specific objections, Sight Sciences responds as follows:

████████████████████████████████████████████████████████

otherwise change its response to this Interrogatory, including by asserting additional theories, arguments, contentions, or other evidence uncovered during fact and expert discovery.

**INTERROGATORY NO. 18:**

For each year You contend You suffered lost profits, describe in detail Your capacity during that year to meet the demand for the Accused Products, including, for example, Your manufacturing and marketing capabilities and market presence. Your answer should also include an Identification of the Person(s) most knowledgeable about Your answer and an Identification of Documents that relate to or support Your answer.

**RESPONSE TO INTERROGATORY NO. 18:**

Sight Sciences incorporates by reference its General Responses and Objections.  Sight Sciences further objects to this Interrogatory as prematurely seeking expert testimony, which Sight Sciences will disclose in accordance with the Scheduling Order.

Sight Sciences objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection from discovery, or to the extent it seeks a legal conclusion or legal analysis and would implicate the mental impressions of counsel to provide a proper response.

Sight Sciences objects that this Interrogatory is compound and consists of multiple subparts, and Sight Sciences reserves the right to object to this and future interrogatories on the ground that Defendants have exceeded the permissible number of interrogatories.

Subject to the foregoing general and specific objections, Sight Sciences responds as follows:

Sight Sciences suffered has suffered lost profits as a consequence of Defendants' infringement from 2018 to present.  Sight Sciences' capacity to meet the demand for the Accused Products each of these years is evident, in part, by the similar number of products manufactured by Sight Sciences and Defendant each year.  In 2018, Defendants sold 1,547 units worldwide. IVANTIS_SS_00420586; 2022-07-07 Ivantis Scheduling Order Section 9.b. Disclosures.  Sight Sciences sold 3,890 units.  SGHT0152605.  In 2019, Defendants sold 18,269 units worldwide.

IVANTIS_SS_00420586; 2022-07-07 Ivantis Scheduling Order Section 9.b. Disclosures.  Sight Sciences sold 18,061 units.  SGHT0152605.  In 2020, Defendants sold 25,440 units worldwide.  IVANTIS_SS_00420586; 2022-07-07 Ivantis Scheduling Order Section 9.b. Disclosures.  Sight Sciences sold 22,434 units.  SGHT0152605.  In 2021, Defendants sold 42,406 units worldwide.  IVANTIS_SS_00420586; 2022-07-07 Ivantis Scheduling Order Section 9.b. Disclosures.  Sight Sciences sold 40,924 units.  SGHT0152605.  From January 1, 2022 through September 30, 2022, Defendants sold 32,103 units worldwide.  IVANTIS_SS_00420586.  ██████████ ████████████████████████     ██████████████     Sight Sciences had the manufacturing infrastructure in place each year to sell all of the OMNI Surgical System units it sold, plus the additional number of the Hydrus Microstent units that were sold because both products are marketed to the same physician and healthcare provider accounts, both products were launched around the same time, and because they were launched relatively recently, their combined annual sales were well within the capacity of Sight's marketing, sales, manufacturing, and distribution abilities.

Sight Sciences' manufacturing capacity is further evidenced by the following manufacturing agreements, SGHT0153031, SGHT0154405, SGHT0154408, SGHT0154432, SGHT0154435, and SGHT0154456, which ████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ██████████████████████████████ty.

Sight Sciences' marketing capacity is evidenced by the growth of its sales and marketing team, which grew from approximately 10 sales representatives in 2018 to approximately 100 sales representatives in 2023.

Persons most knowledgeable about Sight Sciences' marketing, sales, and manufacturing

capacity include Paul Badawi, Mark Papini, and Sam Park.  Sight Sciences additionally reserves the right to rely upon the opinion testimony of one or more lay or expert witnesses.

Discovery is ongoing and Sight Sciences reserves the right to amend, supplement or otherwise change its response to this Interrogatory, including by asserting additional theories, arguments, contentions, or other evidence uncovered during fact and expert discovery.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

*Attorneys for Sight Sciences, Inc.*

COOLEY LLP
Michelle S. Rhyu
David Murdter
Priyamvada Arora
Lauren Strosnick
Alissa Wood
3175 Hanover Street
Palo Alto, CA  94304-1130
(650) 843-5000

Orion Armon
1144 15th Street, Suite 2300
Denver, CO  80202-2686
(720) 566-4000

Allison E. Elkman
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC  20004-2400
(202) 842-7800

Dated: May 1, 2023

EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1317-GBW-SRF |
| | ) | |
| IVANTIS, INC., | ) | |
| ALCON RESEARCH LLC, | ) | |
| ALCON VISION, LLC, | ) | |
| and ALCON INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' NOTICE OF DEPOSITION OF PAUL BADAWI PURSUANT TO FED. R. CIV. P. 30(b)(1)

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil Procedure, counsel for Defendants Ivantis, Inc., Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc. (collectively, "Defendants") will take the deposition of Paul Badawi before a certified court reporter authorized to administer oaths and record testimony. The deposition will take place on Friday, June 23, 2023 beginning at 9 a.m. Pacific Time, at Cooley LLP, 3175 Hanover Street, Palo Alto, CA 94304. The testimony will be recorded by stenographic and/or video-graphic means.

1

OF COUNSEL:
Gregg LoCascio
Noah S. Frank
Justin Bova
Steven Dirks
Socrates L. Boutsikaris
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

Jeannie M. Heffernan
Kat Li
Austin C. Teng
Ryan J. Melde
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX  78701
(512) 678-9100

Ryan Kane
Nathaniel DeLucia
Laura Zhu
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Dated: June 16, 2023

*/s/ Kat Li*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants*

2

## <u>CERTIFICATE OF SERVICE</u>

I, Kat Li, hereby certify that on June 16, 2023, this document was served on the persons listed

below in the manner indicated:

**<u>BY EMAIL</u>**

Melanie K. Sharp
James L. Higgins
Taylor E. Hallowell
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

Orion Armon
COOLEY LLP
1144 15th Street, Suite 2300
Denver, CO 80202
(720) 566-4000
oarmon@cooley.com

Michelle S. Rhyu
David Murdter
Lauren Strosnick
Alissa Wood
Cameron C. Vanderwall
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94305
(650) 843-5000
rhyums@cooley.com
dmurdter@cooley.com
parora@cooley.com
lstrosnick@cooley.com
amwood@cooley.com

*/s/ Kat Li*
Kat Li
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
(512) 678-9100

# EXHIBIT 7
# (excerpted)

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1          ROUGH ASCII -- NOT CERTIFIED

2                N O T I C E

3

4      This transcript is an UNCERTIFIED ROUGH DRAFT

5   TRANSCRIPT.

6      It contains raw output from the court reporter's

7   stenotype machine translated into English by the court

8   reporter's computer, without the benefit of proofreading.

9      It may contain mistranslations (wrong words) and

10   misspellings.  These and any other errors will be

11   corrected in the final transcript.  Since this rough draft

12   transcript has not been proofread, the court reporter

13   cannot assume responsibility for any errors therein.

14      This rough draft transcript is intended to assist

15   attorneys in their case preparation and is not to be

16   construed as the final transcript.  It is not to be read

17   by the witness or quoted in any pleading or for any other

18   purpose and may not be filed with any court.

19

20

21

22

23

24

25

1

♀

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1      THE VIDEOGRAPHER:  Here begins Media Number 1 in the

2   videotaped deposition of Paul Badawi in the matter of

3   Sight Sciences Inc. versus Ivantis Inc. et al., in the

4   United States District Court for the District of Delaware

5   Case Number 211317VACSRF.  Today's date is June 23rd,

6   2023.  The time on the video monitor is 9:06 a.m. Pacific

7   Standard Time.  The videographer today is Lucien Newell

8   representing Planet Depos.  This video deposition is

9   taking place at 3175 Hanover Street, Palo Alto California,

10  94304.

11      Would counsel please voice identify themselves

12  and state whom they represent.

13      MS. HEFFERNAN:  Jeannie Heffernan, Kirkland & Ellis

14  representing the defendants in the case.  With me are Noah

15  Frank and Justin Bova.  Nathaniel DeLucia on Zoom and Adam

16  Pierson is here via Zoom.

17      MS. RHYU:  Michelle Rhyu of the Cooley firm on behalf

18  of Sight Sciences and the witness.

19          Jeremy Hayden, chief legal officer of Sight

20   Sciences.

21       THE VIDEOGRAPHER:   Okay.   The court reporter today is

22   Christa Yan representing Planet Depos.   The witness will

23   now be sworn.

24   BY MS. HEFFERNAN:

25       Q    Good morning, Mr. Badawi.


                                                            2

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1        A    Good morning.

2        Q    Will you please state your name, your full name

3    for the record?

4        A    Paul Badawi.

5        Q    And where do you live?

6        A    I live in Atherton, California.

7        Q    What's your address?

8        A    64 Irving Avenue.

9        Q    And what's your business address?

10       A    440 Campbell Avenue, Menlo Park, California.

11       Q    Have you ever been deposed before?

12       A    I have not.

13       Q    Okay.   I'm sure you've gone over it with your

14   counsel but you and I need to take turns speaking so the

15    court reporter can get a clean record, okay?

16        A    Okay.

17        Q    And you do need to answer verbally so that the

18    court reporter can take down your answer, okay?

19        A    Okay.

20        Q    If I ask a question that you don't understand,

21    please let me know and I'll do my best to rephrase it.

22    Okay?

23        A    Okay.

24        Q    And conversely, if I ask a question and you

25    answer it I will assume that you understood it or it's

⚲

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    fair to assume that you understood it, correct?

2        A    Correct.

3        Q    Okay.  Is there any reason why you can't give

4    complete and accurate testimony today?

5        A    No.

6        Q    Do you understand that you've taken an oath to

7    tell the truth just as you would in a court of law?

8        A    I do.

9        Q    Okay.  Are you on any medications that would

10    impact your ability to tell the truth today?

11         A    No.

12         Q    Do you understand that you've been designated on

13    certain topics on which you will testify on behalf of

14    Sight Sciences today?

15         A    Yes.

16         Q    Okay.  And I've handed the court reporter

17    Exhibit 1 to the Badawi deposition, which is defendant's

18    notice of deposition of plaintiff pursuant to federal rule

19    of civil procedure 30B6.

20              (Whereupon Deposition Exhibit 1 was

21              marked for identification.)

22    BY MS. HEFFERNAN:

23         Q    Have you seen Exhibit 1 before?

24         A    I believe so.  I've reviewed a number of

25    documents.


                                                          4

♀

              UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1         Q    Do you understand that you've been designated on

2    certain topics I'll read them into the record and your

3    counsel may be able to streamline this by confirming.  Do

4    you understand that you've been designated to testify on

5    behalf of Sight Sciences on the following topics, topics

6        one, and you can look through while I'm reading them.

7                Topic 2, topic 3, topic 4, topic 7, topic 9,

8        topic 10, topic 11, topic 16, topic 25, topic 28,

9        topic 29, topic 31, topic 39, topic 40, topic 41,

10       topic 43, topic 44, topic 45, topic 46, topic 50,

11       topic 51, topic 55, and topic 56.

12       A    Yes.

13       MS. RHYU:  And I'll just note that we have designated

14       Mr. Badawi on these topics with some restrictions as noted

15       in our objections and responses.  Before you ask the next

16       question are you planning to drop documents into the chat,

17       into the Zoom chat.

18       MS. HEFFERNAN:  No, I'm not.

19       MS. RHYU:  Thanks.

20       BY MS. HEFFERNAN:

21       Q    What did you do to prepare to testify on the

22       various topics that I just walked through?

23       A    I met with our counsel several times and reviewed

24       a number of documents that are related to this matter.

25       Q    And when you say you met with your counsel, who

5

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    are you referring to?

2         A    Michelle Rhyu.

3         Q    And Ms. Rhyu is an attorney at Cooley?

4         A    Yes.

5         Q    And she's representing you personally today as

6    well?

7         A    Yes.

8         Q    Who else did you meet with?

9         A    Orion Armon.

10        Q    Anyone else?

11        A    Those are the two primary counsels.

12        Q    Okay.  But I'm asking about anyone else.  So any

13   who aren't primary?

14        A    I can't recall meeting anyone else.

15        Q    Did anyone join your meetings by phone or by

16   Zoom?

17        A    Just Jeremy A, our chief legal officer.

18        Q    Okay.  So you've just listed Michelle Rhyu, Orion

19   A, and Jeremy H as the three lawyers that you met with to

20   prepare for your testimony today; is that correct?

21        A    That's correct.

22        Q    And you can't think of anyone else that you've

23   met with in terms of counsel?

24        A    I can't.

25        Q    Okay.  Did you meet with Ms. Mika Mayer to

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    prepare for your testimony today?

2        A    No.

3        Q    Okay.  Apart from counsel, well, and actually let

4    me take a step back.  You said you met with counsel

5    several times, when did you meet with counsel to prepare

6    for your deposition today?

7        A    I think a couple of times over the last two

8    weeks, a few times.

9        Q    Okay.  About how many hours total?

10       A    Probably maybe three days kind of intensely, or

11   two and a half days maybe, two and a half days.

12       Q    Were those in-person sessions?

13       A    Yes.

14       Q    Okay.  During those sessions did you meet with

15   anyone to prepare for your testimony who was not a lawyer?

16       A    During... could you repeat the question?

17       Q    To prepare for your deposition today did you talk

18   to anyone who was not a lawyer?

19       A    To prepare for it?

20       Q    Yes.

21       A    No.  I asked I mean, I've talked to other people

22    inside just about it and just logistics and I'll be out...

23    that's about it.

24        Q    So in terms of gathering information in order to

25    be prepared to testify on behalf of the company on the

⚥

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    various topics I just walked through, you only met with

2    counsel, you did not talk to any nonlawyers to prepare for

3    your testimony on those topics?

4        A    I had some interactions with some people.  I

5    think it was a combination of counsel or me requesting

6    documents.

7        Q    Okay.

8        A    From -- from some of my colleagues.

9        Q    Who were those colleagues?

10       A    Breezingly, for example, our head of our

11    regulatory.

12       Q    Can you spell that?

13       A    Kathy (inaudible).

14    THE STENOGRAPHIC REPORTER:  Could you repeat that.

15    THE WITNESS:  Kathy Chester.

16    BY MS. HEFFERNAN:

13    will testify about.  So I just want to make clear that

14    this, the documents that Mr. Badawi has are not the full

15    set of documents received from Ms. Chester.

16        MS. HEFFERNAN:  So why don't we let Mr. Badawi testify

17    today instead of you, Ms. Rhyu, okay?  Can we agree on

18    that.

19        MS. RHYU:  We can agree on that.

20        MS. HEFFERNAN:  Great.

21        THE WITNESS:  So here's a timeline of OMNI's

22    regulatory timeline.

23    BY MS. HEFFERNAN:

24        Q    Okay.  And -- I'm sorry, go ahead, keep talking.

25    I didn't mean to interrupt you.


                                                                9

                  UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1         A    And actually, looking here, there's also another

2    colleague of mine in finance related to Helix expenditures

3    so I have that information, so that's somebody else that

4    I've been in touch with.

5         Q    Okay.  So why don't we start with a different

6    question and then we'll get back into your preparation.

7              What documents did you bring with you today?

19    literature of six millimeters but you can also create

20    bypass functionality, if part of your implant has a

21    tighter radius of curvature than that have Schlemm's canal

22    and it extends beyond Schlemm's canal.

23          And into the trabecular meshwork or into the

24    anterior chamber.

25      Q    And so in that circumstance, what is being

                                                              41

♀

                UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    bypassed?

2      A    The inner wall of the canal.  So the Schlemm's

3    canal meshwork and the (inaudible) tissue.

4          Juxtacanalicular tissue.

5      Q    You said after you and your brother left the

6    conference you were in touch and excited about it and were

7    communicating.  Were you communicating by email?

8      A    You know, this is -- this is March of 2006.  So

9    possibly email.  Certainly phone.  I mean, it's hard to

10   remember exactly how.  But yeah, I would say email, phone,

11   and it was -- it was urgent because -- and these aren't,

12   you know, this isn't our only invention.  We have other

13   inventions that are also addressed, addressed root

14    underlying cause of disease.

15           And we feel like when we do that with good

16    embodiments, you can be disruptive in terms of safety,

17    efficacy, ease of use.  And so in this case, it was a good

18    leading indicator that that's a good way to develop

19    disruptive medical devices, so we were -- we were very

20    excited about it.  And very soon after, I mean, I was in

21    the medical device space, investment space, and, you know,

22    pretty well networked.

23           And I don't know if we had any investments with

24    any of their clients.  But I had heard that the best

25    medical device patent attorneys, sorry, Michelle, at the


                                                            42

☿

              UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    time it was at Morrison and Foerster, a guy named

2    (inaudible).

3         THE STENOGRAPHIC REPORTER:  Repeat the name.

4         THE WITNESS:  Tom Ciotti.

5         THE STENOGRAPHIC REPORTER:  Thank you.

6         THE WITNESS:  And we connected with him as soon as we

7    could.

8    BY MS. HEFFERNAN:

9         Q    And how did you hear about him?

56

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    It's -- I don't really understand your question.

2       Q    Were you and your brother the first to come up

3    with the idea of inserting an implant into Schlemm's

4    canal?

5       A    Our invention is in and around implants for

6    Schlemm's canal that maximize patency, minimize contact

7    with the inner lumen of Schlemm's canal thereby enhancing

8    transmural flow across the meshwork, across, around the

9    canal and out through the collector channels and there's a

10   number of different embodiments based off of that original

11   invention in 2006.

12          I mean, those statements, general statements were

13   really the first to put something in the canal.  I

14   believe -- that's not what our invention is.

15      Q    Okay.  So I'm not asking you to give me an

16   encapsulation of what you think your invention is.  I just

17   want to understand whether you believe you were the first

18   to insert an implant into Schlemm's canal.  Do you think

19   you were the first to do that?

20      A    I think you just repeated the same question.  I

21   mean, my answer would be the same.

```
22        Q    But I don't want to know about your entire

23   invention.  Just, just follow the question.

24             You know what an implant is, we've been talking

25   about implants today, right?
```

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

```
1         A    (Indicating.)

2         Q    Yes?

3         A    Yes.

4         Q    We've been talking about Schlemm's canal today,

5    right?

6         A    Yes.

7         Q    Do you believe you and your brother were the

8    first to come up with the idea of putting an implant into

9    Schlemm's canal?

10        A    I think there were implants that existed prior to

11   us.  They just -- the implants that we invented, the

12   devices and methods and kits, they're described in our

13   2006 invention and there are limitations to the patents

14   and the claims.

15        Q    But you and your brother were not the first to

16   come up with the idea of putting an implant into Schlemm's
```

17    canal, right?

