IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **Redacted - Public Version** |
| | ) | |
| v. | ) | C.A. No. 21-1317-GBW-SRF |
| | ) | |
| IVANTIS, INC., ALCON RESEARCH LLC, ALCON VISION, LLC, and ALCON INC., | ) | ███████████████ |
| | ) | |
| | ) | |
| Defendants. | ) | |

**LETTER TO THE HONORABLE JUDGE SHERRY R. FALLON
FROM KAREN E. KELLER**

OF COUNSEL:
Gregg LoCascio
Sean McEldowney
Justin Bova
Steven Dirks
Socrates L. Boutsikaris
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

Jeanne M. Heffernan
Kat Li
Austin C. Teng
Ryan J. Melde
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX  78701
(512) 678-9100

Ryan Kane
Nathaniel DeLucia
Laura Zhu
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants*

Brian A. Verbus
Jacob Rambeau
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000

Noah Frank
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Dated: June 28, 2023

Dear Judge Fallon:

## I.     Defendants' Clawbacks

Plaintiff agreed that disclosure of privileged material "shall not operate as a waiver" and that the "Parties will determine inadvertence solely based on the good faith representation of the Producing Party." D.I. 69 at 15. When Defendants discovered a vendor issue in May 2023 that resulted in the inadvertent production of potentially privileged documents, Defendants began to claw back those documents to closely re-review them and produce redacted versions and accompanying privilege logs. Defendants have been diligently doing so for weeks, while at the same time taking or defending multiple depositions a week. In direct contravention of the Protective Order, Sight argues Defendants have waived privilege by inadvertent production, but Defendants have done no such thing and Sight's motion should be denied.

**Details Regarding Ivantis's FTO Analyses:** A freedom-to-operate ("FTO") analysis at the request of a client of competitors' patents is fundamentally privileged. Sight argues Ivantis's FTO analyses of Sight's patents are allegedly not privileged by: (i) misconstruing the FTO documents, arguing they contain only "non-privileged facts"; and (ii) incorrectly arguing Ivantis waived privilege.

Sight identifies three documents (D.I. 222, Exs. 2-4) it alleges reveal details about which Sight patents Ivantis performed FTO analysis on, yet falsely asserts these documents are not privileged. The filenames reflect that they hail from an "FTO Opinion Patent Database," which indicates they reflect privileged analysis. The fact that entries in the "Attorney Notes" column may also contain factual information is beside the point: every communication between a client and attorney consists of *some* factual scenario about which the client seeks legal advice; that does not turn it into a purely fact-finding exercise devoid of legal advice. *See First Quality Tissue, LLC v. Irving Consumer Prod. Ltd*., 2022 WL 971581 (D. Del. Mar. 31, 2022) ("privilege applies to communications involving technical information when they are made for the purpose of providing or obtaining legal advice."). The document *as a whole* reflects an attorney-client communication, including *which particular patents* were selected for analysis, when, and for what purpose.

Sight's argument that Defendants waived privilege is equally unavailing. Sight's single argument for waiver is that Ivantis's CEO Dave Van Meter previously testified that Ken Galt gave "investors overviews of Ivantis' FTO relative to Sight's patents." D.I. 222 at 2. Mr. Van Meter simply stated that investors generally "ask us for an overview of the patent landscape, and that's where Ken gives *overview* of our freedom to operate." D.I. 189, Ex. 9 at 87:1-13. A general description of what lawyers and their agents do does not waive privilege. *See Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 2008 WL 3285751 at *3 (N.D. Ill. Aug. 8, 2008) ("There is a significant difference between indicating the fact or topic of a confidential communication with an attorney and revealing its content. The latter effects a waiver of the attorney-client privilege, while the former does not."). Sight points to no disclosure of any *particular* patent to investors for any *particular* FTO. Thus, there was no waiver.

**Documents from Cari Stone Deposition:** Sight identifies five documents it contends are either not privileged or for which privilege was waived. Regarding IVANTIS_SS_00206226, Sight

specifically agreed at the deposition that allowing questioning on that document would not act as a waiver. Ex. 1 (Stone Dep. Tr.) at 59:7-20, 63:11-23. IVANTIS_SS_00206226 also includes comments directed to lawyers, which clearly reflect requests for legal advice. *See* D.I. 222, Ex. 5 at 1 ██████████████ 2 ███████████████████████████████████████ Indeed, Sight does not actually request that the Court find waiver. IVANTIS_SS_00206226 remains privileged and has been properly clawed back.

As to IVANTIS_SS_00331502, Ms. Stone was questioned only on slides 2, 6, 21, 23, and 27, and Defendants' counsel clawed the document back during the deposition. Ex. 1 (Stone Dep. Tr.) at 64:2-4, 66:21, 69:23-25, 72:9-10, 73:21-22, 75:12-13, 119:4-14. Plaintiff's argument for waiver relies on *Lee Nat. Corp. v. Deramus*, 313 F. Supp. 224 (D. Del. 1970), a case predating the changes to the Federal Rules for inadvertent production, now codified in Fed. R. Evid. 502. That case dealt with information that was "freely and voluntarily revealed" during deposition, not a case like this one where counsel promptly clawed back documents. *Id.* at 227. Plaintiff's other cases are similarly unavailing. *See Nationwide Life Ins. Co. v. St. Clair Mobile Home Parks, LLC*, 2005 U.S. Dist. LEXIS 30348, at *20 (D. Mo. Dec. 1, 2005) ("voluntarily providing" testimony, not inadvertent disclosure under Rule 502); *Hosteller v. Dillard*, 2014 WL 6871262, at *3-4 (S.D. Miss. Dec. 3, 2014) (testimony without objection "regarding the substance and content" of attorney-client meeting). Here, Fed. R. Evid. 502(d) allows extra protection for inadvertent production by allowing parties to agree to protection beyond the default rules, which the parties did in the Protective Order: "production of [privileged] information **shall not** operate as a waiver" and the "Parties ***will not conduct an inquiry under FRE 502(b)*** to determine whether information was produced inadvertently." D.I. 69 at 15. Courts have held the privilege applies despite the allowance of deposition questioning, particularly when waiver "would be inconsistent with the Court's determination that the parties intended for their protective order to override Rule 502(b)." *In re Testosterone Replacement Therapy Prod. Liab. Litig.*, 301 F. Supp. 3d 917, 928 (N.D. Ill. 2018) (upholding privilege claim over document introduced at deposition); *see also In re Google Digital Advert. Antitrust Litig.*, 2023 WL 196146, at *2 (S.D.N.Y. Jan. 17, 2023) ("Where an Order sets forth the procedure for clawing back purportedly protected documents, the terms of that Order control and not the principles that might apply had there been no Order."). Defendants' claw-back of IVANTIS_SS_00331502 and related deposition testimony is proper.

On further review of IVANTIS_SS_00208219, -00208990, and -00321530, Defendants no longer seek to claw back those documents.

**Other Claw-backs:** Defendants first identified their vendor issue to Sight on June 2, 2023, and Defendants have been working diligently to remediate the issue. *See* Ex. 2 (June 2, 2023 Letter from A. Teng). Sight argues that because of the sheer number of claw-backs, the production presumptively cannot be inadvertent. Yet, of the more than 35,000 documents Defendants produced, Sight oddly points to 225 claw-backs. Sight offers no explanation for why such a small proportion of inadvertent disclosures should be deemed intentional. Indeed, Sight points to only 28 documents it contends should not have been included in the claw-backs.

First, Sight identifies an email from Kenneth Galt (Ivantis VP R&D) to Wayne Noda (an Ivantis consultant) and argues it is not privileged because neither Mr. Galt nor Mr. Noda are lawyers and

2

because Mr. Noda was not an Ivantis employee. Sight's arguments intentionally ignore that Mr. Noda was an Ivantis consultant tasked with designing a product for Ivantis that he helped to clear from an FTO standpoint. *In re Flonase Antitrust Litig.*, 879 F. Supp. 2d 454, 459–60 (E.D. Pa. 2012) (applying attorney-client privilege to communications shared with independent contractor). Sight also myopically focuses on the fact that the email does not include a lawyer when it is clear from the communication it was sent at the behest of counsel. *See Shire Dev. Inc. v. Cadila Healthcare Ltd.*, 2012 WL 5247315 (D. Del. June 15, 2012) ("privileged communications may be shared by non-attorney employees 'in order to relay information requested by attorneys.'"). The email relays which patents were analyzed, reflecting the substance of the attorney-client communications. Moreover, it relates solely to a product that is not accused in this case.

Second, Sight argues "Ivantis Integration IT Playbook" presentations are not privileged because they were sent to third parties, "such as KPMG, KME Systems, and/or Arbala systems." Yet these documents reflect legal advice, in particular by referencing ███████████████████ ████████. *See* D.I. 222, Ex. 14 at -55. While Sight attached only a single version of this document "as representative of this group of related presentations," Sight fails to mention that other versions of the same document have more extensive references to Alcon's litigation hold process, which is both privileged and not within the proper scope of discovery. *See* Section II.A, *infra*. Nor has Sight explained why sharing that legal advice with Alcon's consultants who were assisting with the integration of Ivantis into Alcon would waive privilege. It does not.

Third, Sight points to two "Ivantis Integration" presentations, D.I. 222, Ex. 15, IVANTIS_SS_00331837. Defendants withdraw their claw-back of these two documents.

## II.   Sight's 30(b)(6) Topics

**Topics 5/6:** Because there was a finding of spoliation against Ivantis in a prior litigation, Sight now seeks 30(b)(6) testimony regarding Defendants' efforts to preserve documents for this litigation. But "[d]iscovery regarding efforts undertaken … to preserve documents in anticipation of litigation is barred under the Court's Default Standard for Discovery of ESI and Fed. R. Civ. P. 26(b)(3)(A) and (B), particularly in the absence of a credible allegation of spoliation." *See* Oral Order, *Shilpa Pharma, Inc. v. Novartis Pharms. Corp.*, C.A. No. 21-558-SRF, at 1 (D. Del. June 8, 2022).

Sight has presented absolutely no evidence that could credibly support a finding of spoliation in **_this case_**, which is its burden. Spoliation first requires that there exist a duty to preserve documents, which occurs when a party reasonably foresees a specific litigation. *See Bull v. United Parcel Serv., Inc.*, 665 F.3d 68 (3d Cir. 2012). But logic dictates that foreseeability must relate to the patents actually at issue, not any interest in any patents at any time. For instance, Sight cannot reasonably argue that there would be a credible allegation of spoliation in this case if the *Glaukos* litigation had never happened and Ivantis deleted documents in the ordinary course prior to anticipating litigation in this case. Sight's opportunistic decision to sue the day after the *Glaukos* litigation settled does not suffice to support a spoliation claim in this case.

3

A review of Sight's allegations quickly demonstrates that its allegations are not credible. Sight points out that Ivantis conducted FTO analyses between 2008 and 2018. *See* Ex. 4 (Sight's Objs. to Defs. Interrog. No. 21). But conducting evaluations of the IP landscape, without more, does not trigger a duty to preserve. *See Dorman Prod., Inc. v. PACCAR, Inc.*, 2015 WL 12826477, at *3 (E.D. Pa. Nov. 5, 2015) (policy about acquiring patents did not give rise to objectively foreseeable likelihood of litigation). Nor does the 2009 meeting between Doug Roeder and Paul Badawi, which occurred ***before*** the issuance of any Asserted Patent and during which Mr. Badawi never made any connection between the Hydrus and his patent application (which could or could not issue). *See* Ex. 5 (P. Badawi Rough Dep. Tr. I) at 214:23-216:17 (Mr. Badawi could not recall telling Mr. Roeder his belief the '068 application covered Hydrus). In fact, Sight witnesses have confirmed that ████████████████ *See id*. at 218:9-12; Ex. 7 (Selnick Dep. Tr.) at 59:1-14. Sight is lightyears away from meeting its burden to show a "credible allegation of spoliation."

Further, Sight has shown nothing indicating Ivantis willfully destroyed or deleted evidence in anticipation of this litigation. Rather, Sight hangs its hat on the spoliation finding in the *Glaukos* litigation. But the court's finding of spoliation in *Glaukos* relied on facts and circumstances not at issue here, including that: 1) an inventor of the Glaukos patents informed Ivantis that Hydrus "must infringe" those patents; 2) Ivantis hired outside patent litigation counsel to conduct diligence related to Glaukos's patents; 3) multiple investors declined to invest in Ivantis due to concerns about patent litigation with Glaukos; and 4) Ivantis began preparing IPRs to challenge Glaukos's patents before Glaukos filed suit. *See Glaukos Corp. v. Ivantis, Inc.*, 2020 WL 10501850, at *3-4 (C.D. Cal. June 17, 2020). That the same product is at issue here does not support a finding of spoliation; Sight had no reason to anticipate litigation with respect to the Asserted Patents in this case.

Sight has presented no evidence supporting a finding of willfulness. "Mere knowledge of the patent cannot support an allegation of willful infringement." *See iFIT Inc. v. Peloton Interactive, Inc.*, 2022 WL 609605 at *2 (D. Del. Jan. 28, 2022). While Sight contends "changes in document destruction or retention policies after obtaining knowledge of the patents and of infringement support a finding of willfulness," Sight's own witnesses admit that Sight itself never put such a formal policy in place for its own documents and ████████████████ ██████. Ex. 6 (P. Badawi Rough Dep. Tr. II) at 6:6-19; Ex. 5 (P. Badawi Rough Dep. Tr. I) at 218:9-12; Ex. 7 (Selnick Dep. Tr.) at 59:1-14.

**Topics 71/69 and 72/70:** With respect to these Topics, Sight admits it is aware that Ivantis conducted FTO analyses. Sight questioned Defendants' witnesses regarding the non-privileged facts it seeks. *See, e.g.*, Ex. 8 (Shay Dep. Tr.) at 34:2-37:1, 46:9-52:21. Sight now wants to probe privileged aspects of FTO, including whether FTO was done "regarding the Asserted Patents," D.I. 222 at 4, which reflects the contents of attorney-client communications, including whether any analysis was requested in relation to a particular patent. That is privileged.

## III.    Defendants' Deposition Notices

Defendants' 30(b)(1) notices of Sabrina Katz and Sara Sloan Marcus and its second 30(b)(6) notice were timely served with at least 14 days remaining in discovery, which is reasonable

notice. *See* Ex. 9 (Sabrina Katz); Ex. 10 (Sarah Sloan Marcus); D.I. 222, Ex. 21; D. Del. L. R. 30.1 ("'reasonable notice' for the taking of depositions… shall be not less than 10 days."). Plaintiff's arguments to the contrary are without merit.

Defendants' deposition notices of Sabrina Katz and Sara Sloan Marcus do not seek duplicative testimony. Sight has accused Ivantis of improperly co-promoting Hydrus through Andy Rivero in Florida. D.I. 59 ¶74. Ms. Katz and Ms. Marcus are both Sight representatives who work and consult directly with the ophthalmologists in that region and are thus likely to have information related to those allegations, as well as regarding Sight's own co-promotion. *See, e.g.*, Ex. 11 (SGHT0044913) (email from Ms. Marcus re co-promoting); Ex. 12 (SGHT0044916) (discussing "field intel related to Ivantis and their promotion of the cannula"). While Sight suggests Defendants should rely on other depositions, Ms. Katz and Marcus are more likely to have first-hand information. *See* Ex. 13 (Phelps Dep. Tr.) at 78:24-79:5, 107:24-108:7; Ex. 14 (Plank Dep. Tr.) at 24:8-28:15. As the parties have already agreed to take depositions after the close of fact discovery, additional depositions would not disturb that deadline, and Defendants have already moved to amend the case schedule to account for out-of-time depositions. *See* D.I. 223.

Defendants' second 30(b)(6) notice is also proper. Sight asserts Defendants failed to obtain leave before serving its second notice, but leave is not required. *See Cedars-Sinai Med. Ctr. v. Quest Diagnostics Inc.*, 2019 WL 12520126 (C.D. Cal. Apr. 1, 2019) (leave not required where topics do not overlap); *Mobile Telecommunications Techs., LLC v. Blackberry Corp.*, 2015 WL 12698062 (N.D. Tex. July 15, 2015) ("Plaintiff need not seek leave for additional 30(b)(6) deposition testimony on topics different from those previously noticed."). Further, Sight rewrites history regarding the Scheduling Order negotiations. It was ***Sight***, not Defendants, who changed its ***own*** position, first proposing that "Parties may notice and take ***multiple*** 30(b)(6) depositions within their hours limits," but later reversing course and proposing that the "Parties may notice and take ***one*** 30(b)(6) deposition of each adverse party within their hours limits." D.I. 37 at 3. Throughout the parties' exchanges, Defendants' proposal remained agnostic as to the number of 30(b)(6) depositions. *See id.* at 4. The Court ultimately adopted Defendants' agnostic proposal.

Defendants' second 30(b)(6) notice is not duplicative, instead containing targeted Topics directed at necessary testimony. For example, Topic 65 is directed at Sight's response to Defendants' Interrogatory No. 12 concerning the Sight accounts purportedly "negatively impacted" by Defendants' alleged infringement. *See* Ex. 3 (Pl.'s Resps. & Objs. to Defs.' Interrog. No. 12); D.I. 222, Ex. 21. Defendants seek testimony here because these allegedly "negatively impacted" accounts are the basis for Sight's lost profits arguments. Moreover, it was not until June 1, 2023 that Sight identified documents in response to Interrogatory No. 12, identifying these "negatively impacted" accounts. Defendants were not dilatory.

Similarly, Topics 58, 59, 61, 62, 63, and 64 are relevant to ***Defendants'*** allegations of spoliation, which, unlike Sight's, are credible. Paul Badawi, Sight's CEO, testified that he believed Hydrus infringed since 2008. *See* Ex. 5 (P. Badawi Rough Dep. Tr. I) at 81:5-10; D.I. 222, Ex. 21. Yet from 2006 until 2021, ████████████████████████████████, and its paltry document production raises serious concerns that numerous documents have been destroyed. Defendants should be allowed to depose a witness on those issues.

Respectfully submitted,

*/s/ Karen E. Keller*

Karen E. Keller (No. 4489)

cc:     Clerk of Court (by CM/ECF & Hand Delivery)
        All Counsel of Record (by CM/ECF & Email)

# EXHIBIT 1
# (excerpted)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SIGHT SCIENCES, INC.,     )
                          )
          Plaintiff,      )
                          )
     vs.                  )     C.A. No.: 21-1317-GBW-SRF
                          )
IVANTIS, INC., et al.,    )
                          )
          Defendants.     )
                          )

REMOTE VIDEOGRAPHED

DEPOSITION OF CARI STONE

COSTA MESA, CALIFORNIA

THURSDAY, JUNE 1, 2023

Reported by:
LAURA A. RUTHERFORD, RPR
CSR No. 9266



Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4
 5   SIGHT SCIENCES, INC.,  )
                            )
 6          Plaintiff,      )
                            )
 7       vs.                )  C.A. No.: 21-1317-GBW-SRF
                            )
 8   IVANTIS, INC., et al., )
                            )
 9          Defendants.     )
                            )
10
11
12
13
14
15          Remote videographed deposition of CARI STONE,
16   taken on behalf of Plaintiff, at 650 Town Center Drive,
17   10th Floor, Costa Mesa, California, beginning at 9:06
18   a.m., and ending at 1:46 p.m., on Thursday, June 1, 2023,
19   before LAURA A. RUTHERFORD, RPR, Certified Shorthand
20   Reporter No. 9266.
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2
 3   For Plaintiff:
 4      COOLEY, LLP
        BY:  ORION ARMON, ESQ. (VIA ZOOM)
 5      4401 Eastgate Mall, 4th Floor
        San Diego, CA  92121
 6      (720) 566-4119
        oarmon@cooley.com
 7
 8   For Defendants:
 9      KIRKLAND ELLIS
        BY:  AUSTIN C. TENG, ESQ.
10      401 Congress Avenue
        Austin, Texas  78701
11      (512) 355-4351
        austin.teng@kirkland.com
12
13   Videographer:
14      SERGIO ESPARZA, VIDEOGRAPHER
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                        INDEX
 2   WITNESS:                        PAGE
 3   CARI STONE
 4       BY MR. ARMON            8
 5
 6
 7                      EXHIBITS
 8   EXHIBIT NO.    DESCRIPTION              PAGE
 9    1    DEPOSITION NOTICE              10
10    3    LINKEDIN PROFILE              10
11    4    (BATES STAMPED IVANTIS__SS_00206372)    33
12    5    (BATES STAMPED IVANTIS_SS_00206693)     35
13    6    ALCON PLUS IVANTIS, A PERFECT MATCH (BATES
14         STAMPED IVANTIS_SS_00206771)      51
15    7    ALCON Q AND A CONFIDENTIAL.  NOT FOR
16         EXTERNAL DISTRIBUTION (BATES STAMPED
17         IVANTIS_SS_00206226)          57
18    8    (BATES NUMBER IVANTIS_SS_00331502)    63
19    9    ITHICA PRICING SCENARIO WORKSHOP,
20         SEPTEMBER 20, 2021 (BATES STAMPED
21         IVANTIS_SS_00331626)          77
22   10    EMAIL (BATES STAMPED IVANTIS_SS_00224170)   83
23   11    INDUS INDICATION STRATEGY (BATES STAMPED
24         IVANTIS_SS_00208990)          85
25
```

Page 5

```
 1                    INDEX (CONT.)
 2                   EXHIBITS (CONT.)
 3   EXHIBIT NO.    DESCRIPTION              PAGE
 4   12    INDUS PROMOTIONAL GUARDRAILS, 20, 2022
 5         (BATES STAMPED IVANTIS_SS_00208219)    89
 6   13    SURGICAL GLAUCOMA UPDATE, NOVEMBER 3, 2022
 7         (BATES STAMPED IVANTIS_SS_00331906)    94
 8   14    ASCRS 2021 USER MEETING (BATES STAMPED
 9         IVANTIS_SS_00206140)          98
10   15    GLOBAL SURGICAL GLAUCOMA OVERVIEW (BATES
11         STAMPED IVANTIS_SS_00207164)     104
12   16    U.S. SURGICAL GLAUCOMA, SECOND QUARTER '22,
13         BRAND HEALTH TRACKER, JUNE 2022 (BATES
14         STAMPED IVANTIS_SS_00208022)     106
15   17    KEY DEAL EXECUTION IVANTIS (BATES
16         STAMPED IVANTIS_SS_00209169)     109
17   18    ELT COMPETITIVE UPDATE (BATES STAMPED
18         IVANTIS_SS_00207107)         111
19   19    PROJECT ITHICA ACQUISITION DILIGENCE
20         KICK-OFF, SEPTEMBER 2021 (BATES STAMPED
21         IVANTIS_SS_00321530)         113
22
23
24
25
```






Page 58

| | | |
|---|---|---|
| 10:33 | 1 | MR. ARMON:  All right. |
| 10:33 | 2 | Going off the record. |
| 10:33 | 3 | THE VIDEOGRAPHER:  Thank you.  Off the |
| 10:33 | 4 | record.  The time is 10:33 a.m. |
| 10:33 | 5 | (Pause in proceeding.) |
| 10:38 | 6 | THE VIDEOGRAPHER:  On the record.  The time |
| 10:38 | 7 | is 10:38 a.m. |
| 10:38 | 8 | MR. TENG:  All right. |
| 10:38 | 9 | Orion, I just want to make a record about |
| 10:38 | 10 | Exhibit 7 here.  As I understand it, this document is a |
| 10:38 | 11 | draft document.  It's not the final version of the |
| 10:38 | 12 | document.  And it appears to have comments that refer to |
| 10:38 | 13 | communications with counsel. |
| 10:38 | 14 | This document appears to have been |
| 10:38 | 15 | inadvertently produced in this case.  And so, therefore, I |
| 10:38 | 16 | object to the use of this particular document in the |
| 10:38 | 17 | deposition. |
| 10:38 | 18 | But if there's a final draft of the document |
| 10:38 | 19 | that you want to ask the witness questions about, I would |
| 10:38 | 20 | certainly permit that.  But this document needs to be |
| 10:38 | 21 | clawed back and destroyed. |
| 10:38 | 22 | MR. ARMON:  So, Austin, I think there's two |
| 10:39 | 23 | possibilities here.  We can deal with the claw back |
| 10:39 | 24 | separately, or you can let me ask a couple questions, and |
| 10:39 | 25 | if you want to instruct her accordingly, that may allow us |

Page 59

| | | |
|---|---|---|
| 10:39 | 1 | to avoid holding the deposition open while this issue is |
| 10:39 | 2 | separately addressed. |
| 10:39 | 3 | So if you'd like to go that way, I think it |
| 10:39 | 4 | might be more efficient.  If not, that's fine.  But we may |
| 10:39 | 5 | be asking Ms. Stone to reappear at some point, which I'm |
| 10:39 | 6 | sure she probably would prefer not to do. |
| 10:39 | 7 | MR. TENG:  I'd say possibly if -- one, if |
| 10:39 | 8 | you'll stipulate that asking the questions in no way |
| 10:39 | 9 | waives any claim of privilege or interferes with the claw |
| 10:39 | 10 | back process, we can handle separately.  And, certainly, |
| 10:39 | 11 | we'll evaluate the question as to whether or not it calls |
| 10:39 | 12 | for privilege, and she can answer. |
| 10:39 | 13 | MR. ARMON:  Yeah, that's fine.  As to this |
| 10:39 | 14 | document only, and nothing else in the case, I'll |
| 10:39 | 15 | stipulate that allowing Ms. Stone to answer my questions |
| 10:40 | 16 | with respect to this exhibit, or to follow your |
| 10:40 | 17 | instructions, wouldn't be any basis for a waiver of your |
| 10:40 | 18 | privilege rights if you have any. |
| 10:40 | 19 | MR. TENG:  All right. |
| 10:40 | 20 | We can proceed with that understanding. |
| 10:40 | 21 | Q.  BY MR. ARMON:  Okay. |
| 10:40 | 22 | So, Ms. Stone, just let's start at the top of |
| 10:40 | 23 | this document.  I believe you said that you recognized |
| 10:40 | 24 | Exhibit 7. |
| 10:40 | 25 | Is that true? |

Page 60

| | | |
|---|---|---|
| 10:40 | 1 | A.  Yes.  This is a draft document, as Austin |
| 10:40 | 2 | said.  Yep. |
| 10:40 | 3 | Q.  Okay. |
| 10:40 | 4 | And, Ms. Stone, if you direct your attention |
| 10:40 | 5 | to page 2, you'll see that there are various comments that |
| 10:40 | 6 | are directed to -- to you. |
| 10:40 | 7 | So this is something that you saw at some |
| 10:40 | 8 | prior point in time; correct? |
| 10:40 | 9 | A.  Yes. |
| 10:40 | 10 | MR. TENG:  Objection.  Vague. |
| 10:40 | 11 | Q.  BY MR. ARMON:  All right. |
| 10:40 | 12 | |



Page 62



| | |
|---|---|
| 10:44 | 7 |  Marking another Exhibit 8. |
| 10:44 | 8 |  (Exhibit Number 8 was marked for |
| 10:44 | 9 | identification.) |
| 10:44 | 10 |  Q.  BY MR. ARMON:  It's entitled -- |
| 10:44 | 11 |  MR. TENG:  Sorry, Mr. Armon.  If you can give |
| 10:44 | 12 | me just a moment to make the record? |
| 10:44 | 13 |  Again, just to be clear on the record here, |
| 10:44 | 14 | if we can mark whatever is Exhibit 7 as something that |
| 10:44 | 15 | defendants have identified as containing attorney/client |
| 10:44 | 16 | privileged information that was inadvertently produced in |
| 10:44 | 17 | this case, and that defendants have requested that the |
| 10:44 | 18 | plaintiffs, Sight Sciences, follow the protocol in this |
| 10:44 | 19 | case for claw back. |
| 10:44 | 20 |  MR. ARMON:  All right.  Counsel, just follow |
| 10:44 | 21 | up with us in writing on that.  We'll address it after the |
| 10:44 | 22 | deposition, and subject to the stipulation I made with |
| 10:44 | 23 | respect to the waiver issue. |
| 10:44 | 24 |  Q.  BY MR. ARMON:  Ms. Stone, let's turn to |
| 10:44 | 25 | Exhibit 8, please. |

Page 64

| | |
|---|---|
| 10:45 | 1 |  A.  (Witness complies.) |
| 10:45 | 2 |  Q.  This document is labeled, first page, |
| 10:45 | 3 | Ivantis_SS_00331502.  Just let me know if you recognize |
| 10:45 | 4 | it. |
| 10:45 | 5 |  A.  Last three numbers are 502; is that correct? |
| 10:45 | 6 |  Q.  I'm sorry.  I didn't hear that. |
| 10:45 | 7 |  A.  The last three numbers are 502; is that |
| 10:45 | 8 | correct? |
| 10:45 | 9 |  Q.  That's right.  Those are just unique |
| 10:45 | 10 | identifiers for documents that the lawyers in this |
| 10:45 | 11 | litigation have affixed to documents. |
| 10:45 | 12 |  A.  Right.  I just wanted to make sure I was |
| 10:45 | 13 | looking at the correct one. |
| 10:45 | 14 |  Q.  Yes, you are. |
| 10:45 | 15 |  MR. TENG:  Ms. Stone, can you please review |
| 10:45 | 16 | the document here? |
| 10:45 | 17 |  I see that this is, again, marked as |
| 10:45 | 18 | privileged and confidential and has some draft markings. |
| 10:45 | 19 | Could you review the document, and let me know whether or |
| 10:45 | 20 | not this contains any comments from attorneys? |
| 10:46 | 21 |  THE WITNESS:  Sorry.  I'm just reading |
| 10:46 | 22 | through. |
| 10:46 | 23 |  So this page is out? |
| 10:46 | 24 |  MR. TENG:  There's notes here.  Scroll up. |
| 10:47 | 25 |  Scroll up. |

Page 65

| | |
|---|---|
| 10:47 | 1 |  THE WITNESS:  Page 4; right? |
| 10:47 | 2 |  MR. TENG:  I'll direct your attention, and |
| 10:47 | 3 | then, hopefully, we can -- |
| 10:47 | 4 |  So are those speakers notes, or do those |
| 10:47 | 5 | contain any notes from counsel? |
| 10:47 | 6 |  THE WITNESS:  Those are speaker notes, but go |
| 10:47 | 7 | back to, like, slide -- what does this mean? |
| 10:47 | 8 |  MR. TENG:  That just means that it's been |
| 10:47 | 9 | redacted for privilege.  That's fine. |
| 10:47 | 10 |  So my question was directed as to whether any |
| 10:48 | 11 | of the comments in the notes included anything? |
| 10:48 | 12 |  THE WITNESS:  Not that I know of. |
| 10:48 | 13 |  MR. TENG:  Okay. |
| 10:48 | 14 |  Apologies for the interruption, Counsel.  If |
| 10:48 | 15 | you wouldn't mind restating your question and continue? |
| 10:48 | 16 |  THE WITNESS:  So this is -- |
| 10:48 | 17 |  MR. TENG:  That just means it's been redacted |
| 10:48 | 18 | by the defense in the case before it was produced to |
| 10:48 | 19 | remove any privileged information, so the rest of it would |
| 10:48 | 20 | be -- |
| 10:48 | 21 |  THE WITNESS:  Fair game? |
| 10:48 | 22 |  MR. TENG:  Yep. |
| 10:48 | 23 |  THE WITNESS:  Okay.  Okay. |
| 10:48 | 24 |  Q.  BY MR. ARMON:  Okay. |
| 10:48 | 25 |  Ms. Stone, appreciate your review of Exhibit |

17 (Pages 62 to 65)







Page 66

| | | |
|---|---|---|
| 10:48 | 1 | 8. Are you comfortable, based on your review, that the |
| 10:48 | 2 | Exhibit 8 does not contain attorney/client privileged |
| 10:48 | 3 | information based on the look that counsel asked you to |
| 10:48 | 4 | perform? |
| 10:48 | 5 | A. Yeah. I mean, based on my cursory -- this is |
| 10:48 | 6 | a 20-some page document, you know. I didn't have a chance |
| 10:48 | 7 | to read all of it. |
| 10:49 | 8 | Q. Okay. All right. |
| 10:49 | 9 | Let's proceed then. |
| 10:49 | 10 | Do you recognize this Exhibit 8 titled |
| 10:49 | 11 | "Project Ithica" from November 2021? |
| 10:49 | 12 | A. I do. |
| 10:49 | 13 | Q. Okay. |
| 10:49 | 14 | |

| 10:49 | 18 | Q. Did you have any role in preparing Exhibit 8? |
| 10:49 | 19 | A. Yeah. I was part of the team. |
| 10:49 | 20 | Q. Okay. |
| 10:49 | 21 | Let's turn to page 2 of the exhibit, please. |
| 10:49 | 22 | A. (Witness complies.) |
| 10:49 | 23 | Q. It's titled "NOV BOD Ithica Outline." Does |
| 10:50 | 24 | that mean November, Board of Directors, Ithica Outline? |
| 10:50 | 25 | A. Correct. |

Page 67

| 10:50 | 1 | Q. |

Page 68

| 10:51 | 1 | |

| 10:54 | 22 | Q. Okay. All right. |
| 10:54 | 23 | Let's jump down a few pages. I'll move you |
| 10:54 | 24 | to page 6 of Exhibit 8, a slide titled, "Key Findings and |
| 10:54 | 25 | Mitigation Strategy - Pipeline." |

18  (Pages 66 to 69)





Page 70

| 10:54 | 1 | Are you there? |
| 10:54 | 2 | A.  Yes. |
| 10:54 | 3 | Q.  Okay. |
| 10:54 | 4 | |

Page 72

| 10:56 | 1 | |
| 10:57 | 9 | Let's jump to slide 21, please.  I'll move |
| 10:57 | 10 | you there. |
| 10:57 | 11 | |



Page 74

| 11:00 | 1 | A. Right. |
| 11:00 | 2 | Q. Was there a business person at Alcon who |
| 11:00 | 3 | played any role in approving the terms of the |
| 11:00 | 4 | Glaukos/Ivantis settlement? |
| 11:00 | 5 | A. Approving the terms of the Glaukos |
| 11:00 | 6 | settlement? No, not that I know of. |
| 11:00 | 7 | Q. Okay. |
| 11:00 | 8 | Did Ivantis apprise Alcon of its -- the |
| 11:00 | 9 | developments around its settlement negotiations with |
| 11:00 | 10 | Glaukos before it actually settled that litigation? |
| 11:00 | 11 | MR. TENG: Objection. Vague. |
| 11:00 | 12 | And caution the witness, the extent that |
| 11:00 | 13 | Counsel's question is calling for any privileged |
| 11:00 | 14 | information you may have discussed with attorneys or one |
| 11:00 | 15 | of our attorneys, to not reveal that in your answer. |
| 11:00 | 16 | THE WITNESS: I don't know, and I was not |
| 11:00 | 17 | involved. |
| 11:01 | 18 | Q. BY MR. ARMON: Okay. |
| 11:01 | 19 | So you had no input around whether Ivantis |
| 11:01 | 20 | should settle with Glaukos on the terms that it ultimately |
| 11:01 | 21 | agreed to? |
| 11:01 | 22 | A. No, I did not. |
| 11:01 | 23 | Q. Okay. |
| 11:01 | 24 | |



Page 76

| 11:03 | 1 | |

Page 77

| 11:05 | 12 | Let's look at a new exhibit. This is marked |
| 11:05 | 13 | as Exhibit 9. |
| 11:05 | 14 | (Exhibit Number 9 was marked for |
| 11:05 | 15 | identification.) |
| 11:05 | 16 | Q. BY MR. ARMON: It's a document titled, |
| 11:05 | 17 | "Ithica Pricing Scenario Workshop, September 20, 2021." |
| 11:05 | 18 | The first page number, Ivantis_SS_00331626. |
| 11:05 | 19 | A. Yeah. |
| 11:05 | 20 | MR. TENG: And, Mr. Armon, if you'd allow me |
| 11:05 | 21 | just to make a brief remark on the record here? |
| 11:05 | 22 | As we've been going through this document and |
| 11:05 | 23 | through questions, it appears that there may be some |
| 11:05 | 24 | comments in this document that were not fully redacted for |
| 11:05 | 25 | privilege and may contain attorney/client notes that were |



Page 118

| | | |
|---|---|---|
| 13:43 | 1 | you've had any non-privileged communications, and allow me |
| 13:43 | 2 | time to instruct you or get an objection on the record. |
| 13:43 | 3 | THE WITNESS: Can you restate the question |
| 13:43 | 4 | again, just so I'm very clear about what you're asking? |
| 13:43 | 5 | Q. BY MR. ARMON: Yes. |
| 13:43 | 6 | During your time at Alcon, were you involved |
| 13:43 | 7 | in any business discussions or evaluation of the magnitude |
| 13:43 | 8 | of money damages that Alcon or Ivantis might be required |
| 13:43 | 9 | to pay to Sight Sciences for infringing its patents? |
| 13:44 | 10 | A. Just with my legal team. |
| 13:44 | 11 | Q. Okay. |
| 13:44 | 12 | MR. TENG: And, Mr. Armon, just to avoid |
| 13:44 | 13 | confusing the witness, I appreciate you trying to ask your |
| 13:44 | 14 | questions without inquiring. |
| 13:44 | 15 | I'm just going to instruct the witness not to |
| 13:44 | 16 | answer these questions and -- on the basis of |
| 13:44 | 17 | attorney/client privilege. |
| 13:44 | 18 | Q. BY MR. ARMON: You are going to follow that |
| 13:44 | 19 | instruction? |
| 13:44 | 20 | A. Yeah. |
| 13:44 | 21 | Q. Okay. |
| 13:44 | 22 | I appreciate your time. I don't have any |
| 13:44 | 23 | further questions. |
| 13:44 | 24 | A. Are you going to ask me? |
| 13:44 | 25 | MR. TENG: Let me just review here if I have |

Page 119

| | | |
|---|---|---|
| 13:44 | 1 | any questions. |
| 13:44 | 2 | I'd like to go ahead and designate the |
| 13:45 | 3 | transcript as highly confidential, attorney's eyes only. |
| 13:45 | 4 | Also, just to recap some of the discussion |
| 13:45 | 5 | earlier today, during questioning, counsel for plaintiffs |
| 13:45 | 6 | introduced a number of exhibits, including at least |
| 13:45 | 7 | Exhibit 7, 8 and 12, that appear to have been |
| 13:45 | 8 | inadvertently produced with information concerning or |
| 13:45 | 9 | containing confidential attorney/client privileged |
| 13:45 | 10 | information. |
| 13:45 | 11 | We instruct that these exhibits should be |
| 13:45 | 12 | clawed back, and defense will review the transcript and |
| 13:45 | 13 | the exhibit, follow up regarding any other documents that |
| 13:45 | 14 | may need to be clawed back. |
| 13:45 | 15 | MR. ARMON: So, Austin, other than the one |
| 13:45 | 16 | stipulation I provided on the record, you'll need to |
| 13:45 | 17 | follow up with us after the deposition today, and we'll |
| 13:45 | 18 | address those issues with you. |
| 13:45 | 19 | MR. TENG: Understood we'll follow up in |
| 13:45 | 20 | writing. |
| 13:45 | 21 | MR. ARMON: All right. |
| 13:45 | 22 | Thanks very much, Ms. Stone. I appreciate |
| 13:45 | 23 | your time. |
| 13:45 | 24 | THE WITNESS: Sure. Thank you. |
| 13:45 | 25 | THE VIDEOGRAPHER: Off the record. The time |

Page 120

| | | |
|---|---|---|
| 13:45 | 1 | is 1:46 p.m. |
| 13:46 | 2 | MR. TENG: I'll take a rough, please. |
| 13:46 | 3 | THE REPORTER: Thank you. |
| 13:46 | 4 | (Ending time: 1:46 p.m.) |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

| | | |
|---|---|---|
| | 1 | |
| | 2 | |
| | 3 | |
| | 4 | I, CARI STONE, do hereby declare under penalty of |
| | 5 | perjury that I have read the foregoing transcript of my |
| | 6 | deposition; that I have made such corrections as noted |
| | 7 | herein, in ink, initialed by me, or attached hereto; that |
| | 8 | my testimony as contained herein, as corrected, is true |
| | 9 | and correct. |
| | 10 | EXECUTED this _____ day of _____, |
| | 11 | at _____, _____. |
| | | (City)        (State) |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | _____ |
| | | CARI STONE |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

31  (Pages 118 to 121)



EXHIBIT 2

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

401 Congress Avenue
Austin, TX 78701
United States

Austin C. Teng
To Call Writer Directly:
+1 512 355 4351
austin.teng@kirkland.com

+1 512 678 9100

Facsimile:
+1 512 678 9101

www.kirkland.com

June 2, 2023

**By E-mail (oarmon@cooley.com)**

**HIGHLY CONFIDENTIAL
ATTORNEYS-EYES ONLY**

Orion Armon
Cooley LLP
1144 15th Street
Suite 2300
Denver, CO 80202-2686

Re: *Sight Sciences, Inc. v. Ivantis, Inc., et al.*, 1:21-cv-01317-GBW-SRF (D. Del.)

Orion:

During Ms. Stone's deposition yesterday, I notified you that exhibits were introduced that contain inadvertently produced attorney-client privileged information, including the following:

1. Exhibit 7 (IVANTIS_SS_00206226) – Confidential draft document seeking legal advice from counsel

2. Exhibit 8 (IVANTIS_SS_00331502) – Confidential draft presentation reflecting confidential attorney-client communications

3. Exhibit 12 (IVANTIS_SS_00208219) – Confidential draft presentation reflecting confidential attorney-client communications

After further review of the exhibits, we have identified two additional exhibits containing privileged information that were also inadvertently produced.

1. Exhibit 11 (IVANTIS_SS_00208990) – Confidential draft presentation reflecting confidential attorney-client communications

2. Exhibit 19 (IVANTIS_SS_00321530) – Confidential draft presentation reflecting confidential attorney-client communications

Bay Area   Beijing   Boston   Brussels   Chicago   Dallas   Hong Kong   Houston   London   Los Angeles   Miami   Munich   New York   Paris   Salt Lake City   Shanghai   Washington, D.C.

## KIRKLAND & ELLIS LLP

Orion Armon
June 2, 2023
Page 2

**HIGHLY CONFIDENTIAL
ATTORNEYS-EYES ONLY**

We will supplement our privilege log to reflect these documents and provide redacted replacements where appropriate.

### Claw-Back of Privileged Materials and Related Testimony

Pursuant to Paragraph 11 of the Protective Order, please return or destroy these documents and any copies, and confirm your compliance. *See* Fed. R. Civ. P. 26(b)(5)(B)("After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified;"); Protective Order (Dkt. 69) ("Fed. R. Civ. P. 26(b)(5)(B) governs the proper procedure for the notification and return of Privileged Information when identified by the Producing Party.").

In addition, any recordings of Ms. Stone's testimony concerning the privileged portions of these clawed-back exhibits must be returned or destroyed, and may not be used or disclosed, including the following portions of the transcript:

| Exhibits | Citations to Rough Transcript |
|:---:|:---:|
| 7 | 57:13-60:7 |
| 8 | 64:2-66:22, 68:2-69:8 |

We will also notify the court reporter and videographer that the above-referenced portions of the transcript have been clawed back and should be removed or redacted from Ms. Stone's deposition transcript and video. We will provide replacement exhibits to the court reporter and we will work with the court reporter and videographer to provide you with redacted versions of the transcript and video. We are also attaching a redacted version of the rough transcript for your use in the interim.

Please promptly confirm you have complied with this claw-back request.

### Admonition Regarding Other Documents

Additionally, we have become aware of a vendor issue related to the screening of privileged materials and have reason to believe that other documents containing privileged information may have been inadvertently produced in this case. We are actively investigating the issue and working to identify any other documents that may need to be clawed back.

Please notify us immediately if you encounter any documents that appear on their face to include attorney-client privileged information, including those explicitly marked as such. *See* Protective Order ("If a Receiving Party identifies what appears on its face to be Privileged

## KIRKLAND & ELLIS LLP

Orion Armon
June 2, 2023
Page 3

**HIGHLY CONFIDENTIAL**
**ATTORNEYS-EYES ONLY**

Information, the Receiving Party is under a good-faith obligation to notify that Producing Party."). In particular, we expect you not to use any documents that appear on their face to contain privileged information, including at depositions, without first notifying us.

Sincerely,

*Austin Teng*

Austin C. Teng

EXHIBIT 3
(excerpted)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | C. A. No.:  21-1317-GBW-SRF |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | **HIGHLY CONFIDENTIAL –** |
| IVANTIS, INC., ALCON RESEARCH LLC, | ) | **OUTSIDE ATTORNEYS' EYES** |
| ALCON VISION, LLC AND ALCON INC., | ) | **ONLY** |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF SIGHT SCIENCES, INC.'S
SUPPLEMENTAL OBJECTIONS AND RESPONSES TO
DEFENDANTS' THIRD SET OF INTERROGATORIES (NOS. 12, 13, 18)**

Pursuant to Rule 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of this Judicial District, Plaintiff Sight Sciences, Inc. ("Sight Sciences") hereby responds to Defendants Ivantis, Inc., Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc.'s ("Defendants") Third Set of Interrogatories (Nos. 11-18), dated March 31, 2023.

**GENERAL RESPONSES**

1.     Sight Sciences' response to the Interrogatories is made to the best of Sight Sciences' present knowledge, information, and belief. This response is at all times subject to such additional or different information that discovery or further investigation may disclose and, while based on the present state of Sight Sciences' recollection, is subject to such refreshing of recollection, and such additional knowledge of facts, as may result from Sight Sciences' further discovery or investigation.

2.     Sight Sciences reserves the right to make any use of, or to introduce at any hearing and at trial, information and/or documents responsive to the Interrogatories but discovered subsequent to the date of this response, including, but not limited to, any such information or documents obtained in discovery in this action.

"all," and the words "and" and "or." Defendants' usage statements would render the task of interpreting Defendants' Interrogatories unduly burdensome and would render Defendants' Interrogatories vague, ambiguous, unintelligible, and compound. Sight Sciences will respond to each Interrogatory according to its ordinary meaning, without reference to Defendants' usage statements.

**SPECIFIC OBJECTIONS AND RESPONSES**

Without waiving or limiting in any manner any of the foregoing General Objections, but rather incorporating them into each of the following responses to the extent applicable, Sight Sciences responds to the specific Interrogatories in Defendants' Third Set of Interrogatories as follows:

**INTERROGATORY NO. 12:**

Describe in detail the complete factual and legal bases for any equitable relief You contend You are entitled to, including Your request for a "preliminary and/or permanent injunction per 35 U.S.C. § 283" on page 48 of Your Second Amended Complaint.

**RESPONSE TO INTERROGATORY NO. 12:**

Sight Sciences incorporates by reference its General Responses and Objections.  Sight Sciences further objects to this Interrogatory to the extent it prematurely seeks expert testimony, which Sight Sciences will disclose in accordance with the Scheduling Order. Sight Sciences objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection from discovery, or to the extent it seeks a legal conclusion or legal analysis and would implicate the mental impressions of counsel to provide a proper response.

Subject to the foregoing general and specific objections, Sight Sciences responds as follows:

Sight Sciences is entitled to injunctive relief because, as a consequence of Defendants' infringing activities, (1) Sight Sciences has suffered and continues to suffer irreparable harm; (2) legal remedies, such as money damages, are inadequate to compensate Sight Sciences for harm from infringement; (3) the balance of hardships favors entry of an injunction; and (4) the public interest would not be disserved by an injunction. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Sight Sciences presently contends the following with respect to each prong of the *eBay* four-factor test:

**Irreparable Harm.** Sight Sciences has suffered, and continues to suffer, irreparable harm from Defendants' infringement in a number of ways. Exemplary harms from Defendants' infringement of Sight Sciences' Asserted Patents include: (1) Defendants have and are causing Sight Sciences' OMNI Surgical System to lose goodwill, sales and market share as a result of Defendants' marketing and sales of the infringing the Hydrus Microstent, ███████████ ███████████████████████████████████████████████████████████; (2) Sight Sciences' OMNI Surgical System has experienced and continues to experience price erosion as a result of competition with Defendants' infringing the Hydrus Microstent; (3) Defendants have induced and continue to induce their customers to use viscoelastic injection devices instead of the OMNI Surgical System, including a 30/38 gauge needle or cannula or the Streamline device to inject a bolus of visco into Schlemm's canal during canal surgery and/or prior to implanting the Hydrus Microstent, resulting in lost sales and profits; (4) Defendants are and have been encouraging their customers to refuse meetings with Sight Sciences sales representatives, thereby preventing Sight Sciences from expanding its customer base and sales of the OMNI Surgical System; (5) Defendants have and are teaching medical residents and licensed physicians to implant the Hydrus Microstent instead of using the OMNI Surgical System, causing Sight Sciences to lose

goodwill, current and future market share, and sales as a result of physicians adopting the Hydrus Microstent, and after becoming familiar with it, refusing to learn about, be trained on, or adopt the OMNI Surgical System; and (6) Defendants' planned introduction of the Indus canaloplasty device and marketing of that device for combination therapy with the Hydrus Microstent would harm Sight Sciences' goodwill, OMNI Surgical System sales and market share, and result in additional price erosion.

At least the following accounts have been negatively impacted as a result of Defendants' infringement: █████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

Pursuant to Federal Rule of Civil Procedure 33(d), Sight Sciences further identifies the following exemplary documents from which information regarding Sight Sciences' irreparable harm may be ascertained:  SGHT0049042; SGHT0044296; SGHT0054736;  SGHT0022307; SGHT0054687;   SGHT0054687;     SGHT0038237;     SGHT0039286;  SGHT0054389; SGHT0054671;    SGHT0008470;    SGHT0009324;    SGHT0011673;    SGHT0017838; SGHT0027847; SGHT0128469;    IVANTIS_SS_00209067;    IVANTIS_SS_00203800    ; IVANTIS_SS_00203935;        IVANTIS_SS_00215403;        IVANTIS_SS_00215458; IVANTIS_SS_00170715;        IVANTIS_SS_00170766;        IVANTIS_SS_00286986; IVANTIS_SS_00227183;        IVANTIS_SS_00170731;        IVANTIS_SS_00168819; IVANTIS_SS_00224822;        IVANTIS_SS_00331502;        IVANTIS_SS_00331502; IVANTIS_SS_00331626;        IVANTIS_SS_00232636;        IVANTIS_SS_00203800; IVANTIS_SS_00204037.

**Inadequate Remedies at Law.**  Money damages are inadequate to compensate Sight Sciences for harm to its goodwill, or for lost sales, market share, and price erosion impacting the OMNI Surgical System, which have harmed and will continue to harm Sight Sciences' ability to compete in the marketplace with the OMNI Surgical System and other products and services it will introduce in the future that would be used in combination therapy with the OMNI Surgical System.  Additionally, the past, current, and future harms to Sight Sciences' business resulting

from Defendants' training of physicians and residents to adopt the Hydrus Microstent has caused and will continue to cause physicians and healthcare facilities to refuse to adopt the OMNI Surgical System, preventing Sight Sciences from winning new business.  All of the foregoing types of harm are difficult or impossible to fully and completely quantify, especially because Defendants possess a larger salesforce and greater financial resources than Sight Sciences, and have used (and are using) those resources to directly and indirectly affect customer and physician attitudes, beliefs, and behaviors concerning the Hydrus Microstent and the OMNI Surgical System in a variety of ways (including through payments to KOLs, funding speaker dinners, attendance at events, and marketing activities) that are difficult or impossible to quantify.

**Balance of the Hardships.**  Defendants compete with Sight Sciences in the marketplace. Sight Sciences is a small company and its growth has been materially harmed by Defendants' infringement. By contrast, Alcon is a large multinational company with a significant portfolio spanning numerous products beyond that of the Accused Products and would not be materially impacted by a permanent injunction. The balance of the hardships further weighs against Defendants because Defendants willfully infringed the Asserted Patents.

**Public Interest.** The public interest would not be disserved by an injunction for several reasons.  As an initial matter, the Hydrus Microstent is one of several MIGS devices (including the OMNI Surgical System) that has received FDA-approval for the treatment of glaucoma.  As an example, the OMNI was approved by the FDA in 2017 and is indicated to perform *ab interno* canaloplasty followed by transluminal trabeculotomy either as a standalone procedure or in combination with cataract surgery. *See* https://www.accessdata.fda.gov/cdrh_docs/pdf20/K202678.pdf.  The OMNI Surgical System's indication encompasses that of the Hydrus Microstent, which is indicated in conjunction with

cataract surgery to reduce intraocular pressure ("IOP") in patients with mild to moderate glaucoma. *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPMA/pma.cfm?id=P170034. Relevant data shows that the OMNI Surgical System is more efficacious than the Hydrus Microstent and that Sight had (and has) the capacity to serve every Hydrus patient, (*see, e.g.*, SGHT0154465; IVANTIS_SS_00148281), such that enjoining Defendants' infringing activities would have no detrimental effect on patients both with respect to the availability and the effectiveness of treatment.

Moreover, there exists a strong public interest in the protection of intellectual property and enforcement of patent rights for inventive technologies. *Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013). The public interest thus weighs in favor of protecting the patent rights that Sight Sciences secured in the Asserted Patents.

Discovery is ongoing and Sight Sciences reserves the right to amend, supplement or otherwise change its response to this Interrogatory, including by asserting additional theories, arguments, contentions, or other evidence uncovered during fact and expert discovery.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:**

Subject to the foregoing general and specific objections, Sight Sciences additionally responds as follows:

Pursuant to Federal Rule of Civil Procedure 33(d), Sight Sciences further identifies the following documents from which information responsive to this Interrogatory may be ascertained: SGHT0166268; SGHT0167451.

Sight Sciences continues to reserve the right to modify and/or supplement this response as fact and expert discovery proceed.

Sight Sciences continues to reserve the right to modify and/or supplement this response as fact and expert discovery proceed.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

COOLEY LLP
Michelle S. Rhyu
David Murdter
Priyamvada Arora
Lauren Strosnick
Alissa Wood
Cameron C. Vanderwall
3175 Hanover Street
Palo Alto, CA  94304-1130
(650) 843-5000

Orion Armon
1144 15th Street, Suite 2300
Denver, CO  80202-2686
(720) 566-4000

Allison E. Elkman
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC  20004-2400
(202) 842-7800

Dated:  June 1, 2023                    *Attorneys for Sight Sciences, Inc.*

24

EXHIBIT 4
(excerpted)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | C. A. No.:  21-1317-GBW-SRF |
| | ) | |
| Plaintiff, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | **HIGHLY CONFIDENTIAL –** |
| | ) | **OUTSIDE ATTORNEYS' EYES** |
| IVANTIS, INC., ALCON RESEARCH LLC, | ) | **ONLY** |
| ALCON VISION, LLC AND ALCON INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF SIGHT SCIENCES, INC.'S OBJECTIONS AND RESPONSES TO
DEFENDANTS' FOURTH SET OF INTERROGATORIES (NOS. 19-21)**

Pursuant to Rule 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of

this Judicial District, Plaintiff Sight Sciences, Inc. ("Sight Sciences" or "Sight") hereby responds

to Defendants Ivantis, Inc., Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc.'s

("Defendants") Fourth Set of Interrogatories (Nos. 19-21), dated May 5, 2023.

## **GENERAL RESPONSES**

1.      Sight Sciences' response to the Interrogatories is made to the best of Sight Sciences'

present knowledge, information, and belief. This response is at all times subject to such additional

or different information that discovery or further investigation may disclose and, while based on

the present state of Sight Sciences' recollection, is subject to such refreshing of recollection, and

such additional knowledge of facts, as may result from Sight Sciences' further discovery or

investigation.

2.      Sight Sciences reserves the right to make any use of, or to introduce at any hearing

and at trial, information and/or documents responsive to the Interrogatories but discovered

subsequent to the date of this response, including, but not limited to, any such information or

documents obtained in discovery in this action.

objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection from discovery, or to the extent it seeks a legal conclusion or legal analysis and would implicate the mental impressions of counsel to provide a proper response.

Subject to the foregoing general and specific objections, Sight Sciences responds as follows:

Pursuant to Federal Rule of Civil Procedure 33(d), Sight Sciences identifies the following documents from which information responsive to this Interrogatory may be ascertained: SGHT0166268; SGHT0152605; SGHT0153024; SGHT0153029; SGHT0167451; IVANTIS_SS_00420586; IVANTIS_SS_00337117.

Sight Sciences continues to reserve the right to modify and/or supplement this response as fact and expert discovery proceed.

**INTERROGATORY NO. 21:**

Explain the complete factual and legal basis of Sight's contention that spoliation has occurred in this case and any remedy Sight contends is appropriate for such purported spoliation. *See* Mar. 9, 2023 Sight's 2d Supp. Resp. to Defendants Interrog. Nos. 4, 5, and 6. A complete response should include an identification of the date(s) on which Sight believes Defendants should have reasonably anticipated litigation with respect to the issues in this case triggering a duty to preserve evidence related to the issues in this case, along with the complete factual and legal basis for which Sight believes Defendants should have reasonably anticipated litigation as of that (those) date(s).

**RESPONSE TO INTERROGATORY NO. 21:**

Sight Sciences incorporates by reference its General Responses and Objections.  Sight Sciences further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or protection from discovery, or to the extent it seeks a legal conclusion or legal analysis and would

implicate the mental impressions of counsel to provide a proper response.  Sight further objects to the extent it seeks to apply a legal definition of "reasonably anticipated" or "duty to preserve."

Subject to the foregoing general and specific objections, Sight Sciences responds as follows:

On or around March 5, 2008, Ivantis became aware of the disclosures in the patent application to which the Asserted Patents claim priority (U.S. Patent Appl. No. 11/475,523 ("the '523 Application")), which published as U.S. Publ. No. 2007/0298068 ("the '068 Publication"). *See* Defendants' May 30, 2023 Third Supplemental Response to Interrogatory No. 1 at p. 9.

Between late 2008 and early 2009, Ivantis sought to purchase the '523 Application and the related intellectual property from Sight.  On December 18, 2008, Ivantis's then-counsel Jim Shay of Shay Glenn LLP indicated that he had been forwarded the '068 Publication from Ivantis and asked Sight's patent counsel Mika Mayer to set up a meeting between Ivantis and the patent application owners to discuss the '068 Publication.  *See* SGHT0029566; SGHT0029567-568; SGHT0029569; SGHT0029570; SGHT0029571-572; SGHT0029573-574.  Paul Badawi met with Doug Roeder at the offices of Delphi Ventures (3000 Sand Hill, Building 1, Suite 135) on January 7, 2009.  *See* SGHT0029575-577.  During the meeting, Mr. Roeder explained that Delphi Ventures was an investor in Ivantis and generally described Ivantis's business.  Based upon the information Mr. Roeder shared, Mr. Badawi realized that Ivantis would be a competitor.  Mr. Badawi explained to Mr. Roeder that his goal was to build a company around the intellectual property he and his brother had developed, and rejected Mr. Roeder's overtures made on behalf of Ivantis.  There were no further discussions.

On October 16, 2012, U.S. Patent No. 8,287,482 ("the '482 patent") (an Asserted Patent) issued from the '523 Application.  Shortly thereafter, in 2013, Ivantis hired outside patent litigation counsel at Arnold & Porter Kaye Scholer LLP ("Arnold & Porter").  *Glaukos Corp. v. Ivantis, Inc.*, 2020 WL 10501850, at *5 (C.D. Cal. Jun. 17, 2020) ("[I]n 2013, Ivantis hired outside litigation counsel to conduct diligence related to Glaukos's patents."); *see also* IVANTIS_SS_00172370-703 (Sept. 26, 2019 Dep. Tr. of David Van Meter) at -424 (55:3-12)

(testifying that Ivantis first retained litigation counsel from Arnold & Porter "in roughly, I would say, 2013 or so"); *In re Ivantis, Inc.*, C.A. No. 20-147, D.I. 2-1 (Ivantis's Petition for Writ of Mandamus) at 43 (Fed. Cir. Aug. 24, 2020) (stating that Ivantis hired Arnold & Porter in 2013 "to handle diligence-related matters"); *id.* at D.I. 15 (Glaukos's Response) at 23 (Fed. Cir. Sept. 15, 2020) ("[I]n 2013 Ivantis retained two patent trial litigators at Arnold & Porter specifically to perform 'an analysis of certain patents owned by [Glaukos] in connection with Ivantis' Hydrus Microstent."). Ivantis argued in the *Glaukos* Litigation that its retention of Arnold & Porter in 2013 to perform patent diligence was ***not*** related to that litigation. 2020 WL 10501850, at *4; IVANTIS_SS_00172424.

In June 2013, the same year Ivantis hired outside patent litigation counsel, Ivantis instituted an automatic email deletion policy that "automatically (without any action by the user) delete[d] emails older than 365 days from the server"—***without regard to the email's subject matter***. *See Glaukos Corp. v. Ivantis, Inc.*, 8:18-cv-00620-JVS-JDE ("*Glaukos* Litigation"), D.I. 495-12 (Van Meter Decl.), ¶ 4 (C.D. Cal. Apr. 10, 2020); *see also id.* at ¶ 3 ("[E]mails would be retained for 365 days after the communication."); *see also id.* at D.I. 425-23 (C.D. Cal. Mar. 23, 2020) ("Ivantis had an email retention policy in place for several years that automatically deletes emails after 12 months."); *see also Glaukos*, 2020 WL 10501850, at *6, n.4 (C.D. Cal. June 17, 2020) (providing the text of the adverse inference instruction, including that Ivantis "adopted and maintained a policy that deleted ***all company email*** after 12 months, resulting in the destruction of virtually all emails at Ivantis that pre-date April 2017") (emphasis added). Ivantis suspended this automatic email deletion policy on April 19, 2018; "[t]hus, emails as of April 19, 2017 were not subject to the mandatory deletion policy." 2020 WL 10501850, at *1; *see also Glaukos* Litigation, D.I. 495-12 (Van Meter Decl.), ¶ 5. Accordingly, Ivantis's automatic deletion policy affected emails from June 2013 to April 19, 2017.

To the extent emails regarding Sight's Asserted Patents (or related applications or publications) existed on Ivantis's server between June 2013 and April 19, 2017, those emails would have been automatically deleted after 365 days. Notably, during this time period of

automatic deletion, two additional Asserted Patents issued from the '523 Application—U.S. Patent Nos. 9,370,443 ("the '443 patent") on June 21, 2016, and 9,486,361 ("the '361 patent") on November 8, 2016.



*cf. In re Ivantis, Inc.*, C.A. No. 20-147, D.I. 15 at 31 ("[I]n 2016 Ivantis assured investors that it had retained a 'top patent litigation firm.'").  On information and belief, ████████████████ would have—or at minimum should have—identified the '482 patent, which issued in 2012, and the '443 patent, which issued in June 2016.

████████████████████████████ that would or should have identified at least two of the Asserted Patents, Defendants have produced documents indicating

that Ivantis and/or its legal counsel monitored the Badawi brothers' and then Sight's patent portfolio ever since Ivantis's unsuccessful purchasing attempt in 2008, for example:

- In "Summer 2007[,]" Ivantis conducted a "[r]obust patent search" that was "***periodically updated***[.]" IVANTIS_SS_00417127 at -147 (Date Last Modified 3/6/2008) (emphasis added).



- An "Expense detail" spreadsheet for Denali Vision includes expenses for "Consulting – IP Search" with projections through December 2009. IVANTIS_SS_00417162 ("Vision detail" tab, row 20) (Date Last Modified 3/6/2008).

- Defendants produced a copy of Sight's '068 patent publication with a Date Created of 12/6/2010 and Custodian "Paul Badawi." IVANTIS_SS_00337118.

- Defendants produced a Sight Company Presentation with the following relevant metadata: Date Created 3/15/2013; Date Last Modified 9/25/2013; Filename Sight Sciences Presentation; Author Cynthia Kalb; Custodian Paul Badawi.

- In February 2017, an Ivantis Board of Directors meeting 

- During his September 18, 2019 deposition in the *Glaukos* Litigation, Todd Abraham testified that "[Ivantis's] team . . . reviews the [IP portfolio] landscape extensively." IVANTIS_SS_00171981 at -056 (76:15-19).

- On October 22, 2019, Ken Galt sent an email

███████ ████ ████ ████ ██ ████ ████ ██ ██ ████

████████

Accordingly, on information and belief, Ivantis was aware of Sight's patent portfolio, including the Asserted Patents, and knew that the Hydrus Microstent infringed at least one claim of the Asserted Patents.  Ivantis's monitoring of Sight and Sight's patent portfolio starting in December 2008 at latest (as described above), coupled with Ivantis's automatic email destruction policy from June 2013 to April 2017, indicates, on information and belief, that Ivantis spoliated evidence relating to Ivantis's infringement of the Asserted Patents. *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012); *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1323 (Fed. Cir. 2011) (finding that defendant "was on notice of potentially infringing activities" following licensing discussions because "[o]nce the patent issued, the gun was loaded; when the targets were acquired, it was cocked; all that was left was the pull the trigger by filing a complaint").

Sight expects that the noticed depositions of third parties Jim Shay, Steve McAuley, and Matthew Wolf will further reveal that Ivantis knew or should have known that it infringed at least one claim of the Asserted Patents and anticipated or should have anticipated that a lawsuit would be filed after the Hydrus's commercialization.Sight also expects that the outstanding document request subpoenas to third parties Steve McAuley and Arnold & Porter will further reveal that Ivantis knew or should have known that it infringed at least one claim of the Asserted Patents and anticipated or should have anticipated that a lawsuit would be filed after the Hydrus's commercialization.

Additionally, Sight's pending motion to compel production of certain litigation materials from the *Glaukos* Litigation and its related appeal (collectively, "*Glaukos* Litigation Materials"), will be heard by Judge Fallon on June 12, 2023.  (D.I. 170; *see also* May 24, 2023 Docket Entry.) If Judge Fallon grants Sight's motion to compel, Sight expects that the production of the *Glaukos* Litigation Materials—and particularly the unredacted briefs and appendices filed in *In re Ivantis, Inc.*, C.A. No. 20-147 (Fed. Cir.)—will reveal relevant facts and Sight will supplement this Interrogatory upon receiving such information.

Appropriate remedies for spoliation by Ivantis in this case include (1) an adverse inference instruction under Fed. R. Civ. P. 37(e)(2), (2) a finding by the Court that this is an exceptional case under 35 U.S.C. § 285, (3) a finding by the jury that Ivantis's and Alcon's infringement was and is willful and an award of treble damages for past infringement, (4) entry of a permanent injunction against Defendants based on a finding, *inter alia*, that the balance of the equities favors Sight Sciences and not Defendants as a result of Ivantis's spoliation of evidence, (5) a sanction prohibiting Ivantis from referring to any pre-suit investigation of the Asserted Patents as a basis for believing that it did not infringe or that the Asserted Patents were invalid, *see* 2020 WL 10501850, at *4, and (6) pursuant to Rule 37 of the Federal Rules of Civil Procedure, an award of Sight Sciences' attorneys' fees and costs associated with briefing and arguing discovery motions relating to Sight's motions to compel discovery relating to Ivantis's spoliation.

Sight Sciences continues to reserve the right to modify and/or supplement this response as fact and expert discovery proceed.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

COOLEY LLP
Michelle S. Rhyu
David Murdter
Priyamvada Arora
Lauren Strosnick
Alissa Wood
Cameron C. Vanderwall
3175 Hanover Street
Palo Alto, CA  94304-1130
(650) 843-5000

Orion Armon
1144 15th Street, Suite 2300
Denver, CO  80202-2686
(720) 566-4000

Allison E. Elkman
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC  20004-2400
(202) 842-7800

Dated: June 5, 2023          *Attorneys for Sight Sciences, Inc.*

17

EXHIBIT 5
(excerpted)

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1          ROUGH ASCII -- NOT CERTIFIED

2                N O T I C E

3

4       This transcript is an UNCERTIFIED ROUGH DRAFT

5    TRANSCRIPT.

6       It contains raw output from the court reporter's

7    stenotype machine translated into English by the court

8    reporter's computer, without the benefit of proofreading.

9       It may contain mistranslations (wrong words) and

10   misspellings.  These and any other errors will be

11   corrected in the final transcript.  Since this rough draft

12   transcript has not been proofread, the court reporter

13   cannot assume responsibility for any errors therein.

14      This rough draft transcript is intended to assist

15   attorneys in their case preparation and is not to be

16   construed as the final transcript.  It is not to be read

17   by the witness or quoted in any pleading or for any other

18   purpose and may not be filed with any court.

19

20

21

22

23

24

25

1

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1      THE VIDEOGRAPHER:  Here begins Media Number 1 in the

2  videotaped deposition of Paul Badawi in the matter of

3  Sight Sciences Inc. versus Ivantis Inc. et al., in the

4  United States District Court for the District of Delaware

5  Case Number 211317VACSRF.  Today's date is June 23rd,

6  2023.  The time on the video monitor is 9:06 a.m. Pacific

7  Standard Time.  The videographer today is Lucien Newell

8  representing Planet Depos.  This video deposition is

9  taking place at 3175 Hanover Street, Palo Alto California,

10  94304.

11      Would counsel please voice identify themselves

12  and state whom they represent.

13      MS. HEFFERNAN:  Jeannie Heffernan, Kirkland & Ellis

14  representing the defendants in the case.  With me are Noah

15  Frank and Justin Bova.  Nathaniel DeLucia on Zoom and Adam

16  Pierson is here via Zoom.

17      MS. RHYU:  Michelle Rhyu of the Cooley firm on behalf

18  of Sight Sciences and the witness.

19          Jeremy Hayden, chief legal officer of Sight

20  Sciences.

21      THE VIDEOGRAPHER:  Okay.  The court reporter today is

22  Christa Yan representing Planet Depos.  The witness will

23  now be sworn.

24  BY MS. HEFFERNAN:

25      Q    Good morning, Mr. Badawi.


                                                        2


        UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1       A    Good morning.

2       Q    Will you please state your name, your full name

3   for the record?

4       A    Paul Badawi.

5       Q    And where do you live?

6       A    I live in Atherton, California.

7       Q    What's your address?

8       A    64 Irving Avenue.

9       Q    And what's your business address?

10      A    440 Campbell Avenue, Menlo Park, California.

11      Q    Have you ever been deposed before?

12      A    I have not.

13      Q    Okay.  I'm sure you've gone over it with your

14  counsel but you and I need to take turns speaking so the

14    litigation, you know, that's -- that comes into effect

15    only if something makes it to commercialization.  You

16    wouldn't litigate on something precommercial.  So I think

17    again, I think it was 2018 when Hydrus was launched.

18        Q    Why wouldn't you litigate on something before

19    it's commercially launched?

20        MS. RHYU:  And there, I just instruct you not to

21    reveal the substance of any communications with counsel.

22    If you have a separate understanding, if you extract out

23    your communications with counsel, you can answer that

24    question, go ahead.  Otherwise I instruct you not to

25    answer.


                                                                  81

              UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1         THE WITNESS:  That's just my understanding of

2     infringement litigation.  If something is commercial

3     and... that's just my understanding of it.

4     BY MS. HEFFERNAN:

5         Q    In terms of seeing and looking at the Hydrus and

6     thinking that it was covered by your claims, when did you

7     first draw that conclusion or have that impression?

8         A    I think it was pretty early on.  And I can't

9   recall the exact moment, but it was pretty early on when I

10   first saw it.  I don't know if it was 2008 or 2009.

11       Q    Do you remember in connection with -- strike

12   that.

13            Do you remember how you became aware of Hydrus

14   during that time frame?

15       A    There are different possibilities.  It was so

16   long ago.  It could have been, it could have been

17   something I saw online, it could have been a press release

18   on a development around it or a fundraising or... I

19   can't -- I can't remember exactly how.

20            But I think it was around that, that time frame.

21       Q    Was that -- did you come to the conclusion that

22   Hydrus was covered by your claims -- or sorry, when you

23   came to the conclusion that Hydrus was covered by your

24   claims in that 2008, 2009 time frame, did you think about

25   bringing litigation?

82

⚲

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    MS. RHYU:  Objection; assumes facts and misstates the

2   prior testimony.

3    THE WITNESS:  You know, I think, you know, invention,

4   when I looked at it, I thought that it's, you know, it's

15      Q    So that's the 06 application.

16      A    Okay.

17      Q    Or publication.

18           You meet with Doug Roeder in 2009 and that the

19      068 is referenced in the email, you recall that, right?

20      A    Yes.

21      Q    At the time you met with Doug Roeder in 2009, you

22      had a belief that Hydrus fell within the scope of that

23      application, right?

24           MS. RHYU:  Objection, assumes facts.

25

                                                              214

⚲

           UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1       BY MS. HEFFERNAN:

2           Q    I think you already said that this morning, I'm

3       just circling back.

4           MS. RHYU:  Mischaracterizes prior testimony.

5       BY MS. HEFFERNAN:

6           Q    Did you?

7           A    I -- that meeting I mean, we're going back now.

8       I went to meet with him.  They wanted to -- they came at

9       us for our patent.  And I articulated how excited we were

10      about our invention and what it was.  And I think the

11   invention that I described, I described our invention.

12      Q    Did you tell him you believed that that invention

13   covered the Hydrus product?

14      MS. RHYU:  Assumes facts.

15      MS. HEFFERNAN:  It doesn't, it's a question, did you.

16      MS. RHYU:  You're assuming he knew what the Hydrus was

17   at that time.

18      MS. HEFFERNAN:  He did, he already testified this

19   morning he --

20      MS. RHYU:  No he didn't, he said he wasn't sure about

21   the timing.

22   BY MS. HEFFERNAN:

23      Q    Did you tell Mr. Roeder that you believed the 068

24   covered the Hydrus?

25      MS. RHYU:  Same objections, assumes facts.

215

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1      THE WITNESS:  I can't remember the -- I can't remember

2   the exact, the exact words.  But my -- my intent in going

3   there was to make clear what our invention in 2006

4   described.  And different, you know, and I made that

5   clear.  So...

6    BY MS. HEFFERNAN:

7        Q    Did you make that clear that you had a belief

8    that the 068 covered the Hydrus?

9        MS. RHYU:  Lacks foundation, assumes facts.

10       MS. HEFFERNAN:  It doesn't lack foundation, it's his

11   open knowledge.

12       MS. RHYU:  It lacks foundation because you haven't

13   established when he became aware of the Hydrus.

14       MS. HEFFERNAN:  I already did this morning, so...

15       MS. RHYU:  You didn't.

16   BY MS. HEFFERNAN:

17       Q    You can answer the question, did you make that

18   connection for him.  So it's one thing to talk about your

19   invention.  Did you then make the connection between your

20   invention and the Hydrus for Mr. Roeder?

21       MS. RHYU:  Same objection.

22       THE WITNESS:  I think my recollection -- I think he

23   had that connection.

24   BY MS. HEFFERNAN:

25       Q    He said I think your 068 patent covers the

216

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    Hydrus, covers --

2       A    No, not like that, but I think it was, yeah, they

3   wanted to meet.  They had it.  They were interested.

4       Q    But you didn't tell him that was your belief?

5       MS. RHYU:  Again same objections, assumes facts, lacks

6   foundation.

7   BY MS. HEFFERNAN:

8       Q    It's just yes or no, did you tell him that was

9   your belief?

10      A    Again, I can't -- I can't recall.

11      Q    Can't recall, that's fine.

12      A    No, I want to finish my response.  I can't recall

13  the exact words in that meeting, it was 15, 14 years ago,

14  but I do recall making it clear which was what I wanted to

15  make sure I did.  We have very important IP and we're very

16  excited about it.  And it -- and I described, I

17  described -- I described it.

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY



15       Q    So I'll move to strike that answer as

16   nonresponsive.

17            Did you have any communication with Ivantis

18   giving them a heads up that you believe the 482 read on

19   Hydrus?

20       A    I don't believe at the time.

21       Q    At any time prior to 2018 when Ivantis received

22    FDA approval for Hydrus, did you tell Ivantis that you

23    believed the 482 read on Hydrus?

24        A    I don't recall any time, you know, just the

25    meeting, the 2009 meeting with Doug Roeder talking about

218

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1     it.

2         Q    You talked about the 482 reading on Hydrus with

3     Doug Roeder in 2009?

4         A    Sorry, I thought you were asking about the first

5     one.

6     ███  ████████████████████████████

███  ████████████████████████

███  ██  ████████

███  ██  ██████████████████████████████

███  ████████████████████████████████

███  ██████████████████████████

███  ██  ████████████████████████

13        Q    Okay.  What was the business decision not to sue

14    Ivantis in 2018?

15        A    Yeah, those days were I mean, you know, all the

16    private, private med tech company, you're living to get to

17    the next round of financing.  We were not in 2018 in a

EXHIBIT 6
(excerpted)

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1                    ROUGH ASCII -- NOT CERTIFIED

2                         N O T I C E

3

4          This transcript is an UNCERTIFIED ROUGH DRAFT

5     TRANSCRIPT.

6          It contains raw output from the court reporter's

7     stenotype machine translated into English by the court

8     reporter's computer, without the benefit of proofreading.

9          It may contain mistranslations (wrong words) and

10    misspellings.  These and any other errors will be

11    corrected in the final transcript.  Since this rough draft

12    transcript has not been proofread, the court reporter

13    cannot assume responsibility for any errors therein.

14         This rough draft transcript is intended to assist

15    attorneys in their case preparation and is not to be

16    construed as the final transcript.  It is not to be read

17    by the witness or quoted in any pleading or for any other

18    purpose and may not be filed with any court.

19

20

21

22

23

24

25

1

⚥

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    THE VIDEOGRAPHER:  Here begins Media Number 1 in the

2    videotaped deposition of Paul Badawi in the matter of

3    Sight Sciences Inc. versus Ivantis Inc. et al., in the

4    United States District Court for the District of Delaware

5    Case Number 21-1317-GBW-SRF.  Today's date is June 26,

6    2023.  The time on the video monitor is 9:14 a.m. Pacific

7    Standard Time.  The videographer today is Joe Ramirez

8    representing Planet Depos.  This video deposition is

9    taking place at Cooley LLP Palo Alto.  Will counsel please

10   voice identify themselves and state whom they represent.

11   MS. HEFFERNAN:  Jeannie Heffernan of Kirkland & Ellis

12   for the defendants and with me on the Zoom are Noah Frank,

13   Justin Bova and Nathaniel DeLucia also with Kirkland &

14   Ellis and Adam Pierson of Alcon.

15   MS. RHYU:  Michelle Rhyu of Cooley representing Sight

16   Sciences and the witness and with me on Zoom is our

17   in-house counsel Jeremy Hayden.

18   THE VIDEOGRAPHER:  The court reporter today is Christa

19    Yan representing Planet Depos.  The witness will now be

20    sworn.

21    BY MS. HEFFERNAN:

22        Q    Good morning, Mr. Badawi.  Welcome back.

23        A    Good morning, thank you.

24        Q    Do you understand that you have been under oath

25    since you took the oath on Friday morning?

2

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1         A    Yes.

2         Q    Did you discuss your testimony with anyone?

3         A    No.

4         Q    Did you do anything to prepare for today's

5    deposition, I mean, this part of the deposition, apart

6    from what we discussed on Friday?

7         A    No.

8         Q    So nothing, no additional preparation over the

9    weekend?

10        A    No.

11        Q    Okay.  Did you search for any documents over the

12    weekend?

13        A    I don't believe, I don't think so.

14        Q    What are you a little confused about?

15        A     Well, busy weekend.  So... I'd like to answer

16   accurately.  I don't think I did.

17        Q     Okay.  Did you review any documents over the

18   weekend for today's deposition?

19        A     I don't think I did.

20        Q     Does Sight Sciences have a document retention

21   policy?

22        A     We do.

23        Q     And is that a formal written policy?

24        A     I'd have to check with our IT, head of IT but I

25   believe, I believe we do have a formal policy.


                                                            3

♀

              UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1         Q     Okay.  When was that policy put into place?

2         A     As it relates to this litigation?

3         Q     No.  Just in general.  Document retention policy.

4    When was the first document retention policy put into

5    place?

6         A     I can't recall.  I... I mean, I know just a

7    general, general matter, we keep all of our documents.

8         Q     Forever?

9         A     Yeah, I mean, we don't, we don't delete

10    documents.

11        Q    You've never deleted an email you've received

12    ever in the course of your work?

13        A    No, I have, I have.  I generally try to keep all

14    of my work emails.  I delete spam.  You know, I delete,

15    yeah stuff that I think is not pertinent to work.

16        Q    What is Sight Sciences document retention policy

17    for emails?

18        A    We have them, you know, they're on, all of our

19    emails are on our computers and there's a backup.  We have

20    a very, very strong head of IT, everything's backed up,

21    certainly one drive I believe is the backup.  So we've

22    got -- he's got everything.  He's very, very well

23    experienced.  Very happy.  When we could build out this

24    team, to do it more professionally and yeah, I think you

25    should have full confidence that we have all of our

                                                          4

♀

          UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    records.

2        Q    You --

3        MS. RHYU:  I'll note for the record this is outside

4    the scope of 30B6 testimony.  This is personal testimony.

5    BY MS. HEFFERNAN:

6      Q    So you have every record of the company since

7   2006; is that correct?

8      A    No, I mean, that's -- that's -- I can't say that.

9   Generally, the intent is to keep everything that's

10   pertinent to work.  We haven't proactively like deleted

11   anything.  We delete some things, I think is not pertinent

12   to work, again, but just generally I don't want to make a

13   statement like there's nothing ever... because I can't,

14   you know, that's 15, 16, 17 years.  Has an email, you

15   know,... but, you know, nothing, I can't think of anything

16   pertinent specific to this, for example.

17      Q    What is the retention period for emails, are you

18   telling me it's forever, it's permanent?

19      A    I think so.  I mean, so I think in going back for

20   this exercise as we went back in our records, I'm pretty

21   sure like once I had started a Sight Sciences email, that

22   those emails are all there.  I don't know, with 2010.

23   2011.

24      Q    So my question's a little different.  It's not

25   whether you could go back and find some emails from 2010.

5

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1    My question is, you stated that there is a formal document

2    retention policy in place at Sight Sciences.  And my

3    question is, according to that policy, what is the

4    document retention period for emails, is it permanent?

5         A    Oh.  I haven't read that policy.  I haven't read

6    that policy.

7         Q    Okay.

8         A    I...

9         MS. RHYU:  And I'll just clarify, I said that this

10   testimony is outside the scope of 30B6 testimony.  And I

11   intended for that statement to apply to this line of

12   questioning.  Not just the particular question.

13        THE WITNESS:  I'd just like to add, I haven't read it

14   right now in preparation for this to speak to every, every

15   detail in that policy.

16   BY MS. HEFFERNAN:

17        Q    When was that policy put in place?

18        MS. RHYU:  Asked and answered.

19        THE WITNESS:  Well, I know there was a document

20   retention policy put in place specifically around this

21   litigation.

22   BY MS. HEFFERNAN:

23        Q    So that's a different thing.  That's -- that's

24   sort of a document preservation notice or hold.

25        A    Okay.

⚲

UNCERTIFIED ROUGH DRAFT - FOR ATTORNEYS' EYES ONLY

1      Q    I'm talking about ordinary course of business,

2    irrespective of this litigation.  A document retention

3    policy.  Do you understand the difference between those

4    two things?

5      A    Yes, that was helpful.

6      Q    Okay.  So thinking not about a document

7    preservation notice in connection with this litigation.

8      A    Okay, yeah.

9      Q    But thinking about a document retention policy.

10   Do you have one at Sight Sciences?

11   MS. RHYU:  Asked and answered.

12   THE WITNESS:  I'd like to -- I'd like to speak with

13   our head of IT.  But, you know, everything, everything is

14   backed up.  So...

15   BY MS. HEFFERNAN:

16     Q    Do you have like a written formal policy that has

17   by category of document or information what the retention

18   period is?

19     A    I don't -- I can't, I don't know.

20     Q    Okay.

21     A    But, but with everything backed up and we don't

EXHIBIT 7
(excerpted)



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

# Transcript of Jesse Selnick

**Date:** June 19, 2023
**Case:** Sight Sciences, Inc. -v- Ivantis, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

**1**

```
1         IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF DELAWARE
3    -------------------------------X
4    SIGHT SCIENCES, INC.,        :
5                 Plaintiff,      :
6         v.                      :Civil Action No:
7                                 :21-1317-GBW-SRF
8    IVANTIS, INC., ALCON RESEARCH :
9    LLC, ALCON VISION, LLC, and   :
10   ALCON INC.,                   :
11                Defendants.  :
12   -------------------------------X
13
14   HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
15        DEPOSITION OF JESSE SELNICK
16           MONDAY, JUNE 25, 2023
17              9:32 A.M.
18
19
20
21
22
23   Job No.: 495141
24   Pages 1 - 293
25   Reported by: Adrienne Mignano, RPR
```

**2**

```
1         Deposition of JESSE SELNICK, held at the law
2    firm of:
3
4             COOLEY, LLP
5             55 Hudson Yards
6             New York, New York 10001
7
8
9         Pursuant to Notice, before Adrienne M.
10   Mignano, a Notary Public and Registered Professional
11   Reporter for the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1              A P P E A R A N C E S
2
3    ON BEHALF OF PLAINTIFFS:
4        ORION ARMON, ESQUIRE
5        COOLEY, LLP
6        55 Hudson Yards
7        New York, New York 10001
8        212.479.6000
9
10
11   ON BEHALF OF DEFENDANTS:
12        NATHANIEL DeLUCIA, ESQUIRE
13        KIRKLAND & ELLIS LLP
14        601 Lexington Avenue
15        New York New York 10022
16        212.446.4800
17
18   ALSO PRESENT:
19        Jeremy Hayden, Esq. - Sight Sciences
20        Noah Frank, Esq. - Kirkland
21        Bill Leitsch - TM
22        Harold Rodriguez - Videographer
23
24
25
```

**4**

```
1              C O N T E N T S
2
3    EXAMINATION OF JESSE SELNICK      PAGE
4        By Mr. DeLucia              7
5        By Mr. Armon              289
6        By Mr. DeLucia            290
7
8              E X H I B I T S
9        (Attached to the transcript)
10   SELNICK DEPOSITION EXHIBITS       PAGE
11   Exhibit 1   Schedule 14A SEC filing for    17
                 Sight Sciences, Inc.
12   Exhibit 2   Defendants' Notice of Deposition  9
                 of Jesse Selnick Pursuant to
13               Federal Rule of Civil Procedure
                 Rule 30(b)(1)
14   Exhibit 3   Defendants' Notice of Deposition  0
                 of Plaintiff Pursuant to Federal
15               Rule of Civil Procedure Rule
                 30(b)(6)
16   Exhibit 4   IPO Prospectus for Sight         87
                 Sciences Common Stock
17   Exhibit 5   Morgan Stanley presentation     100
                 titled "Redefining the Eye Care
18               Experience"
19   Exhibit 6   Stifel document titled          107
                 "Discussion Materials"
20   Exhibit 7   Excel spreadsheet, Bates number  25
                 SGHT0021536
21   Exhibit 8   Excel spreadsheet, Bates number  31
                 SGHT0057230
22   Exhibit 9   Excel spreadsheet, Bates number  65
                 SGHT0049072
23   Exhibit 10  Sight Sciences' 10-K for the    186
                 Fiscal Year Ended 12-31-22
24   Exhibit 11  Excel document titled "P&L Data  08
                 FY 18-23"
25
```



**57**

1    Q   Have you reviewed any of the patents
2 that are asserted in this case?
3    **A   No.**
4    Q   So you don't have an opinion one way
5 or the other, as a legal or technical matter,
6 whether the Hydrus infringes those patents?
7    **A   No.**
8    Q   But am I correct that Paul Badawi,
9 for example, communicated a belief that Ivantis
10 was infringing on Sight Sciences' intellectual
11 property?
12    **A   He has communicated that to me.**
13    Q   You mentioned "others with more
14 detailed knowledge." Who else at Sight Sciences
15 communicated a belief that Ivantis or the Hydrus
16 was infringing Sight Sciences' intellectual
17 property?
18      MR. ARMON: I'll caution you not to
19 answer to the extent that it would implicate
20 attorney-client communications. So you may
21 answer to the extent that your answer does not
22 implicate attorney-client communications.
23    **A   The only other person that I have**
24 **ever had a conversation with about it that had**
25 **their own sort of -- that I would say had their**

**58**

1 **own ability to derive an opinion because of**
2 **their knowledge of the patent was David Badawi.**
3    Q   So setting aside lawyers, the
4 individuals at Sight Sciences who communicated
5 this belief that Ivantis might be infringing
6 Sight Sciences' intellectual property were Paul
7 and David Badawi; is that correct?
8    **A   Correct. They have the most**
9 **familiarity with Helix's intellectual property.**
10    Q   And when was the first time that
11 either Paul or David Badawi communicated this
12 belief to you?
13    **A   The first time I can recall is when I**
14 **joined the company in ▮▮▮ that there was kind**
15 **of a more detailed conversation about this**
16 **belief.**
17    Q   And what was that detailed
18 conversation?
19    **A   That there was a belief that Hydrus**
20 **infringed upon Helix's intellectual property.**
21 **I'm not capable of having a more substantive**
22 **conversation than that because I don't have the**
23 **familiarity with patents in general or medical**
24 **device patents or stent patents. So it was more**
25 **of a statement than a robust conversation.**

**59**

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15    Q   If Sight Sciences had had the money
16 in ▮▮▮ was it your understanding that they
17 would have pursued litigation against Ivantis at
18 that time?
19      MR. ARMON: Objection based on it
20 calls for speculation.
21    **A   Yeah, you know, we never had that**
22 **conversation, that if we had $30 million or**
23 **whatever -- you know, pick a number, would we**
24 **pursue enforcing the patents. That wasn't a**
25 **conversation we ever had. It was our reality**

**60**

1 **that we didn't. And so it wasn't something that**
2 **we discussed further.**
3    Q   Did you get the impression from
4 Mr. Badawi that he would have liked to pursue
5 litigation against Ivantis back in ▮▮▮
6      MR. ARMON: Objection. Form.
7    **A   Yeah, I would say Paul spent a lot of**
8 **time and thought in working on our intellectual**
9 **property portfolio, and Paul feels extremely**
10 **passionate about anyone that he has a view or a**
11 **view -- a more informed view by him and other**
12 **experts that is potentially infringing upon it.**
13    **So I'm not a mind reader, but it is**
14 **a -- it was a differentiator for our business,**
15 **is a differentiator today for Sight Sciences.**
16 **And so, yeah, there is always going to be a**
17 **desire, or if there is the ability to, to**
18 **enforce the intellectual property.**
19    Q   Was it your understanding that the
20 plan was to enforce Sight Sciences' intellectual
21 property at some point in the future once it had
22 the funding to do so?
23      MR. ARMON: Objection. I'll instruct
24 you not to answer that question on the basis of
25 attorney-client privilege.

EXHIBIT 8
(excerpted)

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


SIGHT SCIENCES, INC.,

        Plaintiff,

        vs.               Case No.
                         21-1317-GBW-SRF

IVANTIS, INC., ALCON
RESEARCH, LLC, ALCON VISION,
LLC, and ALCON, INC.,

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~


HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL EYES ONLY

REMOTE VIDEORECORDED DEPOSITION OF JAMES SHAY


JUNE 20, 2023, 9:13 A.M.


WITNESS SITUATED IN SAN FRANCISCO, CALIFORNIA


Reported by Megan M. Grossman-Sinclair
CSR No. 12586



Page 2

```
 1        APPEARANCES OF COUNSEL
          (All appearances via Zoom Videoconference)
 2
 3
 4   For Plaintiff:
 5       COOLEY LLP
         LAUREN STROSNICK, ESQ.
 6       DR. MICHELLE RHYU, ESQ.
         3175 Hanover Street
 7       Palo Alto, CA 94304
         T: (650) 843-5000
 8       Lstrosnick@cooley.com
         Rhyums@cooley.com
 9
10
     For Defendants:
11
         KIRKLAND & ELLIS
12       JEANNE M. HEFFERNAN, P.C.
         401 Congress Avenue
13       Austin, TX 78701
         T: (512) 678-9123
14       Jheffernan@kirkland.com
15       KIRKLAND & ELLIS
         STEVEN DIRKS, ESQ.
16       1301 Pennsylvania Avenue, N.W.
         Washington, D.C. 20004
17       T: (202) 389-3024
         Steven.dirks@kirkland.com
18
19
     The Videographer:
20
         JOSEPH NEW
21
22
     Also Present:
23
         JULIE RUSE, DM/IST
24       Cooley LLP
25
```

Page 3

```
 1         INDEX OF EXAMINATION
 2   WITNESS:  JAMES SHAY
 3
 4   EXAMINATION                     PAGE
 5   By Ms. Strosnick          7, 162
 6   By Ms. Heffernan          143
 7
 8
 9        QUESTIONS NOT ANSWERED
10        PAGE    LINE
11         33      6
12         48     10
13         75      7
14         92      6
15
16
17      INFORMATION REQUESTED
18      PAGE    LINE
19       (None)
20
21
22
23
24
25            * * *
```

Page 4

```
 1        INDEX TO EXHIBITS
 2   MARKED                       PAGE
 3   Exhibit 59  Subpoena to Testify at a      13
                 Deposition in a Civil Action.
 4
     Exhibit 60  Website profile of James      21
 5               Shay.
 6   Exhibit 63  E-mail by Tom Zlogar          40
                 April 11, 2008, Subject:
 7               Ivantis Due Diligence
                 Materials.
 8
     Exhibit 64  Ivantis IP Review PowerPoint  41
 9               April 9, 2008.
10   Exhibit 66  Ivantis Patents and           56
                 Publications of Interest.
11
     Exhibit 67  Metadata with Ivantis Patents 58
12               and Publications of Interest.
13   Exhibit 69  E-mail chain, top e-mail by   61
                 Jim Shay, Subject:  Diligence
14               checklist, February 14, 2011.
15   Exhibit 70  References of Interest.        68
16   Exhibit 74  E-mail by Jim Shay, Subject:  77
                 Badawi patent application,
17               December 18, 2008.
18   Exhibit 75  U.S. Patent Application        88
                 Publication
19               US 2007/0298068
20   Exhibit 80  Second Amended Complaint.     103
21   Exhibit 81  U.S. Patent No. US 8,287,482  105
22   Exhibit 82  U.S. Patent No. US 9,370,443  116
23
24
25
```

Page 5

```
 1     INDEX TO EXHIBITS (Continued)
 2   MARKED                       PAGE
 3   Exhibit 85  U.S. Patent No. US 9,486,361   117
 4   Exhibit 86  U.S. Patent No. US 10,314,742  119
 5   Exhibit 87  U.S. Patent No. US 11,389,328  120
 6   Exhibit 88  U.S. Patent No. US 7,740,604   128
 7   Exhibit 89  Information Disclosure         136
                 Statement by Applicant.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25            * * *
```



Page 34

```
1    BY MS. STROSNICK:
2        Q.  Yeah, let me rephrase.  Did you
3    conduct any patent searches for Ivantis?
4            MS. HEFFERNAN:  You can answer that
5    question "yes" or "no."
6            THE WITNESS:  Yes.
7    BY MS. STROSNICK:
8        Q.  Did you conduct any freedom to
9    operate analysis for Ivantis?
10           MS. HEFFERNAN:  Again, you can
11   answer that question "yes" or "no."
12           THE WITNESS:  Yes.
13   BY MS. STROSNICK:
14       Q.  When did you provide FTO analysis
15   for Ivantis?
16           MS. HEFFERNAN:  Objection; vague,
17   and you can answer with a date or dates if you
18   recall.  But nothing further.
19           THE WITNESS:  I don't recall
20   specific dates of doing freedom to operate
21   analyses.
22   BY MS. STROSNICK:
23       Q.  Did you perform more than one FTO
24   analysis for Ivantis?
25           MS. HEFFERNAN:  You can answer that
```

Page 35

```
1    "yes" or "no."
2            THE WITNESS:  Yes.
3    BY MS. STROSNICK:
4        Q.  About how often did you provide FTO
5    analysis for Ivantis?
6            MS. HEFFERNAN:  Objection; vague.
7    And clarifying the question, did you say about how
8    often or about how long?
9            MS. STROSNICK:  About how often.
10           MS. HEFFERNAN:  Objection; vague,
11   and you can answer the question if you have an
12   answer, but just be careful.
13           THE WITNESS:  No, I understand.
14   And also, you know, over 15 years, the answer to
15   how often is almost meaningless.  So I -- I really
16   can't answer that.
17   BY MS. STROSNICK:
18       Q.  Did you provide FTO analysis on at
19   least an annual basis?
20       A.  On -- did you say on an annual
21   basis?
22       Q.  Yes.
23           MS. HEFFERNAN:  You can answer that
24   "yes" or "no."
25           THE WITNESS:  No.
```

Page 36

```
1    BY MS. STROSNICK:
2        Q.  Did you provide FTO analysis less
3    often than an annual basis?
4            MS. HEFFERNAN:  Objection; vague.
5    You can answer that "yes" or "no."
6            THE WITNESS:  I am struggling even
7    with a yes-or-no answer because it implies that
8    there is aperiodicity to it, that there is a time
9    frame, you know, every so whatever number of
10   months or years.
11           MS. HEFFERNAN:  I think that's
12   where you should stop.
13           THE WITNESS:  I am going to stop.
14   Instruction from my counsel.
15   BY MS. STROSNICK:
16       Q.  Did you perform FTO analysis on a
17   regular basis for Ivantis?
18           MS. HEFFERNAN:  Objection; vague.
19   You can answer that question "yes" or "no."
20           THE WITNESS:  No.
21   BY MS. STROSNICK:
22       Q.  But you performed FTO analysis for
23   Ivantis when they requested it; right?
24           MS. HEFFERNAN:  You can answer that
25   "yes" or "no."
```

Page 37

```
1            THE WITNESS:  Yes.
2    BY MS. STROSNICK:
3        Q.  Did you perform any patent
4    litigation for Ivantis?
5            MS. HEFFERNAN:  You can answer that
6    "yes" or "no."  Objection; vague.
7            THE WITNESS:  No.
8    BY MS. STROSNICK:
9        Q.  Are you aware of the fact that Shay
10   Glenn transferred its Ivantis files to Alcon in
11   connection with Alcon's acquisition of Ivantis in
12   January 2022?
13       A.  Yes.
14       Q.  Were you involved in that transfer
15   of Ivantis files?
16           MS. HEFFERNAN:  You can answer
17   "yes" or "no."
18           THE WITNESS:  Yes.
19   BY MS. STROSNICK:
20       Q.  When was that transfer done?
21       A.  I don't specifically remember.  I
22   don't remember the date.
23       Q.  It was after Alcon completed the
24   acquisition of Ivantis; right?
25       A.  Yes.
```



Page 46

1          THE WITNESS:  Slide 10, got it.
2    BY MS. STROSNICK:
3          Q.  Do you see this slide title Freedom
4    to Operate?
5          A.  Yes.
6          Q.  And there are three key points to
7    keep in mind listed; correct?
8          A.  I see that, yes.
9          Q.  To your knowledge, as of the date
10   of this presentation, April 9th, 2008, Shay Glenn
11   had performed a freedom to operate analysis for
12   Ivantis; correct?
13         A.  I don't know.  It depends on your
14   definition of a freedom to operate analysis.
15         Q.  How would you define freedom to
16   operate analysis?
17         A.  I think there are multiple ways to
18   define it.  One is by scope.  How many -- well,
19   one way is by scope and another way is by the
20   specific item.  So, for example, you can perform a
21   freedom to operate analysis on a single patent.
22   Or you could do an analysis of a whole field.  You
23   can -- the size of the analysis can be -- the
24   scope of the analysis can be limited to particular
25   subject matter, particular geographies, US patents

Page 47

1    versus European patents, for example.  There are
2    many different ways to define a freedom to operate
3    analysis.
4          Q.  Would Shay Glenn perform a freedom
5    to operate analysis with respect to a single
6    patent for Ivantis?
7          A.  I think I can answer that question
8    generally, but I don't feel comfortable answering
9    it in specific to work done for a client.  But I
10   think in general when asked we would perform a
11   freedom to operate analysis for a single patent,
12   yes.
13         Q.  And do you recall whether you did
14   in fact perform an FTO analysis for a single
15   patent for Ivantis at any point?
16         MS. HEFFERNAN:  I think you can
17   answer that "yes," "no," or "I don't know."
18   Unless you -- unless you disagree.  You know your
19   work better than I do so...  And by that I mean
20   unless you disagree that that reveals --
21         THE WITNESS:  Yeah, no.  That's
22   what I am struggling with.  Again, I don't want to
23   cross the attorney-client privilege line.
24         MS. STROSNICK:  It may reveal
25   privileged information and I don't --

Page 48

1          THE WITNESS:  I know you don't want
2    that.  I want to be careful about that.  So the
3    pending question is did Ivantis ever ask us to
4    perform a freedom to operate analysis on a single
5    patent.
6          MS. STROSNICK:  Yes.
7          THE WITNESS:  The answer to that is
8    yes.
9    BY MS. STROSNICK:
10         Q.  Do you remember the time frame of
11   when Ivantis asked you to provide a freedom to
12   operate analysis on a single patent?
13         MS. HEFFERNAN:  I think that might
14   be getting closer to attorney-client privileged
15   communications.
16         THE WITNESS:  Yeah, I am getting
17   concerned about that too.  I think I am going to
18   have to decline to answer that because it pertains
19   to advice the client was asking me to provide.
20   BY MS. STROSNICK:
21         Q.  I am not looking for anything
22   privileged here.  I'm just asking about the fact
23   of when to your recollection that FTO analysis
24   occurred.
25         A.  I understand.  I understand what

Page 49

1    you are asking I think, but I also am concerned
2    that the time frame of it, once you start talking
3    about time frame, patents have time frames, right,
4    they have grant dates and publication dates and
5    filing dates.  So by honing in on a time frame,
6    you are honing on specifics about advice that a
7    client sought.  And that just makes me feel
8    uncomfortable.  I don't want to cross that
9    attorney-client privilege line.  I'm sorry.
10         Q.  Okay.  So you are refusing to
11   answer the question based on privilege?
12         A.  Yes.
13         Q.  Going back to another type of FTO
14   analysis you mentioned, do you recall the fact of
15   whether you ever provided an FTO analysis for
16   Ivantis regarding a larger field of the IP
17   landscape?
18         MS. HEFFERNAN:  You can answer that
19   "yes," "no," or "I don't know" if you don't
20   recall.
21         THE WITNESS:  I don't recall
22   specifically, no.
23   BY MS. STROSNICK:
24         Q.  Okay.  Going back to Exhibit 64.
25   As of the date of this document, April 9, 2008,



Page 50

1    Shay Glenn was at least contemplating performing a
2    freedom to operate for Ivantis; correct?
3           A.   You are -- your question assumes
4    things that we haven't established.  I see what
5    this document says, but as I said, I don't know
6    who authored this document.  I don't know if this
7    is actually something from Shay Glenn despite a
8    logo appearing at the bottom.  And I don't know
9    that I can agree with your -- the conclusion you
10   are trying to make me draw.  I just -- because I
11   don't know.  I don't have -- I don't have the
12   basis for that.
13          Q.   Apart from this document, can you
14   remember whether Shay Glenn performed any freedom
15   to operate analysis for Ivantis in the 2008 time
16   frame?
17          A.   I -- 15 years ago?  I don't recall.
18          Q.   Do you recall anything about the
19   timing of when Shay Glenn provided an FTO analysis
20   to Ivantis?
21          MS. HEFFERNAN:  Objection; vague.
22   And you can answer I guess "yes," "no," or "I
23   don't know."  Or "don't recall" rather.
24          THE WITNESS:  Yeah, as point of
25   clarification, are you talking about issues

Page 51

1    relevant to the lawsuit that we are here to talk
2    about or at any time in the -- you know, the
3    15-year representation or whatever it was, 14
4    years representing Ivantis?
5    BY MS. STROSNICK:
6           Q.   I am just talking generally right
7    now.
8           A.   So the question is have -- do I
9    recall ever being asked by Ivantis to perform a
10   freedom to operate review of a single patent or of
11   more than a single patent at any time in my
12   representation of them?  Is that the question?
13          Q.   Yes.
14          MS. HEFFERNAN:  That was not the
15   question, actually.
16          THE WITNESS:  Oh, okay.  I don't
17   understand the question.
18          MS. HEFFERNAN:  So why don't -- if
19   the court reporter to read the actual question
20   that was asked back to the witness, that would be
21   helpful.  So the court reporter is going to do
22   that now so we can't talk while she does that.
23          THE WITNESS:  I'll wait.  I'll
24   wait.
25          (Record read as follows:

Page 52

1           "Question:  Do you recall anything
2           about the timing of when Shay Glenn
3           provided an FTO analysis to
4           Ivantis?")
5    BY MS. STROSNICK:
6           Q.   And let me rephrase that actually.
7    Do you recall when Shay Glenn provided an FTO
8    analysis to Ivantis?
9           MS. HEFFERNAN:  You can answer that
10   "yes," "no," "I don't recall."
11          THE WITNESS:  I don't specifically
12   recall, no.
13   BY MS. STROSNICK:
14          Q.   But you do recall that Ivantis did
15   provide an FTO analysis -- or, sorry.  You do
16   recall that Shay Glenn provided an FTO analysis
17   for Ivantis at some point while you were
18   representing them; right?
19          MS. HEFFERNAN:  Again, you can
20   answer that "yes," "no" --
21          THE WITNESS:  Yes.
22   BY MS. STROSNICK:
23          Q.   Let's take a look back at slide 10
24   of Exhibit 64.  Do you see this lists key points
25   to keep in mind and the first key point says:

Page 53

1           "Implants (shunts, dents,
2           et cetera) maintain patency of AH
3           flow path are old."
4           Did I read that correctly?
5           A.   More or less, yes.
6           Q.   What do you mean by more or less?
7           A.   Oh, I am -- you know, tomato,
8    tomato, you say "patency," you "patency."
9           Q.   Apologies.  And AH refers to
10   acquiesce humor; correct?
11          A.   Yes, it does.
12          Q.   Do you read this as commenting on
13   the novelty or obviousness of patents covering
14   implants that maintain patency of acquiesce humor
15   flow path?
16          A.   Do I think that today or do I -- is
17   that what your question is?
18          Q.   No, my question is do you read this
19   first point as talking about the novelty or
20   obviousness of patents covering implants that
21   maintain the patency of AH flow path?
22          A.   You are asking me to guess about
23   the meaning of something that I'm not sure I wrote
24   or I don't know who wrote.  So it would just be a
25   guess.

MAGNA
LEGAL SERVICES

EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1317-GBW-SRF |
| | ) | |
| IVANTIS, INC., | ) | |
| ALCON RESEARCH LLC, | ) | |
| ALCON VISION, LLC, | ) | |
| and ALCON INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' NOTICE OF DEPOSITION OF SABRINA KATZ
PURSUANT TO FED. R. CIV. P. 30(b)(1)**

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil Procedure, counsel for Defendants Ivantis, Inc., Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc. (collectively, "Defendants") will take the deposition of Sabrina Katz before a certified court reporter authorized to administer oaths and record testimony. The deposition with take place on June 29, 2023 beginning at 9:00 a.m. Eastern Time, remotely by video, or at a time and place mutually agreed upon by the Parties. The testimony will be recorded by stenographic and/or video-graphic means.

OF COUNSEL:
Gregg LoCascio
Noah S. Frank
Justin Bova
Steven Dirks
Socrates L. Boutsikaris
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

Jeannie M. Heffernan
Kat Li
Austin C. Teng
Ryan J. Melde
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
(512) 678-9100

Ryan Kane
Nathaniel DeLucia
Laura Zhu
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Brian A. Verbus
Jake Rambeau
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000

Dated: June 14, 2023

*/s/ Kat Li*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Kat Li, hereby certify that on June 14, 2023, this document was served on the persons listed

below in the manner indicated:

**BY EMAIL**

Melanie K. Sharp
James L. Higgins
Taylor E. Hallowell
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

Orion Armon
COOLEY LLP
1144 15th Street, Suite 2300
Denver, CO 80202
(720) 566-4000
oarmon@cooley.com

Michelle S. Rhyu
David Murdter
Lauren Strosnick
Alissa Wood
Cameron C. Vanderwall
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94305
(650) 843-5000
rhyums@cooley.com
dmurdter@cooley.com
parora@cooley.com
lstrosnick@cooley.com
amwood@cooley.com

/s/ Kat Li
Kat Li
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
(512) 678-9100

3

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1317-GBW-SRF |
| | ) | |
| IVANTIS, INC., | ) | |
| ALCON RESEARCH LLC, | ) | |
| ALCON VISION, LLC, | ) | |
| and ALCON INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' NOTICE OF DEPOSITION OF SARAH SLOAN MARCUS PURSUANT TO FED. R. CIV. P. 30(b)(1)

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil Procedure, counsel for Defendants Ivantis, Inc., Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc. (collectively, "Defendants") will take the deposition of Sarah Sloan Marcus before a certified court reporter authorized to administer oaths and record testimony. The deposition with take place on June 28, 2023 beginning at 9:00 a.m. Eastern Time, remotely by video, or at a time and place mutually agreed upon by the Parties. The testimony will be recorded by stenographic and/or video-graphic means.

1

OF COUNSEL:
Gregg LoCascio
Noah S. Frank
Justin Bova
Steven Dirks
Socrates L. Boutsikaris
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

Jeannie M. Heffernan
Kat Li
Austin C. Teng
Ryan J. Melde
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX  78701
(512) 678-9100

Ryan Kane
Nathaniel DeLucia
Laura Zhu
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Brian A. Verbus
Jake Rambeau
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000

Dated: June 14, 2023

/s/ Kat Li
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Kat Li, hereby certify that on June 14, 2023, this document was served on the persons listed

below in the manner indicated:

**BY EMAIL**

Melanie K. Sharp
James L. Higgins
Taylor E. Hallowell
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

Orion Armon
COOLEY LLP
1144 15th Street, Suite 2300
Denver, CO 80202
(720) 566-4000
oarmon@cooley.com

Michelle S. Rhyu
David Murdter
Lauren Strosnick
Alissa Wood
Cameron C. Vanderwall
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94305
(650) 843-5000
rhyums@cooley.com
dmurdter@cooley.com
parora@cooley.com
lstrosnick@cooley.com
amwood@cooley.com

_/s/ Kat Li_____
Kat Li
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
(512) 678-9100

EXHIBIT 11

**From:**   Shawn O'Neil <soneil@sightsciences.com>
**Sent:**   Wed, 4 Aug 2021 13:16:43 +0000 (UTC)
**To:**     Chris Phelps <cphelps@sightsciences.com>; John Liu<JLiu@sightsciences.com>; Jeremy Hayden
            <JHayden@sightsciences.com>; "Jeff Francis" <jfrancis@sightsciences.com>
**Cc:**     Paul Badawi <Paul@sightsciences.com>
**Subject:** RE: ███████████████ - Follow Up Information

---

Chris,  thank you for passing along.  I am including Paul on this as well.

Definitely a concern if this is coming from Frank Shields, VP of Sales for Ivantis.  This demonstrates that the promotion and encouragement to do a canalostomy procedure but code as canaloplasty (66174) is not isolated and in fact part of a national strategy/direction.  This needs to be corrected.

**Shawn O'Neil**
Chief Commercial Officer
4040 Campbell Avenue Suite 100
Menlo Park, CA 94025
Cell: 817-800-0406



**"Delivering the Power of Sight!"**

---

**From:** Chris Phelps <cphelps@sightsciences.com>
**Sent:** Tuesday, August 3, 2021 9:13 PM
**To:** Shawn O'Neil <soneil@sightsciences.com>; John Liu <JLiu@sightsciences.com>; Jeremy Hayden <JHayden@sightsciences.com>;
Jeff Francis <jfrancis@sightsciences.com>
**Subject:** Fw: ███████████████ - Follow Up Information

Please see the below

his is quite like what we are hearing now throughout Florida. We are also now aware of this occurring in Georgia particularly the Savannah area. We have some concern it might also be in play in North Carolina yet have no direct evidence yet. The last name of the DM in Carolina is Shields same as the RD in Florida who is well known for this.

Frank Shields, Ali Salo and Andy are 100% involved from what we have gathered albeit Ali has denied it to her own rep and Sarah. Andy is heavily promoting this and selling the cannula.

Sarah has a strong relationship with Dr Dorsett and this account is important to us. He is also friends with Frank Shields so there is some sensitivity in terms of impact on the account in relation to Sarah sharing the information.

We will continue to monitor and pass on any pertinent information that is objective and tangible.

**Chris Phelps**

**East Area Director, Surgical Glaucoma**

4040 Campbell Ave. Ste #100

Menlo Park, CA 94025

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                 SGHT0044913

Cell: (816) 820-8081



*"Delivering the Power of Sight!"*

---

**From:** Sarah Sloan <ssloan@sightsciences.com>
**Sent:** Tuesday, August 3, 2021 8:52 PM
**To:** Shawn Hay <shay@sightsciences.com>; Chris Phelps <cphelps@sightsciences.com>
**Cc:** Sarah Sloan <ssloan@sightsciences.com>
**Subject:** ████████████████ - Follow Up Information

Hi Chris & Shawn,

Thank you both for your time today helping me navigate the communication when addressing the situation with a "manually operated, "new canaloplasty" device, reportingly being offered by Ivantis for use with Hydrus.

As a recap of the dialogue and information that took place today 8/3/21 in reference to ████████████████ which is owned by Dr. Kevin Dorsett, along with his clinic, Lakeland Eye Clinic, please review the following:

As the foundation, ████████████ has been longstanding customer and user of OMNI, spanning from late Summer 2019 - current. Today I received a call from Dr. Dorsett's surgery scheduler inquiring about a "new" way to perform a canaloplasty that was being offered by Ivantis. Heather stated she heard it was a "less expensive way to perform a dilation of the canal using a cannula, that may or may not be reusable". She simply wanted to know if I was familiar as she heard from Dr. Dorsett and his technician that there was a meeting to take place on Wednesday 8/4/21 with the Ivantis manager in Florida, Ali Salo, to get more information about this technology.

From communication with the local Ivantis rep, Geniene, she was completely unaware of the lunch meeting and repeated to me that, "she is not promoting any canaloplasty type procedure, only Hydrus but that she was aware that Andy Rivera has actively promoted a "new cannula" that costs $100 which connects directly to a viscoelastic and assists in dilating the canal prior to inserting the Hydrus microstent".

I will find out more information on Thursday after the meeting takes place and Heather reports back. Any new information I will actively pass along directly to you both. Although this account has a longstanding friendship with both Ali and Frank Shields, higher management at Ivantis and residents in my market, I don't suspect Dr Dorsett will proceed forward with off-label use of technology. Either way, I wanted to pass along the information, so you're ware of market activity taking place.

With gratitude,

*Sarah Sloan*

Surgical Sales, Glaucoma | Southwest Florida
3000 Sand Hill Rd., Bldg. 3-105
Menlo Park, CA 94025
Ssloan@SightSciences.com
Cell: 727-686-1270

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBIT 12

| | |
|---|---|
| **From:** | Shawn Hay <shay@sightsciences.com> |
| **Sent:** | Wed, 25 Aug 2021 20:24:08 +0000 (UTC) |
| **To:** | Chris Phelps <cphelps@sightsciences.com> |
| **Subject:** | Hydrus Cannula intel. |
| **Attachments:** | IMG_0959.HEIC;IMG_0960.HEIC;IMG_3947.heic |

Chris,

In an effort to keep all of this together, below is the information from the previous email.

_Lost Business_



_Accounts we aren't able to gain business due to use._



_Below are examples of field intel related to Ivantis and their promotion of the cannula._

1. ██████████ Savannag, Ga.
   a. Dr. Kim shared that the ivantis rep was selling him on using the canulla for his Hydrus cases, Dr. Kim decided not to use it and shared he would rather bend his own canulla than buy that.
   b. Surgery center confirmed canullas were dropped off.
   c. Was the local Ivantis rep not Andy.
2. ██████████ Jacksonville, FL.
   a. Surgery center owned by Dr. Bowden, they confirmed that the local rep dropped off canulla's for use with Hydrus, the doctor did not use them.
3. ██████████
   a. Dr. Dorsett's staff called Sarah to share that the Ivantis RD had a lunch meeting set up to discuss a new canalplasty option for his Hydrus/ Omni cases.
   b. Sarah personally addressed this with the Ivantis DM and local Rep and had it shut down.
   c. During her conversation, the RD let it slip that Andy was charging accounts $100/ cannula.
4. ██████████
   a. While at Dr. Mahootchi's cases, I observed a B&L retinal 27 gauge cannula with a sticky note that said "use with Hydrus".  I asked doc what it was and he dismissed it as something hes neevr tried.
   b. It is believed that Ali, Ivantis RD left it for him as she used to be with B&L Surgical.
   c. Photo of box attached to email.
5. ██████████
   a. Sabrina was in surgery with Dr. Arosamena, she had multiple Omni's and a coupld of Hydrus.  With the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Hydrus cases, she utilized the the cannula that Andy dropped off for those Hydrus cases and confirmed they are billing for them. Photo of cannula attached.

b. She did ensure that this was not taking the place of Omni as she never has combined technologies.

6. Dinner with Dr. Goldman, Dr. Luchs and Dr. Bellotte.

a. During a dinner meeting with Sabrina, Dr. Goldman and Dr. Belotte confirmed with Sabrina that Andy approached them with the cannula as an option to do a "canaloplasty" with Hydrus.

7. ███████████████████████████████

a. This account called Sarah about an Omni case for Dr. Damon Welch, who had not been trained on Omni. Further investigation revealed that the order to the ASC said canaloplasty and they thought it was for Omni but he was actually doing the canulla plus Hydrus.  He and Andy are close.

8. ████████████████████████

a. Dr. Bellotte confirmed with Cara that he was approached by Andy to use the canulla instead of Omni and combine with Hydrus.  He did not chose to use it.

9. ███████████████████

a. Sabrina found a video of Dr. Sayed on youtube using a prolene with the Hydrus canula to perform a "mechanical ccanaloplasty"  this was Andy's first attempt to encroach on our business.

b. https://youtu.be/HkqIC6K1roQ.

Shawn Hay
Regional Sales Director, Surgical Glaucoma

**Sight Sciences**
3000 Sand Hill Rd.
Menlo, CA 94025
Cell: 813-388-1027
shay@sightsciences.com
www.sightsciences.com/us/





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# EXHIBIT 13
# (excerpted)



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Transcript of Chris Phelps

**Date:** June 15, 2023
**Case:** Sight Sciences, Inc. -v- Ivantis, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

1    UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF DELAWARE
3    - - - - - - - - - - - - x
4    SIGHT SCIENCES, INC.,    :
5          Plaintiff,         :
6      v.               :    Civil Action No.
7    IVANTIS, INC., ALCON   :    21-1317-GBW-SRF
8    RESEARCH, LLC, ALCON     :
9    VISION, LLC, and         :
10   ALCON INC.,              :
11         Defendants.        :
12   - - - - - - - - - - - - x
13
14      Videotaped Deposition of CHRIS PHELPS
15      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
16              Held Virtually
17           Thursday, June 15, 2023
18                9:05 a.m.
19
20
21
22
23   Job No.: 495140
24   Pages: 1 - 176
25   Reported By: Anita M. Trombetta, RMR, CRR

**2**

1
2
3
4
5
6
7
8      Videotaped deposition of CHRIS PHELPS,
9    held via Zoom pursuant to notice, before
10   Anita M. Trombetta, RMR, CRR, Notary Public in and
11   for the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1    A P P E A R A N C E S:
2
3      ON BEHALF OF THE PLAINTIFF:
4          ORION ARMON, ESQUIRE
5          COOLEY, LLP
6          1144 15th Street, Suite 2300
7          Denver, Colorado 80202
8          (720) 566-4000
9
10     ON BEHALF OF THE DEFENDANTS:
11         KIRKLAND & ELLIS, LLP
12         NOAH FRANK, ESQUIRE
13         CAMERON LINDSAY, ESQUIRE
14         200 Clarendon Street, 47th Floor
15         Boston, Massachusetts 02116
16         (617) 385-7570
17
18
19
20   ALSO PRESENT:
21   SUE PYBAS, Exhibit Technician
22   CRAIG FEAR, Video Specialist
23
24
25

**4**

1    --------------------I N D E X------------------
     WITNESS
2    CHRIS PHELPS
3    EXAMINATION BY                          Page
4    MR. FRANK                               7
     --------------------EXHIBITS------------------
5    Phelps Exhibits                         Page
6    Exhibit 1    LinkedIn Profile           4
     Exhibit 2    Document Bearing Bates SGHT  41
7                 0044998
     Exhibit 3    Document Bearing Bates SGHT  54
8                 0043642
     Exhibit 4    Document Bearing Bates SGHT  59
9                 0088414
     Exhibit 5    Document Bearing Bates SGHT  74
10                0116111
     Exhibit 6    Sight Sciences Presentation  83
11                Bearing Bates SGHT 0043356
     Exhibit 7    OMNI Instructions for Use    90
12   Exhibit 8    Sharktank@sightsciences.com  97
                  Email
13   Exhibit 9    2023 Sight Sciences SEC      119
                  Form 8-K
14   Exhibit 10   Document Bearing Bates SGHT  122
                  0167451
15   Exhibit 11   Document Bearing Bates SGHT  129
                  0038821
16   Exhibit 12   Document Bearing Bates SGHT  130
                  0166268
17   Exhibit 13   Document Bearing Bates SGHT  151
                  0045141
18   Exhibit 14   Document Bearing Bates SGHT  155
                  0045147
19   Exhibit 15   Email Bearing Bates SGHT     158
                  0091331
20   Exhibit 16   Document Bearing Bates SGHT  163
                  015434
21   Exhibit 17   Document Bearing Bates SGHT  168
                  0111827
22   Exhibit 18   Document Bearing Bates SGHT  170
                  0045915
23   -----------INSTRUCTION NOT TO ANSWER----------
24
     -----------------REQUESTS---------------------
25                                         Page 63

---

**77**

1    Q  Who would have written this document?
2    A  I wouldn't -- I wouldn't know.  If it's
3    marketing, 2020, Patrick was still around, but
4    this could have been just about anybody, really.
5    If this was something they were doing out of Menlo
6    Park.  I don't know.  I'm not a part of these kind
7    of things.  This isn't my world.
8    Q  The second bullet says, "MIGS stents will
9    go faster than the market, taking share from
10   Trabectome and KDB."
11      Do you see that?
12   A  I do.
13   Q  And so at least someone at Sight Sciences
14   relayed that opinion that MIGS would take share
15   from Trabectome and KDB, right?
16   A  They're predicting that.  They didn't say
17   it was happening.  They're predicting it as a
18   marketing thing, or Market Scope predicted it.
19   Somebody did.  I don't know.  Like I said, I'm not
20   accurately able to speak to this because these
21   aren't things I do.  I'm not a part of these kind
22   of meetings.  So I can't accurately answer what
23   this person meant by anything.
24   Q  You can pull that down.
25      So you're located in Iowa, correct?

---

**78**

1    A  That's correct.
2    Q  And so I guess my question is, sort of,
3    why -- why Iowa?
4    A  Well, I'm very close to my children, and
5    my children live in Iowa, so I live in Iowa.  I
6    was still with Alcon when I moved here, and Alcon
7    was kind enough to allow me to come here when I
8    got divorced and follow my children.  I'm very
9    close to my children, and I have primary custody.
10   So I have to be here.
11   Q  And so do you travel for work?
12   A  Of course.
13   Q  And, generally, where do you travel for
14   work?
15   A  Well, I have the east, so I usually go
16   east.  My last trip was in Pittsburgh.  But more
17   often than not, I'm going to Texas for leadership
18   meetings, for, you know, whatever.  I -- we have
19   an office in Texas.  You know, I go down and meet
20   with Mark or whomever.  Not very often.  Maybe
21   once a quarter.
22      My last trip in the field, though, was to
23   Pittsburgh a couple weeks ago.
24   Q  And so, other than your sales reps that
25   report up to you, who else at Sight Sciences do

---

**79**

1    you interact with on a daily basis?
2    A  Daily basis?  I don't interact with the
3    sales reps daily.  I interact with my regional
4    directors most days.  Not all of them, though.  At
5    least once a week within our -- on some calls.
6       But I talk to Mark a decent amount.
7    Obviously, he's my boss.  I have to.
8       And then Brian and I talk probably once a
9    week.  Brian Heaney.
10      Jeff Colburn, I talk probably once every
11   two weeks.  That's about it.
12   Q  Do you speak with Mr. Badawi often?
13   A  No.  He's the CEO.
14   Q  So speaking of the MIG market and some of
15   the competitors that we've spoken about, each of
16   those competitors has particular advantages or
17   disadvantages, right?
18   A  Each company thinks so.  Yes, I'm sorry.
19      We feel that we work better than others.
20   They feel they work better than us.  It's -- they
21   have studies.  We have studies.  But we're all
22   trying to accomplish the same goal, which is lower
23   IOPs so patients don't go blind.
24   Q  So aside from sort of potentially
25   subjective studies, there are differences and

---

**80**

1    indications between the different products,
2    correct?
3    A  Correct.
4    Q  And so, for instance, OMNI has a
5    standalone indication such that you don't need to
6    use OMNI at the time of cataract surgery, right?
7    A  That's correct.  We do have that
8    indication.
9       (Court reporter clarification.)
10      THE WITNESS:  I'm sorry.
11   A  Yes, we do have that indication.
12   Q  And I believe there's also differences in
13   the severity of disease, correct?
14   A  I believe so.  I'd have to double-check,
15   but, yeah.
16   Q  Now, the standalone indication, I think
17   earlier you mentioned something about that you
18   weren't pushing it enough.
19      Does that ring a bell?
20   A  No, we push it.  We're not successful at
21   it.  It's maybe 2 percent, 1 percent of our
22   business.  It's a very difficult thing to sell and
23   to -- you're asking surgeons to change their
24   algorithm and their way of thinking, things
25   they've been doing the same way for a long time.

105

1  to OMNI?
2  **A They could switch to OMNI. They could**
3  **switch to iStent. They could switch to New World.**
4  **They could switch to iTrack. We don't -- we don't**
5  **know.**
6  Q And you've never surveyed any physicians
7  about what product they would use if Hydrus
8  weren't on the market?
9  **A Not that I'm aware of. I mean, if Hydrus**
10 **wasn't on the market, what product would they use?**
11 **No, I've never done that. It's not really an**
12 **appropriate question you'd ask a surgeon, in my**
13 **view.**
14 Q If you didn't have salespeople, you
15 wouldn't be selling OMNI, right?
16 **A That's not a question for me. If we**
17 **didn't have salespeople -- if the company existed,**
18 **and we didn't have any salespeople, and OMNI was**
19 **still on the market, if they wanted to use it,**
20 **they'd still be buying it from somebody. So Paul,**
21 **me, Mark. I don't know. It's -- I'm not sure**
22 **what you're asking there. It's...**
23 Q Well, from when you joined, you said you
24 were, what, the seventh salesperson?
25 **A Yes.**

106

1  Q Okay. And --
2  **A Somewhere around there.**
3  Q Okay. And now, I think you said, there's
4  somewhere upwards of 50?
5  **A Yeah.**
6  Q Okay. And so I take it, then, the reason
7  that you hired more salespeople is to sell more
8  OMNIs, right?
9  **A The reason we hired more salespeople is we**
10 **had to hire sales force. If you want to compete**
11 **in the MIGS market against companies like Alcon or**
12 **Ivantis then and Glaukos, you can't sell to seven**
13 **people in the country. If you actually want to**
14 **commercialize, then we were very -- when we did**
15 **commercialize, we went from seven to, I don't**
16 **know, 20 or 22. But that's not a sales force,**
17 **seven people.**
18 **If you want to compete in the MIGS market,**
19 **which is very tough, you need more than seven**
20 **people.**
21 Q Now, the more salespeople hire -- you
22 hire, ideally, the more sales you make, right?
23 **A The goal is to cover a geography**
24 **appropriately, and whatever number of reps that**
25 **turns into, that's where we noted. So it's not --**

107

1  it's not really fair, to say, "Okay. Joe
2  **Smith" -- that's a fake name -- "you have**
3  **Missouri, Arkansas, and Oklahoma. Go get 'em."**
4  **That's not realistic, right? So it's more**
5  **by geography, and you break it down where people**
6  **can handle it and still have a life.**
7  Q Now, within that territory, for instance,
8  if you started selling double, you'd need to hire
9  an additional salesperson, right?
10 **A No, not necessarily.**
11 Q Why not?
12 **A Because -- because some geographies are**
13 **pretty tight, and, you know, we have territories**
14 **where that's occurred, and there is just one rep**
15 **that does that. You don't need two.**
16 **There's areas where we had to split it up**
17 **because it's so big. Like the state of Michigan.**
18 **We split it into two because it's such a big**
19 **state, right? It's huge. And it wasn't -- it's**
20 **not realistic to think that rep down near Detroit**
21 **is going to go up to Grand Rapids, which is, what,**
22 **seven hours away, driving. That's not realistic,**
23 **and it's not fair to the human being.**
24 Q So sales reps visit doctors' offices,
25 right?

108

1  **A They visit ambulatory surgery centers.**
2  **They visit hospitals. They visit the OR. They**
3  **visit clinics sometimes.**
4  Q And salespeople at Sight also sit in in
5  surgery, right?
6  **A Yes. That's part of their job is to go in**
7  **the OR.**
8  Q And the more OMNIs you sell, the more your
9  sales reps are paid, right?
10 **A Well, it depends on their quota versus**
11 **their commissions. Their salary doesn't change.**
12 **And if they meet their quota -- it's about their**
13 **quota. They have to meet a quota. It's not about**
14 **how many OMNIs you sell. Because you could sell a**
15 **hundred OMNIs, but if your goal is 110, you're not**
16 **making any money, so...**
17 Q Now, above the quota, though, the more
18 OMNIs you sell, the more that sales rep is going
19 to make, right?
20 **A A small incremental amount, yeah.**
21 Q For instance, you made more because you
22 went over your quota, right?
23 **A I made $300 more, actually. I know that**
24 **for a fact because I was mad about it last night,**
25 **and I called Mark and I said, "I should have got**

# EXHIBIT 14
# (excerpted)



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

# Transcript of Richard Allen Plank

**Date:** May 23, 2023
**Case:** Sight Sciences, Inc. -v- Ivantis, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

1  UNITED STATES DISTRICT COURT

2  FOR THE DISTRICT OF DELAWARE

3  - - - - - - - - - - - - - - - x

4  SIGHT SCIENCES, INC.,        :

5        Plaintiff,             :

6    v.                         : Case No.

7  IVANTIS, INC., ALCON RESEARCH : 21-1317-GBW-SRF

8  LLC, ALCON VISION, LLC, and  :

9  ALCON INC.,                  :

10       Defendants.            :

11 - - - - - - - - - - - - - - - X

12 HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

13    Vidotaped Deposition of RICHARD ALLEN PLANK

14            Conducted Virtually,

15            Tuesday, May 23, 2023

16              10:08 a.m. EDT

17

18

19

20

21

22

23 Job No.: 493825

24 Pages: 1 - 219

25 Reported By: Debra Ann Whitehead

**2**

1     Videotaped Deposition of RICHARD ALLEN PLANK,

2  conducted virtually.

3

4

5

6

7

8

9

10

11

12     Pursuant to notice, before Debra Ann Whitehead,

13 E-Notary Public in and for the Commonwealth of

14 Virginia.

15

16

17

18

19

20

21

22

23

24

25

**3**

1              A P P E A R A N C E S

2  ON BEHALF OF PLAINTIFF:

3     ORION ARMON, ESQUIRE

4     COOLEY, LLP

5     1144 15th Street

6     Suite 2300

7     Denver, Colorado 80202

8     (720) 566-4000

9

10 ON BEHALF OF DEFENDANTS:

11    NATHANIEL DeLUCIA, ESQUIRE

12    LAURA B. ZHU, ESQUIRE

13    KIRKLAND & ELLIS, LLP

14    601 Lexington Avenue

15    New York, New York 10022

16    (212) 446-4800

17

18 ALSO PRESENT:

19    SUE PYBAS, A/V Technician

20    JEAN-LOUIS ZIESCH, Video Specialist

21

22

23

24

25

**4**

1              C O N T E N T S

2  EXAMINATION OF RICHARD ALLEN PLANK      PAGE

3     By Mr. DeLucia                       7

4

5              E X H I B I T S

6       (Attached to the Transcript)

7  PLANK DEPOSITION EXHIBIT                PAGE

8  Exhibit 1   Notes prepared by Mr. Plank    13

9  Exhibit 2   Defendants' Notice of Deposition 73

10             of Richard Plank Pursuant to

11             Fed. R. Civ. P. 30(b)(1)

12 Exhibit 3   E-mail from Mr. Nadeau, to      132

13             Mr. Plank, 9/20/22, Bates

14             SGHT0091224

15 Exhibit 4   Presentation, Clinical Study    134

16             Story, Bates SGHT0091225 - 0091260

17 Exhibit 5   E-mail from Mr. Schnick, to     139

18             Mr. Huang, et al., 1/28/21,

19             Bates SGHT0043642 - 0043643

20 Exhibit 6   Market Scope US Glaucoma        145

21             Quarterly Updatem Q4 2020,

22             Bates SGHT0043645 - 0043673

23 Exhibit 7   Market Scope US Glaucoma        147

24             Quarterly Update, Q1 2022,

25             Bates SGHT0020526 - 0020554

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of Richard Allen Plank
Conducted on May 23, 2023

6 (21 to 24)

---

**21**

1   it's not publicly known?
2       A   Just like I have already answered, just
3   word of mouth and understanding.
4           You go into a given city and there's, you
5   know, eight ophthalmology clinics right around.
6   You go in and you ask and you understand, you
7   know, what do they treat, what's the volume.  So
8   just curiosity discovery questions when we go in
9   and cold call.
10      Q   Is a sales representative's ability to do
11  those cold calls and identify those high volume
12  surgeons important to effectuating a sale of OMNI?
13      A   You cut out on that last part.  Is the
14  sales individual responsibility what?
15      Q   Sure.  Strike that.  Just let me try
16  again.
17          Is a sales representative's ability to go
18  out and identify those potential surgeon targets
19  important to facilitating the sale of OMNI?
20      A   Yes.
21      Q   Let's -- turning back to Plank Exhibit 1.
22  Let me see.
23          Under the ████████████, first
24  entry, the first bullet point says, 6/MO.  What is
25  that referring to?

**22**

1       A   We quantify everything on a monthly
2   average, and then we build that out to what a
3   quarterly average is.  So, you know, to our best
4   guess, because it's not the same week to week or
5   month to right.  Right?  So there's varying
6   levels.  But over a three-month period you can
7   usually guesstimate within a small margin of
8   error.
9           So if we say roughly, you know, 6 a month
10  or so, or 20 per quarter, would be a good
11  guesstimate on any given quarter on the amount of
12  procedures.
13      Q   So 6/MO represents an average of six
14  procedures a month?
15      A   Yes, roughly.  And it's just an average,
16  because it could be ten one month and five the
17  next or four or what-have-you.
18      Q   And next to that first bullet on Plank
19  Exhibit 1 it states, If Hydrus was not available,
20  these would be OMNI cases.
21          Do you see that?
22      A   Yes, I do.
23      Q   Where is that -- strike that.
24          What is that statement based on?
25      A   Based on intel from that individual; and

**23**

1   them calling on that account, asking questions to
2   the staff, asking questions to the surgeon,
3   knowing at one time -- as I mentioned, I trained
4   Dr. Anita Campbell five and a half years ago on
5   her first OMNI and certified her utilizing OMNI.
6   And at that time I know that she was using OMNI
7   more first line and the volume that she was using
8   and continued to use.
9           And then Hydrus was introduced.  And now
10  she does some Hydrus, and approximately that many
11  the prior.  And that we believe that if Hydrus was
12  not available, she would be doing OMNI.
13      Q   So the statement in Plank Exhibit 1, if
14  Hydrus was not available these would be OMNI
15  cases, that's your conclusion?
16      A   That is my rep's conclusion, my
17  conclusion based on historical events.
18      Q   Did Dr. Campbell tell you that if Hydrus
19  was not available, she would purchase OMNI?
20      A   No.
21      Q   The next bullet states, Won't combine
22  canalplasty with Hydrus.
23          Do you see that?
24      A   I do.
25      Q   And is "canalplasty" referring to a

**24**

1   canaloplasty?  Is that another way of saying that?
2       A   Canaloplasty, yes.
3       Q   Yeah.  And is OMNI a form of
4   canaloplasty?
5       A   Yes.
6       Q   So where does the statement -- or strike
7   that.
8           What is the basis for the statement,
9   won't combine canalplasty with Hydrus, in Plank
10  Exhibit 1?
11      A   Our device, OMNI performs two distinct
12  procedures -- one is a canaloplasty, one is a
13  trabeculotomy -- and a lot of surgeons just use
14  that as a standalone.
15          It has never been the direction that I
16  have given to my team or direction from Sight
17  Sciences to go out and use this in adjunct with
18  other mixed procedures, but it is widely done
19  across the industry.
20          And we hear from accounts and reps from
21  Alcon that will reach out to our Sight Sciences
22  reps, and ask to partner with them with some
23  accounts to combine the two procedures.  Because
24  performing the canalplasty with the OMNI surgical
25  system makes it easier, from the feedback that we

---

25

1　have from surgeons, to insert the Hydrus stent.
2　　　And so it was just a comment that she
3　made in our business review that that's something
4　that some doctors don't believe in that practice.
5　She's one that doesn't believe in that practice.
6　Again, it's not one of our marketing directions to
7　do that, because we believe that OMNI standalone
8　is a most efficacious product.
9　　Q　I just want to make sure I understood
10　that correctly.
11　　　Did Dr. Campbell tell you that she will
12　not combine OMNI with Hydrus?
13　　A　She did not tell me that, and I do not
14　know if she told the individual rep that. It was
15　just a note in our conversation, that's not
16　something that she practices or does.
17　　Q　And who made that note?
18　　A　I did.
19　　Q　And you said note in your conversation.
20　　　Is that a note that you made during a
21　conversation with Dr. Campbell?
22　　A　No.
23　　Q　So what conversation did you have in
24　which you made this note?
25　　A　As I shared earlier, when I have business

26

1　reviews with my regional directors and sometimes
2　directly with their surgical sales reps, or it's a
3　conversation that he or she might have with her
4　team that he'll relate to me if I'm asking him
5　questions. Right? I'll just seek to understand.
6　　　As I shared earlier, you know, here is
7　accounts that we have had business. I know that
8　this is a high volume surgeon. What is our
9　opportunity there. What's preventing us in your
10　mind, or your rep's mind, of why we're not getting
11　X amount of business or we've lost business in
12　here.
13　　　So these would be answers from them in
14　terms from street intel in questions that they ask
15　and observations that they make in the field.
16　　Q　So the comment "won't combine canalplasty
17　with Hydrus" in Plank Exhibit 1 is a note that you
18　made during a conversation with one of your
19　regional sales reps.
20　　　Did I understand that correctly?
21　　A　Regional directors, yes. And really it
22　was -- shouldn't have been "won't." Probably
23　mistyped. It should say, don't, doesn't combine,
24　because some doctors do and some doctors don't.
25　　　Again, it's not something that we market

27

1　and sell to. We just acknowledge that some do and
2　some don't by what they tell us. We don't ask
3　them, will you.
4　　Q　Do you have a sense for how widely done
5　it is across the industry to combine OMNI with
6　Hydrus in the same procedure?
7　　A　I do. But it would be just my
8　speculation based on general conversations that I
9　have with my team in my area and then maybe a
10　conversation I have with my counterpart that
11　covered the East.
12　　　And my best guesstimate would be -- you
13　know, it varies from geography to geography, but I
14　would guesstimate 30 to 40 percent. Again, that's
15　just, you know, my math based on conversations
16　that I have with my team.
17　　Q　And so I'm understanding that correctly,
18　30 to 40 percent of OMNI sales are a combination
19　of OMNI and Hydrus in the same procedure.
20　　　Is that what you meant?
21　　A　Yes. I would say best guess. And again,
22　strictly a guess. I don't have anything to
23　validate that.
24　　Q　But your estimate of 30 percent to 40
25　percent of OMNI sales being combined OMNI/Hydrus

28

1　is based on your experience in the field selling
2　these things and speaking to reps?
3　　A　Yes. I can speak directly to a lot of
4　accounts that I have been in the OR with or
5　surgeons, just like Dr. Anita Campbell, that were
6　OMNI users within the last year plus, two years.
7　Right?
8　　　As doctors get creative in terms of how
9　they treat, then I do know that the Invantis reps
10　and then Alcon reps, what I hear from my sales
11　team, that then they will come in and try to
12　partner. Or they'll go in and they'll say, hey,
13　you're using OMNI, why don't you do this and
14　insert. And that's how it started; they started
15　to piggyback on a lot of the business that we had.
16　　Q　Now, you testified that combining OMNI
17　with Hydrus is not something that Sight Sciences
18　markets.
19　　　Did I understand that correctly?
20　　A　Yeah. It's not the company strategy and
21　it's nothing that I have ever coached or directed
22　my team to do.
23　　Q　As part of the conversations you have
24　with potential accounts when marketing OMNI, do
25　you note that OMNI can be combined with Hydrus in

<u>**CERTIFICATE OF SERVICE**</u>

I, Karen E. Keller, hereby certify that on June 28, 2023, this document was served on

zsightsciencesivantis@cooley.com and the persons listed below in the manner indicated:

<u>**BY EMAIL**</u>

| | |
|---|---|
| Melanie K. Sharp | Michelle S. Rhyu, J.D., Ph.D. |
| James L. Higgins | David N. Murdter |
| Taylor E. Hallowell | Lauren Strosnick |
| YOUNG, CONAWAY, STARGATT & TAYLOR LLP | Alissa Wood |
| Rodney Square | Cameron C. Vanderwall |
| 1000 North King Street | Angela R. Madrigal |
| Wilmington, DE 19801 | Juan Pablo Gonzalez |
| (302) 571-6600 | COOLEY LLP |
| msharp@ycst.com | 3175 Hanover Street |
| jhiggins@ycst.com | Palo Alto, CA 94305 |
| thallowell@ycst.com | (650) 843-5000 |
| | rhyums@cooley.com |
| Orion Armon | dmurdter@cooley.com |
| COOLEY LLP | lstrosnick@cooley.com |
| 1144 15th Street, Suite 2300 | amwood@cooley.com |
| Denver, CO 80202 | cvanderwall@cooley.com |
| (720) 566-4000 | jgonzalez@cooley.com |
| oarmon@cooley.com | amadrigal@cooley.com |
| | |
| Dustin M. Knight | Bonnie Fletcher Price |
| COOLEY LLP | COOLEY LLP |
| 11951 Freedom Drive, 14th Floor | 1299 Pennsylvania Avenue, NW |
| Reston, VA 20190 | Suite 700 |
| (703) 456-8024 | Washington, DC 20004 |
| dknight@cooley.com | (202) 776-2099 |
| | bfletcherprice@cooley.com |

*/s/ Karen E. Keller*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants*