IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SIGHT SCIENCES, INC.,      )
     )
     Plaintiff,      )
     )
     v.      )
     )
IVANTIS, INC., ALCON RESEARCH LLC,      )
ALCON VISION, LLC AND ALCON INC.,      )
     )
     Defendants.      )

C. A. No.: 21-1317-GBW-SRF

**JURY TRIAL DEMANDED**

██████████████████

**Redacted - Public Version Filed on:
November 14, 2023**

**SIGHT SCIENCES, INC.'S ANSWERING BRIEF
IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE
<u>CERTAIN OPINIONS OF MR. JOHN JAROSZ AND DR. CRAWFORD DOWNS</u>**

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

*Attorneys for Sight Sciences, Inc.*

Dated:  November 2, 2023

COOLEY LLP
Michelle S. Rhyu
Jeffrey Karr
Lauren Strosnick
Alissa Wood
Juan Pablo González
Angela R. Madrigal
3175 Hanover Street
Palo Alto, CA  94304-1130
(650) 843-5000

Orion Armon
1144 15th Street, Suite 2300
Denver, CO  80202-2686
(720) 566-4000

Dustin M. Knight
Joseph Van Tassel
Reston Town Center
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
(703) 456-8000

Bonnie Fletcher Price
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
(202) 842-7800

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  NATURE AND STAGE OF PROCEEDINGS ................................................... 1

III.  SUMMARY OF ARGUMENTS ......................................................................... 1

IV.  LEGAL STANDARD .......................................................................................... 2

V.  ARGUMENTS ..................................................................................................... 2

    A.  Jarosz Properly Relied on Facts from Witnesses with Knowledge ............. 2

        1.  The questionnaire was not meant to be a "scientific survey" .......... 3

        2.  The questionnaire responses are reliable and corroborated ............ 4

    B.  Defendants' Complaints Regarding How Jarosz Calculated Incremental Costs for His Lost Profits Analysis Go to Weight—Not Admissibility ............. 5

    C.  Jarosz's Price Premium Analysis—Which Is One Step in his Reasonable Royalty Calculation—Is a Reliable Methodology ........................................ 7

    D.  Downs and Jarosz's Apportionments are Proper and Tethered to the Evidence ....................................................................................................... 10

        1.  Courts approve of Downs' methodology of apportioning features that differentiate Hydrus over competing products ............................... 11

        2.  Jarosz relied on Downs' apportionment review and conducted his own ................................................................................................... 14

        3.  Jarosz's Market Approach properly apportioned Ivantis' and Alcon's contributions to Hydrus from patented features ...................... 15

    E.  Jarosz Properly Relied on the Glaukos License Agreement ...................... 16

        1.  The Glaukos license is a reliable indicator of an appropriate royalty ...... 17

            a.  Alcon considered the 10% rate a ▮▮▮▮—showing its reliability ............................................................................ 17

            b.  The litigation and economic circumstances cited by Defendants do not make the Glaukos license an unreliable comparator ...................................................................... 17

                (1)  Court rulings do not render the license non-comparable ....................................................... 18

                (2)  The Alcon acquisition does not affect comparability ...... 19

        2.  Downs' comparability analysis of the patents is reliable ........................ 19

    F.  Downs Stayed Well Within His Lane of Expertise ............................................ 20

    G.  Downs Applied the Court's Claim Constructions ............................................ 20

    H.  Downs Appropriately Responded to Tanna's Invalidity Arguments .................. 24

**TABLE OF CONTENTS**
(continued)

**Page**

VI.     CONCLUSION.................................................................................................................. 25

## TABLE OF ABBREVIATIONS

| Document/Item | Abbreviation |
|---|---|
| U.S. Patent No. 11,389,328 (D.I. 59, Ex. E) | "'328" |
| U.S. Patent No. 9,486,361 (D.I. 1-1, Ex. C) | "'361" |
| Petition for Inter Partes Review Under 37 C.F.R. § 42.101 | "'443 IPR Pet." |
| Declaration of Dr. Michael Reynard Regarding U.S. Patent No. 9,370,443, filed in *Ivantis, Inc. v. Sight Sciences, Inc.*, IPR2022-01529 (P.T.A.B), Ex. 1001 | "'443 IPR Reynard Decl." |
| U.S. Patent No. 9,370,443 (D.I. 1-1, Ex. B) | "'443" |
| U.S. Patent No. 8,287,482 (D.I. 1-1, Ex. A) | "'482" |
| U.S. Patent No. 10,314,742 (D.I. 1-1, Ex. D) | "'742" |
| 8/1/2022 Second Amended Complaint, D.I. 59 | "2d Am. Complaint" |
| 6/20/2023 Transcript of Deposition of Todd Abraham, Defendants' witness designated on Sight Sciences' Rule 30(b)(6) Topic Nos. 1 (as to research and development, manufacturing, and regulatory departments), 3 (as to conception, design, development, and testing), 11 (as to acceptable non-infringing alternatives to the Hydrus® Microstent and/or Patents-in-Suit), 12 (as to known non-infringing alternatives to the Patents-in-Suit), 21 (Alcon) / 22 (Ivantis), and 67 (Alcon) /69 (Ivantis) | "Abraham Tr." |
| 6/16/2023 Transcript of Deposition of Jasmine Ainetchian, Defendants' witness designated on Sight Sciences' Rule 30(b)(6) Topic Nos. 3 (as to sales, outreach to physicians, and international marketing), 31, 32, 34-36 (Alcon) / 37 (Ivantis), 38, 39, 40, 43, 47, 48 (as to business model or strategy), 55, 56, 71 (as to shareholders), 72, 75 (as to investors, customers, physicians, and key opinion leaders) | "Ainetchian Tr." |
| Ivantis, Inc., Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc. | "Defendants" |
| Defendants' Brief in Support of Their Motion to Exclude Certain Opinions of Mr. John Jarosz and Dr. Crawford Downs, D.I. 294 | "Defs' Daubert" |
| [Proposed] Order on Defendants' Motion to Exclude Certain Opinions of Mr. John Jarosz and Dr. Crawford Downs, D.I. 293-1 | "Defs' Proposed Order" |
| Exhibits attached to the Declaration of Noah Frank in Support of Defendants' Motion to Exclude and Motion for Summary Judgment, D.I. 298 | "Defs' Ex." |

| Document/Item | Abbreviation |
|---|---|
| 9/22/2023 Transcript of Deposition of J. Crawford Downs, Ph.D., Sight Sciences' Expert Witness on Infringement | "Downs 9/22 Tr." |
| 9/28/2023 Transcript of Deposition of J. Crawford Downs, Ph.D., Sight Sciences' Expert Witness on Infringement | "Downs 9/28 Tr." |
| 7/13/2023 Opening Expert Report of Dr. J. Crawford Downs on Infringement of U.S. Patent Nos. 8,287,482; 9,370,443; 9,486,361; 10,314,742; and 11,389,328 | "Downs Op." |
| 8/22/2023 Corrected Rebuttal Expert Report of Dr. J. Crawford Downs on Invalidity of U.S. Patent Nos. 8,287,482; 9,370,443; 9,486,361; 10,314,742; and 11,389,328 | "Downs Reb." |
| 9/7/2023 Reply Expert Report of Dr. J. Crawford Downs on Infringement of U.S. Patent Nos. 8,287,482; 9,370,443; 9,486,361; 10,314,742; and 11,389,328 | "Downs Reply" |
| Exhibits attached to the Declaration of Lauren Strosnick In Support of Sight Sciences. Inc.'s Opening Brief In Support of Its Motions for Summary Judgment and to Exclude Expert Testimony | "Ex. 1" through "Ex. 84" |
| Exhibits attached to the Declaration of Lauren Strosnick In Support of Sight Sciences. Inc.'s Answering Brief in Opposition to Defendants' Motions for Summary Judgment of Invalidity and Answering Brief in Opposition to Defendants' Motion to Exclude Certain Opinions of Mr. John Jarosz and Dr. Crawford Downs, filed concurrently herewith | "Ex. 85" through "Ex. 133" |
| U.S. Food and Drug Administration | "FDA" |
| 8/172023 Expert Report of Professor David Gal, Ph.D. | "Gal Reb." |
| 9/15/2023 Transcript of Deposition of David Gal, Ph.D., Defendants' Expert | "Gal Tr." |
| 7/13/2023 Opening Expert Report of Dr. John Galanis on Infringement of United States Patent Nos. 9,486,361; 10,314,742; and 11,389,328 | "Galanis Op." |
| 7/13/2023 Expert Report of John C. Jarosz, Sight Sciences' Expert Witness on Damages | "Jarosz Op." |
| 9/7/2023 Reply Expert Report of John C. Jarosz | "Jarosz Reply" |
| 9/13/2023 Transcript of Deposition of John C. Jarosz, Plaintiff's Expert on Damages | "Jarosz Tr." |
| 8/16/2023 Rebuttal Expert Report of Andrew G. Iwach, M.D., Defendants' Expert on Infringement | "Iwach Reb." |
| 5/25/2023 Transcript of Deposition of Charles J. Marshall, Defendants' witness designated on Sight | "Marshall Tr." |

| Document/Item | Abbreviation |
|---|---|
| Sciences' Rule 30(b)(6) Topic Nos. 3 (as to domestic and marketing documents), 37, 42, 44, 45, 46, 53, 85, and 86 | |
| 8/17/2023 Expert Rebuttal Report of Paul K. Meyer on Damages | "Meyer Reb." |
| 9/27/2023 Transcript of Deposition of Paul K. Meyer, Defendants' Expert on Damages | "Meyer Tr." |
| 6/15/2023 Transcript of Deposition of Brandon Mojica, Defendants' witness designated on Sight Sciences' Rule 30(b)(6) Topic Nos. 2, 3 (as to financial documents), 21 (Alcon) /22 (Ivantis) (as to date of first sale), 22 (Alcon) /23 (Ivantis), 23 (Alcon) /24 (Ivantis), 25 (Alcon) /26 (Ivantis), 26 (Alcon) /27 (Ivantis), 27 (Alcon) /28 (Ivantis), 35 (Alcon) /36 (Ivantis), 41 (Alcon) /42 (Ivantis), 48 (Ivantis) (as to finances and financial statements), 49 (Alcon), 50, 51, 52 | "Mojica Tr." |
| 7/13/2023 Declaration of Mark Papini | "Papini Decl." |
| 8/2/2023 Transcript of Deposition of Mark Papini, Plaintiff's witness designated on Defendants Rule 30 (b)(6) Topic Nos. 17, 18 (as to information in Sight's possession regarding Hydrus), and 26, as well as Topic Nos. 6, 14 (solely as to Sight's knowledge of inducement of infringement by Ivantis or Alcon implantation of Hydrus with or without OMNI, Streamline, or other methods for injecting viscoelastic into the canal), 19, 22, 23, 24, 28 (as to marketing or sales agreements with third-parties), 30, 32-38, 39 (as to irreparable harm from defendants' conduct), and 52 (as to capacity to sell and market) | "Papini 8/2 Tr." |
| Sight Sciences, Inc.'s Answering Brief in Opposition to Defendants' Motions for Summary Judgment of Invalidity, Motion No. 3: The Asserted Claims Are Not Indefinite, being filed concurrently herewith | "Sight's Ans. Br. to Defs' MSJ No. 3" |
| 8/26/2023 Sight Sciences, Inc.'s Corrected Initial Infringement Contentions | "Sight's Corrected Initial Infringement Contentions" |
| 11/10/2023 Plaintiff Sight Sciences, Inc.'s Opening Claim Construction Brief | "Sight's Opening CC Br" |
| 7/13/2023 Opening Expert Report of Angelo P. Tanna M.D., Defendants' Expert on the Invalidity of U.S. Patent Nos. 8,287,482; 9,370,443; 9,486,361; 10,314,742; and 11,389,328 | "Tanna Op." |
| 8/16/2023 Rebuttal Expert Report of Angelo P. Tanna, M.D. | "Tanna Reb." |

| Document/Item | Abbreviation |
|---|---|
| 9/7/2023 Reply Expert Report of Angelo P. Tanna, M.D. On the Invalidity of U.S. Patent Nos. 8,287,482; 9,370,443; 9,486,361; 10,314,742; and 11,389,328 | "Tanna Reply" |
| 6/6/2023 Transcript of Deposition of Jason Weems, Defendants' witness designated on Sight Sciences' Rule 30(b)(6) Topic Nos. 4, 48, 57, 58, 59, 60, 64, 66, 67, 69, 74, 76, 80, 81, 82 | "Weems Tr." |

## **TABLE OF AUTHORITIES**

**Cases**

*10x Genomics, Inc. v. NanoString Techs., Inc.*, C.A. No. 21-653-MFK,
    2023 WL 5805585 (D. Del. Sept. 7, 2023) ............................................................................16

*ActiveVideo Networks, Inc. v. Verizon Commc'ns*,
    694 F.3d 1312 (Fed. Cir. 2012) ........................................................................................2, 19

*Apple Inc. v. Motorola, Inc.*,
    757 F.3d 1286 (Fed. Cir. 2014), *overruled on other grounds*, *Williamson v.*
    *Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ........................................................8, 11

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
    876 F.3d 1350 (Fed. Cir. 2017) ...........................................................................................13

*AstraZeneca AB v. Apotex Corp.*,
    782 F.3d 1324 (Fed. Cir. 2015) ..............................................................................17, 18, 19

*Bayer Healthcare LLC v. Baxalta Inc.*,
    407 F.Supp.3d 462 (D. Del. 2019) ......................................................................................8, 11

*Bazemore v. Friday*,
    478 U.S. 385 (1986) ..................................................................................................................7

*Bd. of Regents Univ. of Tex. Sys. v. Bos. Sci., Corp.*,
    645 F.Supp.3d 324 (D. Del. 2022) ...............................................................................*passim*

*Cirba Inc. v. VMware, Inc.*, C.A. No. 19-742-GBW,
    2023 WL 3151853 (D. Del. Apr. 18, 2023) .......................................................11, 12, 13, 21

*Cordis Corp. v. Medtronic Ave, Inc.*,
    511 F.3d 1157 (Fed. Cir. 2008), *supplemented sub nom. Cordis Corp. v. Bos.*
    *Sci. Corp.*, 275 F. App'x 966 (Fed. Cir. 2008) ....................................................................25

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ..................................................................................................................2

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Group*,
    879 F.3d 1332 (Fed. Cir. 2018) ...........................................................................................15

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ................................................................................................................14

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*,
    540 F.3d 1337 (Fed. Cir. 2008) ...........................................................................................24

*Kannankeril v. Terminix Int'l Inc.*,
128 F.3d 802 (3d Cir. 1997)............................................................................................2

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012)........................................................................................18

*Limelight Networks, Inc. v. XO Commc'ns, LLC*,
No. 3:15-CV-720-JAG, 2018 WL 678245 (E.D. Va. Feb. 2, 2018)......................................16

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)....................................................................................10

*MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 11-CV-5341,
2014 WL 2854890 (N.D. Cal. June 20, 2014)..................................................................9

*Micro Chem., Inc. v. Lextron, Inc.*,
317 F.3d 1387 (Fed. Cir. 2003).....................................................................................15

*Moskowitz Fam. LLC v. Globus Med., Inc.*, C.A. No. 20-3271,
2023 WL 5487662 (E.D. Pa. Aug. 24, 2023) ............................................................18, 20

*Nortek Air Solutions, LLC v. Energy Lab Corp.*, No. 14-cv-02919,
2016 WL 3856250 (N.D. Cal. July 15, 2016)..................................................................12

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008).....................................................................................23

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994)..............................................................................................2

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)................................................................................20, 23

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
904 F.3d 965 (Fed. Cir. 2018).........................................................................................7

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010)..................................................................................17, 18

*In re TMI Litig.*,
193 F.3d 613 (3d Cir. 1999).......................................................................................2, 4

*UCB, Inc. v. Teva Pharms. USA, Inc.*, No. 1:12-CV-4420,
2015 WL 11199058 (N.D. Ga. Mar. 18, 2015)..................................................................9

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)........................................................................10, 14, 16

*Walker v. Gordon,*
  46 F. App'x 691 (3d Cir. 2002) ............................................................................2, 7

*W.R. Grace & Co.—Conn., v. Intercat, Inc.,*
  60 F.Supp.2d (D. Del. 1999) .........................................................................................6

## I.     INTRODUCTION

Defendants' *Daubert* attacks fail.  Sight's damages expert, John Jarosz, and its technical expert, Dr. Crawford Downs, are well-qualified, employ appropriate methodologies, and base their opinions on adequate facts and data.  Defendants' scattershot complaints are unfounded or raise issues that go to the weight of their opinions, so their *Daubert* motions should be denied.

## II.    NATURE AND STAGE OF PROCEEDINGS

Sight Sciences, Inc. ("Sight") filed suit against Ivantis, Inc. ("Ivantis") on September 16, 2021.  (D.I. 1.)  Alcon Research LLC, Alcon Vision, LLC, and Alcon Inc. (collectively, "Alcon") were named defendants in summer 2022.  (D.I. 59.)  Trial is set for April 8, 2024.  (D.I. 93, ¶19.)

## III.   SUMMARY OF ARGUMENTS

Sight's experts complied with the requirements to testify under Federal Rule of Evidence 702 and the Supreme Court's *Daubert* standard.  Defendants' attacks fail for these reasons:

1.     Sight's damages expert, Jarosz, did not rely on an improper scientific survey; he relied on a corroborated questionnaire to support the fact, not the amount, of damages.

2.     Jarosz applied a commonly-accepted methodology to calculate incremental costs, and inputs from Sight's management were aligned with the small (6%) amount of lost profits sales.

3.     Jarosz used reliable data that Defendants and their own expert also use for the first part of his incremental benefits reasonably royalty analysis, the price premium calculation.

4.     Jarosz and Sight's technical expert, Downs, used apportionment methodologies for the second step of Jarosz's apportionment analysis that were reliable and approved by this Court.

5.     Jarosz appropriately relied on the Glaukos license, which Alcon admits was reliable by characterizing its 10% royalty as a ███ and Downs and Jarosz established comparability.

6.     Downs never strayed outside his areas of expertise.

7.     Downs did not apply new claim constructions; Downs carefully applied the Court's

constructions to the facts of this case.

       8.     Downs' strain analysis used a reliable and scientifically supported method.

## IV.   LEGAL STANDARD

Rule 702 allows for relevant, reliable opinion testimony from a qualified expert. *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 589 (1993). The standard for determining reliability is "not that high." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994). "The test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research." *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999). "Rather, the test is whether the 'particular opinion is based on valid reasoning and reliable methodology.'" *Id.* (quoting *Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). "[C]ross-examination, presentation of contrary evidence, and careful instruction" are the preferred means for attacking expert testimony. *Daubert*, 509 U.S. at 596. "Determinations regarding the weight to be accorded, and the sufficiency of, the evidence relied upon by the proffered expert, are within the sole province of the jury." *Walker v. Gordon*, 46 F. App'x 691, 695 (3d Cir. 2002). Disagreement with an expert's opinions is no basis for exclusion. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns*, 694 F.3d 1312, 1333 (Fed. Cir. 2012).

## V.   ARGUMENTS

### A.   <u>Jarosz Properly Relied on Facts from Witnesses with Knowledge</u>

Jarosz cited responses to a questionnaire sent to Sight's sales force. (Ex. 107 (Jarosz Op.) ¶¶64, 88, 162, 226-233.) The questionnaire asked Sight's sales representatives to: (1) list accounts that had been harmed by competition with Defendants; and (2) list potential accounts that refuse to try OMNI because of Hydrus. (Defs' Daubert at 2; Defs' Ex. 50.) Jarosz relied on the sales representatives' responses for limited purposes: (1) to document direct competition between Ivantis and Sight through the overlap in accounts (Ex. 107 (Jarosz Op.) ¶¶64, 88, 162); and (2)

document instances where Hydrus displaced OMNI or precluded Sight from obtaining new customers.  (*Id.* ¶¶226, 229.)  Jarosz used the responses as one piece of evidence to show the **fact** that Sight had lost sales, not to calculate the **amount**.  (*Id.* ¶¶226-233.)  Defendants move to exclude Jarosz's reliance on the questionnaire—not because they can show that any of the answers are inaccurate, but because they do not like the way Sight asked the questions.  (*See generally* Defs' Daubert, Section III; D.I. 293-1 (Defs' Proposed Order to Exclude Jarosz ¶¶64, 88, 162, 226-233).)  Such argument does not support exclusion of the responses or Jarosz's opinions.

### 1.    The questionnaire was not meant to be a "scientific survey"

The crux of Defendants' argument is that the questionnaire did not meet the standards for a scientific survey.  (Ex. 108 (Gal Reb.) ¶21 ("Trial counsel's questionnaire is not a scientific or valid survey, and thus the results of the questionnaire are unreliable.").)  Defendants' complaint is a strawman.  **The questionnaire was not meant to be a scientific survey, but rather an efficient way to obtain relevant information from witnesses with knowledge about the fact of damages**.  Defendants agree that a scientific survey is not the only method to obtain reliable information.  (Ex. 109 (Gal Tr.) 115:16-23.)  Defendants also cannot dispute that Sight's sales representatives have relevant facts—including what competing products their customers buy.  (*Id.* 34:21-35:1, 36:23-37:21; Ex. 110 (Papini 8/2 Tr.) 145:18-146:1 (testifying that sales managers "know their business very well, . . ."); D.I. 225 at 5 (Defendants arguing that Sight's sales representatives are "likely to have information related to [Ivantis' promotion of Hydrus]").)

Obtaining facts from witnesses with knowledge is a reliable way to identify where there were lost sales.  The Reference Guide on Survey Research from the Federal Judicial Center, which Defendants' survey expert, Dr. Gal cites, says: "surveys are not the only means of demonstrating particular facts, . . ." and "[a] party using a nonsurvey method generally identifies several witnesses who testify about their own characteristics, experiences, or impressions."  (Ex. 111 (Gal Tr. Ex. 3)

3

at *9.)  That is what Sight did here.  The questionnaire was a non-survey method to collect relevant information, so Defendants' complaints are irrelevant: "[i]f you're saying that the party is not conducting a survey, then I wouldn't believe that the rules of a survey apply to something that's not being conducted as intended to be a survey."  (Ex. 109 (Gal Tr.) 19:11-20:19.)  Defendants' argument that Sight's non-survey approach was a bad survey is no basis to exclude Jarosz's reliance on the questionnaire.  Defendants also allege "double-hearsay," but an expert can rely on hearsay if it is the type of information that experts rely upon.  *See In re TMI Litig.*, 193 F.3d at 697.  Experts routinely rely on information received from witnesses with knowledge.

### 2.      The questionnaire responses are reliable and corroborated

Moreover, Defendants cannot establish that the questionnaire is unreliable for Jarosz's purposes.  First, Defendants do not dispute competition between OMNI and Hydrus or overlap in accounts—the very bases for Jarosz's reliance on the questionnaire.  (Ex. 107 (Jarosz Op.) ¶¶64, 88, 162.)  Defendants' damages expert **admits** that OMNI and Hydrus compete.  (Ex. 112 (Meyer Tr.) 72:12-17 ("And all I'm saying is I'm not disputing that OMNI competes with -- with Hydrus. I recognize that.  I recognize there [are] lots of documents that reference that."); *see also* Ex. 113 (Meyer Reb.) Attachment 12 (█████Hydrus Customers Overlapping with Sight Customers); Ex. 114 (Jarosz Reply) Tab 3 (comparison showing overlap of all Sight and Ivantis customer accounts); Ex. 116 ¶¶2, 3, 7, 12.)  The Court should not strike Jarosz's reliance on the questionnaire where Defendants do not dispute that the conclusions he drew from it are correct.

Defendants do not dispute the truth of any of the responses.  It is undisputed that Sight sales representatives know the relevant facts.  (Ex. 109 (Gal Tr.) 34:21-35:1, 36:23-37:21; Ex. 110 (Papini 8/2 Tr.) 145:18-146:1; D.I. 225 at 5.)  And Defendants' expert did not assess the accuracy of any response.  (Ex. 109 (Gal. Tr.) 116:2-117:6 ("I don't have any opinion on whether [the responses are] factually accurate or not . . . ."), 69:17-70:1.)  Gal's sole critique is that the way the

questions were asked **might** lead to incorrect answers—not that they did.  (*Id.* 61:24-62:13, 116:2-22.)  The responses were verified by Mark Papini and other witnesses.  (Ex. 110 (Papini 8/2 Tr.) 144:24-146:5; 153:2-18; 154:7-155:12; 195:9-14; 199:1-15; Ex. 116 ¶12.)  And Defendants' document shows their "sales by geography" for the period 2018-2021, which further corroborates responses provided by Sight sales representatives.  (Ex. 109 (Gal Tr.) 63:11-65:7 (Gal acknowledging (1) questionnaire response showed account lost to Hydrus in March 2020, and (2) document corroborated sales for that account in 2020), 67:2-68:13 (same for other customer).)

Unlike the non-survey process suggested by the academic article Gal cited, Sight was transparent about its process.  (*See* Ex. 111 (Gal Tr. Ex. 3) at \*9 ("[T]he party [using a non-survey method] is not likely to select witnesses whose attributes conflict with the party's interests.").)  Sight sent the questionnaire to **all** its sales representatives and disclosed **all** responses.  (*See* Ex. 115 (Gal Tr. Ex. 2) at 2 ██████████████████████████████████)  The fact that the questionnaire yielded varied responses disproves Defendants' claims of bias.

### B. Defendants' Complaints Regarding How Jarosz Calculated Incremental Costs for His Lost Profits Analysis Go to Weight—Not Admissibility

Defendants next take issue with Jarosz's reliance on information in a sworn declaration submitted by Mark Papini in order to calculate incremental costs for his lost profits analysis.  (Ex. 107 (Jarosz Op.) ¶97.)  Defendants quote a couple of deposition soundbites to argue that Papini was not qualified to supply the information.  (Defs' Daubert at 5-6.)  Those soundbites do not justify exclusion of Jarosz's lost profits calculations.  Defendants do not dispute the correctness of the incremental costs Papini identified—██████████████████████████████████ Nor do Defendants disagree with ██████████████████████████ ██████████████████████████████ Defendants' argument boils down to disagreement over Papini's statement that those costs are the "only" incremental

costs.  (*Id.*)  Jarosz had ample reason to accept Papini's declaration and 30(b)(6) testimony.

First, Defendants' damages expert, Paul Meyer, agrees that an expert can rely on information from management if they are qualified to provide it.  (Ex. 113 (Meyer Reb.) ¶121.)  In fact, Meyer relied on information from Defendants' management extensively, especially for his opinion on the purported "availability of design arounds."  (*Id.* ¶¶154-159 (extensively citing "Input from Todd Abraham.")  This District has approved of the same methodology.  *See W.R. Grace & Co.—Conn., v. Intercat, Inc.*, 60 F.Supp.2d, 316, 325 (D. Del. 1999) ("The patent owner's view as to which of its costs are fixed or variable is entitled to credit based on its familiarity with its own costs.")  Papini is Sight's Vice President of Glaucoma Sales and knows the costs associated with making sales.  (Ex. 116 ¶¶1-3.)  Sight's Controller, Jim Rodberg, confirmed Papini's knowledge and the substance of Papini's declaration.  (Ex. 114 (Jarosz Reply) ¶71 n.149.)

Second, Jarosz had ample reason to believe that the "only" incremental costs were ███████████████████████████████████████████████████████████—the magnitude of the incremental sales.  (*Id.* ¶¶56-71.)  Jarosz concluded that if Sight had captured the sales lost to Defendants, it would have needed to increase production and sales by just ████  (*Id.* ¶59.)  Jarosz reliably concluded that Sight could capture such a small increase without incurring additional overhead costs.  (*Id.* ¶59 & n.117.)  Jarosz's conclusion was particularly reasonable given the stage of Sight's development as a company, the fact that it had built for growth, and numerous other factors.  (*Id.* ¶¶56-71.)  Jarosz cited academic literature for his opinion that "very few costs, beyond costs of goods sold, vary with small activity level changes."  (*Id.* ¶59 & n.117.)  And Jarosz relied on the fact that Sight, a public company, announced to investors that it was targeting 30% revenue growth while maintaining the **same** level of operating (non-manufacturing) expenses.  (*Id.*)  Jarosz's detailed, fact-based explanation of his conclusions is more than enough

to defeat Defendant's *Daubert* challenge.  (*Id.* ¶¶56-71.)

To avoid grappling with the valid responsive points made in Jarosz's reply report, Defendants argue that the Court should ignore them because they are "new" opinions.  (Defs' Daubert at 7.)  Jarosz offered no new opinions.  Jarosz confirmed his conclusions (Ex. 114 (Jarosz Reply) ¶59 (citing Ex. 107 (Jarosz Op.) at 50 & Tabs 8, 15)), explained the flaws in the criticisms by Meyer, and explained why his original opinion, based on Papini's sworn declaration, that the "only" incremental costs were ███████████████████████████ was correct. (Ex. 114 (Jarosz Reply) ¶¶56-71.)  Defendants' attacks go to the weight of Jarosz's opinion—not its admissibility.  *See Walker*, 46 F. App'x at 695 ("Determinations regarding the weight to be accorded, and the sufficiency of, the evidence relied upon by the proffered expert, are within the sole province of the jury.").  Defendants' complaint that Jarosz should have included more analysis in his opening report's incremental cost assessment is not a basis to exclude his entire lost profits opinion.  *See Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J. concurring) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.").

### C.   Jarosz's Price Premium Analysis—Which Is One Step in his Reasonable Royalty Calculation—Is a Reliable Methodology

Despite Jarosz employing a court-approved methodology to determine a reasonable royalty, Defendants move to exclude both aspects of his underlying Incremental Benefits analysis—his calculation of the profit premium and his and Downs' apportionment analyses. (Defs' Daubert, Sections V, VI.)  Defendants' arguments—addressed in this section and the next— against Jarosz's methodology are meritless.

"A patentee is only entitled to a reasonable royalty attributable to the infringing features." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018). "Thus, 'to be admissible, all expert damages opinions must separate the value of the allegedly

infringing features from the value of all other features.'" *Bd. of Regents Univ. of Tex. Sys. v. Bos. Sci., Corp.*, 645 F.Supp.3d 324, 328-29 (D. Del. 2022) (citation omitted).   One approach is to "estimate the value of the benefit provided by the infringed features by [] comparing the accused product to non-infringing alternatives." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014), *overruled on other grounds*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).   Jarosz took that approach here and it complied fully with Federal Circuit apportionment requirements.  (Ex. 107 (Jarosz Op.) ¶113.)

Jarosz's Incremental Benefits approach consists of many steps.  (*Id.* ¶¶113-125.)  Jarosz first identifies the profits that might be attributable to the patents by comparing the profit of Hydrus and the Glaukos iStent.  (*Id.* ¶¶114-115, 121.)  Jarosz reasonably believed the iStent to be a close non-infringing alternative.  (*Id.* ¶123; Ex. 117 (Jarosz Tr.) at 41:6-9.)  In so doing, Jarosz accounted for the revenues and profits that are earned by infringing and non-infringing products which cannot be attributed to the patented features.  Jarosz then considered the Hydrus profit premium, or extra profits, as the "upper bound" of the incremental benefit that might be attributed to the Asserted Patents.  (Ex. 107 (Jarosz Op.) ¶¶121-125.)  For the second part of his analysis, Jarosz independently reviewed the evidence <u>and</u> relied on the apportionment analysis of Downs to identify which of the factors that differentiate Hydrus over iStent are attributable to the Asserted Patents.  (*Id.* ¶¶125, 181-189.)  Jarosz applied an apportionment factor to that profit premium, or those extra profits.  Courts, including this Court, approve of Jarosz' methodology.  *See UT Bd. of Regents*, 645 F.Supp.3d at 331-32, 334 (admitting reasonable royalty opinion that used same approach—calculating "profit premium" and then relying on technical assessment to apportion 90% of that premium to the asserted patents); *Bayer Healthcare LLC v. Baxalta Inc.*, 407 F.Supp.3d 462, 481 (D. Del. 2019); *see also Apple*, 757 F.3d at 1318.

Defendants assert that Jarosz opines that "any purported 'price premium' . . . is as a result of Hydrus practicing the Asserted Patents." (Defs' Daubert at 8.) Defendants blatantly misstate Jarosz's opinion. After calculating the profit premium, Jarosz determined how much of the profit premium was attributable to the patents and how much was not, based on his own analysis and Downs' technical apportionment analysis. (Ex. 107 (Jarosz Op.) ¶¶125, 189.)

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████

Defendants next argue that Jarosz calculated the price premium using unreliable data. (Defs' Daubert at 8-9.) Like the expert in *UT v. Boston Scientific*, Jarosz isolated the price premium by calculating the difference in the Average Sales Price ("ASP") between Hydrus and iStent as of mid-2018, corresponding to the date of the hypothetical reasonable royalty negotiation here. *See UT Bd. of Regents*, 645 F.Supp.3d at 331. Lacking actual pricing data from Glaukos, Jarosz estimated the iStent ASP using the most reliable and timely data available: a 2019 quarterly report from a third-party data provider, Market Scope. (*See* Ex. 107 (Jarosz Op.) Tab 9 (citing IVANTIS_SS_00013107 at 13128); *see also* Defs' Ex. 37.) Experts routinely rely on such third-party data for damages calculations. *See UCB, Inc. v. Teva Pharms. USA, Inc.*, No. 1:12-CV-4420, 2015 WL 11199058, at *6-7 (N.D. Ga. Mar. 18, 2015) (denying motion to exclude opinion that relied on third-party sales data for lost profits analysis); *MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 11-CV-5341, 2014 WL 2854890, at *5 (N.D. Cal. June 20, 2014) (expert estimated U.S. sales by using publicly available data from a third-party analyst). In fact, Meyer also relied heavily on Market Scope reports in his analysis. (*See, e.g.*, Ex. 113 (Meyer Reb.) ¶¶46-

63, 95-96.)  Meyer relied on the exact Q1 2019 report that Defendants now attack.  (*See id.* ¶204 & n.489.)  Defendants rely on Market Scope in their normal course of business, too.  (*See* Ex. 120 (IVANTIS_SS_00228953); *see also* Ex. 121 (Mojica Tr.) 74:4-12 ("[T]he Market Scope report is primarily what [Alcon] use[s] . . . ."); Ex. 122 (Marshall Tr.) 72:19-73:6, 124:2-12.)

To attack reliability, Defendants cherry-picked Market Scope data from a single quarter for a soundbite that the data was off "by an order of magnitude."  (Defs' Daubert at 7-9.)  But Jarosz did not rely only on data from that quarter.  And as Jarosz showed, Market Scope's aggregate estimates over time closely track actual sales data.  For example, for the period from August 2018 through 2022, Sight reported sales of ███ units of OMNI in the U.S. (Ex. 107 (Jarosz Op.) Tab 8, sum of [A][1] through [E][1].)  For that same period, Market Scope reported total U.S. OMNI procedures of 127,429.  (*Id.* Tab 8 & Tab 10.)  ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

The difference between Market Scope's and the parties' data is nowhere near an "order of magnitude."  *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009) ("[A] reasonable royalty analysis necessarily involves an element of approximation and uncertainty." (internal quotations and citation omitted)); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014) ("absolute precision" not required).

### D.    <u>Downs and Jarosz's Apportionments are Proper and Tethered to the Evidence</u>

As explained above, Jarosz's Incremental Benefits approach involved multiple apportionment steps.  The first step apportioned by eliminating from consideration the profits and revenues tied to features common to infringing and non-infringing products alike.  Jarosz's second step apportioned Hydrus' incremental profits between those attributable to the Asserted Patents and those that are not.  Consistent with caselaw, the second apportionment step focused on factors

that differentiate Hydrus over its competition. *See UT Bd. of Regents*, 645 F.Supp.3d at 331-32 (approving similar apportionment methodology focused on differentiating factors); *Bayer Healthcare*, 407 F.Supp.3d at 481; *Apple*, 757 F.3d at 1318-19.

### 1.     Courts approve of Downs' methodology of apportioning features that differentiate Hydrus over competing products

Downs' technological apportionment methodology was appropriate. This Court and others have approved of a technical expert calculating a quantitative technological apportionment factor by (i) focusing on differentiating features and (ii) considering how defendants marketed the accused product. In *UT Bd. of Regents*, this Court endorsed the methodology and reliability of an expert who focused on differences between patented and unpatented stents, considered how the defendant marketed the accused products, and assessed factors that drove purchasing decisions. *See UT Bd. of Regents*, 645 F.Supp.3d at 332-33. Other courts also have endorsed apportionment involving comparison of features of accused products to comparable technology or non-infringing alternatives. *See Apple*, 757 F.3d at 1318 (finding damages expert properly relied on technical expert to factually account for the difference between the Trackpad's features and the asserted claims); *Cirba Inc. v. VMware, Inc.*, C.A. No. 19-742-GBW, 2023 WL 3151853, at *6 (D. Del. Apr. 18, 2023) ("[I]t is not improper to rely on a technical expert's explanation of a patented features' incremental benefit in deriving an apportionment figure.").

Downs applied this court-approved methodology. Downs analyzed Defendants' documents, including internal strategy presentations, trainings and meeting slides directed to physicians, representations made in correspondence with the FDA, feedback received from physicians, and deposition testimony. (*See* Ex. 97 (Downs Op.) ¶¶375-390; Ex. 100 (Downs Reply) ¶¶143-149, 151-154.) Downs focused on an Alcon 2022 strategy presentation that listed six "Hydrus value drivers," and determined that five of the six were attributable to the Asserted

Patents.[1]  (Ex. 97, ¶¶381-382, 384-385 (citing IVANTIS_SS_00324043 at 324067).)  Downs appropriately relied on Defendants' own assessment of the benefits of Hydrus over competing products.  (*See* Ex. 99 (Downs 9/22 Tr.) 311:14-20 ("I'm relying on the company itself to tell me where they think the value is."), 316:22-317:2); *see also UT Bd. of Regents*, 645 F.Supp.3d. at 333 (approving similar approach).  Downs also relied on other evidence confirming that the six value drivers capture the technical benefits of Hydrus compared to competing products.  (*See* Ex. 97 (Downs Op.) ¶¶375-380, 382, 386-390; Ex. 100 (Downs Reply) ¶¶143-149, 151-154; Ex. 124 (IVANTIS_SS_00206147) at 206149.)  And Downs cited prior opinions of Defendants' experts conceding that these value drivers lead to Hydrus's enhanced efficacy over competing devices. (*See* Ex. 100 (Downs Reply) ¶147.)  Defendants' argument that Downs improperly apportioned because he did not "*independently* identify the technological benefits of Hydrus," or "survey . . . physicians to determine whether any of his 'value drivers' actually influence consumer demand," misapplies the law and mischaracterizes Downs' testimony.  (Defs' Daubert at 10-11 (emphasis added).)  Downs testified that "a good way to figure out where value is . . . is to identify those places where the person who owns the property thinks the value is," which is what he did.  (Ex. 99 (Downs 9/22 Tr.) at 304:12-20.)  Defendants' caselaw supports Sight's position, *see Cirba*, 2023 WL 3151853, at *6 (expert's apportionment, which relied on "technical expert's explanation of [the] patent features' incremental benefit," was proper), or is inapposite, *see Nortek Air Sols., LLC v. Energy Lab Corp.*, No. 14-cv-02919, 2016 WL 3856250, at *5-6 (N.D. Cal. July 15, 2016) (excluding expert's opinions because he did not apply *any* apportionment analysis and instead improperly attempted to invoke the Entire Market Value Rule).  Finally, the footnote cited in *Cirba*

---

[1] Defendants' experts did not meaningfully dispute Alcon's conclusions about Hydrus' value drivers.  (*See, e.g.*, Ex. 123 (Tanna Reb.) ¶25; Ex. 13 (Iwach Reb.) ¶¶283-291.)

is unrelated to apportionment.  2023 WL 3151853, at *5 n.6.

Defendants' criticism that Downs failed to analyze the degree to which the Hydrus value drivers impact sales and profits is misleading and irrelevant.  Downs, a technical expert, is not qualified to—and did not perform—that analysis.  As Defendants concede, the "value drivers identified by Downs are based on a comparison of Hydrus' marketed advantages over other commercialized products . . . ."  (Defs' Daubert at 12.)  Downs conducted a technological valuation of Hydrus features that provide a benefit over the competition and are attributable to the asserted patents.  Courts endorse that approach.  *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1369 (Fed. Cir. 2017) (damages expert properly relied on technical expert analysis of comparable technology and benefits in support of a reasonable royalty rate).  Critically, as noted above, part of the basis for Downs' analysis is Defendants' own assessment of the benefits of Hydrus over competing products, including the admissions in Defendants' strategy presentation.

Finally, Defendants' argument that Downs failed to consider the entirety of Hydrus' value is a red herring.  As explained above, in the first step in his damages analysis, Jarosz apportioned out other unpatented features that were common among infringing and non-infringing products.  Downs was asked to focus on features that differentiate Hydrus in the marketplace and are attributable to the Asserted Patents to inform the second of Jarosz's two-step apportionment.  Again, courts approve of this methodology.  *See UT Bd. of Regents*, 645 F.Supp.3d. at 332 (denying motion to exclude damages expert's opinions that relied on technical expert analysis to conclude that certain features that differentiated the accused product accounted for 90% of the premium over non-infringing stents); *see also supra* at 11-12.  Moreover, Defendants have not shown that their own identification of features that drive Hydrus' value over competing products was wrong or unreliable.  (*See, e.g.*, Ex. 123 (Tanna Reb.) ¶25; Ex. 13 (Iwach Reb.) ¶¶283-291.)

And Defendants cite no evidence that other features drive purchasing decisions of Hydrus versus competing alternatives.  (*See* Defs' Daubert at 12-13.)  In contrast, there is ample evidence that the six value drivers do so.  (*See* Ex. 97 (Downs Op.) ¶¶375-390; Ex. 100 (Downs Reply) ¶¶141-149.)  Defendants' criticism that Downs cherry-picked Defendants' self-identified six Hydrus value drivers and excluded others, like three of Defendants' "four pillars of MIGS market leadership," also fails.  (Defs' Daubert at 12 (citing Defs' Ex. 36 at IVANTIS_SS_0011413).)  The "superior clinical data" pillar is indisputably part of the efficacy and tri-modal mechanism of action value drivers and therefore redundant.  (*See* Ex. 97 (Downs Op.) ¶¶377-380.)  The remaining two "pillars" are irrelevant.  ███████████████████████

████████████████████████████████████████████

████████████████████████████████

2.      **Jarosz relied on Downs' apportionment review <u>and</u> conducted his own**

Defendants entirely ignore Jarosz's economic apportionment analysis under *Georgia-Pacific* Factor 13, which involved analysis of sales and marketing presentations, business plans, training materials, and physician feedback, and reached conclusions similar to Downs'.  (Ex. 107 (Jarosz Op.) ¶¶181-189, Tab 20; Ex. 114 (Jarosz Reply) ¶121.)  Defendants also overlook Jarosz's quantification of the relative importance of Hydrus' advantages over iStent by "analyz[ing] the number of times each advantage is mentioned in Ivantis' internal documents . . . ." (Ex. 107 (Jarosz Op.) ¶189, Tab 20.)  Jarosz calculated that over 90% of the mentions in the documents reviewed that identified the Hydrus value drivers as advantages over iStent could be attributed to the Asserted Patents, but conservatively applied Downs' lower 83% apportionment factor to arrive at his ultimate royalty rate. (*Id*; *see also* Ex. 114 (Jarosz Reply) ¶121.)  Defendants' cases are inapposite. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146-47 (1997) (finding the studies relied upon were completely insufficient and not tied to the expert's conclusions); *VirnetX*, 767 F.3d at

1328 (expert did not attempt to separate unpatented elements from royalty base).

Jarosz's multi-step apportionment analysis and ultimate opinions drawn from his own analysis and reliance on Downs' conclusions were based on "sufficient facts or data." *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003). Jarosz carefully tied the advantages of the patented Hydrus features to his royalty rate. *Cf. Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Group*, 879 F.3d 1332, 1350 (Fed. Cir. 2018) (expert failed to explain the extent to which the patented features factored into the value of the accused product and royalty rate). Jarosz's reasonable royalty pursuant to his Incremental Benefits approach amounts to less than ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

### 3.    Jarosz's Market Approach properly apportioned Ivantis' and Alcon's contributions to Hydrus from patented features

Jarosz also properly utilized the Market Approach as one of several approaches for determining a reasonable royalty. Jarosz examined Alcon's purchase of Ivantis. From the agreed-upon purchase price, he apportioned down to the value of the Hydrus product line by allocating out, based on Alcon's own assessment, Ivantis' unpatented contributions of cash and cash equivalents, inventory, fixed assets, "right-of-use" assets, and "customer relationship," applying a ███████ adjustment factor. (Ex. 107 (Jarosz Op.) ¶¶134-135, Tab 19; Ex. 114 (Jarosz Reply) ¶102; *see also, e.g.*, Ex. 117 (Jarosz Tr.) at 234:14-238:20.) Jarosz apportioned out and did not capture payment for Ivantis' unpatented contributions in his reasonable royalty.

Jarosz then apportioned out Alcon's on-going, non-patented contributions to Hydrus' value by isolating post-acquisition projected free cash flows arising from the product line. By focusing on free cash flow, Jarosz apportioned out Alcon's contributions to Hydrus' value associated with

Alcon manufacturing, marketing and sales, general and administrative, research and development, and capital expenditures.  (Ex. 107 (Jarosz Op.) Tabs 18 & 19, and references therein.)  That is, he did not capture in his reasonable royalty any of Alcon's unpatented contributions.

To summarize, Jarosz apportioned out Ivantis' *and* Alcon's unpatented contributions to Hydrus' market value, so Jarosz **did** account for Defendants' contributions to the value of Hydrus.  (*See* Defs' Daubert at 13.)  Finally, Jarosz applied a quantitative apportionment factor associated with only the patented contributions to Hydrus' product value, as described above, based on his own analysis and Downs' analysis (*see* Section V.D.1., *supra*) to reach his opinion on a reasonable royalty based on the Market Approach.

Jarosz's Market Approach methodology has been approved as reliable.  "To determine a reasonable royalty rate for a patented technology, a court may look to prior acquisition agreements . . . from cases involving sufficiently comparable technology."  *Limelight Networks, Inc. v. XO Commc'ns, LLC*, No. 3:15-CV-720-JAG, 2018 WL 678245, at *6 (E.D. Va. Feb. 2, 2018) (citing *VirnetX*, 767 F.3d at 1330).  This District has approved of the use of acquisition agreements, including valuations of business line items flowing from such agreements, as an appropriate foundation for a reasonable royalty analysis.  *10x Genomics, Inc. v. NanoString Techs., Inc.*, C.A. No. 21-653-MFK, 2023 WL 5805585, at *8-9 (D. Del. Sept. 7, 2023) (the amount paid to acquire a company with desired technology may be relevant to reasonable royalty).  Jarosz's Market Approach resulted in royalty estimates that amount to less than ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

E.     **Jarosz Properly Relied on the Glaukos License Agreement**

Jarosz also calculated reasonable royalty damages using Ivantis' agreement with Glaukos

as a comparable license.  (Ex. 107 (Jarosz Op.) ¶141.)  Defendants move to exclude Jarosz's reliance on the Glaukos license because it arose from litigation and they are dissatisfied with Downs' technical comparison of the Glaukos and Sight patents.  (Defs' Daubert, Section VII.)  Neither argument warrants exclusion of the license agreement or Jarosz's opinions thereon.

### 1.    The Glaukos license is a reliable indicator of an appropriate royalty

"[T]here is no per se rule barring reference to settlements simply because they arise from litigation."  *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1336 (Fed. Cir. 2015); *see also ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) (the "most reliable license" in the record arose from litigation).  Use of settlement agreements must take into account similarities and differences in technologies, market conditions, and the state of the litigation when settled.  *See ResQNet.com*, 594 F.3d at 872.  Jarosz complied with those requirements.  (Ex. 107 (Jarosz Op.) ¶¶129-131, 138-141, 144-147, 161-163.)

### a.    Alcon considered the 10% rate a ▬▬▬—showing its reliability

The reliability of the Glaukos royalty rate is not legitimately in dispute.  Ivantis and Alcon entered into an option agreement through which Alcon could acquire Ivantis.  (Defs' Daubert at 16-17.)  Before exercising the option, and before executing the Glaukos license, Alcon valued Ivantis.  (Ex. 126 (Weems Tr.) 164:4-7.) ▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

### b.    The litigation and economic circumstances cited by Defendants do not make the Glaukos license an unreliable comparator

Jarosz considered the similarities and differences between the Glaukos license and the

agreement that would result from a hypothetical negotiation between Sight and Defendants.  (Ex. 107 (Jarosz Op.) ¶¶129-131, 138-141, 144-147.)  Jarosz accounted for the stage of the litigation. (*Id.* ¶¶145-146.)  Jarosz compared the nature of the parties to both agreements (*i.e.,* direct competitors).  (*Id.* ¶¶161-163.)  Jarosz accounted for differences in technology, market conditions, and the stage of the litigation.  *See ResQNet.com*, 594 F.3d at 872.  Defendants claim unreliability because Jarosz allegedly failed to consider how rulings adverse to Ivantis, and Ivantis' desire to be acquired, impacted license terms.  As explained below, neither complaint has merit.

### (1)    Court rulings do not render the license non-comparable

First, Defendants point to the Court's adverse inference finding against Ivantis.  (Defs' Daubert at 18-19.)  The adverse inference made findings of validity and infringement more likely. (Ex. 114 (Jarosz Reply) ¶91.)  But settlements that occur after a finding of infringement and validity can be "persuasive evidence" of a reasonable royalty—mirroring the hypothetical negotiation where infringement and validity are presumed.  *AstraZenenca AB*, 782 F.3d at 1336-37; *see also Moskowitz Fam. LLC v. Globus Med., Inc.*, C.A. No. 20-3271, 2023 WL 5487662, at *12 (E.D. Pa. Aug. 24, 2023) ("[L]icenses negotiated to settle a case after a court has established validity and infringement of the patent are very probative of reasonable royalty." (citation omitted)).  *LaserDynamics* is distinguishable.  The Federal Circuit cited a host of reasons other than a sanctions award for why the settlement was "the least reliable license" in the record. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 77-78 (Fed. Cir. 2012) (noting that the settlement was one of 29 licenses, three years before the hypothetical negotiation date, and resulted in a license fee six times larger than the next highest amount paid).  And the sanctions in that case were much worse, based on conduct that was "to an extent previously unknown by this Court." *Id.* at 58.  Here, the Glaukos license is one of very few agreements available for consideration and ██████████████████████████—not an outsized outlier.  (Ex. 127 (Weems Tr. Ex. 27).)

Second, Defendants cite the Court's finding of summary judgment in Glaukos' favor on Ivantis' infringement counterclaims.  The hypothetical negotiation construct does not assume the existence of a counterclaim.  The elimination of Ivantis' claims of infringement brought the parties closer to the hypothetical negotiation setting.  *Cf. AstraZenenca AB*, 782 F.3d at 1336-37.  Even if the adverse rulings resulted in some premium paid by Ivantis (which Defendants have not established), Jarosz's methodology adequately excluded it.  The Glaukos license included a 10% running royalty, a lump sum fee of $60 million, and a cross-license to Ivantis' patents.  Jarosz considered only the 10% royalty and **excluded** the lump sum and cross-license without any upward adjustment to the 10% rate.  (Ex. 107 (Jarosz Op.) ¶147; Ex. 114 (Jarosz Reply) ¶¶100-101.)

### (2)   The Alcon acquisition does not affect comparability

Defendants assert that Jarosz failed to consider how Ivantis' desire to be acquired impacted license terms.  Jarosz opined that such desire does not imply paying a premium, rather, just the opposite.  (Ex. 114 (Jarosz Reply) ¶¶92-93.) ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████    (*Id.* at IVANTIS_SS_00420569-70 (specifically, definition of "Specified Action Closing Consideration Adjustment").)   At most, Defendants' arguments raise an issue for cross-examination.  *See ActiveVideo*, 694 F.3d at 1333 ("[A]ny failure . . . to control for certain variables are factual issues best addressed by cross examination and not by exclusion.").

### 2.   Downs' comparability analysis of the patents is reliable

Defendants also attack Downs' technical comparison of the Glaukos and Sight patents. (Defs' Daubert, Section VII.C.)  Defendants' assertion that Downs' comparability analysis used categories that he unilaterally created is incorrect.  Downs first considered "device-specific

attributes."  (Defs' Daubert at 21.)  Glaukos and Sight both accused Hydrus of infringement, supporting a conclusion that the asserted patents' device-specific claims are comparable.  *See Moskowitz Fam.*, 2023 WL 5487662, at *7 (comparability supported by suits on same products).

Downs also used patent claim requirements for his comparison—unquestionably an appropriate method.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) ("[T]he words of the claims . . . define the scope of the patented invention" (citations omitted)).  He took the "device kit with introducer" and "methods for reducing IOP in combination with viscoelastic fluid" terms directly from the relevant Sight patents.  (Ex 97 (Downs Op.) ¶¶243, 258, 260, 269; *see also* Ex. 128 (Galanis Op.) ¶54.)  Downs did not fabricate his categories for comparison.

### F.   Downs Stayed Well Within His Lane of Expertise

Defendants are wrong that Downs offered opinions that "relate to the FDA approval requirements for medical devices, …" (Defs' Daubert at 22.)  Downs offers a **technical** opinion that Defendants' proposed alternative designs would have "significant differences that would have a meaningful impact on the safety and efficacy of the device."  (Ex. 100 (Downs Reply) ¶91; Ex. 97 (Downs Op.) ¶¶365-372.)  Downs relies on admissions from Hydrus' designer and Sight's FDA expert in concluding that the technical changes Defendants propose could negate prior clinical data.  (Ex. 100 (Downs Reply) ¶127; Ex. 97 (Downs Op.) ¶¶362-364.)  Downs' opinion is proper.

Second, Defendants incorrectly claim that Downs opines on Patent Office procedure. Downs cites the Patent Office's factual findings of cumulativeness[2] as one factor in reaching his ultimate opinions that the Asserted Claims are not invalid.  (*See, e.g.,* Ex. 90 (Downs Reb.) ¶¶100-104.)  Those fact findings are relevant inputs to Downs' rebuttal of Tanna's invalidity opinions.

### G.   Downs Applied the Court's Claim Constructions

---

[2] Ex. 50 SGHT0154618 at 154631; Ex. 49 SGHT0154633 at 154652; Ex. 52 SGHT0154566 at 154585; Ex. 51 SGHT0154587 at 154615-16.

Downs faithfully applied the Court's claim constructions.  "While an expert witness is not allowed to deviate from the Court's claim construction, that expert is allowed to provide opinions reflecting the application of the Court's claim construction to the facts of this case," and that is precisely what Downs did here.  *Cirba*, 2023 WL 3151853, at *8.

"**Does Not Significantly Block**" – The opinions in Downs' reports are consistent with the Court's claim construction, as well as how Sight and Downs have always interpreted this term. The Court construed this term to have the meaning provided in the specification, as Sight proposed—*i.e.*, "the support does not significantly block either fluid outflow from the trabecular meshwork or fluid outflow to the collector channels."  (D.I. 287 at 1; D.I. 134 at 21-25; '443, 7:35-39.)  This construction explicitly contemplates "**fluid outflow from the trabecular meshwork**," which the Court found POSAs would evaluate by determining "whether an **increase in aqueous outflux** . . . **has been achieved** by the support," (D.I. 273 at 6) and approvingly quoted the specification's exemplary description that "the support allows between about 0.1 and about 5 microliters per minute **aqueous outflux from the eye through the trabecular meshwork** and collector channels" (D.I. 134 at 24) (emphases added).  Downs consistently applied the Court's construction, before and after Downs's rebuttal expert report, by evaluating whether the accused Hydrus device and Defendants' purported prior art devices achieve an increase in aqueous outflux from the eye through the trabecular meshwork.  (*See, e.g.*, D.I. 59 (2d Am. Complaint) ¶¶51-53, 56 (alleging that fluid outflow through the trabecular meshwork into Schlemm's canal occurs through the accused Hydrus's fenestrations and is not significantly blocked by the device); Ex. 129 (Ex. A to Sight's Corrected Initial Infringement Contentions) at 13-25; Ex. 97 (Downs Op.) ¶¶87-89, 91, 94-111; Ex. 90 (Downs Reb.) ¶¶144-192; Ex. 93 (Downs 9/28 Tr.) 32:5-13; Ex. 99 (Downs 9/22 Tr.) 210:25-211:4 ("Because the limitation is all of that. It's you can't block … the

TM. Can't block the collector channels. And it's got to -- the way you would test that is through increased flow.").)  As explained in Sight's Opposition to Defendants' MSJ No. 3 and recognized by the Court, measuring IOP in a live patient or measuring aqueous outflux are not the only ways to determine whether a support substantially interferes with fluid outflow from the trabecular meshwork or to the collector channels.  (*See* Sight's Ans. Br. to Defs' MSJ No. 3, § VII.B; *see also* D.I. 134 at 23.)

"**Arcuate Member**" – Downs did not "inject[] three different, additional limitations," into the Court's construction of arcuate member.  Downs' testimony properly recognized that the patent claims require that the arcuate member must be part of the *support* that resides within Schlemm's canal. (*See* Ex. 93 (Downs 9/28 Tr.) 165:2-7.)  Defendants mischaracterize Downs' deposition testimony to argue that he interpreted arcuate member to mean "a structure that is curved along its entire length," instead of the Court's construction of "a structure having one or more curved portions."  (Defs' Daubert at 24; D.I. 287 at 1.)  Defendants' second point, that Downs construes arcuate member to require "a curved portion <u>of a certain size</u>" is equally unavailing.  (Defs' Daubert at 24 (emphasis in original)).)  During deposition, Downs responded "no" to Defendants' question of whether he was "reading some length into the curve in order for it to be an arcuate member." (Ex. 93 (Downs 9/28 Tr.) 257:4-6.)  Downs' opinions are consistent with the Court's report and recommendation, which distinguished the curved portion required for the arcuate member from a "bend"—a construction the Court rejected.  (D.I. 134 at 17 ("The intrinsic record does not support Defendants' position that the arcuate member may be bent."); *id.* at 19 (dismissing Defendants' concern that "the exclusion of 'bent' would allow Plaintiff to exclude small radii of curvature from the scope of the term . . . .").)  Defendants' third argument that Downs requires the curved portion to be "preformed" is simply a disagreement with how Downs applied the Court's

construction to the facts of the case.   Downs reasonably applied the Court's construction, concluding that "a POSA would have understood that a structure with a curved portion is distinct from a straight structure that is subsequently shaped by being implanted within a curved space." (Ex. 90 (Downs Reb.) ¶344.)  Downs never strayed from the Court's construction.

"**Maintain the Patency**" – Downs applied the **express definition** provided for this term in the specification:  To "maintain the patency" of at least a portion of Schlemm's canal, a device must "operate[] to keep the canal at least partially unobstructed to transmural flow, such that fluid can 1) exit through the trabecular meshwork; 2) traverse the canal; and 3) drain via the collector channels."  ('482, 7:28-33.)  *See Phillips*, 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs.").  Defendants' argument that Downs impermissibly applies a new construction mischaracterizes Downs' deposition testimony.  (Defs' Daubert at 25.)  While Downs testified that in the context of a different patent, "maintain the patency" may simply mean "to hold a structure open," he clarified that "I don't think this is the same definition as we're talking about in terms of Sight's patents."  (Ex. 93 (Downs 9/28 Tr.) 209:7-210:11.)  That this term was not identified for construction is irrelevant; the law on patentees as lexicographers is settled and the definition of "maintain the patency" is unequivocal.  *Phillips*, 415 F.3d at 1316.  Defendants offer no justification for disregarding the patent's definition.  If the Court finds otherwise, a dispute exists that must be addressed before trial. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362-63 (Fed. Cir. 2008).

"**Implantable Circumferentially within Schlemm's Canal**" – Downs did not apply a new construction in his rebuttal report.  This term was not construed or expressly defined in the specification.  Downs reasonably interpreted the plain and ordinary meaning of this term from the

perspective of a POSA as describing "longitudinal or lengthwise insertion around the circumference of Schlemm's canal," (*see* '443, 8:54-57) as well as "insertion into Schlemm's canal in a single direction" (*id.*, 11:16-20). These interpretations of the disclosures in the specification in Downs' opening and rebuttal reports are consistent and reflect plain and ordinary meaning.

"**Fenestration**" – Downs' description of a fenestration as a "window or opening," is not inconsistent with his further description as a "closed-boundary window or opening." (Defs' Daubert at 26.) These complementary descriptions reflect the teachings of the patent, which distinguish fenestrations (depicted as closed-boundary openings) from fluted edges (open-boundary openings). ('482, 5:44-48, 10:49-53.) Sight has applied this same distinction throughout the case. (Ex. 131 (Sight's Opening CC Br.) at 7 (distinguishing gaps from fenestrations and windows).) The testimony of inventor David Badawi does not establish any inconsistency and is irrelevant to the admissibility of Downs' opinions. *See Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1347 (Fed. Cir. 2008) (inventor testimony irrelevant to determining claim scope).

### H.  Downs Appropriately Responded to Tanna's Invalidity Arguments

Downs' strain analysis reasonably responded to Tanna's improper attempts to alter prior art figures to prove invalidity. Defendants' expert, Tanna, altered figures from the Gharib prior art reference, and based only on the proportions of those figures, opined that Gharib meets the Asserted Claims. (*See, e.g.,* Ex. 89 (Tanna Op.) ¶¶131-134; *see also* Ex. 90 (Downs Reb.) ¶¶112-116.) Downs' rebuttal necessarily began where Tanna left-off—Gharib's Figure 5A and Tanna's altered Figure 5A—and offered strain analyses to explain why Gharib does not enable the use of the material nitinol for such embodiments. (Ex. 90 (Downs Reb.) ¶¶205-215.) Defendants' assertion that Downs cannot rebut the evidence that forms the basis for Tanna's erroneous analysis disregards the purpose of rebuttal and is no basis for disqualification.

Second, Downs' strain analysis applies sound methodology.  Downs testified that his maximum strain equation applies well-known principles of beam theory described in the textbook "Mechanics of Materials," and that he relied on the publication "Mechanical Fatigue and Fracture of Nitinol, An International Materials Review" to determine the fracture strain of nitinol.  (Ex. 93 (Downs 9/28 Tr.) 166:24-170:7; *see also* Ex. 130 (Beer & Johnston, Jr., Mechanics of Materials (2d ed. 1992)).)  Defendants fully explored the bases for Downs' opinions during his deposition and were afforded the opportunity to respond to those opinions in Tanna's expert reply report. Defendants do not dispute the physics of beam theory and chose not to meaningfully rebut Downs' calculations of maximum strain in Tanna's reply expert report.  (*See, e.g.*, Ex. 132 (Tanna Reply) ¶¶230-231.)  Defendants do not dispute that Downs qualifies as an expert in biomedical engineering—nor could they.  (*See* Ex. 97 (Downs Op.) ¶¶2, 4 (describing qualifications).)  Downs appropriately applied his knowledge of well-known and accepted materials engineering principles and equations in his rebuttal analysis.  *See Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1170 (Fed. Cir. 2008), *supplemented sub nom. Cordis Corp. v. Bos. Sci. Corp.*, 275 F. App'x 966 (Fed. Cir. 2008) (expert was qualified to perform a finite element analysis and concerns about assumptions and data used in simulation were questions for the jury).  Defendants' disagreements with the assumptions used in Downs' strain analysis, the calculations themselves, and his opinions based on those calculations, go to the weight of the evidence, not its admissibility.

## VI.    CONCLUSION

Defendants' *Daubert* attacks fail.  Sight's experts are qualified, employed reliable and accepted methodologies, and used sufficient data.  Defendants' motions should be denied.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

COOLEY LLP
Michelle S. Rhyu
Jeffrey Karr
Lauren Strosnick
Alissa Wood
Juan Pablo González
Angela R. Madrigal
3175 Hanover Street
Palo Alto, CA  94304-1130
(650) 843-5000

Orion Armon
1144 15th Street, Suite 2300
Denver, CO  80202-2686
(720) 566-4000

Dustin M. Knight
Joseph Van Tassel
Reston Town Center
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
(703) 456-8000

Bonnie Fletcher Price
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
(202) 842-7800

Dated: November 2, 2023                *Attorneys for Sight Sciences, Inc.*

30935985.1

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on November 2, 2023, I caused to be electronically filed a true and correct copy of Sight Sciences, Inc.'s Answering Brief in Opposition to Defendants' Motion to Exclude Certain Opinions of Mr. John Jarosz and Dr. Crawford Downs with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

John W. Shaw
Karen E. Keller
Andrew E. Russell
Nathan R. Hoeschen
Shaw Keller LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com

I further certify that on November 2, 2023, I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL:**

Gregg LoCascio
Sean M. McEldowney
W. Todd Baker
Justin Bova
Steven Dirks
Socrates L. Boutsikaris
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC  20004
gregg.locascio@kirkland.com
sean.mceldowney@kirkland.com
justin.bova@kirkland.com
steven.dirks@kirkland.com
socrates.boutsikaris@kirkland.com

Jeanne M. Heffernan
Kat Li
Austin C. Teng
Ryan J. Melde
Lydia B. Cash
Kirkland & Ellis LLP
401 Congress Avenue
Austin, TX  78701
jheffernan@kirkland.com
kat.li@kirkland.com
austin.teng@kirkland.com
ryan.melde@kirkland.com
lydia.cash@kirkland.com

Ryan Kane
Nathaniel DeLucia
Laura Zhu
Emily C. Sheffield
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY  10022
ryan.kane@kirkland.com
nathaniel.delucia@kirkland.com
laura.zhu@kirkland.com
emily.sheffield@kirkland.com

Brian A. Verbus
Jacob Rambeau
300 N. LaSalle
Chicago, IL 60654
brian.verbus@kirkland.com
jake.rambeau@kirkland.com

Noah S. Frank
200 Clarendon Street
Boston, MA 02116
noah.frank@kirkland.com

_____/s/ Melanie K. Sharp_____
Melanie K. Sharp (No. 2501)

30936134.1