18         MS. RHYU:  Asked and answered.

19    BY MS. HEFFERNAN:

20         Q    You weren't the first, right, it had been done

21    before, maybe done differently but the idea of putting an

22    implant into Schlemm's canal had been done before, right?

23         A    Yeah, if I'm understanding your question

24    correctly.  I'm not sure where you're going with this.

25         Q    Well, it doesn't matter where I'm going.  Let's

                                                              58

              UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1     just focus on that question.  The idea of putting an

2     implant into Schlemm's canal, that had been done before,

3     right?

4          A    I mean, we would need to -- I believe so.  We

5     would need to look at the prior art to see if it meets

6     what your description is.  We were -- that's not a

7     description of... that's not a description of our

8     invention.

9          Q    I'm not trying to describe your invention.  I'm

10    just asking you if you and your brother were the first to

11    come up with the idea of putting an implant into Schlemm's

12    canal.  And you weren't, right?  It had been done before.

14    litigation, you know, that's -- that comes into effect

15    only if something makes it to commercialization.  You

16    wouldn't litigate on something precommercial.  So I think

17    again, I think it was 2018 when Hydrus was launched.

18        Q    Why wouldn't you litigate on something before

19    it's commercially launched?

20        MS. RHYU:  And there, I just instruct you not to

21    reveal the substance of any communications with counsel.

22    If you have a separate understanding, if you extract out

23    your communications with counsel, you can answer that

24    question, go ahead.  Otherwise I instruct you not to

25    answer.


                                                             81

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1        THE WITNESS:  That's just my understanding of

2    infringement litigation.  If something is commercial

3    and... that's just my understanding of it.

4    BY MS. HEFFERNAN:

5        Q    In terms of seeing and looking at the Hydrus and

6    thinking that it was covered by your claims, when did you

7    first draw that conclusion or have that impression?

8        A    I think it was pretty early on.  And I can't

9      recall the exact moment, but it was pretty early on when I

10     first saw it.  I don't know if it was 2008 or 2009.

11         Q    Do you remember in connection with -- strike

12     that.

13              Do you remember how you became aware of Hydrus

14     during that time frame?

15         A    There are different possibilities.  It was so

16     long ago.  It could have been, it could have been

17     something I saw online, it could have been a press release

18     on a development around it or a fundraising or... I

19     can't -- I can't remember exactly how.

20              But I think it was around that, that time frame.

21         Q    Was that -- did you come to the conclusion that

22     Hydrus was covered by your claims -- or sorry, when you

23     came to the conclusion that Hydrus was covered by your

24     claims in that 2008, 2009 time frame, did you think about

25     bringing litigation?

82

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1      MS. RHYU:  Objection; assumes facts and misstates the

2      prior testimony.

3      THE WITNESS:  You know, I think, you know, invention,

4      when I looked at it, I thought that it's, you know, it's

5      fellow VC, would like to discuss this application with you

6      at a high level, paren, investor to investor, before

7      engaging with discussions with the company directly.  Do

8      you see that?

9          A     Mm-hmm, yes.

10         Q     And VC refers to --

11         A     Venture capitalist.

12         Q     Correct.

13               What did you -- what did you understand Ms. Mayer

14     to be setting up at the time?

15         MS. RHYU:  Objection; vague.

16         THE WITNESS:  My assumptions here would have been,

17     again, these are assumptions, that she knows Doug, she had

18     lunch with him.  He -- these are all assumptions.  I

19     wasn't at the lunch.  And I don't think I've talked to

20     Mika about what those discussions were.

21               I'm guessing that he told her about an

22     investment, maybe, that he had made in a surgical glaucoma

23     company.  And Mika may have mentioned, these are all my

24     assumptions, may have mentioned that I represent two

25     inventors with a surgical glaucoma invention.  And maybe

94

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    he said, I don't know, tell me more.

2    BY MS. HEFFERNAN:

3        Q    I'm really asking about the sentence that I just

4    read.  Paul Badawi an inventor on that application and a

5    fellow VC, would like to discuss this application with you

6    at a high level.  Investor to investor, before engaging in

7    discussions with the company directly.

8             So she's saying that you want to discuss the

9    application with Doug Roeder, at a high level.

10       A    Yeah.

11       Q    Before engaging in discussions with the company

12   directly.

13       A    No.

14       Q    I mean, did I read that incorrectly?

15       A    I think you can read -- yeah, I think this

16   sentence could read in different ways and I can tell you,

17   I can tell you the reality.  We were super excited about

18   our invention.  And excited to build a company out of the

19   invention as soon as we had time and capital to do so.

20            So the would like, I guess that's, maybe that's

21   what you're getting at and I think that's -- the context

22   matters and the language matters.  I would like to

23   discuss -- I didn't like anything in that regard.  It

24   reads like I'm interested in, you know, me, me going after

25   him for something.  They have a good reputation.

♀

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1          Am I open minded?  Sure.  But the -- it's

2     different because I think the way you were stating it, if

3     you want to remind me how you were stating it, sounded

4     like I was, you know, pursuing him for some purpose.  My,

5     my recollection and pretty clear, is they, they have --

6     they are aware of us, and want, need to talk to us.  Not

7     the other way around.

8          Q    So Mika Mayer is your lawyer at the time, right,

9     still is, right?

10         A    Yes.

11         Q    Okay.  So she's -- she's -- I'm just reading

12    what's written here.  Paul Badawi an inventor on that

13    application, and a fellow VC, would like to discuss this

14    application with you at a high level investor to investor

15    before engaging in discussions with the company directly.

16         I read that correctly, right?

17         A    You did.

18         Q    And she's reaching out to Doug at your request,

19    right?

20         MS. RHYU:  Objection; misstates the document.

21       MS. HEFFERNAN:  It doesn't.

22       THE WITNESS:  I don't know if it was at my request.

23  It says, would like to discuss.  I don't know... that -- I

24  think you're deriving your own meaning from that.  I

25  was -- my sentiment feeling as I remember it, I was happy

96

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1   to do so.  But again, the focus, you got to remember, the

2   mindset of two inventors that had something really good,

3   our mindset was let's build something great out of this.

4   BY MS. HEFFERNAN:

5       Q    And was one of the ways to do that to attract

6   investment?

7       A    Of course.

8       Q    Is that one of the reasons why you wanted to talk

9   to Doug Roeder, possibility of getting an investment from

10  him?

11      A    I believe that was a consideration.

12      Q    Had you heard of Doug Roeder before this

13  outreach, like did you know of him in the VC community?

14      A    Yeah, I knew Delfi, reputable, good reputation.

15      Q    So you knew of Delfi, did you also know of Doug

16  Roeder?

17     A     Knew of him, we may have met, may have met in the

18     past.  I don't -- I don't recall if we had yet exactly.

19     Q     Okay.  And he's got a good reputation in the VC

20     healthcare community, right?

21     A     I believe so.

22     Q     It would have been a good thing for you and your

23     brother if you could have attracted investment at the

24     time, right?

25     A     Yes.  Generally, I'm trying to think if we

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1     were -- if we were ready to do so.  The timing, so I was

2     obviously, you know, I would have had to have sold our

3     portfolio, so we had a number of investments at 3i.  I was

4     heading the U.S. healthcare med tech venture group at the

5     end.  As we were getting out of venture, the London

6     headquarters, that was mostly growth and buyouts and they

7     wanted to get out of venture, it was not a business they

8     felt comfortable with, you know, high risk, early stage

9     investments.

10           So I had -- so we were selling, selling the

11     portfolio, and I would have needed to have completed that

12    to be able to focus on-site, you know, I couldn't -- who's

13    going to, you know, you can't go raise money I mean, both

14    from my perspective and an investor's perspective, if, you

15    know, I'm working at 3i with a large venture portfolio.

16          So I mean, the answer would be yes depending on

17    when I freed up to hit this really, really hard and I can

18    tell you as soon as, as soon as I did, I started focusing

19    on it.

20    Q    When did you -- strike that.

21          Did you consider seeking an investment from 3i?

22    A    No, they -- that was -- so they -- when I got

23    there in 2004, right, my interest is earlier stage, right?

24    Seed stage, investing in, you know, identifying disruptive

25    innovations, putting capital just like Larry Bock, putting

                                                              98

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    putting capital, putting teams together, I did that very

2    successfully at 3i, we can talk about some of those

3    examples but what happened over time from 2004 to 2006,

4    that was, you know, my fellowship, we started moving later

5    and later stage away, because again, the London

6    headquarters was getting more and more uncomfortable with

7    these early stage high risk promise of huge multiple

8    returns.

9        They would rather write bigger checks in more

10   stable businesses and get a more stable right way more

11   consistently.  So they were moving away from early stage

12   anything.  So that's why ultimately they chose to sell off

13   the venture portfolio, so they weren't going to be... you

14   know, that's it.

15        Q    To whom did they sell the venture portfolio?

16        A    So the -- the IT portfolio, so I did healthcare,

17   medical devices.  The IT portfolio is much larger and I

18   believe that got split into, you know, maybe European

19   buyer or U.S. buyer, maybe several U.S. buyers, but I

20   can't remember exactly.  The medical device portfolio that

21   I was overseeing, I believe ultimately was purchased by a

22   healthcare specialist.  I think a secondary fund,

23   healthcare specialist in London called Apasit capital.

24        Q    Okay.  So when that was -- when the healthcare

25   portfolio was sold off, basically your job was dissolved,

99

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    is that fair to say?

2        A    Once we -- from 3i?

10      I think his -- Steven Tell's arrival was closer

11   in proximity to that series A closing in September of

12   2011.  I can't remember exactly and I don't know if it was

13   2011 or... if we started talking to him in like late 2010,

14   I don't know.

15      Q    Okay.  Thinking about this time when you're

16   seeking investments and talking to potential investors,

17   where did you and Doug Roeder meet, do you remember?

18      A    I do.  Obviously, a long time ago.  But we met at

19   the same place where I used to work.  Remember when I came

20   up from, from business school at UCLA and I got the role

21   at Delta Opportunity Fund, it was 3,000 sand hill was our

22   office.  So his offices were the Delfi offices as well, so

23   it's a place I linked him, where I remember.

24      Q    And at that time meeting, did you and Doug talk

25   about a potential investment into your idea, I'm trying --

                                                            104

♀

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1   how should I refer -- you didn't have a company at the

2   time, right?

3      A    We -- I don't believe.

4      Q    How should I refer to what it was you were doing

5   at the time just for sake of nomenclature?

6       A    David and I, two inventors, founders, advancing,

7    advancing along their invention the best they could with

8    whatever resources they could.

9       Q       Right.  But what did you found?  I guess I'm

10   trying to refer to the entity in some way.  How do I refer

11   to that entity?  It wasn't Sight Sciences yet, right?

12      A    Oh, what it was called, if I had a pitch deck or

13   something?  I don't think I did then.  We didn't do that.

14   There was a name before Sight Sciences, but I think

15   Westwood Vision, but I don't remember when we started with

16   that name.  We ultimately didn't go with that, obviously.

17   I think it was taken.

18      Q    Well, so what happened at the meeting, did you

19   discuss with Doug Roeder, the possibility of investing in

20   the work that you and your brother were doing?

21      A    No.  I don't -- I don't think we were -- I don't

22   know that we were ready yet.  I remember -- so I was under

23   the impression that they were aware of us and our

24   invention, and they wanted to talk to us.  I want to build

25   a company, I do need to figure out how to raise money but

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

```
 1    I wanted to build a company, David wanted to build a

 2    company.  And generally, I think I wanted to make sure

 3    that we, you know, we had a really, really great invention

 4    and we cared, we cared a lot about it.

 5           So... you know, what...

 6    Q     So the answer is no, you did not discuss with

 7    Doug Roeder the possibility of investing in the work that

 8    you and your brother were doing?

 9    A     I think we made, you know, he was already aware

10    of it.  So I believe, and I can't remember the exact

11    discussion word for word, but I went there wanting him to

12    be clear, what we had invented.  Obviously, we got there,

13    I'm sure we talked about venture and whatnot, but the

14    reason for the meeting was around the patent and I think

15    they would have an interest in it.

16           And I wanted to leave there, and I think that I

17    did leave there by conveying to him, we think we have

18    solved this problem the right way, we were very excited

19    about our invention.  We want to build a company around

20    it.  And at some point, we'll be raising money.

21    Q     And did you tell him you were hoping that he

22    would invest and you were ready to raise money?

23    A     I don't think -- I don't remember that exactly.

24    Q     Well, it sound like you weren't really interested

25    in the meeting at all.  From what you just said.
```

13    they going to invest in two different companies or do they

14    just want to buy it.

15    BY MS. HEFFERNAN:

16        Q    Okay.  And so what was -- what did he say in

17    response to that?

18        A    I think that was on -- kind of on the way out and

19    I don't think we talked again.

20        Q    Okay.  So you asked him do you want to invest

21    into similar companies?

22        A    No, I think I stated at some point I think it was

23    just we were being polite.  He had expressed an interest.

24    All we had was a patent at that time.  That's why we were

25    meeting.

109

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1        Q    Did you have a patent at that time?

2        A    Well, we had our invention.

3        Q    You had --

4        A    He had, whatever, I don't want to misspeak.  What

5    did he say -- application, a patent application.

6        Q    So you didn't have claims yet, right, no issued

7    claims?

8      A    What timeline is this?

9           No.  We would not have.

10     Q    And so it would be unknown what kind of claims if

11   any you might get out of that patent application, right?

12     MS. RHYU:  Objection, calls for a legal conclusion.

13     THE WITNESS:  Yeah, I don't know, I can't assess the,

14   you know, I can't assess that.  But...

15   BY MS. HEFFERNAN:

16     Q    Just because you apply for a patent doesn't mean

17   you're going to get one, right?  You know that.

18     A    That's correct, but what we had invented in 2006,

19   an implant for Schlemm's canal that understands the

20   different flow -- we had taken into consideration these

21   unique flow patterns and have methods and designs and kits

22   to address the unique flow patterns to enhance outflow and

23   lower IOP with our inventions.

24          Again, at that time, you want my mindset?  Super

25   excited about it because it's -- we believed it was a

110

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1   disruptive solution.  And we were going to have a major

2   impact on glaucoma.  It was the right way to solve this

3   problem.  And I'm under the impression, I think that they

4      recognized that and wanted to meet.

5      Q    Now, you didn't know at the time what claims if

6    any were issued from your application, right?

7      A    I don't -- I don't think you can know with

8    certainty anything until it's -- until it's done.  If

9    that's your question.

10     Q    Yeah, my -- yeah, that's my question.  You had a

11   pending patent application which has been published.  And

12   you didn't know at that time, no one could know, what

13   claims if any would issue from that application, fair?

14     A    Yeah, to know with certainty, I think -- I don't

15   think anyone knows with certainty.  Did we feel again, I

16   think it's correlation to the excitement on how disruptive

17   we thought our invention was.  So we were very confident

18   but knowing with certainty, I think -- I don't think

19   that's... I don't think anyone can be, you know, certain.

20     Q    Right.

21          Okay.  So in the time frame we're talking about

22   is this 2008, 2009 time frame when you met with Doug

23   Roeder, right?

24     A    2008, 2009 time frame, I believe so.

25     Q    Yeah.  Yeah.

111

25    human eye glaucoma model in order to determine the -- its

134

♀

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1     efficacy in reducing intraocular pressure, the modifiable

2     variable with the strongest link to glaucoma.

3           Do you see that?

4     A    I do.

5     Q    So as of the time of this application, fair to

6     say Sight Sciences did not yet have proof of the efficacy

7     of the Helix in reducing intraocular pressure?

8     MS. RHYU:  Objection; vague, assumes facts.

9     THE WITNESS:  So I think, you know, what we're writing

10    here I think is appropriate.  But in terms of knowing,

11    knowing that our invention would work, we knew that -- we

12    knew that in 2006.  And we'll go back to why.

13          The why, that we've proven that again and again,

14    with other products now since then when you're -- when you

15    can understand the underlying diseased anatomy and what

16    the root underlying cause of disease is, and you can

17    intervene, you know, interventionally with something that

18    restores that anatomy, and restores that natural function

19    it won't just work.  It would be disruptive.

20          So now, I can't -- I don't think it's appropriate

21     to characterize it that way right here.  And I think -- I

22     think it's good to do these tests and work through the

23     process.  But in terms of understanding whether something

24     would work, we knew that.  In terms of working through the

25     process, and proving it, and doing the necessary steps to

135

♀

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1      getting to human clinical trials I think that's what we're

2      looking to do here.

3      BY MS. HEFFERNAN:

4          Q     Now, when you say you knew that back in 2006, you

5      didn't have a prototype in 2006, right?

6          A     No, not -- I don't believe, no.

7          Q     So when you say that you knew it, you had a firm

8      belief it would work; is that fair to say?

9          A     Very firm, and very well-informed.  I think -- I

10     think the two inventors, this was our first.  But we've

11     done it again and again.  And we're going to do it a lot

12     more going forward.  We have a process.  We have an

13     iterative process.  It works.  And this was the first

14     example.  So yes, in 2006, we knew.

15         Q     Well, okay.  That's -- when you say you knew, you

8      A    It's not justifiable.

9      Q    Right, that the reviewer found the budget to be

10   high in a way that was not justified?

11      MS. RHYU:  Objection; calls for speculation, document

12   speaks for itself.

13   BY MS. HEFFERNAN:

14      Q    Well, what was your impression of it?

15      MS. RHYU:  Objection; calls for speculation.

16      THE WITNESS:  It...

17      MS. HEFFERNAN:  It doesn't.

18      MS. RHYU:  It does call for speculation.

19      MS. HEFFERNAN:  No I'm asking him for his impression

20   when he read that sentence.  It's not calling for

21   speculation.

22      THE WITNESS:   Yeah, I read it, it's that the budget,

23   year two budget -- what does that mean?  Year two budget

24   is for 18 months?  I can't even make sense of this.

25

⚥

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1   BY MS. HEFFERNAN:

2      Q    You don't recall that your year two budget was

3   for 18 months?

4          A      No, just year two is... year two is... oh, that's

5    the second period?  I have to refresh my memory here.  Is

6    year two phase two and go for 18 months because year two

7    and phase two are confusing me.  But in any event, this

8    reviewer thought that the budget was high and needed to be

9    significantly reduced, you know, I did my best, I did my

10   best to understand the purpose and how these things, what

11   they look for, you know, they look for innovators,

12   start-up companies, entrepreneurs with, you know,

13   disruptive innovations that can improve health, and they

14   want to back companies, they're one of the largest funders

15   of kind of seed like government funded seed stage, early

16   venture stage kind of funding.

17          I thought we fit perfectly in that.  I really

18   did.  And I thought -- I actually felt we would get this.

19   There are some positive comments in here.  Which is nice.

20   And they talk about how it's, you know, an innovative

21   approach, and there's promise.  There's tons of

22   weaknesses.  Had I been able to better write this grant,

23   would it have gone through better?  Maybe.

24          I don't know.  But again, in and around the

25   failure or failures, with this grant process, that we felt

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    we would get we were able to raise a strong venture round

2    later in 2011.

3         Q    Okay.  So on the second peer reviewer, had budget

4    concerns under investigators that the budget

5    justifications for the roles and responsibilities for all

6    the involved personnel were not well-defined.  And then

7    under the environment, one of the weaknesses was that the

8    budget -- total budget was high in a way that was not

9    justified and needed to be significantly reduced, fair?

10        MS. RHYU:  Objection; calls for speculation.

11        THE WITNESS:  I mean, you're restating what's in here,

12   it looks like.

13   BY MS. HEFFERNAN:

14        Q    Okay.  So let's see what you did to respond.

15        THE STENOGRAPHIC REPORTER:  Sorry, we've been going an

16   hour and a half.  Can we take a quick bathroom break?

17        MS. HEFFERNAN:  Certainly.

18        THE VIDEOGRAPHER:  Off the record at 3:02 p.m.

19             (Recess taken.)

20             (Whereupon Deposition Exhibit 6 was

21             marked for identification.)

22        THE VIDEOGRAPHER:  We are back on the record.  The

23   time is 3:20 p.m.

22   deficiencies probably the way grants are written is what I

23   hear from lots of scientists and people in the field that

24   there's an art to this.

25          And I clearly don't know the art of grant

168

♀

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    writing, because I think I failed in this endeavor twice

2    and even with this clinical data here, it still wasn't

3    enough.

4          Q    So you, you ask a question, and the question is

5    will nitinol stents deliver into Schlemm's canal be safe

6    and efficacious, do you see that?

7          A    Yes.

8          Q    Okay.  And then you answer that question in the

9    next paragraph, right?

10         A    Another, just further answering I think what is

11   in that first grant.  I think again, the question is

12   random -- I think the question arises from the questions

13   posed in the rejection of the first grant that I thought

14   was surprising, and I didn't really agree with much of it.

15         But I think they wanted to -- they wanted more

16   information, it looked like a lot of the questions were in

17   and around that.  So I tried to summarize the rejection

18    reasons and this was one of the buckets.  And this was, I

19    thought this was useful data to share with them to address

20    this question that several reviewers seemed to have.

21    Q    So I have been very patient throughout the day.

22    I'm moving to strike that answer as nonresponsive and I

23    would like to start focusing the answers on the questions

24    asked.

25         The question was, the next paragraph after the

                                                          169

⚥

          UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    first question answers the first question, right?

2         MS. RHYU:  Objection; document speaks for itself.

3         THE WITNESS:  What was wrong with my answer?  I don't

4    understand.

5    BY MS. HEFFERNAN:

6    Q    You didn't answer the question, you rambled on

7    about a lot of stuff but you didn't answer my question.

8         So the question's very simple.  You pose a

9    question, sure, the question that you crystalized, okay,

10   is will nitinol stents delivered into Schlemm's canal be

11   safe and efficacious, right?

12   A    Yes, that's the question.

15    we've been active with it.  I think -- and you asked for

16    regulatory history there.  We've been active on the Helix

17    project and we're excited about, hopefully we can get it

18    into human studies really soon.

19        Q    And Hydrus, Ivantis's Hydrus launched in 2012,

20    right?

21        MS. RHYU:  Objection -- oh.  Sorry.  Withdraw the

22    objection.

23        THE WITNESS:  It launched in 2012?

24    BY MS. HEFFERNAN:

25        Q    Got FDA approval for commercial launch -- no,


                                                        203

        UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    there's the wrong date.  That was the studies?

2        A    IStent in 2012 -- Hydrus in 2008 --.

3        Q    Hydrus launched in 2018, right?

4        A    I believe so.

5        Q    At the time that Hydrus launched, did you believe

6    it infringed your issued patents?

7        A    I believed it did.

8        Q    And prior to the date of the Hydrus launch, did

9    you believe Hydrus infringed your issued patents?

10      A      Prior to the date of Hydrus launch?

11      Q      Yes.

12      A      My understanding, I think we talked about this

13   before.  You can't... to infringe technically, you need to

14   be commercial, right?

15      Q      That's your understanding of that?

16      A      I thought that was a legal definition.

17      Q      Did you believe prior to Hydrus launch that it

18   fell within the claims of your issued patents?

19      A      I believe I did.

20      Q      Why don't we -- sorry.  Okay.  Yeah.  Why don't

21   we take a short break.

22      THE VIDEOGRAPHER:  Okay.

23      THE WITNESS:  Am I able to comment on something?

24      MS. RHYU:  No, you need to wait till a question's

25   asked.

204

⚲

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1      THE WITNESS:  Okay.

2      THE VIDEOGRAPHER:  Going off the record.  The time is

3   4:31 p.m.

4            (Recess taken.)

5      THE VIDEOGRAPHER:  We are back on the record.  The

6    BY MS. HEFFERNAN:

7        Q    Did you make that clear that you had a belief

8    that the 068 covered the Hydrus?

9        MS. RHYU:  Lacks foundation, assumes facts.

10       MS. HEFFERNAN:  It doesn't lack foundation, it's his

11   open knowledge.

12       MS. RHYU:  It lacks foundation because you haven't

13   established when he became aware of the Hydrus.

14       MS. HEFFERNAN:  I already did this morning, so...

15       MS. RHYU:  You didn't.

16   BY MS. HEFFERNAN:

17       Q    You can answer the question, did you make that

18   connection for him.  So it's one thing to talk about your

19   invention.  Did you then make the connection between your

20   invention and the Hydrus for Mr. Roeder?

21       MS. RHYU:  Same objection.

22       THE WITNESS:  I think my recollection -- I think he

23   had that connection.

24   BY MS. HEFFERNAN:

25       Q    He said I think your 068 patent covers the

216

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    Hydrus, covers --

2        A     No, not like that, but I think it was, yeah, they

3    wanted to meet.  They had it.  They were interested.

4        Q     But you didn't tell him that was your belief?

5        MS. RHYU:  Again same objections, assumes facts, lacks

6    foundation.

7    BY MS. HEFFERNAN:

8        Q     It's just yes or no, did you tell him that was

9    your belief?

10       A     Again, I can't -- I can't recall.

11       Q     Can't recall, that's fine.

12       A     No, I want to finish my response.  I can't recall

13   the exact words in that meeting, it was 15, 14 years ago,

14   but I do recall making it clear which was what I wanted to

15   make sure I did.  We have very important IP and we're very

16   excited about it.  And it -- and I described, I

17   described -- I described it.

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY



15      Q    So I'll move to strike that answer as

16  nonresponsive.

17           Did you have any communication with Ivantis

18  giving them a heads up that you believe the 482 read on

19  Hydrus?

20      A    I don't believe at the time.

21      Q    At any time prior to 2018 when Ivantis received

22   FDA approval for Hydrus, did you tell Ivantis that you

23   believed the 482 read on Hydrus?

24        A    I don't recall any time, you know, just the

25   meeting, the 2009 meeting with Doug Roeder talking about

218

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    it.

2         Q    You talked about the 482 reading on Hydrus with

3    Doug Roeder in 2009?

4         A    Sorry, I thought you were asking about the first

5    one.

13        Q    Okay.  What was the business decision not to sue

14   Ivantis in 2018?

15        A    Yeah, those days were I mean, you know, all the

16   private, private med tech company, you're living to get to

17   the next round of financing.  We were not in 2018 in a

18    financial position to sue.  And we also weren't in a

19    position to I think if we had initiated a lawsuit then,

20    that's... that's, you know, that's something I don't think

21    investors, and we had to raise more private financing, I

22    don't think that's something investors necessarily are

23    jumping up and down to see in a private company that their

24    money on a still risky private investment like most

25    private med tech companies are, that they would want to be

219

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1     funding litigation.

2              So... you know, between the lack of sufficient

3     cushion on resources, and the, I think how it might be

4     problematic to raising capital, exacerbating the capital

5     consideration, we didn't think it was the right time.

6     Q    You're aware that you can get investment in

7     litigation just like you can get investment in research

8     and development, right?

9     A    Oh, like litigation funding?

10    Q    Yeah, of course.  You're aware of that, right?

11    A    Yeah, not top of mind for me.  When I think

12    about, when I think about litigation, I think -- I don't

13    know much about that.  I know it exists.  I think they --

14    I think the litigation funders take the majority or some

15    outrageous fee or upside, I've never looked at that

16    closely.  I'm aware of its existence -- no, when I think

17    about litigation, I think when are we going to be in a

18    good position to enforce our patent rights ourselves.

19           I just don't -- it's not something I think about

20    like outsourced litigation funding.

21    Q    And you saw Hydrus as a competitor to Helix will

22    whenever you would have eventually been able to launch

23    Helix, right?

24    A    Yeah.

25    Q    So you allowed the competitor to Helix Hydrus to

                                                            220

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    commercially launch and did not try to stop that launch

2    with litigation, right?

3    A    Oh, we were busy -- we're busy with OMNI.  We're

4    busy trying to execute, commercially execute well, we're

5    very -- you have to be very aware of our cash situation.

6    So we can't do everything that we would love to do.  We

7    would love to step on the gas on Helix.  We would love to

8    enforce our patent rights.  I mean, that wasn't -- that

EXHIBIT 8
(excerpted)

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1              ROUGH ASCII -- NOT CERTIFIED

2                    N O T I C E

3

4        This transcript is an UNCERTIFIED ROUGH DRAFT

5    TRANSCRIPT.

6        It contains raw output from the court reporter's

7    stenotype machine translated into English by the court

8    reporter's computer, without the benefit of proofreading.

9        It may contain mistranslations (wrong words) and

10   misspellings.  These and any other errors will be

11   corrected in the final transcript.  Since this rough draft

12   transcript has not been proofread, the court reporter

13   cannot assume responsibility for any errors therein.

14       This rough draft transcript is intended to assist

15   attorneys in their case preparation and is not to be

16   construed as the final transcript.  It is not to be read

17   by the witness or quoted in any pleading or for any other

18   purpose and may not be filed with any court.

19

20

21

22

23

24

25

1

⚲

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    THE VIDEOGRAPHER:  Here begins Media Number 1 in the

2    videotaped deposition of Paul Badawi in the matter of

3    Sight Sciences Inc. versus Ivantis Inc. et al., in the

4    United States District Court for the District of Delaware

5    Case Number 21-1317-GBW-SRF.  Today's date is June 26,

6    2023.  The time on the video monitor is 9:14 a.m. Pacific

7    Standard Time.  The videographer today is Joe Ramirez

8    representing Planet Depos.  This video deposition is

9    taking place at Cooley LLP Palo Alto.  Will counsel please

10   voice identify themselves and state whom they represent.

11    MS. HEFFERNAN:  Jeannie Heffernan of Kirkland & Ellis

12   for the defendants and with me on the Zoom are Noah Frank,

13   Justin Bova and Nathaniel DeLucia also with Kirkland &

14   Ellis and Adam Pierson of Alcon.

15    MS. RHYU:  Michelle Rhyu of Cooley representing Sight

16   Sciences and the witness and with me on Zoom is our

17   in-house counsel Jeremy Hayden.

18    THE VIDEOGRAPHER:  The court reporter today is Christa

19    Yan representing Planet Depos.  The witness will now be

20    sworn.

21    BY MS. HEFFERNAN:

22        Q    Good morning, Mr. Badawi.  Welcome back.

23        A    Good morning, thank you.

24        Q    Do you understand that you have been under oath

25    since you took the oath on Friday morning?


                                                              2


                UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1         A    Yes.

2         Q    Did you discuss your testimony with anyone?

3         A    No.

4         Q    Did you do anything to prepare for today's

5     deposition, I mean, this part of the deposition, apart

6     from what we discussed on Friday?

7         A    No.

8         Q    So nothing, no additional preparation over the

9     weekend?

10        A    No.

11        Q    Okay.  Did you search for any documents over the

12    weekend?

13        A    I don't believe, I don't think so.

14        Q    What are you a little confused about?



```
13      A    Look, we obviously -- what was the date of that
14  email?
15      Q    I think it was 2012.
16      A    Okay, so...
17      Q    It's Exhibit 10.
18      A    Sorry?
19      Q    I think it's Exhibit 10.
20      A    Oh.
21      Q    So June 11, 2012.
```

16

████  ████████████████████████████

████    ██    █████████████████████████████

████  █████████████████████████████████

5        MS. RHYU:  Objection, lacks foundation.  And to the

6   extent that taps into attorney-client communications, if

7   you can answer the question without, without tapping into

8   that information go ahead.  But otherwise, I instruct you

9   not to answer.

10       THE WITNESS:  I feel like these are repeat questions

11  from Friday, if they're not --

12  BY MS. HEFFERNAN:

13       Q    Doesn't matter.  I'm asking the question now.

14       A    Again, okay.

15       Q    And the question is --

16       A    So we --

17       Q    Let me ask, did you have Hydrus in mind when

18  Sight Sciences was drafting the claims of the 482 patent?

19       MS. RHYU:  Lacks foundation and I caution the witness

20  not to reveal attorney-client communication.

21       THE WITNESS:  Yeah, I think again, as I responded on

22  Friday, we have an invention in 2006, it's all there.  And

23  we were very excited about it.  You know, it's the right

24  way to treat this disease.  We've filed additional

25  embodiments with a focus on our 2006 invention,

⚦

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    embodiments of it.  And we think all of those embodiments

2    that we filed on would be great.

3    BY MS. HEFFERNAN:

4        Q    Move to strike as nonresponsive.

5             Did you have Hydrus in mind when Sight Sciences

6    was drafting the claims of the 482 patent?

7        MS. RHYU:  Okay, this time I'm going to instruct him

8    not to answer because you're trying to get a core,

9    privileged information, and he's trying very hard to

10   respond to your question without revealing privileged

11   information.  And that is all that he has to say.  So I

12   instruct you not to answer.

13   BY MS. HEFFERNAN:

14       Q    Are you going to follow your counsel's

15   instruction?

16       A    Yes.

17       Q    I don't recall if I asked you this question.  So

18   I'm going to ask it, possibly again.

19            When was the -- when did you receive a document

20   preservation notice in connection with this litigation?

21       MS. RHYU:  Asked and answered.

25    I guess Exhibit 13.  This is Mr. Badawi's handwritten

23

♀

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    notes.

2        THE VIDEOGRAPHER:  Okay, please stand by.

3            (Whereupon Deposition Exhibit 13 was

4            marked for identification.)

5        THE VIDEOGRAPHER:  It looks like Noah has already...

6        MS. HEFFERNAN:  Okay, great.

7    BY MS. HEFFERNAN:

8        Q    Okay, so Mr. Badawi, do you see what's been

9    marked as Exhibit 13?

10       A    I don't see that it's been marked but I see a

11   document in front of me.

12       Q    Okay.  What is this document?

13       A    This is -- these are some notes prepared by

14   myself around our asserted patents so that I could be more

15   helpful to you, should you ask about any specific one,

16   just so I could be more responsive.  Yeah.

17       Q    And let's go ahead, Mr. Frank, and mark as

18   Exhibit 14 the OMNI regulatory timeline.

19           (Whereupon Deposition Exhibit 14 was

20              marked for identification.)

21    BY MS. HEFFERNAN:

22        Q    Do you see Exhibit 14?

23        A    I see OMNI regulatory timeline.

24        Q    And what is this document?

25        A    This is a document summarizing regulatory

                                                              24

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    history, I think that you guys had requested and our head

2    of regulatory had prepared for this discussion.

3        Q    So who prepared Exhibit 14?

4        A    I believe it was our VP of regulatory, Kathy

5    Chester.

6        Q    And let's mark as Exhibit 15, the one page

7    document that's labeled topic 2 at the top of it.

8              (Whereupon Deposition Exhibit 15 was

9              marked for identification.)

10    BY MS. HEFFERNAN:

11        Q    Do you see Exhibit 15?

12        A    Yes.

13        Q    What is it?

14        A    These are some of the outside costs related to

15    more recent Helix development that I think you guys had

16    asked for so we asked our controller to prepare.

17        Q    Who's your controller?

18        A    Jim Rodberg.

19        Q    When did he prepare this document?

20        A    For this deposition, within, within the past

21    week.

22        Q    Where did he get the information from?

23        A    I'm guessing from our accounting system.

24        Q    What's the name of your accounting system?

25        A    I'm drawing a blank right now.

                                                                25

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1        Q    You said that these are -- these reflect outside

2    costs related to more recent Helix development.

3             What is the time frame of the Helix development

4    that these costs relate to?

5        MS. RHYU:  You should feel free to look at the hard

6    copies that you have there as well.  They're just beside

7    you underneath your notes.

8        THE WITNESS:  Okay.

9    BY MS. HEFFERNAN:

10       Q    So let the record reflect that Ms. Rhyu has not

11   directed Mr. Badawi to a spreadsheet --

12        A    Okay.

13        Q    You can --

14        A    I'll give you generally then.

15        MS. RHYU:  I'm sorry, are you suggesting he can't look

16   at the hard copy documents that we provided to you?

17        THE WITNESS:  I can't have all this information in my

18   brain on --

19   BY MS. HEFFERNAN:

20        Q    Go ahead with what Ms. Rhyu has instructed you

21   to, that's fine.

22             Let's say go ahead and mark the next document as

23   Exhibit 16.

24             (Whereupon Deposition Exhibit 16 was

25             marked for identification.)


                                                          26

                  ⚲

                  UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    BY MS. HEFFERNAN:

2         Q    It's a spreadsheet, two page spreadsheet.

3         A    I don't see the dates on here actually.  Hold on.

4         Q    Mr. Badawi, do you see what's on your screen as

5    Exhibit 15?

6         A    Yes.

7        Q     Okay.  Do you recognize this document?

8        A     Yes.

9        Q     Is this the document you were just consulting?

10       A     Yes.

11       MS. RHYU:  Is this Exhibit 15 or 16?

12       MS. HEFFERNAN:  Sorry, Exhibit 16, thank you.

13   BY MS. HEFFERNAN:

14       Q     Exhibit 16, what is it?

15       A     These are the expenses of outside vendors for

16   Helix development.

17       Q     During what time frame?

18       A     So I'm looking for the dates here.  I mean, I

19   know it's... probably most of this is within -- if you can

20   scroll, there's a post, there's a date on one of these,

21   that's within... I don't want to answer incorrectly if

22   there's more accurate.  It's right here.

23       Q     So if you go to the second page --

24       A     So there's a lot of, a lot of 2023 I see.

25       Q     Right.  Are you looking at the column X posting

                                                          27

                UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    date?

2        A     Yes.

3        Q     Okay.

4        A     There's some 2022.  Yeah, here it is.  So it's

5   2022, 2023, more 2022, 2023.  Yeah.

6        Q     Is Exhibit 15 a pivot table for exhibit 16?

7        A     I believe it is.

8        Q     Okay.  And you have these documents in native

9   through Excel spreadsheets, is that correct?

10       A     He would have them.  I don't have them.

11       Q     They're stored that way, correct?  Do you not

12   know that these are Excel spreadsheets?

13       A     It looks like they are.

14       THE STENOGRAPHIC REPORTER:  You said pivot table?

15       MS. HEFFERNAN:  Yes.

16       THE STENOGRAPHIC REPORTER:  Thank you.

17   BY MS. HEFFERNAN:

18       Q     So this is ledger detail for Helix development

19   during the 2022, 2023 time frame.  Is that correct?

20       A     That's what it looks like, yes.

21       Q     Okay.  Do you have such information for Helix

22   development prior to 2022?

23       A     I believe -- I believe we started, again,

24   probably around the time of the IPO with more capital

25   being able to resume thoughtfully, you know, having a good

♀

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    plan around bringing it to market, bringing it through,

2    you know, clinical regulatory development so again, I

3    think there were, I don't know that there were outsourced,

4    as many outsourced costs on Helix development before 2022,

5    2020, 2021, but we started spending more time looking into

6    it.

7          So if that's what you're asking, timeline for

8    focusing on like resuming its development, there was

9    internal, internal discussions that wouldn't necessarily

10   show up in external vendor, you know, payments.

11   Q    Are these in Exhibits 15 and 16, are these all of

12   the costs associated with developing Hydrus during the

13   2022 to 2023 --

14   A    Helix.

15   Q    Sorry, thank you.  Let me ask that again.

16         Are Exhibits 15 and 16 all of the costs

17   associated with developing Helix during the 2022 to 2023

18   time frame?

19   A    I think they represent the majority of the

20   external costs, costs paid, to vendors externally.  They

21   don't account for internal development costs, head count,

22   engineers, et cetera.  But and I don't know -- I can't say

23    definitively that they have every single cost there, but I

24    would say the goal was to get everything in there so I

25    would think it's the vast majority.

♀

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    Q    The vast majority of external costs associated

2    with developing Helix; is that correct?

3    A    In that time frame, yes.

4    Q    In that time frame.

5         Where do you track internal costs associated with

6    developing Helix?

7    A    So there are -- it's easier when you -- for

8    employees, if they're focused solely on that project,

9    obviously.  That's pretty straightforward.  It gets a

10   little trickier for a number of employees where they're

11   splitting time between that and five other projects.

12        Examples of that would be our head of R&D.

13   Right, head of R&D is overseeing Helix but also overseeing

14   other R&D projects.  Our head of regulatory splits her

15   time between Helix regulatory, FDA discussions, and other

16   products we're working on.  So we have, some engineers

17   that I think are specifically dedicated to Helix and then

18    we have more senior folks who split their time, some

19    Helix, some other stuff.

20        Q    Is there a list of what people are assigned to

21    which product, projects?

22        A    I'm not sure if there's a, like a list.

23        Q    So how would we know who the -- who the engineers

24    are or how many engineers are assigned to developing

25    Helix, for example?


30

♀

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1        A    I think that's a head of R&D, as far as -- I

2    mean, if I was to try and go find that information I think

3    that's a head of -- I would go to our head of R&D.  Maybe

4    our controller, maybe you could ask, you know, maybe the

5    controller might have that information.  I don't know that

6    there's a list.  I can't answer that.

7        Q    But something that could be generated, though,

8    right, you keep track of who works on what, right?

9        MS. RHYU:  Objection; assumes facts, calls for

10    speculation.

11        THE WITNESS:  Yeah, we know who works on what.  People

12    within the organization know that.  You're asking me.

13    BY MS. HEFFERNAN:

14      Q    No --

15      A    I don't -- I don't know exactly what all of our

16      250 employees are doing in any, on any given day.

17      Q    Yeah, that wasn't really my question.  But it's

18      something that the company is aware of, right, who's

19      working on what?

20      A    Yeah.

21      MS. RHYU:  Objection; vague.

22      THE WITNESS:  Yeah, it's a vague question.  And I

23      don't know what you're getting at.  There are -- managers

24      know what their employees work on.  But there's different

25      levels of the organization, right?  So that question, it's

31

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1      not -- it's not an accurate question of, you know, do

2      people know what other people work on?  If they work

3      closely with them.

4      BY MS. HEFFERNAN:

5      Q    Can you generate -- do you know -- strike that.

6             If I wanted to get internal cost information

7      about the development of Helix over time, could something

8      like Exhibit 16 be generated so that I could see how many

9    people, for example, and their salaries are going towards

10   Helix development over time?

11        MS. RHYU:  Objection; hypothetical and vague.

12        THE WITNESS:  So I don't know the answer.  If it could

13   be generated right now meaning does this engineer have

14   Helix next to his or her name, and is that in our

15   accounting system, so you could just type in Helix and it

16   would pull up everything.  I don't know if it's set up

17   that way right now.  But that information I think could be

18   accessed if it's not automatic via accounting software.

19        Then certainly, via a more hands on exercise with

20   our people asking them who's working on what and doing it,

21   doing it that way.

22   BY MS. HEFFERNAN:

23        Q    Okay.

24        A    I can't, I don't know which way but I think the

25   answer would be, yes.  I think you could get a rough idea

                                                          32

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    of --

2         Q    Okay.  And am I right, I'm looking at column Y in

3    Exhibit 16 that Helix has project ID PRO1007?

4         A    Sorry, where are you looking?

5        Q    Column Y, in Exhibit 16.

6        A    Column Y... project ID.  Yes.

7        Q    And has that always been Helix's project ID?

8        A    I don't know.  I... probably.

9        Q    Like back from the early days?

10       A    Oh, I don't know that we had project IDs.  I

11   don't know when project ID approach was instituted.

12       Q    Do you know what the project ID number is for

13   OMNI?

14       A    I don't.

15       Q    What about SION?

16       A    I don't.

17       Q    Okay.  Does information like this that we see in

18   Exhibits 15 and 16 regarding external costs, does that --

19   does this type of information exist also for OMNI?

20       A    I would -- I would presume it does.  But I can't

21   answer that with certainty.  But I can't -- I don't know

22   what project ID it is.  But I would assume if they have

23   this project ID approach for Helix, that they would have a

24   similar approach for OMNI.

25       Q    Okay.  And would they have a similar approach for

33

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1   SION?

2        A    I would guess that's the case, yes.

3        Q    And do you have -- does Sight Sciences have any

4   other products either under development or commercialized?

5        A    We have a dry eye device --

6        Q    Oh, that's right.

7        A    TearCare.

8        Q    TearCare.

9             Anything else?

10       A    In development or commercial?

11       Q    Either.

12       A    Well, I mean, yeah, we have a pipeline in

13  development.  But commercial, commercial, we have OMNI,

14  SION, and TearCare.

15       Q    And would you -- would a similar breakout of

16  external expenses exist for TearCare as well?

17       A    I... I would guess that's the case.

# EXHIBIT 9

| From: | Wood, Alissa |
|---|---|
| To: | Teng, Austin C.; Strosnick, Lauren; DeLucia, Nathaniel Louis; Armon, Orion; Bova, Justin; Rhyu, Michelle; Madrigal, Angela R.; *msharp@ycst.com; Hallowell, Taylor E.; *jhiggins@ycst.com; Murdter, David; Vanderwall, Cameron C.; Douglas, Jeannine; Gibbs, Tracy; z/Sight Sciences Ivantis; Radovanovich, Alyssa M. |
| Cc: | SKIvantis; #Alcon-SightSciences |
| Subject: | [Sight Sciences v. Ivantis]: P. Badawi Deposition Designations |
| Date: | Thursday, June 15, 2023 6:38:40 PM |

---

**This message is from an EXTERNAL SENDER**
Be cautious, particularly with links and attachments.

Counsel,

Subject to Sight's responses and objections, Sight will designate Paul Badawi on Defendants' 30(b)(6) Topics 1-4, 7, 9-11, 16, 25, 28 (as to any agreements, contracts, partnerships, or arrangements by Sight with any third party relating to the approval of OMNI), 29, 31, 39, 40, 41, 43, 44, 45, 46, 50, 51, 55, and 56.

Regards,

**Alissa Wood**
Admitted to practice in California only
Not admitted to practice in Oregon
Cooley LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
+1 650 843 5346 office
+1 650 849 7400 fax
+1 503 349 0173 mobile
amwood@cooley.com

---

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

EXHIBIT 10
(excerpted)

| From: | Frank, Noah S. |
|---|---|
| To: | Rhyu, Michelle; Strosnick, Lauren; Dirks, Steven; Armon, Orion; Madrigal, Angela R.; *msharp@ycst.com; Hallowell, Taylor E.; *jhiggins@ycst.com; Murdter, David; Vanderwall, Cameron C.; Wood, Alissa; Douglas, Jeannine; Gibbs, Tracy; z/Sight Sciences Ivantis; Radovanovich, Alyssa M. |
| Cc: | SKIvantis; #Alcon-SightSciences |
| Subject: | RE: Sight Sciences v. Ivantis: Sight"s 30(b)(6) Responses |
| Date: | Wednesday, June 21, 2023 5:18:47 PM |
| Attachments: | 2023.06.21 Motion for Teleconference.docx |

Michelle,

As to Mr. Badawi's deposition, we disagree that an extra three hours is sufficient. In addition to being a 30(b)(6) witness, Plaintiff's witnesses have repeatedly disclaimed knowledge and pointed Defendants to Mr. Badawi. While we intend to continue Mr. Badawi's deposition through Monday, June 26, we maintain that Mr. Badawi should sit for a full two days. We will, however, withdraw Ms. Cantu's deposition notice in light of your production of WPS documents and Mr. Badawi's forthcoming testimony on the issue. Given that we have already met-and conferred on this issue last week, it appears that we are at an impasse and we intend to raise this issue with the Court.

Additionally, we intend to raise Plaintiff's refusal to modify the schedule to accommodate depositions occurring out of time. While I recognize that you have raised this as an issue in your motion for teleconference, it is unclear why Plaintiff is raising the issue rather than Defendants, and I have therefore included it in the attached motion for a teleconference. I also previously asked for your availability so that we could include it in the attached motion, although given that you have included your availability in your motion, I have added it to the attached. Please let us know by COB today if Plaintiff has any edits to the joint motion as we intend to file it by 5 pm eastern tomorrow.

Regards,

**Noah Frank**

--------------------------------------------------

**KIRKLAND & ELLIS LLP**
200 Clarendon Street, Boston, MA 02116
**T** +1 617 385 7570
**F** +1 617 385 7501

1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004
**T** +1 202 389 5235
**F** +1 202 389 5200

--------------------------------------------------

noah.frank@kirkland.com

---

**From:** Rhyu, Michelle <RHYUMS@cooley.com>
**Sent:** Wednesday, June 21, 2023 11:37 AM
**To:** Frank, Noah S. <noah.frank@kirkland.com>; Strosnick, Lauren <lStrosnick@cooley.com>; Dirks, Steven <steven.dirks@kirkland.com>; Armon, Orion <oarmon@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@cooley.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Wood, Alissa

<amwood@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Radovanovich, Alyssa M. <ARadovanovich@ycst.com>
**Cc:** SKIvantis <SKIvantis@shawkeller.com>; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: Sight Sciences v. Ivantis: Sight's 30(b)(6) Responses

---

**This message is from an EXTERNAL SENDER**

Be cautious, particularly with links and attachments.

---

Dear Noah,

We maintain that your additional 30(b)(6) notice is improper, harassing, and inconsistent with defendants' prior position opposing multiple 30(b)(6) notices.  We therefore will not provide witnesses for those topics.  However, to avoid motion practice as previously stated, if you agree to withdraw the second 30(b)(6) notice and Ms. Cantu's deposition notice, we are willing to have Mr. Badawi prepped to address Topic 67 in his personal capacity.

As for Mr. Badawi's deposition, we disagree that you are entitled to an additional 5.5 hours for testimony A single 30(b)(6) deposition presumptively should take only 7 hours, and Mr. Badawi is only designated for 40% of your topics.  Our offer of 10 total hours of deposition should be more than enough, particularly in view of the extensive overlap between Mr. Badawi's personal knowledge and the deposition topics.  After 10 hours on the record, we will consider whether it is appropriate to provide Mr. Badawi for additional time.  As for your request for availability for a teleconference with the Court, the scheduling order prescribes how discovery disputes should be brought to the court's attention.  Accordingly, we do not understand your suggestion for a teleconference with the Court.

Michelle

---

**From:** Frank, Noah S. <noah.frank@kirkland.com>
**Sent:** Wednesday, June 21, 2023 6:58 AM
**To:** Rhyu, Michelle <RHYUMS@cooley.com>; Strosnick, Lauren <lStrosnick@cooley.com>; Dirks, Steven <steven.dirks@kirkland.com>; Armon, Orion <oarmon@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@ycst.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Wood, Alissa <amwood@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Radovanovich, Alyssa M. <ARadovanovich@ycst.com>
**Cc:** SKIvantis <SKIvantis@shawkeller.com>; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: Sight Sciences v. Ivantis: Sight's 30(b)(6) Responses

[External]

Michelle,

Regarding Mary Cantu's deposition notice, we will agree to withdraw her notice if Sight designates Mr. Badawi on Defendants' 30(b)(6) Topic 67.

While we appreciate the offer to resolve the issue with regard to Mr. Badawi's deposition, given the scope of Mr. Badawi's knowledge (and the lack of knowledge of other Sight witnesses) we believe Mr. Badawi's deposition should be extended by 5.5 hours. We are available on June 26th to continue his deposition. Given the impending close of fact discovery, please confirm by COB today that Sight agrees to extend Mr. Badawi's deposition by 5.5 hours. If Sight does not agree, please provide Sight's availability for a teleconference with the Court so we may promptly resolve this issue.

Regards,

**Noah Frank**

------------------------------------------------------------

**KIRKLAND & ELLIS LLP**
200 Clarendon Street, Boston, MA 02116
**T** +1 617 385 7570
**F** +1 617 385 7501

1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004
**T** +1 202 389 5235
**F** +1 202 389 5200

------------------------------------------------------------

noah.frank@kirkland.com

---

**From:** Rhyu, Michelle <RHYUMS@cooley.com>
**Sent:** Tuesday, June 20, 2023 3:46 PM
**To:** Frank, Noah S. <noah.frank@kirkland.com>; Strosnick, Lauren <lStrosnick@cooley.com>; Dirks, Steven <steven.dirks@kirkland.com>; Armon, Orion <oarmon@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@ycst.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Wood, Alissa <amwood@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Radovanovich, Alyssa M. <ARadovanovich@ycst.com>
**Cc:** SKIvantis <SKIvantis@shawkeller.com>; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: Sight Sciences v. Ivantis: Sight's 30(b)(6) Responses

Noah,
Thanks for the call we just had.  To memorialize, in the interest of reducing motion practice, I proposed:
- Paul Badawi's deposition would be extended for 3 hours.  The time is based on his being

designated for 24/56 30B6 topics.  That is 43% of the topics.  Assuming a single 30B6 would last 7 hours, 43% of that is 3 hours.  We would be able to hold the extended portion of the deposition on Monday morning, June 26.

- As for Mary Cantu's deposition notice, you had indicated that you may be willing to withdraw her notice if we were willing to produce MAC presentations.  We are willing to produce the WPS presentation made last week and "other MAC" presentations if they are complete.  Mr. Badawi would be prepared to address those presentations in his testimony, in his personal capacity.  Please confirm that you will withdraw Ms. Cantu's deposition notice under these circumstances.

You indicated you would get back to me by tomorrow regarding whether Defendants accept these proposals.

Thanks,

Michelle

---

**From:** Frank, Noah S. <noah.frank@kirkland.com>
**Sent:** Tuesday, June 20, 2023 7:35 AM
**To:** Rhyu, Michelle <RHYUMS@cooley.com>; Strosnick, Lauren <lStrosnick@cooley.com>; Dirks, Steven <steven.dirks@kirkland.com>; Armon, Orion <oarmon@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@ycst.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Wood, Alissa <amwood@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Radovanovich, Alyssa M. <ARadovanovich@cooley.com>
**Cc:** SKIvantis <SKIvantis@shawkeller.com>; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: Sight Sciences v. Ivantis: Sight's 30(b)(6) Responses

**[External]**

---

Michelle,

I can speak briefly at 12:30 PT today. Please call my Boston office line.

**Noah Frank**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
**KIRKLAND & ELLIS LLP**
200 Clarendon Street, Boston, MA 02116
**T** +1 617 385 7570
**F** +1 617 385 7501

1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004
**T** +1 202 389 5235
**F** +1 202 389 5200
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
noah.frank@kirkland.com

**From:** Rhyu, Michelle <RHYUMS@cooley.com>
**Sent:** Tuesday, June 20, 2023 12:10 AM
**To:** Frank, Noah S. <noah.frank@kirkland.com>; Strosnick, Lauren <lStrosnick@cooley.com>; Dirks, Steven <steven.dirks@kirkland.com>; Armon, Orion <oarmon@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@ycst.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Wood, Alissa <amwood@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Radovanovich, Alyssa M. <ARadovanovich@ycst.com>
**Cc:** SKIvantis <SKIvantis@shawkeller.com>; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: Sight Sciences v. Ivantis: Sight's 30(b)(6) Responses

Noah,
Let me know if you have some time tomorrow or Wednesday to discuss the matter of potentially extending Paul Badawi's deposition.  I am open tomorrow at 12:30 PT and 8AM PT on Wednesday.
Michelle

**From:** Frank, Noah S. <noah.frank@kirkland.com>
**Sent:** Monday, June 19, 2023 1:37 PM
**To:** Strosnick, Lauren <lStrosnick@cooley.com>; Dirks, Steven <steven.dirks@kirkland.com>; Armon, Orion <oarmon@cooley.com>; Rhyu, Michelle <RHYUMS@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@ycst.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Wood, Alissa <amwood@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Radovanovich, Alyssa M. <ARadovanovich@ycst.com>
**Cc:** SKIvantis <SKIvantis@shawkeller.com>; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: Sight Sciences v. Ivantis: Sight's 30(b)(6) Responses

**[External]**

Counsel,

As discussed on our meet-and-confer earlier today, please see Defendants' proposed redactions. I also confirm that we have no proposed redactions to the Court's order. As Michelle suggested on the call today, to the extent Plaintiff disagrees with the proposed redactions, it may note that disagreement in a cover letter upon filing.

Regards,

**Noah Frank**

---------------------------------------------

**KIRKLAND & ELLIS LLP**
200 Clarendon Street, Boston, MA 02116
**T** +1 617 385 7570
**F** +1 617 385 7501

1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004
**T** +1 202 389 5235
**F** +1 202 389 5200

---------------------------------------------

noah.frank@kirkland.com

---

**From:** Strosnick, Lauren <lStrosnick@cooley.com>
**Sent:** Friday, June 16, 2023 5:36 PM
**To:** Dirks, Steven <steven.dirks@kirkland.com>; Armon, Orion <oarmon@cooley.com>; Rhyu, Michelle <RHYUMS@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@ycst.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Wood, Alissa <amwood@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Radovanovich, Alyssa M. <ARadovanovich@ycst.com>
**Cc:** SKIvantis <SKIvantis@shawkeller.com>; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: Sight Sciences v. Ivantis: Sight's 30(b)(6) Responses

Counsel,

As mentioned on the meet-and-confer today, please let us know your availability on Monday (6/19) between noon-5pm ET to discuss items 1-5 in my email below.  Thank you for confirming you will produce the privilege log of Shay Glenn materials today, as there is only 1 business day until Jim Shay's deposition on June 20.

Thanks,
Lauren

**Lauren Strosnick**
Direct: +1 650 843 5065

---

**From:** Strosnick, Lauren
**Sent:** Thursday, June 15, 2023 10:08 PM
**To:** Dirks, Steven <steven.dirks@kirkland.com>; Armon, Orion <oarmon@cooley.com>; Rhyu, Michelle <RHYUMS@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@ycst.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Wood, Alissa <amwood@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; z/Sight Sciences Ivantis

# EXHIBIT 11
# (excerpted)

| From: | Verbus, Brian A. |
| To: | Strosnick, Lauren; Teng, Austin C.; DeLucia, Nathaniel Louis; Armon, Orion; Bova, Justin; Rhyu, Michelle; Madrigal, Angela R.; *msharp@ycst.com; Hallowell, Taylor E.; *jhiggins@ycst.com; Murdter, David; Vanderwall, Cameron C.; Wood, Alissa; Douglas, Jeannine; Gibbs, Tracy; z/Sight Sciences Ivantis; Radovanovich, Alyssa M. |
| Cc: | SKIvantis; #Alcon-SightSciences |
| Subject: | RE: Sight Sciences v. Ivantis - Deposition scheduling |
| Date: | Thursday, June 15, 2023 3:57:05 PM |
| Attachments: | 2023.06.15 Stip to Extend Time (KE Edits).docx |

Lauren,

With respect to the stipulation, we do not agree to Sight doing a supplemental opening expert report based on the deposition date for Mr. Chodzko. That is prejudicial to Defendants' ability to prepare their rebuttal reports, and Defendants offered Mr. Chodzko for deposition during the fact discovery period (see A. Teng 5/22/2023 email proposing June 7, 2023 for Mr. Chodzko's deposition). Instead, we propose the parties shift back all expert discovery dates by one week and then slightly adjust summary judgment / *Daubert* motion deadlines so that the parties can still complete briefing by November 16, 2023. The attached redline provides these proposed scheduling adjustments. Please let us know by tomorrow whether Sight agrees.

With respect to Mr. Papini, please provide his availability for a deposition the week of July 3, 2023. Once we have agreed upon a date, we can add him to paragraph one in the draft stipulation.

Mr. Trauthen's deposition will take place at Alcon (the same location we provided for Mr. Sather) if the deposition is remote; if the deposition will be in person, we will hold it at the Courtyard Marriott Irvine Spectrum, 7955 Irvine Center Dr., Irvine, CA 92618. Please let us know by 5:00pm PT today whether the deposition will be in person or remote so we can make the necessary logistical arrangements.

We will get back to you shortly regarding locations for the other witnesses you identified.

Best,
Brian


**Brian A. Verbus**
------------------------------------------------
**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 3775
**F** +1 312 862 2200
------------------------------------------------

brian.verbus@kirkland.com

---

**From:** Strosnick, Lauren <lStrosnick@cooley.com>
**Sent:** Wednesday, June 14, 2023 6:35 PM
**To:** Verbus, Brian A. <brian.verbus@kirkland.com>; Teng, Austin C. <austin.teng@kirkland.com>; DeLucia, Nathaniel Louis <nathaniel.delucia@kirkland.com>; Armon, Orion <oarmon@cooley.com>; Bova, Justin <justin.bova@kirkland.com>; Rhyu, Michelle <RHYUMS@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E.

<THallowell@ycst.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Wood, Alissa <amwood@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Radovanovich, Alyssa M. <ARadovanovich@ycst.com>
**Cc:** SKIvantis <SKIvantis@shawkeller.com>; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: Sight Sciences v. Ivantis - Deposition scheduling

---

**This message is from an EXTERNAL SENDER**

Be cautious, particularly with links and attachments.

---

Brian, please see our revisions to the stipulation in the attached.

Dr. Galanis will be located at the following address for his deposition: 231 S Bemiston Ave, Clayton (St. Louis), MO 63105.

Can you please let us know where Mr. Trauthen (Irvine), Mr. Schieber (Irvine), Mr. Chodzko (Orange County), and Mr. McAuley (Minneapolis) will be for their depositions, so we can prepare our notices?

**Lauren Strosnick**
Direct: +1 650 843 5065

---

**From:** Verbus, Brian A. <brian.verbus@kirkland.com>
**Sent:** Wednesday, June 14, 2023 2:30 PM
**To:** Strosnick, Lauren <lStrosnick@cooley.com>; Teng, Austin C. <austin.teng@kirkland.com>; DeLucia, Nathaniel Louis <nathaniel.delucia@kirkland.com>; Armon, Orion <oarmon@cooley.com>; Bova, Justin <justin.bova@kirkland.com>; Rhyu, Michelle <RHYUMS@cooley.com>; Arora, Priya <PArora@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@ycst.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Wood, Alissa <amwood@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Radovanovich, Alyssa M. <ARadovanovich@ycst.com>
**Cc:** SKIvantis <SKIvantis@shawkeller.com>; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: Sight Sciences v. Ivantis - Deposition scheduling

**[External]**

---

Lauren, please provide confirmation that we can add signatures and file, or any edits, by noon tomorrow.  Please also let us know where the witness will be for the deposition so we can prepare our notice.

Best,
Brian

**Brian A. Verbus**

------------------------------------------

**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 3775
**F** +1 312 862 2200

------------------------------------------

brian.verbus@kirkland.com

**From:** Verbus, Brian A. <brian.verbus@kirkland.com>
**Sent:** Monday, June 12, 2023 4:23 PM
**To:** Strosnick, Lauren <lStrosnick@cooley.com>; Teng, Austin C. <austin.teng@kirkland.com>; DeLucia, Nathaniel Louis <nathaniel.delucia@kirkland.com>; Armon, Orion <oarmon@cooley.com>; Bova, Justin <justin.bova@kirkland.com>; Rhyu, Michelle <RHYUMS@cooley.com>; Arora, Priya <PArora@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@ycst.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Wood, Alissa <amwood@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Radovanovich, Alyssa M. <ARadovanovich@ycst.com>
**Cc:** SKIvantis <SKIvantis@shawkeller.com>; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: Sight Sciences v. Ivantis - Deposition scheduling

Lauren, to advance this issue, attached is a draft joint stipulation.  Please let us know if you have any edits or if we can add signatures and file.

**Brian A. Verbus**

------------------------------------------

**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 3775
**F** +1 312 862 2200

------------------------------------------

brian.verbus@kirkland.com

**From:** Verbus, Brian A. <brian.verbus@kirkland.com>
**Sent:** Thursday, June 8, 2023 1:44 PM
**To:** Strosnick, Lauren <lStrosnick@cooley.com>; Teng, Austin C. <austin.teng@kirkland.com>; DeLucia, Nathaniel Louis <nathaniel.delucia@kirkland.com>; Armon, Orion <oarmon@cooley.com>; Bova, Justin <justin.bova@kirkland.com>; Rhyu, Michelle <RHYUMS@cooley.com>; Arora, Priya <PArora@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@ycst.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C.

<cvanderwall@cooley.com>; Wood, Alissa <amwood@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Radovanovich, Alyssa M. <ARadovanovich@ycst.com>>
**Cc:** SKIvantis <SKIvantis@shawkeller.com>; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: Sight Sciences v. Ivantis - Deposition scheduling

Lauren, we can take the deposition of Dr. Galanis on July 6th beginning at 10:00 AM CT.  Please prepare a draft joint stipulation to take the deposition after the close of discovery and send to us for review.

**Brian A. Verbus**

-------------------------------------------------

**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 3775
**F** +1 312 862 2200

-------------------------------------------------

brian.verbus@kirkland.com

---

**From:** Strosnick, Lauren <lStrosnick@cooley.com>>
**Sent:** Wednesday, June 7, 2023 3:45 PM
**To:** Verbus, Brian A. <brian.verbus@kirkland.com>; Teng, Austin C. <austin.teng@kirkland.com>; DeLucia, Nathaniel Louis <nathaniel.delucia@kirkland.com>; Armon, Orion <oarmon@cooley.com>; Bova, Justin <justin.bova@kirkland.com>; Rhyu, Michelle <RHYUMS@cooley.com>; Arora, Priya <PArora@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@ycst.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Wood, Alissa <amwood@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Radovanovich, Alyssa M. <ARadovanovich@ycst.com>>
**Cc:** SKIvantis <SKIvantis@shawkeller.com>; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: Sight Sciences v. Ivantis - Deposition scheduling

Hi Brian,

Dr. Galanis is not available for any full days other than June 29 within the discovery period.  He is available July 6 after 10am CT.

Thanks,
Lauren

**Lauren Strosnick**
Direct: +1 650 843 5065

---

**From:** Verbus, Brian A. <brian.verbus@kirkland.com>>

**Sent:** Tuesday, June 6, 2023 6:09 PM
**To:** Strosnick, Lauren <lStrosnick@cooley.com>; Teng, Austin C. <austin.teng@kirkland.com>; DeLucia, Nathaniel Louis <nathaniel.delucia@kirkland.com>; Armon, Orion <oarmon@cooley.com>; Bova, Justin <justin.bova@kirkland.com>; Rhyu, Michelle <RHYUMS@cooley.com>; Arora, Priya <PArora@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@ycst.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Wood, Alissa <amwood@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Radovanovich, Alyssa M. <ARadovanovich@ycst.com>
**Cc:** SKIvantis <SKIvantis@shawkeller.com>; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: Sight Sciences v. Ivantis - Deposition scheduling

**[External]**

Hi Lauren,

Regarding Dr. Galanis, we do not agree to take his fact deposition during expert discovery, and likewise cannot agree to a two-hour limitation on the deposition.  We previously offered June 23-24 as dates—if those work, please let us know.  If not, please provide alternate dates that will work in the fact discovery period.

We will follow up shortly regarding Mr. Chodzko.

Best,
Brian

**Brian A. Verbus**
----------------------------------------
**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 3775
**F** +1 312 862 2200
----------------------------------------
brian.verbus@kirkland.com

**From:** Strosnick, Lauren <lStrosnick@cooley.com>
**Sent:** Tuesday, June 6, 2023 12:06 PM
**To:** Teng, Austin C. <austin.teng@kirkland.com>; DeLucia, Nathaniel Louis <nathaniel.delucia@kirkland.com>; Armon, Orion <oarmon@cooley.com>; Bova, Justin <justin.bova@kirkland.com>; Rhyu, Michelle <RHYUMS@cooley.com>; Arora, Priya <PArora@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@ycst.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Wood, Alissa <amwood@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; z/Sight Sciences Ivantis

oarmon@cooley.com

**From:** Bova, Justin <justin.bova@kirkland.com>
**Sent:** Friday, April 21, 2023 3:07 PM
**To:** Armon, Orion <oarmon@cooley.com>; Rhyu, Michelle <RHYUMS@cooley.com>; Arora, Priya <PArora@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@cooley.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Strosnick, Lauren <lStrosnick@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>
**Cc:** SKIvantis <SKIvantis@shawkeller.com>; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: Sight Sciences v. Ivantis - Deposition scheduling

**[External]**

Counsel, we are in receipt of the list of individuals Sight will notice for deposition, and we are investigating. Defendants will notice the below individuals for deposition.  Please let us know their availability and location. Please also let us know whether you are authorized to accept service of a subpoena on behalf of the former employees

1. Aaron Capsel
2. Ali Bauerlein
3. Chris Phelps
4. Daniel O'Keeffe
5. Dave Needleman
6. David Y. Badawi, M.D.
7. Jesse Selnick
8. Jim Rodberg
9. Mark Papini
10. Mika Meyer
11. Paul Badawi
12. Reay Brown
13. Richard Plank
14. Shawn O'Neill
15. Tim Buckley

Thank you,
Justin

**Justin Bova**
--------------------------------------------------
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Ave NW, Washington, D.C. 20004
**T** +1 202 389 3261 **M** +1 202 718 2499
**F** +1 202 389 5200
--------------------------------------------------

justin.bova@kirkland.com

---

**From:** Armon, Orion <oarmon@cooley.com>
**Sent:** Monday, April 17, 2023 11:26 PM
**To:** Bova, Justin <justin.bova@kirkland.com>; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>; Rhyu, Michelle <RHYUMS@cooley.com>; Arora, Priya <PArora@cooley.com>; Madrigal, Angela R. <AMadrigal@cooley.com>; *msharp@ycst.com <msharp@ycst.com>; Hallowell, Taylor E. <THallowell@ycst.com>; *jhiggins@ycst.com <jhiggins@ycst.com>; Murdter, David <dmurdter@cooley.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>; Strosnick, Lauren <lStrosnick@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>
**Cc:** SKIvantis <SKIvantis@shawkeller.com>; Armon, Orion <oarmon@cooley.com>
**Subject:** Sight Sciences v. Ivantis - Deposition scheduling

Counsel – Sight Sciences will notice the following individuals for deposition. Please provide dates when each witness is available for deposition between May 2 and the close of fact discovery, along with their preferred deposition location. For former employees, please let us know whether you are authorized to accept service of a subpoena on behalf of the witness, and where we should direct payment for witness and mileage fees.

1. Andy Schieber
2. Dave Van Meter
3. Brandon Mojica
4. Chuck Marshall
5. Cari Stone
6. Todd Abraham
7. Ahmad Hadba
8. David Kimball
9. Brett Trauthen
10. Jasmine Ainetchian
11. Ben Sather
12. Laurent Attias
13. Jim Shay
14. Doug Roeder

Orion

Orion Armon
Cooley LLP
1144 15th Street, Suite 2300
Denver, CO 80202-2686
720 566 4119 office
303 949 0925 mobile
oarmon@cooley.com

# EXHIBIT 12
# (excerpted)



**HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

# Transcript of Daniel O'Keeffe

**Date:** June 8, 2023
**Case:** Sight Sciences, Inc. -v- Ivantis, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

---

**1**

```
1            UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF DELAWARE
3
4    --------------------------------x
5    SIGHT SCIENCES, INC.,          :
6              Plaintiff,           :  Case No.
7         vs.                       :  21-1317-GBW-SRF
8    IVANTIS, INC., ALCON RESEARCH, :
9    LLC, ALCON VISION, LLC, AND    :
10   ALCON, INC.,                   :
11             Defendants.          :
12   --------------------------------x
13
14           ::: HIGHLY CONFIDENTIAL :::
15       ::: OUTSIDE ATTORNEYS' EYES ONLY :::
16          DEPOSITION OF DANIEL O'KEEFFE
17              CONDUCTED VIRTUALLY
18            Thursday, June 8, 2023
19
20
21
22   Stenographically Reported by:
     LORI STOKES
23   RPR, CSR No. 12732
24   Job No. 495136
25   Pages 1-227
```

**2**

```
1
2
3
4       The Videotaped Deposition of DANIEL O'KEEFFE,
5    was taken virtually on behalf of Defendants,
6    beginning at 9:02 a.m., Pacific Time, on
7    June 8, 2023, before LORI STOKES, RPR, Certified
8    Shorthand Reporter No. 12732.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1    APPEARANCES VIA VIDEOCONFERENCE:
2
3    FOR PLAINTIFF
4        COOLEY, LLP
5        BY:  DR. MICHELLE RHYU
6             ANGELA MADRIGAL
7        Attorneys at Law
8        3175 Hanover Street
9        Suite 300
10       Palo Alto, California 94304-1130
11       650.843.5000
12
13   FOR DEFENDANTS
14       KIRKLAND & ELLIS LLP
15       BY:  STEVEN DIRKS
16            JAKE RAMBEAU (Chicago)
17       Attorneys at Law
18       1301 Pennsylvania Avenue, NW
19       Washington, DC 20004
20       202.389.5000
21
22   REMOTE TECHNICIAN: Sue Pybas
23   VIDEOGRAPHER:   Charlie McGrath
24
25
```

**4**

```
1                    INDEX
2    WITNESS                      EXAMINATION
3    DANIEL O'KEEFFE
4        BY MR. DIRKS ............................9
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of Daniel O'Keeffe
Conducted on June 8, 2023

4 (13 to 16)

---

13

1    A   Roughly, yeah.
2        MS. RHYU:  Objection.  I think that
3    misstates prior testimony.  Or there was a vagueness
4    there.
5    BY MR. DIRKS:
6        Q   Was it --
7        MS. RHYU:  Do you want to just reask just
8    for clarification how many times we met this week.
9        MR. DIRKS:  Okay.
10   BY MR. DIRKS:
11       Q   For clarification, how many times this
12   week did you meet?  Was it four times?
13       A   Once.
14       Q   Oh, I see.  So one time this week?
15       A   Yes.
16       Q   And several times the previous week?
17       A   I think it was maybe twice the week
18   before.
19       Q   Okay.  So one time this week; twice the
20   week before; and then a couple weeks ago, another
21   time.
22           Do I have that right?
23       A   Once or twice a couple weeks ago.
24       Q   Okay.
25       A   I forget.

---

14

1        Q   But about four times in total?
2        MS. RHYU:  And I'd just caution the
3    witness not to speculate.  Just try to remember.
4        THE WITNESS:  Four or five times.
5    BY MR. DIRKS:
6        Q   Okay.  Four or five times.
7            And about four hours each time?
8        A   Possibly.
9        Q   Okay.  Other than you and counsel, was
10   there anybody else in the room?
11       A   No.  I answered to those people that were
12   in the room.
13       Q   Okay.  Did you look at any documents?
14       A   I did.
15       Q   Did you -- did you talk to anybody --
16   outside of your preparation with counsel, did you
17   talk with anybody at Sight Sciences about your
18   upcoming deposition?
19       A   I talked to my manager about being away
20   from the office during those meetings, and I
21   couldn't attend my work responsibilities.
22       Q   But you didn't talk about any substance of
23   what your testimony was going to be about or
24   anything?
25       A   I did not.

---

15

1        Q   What is your understanding of what is
2    accused in this case?
3        MS. RHYU:  Objection.  Vague.
4        THE WITNESS:  My understanding is that the
5    Ivantis Hydrus is infringing on Sight Sciences' IP.
6    BY MR. DIRKS:
7        Q   And how did you gain that understanding?
8        MS. RHYU:  If you can answer that question
9    without revealing attorney-client privileged
10   information, go ahead.
11       THE WITNESS:  I recall reading a press
12   release a couple of years ago, approximately.
13   BY MR. DIRKS:
14       Q   And was that the first time that you had
15   learned of Sight Sciences' lawsuit brought against
16   Ivantis?
17       A   That was the first time I heard of the --
18   no.
19           I heard that a lawsuit may occur prior to
20   that, but I don't know when exactly.
21       Q   Was it weeks before?  Months before?
22       MS. RHYU:  Calls for speculation.
23       THE WITNESS:  I don't recall specifically,
24   but I would think it would have been weeks.
25   ///

---

16

1    BY MR. DIRKS:
2        Q   More than two?
3        MS. RHYU:  Objection.  Calls for
4    speculation.  Asked and answered.
5        THE WITNESS:  I don't recall exactly.
6    Sorry.
7    BY MR. DIRKS:
8        Q   But more than one.  You said "weeks,"
9    right?
10       MS. RHYU:  Same objection.
11       THE WITNESS:  Sorry.  I don't recall
12   exactly when it happened.
13   BY MR. DIRKS:
14       Q   But at some time before the lawsuit was
15   filed, you had heard about Sight's potential plans
16   to sue Ivantis?
17       A   Yes.  I can answer a matter of weeks.
18       Q   And how did you hear about that potential
19   plan to sue Ivantis?
20       MS. RHYU:  Again, if you can answer that
21   question without revealing the substance of an
22   attorney-client communication, you can go ahead.
23       THE WITNESS:  I recall having a
24   conversation with Paul Badawi about it.
25   ///

---

# EXHIBIT 13
# (excerpted)

## 1

```
1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF DELAWARE
3   --------------------------------X
4   SIGHT SCIENCES, INC.,           :
5               Plaintiff,   :
6        v.           :Civil Action No:
7                     :21-1317-GBW-SRF
8   IVANTIS, INC., ALCON RESEARCH   :
9   LLC, ALCON VISION, LLC, and     :
10  ALCON INC.,           :
11             Defendants.  :
12  --------------------------------X
13
14  HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
15           DEPOSITION OF JESSE SELNICK
16            MONDAY, JUNE 25, 2023
17               9:32 A.M.
18
19
20
21
22
23  Job No.: 495141
24  Pages 1 - 293
25  Reported by: Adrienne Mignano, RPR
```

## 2

```
1          Deposition of JESSE SELNICK, held at the law
2   firm of:
3
4            COOLEY, LLP
5            55 Hudson Yards
6            New York, New York 10001
7
8
9          Pursuant to Notice, before Adrienne M.
10  Mignano, a Notary Public and Registered Professional
11  Reporter and for the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## 3

```
1             A P P E A R A N C E S
2
3   ON BEHALF OF PLAINTIFFS:
4       ORION ARMON, ESQUIRE
5       COOLEY, LLP
6       55 Hudson Yards
7       New York, New York 10001
8       212.479.6000
9
10
11  ON BEHALF OF DEFENDANTS:
12       NATHANIEL DeLUCIA, ESQUIRE
13       KIRKLAND & ELLIS LLP
14       601 Lexington Avenue
15       New York, New York 10022
16       212.446.4800
17
18  ALSO PRESENT:
19       Jeremy Hayden, Esq. - Sight Sciences
20       Noah Frank, Esq. - Kirkland
21       Bill Leitsch - TM
22       Harold Rodriguez - Videographer
23
24
25
```

## 4

```
1             C O N T E N T S
2
3   EXAMINATION OF JESSE SELNICK        PAGE
4        By Mr. DeLucia              7
5        By Mr. Armon              289
6        By Mr. DeLucia            290
7
8             E X H I B I T S
9          (Attached to the transcript)
10  SELNICK DEPOSITION EXHIBITS         PAGE
11  Exhibit 1   Schedule 14A SEC filing for    17
                Sight Sciences, Inc.
12  Exhibit 2   Defendants' Notice of Deposition  9
                of Jesse Selnick Pursuant to
13              Federal Rule of Civil Procedure
                Rule 30(b)(1)
14  Exhibit 3   Defendants' Notice of Deposition  0
                of Plaintiff Pursuant to Federal
15              Rule of Civil Procedure Rule
                30(b)(6)
16  Exhibit 4   IPO Prospectus for Sight       87
                Sciences Common Stock
17  Exhibit 5   Morgan Stanley presentation    100
                titled "Redefining the Eye Care
18              Experience"
19  Exhibit 6   Stifel document titled         107
                "Discussion Materials"
20  Exhibit 7   Excel spreadsheet, Bates number 25
                SGHT0021536
21  Exhibit 8   Excel spreadsheet, Bates number 31
                SGHT0057230
22  Exhibit 9   Excel spreadsheet, Bates number 65
                SGHT0049072
23  Exhibit 10  Sight Sciences' 10-K for the   186
                Fiscal Year Ended 12-31-22
24  Exhibit 11  Excel document titled "P&L Data 08
                FY 18-23"
25
```

---

**Page 5**

```
            E X H I B I T S

        (Attached to the transcript)

SELNICK DEPOSITION EXHIBITS            PAGE

Exhibit 12  Excel spreadsheet, Bates number   28
            SGHT0114140
Exhibit 13  Excel spreadsheet, Bates number   46
            SGHT0152828
Exhibit 14  Excel spreadsheet, Bates number   70
            SGHT0152605
Exhibit 15  E-mail chain, top e-mail from    276
            Jesse Selnick to Aaron Capsel
            dated 3-6-22
Exhibit 16  E-mail chain, top e-mail from    279
            Jeff Francis to Chris Phelps
            dated 8-16-21
Exhibit 17  E-mail chain, top e-mail from    281
            Pete England to Jesse Selnick
            dated 1-10-22
Exhibit 18  E-mail chain, top e-mail from    284
            Jesse Selnick to Paul Badawi
            dated 7-11-19
```

---

**Page 6**

1      THE VIDEOGRAPHER: Here begins Media
2  Number 1 in the videotaped deposition of Jesse
3  Selnick in the matter of Sight Sciences, Inc.
4  versus Ivantis, Inc., et al., in the United
5  States District Court for the District of
6  Delaware; Case Number 21-1317-GBW-SRF.
7      Today's date is June 19th, 2023. The
8  time on the video monitor is 9:34 a.m. This
9  video deposition is taking place at 55 Hudson
10 Yards, New York, New York 10001.
11     Would counsel please voice identify
12 themselves and state whom they represent.
13     MR. DeLUCIA: Sure. This is
14 Nathaniel DeLucia, of Kirkland & Ellis,
15 representing the defendants. And viewing
16 remotely is my colleague Noah Frank, also of
17 Kirkland, and Bill Leitsch at TM.
18     MR. ARMON: Orion Armon, from Cooley,
19 on behalf of Sight Sciences and the witness.
20 And with me is Jeremy Hayden, chief legal
21 officer of Sight Sciences.
22     THE VIDEOGRAPHER: The court reporter
23 today is Adrienne Mignano, representing Planet
24 Depos. Would the witness now be sworn in,
25 please.

---

**Page 7**

1  Whereupon,
2          JESSE SELNICK,
3  being first duly sworn or affirmed to testify to
4  the truth, the whole truth, and nothing but the
5  truth, was examined and testified as follows:
6      EXAMINATION BY COUNSEL FOR THE DEFENDANTS
7  BY MR. DeLUCIA:
8      Q   Good morning, Mr. Selnick. Have you
9  ever been deposed before?
10     A   I have.
11     Q   How many times?
12     A   Once.
13     Q   And what was the circumstance of the
14 last deposition?
15     A   It was in relation to shareholder
16 lawsuits around a company I worked at in 1998,
17 1999.
18     Q   And which company was that, that you
19 worked for?
20     A   EPS Solutions.
21     Q   And was that before your time at
22 Black Rock?
23     A   I've never worked at Black Rock.
24     Q   Oh, I'm sorry. Apologies. What was
25 the date again, just so I have it square?

---

**Page 8**

1      A   1998, 1999. I don't remember exactly
2  when I was deposed. I think I was in grad
3  school, so somewhere in 2000 and 2002.
4      Q   Gotcha. And why were you deposed in
5  connection with that shareholder lawsuit?
6      A   Just the shareholder -- just the
7  shareholder stock that I was close to
8  information about the activities of the company,
9  and that I had relevant information. So ...
10     Q   And that was the only time you have
11 been deposed before?
12     A   Yes.
13     Q   All right. In that case, since it's
14 been a while, we might as well go over some
15 preliminary ground rules. If you need a break
16 at any point today, as long as there is a
17 question not pending, let me know and we can
18 take one. If you don't understand a question,
19 please let me know and I'll try to rephrase it.
20 But if you answer the question, I'll assume you
21 understand it, okay?
22     And so, on that point, any answers,
23 please make sure that they are oral just so that
24 it is picked up by the court reporter and can be
25 recorded for the transcript, okay?

**49**

1  processes.
2      Q   Who would make the decision at Sight
3  Sciences where that R&D money went?
4      A   Ultimately it would be Paul Badawi,
5  but ultimately I was accountable for liquidity.
6  So the assessment on whether we had the capacity
7  to spend on anything was really my
8  responsibility.
9      Q   But you don't know one way or the
10 other which product R&D money was being spent
11 on?
12     A   It wasn't tracked that way.
13         MR. ARMON:  We've been going for
14 about an hour.  When you get to a stopping
15 point, let's take a five-minute break.
16         MR. DeLUCIA:  Sure, yes.  A couple
17 more questions and then I think we're good.
18     Q   Would developing a stent product at
19 Sight Sciences be expensive?
20     A   My understanding is that it would be
21 a long process and that it would require, not on
22 the product investment side but on sort of the
23 clinical and reimbursement side, significant
24 investment.  But my understanding also was the
25 product development -- there was significant

**50**

1  product development and that there was more
2  actionability on that side.
3          I don't have the benefit of knowing
4  what the cost would be or what the time frame
5  would be because I never saw anything that was
6  like a formal business case around what that
7  would be.
8      Q   So when you stepped down as CFO,
9  there was no timeline given for it would take
10 this many years to get the stent product to the
11 market?
12     A   I didn't have the benefit of seeing
13 one, no.
14     Q   Wouldn't you -- as CFO, they would
15 have shared that information with you?
16     A   If there was an acceleration on
17 focused spend on a particular initiative or a
18 product being developed, I would have seen it.
19 But absent that, there was -- R&D is a very
20 generalized bucket at Sight Sciences, and there
21 is flexibility in terms of what their time is
22 focused on and what their dollars are being
23 spent on that didn't report in to me.  And there
24 wasn't granular tracking of that beyond, sort
25 of, the aggregate amount that the department was

**51**

1  spending.
2      Q   So there was no accelerated focus on
3  the stent product while you were CFO?
4      A   Not -- to my knowledge, there was
5  not, like, a focused drive towards a specific
6  objective in terms of launching the product by a
7  date certain with a dollar budget commitment.
8          MR. DeLUCIA:  We can do a break now.
9          MR. ARMON:  Hold on.  Please
10 designate the entire record highly confidential,
11 outside attorneys' eyes only.
12         THE VIDEOGRAPHER:  Going off the
13 record at 10:38 a.m.
14         (A recess was taken.)
15         THE VIDEOGRAPHER:  We are now back on
16 the record.  The time is now 10:52 a.m.
17 BY MR. DeLUCIA:
18     Q   Welcome back, Mr. Selnick.  Did you
19 speak with anyone during the break regarding the
20 substance of your testimony?
21     A   No.
22     Q   You mentioned earlier a 2022 investor
23 presentation that discussed a potential Sight
24 Sciences stent product.  Who was that
25 presentation made to?

**52**

1      A   Was in -- it was included in a
2  PowerPoint presentation that was posted to our
3  investor relations site, if I recall, and it had
4  some more specificity around different
5  development concepts for future products.  And
6  it was discussed on either the year-end 2021 or
7  the first quarter 2022 earnings call, just the
8  pipeline and what existed in the pipeline.
9      Q   Do you recall whether that
10 presentation referred to Helix or just a stent
11 more generally?
12     A   I don't recall what words were in the
13 slide.  But I think the concept of stent being a
14 component of the product road map was included.
15     Q   Was "Helix" a term that Sight
16 Sciences used in external facing communications?
17     A   I don't remember us using it formally
18 to public investors.  I do remember it being
19 referred to significantly in our private
20 fundraising and also just in internal
21 conversations.
22     Q   And internal conversations, that's
23 internal at Sight Sciences you're referring to?
24     A   Yes.  I mean, it was a shorthand term
25 used to describe Sight Sciences' sort of stent

Transcript of Jesse Selnick
Conducted on June 19, 2023



**Page 57**

1  Q   Have you reviewed any of the patents
2  that are asserted in this case?
3  **A   No.**
4  Q   So you don't have an opinion one way
5  or the other, as a legal or technical matter,
6  whether the Hydrus infringes those patents?
7  **A   No.**
8  Q   But am I correct that Paul Badawi,
9  for example, communicated a belief that Ivantis
10 was infringing on Sight Sciences' intellectual
11 property?
12 **A   He has communicated that to me.**
13 Q   You mentioned "others with more
14 detailed knowledge." Who else at Sight Sciences
15 communicated a belief that Ivantis or the Hydrus
16 was infringing Sight Sciences' intellectual
17 property?
18    MR. ARMON: I'll caution you not to
19 answer to the extent that it would implicate
20 attorney-client communications. So you may
21 answer to the extent that your answer does not
22 implicate attorney-client communications.
23 **A   The only other person that I have**
24 **ever had a conversation with about it that had**
25 **their own sort of -- that I would say had their**

**Page 58**

1  **own ability to derive an opinion because of**
2  **their knowledge of the patent was David Badawi.**
3  Q   So setting aside lawyers, the
4  individuals at Sight Sciences who communicated
5  this belief that Ivantis might be infringing
6  Sight Sciences' intellectual property were Paul
7  and David Badawi; is that correct?
8  **A   Correct. They have the most**
9  **familiarity with Helix's intellectual property.**
10 Q   And when was the first time that
11 either Paul or David Badawi communicated this
12 belief to you?
13 **A   The first time I can recall is when I**
14 **joined the company in ▓▓▓▓ that there was kind**
15 **of a more detailed conversation about this**
16 **belief.**
17 Q   And what was that detailed
18 conversation?
19 **A   That there was a belief that Hydrus**
20 **infringed upon Helix's intellectual property.**
21 **I'm not capable of having a more substantive**
22 **conversation than that because I don't have the**
23 **familiarity with patents in general or medical**
24 **device patents or stent patents. So it was more**
25 **of a statement than a robust conversation.**

**Page 59**

15    Q   If Sight Sciences had had the money
16 in ▓▓▓ was it your understanding that they
17 would have pursued litigation against Ivantis at
18 that time?
19       MR. ARMON: Objection based on it
20 calls for speculation.
21 **A   Yeah, you know, we never had that**
22 **conversation, that if we had $30 million or**
23 **whatever -- you know, pick a number, would we**
24 **pursue enforcing the patents. That wasn't a**
25 **conversation we ever had. It was our reality**

**Page 60**

1  **that we didn't. And so it wasn't something that**
2  **we discussed further.**
3  Q   Did you get the impression from
4  Mr. Badawi that he would have liked to pursue
5  litigation against Ivantis back in ▓▓▓
6       MR. ARMON: Objection. Form.
7  **A   Yeah, I would say Paul spent a lot of**
8  **time and thought in working on our intellectual**
9  **property portfolio, and Paul feels extremely**
10 **passionate about anyone that he has a view or a**
11 **view -- a more informed view by him and other**
12 **experts that is potentially infringing upon it.**
13 **So I'm not a mind reader, but it is**
14 **a -- it was a differentiator for our business,**
15 **is a differentiator today for Sight Sciences.**
16 **And so, yeah, there is always going to be a**
17 **desire, or if there is the ability to, to**
18 **enforce the intellectual property.**
19 Q   Was it your understanding that the
20 plan was to enforce Sight Sciences' intellectual
21 property at some point in the future once it had
22 the funding to do so?
23       MR. ARMON: Objection. I'll instruct
24 you not to answer that question on the basis of
25 attorney-client privilege.

# EXHIBIT 14
# (excerpted)

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF DELAWARE
3   - - - - - - - - - - - x
4   SIGHT SCIENCES, INC., :
5           Plaintiff,  :
6       v.              :    CA No.
7   IVANTIS, INC.; ALCON  : 21-1317-GBW-SRF
8   RESEARCH LLC; ALCON   :
9   VISION, LLC; and      :
10  ALCON INC.,           :
11          Defendants. :
12  - - - - - - - - - - - X
13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
14
15    Videotaped Deposition of SIGHT SCIENCES, INC.,
16      By and through its Designated Representative
17                JIM RODBERG,
18         and in his Personal Capacity
19             Conducted Virtually
20           Tuesday, June 13, 2023
21               10:04 a.m. EDT
22
23  Job No.:  495139
24  Pages 1 - 95
25  Reported by:  Debra A. Whitehead
```

**Page 2**

```
1     Videotaped Deposition of JIM RODBERG, conducted
2   virtually.
3
4
5       Pursuant to notice, before Debra Ann Whitehead,
6   E-Notary Public in and for the State of Maryland.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1        A P P E A R A N C E S
2   ON BEHALF OF PLAINTIFF AND THE WITNESS:
3       ORION ARMON, ESQUIRE
4       COOLEY LLP
5       1144 15th Street
6       Suite 2300
7       Denver, Colorado 80202-2686
8       (720) 566-4119
9
10  ON BEHALF OF DEFENDANTS:
11      NOAH FRANK, ESQUIRE
12      KIRKLAND & ELLIS LLP
13      200 Clarendon Street
14      Boston, Massachusetts 02116
15      (617) 385-7570
16         - and -
17      LAURA B. ZHU, ESQUIRE
18      KIRKLAND & ELLIS LLP
19      601 Lexington Avenue
20      New York, New York 10022
21      (212) 446-4800
22
23
24
25
```

**Page 4**

```
1   A P P E A R A N C E S   C O N T I N U E D
2   ALSO PRESENT:
3       EMILY DUNN, Video Specialist
4       BILL LEITSCH, TM Financial Forensics
5       CAMERON LINDSAY, Kirkland & Ellis
6       SUE PYBAS, A/V Technician
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 1:21-cv-01317-GBW-SRF   Document 242   Filed 07/11/23   Page 162 of 192 PageID #: 8698

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
Transcript of Jim Rodberg, Designated Representative and Individually 14 (53 to 56)
Conducted on June 13, 2023



Page 53

1  commercial team would have additional detail.
2      Q   What's the TearCare product?
3      A   Can you clarify?
4      Q   If you were to explain to someone who had
5  never heard of TearCare, can you explain what that
6  is?
7      A   It's a device for the treatment of dry
8  eye.
9      Q   And is it a consumer device, or is it a
10 device for physicians to use?
11     A   That's out of my line of responsibility.
12     Q   Well, OMNI is the vast majority of Sight
13 Sciences' sales. Correct?
14     A   Yes.
15     Q   And OMNI is a device that requires some
16 degree of professional education and training.
17 Correct?
18     A   That's out of my line of responsibility.
19     Q   So you don't know whether professional
20 education and training primarily is in regard to
21 sales of OMNI?
22     A   I do not know.
23     Q   And, for instance, if you go to the next
24 row, 16, it says, 570-Customer Success.
25       Do you know if that would primarily

Page 54

1  benefit OMNI, given that OMNI is the vast majority
2  of sales at Sight Sciences?
3      A   I do not know that.
4      Q   What about Row 22, 725-Finance; do you
5  know if that would primarily benefit OMNI?
6      A   I do not know that.
7      Q   Are there any of these payroll and
8  related expenses in tab OpEx Type By Department,
9  in what we've marked as Exhibit 5, that relate
10 primarily to OMNI?
11     A   The one I mentioned before about
12 marketing surgical is -- I could assume that is.
13 But again, I don't -- I don't have the specifics.
14     Q   What about Row 7, R&D; would that relate
15 to OMNI?
16     A   I don't know.
17     Q   Is there still ongoing R&D related to
18 OMNI?
19     A   That's outside of my responsibility.
20     Q   Who would know that?
21     A   Our CEO.
22     Q   And who sets R&D budgets at Sight
23 Sciences?
24     A   Can you clarify by setting, what you mean
25 by setting budgets?

Page 55

1      Q   Is there an R&D budget at Sight Sciences?
2      A   We have -- we have specific personnel and
3  expenses related to R&D, yes. And there are
4  annual budgets related to these different
5  departments.
6      Q   So is the R&D department at Sight
7  Sciences, does that include R&D for all Sight
8  products?
9      A   I believe so, yes.
10     Q   And so is there no distinction in the R&D
11 of, for instance, TearCare versus OMNI versus
12 SION?
13     A   Can you clarify?
14
15
16
17
18
19
20
21
22
23
24
25

Page 56

1
2
3      Q   So if you wanted to invest more in
4  TearCare versus OMNI, how would you go about doing
5  that?
6      A   That would be outside of my
7  responsibilities as corporate controller.
8      Q   You need R&D in order to develop a
9  product. Correct?
10     A   I don't -- I don't know.
11     Q   Well, Sight certainly spent money on R&D
12 developing OMNI. Correct?
13     A   Yes.
14     Q   And if they hadn't spent that money
15 developing OMNI, then there would be no OMNI
16 product. Right?
17     A   That is outside of my line of
18 responsibility.
19     Q   Well, if they never spent the money to
20 develop the products, there would be no products.
21 Right? That's logic?
22     A   Yes. I could assume that, yes.
23     Q   And -- but you don't know how to find out
24 how much it costs to develop OMNI, do you?
25     A   No, we do not have the breakout of down

---

**73**

1  these, not the creation of 8-Ks.

2  Q   So, for instance, if you go to Page 2,

3  Item 8.01, Other Events, would you have had any

4  involvement in putting that together?

5  A   I would review for grammatical accuracy.

6  Q   So are you aware of a proposed change in

7  reimbursement related to nonimplantable MIGS

8  procedures?

9  A   I am aware of the -- yes, the headline.

10  But the details, I'm not well versed in the

11  details of the reimbursement changes.

12  Q   Have you had any discussions with other

13  Sight personnel about those reimbursement changes?

14  A   Yes.

15  Q   And who did you speak with about those

16  reimbursement changes?

17  A   I spoke with Paul Badawi.

18  Q   And what did Paul Badawi tell you about

19  those reimbursement changes?

20  A   The general overview of what was

21  happening and how we would -- our plan to talk to

22  the MACs.

23  Q   Our plan to talk to the what?

24  A   The plan to dispute or to challenge.

25  Similar to what we did with Palmetto in 2020, the

---

**74**

1  response to these proposals.

2  Q   And when you say "the MACs," is that

3  medicare administrative contractor?

4  A   Yes. Yep, M-A-C.

5  Q   What did you do with Palmetto in 2020?

6  A   I don't have the specifics. I just know

7  of the -- of the headline, I guess. A similar

8  situation, where a proposed reimbursement change.

9  Q   Do you know what happened with the

10  reimbursement change proposed by Palmetto in 2020?

11  A   My understanding is it was withdrawn or

12  was not effective. But I -- I'm not the expert on

13  anything reimbursement related.

14  Q   If you look at Item 8.01 in Exhibit 11,

15  in the third paragraph, the second sentence says,

16  "To help inform WPS's review, the company plans to

17  present peer-reviewed, published clinical evidence

18  establishing that procedures involving the OMNI

19  technology are reasonable and necessary based on

20  Medicare coverage standards at the upcoming open

21  WPS meeting on June 14, 2023, and in the comment

22  period through July 15, 2023."

23  Do you see that?

24  A   Yes.

25  Q   Do you know whether there was a WPS

---

**75**

1  meeting on June 14, 2023, that Sight presented at?

2  A   I believe that's tomorrow.

3  Q   Fair enough.

4  Are you aware that that meeting is

5  occurring?

6  A   Based on this, yes.

7  Q   Were you aware prior to this?

8  A   Can you clarify?

9  Q   Prior to today and us going through this

10  8-K, were you aware that Sight was presenting at

11  the upcoming open WPS meeting on June 14, 2023?

12  A   I was made aware when I reviewed this

13  document ahead of filing on June 2nd.

14  Q   Has Sight put together any materials for

15  that WPS meeting that you're aware of?

16  A   I'm not aware of. I don't know.

17  Q   Who would be in charge of putting

18  together materials for that meeting?

19  A   Paul Badawi.

20  Q   And I take it you've not seen any of the

21  materials that Mr. Badawi is putting together?

22  A   Correct.

23  MR. FRANK: Counsel, we'd ask that those

24  materials be produced once that meeting occurs.

25  All right. You can take that down.

---

**76**

1  Q   So, Mr. Rodberg, are you aware that you

2  had previously been designated on additional

3  topics?

4  A   Can you define "additional"?

5  Q   Sure. So you had been designated

6  previously on Topics 17 and 26 related to sales

7  forecasts --

8  A   Yes.

9  Q   -- and then analysis, research, or

10  studies of pricing of Sight products.

11  Do you remember that?

12  A   Yes.

13  Q   Now, you're still designated on the

14  sales, sales forecasts, costs, profits, profit

15  forecasts, and market share data in Sight's

16  possession or control for any product or method

17  embraced by any claim in any patent-in-suit, such

18  as those described in any business plans,

19  communications, or documents.

20  Correct?

21  A   What? I believe so. I remember the

22  numbers more so than the --

23  Q   Sure. That's Topic 18.

24  A   Yes.

25  Q   And so I'm just trying to understand, in

---

EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1317-GBW-SRF |
| | ) | |
| IVANTIS, INC., ALCON RESEARCH LLC, ALCON VISION, LLC, and ALCON INC., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' SECOND NOTICE OF DEPOSITION OF
PLAINTIFF PURSUANT TO FED. R. CIV. P. 30(b)(6)**

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, counsel for Defendants Ivantis, Inc., Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc. (collectively, "Defendants") will take the deposition of Plaintiff Sight Sciences, Inc. ("Sight"). The deposition will take place at Kirkland & Ellis LLP, 1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004, on June 29, 2023, at 9 a.m. Eastern time, or at such other time and place as mutually agreed-upon, and will continue from day to day until completed.

Sight shall designate one or more of its officers, directors, managing agents, or other persons with knowledge of the matters set forth in Attachment A of this Notice to appear and testify on its behalf at the deposition. The Person(s) so designated shall testify as to matters known or reasonably available to Sight, including without limitation all matters known or reasonably available to individuals identified in Sight's initial disclosures in the above-captioned case.

The deposition will be before a Person authorized by law to administer oaths and will

1

be recorded using the stenographic method, through the instant visual display of testimony, and will also be recorded using audio and videotape technology. Testimony derived pursuant to this Notice of Deposition shall be used for any and all appropriate purposes. You are invited to attend and participate.

<div style="margin-left:50%">

/s/ Andrew E. Russell
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
Attorneys for Defendants

</div>

OF COUNSEL:
Gregg LoCascio
Justin Bova
Steven Dirks
Socrates L. Boutsikaris
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

Kat Li
Jeanne M. Heffernan
Austin C. Teng
Ryan J. Melde
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX  78701
(512) 678-9100

Ryan Kane
Nathaniel DeLucia
Laura Zhu
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Brian A. Verbus
Jacob Rambeau
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000

Noah S. Frank
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Dated: June 15, 2023

## ATTACHMENT A

## DEFINITIONS

1.      "Alcon" shall mean Defendants Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc. and their officers, employees, counsel, agents, consultants, and representatives, and includes joint ventures and other entities that are wholly or partially owned by Alcon, either directly or indirectly, and the officers, employees, counsel, agents, consultants, and representatives of these divisions, subsidiaries, and joint ventures.

2.      "Ivantis" shall mean Ivantis, Inc., its present and former officers, directors, employees, counsel, agents, consultants, and representatives, and includes affiliates, assignees, predecessors in interest, or successors in interest.

3.      "Defendants" collectively refers to Alcon and Ivantis.

4.      "Sight Sciences," "Plaintiff," "You," or "Your" shall mean Plaintiff Sight Sciences, Inc., its present and former officers, directors, employees, counsel, agents, consultants, representatives, subsidiaries, affiliates, assignees, predecessors in interest, successors in interest, and anyone acting or purporting to act on their behalf, including, without limitation, any inventors of the Asserted Patents.

5.      "This Case" or "This Action" refers to the above-captioned action, *Sight Sciences, Inc. v. Ivantis, Inc., Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc.*, No. 21-cv-1317-GBW-SRF (D. Del.).

6.      "Complaint" refers to the Complaint filed in This Action (D.I. 1) on September 16, 2021, and any amendments thereto, including Sight Sciences' First Amended Complaint (D.I. 19), filed on December 15, 2021, and Sight Sciences' Second Amended Complaint (D.I. 59), filed on August 1, 2022.

7.     "Asserted Patents" means U.S. Patent Nos. 8,287,482; 9,370,443; 9,486,361; 10,314,742; and 11,389,328 and the respective patent applications, including any applications to which they claim priority, that led to each, as well as any other patent that Sight Sciences contends Defendants infringe.

8.     "Hydrus" shall mean the Ivantis Hydrus® Microstent, as identified in the Complaint.

9.     "Accused Products" shall mean the Hydrus and any other device, system, or method that Sight Sciences alleges infringes the Asserted Patents in This Action.

10.     "Asserted Claim" means each claim of the Asserted Patents that Sight Sciences alleges, in the Complaint or in subsequent pleadings or disclosures, is infringed by one or more of the Accused Products, either directly or indirectly.

11.     "Person" shall mean any natural person, alive or deceased, and any business, legal or governmental entity or association.

12.     "Document" shall mean all materials, as defined in Rule 34(a) of the Federal Rules of Civil Procedure, including, without limitation, any handwritten, printed, typed, recorded photographic, and computer-generated materials of any kind or nature, however produced or reproduced, as well as material stored electronically, electromagnetically, mechanically, optically, and electronic recordings or transcripts thereof, and includes drafts, revisions of drafts, preliminary and preparatory materials, originals, copies, emails, attachments, exhibits, removable notes, and all translations and summaries thereof.

13.     The terms "concerning" and "relating to" shall mean, in whole or in part, referring to, describing, evidencing, constituting, containing, comprising, referring to, embodying, connected to, reflecting, analyzing, showing, discussing, identifying, illustrating, stating,

regarding, supporting, refuting, rebutting, responding to, commenting on, evaluating, about, in respect of, mentioning, dealing with, or in any way pertaining to, either explicitly or implicitly.

14.     The singular form of each word shall be interpreted in the plural, and vice versa, so as to give each request the broadest possible scope.

15.     Regardless of the tense employed, all verbs shall be read as applying to past, present, and future as necessary to make any phrase more, rather than less, inclusive.

16.     The conjunctives "and" and "or" shall be construed either disjunctively or conjunctively, as necessary, to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

17.     The terms "all," "each," and "any" shall be construed as all and any.

## TOPICS FOR EXAMINATION

57.     The contributions of each inventor, separately, to the conception and reduction to practice of the Asserted Patents.

58.     Sight's awareness, monitoring, or analysis of Defendants or Defendants' intellectual property.

59.     Sight's awareness, monitoring, or analysis of Hydrus, including the date You first became aware of Hydrus.

60.     Any materials provided to Sight's prosecution counsel and/or any Person responsible for prosecuting the Asserted Patents during prosecution of the Asserted Claims.

61.     The facts and circumstances related to when Sight first believed it had intellectual property, including a patent or patent application, that covered Hydrus.

62.     The facts and circumstances related to when Sight first discussed or considered litigation regarding the Accused Products, and its final decision to sue in 2021.

63.     All communications with Alcon or Ivantis regarding Sight's patent rights before you filed this lawsuit.

64.     Your knowledge and internal and external communications concerning Alcon's potential acquisition of Ivantis, including the date You first became aware of a potential acquisition or an option to acquire Ivantis.

65.     Your sales activities and history of sales for each account or customer relationship You contend has been "negatively impacted" by Defendants' alleged infringement, including the causal nexus to Defendants' alleged infringement. *See, e.g.*, Pl.'s Resp. to Interrog. 12.

66.     The facts and circumstances related to your attempts to develop and commercialize Helix.

67.     The facts and circumstances related to Sight's analysis and response to proposed Medicare reimbursement changes related to Omni, including but not limited to the issue described in Item 8.01 of Sight Sciences' June 8, 2023 Form 8-K filing with the U.S. Securities and Exchange Commission.

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew E. Russell, hereby certify that on June 15, 2023, this document was served on

the persons listed below in the manner indicated:

### <u>BY EMAIL</u>

Melanie K. Sharp
James L. Higgins
Taylor E. Hallowell
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

Orion Armon
COOLEY LLP
1144 15th Street, Suite 2300
Denver, CO 80202
(720) 566-4000
oarmon@cooley.com

Michelle S. Rhyu, J.D., Ph.D.
David N. Murdter
Lauren Strosnick
Alissa Wood
Cameron C. Vanderwall
Angela R. Madrigal
Juan Pablo Gonzalez
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94305
(650) 843-5000
rhyums@cooley.com
dmurdter@cooley.com
lstrosnick@cooley.com
amwood@cooley.com
cvanderwall@cooley.com
jgonzalez@cooley.com
amadrigal@cooley.com

*/s/ Andrew E. Russell*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants*

EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1317-GBW-SRF |
| | ) | |
| IVANTIS, INC., | ) | |
| ALCON RESEARCH LLC, | ) | |
| ALCON VISION, LLC, | ) | |
| and ALCON INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' NOTICE OF DEPOSITION OF SABRINA KATZ
PURSUANT TO FED. R. CIV. P. 30(b)(1)**

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil Procedure, counsel for Defendants Ivantis, Inc., Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc. (collectively, "Defendants") will take the deposition of Sabrina Katz before a certified court reporter authorized to administer oaths and record testimony. The deposition with take place on June 29, 2023 beginning at 9:00 a.m. Eastern Time, remotely by video, or at a time and place mutually agreed upon by the Parties. The testimony will be recorded by stenographic and/or video-graphic means.

1

OF COUNSEL:
Gregg LoCascio
Noah S. Frank
Justin Bova
Steven Dirks
Socrates L. Boutsikaris
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

Jeannie M. Heffernan
Kat Li
Austin C. Teng
Ryan J. Melde
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX  78701
(512) 678-9100

Ryan Kane
Nathaniel DeLucia
Laura Zhu
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Brian A. Verbus
Jake Rambeau
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000

Dated: June 14, 2023

/s/ Kat Li
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants*

2

## <u>CERTIFICATE OF SERVICE</u>

I, Kat Li, hereby certify that on June 14, 2023, this document was served on the persons listed

below in the manner indicated:

**<u>BY EMAIL</u>**

Melanie K. Sharp
James L. Higgins
Taylor E. Hallowell
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

Orion Armon
COOLEY LLP
1144 15th Street, Suite 2300
Denver, CO 80202
(720) 566-4000
oarmon@cooley.com

Michelle S. Rhyu
David Murdter
Lauren Strosnick
Alissa Wood
Cameron C. Vanderwall
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94305
(650) 843-5000
rhyums@cooley.com
dmurdter@cooley.com
parora@cooley.com
lstrosnick@cooley.com
amwood@cooley.com

*/s/ Kat Li*
Kat Li
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
(512) 678-9100

EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1317-GBW-SRF |
| | ) | |
| IVANTIS, INC., | ) | |
| ALCON RESEARCH LLC, | ) | |
| ALCON VISION, LLC, | ) | |
| and ALCON INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' NOTICE OF DEPOSITION OF SARAH SLOAN MARCUS
PURSUANT TO FED. R. CIV. P. 30(b)(1)**

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil Procedure, counsel for Defendants Ivantis, Inc., Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc. (collectively, "Defendants") will take the deposition of Sarah Sloan Marcus before a certified court reporter authorized to administer oaths and record testimony. The deposition with take place on June 28, 2023 beginning at 9:00 a.m. Eastern Time, remotely by video, or at a time and place mutually agreed upon by the Parties. The testimony will be recorded by stenographic and/or video-graphic means.

1

OF COUNSEL:
Gregg LoCascio
Noah S. Frank
Justin Bova
Steven Dirks
Socrates L. Boutsikaris
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

Jeannie M. Heffernan
Kat Li
Austin C. Teng
Ryan J. Melde
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX  78701
(512) 678-9100

Ryan Kane
Nathaniel DeLucia
Laura Zhu
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Brian A. Verbus
Jake Rambeau
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000

Dated: June 14, 2023

/s/ Kat Li
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants*

2

## CERTIFICATE OF SERVICE

I, Kat Li, hereby certify that on June 14, 2023, this document was served on the persons listed below in the manner indicated:

**BY EMAIL**

Melanie K. Sharp
James L. Higgins
Taylor E. Hallowell
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

Orion Armon
COOLEY LLP
1144 15th Street, Suite 2300
Denver, CO 80202
(720) 566-4000
oarmon@cooley.com

Michelle S. Rhyu
David Murdter
Lauren Strosnick
Alissa Wood
Cameron C. Vanderwall
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94305
(650) 843-5000
rhyums@cooley.com
dmurdter@cooley.com
parora@cooley.com
lstrosnick@cooley.com
amwood@cooley.com

/s/ Kat Li
Kat Li
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
(512) 678-9100

3

EXHIBIT 18

| From: | Teng, Austin C. |
|---|---|
| To: | Strosnick, Lauren; Frank, Noah S.; Rhyu, Michelle; Merideth, Vicki; cvilloslada@ycst.com; Armon, Orion; Gibbs, Tracy; Wood, Alissa; z/Sight Sciences Ivantis; Murdter, David; Douglas, Jeannine; mgassaway@ycst.com; thallowell@ycst.com; *jhiggins@ycst.com; *msharp@ycst.com; Vanderwall, Cameron C. |
| Cc: | SKIvantis@shawkeller.com; #Alcon-SightSciences; Mecham, Ross D; Wood, Alissa |
| Subject: | RE: C.A. No. 21-1217-GBW-SRF Sight Sciences, Inc. v. Ivantis, Inc. et al. - Document Production Deficiencies |
| Date: | Friday, June 23, 2023 11:11:26 PM |
| Attachments: | 2023.06.23 Amended Motion for Teleconference.docx |

Counsel,

Thank you for your time on today's meet and confer. Based on our call, we understand that not all of Sight's emails within a produced email thread were consistently marked as responsive, and as a result, not all attachments referenced throughout the thread have necessarily been produced.

For any email Sight has produced, Sight is obligated to produce the compete thread, including any attachments referenced throughout. The missing information does not appear on your privilege log, and therefore there is no valid reason for withholding the missing emails and attachments. Rule 34(a)(1)(A) requires the production of designated ESI, and nothing in the Discovery Order excuses the parties from having to produce all of the attachments associated with responsive email threads. Your argument regarding the definition of "Family" is beside the point. While the Discovery Order permits deduplication at the "Family level," the Producing Party is still required to produce at least "a single copy of responsive Duplicate ESI." D.I. 49 § 4(d). And the Discovery Order clearly favors production of complete sets of information. *See, e.g.,* D.I. 49 § 4(e) ("Unless documents contain solely Privileged Information, parties will produce complete Document Families where any portion of the Family contains relevant information.").

While you have stated that you do not believe the attachment issue is widespread, we did a quick check following our call and identified as many as 400 emails that reference attachments earlier in the thread. It is unreasonable to expect Defendants to scour your production for missing information when Sight maintains the information in a structured format, and it is easily within your vendor's capabilities to identify all unproduced emails associated with the emails you did produce. There is no undue burden associated with producing the missing information. Your vendor can easily identify the associated emails and attachments and produce them. There is no need to re-review for relevance given your production of an email thread concedes the relevance and responsiveness of the associated emails.

We have notified you repeatedly about the missing attachments since April of this year and have attempted to resolve this without need for court intervention. *See* 4/21/2023 J. Bova Letter at 2; 4/28/2023 J. Bova e-mail; 5/10/2023 J. Bova Letter at 6; 5/26/2023 A. Teng e-mail; 6/12/2023 S. Dirks e-mail. Defendants have also identified examples of the issue as a courtesy. *See, e.g.,* SGHT0030283, SGHT0030410, SGHT0030936, SGHT0031063, SGHT0130538, SGHT0160500. Your offer to continue evaluate any claims of missing attachments on a case-by-case basis is not workable given the late stage of discovery. Therefore, as we discussed on the call, the parties are at impasse with respect to Sight's withholding of email attachments. Attached is an amended joint motion for teleconference. Please let us know if you have any edits so we can get this on file.

We will follow up regarding the items we discussed today from your June 21 email.

Best regards,
Austin

**Austin Teng**

-------------------------------------------

**KIRKLAND & ELLIS LLP**
401 Congress Avenue, Austin, TX 78701
**T** +1 512 355 4351  **M** +1 214 444 8364
**F** +1 512 678 9101

-------------------------------------------

austin.teng@kirkland.com

---

**From:** Strosnick, Lauren <lStrosnick@cooley.com>
**Sent:** Friday, June 23, 2023 11:19 AM
**To:** Frank, Noah S. <noah.frank@kirkland.com>; Rhyu, Michelle <RHYUMS@cooley.com>; Merideth, Vicki <vicki.merideth@kirkland.com>; cvilloslada@ycst.com; Armon, Orion <oarmon@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; Wood, Alissa <amwood@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Murdter, David <dmurdter@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; mgassaway@ycst.com; thallowell@ycst.com; *jhiggins@ycst.com <jhiggins@ycst.com>; *msharp@ycst.com <msharp@ycst.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>
**Cc:** SKIvantis@shawkeller.com; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>; Mecham, Ross D <rmecham@cooley.com>; Wood, Alissa <amwood@cooley.com>
**Subject:** RE: C.A. No. 21-1217-GBW-SRF Sight Sciences, Inc. v. Ivantis, Inc. et al. - Document Production Deficiencies

---

**This message is from an EXTERNAL SENDER**

Be cautious, particularly with links and attachments.

---

Counsel,

We are available to meet-and-confer regarding this issue at 5pm ET today.  If that works, please send a dial-in.  For clarity, we have applied the definition of "family" set forth in the parties' ESI Order – "a group of documents that are maintained as a single unit in the ordinary course of business (*e.g.*, an email and its attachments)."  D.I. 49, ¶ 3.b.  Contrary to your assertions, an attachment is only part of the document family when its parent document is the last-in-time (LIT) email in the email chain. Your concerns thus remain unfounded.  Our e-discovery attorney assigned to this case will join the call to assist with any technical questions.

Please also be prepared to discuss the deficiencies in Defendants' document productions summarized in our attached email from 6/21.

Thanks,

Lauren

Lauren Strosnick
Direct: +1 650 843 5065

---

**From:** Frank, Noah S. <noah.frank@kirkland.com>
**Sent:** Thursday, June 22, 2023 11:51 AM
**To:** Strosnick, Lauren <lStrosnick@cooley.com>; Rhyu, Michelle <RHYUMS@cooley.com>; Merideth, Vicki <vicki.merideth@kirkland.com>; cvilloslada@ycst.com; Armon, Orion <oarmon@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; Wood, Alissa <amwood@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Murdter, David <dmurdter@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; mgassaway@ycst.com; thallowell@ycst.com; *jhiggins@ycst.com <jhiggins@ycst.com>; *msharp@ycst.com <msharp@ycst.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>
**Cc:** SKIvantis@shawkeller.com; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: C.A. No. 21-1217-GBW-SRF Sight Sciences, Inc. v. Ivantis, Inc. et al. - Document Production Deficiencies

---

**[External]**

---

Lauren,

Far from being "unfounded," our concerns are evident based on both the deficiencies we have identified, as well as your response, which calls into question the "reasonableness" of Sight's document collection, review, and production. From your email, it appears that Sight believes it can withhold responsive documents from within a family simply because they were not attached to the latest-in-time email. It is also unclear what definition of "family" Sight has been using to collect and review documents.

While Sight has explained what it did to rectify this particular instance, it has not explained why this occurred in the first place. Nor has Sight explained whether it even investigated the cause of this issue. We are available to meet and confer today at 1 pm pacific. Please also be prepared to discuss the missing email response from Paul Badawi on 1/13/2016 that I raised yesterday.

Regards,

**Noah Frank**

---

**KIRKLAND & ELLIS LLP**
200 Clarendon Street, Boston, MA 02116
**T** +1 617 385 7570
**F** +1 617 385 7501

1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004
**T** +1 202 389 5235
**F** +1 202 389 5200

---

noah.frank@kirkland.com

**From:** Strosnick, Lauren <lStrosnick@cooley.com>
**Sent:** Thursday, June 22, 2023 9:55 AM
**To:** Frank, Noah S. <noah.frank@kirkland.com>; Rhyu, Michelle <RHYUMS@cooley.com>; Merideth, Vicki <vicki.merideth@kirkland.com>; cvilloslada@ycst.com; Armon, Orion <oarmon@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; Wood, Alissa <amwood@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Murdter, David <dmurdter@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; mgassaway@ycst.com; thallowell@ycst.com; *jhiggins@ycst.com <jhiggins@ycst.com>; *msharp@ycst.com <msharp@ycst.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>
**Cc:** SKIvantis@shawkeller.com; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: C.A. No. 21-1217-GBW-SRF Sight Sciences, Inc. v. Ivantis, Inc. et al. - Document Production Deficiencies

Counsel,

Your concerns regarding alleged "missing attachments" are unfounded.  As an initial matter, your description of these documents as having "missing attachments" is a misnomer – the two documents you initially identified are not in fact missing attachments; it is clear from the face of each document that there is no attachment to the last-in-time email.  The same is true for the six additional documents you identified on 6/20.  Instead, we understand your concern to be about earlier emails in the chain that reference attachments being sent.  We therefore searched Sight's documents for the emails referencing attachments in SGHT0031048 and SGHT0031051, and located some or all of the attachments that we will produce by tomorrow.  Specifically, here are the steps we took with respect to these two documents:

- We identified that the previous emails referencing attachments were all sent from the paul@sightsciences.com address;
- We searched previously-collected ESI as well as original sources in an effort to locate these messages as the last-in-time sent versions including the attachments;
- We also searched other contemporaneous messages, and identified communications with Stephen Pons that reflect Paul Badawi as an intermediary passing along the attachments;
- We identified contemporaneous standalone documents or messages from Stephen Pons that include attachments corresponding to the documents referenced in the original threads, and will produce those documents this week.

We will undertake a similar investigation for the six additional documents you identified yesterday.

Sight rejects your unfounded allegations regarding the completeness of its production.  Sight has undertaken a reasonable collection, review, and production of ESI (including email) based on responsiveness to the issues in this case and Defendants' requests for production, and we have investigated your follow-up questions in good faith.  Sight has produced families associated with responsive documents, but the obligation to produce families does not include locating referenced attachments that are not part of those families.  While we are willing to perform a reasonable number of searches for specific attachments that you identify, there is no requirement or agreement in this case for the parties to search for attachments referenced in emails that are not part of

responsive families.

We are happy to meet and confer to discuss this issue further as needed.

Thanks,
Lauren

**Lauren Strosnick**
Direct: +1 650 843 5065

**From:** Frank, Noah S. <noah.frank@kirkland.com>
**Sent:** Wednesday, June 21, 2023 5:29 PM
**To:** Rhyu, Michelle <RHYUMS@cooley.com>; Strosnick, Lauren <lStrosnick@cooley.com>; Merideth, Vicki <vicki.merideth@kirkland.com>; cvilloslada@ycst.com; Armon, Orion <oarmon@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; Wood, Alissa <amwood@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Murdter, David <dmurdter@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; mgassaway@ycst.com; thallowell@ycst.com; *jhiggins@ycst.com <jhiggins@ycst.com>; *msharp@ycst.com <msharp@ycst.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>
**Cc:** SKIvantis@shawkeller.com; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: C.A. No. 21-1217-GBW-SRF Sight Sciences, Inc. v. Ivantis, Inc. et al. - Document Production Deficiencies

**[External]**

Michelle,

Contrary to your assertion, spreadsheets in Sight's production indicate otherwise. For example, row 16887 in SGHT0162043 identifies the existence of an email response from Paul Badawi on 1/13/2016 (not produced) to the email dated 12/30/2015 (SGHT0032220). We remain seriously concerned about Sight's process to collect and produce documents in this case. Please confirm that, other than this missing email, you have produced complete families for all responsive emails or explain Sight's rationale for not doing so.  At a minimum, by tomorrow, please produce the aforementioned email or explain the discrepancy.

By tomorrow, please also respond to our concerns identified below regarding missing attachments. If this issue is not resolved by tomorrow we intend to raise it with the Court in our motion for teleconference.

Regards,

**Noah Frank**
------------------------------------------------
**KIRKLAND & ELLIS LLP**
200 Clarendon Street, Boston, MA 02116
**T** +1 617 385 7570
**F** +1 617 385 7501

1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004
**T** +1 202 389 5235
**F** +1 202 389 5200

‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐

noah.frank@kirkland.com

---

**From:** Rhyu, Michelle <RHYUMS@cooley.com>
**Sent:** Wednesday, June 21, 2023 3:07 PM
**To:** Frank, Noah S. <noah.frank@kirkland.com>; Strosnick, Lauren <lStrosnick@cooley.com>; Merideth, Vicki <vicki.merideth@kirkland.com>; cvilloslada@ycst.com; Armon, Orion <oarmon@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; Wood, Alissa <amwood@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Murdter, David <dmurdter@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; mgassaway@ycst.com; thallowell@ycst.com; *jhiggins@ycst.com <jhiggins@ycst.com>; *msharp@ycst.com <msharp@ycst.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>
**Cc:** SKIvantis@shawkeller.com; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: C.A. No. 21-1217-GBW-SRF Sight Sciences, Inc. v. Ivantis, Inc. et al. - Document Production Deficiencies

Noah,
Regarding the Sight email dated 12/30/2015 (SGHT0032220), we have investigated, and you have received the complete thread of that email.  Mr. Badawi did not respond to that email.  Other team members will get back to you on the status of the investigation about the purported missing attachments.

Michelle

---

**From:** Frank, Noah S. <noah.frank@kirkland.com>
**Sent:** Wednesday, June 21, 2023 1:49 PM
**To:** Strosnick, Lauren <lStrosnick@cooley.com>; Merideth, Vicki <vicki.merideth@kirkland.com>; cvilloslada@ycst.com; Armon, Orion <oarmon@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; Wood, Alissa <amwood@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Murdter, David <dmurdter@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; mgassaway@ycst.com; Rhyu, Michelle <RHYUMS@cooley.com>; thallowell@ycst.com; *jhiggins@ycst.com <jhiggins@ycst.com>; *msharp@ycst.com <msharp@ycst.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>
**Cc:** SKIvantis@shawkeller.com; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** RE: C.A. No. 21-1217-GBW-SRF Sight Sciences, Inc. v. Ivantis, Inc. et al. - Document Production Deficiencies

**[External]**

Counsel,

I have not received a response to the below email. Please provide your availability to meet and

confer regarding this issue today.

Regards,

**Noah Frank**
------------------------------------------------
**KIRKLAND & ELLIS LLP**
200 Clarendon Street, Boston, MA 02116
**T** +1 617 385 7570
**F** +1 617 385 7501

1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004
**T** +1 202 389 5235
**F** +1 202 389 5200
------------------------------------------------
noah.frank@kirkland.com

---

**From:** Frank, Noah S. <noah.frank@kirkland.com>
**Sent:** Tuesday, June 20, 2023 7:47 AM
**To:** Strosnick, Lauren <lStrosnick@cooley.com>; Merideth, Vicki <vicki.merideth@kirkland.com>; cvilloslada@ycst.com; Armon, Orion <oarmon@cooley.com>; Gibbs, Tracy <tgibbs@cooley.com>; Wood, Alissa <amwood@cooley.com>; z/Sight Sciences Ivantis <zSightSciencesIvantis@cooley.com>; Murdter, David <dmurdter@cooley.com>; Douglas, Jeannine <jdouglas@cooley.com>; mgassaway@ycst.com; Rhyu, Michelle <RHYUMS@cooley.com>; thallowell@ycst.com; *jhiggins@ycst.com <jhiggins@ycst.com>; *msharp@ycst.com <msharp@ycst.com>; Vanderwall, Cameron C. <cvanderwall@cooley.com>
**Cc:** SKIvantis@shawkeller.com; #Alcon-SightSciences <Alcon-SightSciences@kirkland.com>
**Subject:** C.A. No. 21-1217-GBW-SRF Sight Sciences, Inc. v. Ivantis, Inc. et al. - Document Production Deficiencies

Counsel,

Defendants have for months repeatedly asked Sight to produce all missing attachments from its productions. *See* 4/21/2023 J. Bova Letter at 2; 4/28/2023 J. Bova e-mail; 5/10/2023 J. Bova Letter at 6; 5/26/2023 A. Teng e-mail; 6/12/2023 S. Dirks e-mail. Despite your assertions to the contrary, it is not Defendants' burden to locate all missing attachments in Sight's deficient production; Defendants identified examples of the issue as a courtesy. Sight's "investigation" of the missing attachments issue, in which Sight merely reviewed the two example documents that reference attachments being sent and "locat[ed] some or all of the attachments," does nothing to resolve Defendants' concerns about the pervasiveness of this issue. To date, Sight still has not (1) explained why these attachments were missing, (2) identified and produced other missing attachments, or (3) confirmed that it investigated whether there are additional missing attachments beyond those identified. Indeed, there are many more examples of missing attachments. *See, e.g.,* SGHT0030283, SGHT0030410, SGHT0030936, SGHT0031063, SGHT0130538, SGHT0160500. Defendants emphasize that this list is merely exemplary and it is not Defendants' obligation to identify each and every missing attachment.

To further illustrate Defendants' concerns, Sight's production contains incomplete email threads. For example, an email dated 12/30/2015 (SGHT0032220) poses a question to Paul Badawi and Sight has not produced any email response. As with the missing attachments above, this is only exemplary and Sight has an obligation to produce complete email threads for responsive emails.

Given Mr. Badawi's upcoming deposition, please confirm by Tuesday, June 20 that Sight will produce the missing email response and attachments already identified by Wednesday, June 21. Please also confirm that Sight will investigate why these issues occurred and whether there are other missing attachments and missing emails from threads, and provide explanations by Wednesday, June 21. Defendants' continual discovery of the incomplete state of Sight's production is highly prejudicial. If Sight does not agree to provide explanations regarding these issues by Wednesday, June 21, please provide your availability to meet and confer that day.

Regards,


**Noah Frank**
-----------------------------------------------------

**KIRKLAND & ELLIS LLP**
200 Clarendon Street, Boston, MA 02116
**T** +1 617 385 7570
**F** +1 617 385 7501

1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004
**T** +1 202 389 5235
**F** +1 202 389 5200
-----------------------------------------------------
noah.frank@kirkland.com


The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

EXHIBIT 19

| From: | "Paul Badawi" <Paul@sightsciences.com> on behalf of <paul@sightsciences.com> |
|---|---|
| Sent: | Mon, 11 Jun 2012 20:50:53 +0000 (UTC) |
| To: | "David Badawi" <david@sightsciences.com> |
| Subject: | [FWD: Good News!] |
| Attachments: | PALO ALTO-60696-20001.01 Pending Claims-1382637.DOC;67915-20001.01_06-11-12_NOA.PDF |

D-bonzai,

Congratulations! The ████████ as been officially granted! Check out claim 1!

On to the next one!

-Preuter

# Redacted - Privilege

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @mofo.com, and delete the message.

------------------------------------------------------------------

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY