IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **Redacted - Public Version** |
| | ) | |
| v. | ) | C.A. No. 21-1317-GBW-SRF |
| | ) | |
| IVANTIS, INC., ALCON RESEARCH LLC, ALCON VISION, LLC, and ALCON INC., | ) ) ) | ██████████████ |
| | ) | |
| Defendants. | ) | |

**ALCON'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN OPINIONS OF MR. JOHN JAROSZ AND DR. CRAWFORD DOWNS**

OF COUNSEL:
Gregg LoCascio
Sean McEldowney
Justin Bova
Steven Dirks
Socrates L. Boutsikaris
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

Jeanne M. Heffernan
Kat Li
Ryan J. Melde
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX  78701
(512) 678-9100

Ryan Kane
Nathaniel DeLucia
Emily Sheffield
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants*

Brian A. Verbus
Jacob Rambeau
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000

Noah Frank
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Dated: November 16, 2023

## <u>TABLE OF CONTENTS</u>

I.     MR. JAROSZ'S RELIANCE ON THE QUESTIONNAIRE IS UNRELIABLE ............. 1

II.    MR. JAROSZ'S SOURCE OF INCREMENTAL COSTS IS UNRELIABLE ................ 3

III.   MR. JAROSZ'S PRICE PREMIUM RESTS ON UNRELIABLE DATA ...................... 4

IV.   MR. JAROSZ'S AND DR. DOWNS'S APPORTIONMENT FAIL RULE 702 .............. 5

     A.    Dr. Downs's Value-Driver Analysis Does Not Apportion. .................................. 6

     B.    Mr. Jarosz's "Incremental Benefits" Approach Does Not Apportion. .................. 7

     C.    Mr. Jarosz's "Market" Approach Does Not Apportion. ........................................ 8

V.     MR. JAROSZ'S USE OF THE GLAUKOS SETTLEMENT IS UNRELIABLE ............. 9

VI.   OPINIONS OUTSIDE DR. DOWNS'S EXPERTISE SHOULD BE EXCLUDED ....... 12

VII.  DR. DOWNS'S NEW CLAIM CONSTRUCTIONS SHOULD BE EXCLUDED ......... 12

VIII. DR. DOWNS'S STRAIN ANALYSIS SHOULD BE EXCLUDED ............................. 14

<u>**Note**</u>: Except where specifically referring to distinct entities, Defendants are collectively referred to as "Alcon." Additionally, all emphasis is added unless otherwise indicated.

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*10x Genomics v. NanoString Tech.*,
    2023 WL 5805585 (D. Del. Sept. 7, 2023) ................................................................. 9

*Agere Sys. v. Broadcom*,
    2004 WL 1658530 (E.D. Pa. July 20, 2004) .............................................................. 13

*Am. Cruise Lines v. HMS Am. Queen Steamboat*,
    2017 WL 3528606 (D. Del. Aug. 16, 2017) .............................................................. 12

*Apple v. Motorola*,
    757 F.3d 1286 (Fed. Cir. 2014) ................................................................................... 6

*Arctic Cat v. Bombardier*,
    876 F.3d 1350 (Fed. Cir. 2017) ................................................................................... 6

*Atlas IP v. Medtronic*,
    2014 WL 5741870 (S.D. Fla. Oct. 6, 2014) ................................................................ 7

*Bayer Healthcare v. Baxalta*,
    407 F. Supp. 3d 462 (D. Del. 2019) ............................................................................ 7

*Bazemore v. Friday*,
    478 U.S. 385 (1986) .............................................................................................. 3, 4

*Cent. Admixture Pharmacy v. Advanced Cardiac*,
    482 F.3d 1347 (Fed. Cir. 2007) ................................................................................. 13

*Cirba v. VMware*,
    2023 WL 3151853 (D. Del. Apr. 18, 2023) ............................................................. 6, 7

*Citizens Fin. Grp. v. Citizens Nat'l Bank of Evans City*,
    383 F.3d 110 (3d. Cir. 2004) ....................................................................................... 1

*ePlus v. Lawson Software*,
    700 F.3d 509 (Fed. Cir. 2012) ................................................................................... 13

*Exmark Mfg. v. Briggs & Stratton Power Prod. Grp.*,
    879 F.3d 1332 (Fed. Cir. 2018) ................................................................................... 8

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) .................................................................................................... 8

*Heller v. Shaw Indus.*,
    167 F.3d 146 (3d Cir. 1999)...............................................................................14

*Howmedica v. Wright Med. Tech.*,
    540 F.3d 1337 (Fed. Cir. 2008)...........................................................................14

*LaserDynamics v. Quanta Computer*,
    694 F.3d 51 (Fed. Cir. 2012)....................................................................7, 10, 11

*Limelight Networks v. XO Commc'n.*,
    2018 WL 678245 (E.D. Va. Feb. 2, 2018)............................................................9

*MediaTek v. Freescale Semiconductor*,
    2014 WL 2854890 (C.D. Cal. June 20, 2014) .......................................................5

*Moskowitz Fam. v. Globus Med.*,
    2023 WL 5487662 (E.D. Pa. Aug. 24, 2023) ...............................................10, 12

*Nystrom v. TREX*,
    424 F.3d 1136 (Fed. Cir. 2005)...........................................................................14

*O2 Micro. v. Beyond Innovation Tech.*,
    521 F.3d 1351 (Fed. Cir. 2008)...........................................................................13

*Omega Pats. v. CalAmp*,
    13 F.4th 1361 (Fed. Cir. 2021) .............................................................................5

*Oracle v. Google*,
    798 F. Supp. 2d 1111 (N.D. Cal. 2011) ..............................................................10

*Phillips v. AWH*,
    415 F.3d 1303 (Fed. Cir. 2005)...........................................................................12

*Pittsburgh Press Club v. U.S.*,
    579 F.2d 751 (3d Cir. 1978)..................................................................................1

*Power Integrations v. Fairchild Semiconductor*,
    904 F.3d 965 (Fed. Cir. 2018)...........................................................................6, 8

*Promega v. Life Techs.*,
    875 F.3d 651 (Fed. Cir. 2017)...............................................................................4

*ResQNet.com v. Lansa*,
    594 F.3d 860 (Fed. Cir. 2010)...............................................................................9

*In re TMI Litig.*,
    193 F.3d at 705 ..................................................................................................1, 2

*UCB v. Teva Pharms.*,
    2015 WL 11199058 (N.D. Ga. Mar. 18, 2015)........................................................5

*Uniloc USA v. Microsoft*,
    632 F.3d 1292 (Fed. Cir. 2011)........................................................................9

*UT Bd. of Regents v. Bos. Sci.*,
    645 F. Supp. 3d 324 (D. Del. 2022)................................................................6, 7

*W.R. Grace v. Intercat*,
    60 F. Supp. 2d 316 (D. Del. 1999)....................................................................3

*Walker v. Gordon*,
    46 F.App'x 691 (3d Cir. 2002) .........................................................................3

*Wi-LAN v. Sharp Elecs.*,
    992 F.3d 1366 (Fed. Cir. 2021).........................................................................1

## I.      MR. JAROSZ'S RELIANCE ON THE QUESTIONNAIRE IS UNRELIABLE

Sight does not dispute Trial Counsel's Questionnaire suffers from numerous methodological flaws or that the responses are double-hearsay. *See* D.I. 294 at 2-4; D.I. 298-12 ¶¶23-45. Instead, Sight protests the Questionnaire was "not meant to be a '***scientific*** survey,'" yet Mr. Jarosz uses the responses "to show the ***fact*** that Sight had lost sales." D.I. 326 at 3 (latter emphasis in original). Mr. Jarosz thus relies on the responses for the truth of the matter asserted—classic hearsay—even though the survey was admittedly ***not*** designed to guarantee reliability. D.I. 298-12 ¶¶46-47; *Cf. Pittsburgh Press Club v. U.S.*, 579 F.2d 751, 757-58 (3d Cir. 1978).

Sight argues Mr. Jarosz's reliance on hearsay is allowed "if it is the type of information that experts rely upon." D.I. 326 at 4. But Sight fails to prove the biased Questionnaire—which admittedly does not follow generally accepted survey principles—is the type of information upon which experts reasonably rely. *See* Ex. 70 at 890 (to overcome hearsay concerns, "the question [under Rule 703] becomes, 'Was the poll or survey conducted in accordance with generally accepted survey principles, and were the results used in a statistically correct way?'"). And although Sight argues "[e]xperts routinely rely on information received from witnesses with knowledge," D.I. 326 at 4, Mr. Jarosz never spoke with the survey respondents or purchase decision-makers. *See Wi-LAN v. Sharp Elecs.*, 992 F.3d 1366, 1375 (Fed. Cir. 2021).

*In re TMI Litigation* provides no support to Sight. There, the Third Circuit ***excluded*** expert testimony because the expert relied on summaries of patient health histories prepared by trial counsel employees and took no steps to verify the information. 193 F.3d 613, 698 (3d Cir. 1999). The Questionnaire suffers from those and other flaws. D.I. 294 at 2-5; D.I. 298-12 ¶¶46-47; *see also Pittsburgh Press*, 579 F.2d at 758 ("survey must be conducted independently of the attorneys involved in the litigation."). These "fatal" flaws go to admissibility, not weight. *See Citizens Fin. Grp. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 121 (3d. Cir. 2004).

Surreally, Sight argues the Questionnaire should escape scrutiny because it was a "non-survey."[1] D.I. 326 at 4. But Sight offers no support for that argument, misleadingly citing a section of the Reference Guide that compares survey evidence with "***individual testimony***." Ex. 70 at 893. But Sight surveyed its sales reps, so survey rules apply.[2]

Sight argues it need not prove reliability because "defendants do not dispute the truth of any of the responses" or "the conclusions [drawn]." D.I. 326 at 4. First, Sight bears the burden to prove reliability, which it cannot do. *In re TMI Litig.*, 193 F.3d at 705. Second, Alcon cannot test the responses because Sight did not disclose the respondents during discovery. *See* Ex. 71 (failing to identify any survey recipient). Third, Alcon disputes one can draw ***any*** conclusions from the responses given the Questionnaire's methodological flaws. *See* D.I. 294 at 3-4 (citing Gal Rep.).

Sight claims the responses are reliable because they were "verified." D.I. 326 at 5. But no independent verification occurred. *See* Ex. 70 at 910. Instead, Mr. Papini (aware of the survey's litigation purpose) spoke with his managers (who report to him), who "relay[ed] their discussions with the reps" (who report to them). *See* D.I. 298-20 at 146:2-5. Moreover, no one contacted any purchase decision-makers to verify the second-hand information the biased sales reps provided. D.I. 298-20 at 146:2-5, 150:24-151:11, 169:9-22; D.I. 333-7 at 198:9-25, 199:22-200:3. Sight contends the results were not biased, ██████████████████████████████████ ████████████████████████ D.I. 298-57, because the responses were "varied." That is a non-sequitur.

---

[1] This argument is belied by the record. *See* D.I. 298-57 ████████████████████████████████████ ████████████████████████████████████ Messrs. Jarosz and Papini both refer to the Questionnaire as a "survey." *See* D.I. 298-10 ¶64; D.I. 333-13 ¶12.

[2] Sight claims Dr. Gal agreed survey rules do not apply to the Questionnaire. D.I. 326 at 4. In truth, Dr. Gal testified that even if the Questionnaire "had not been characterized as a survey," it was "an attempt to conduct a survey, not necessarily done scientifically, right, but it's an attempt to conduct a survey in order to obtain evidence from which to draw conclusions." D.I. 333-6 at 21:18-22.

The entire Questionnaire was infused with bias, making the results unreliable, regardless of response "variety." *See* D.I. 294 at 2-5; D.I. 298-12 ¶¶46-47. Because the Questionnaire suffers from fatal methodological flaws, Mr. Jarosz's opinions regarding it should be excluded.

## II.     MR. JAROSZ'S SOURCE OF INCREMENTAL COSTS IS UNRELIABLE

Sight correctly notes "an expert can rely on information from management ***if they are qualified to provide it***." D.I. 326 at 6. But that is not what happened here. Mr. Jarosz relies on Mr. Papini, who admits ***"finance isn't [his] world"*** and he never spoke with a Sight employee to confirm the costs Sight's trial counsel fed him. D.I. 298-20 at 254:2-3, 254:13-17, 255:13-256:2. Mr. Papini merely regurgitated to Mr. Jarosz information trial counsel instructed him to include. *Id.* Sight ignores this criticism, pointing to Mr. Rodberg, who claims Mr. Papini ***is*** knowledgeable about incremental costs, despite Mr. Papini's testimony to the contrary. The inquiry should end there, and the Court should exclude Mr. Jarosz's incremental cost "opinion."

Realizing Mr. Jarosz's opening report is devoid of any actual analysis of incremental costs (*see* D.I. 298-10 ¶97), Sight seeks shelter in Mr. Jarosz's reply report, claiming he "confirmed his conclusions" from his opening report. D.I. 326 at 7. But Mr. Jarosz did not have any opinions to "confirm"; he simply parroted Mr. Papini, who parroted trial counsel. D.I. 298-10 ¶97. Mr. Jarosz admitted the new analysis in his reply report did not appear in his opening. D.I. 298-22 at 100:20-101:4, 102:2-4. These new opinions should be stricken. *See* D.I. 294 at 6.

Sight does not address any of Alcon's cited cases, *see* D.I. 294 at 5-6, instead relying on inapposite cases like *W.R. Grace v. Intercat*, where the plaintiff's expert undertook a detailed analysis of which costs were fixed and incremental (unlike here). 60 F. Supp. 2d 316, 325-326 (D. Del. 1999). Nor do Sight's cases support its argument that Mr. Jarosz's failure goes to weight, not admissibility. *Walker v. Gordon* did not deal with incremental costs, but a challenge to a psychiatric expert's opinion. 46 F.App'x 691, 693, 695-96 (3d Cir. 2002). *Bazemore v. Friday* has

nothing to do with incremental costs; it dealt with a challenge to using "statistical evidence as proof of [racial] discrimination." 478 U.S. 385, 397 (1986) (Brennan, J. concurring). Because Mr. Jarosz failed to use reliable methods and evidence to calculate incremental costs, his lost profits opinion should be excluded. *See Promega v. Life Techs.*, 875 F.3d 651, 660 (Fed. Cir. 2017).

## III.    MR. JAROSZ'S PRICE PREMIUM RESTS ON UNRELIABLE DATA

Mr. Jarosz's Incremental Benefits opinion should be excluded because the data underlying his price premium input is unreliable. *See* D.I. 294 § V. Attempting to sidestep Alcon's motion, Sight primarily focuses on how Mr. Jarosz's Incremental Benefits opinion purportedly apportions, *see* D.I. 326 at 8, but that is the subject of another *Daubert* (*see* Section IV, *infra*). Regarding the unreliability arguments Alcon raised, Sight's response confirms Mr. Jarosz's price premium calculation is based on unreliable data and should be excluded.

Mr. Jarosz calculates his price premium by dividing iStent's actual Q2 2018 US net sales from a Glaukos 10-Q (numerator) by estimated Q2 2018 procedures from Market Scope (denominator). *See* D.I. 298-10, Tab 9, line [1]. Yet Mr. Jarosz admits the denominator is off "by an order of magnitude." D.I. 298-22 at 162:8-16. Sight attempts to resuscitate his use of inaccurate quarterly estimates by arguing he "did not rely *only* on data from that quarter"—apparently referring to the actuals in the numerator. D.I. 326 at 10. That is irrelevant: because the denominator is off, so is the end result.

The Market Scope data, which Market Scope itself cautions lacks "precision," is not reliable for Mr. Jarosz's purposes. D.I. 298-37 at 108. While Alcon relies on Market Scope data for *trends* where Alcon lacks third-party data, Alcon's witnesses were unequivocal that the reports are not accurate. *See* D.I. 333-19 at 125:7-12; 124:19-25 ("***So directional, I will agree; accurate, no***."); D.I. 333-19 at 75:3-5. Sight's "gotcha" that Mr. Meyer relied on "the exact Q1 2019 report," (D.I. 326 at 10), falls flat because Mr. Meyer used it to ***rebut*** Mr. Jarosz. *See* D.I. 298-13 ¶204.

Moreover, it is false that Mr. Jarosz "lack[ed] actual pricing data." *Id.* Mr. Jarosz had **actual** iStent ASP information for January 2018–September 2019 from the *Glaukos* litigation (Ex. 72 at n.375). *See* D.I. 298-22 at 169:10-171:17. But Mr. Jarosz chose not to use it ███████████ ███████████████████████████████████████████████████████████████████████████ ██████████████; *see also* D.I. 298-13 ¶195.[3] Finally, "Market Scope's aggregate estimates over time" are irrelevant. Mr. Jarosz does not rely on aggregate estimates over time. D.I. 326 at 10.

Sight's cases are inapposite. In *MediaTek v. Freescale Semiconductor*, Freescale did "not dispute the reliability of the data." 2014 WL 2854890 at *5 (C.D. Cal. June 20, 2014). And in *UCB v. Teva Pharms.* the third-party data was "reliable and accurate" and "commonly used for auditing purposes." 2015 WL 11199058, at *7 (N.D. Ga. Mar. 18, 2015). Sight is left with *Lucent* and *VirnetX* for general propositions regarding the precision required for a reasonable royalty. D.I. 326 at 10. But neither allows for the use of unreliable data concededly off "by an order of magnitude."

## IV.   MR. JAROSZ'S AND DR. DOWNS'S APPORTIONMENT FAIL RULE 702

Sight must "give evidence tending to separate or apportion [its] damages between the patented feature and the unpatented features… [M]easuring this value requires a determination of the value added by such features." *Omega Pats. v. CalAmp*, 13 F.4th 1361, 1376 (Fed. Cir. 2021). Sight pays lip service to this requirement by proffering unreliable expert testimony. Ultimately, the only thing one can conclude from Mr. Jarosz's and Dr. Downs's "apportionment" analyses is that Ivantis advertised six features of Hydrus and Dr. Downs concludes five of them allegedly have a connection to the Asserted Patents. Missing is any economic basis for Mr. Jarosz to conclude that 5/6 of the **value** of Hydrus's alleged price premium over iStent is due to the Asserted Patents—

---

[3] ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████

particularly given both experts admit other (unaccounted-for) features drive value and sales.

### A.   Dr. Downs's Value-Driver Analysis Does Not Apportion.

Sights admits Dr. Downs is not qualified to analyze "the degree to which the Hydrus value drivers impact sales and profits." D.I. 326 at 13. Thus, his 5/6 opinion based on "value drivers" identified in a marketing document plucked from Alcon's production cannot serve as economic apportionment. For that, "the patentee must prove that [unpatented] features ***do not cause consumers to purchase*** the product," which Sight admits Dr. Downs cannot do. *Power Integrations v. Fairchild Semiconductor*, 904 F.3d 965, 979 (Fed. Cir. 2018).

Sight insists Dr. Downs's 5/6 opinion applies a "court-approved methodology." D.I. 326 at 11. However, none of Sight's cited cases support Dr. Downs. In *UT Bd. of Regents v. Bos. Sci.*, the expert opined on ***economic*** apportionment (*i.e.*, what "drove stent purchasing decisions"). 645 F. Supp. 3d 324, 333 (D. Del. 2022). That expert did not base his opinion solely on marketing documents, but on his "extensive experience as an interventional cardiologist" and "personal experience" with the accused products and salespeople. *Id.* In *Apple v. Motorola*, the expert "attempted to isolate the value" of the patented technology "by valuing other, non-claimed features [] and subtracting th[eir] value." 757 F.3d 1286, 1318 (Fed. Cir. 2014). In *Arctic Cat v. Bombardier*, the expert opined on whether two products were "comparable," not on apportionment. 876 F.3d 1350, 1369-70 (Fed. Cir. 2017). In *Cirba v. VMware*, the technical expert opined on "the incremental benefits of the patented method" based on "a detailed analysis of a variety of ***quantitative*** factors." 2023 WL 3151853, at *6 (D. Del. Apr. 18, 2023). Here, Dr. Downs arbitrarily relies on a handful of qualitative marketing materials from which Mr. Jarosz unjustifiably draws quantitative conclusions.

Sight argues Dr. Downs's 5/6 opinion passes muster because he testified "a good way to figure out where value is...is to identify those places where the person who owns the property

thinks the value is." D.I. 326 at 12. But "[i]t is not enough to merely show that [the patented feature] is viewed as valuable, important, or even essential…." *LaserDynamics v. Quanta Computer*, 694 F.3d 51, 68 (Fed. Cir. 2012). And Dr. Downs admitted he failed to account for other Hydrus "value drivers" not covered by the Asserted Patents. D.I. 298-23 at 312:14-23, 313:8-11. Sight argues Dr. Downs can rely on marketing materials instead of independently analyzing Hydrus's technical benefits compared to the Asserted Patents, but in each of the cases Sight points to, the technical expert ***did*** perform an independent analysis. *See supra*. Moreover, this Court previously found in another context that what a company "touts...as part of marketing" is not indicative of what "drive[s]...customer sales." *Cirba*, 2023 WL 3151853, at *5 n.6. Dr. Downs's 5/6 "conjectural and speculative" opinion based on "marketing material" should be stricken. *See Atlas IP v. Medtronic*, 2014 WL 5741870, at *5 (S.D. Fla. Oct. 6, 2014).

## B. Mr. Jarosz's "Incremental Benefits" Approach Does Not Apportion.

Sight argues the "first step" in Mr. Jarosz's analysis, where he compares the price of Hydrus to iStent, apportions out "revenues and profits...which cannot be attributed to the patented features." D.I. 326 at 8; *id.* at 10. But even Mr. Jarosz's report makes clear his "first step" does not apportion because it includes the contributions of other value drivers. D.I. 298-10 ¶¶114, 125. Sight relies on *UT Bd. of Regents* and *Bayer* to argue Mr. Jarosz apportioned in his price comparison, but those cases are inapposite. In both, the accused and non-infringing products were sold by the accused infringer and the only material difference was the inclusion of the patented features. *See UT Bd. of Regents*, 645 F. Supp. 3d at 330-333 ("only material difference" between BSC stents was patented coating); *Bayer Healthcare v. Baxalta*, 407 F. Supp. 3d 462, 481 (D. Del. 2019) (older and newer generation products "materially identical aside from [] infringing features"). Here, Hydrus and iStent are sold by different companies, and no technical expert established that the only "material differences" are solely attributable to the Asserted Patents.

7

It is the *second* step of Mr. Jarosz's analysis where he concedes he is supposed to "isolate...the specific contribution of the patent at issue as distinct from the contributions of other patented and non-patented technologies or considerations." D.I. 298-10 ¶115. However, he does not do so. Instead, he turns to Dr. Downs's flawed 5/6 opinion and blindly concludes an appropriate economic "Apportionment Factor" is "five out of six (or 83 percent)." D.I. 298-14 ¶¶17, 385; D.I. 298-10 ¶¶188, Tab 16, line [8], Tab 19, line [7]. Mr. Jarosz never determined the "incremental value" of these five features (nor did Dr. Downs) or showed these five features "cause consumers to purchase the product" (nor did Dr. Downs). *Exmark Mfg. v. Briggs & Stratton Power Prod. Grp.*, 879 F.3d 1332, 1348 (Fed. Cir. 2018); *Power Integrations*, 904 F.3d at 979. There is "simply too great an analytical gap" to bridge between Dr. Downs's 5/6 opinion and economic apportionment. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, (1997).

Sight's claim that Mr. Jarosz performed his own apportionment provides no support. Mr. Jarosz admits he did not use that analysis in his calculations. Ex. 68, Jarosz Tr. at 267:8-14. And for good reason: without any technical support, he merely counts the number of times certain words are mentioned in marketing documents. *Compare* D.I. 298-10 Tab 20 (attributing "Outflow Area" to Asserted Patents) *with* D.I. 298-23 at 305:4-6 ("I'm not sure what outflow area means.").

### C.     Mr. Jarosz's "Market" Approach Does Not Apportion.

Sight argues Mr. Jarosz's Market Approach, based on the expected value of Alcon's acquisition of Ivantis, "properly apportion[s]." D.I. 326 at 15. It does not. As Sight admits, in the first step of this approach, Mr. Jarosz applies an adjustment factor to go from the value of the *entire company* down to the "value of the *Hydrus product line*." *Id*. Mr. Jarosz then relies on Dr. Downs's 5/6 opinion to conclude that 83.3% percent of the value of the Hydrus product line is attributable to the Asserted Patents. Ex. 68, at 227:9-228:3; *see also* D.I. 298-10 ¶188, Tab 19, line [7]. Mr. Jarosz's flawed reliance on the same 5/6 opinion from his Incremental Benefits approach

infects his Market Approach. *See supra*. Moreover, Mr. Jarosz does not explain how Dr. Downs's 5/6 opinion can reliably be applied to the estimated acquisition value of an entire company. Sight cites *Limelight Networks v. XO Commc'n.*, but that supports Alcon because the court held the expert's reliance on "acquisition" documents was "an arbitrary method to determine the patent's value." 2018 WL 678245 at *7 (E.D. Va. Feb. 2, 2018). In *10x Genomics v. NanoString Tech.*, the acquisition agreement was relevant to the value of the asserted patents because it allotted a particular amount to technologically comparable patents. 2023 WL 5805585, at *9 (D. Del. Sept. 7, 2023). Finally, Sight's argument that Mr. Jarosz apportioned because his Incremental Benefits and Market Approaches both result in a royalty that ██████████████████████████ ████████████ is an impermissible reasonableness check that violates the entire market value rule. D.I. 326 at 15, 16; *see Uniloc USA v. Microsoft*, 632 F.3d 1292, 1321 (Fed. Cir. 2011).

## V.   MR. JAROSZ'S USE OF THE GLAUKOS SETTLEMENT IS UNRELIABLE

Sight argues there is no *per se* rule barring the use of settlement agreements as comparable licenses, ignoring such use has long been disfavored. Citing *ResQNet*, Sight acknowledges one must account for "the state of the litigation," D.I. 326 at 17, but Mr. Jarosz does not. Instead, he merely nods to it, ignoring adverse rulings and the effect the pending acquisition had on settlement. See D.I. 298-10 ¶¶145-147. Sight ignores *ResQNet*'s cautions against using settlement agreements because "litigation itself can skew the results of the hypothetical negotiation." *ResQNet.com v. Lansa*, 594 F.3d 860, 872 (Fed. Cir. 2010). And that is exactly what happened in *Glaukos*.

Sight argues Mr. Jarosz can assume the *Glaukos* settlement is comparable because ████ ██████████████████████████ a point not made by Mr. Jarosz. D.I. 326 at 17-19. But the document Sight points to was created in May 2021—almost a year after the adverse inference ruling that led to the settlement and more than two years after Ivantis lost its patent counterclaims on summary judgment—it was not a ***pre-litigation*** assessment, as Sight claims. *See* D.I. 333-24,

Ex. 127; Ex. 73 (Exhibit 127 metadata); D.I. 326 at 17. Thus, even if Alcon as the acquirer ██████████████████████ that view is against the backdrop of the adverse rulings, bargaining disparity, and pending acquisition; all things Mr. Jarosz did not analyze. And it does not contradict Ivantis witness testimony that 10% was ███████████████. *See* D.I. 298-21 at 108:7-109:3.

Sight claims Mr. Jarosz's exclusion of the lump sum payment and cross license in the *Glaukos* settlement offsets the adverse rulings and acquisition impact. But Mr. Jarosz made no such link in his report and Sight cannot back-fill now. *See* D.I. 326 at 14; D.I. 298-11 ¶¶145, 147 (lacking any discussion of adverse rulings or acquisition). Moreover, Sight's cases do not support its argument that the *Glaukos* settlement is comparable. In *Moskowitz Fam. v. Globus Med.*, the court noted that, unlike Mr. Jarosz, "Mr. Meyer provided an analysis of economic comparability" "over the course of twenty-one paragraphs" and explained why the "settlement was a proper comparator." 2023 WL 5487662, at *9, 12 (E.D. Pa. Aug. 24, 2023). Sight claims "the adverse inference made findings of validity and infringement more likely," D.I. 326 at 18, but ignores how it could infect other determinations, like willful infringement and damages. The coercive environment of the *Glaukos* litigation, involving adverse rulings and acquisition conditions tied to the litigation, does not replicate the hypothetical negotiation between willing parties. *See Oracle v. Google*, 798 F. Supp. 2d 1111, 1121 (N.D. Cal. 2011) (hypothetical negotiation "should not be based on any premise that the patent holder had the infringer 'over the barrel'").

Sight attempts to distinguish *LaserDynamics* by noting that settlement was entered into "three years before the hypothetical negotiation date." D.I. 326 at 18. Sight is incorrect: the settlement was entered into three years ***after*** the hypothetical negotiation. 694 F.3d at 78. So was the *Glaukos* settlement, which makes it similarly non-comparable given the rapidly "changing technological and financial landscape" of the market. *See id.* Sight further tries to distinguish the

*LaserDynamics* settlement by painting it as an outlier, but so was *Glaukos*: both Alcon and Ivantis witnesses testified that "low single digits" were common royalty rates in the medical device industry, confirming the upward pressure the litigation put on the rate. D.I. 298-21 at 106:7-107:5; Ex. 69, Weems Tr. at 210:16-22. Whether the sanctions were worse in *LaserDynamics* or *Glaukos* misses the point. In both cases, the sanctions disadvantaged the sanctioned party.

Sight next argues the Court's denial of Ivantis's infringement counterclaims "brought the parties closer to the hypothetical negotiation setting." D.I. 326 at 19. In truth, it obliterated Ivantis's affirmative case and bargaining leverage, creating more risk—dynamics not present in the hypothetical negotiation. *See* D.I. 298-27 at 238:2-7. Sight contends the pending Alcon acquisition was irrelevant to the *Glaukos* settlement because Ivantis should have targeted the lowest royalty possible. While that is every licensee's goal, Sight ignores that the target shifts based on circumstances. Ivantis accepted an above-market rate based on ████████████████████ ██████████. *See id.* at 212:15-20; 239:5-8. But the hypothetical negotiation would involve no such pressure and Ivantis would be able to negotiate the lowest royalty possible based on the intrinsic value of the patents, free of the extrinsic pressures put upon the *Glaukos* settlement.

Sight tries to rehabilitate Dr. Downs's "comparability" analysis, arguing he took his "categories" from the claims. Yet Dr. Downs provided no analysis of the claims; he simply took 13 words from 5 patents and filled out a chart with X's. *See* D.I. 298-14 ¶¶397-98. Dr. Downs provided no explanation of why he concluded the Glaukos patents are narrower than the Asserted Patents. *See id.* That the accused product is the same does not excuse not analyzing the differing incremental values of the *Glaukos* patents and the Asserted Patents (if all are valid, there must be patentable differences). Sight's cases offer no support, as the technical expert in *Moskowitz* was not the subject of a *Daubert* motion, separately discussed each of the three patents, and identified

the similarities and differences between them and the patents in the settlement. 2023 WL 5487662, at *7. *Phillips v. AWH* does not even discuss the technical comparability requirement. 415 F.3d 1303 (Fed. Cir. 2005). Because the *Glaukos* settlement is riddled with critical differences from the hypothetical negotiation, the Court should exclude Mr. Jarosz's reliance on it.

## VI.   OPINIONS OUTSIDE DR. DOWNS'S EXPERTISE SHOULD BE EXCLUDED

Regarding Dr. Downs's FDA opinions, Sight argues they are technical opinions, citing paragraphs Alcon did not challenge. D.I. 326 at 20 (citing Downs Op. ¶¶365-372; Downs Reply ¶91). Regarding the challenged opinions, Dr. Downs has no FDA expertise and is therefore not qualified to give FDA opinions. D.I. 294 at 21-22. Regarding his PTO opinions, Sight argues they are relevant, but an opinion must be both relevant **and** reliable to be admissible. D.I. 326 at 20. Because it is undisputed he lacks expertise to understand and interpret the PTO's alleged findings, Dr. Downs's PTO opinions should be excluded. *See Am. Cruise Lines v. HMS Am. Queen Steamboat,* 2017 WL 3528606, at *6 (D. Del. Aug. 16, 2017).

## VII.   DR. DOWNS'S NEW CLAIM CONSTRUCTIONS SHOULD BE EXCLUDED

**"Does Not Significantly Block"** – Under the Court's construction, a device does not have to **create** flow to meet this term, and flow is not **required** in any particular location. D.I. 294 at 23; D.I. 297 § III.A; D.I. 273 at 6-7; D.I. 118 at 20-21; D.I. 119-19 ¶¶ 21, 25; D.I. 119-20 at 141:12-142:8. Dr. Downs did not contend otherwise in his opening report, but later asserted that "flow **has** to occur" specifically through the trabecular meshwork. D.I. 298-15 ¶¶ 146-192, 247-279, 375-412, 464-491, 538, 542-576; D.I. 298-23 at 85:15-86:8, 208:12-211:13. Sight's response ignores that Dr. Downs's new construction contradicts his own, earlier interpretation of this term, as well as the Court's orders (D.I. 294 at 23-24; D.I. 326 at 21-22).

**"Arcuate Member"** – Dr. Downs improperly added three new requirements to the Court's construction. As to the **first** (curved along entire length), Sight alleges Alcon "mischaracterize[s]"

12

Dr. Downs (D.I. 326 at 22), but his testimony was clear:  "*the entire … support has to be curved*."
D.I. 298-24 at 164:19-165:22; *see also id.* at 255:2-256:10. For the **second** (certain size), Sight
ignores Dr. Downs's analysis and testimony showing his new size requirement, D.I. 298-15 ¶¶142-
43; D.I. 298-24 at 166:11-12, 257:4-260:13, 261:7-262:11, 264:20-277:17, instead crop-quoting
other testimony that does not change the fact that he adds this new requirement. And the Court did
not impose a size requirement by declining to adopt "bent" as within the scope of the term. *See*
D.I. 134 at 17-19; D.I. 326 at 22. For the **third** (preformed), Alcon's argument is not "simply a
disagreement" with Dr. Downs's application of the Court's construction (D.I. 326 at 22-23)—it is
that his new "preformed" requirement rewrites the term's scope.

 **"Maintain the Patency"** – Sight does not dispute the term's plain and ordinary meaning
is "to hold a structure open," which Dr. Downs conceded, and Sight's characterization of that
testimony as referring to prior art is incorrect. D.I. 298-24 at 208:6-209:24; D.I. 298-31 at 8:22-
23. Dr. Downs applies a non-plain meaning construction based on his flawed understanding of the
specification, but whether broad claim language is limited by lexicography is a claim-construction
issue. *Agere Sys. v. Broadcom*, 2004 WL 1658530, at *18 (E.D. Pa. July 20, 2004). Sight never
sought a construction to that effect so its new construction is waived. *Cent. Admixture Pharmacy
v. Advanced Cardiac*, 482 F.3d 1347, 1356 (Fed. Cir. 2007); *ePlus v. Lawson Software*, 700 F.3d
509, 520 (Fed. Cir. 2012). Sight also fails to address that Dr. Downs adds other, allegedly
"inherent" requirements into the construction that do not appear in the specification and will
confuse the jury. *See* D.I. 298-23 at 64:24-75:18; D.I. 294 at 25. *O2 Micro* is inapposite because
this term does not have more than one ordinary meaning. *See* D.I. 326 at 23; *O2 Micro. v. Beyond
Innovation Tech.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).

 **"Implantable Circumferentially within Schlemm's Canal"** – Sight provides no basis

for the different constructions Dr. Downs used in his opening and rebuttal reports instead pointing to the specification as allegedly supporting both. D.I. 326 at 23-24. Sight's quotes do not appear in the specification (*id.*, citing D.I. 298-2 at 8:54-57, 11:16-20), and Sight fails to admit that the second construction is narrower than, and contradicted by, the specification. D.I. 294 at 25-26.

**"Fenestration"** – Sight's new construction is not a "complementary description[]" of the term (D.I. 326 at 21), but adds another requirement (a "closed boundary," D.I. 298-15 ¶¶159, 194, 493) in the hopes of avoiding prior art. Sight fails to reconcile that nothing in the record supports its new, narrower construction, and ample evidence supports Sight's broader construction, including inventor testimony. D.I. 90 at 2-3; D.I. 298-25 at 133:15-18; D.I. 298-14 ¶72; D.I. 298-24 at 247:8-18; *Howmedica v. Wright Med. Tech.*, 540 F.3d 1337, 1352 n.5 (Fed. Cir. 2008).

## VIII.   DR. DOWNS'S STRAIN ANALYSIS SHOULD BE EXCLUDED

Sight does not dispute Dr. Downs's strain analysis is based on proportions in a patent figure, *see* D.I. 294 at 26; D.I. 298-24 at 170:8-23; D.I. 298-15 ¶¶ 205-215, or that such reliance is legally improper. *Nystrom v. TREX*, 424 F.3d 1136, 1149 (Fed. Cir. 2005). Sight attempts to justify Dr. Downs's improper analysis as a response to Dr. Tanna's use of patent-figure proportions (D.I. 326 at 24), but Dr. Tanna used patent figures to depict curvatures taught in the prior art—his opinions have nothing to do with proportions. D.I. 298-18 § X. Dr. Downs's methods are not well-known or accepted, and nothing in the record supports them. *Heller v. Shaw Indus.*, 167 F.3d 146, 163-65 (3d Cir. 1999). Dr. Downs "believe[d]" his strain equation could be found in an unproduced textbook he did not bring to his deposition or identify in any report. D.I. 298-24 at 166:24-167:12, 169:1-170:7. Sight waited until its response to Alcon's motion to furnish an excerpt of the textbook, depriving Alcon and its experts a fair opportunity to respond. D.I. 326 at 25 (citing D.I. 333-27). The textbook does not in fact provide Dr. Downs's strain equation or otherwise establish its reliability, and nothing supports Dr. Downs's various flawed assumptions. D.I. 298 at 26-27.

OF COUNSEL:
Gregg LoCascio
Sean M. McEldowney
Justin Bova
Steven Dirks
Socrates L. Boutsikaris
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

Jeanne M. Heffernan
Kat Li
Ryan J. Melde
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
(512) 678-9100

Ryan Kane
Nathaniel DeLucia
Emily Sheffield
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Brian A. Verbus
Jacob Rambeau
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000

Noah S. Frank
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Dated: November 16, 2023

/s/ Andrew E. Russell
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2023, this document was served on zsightsciencesivantis@cooley.com and the persons listed below in the manner indicated:

**<u>BY EMAIL</u>**

Melanie K. Sharp
James L. Higgins
Taylor E. Hallowell
YOUNG, CONAWAY, STARGATT
 & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

Orion Armon
COOLEY LLP
1144 15th Street, Suite 2300
Denver, CO 80202
(720) 566-4000
oarmon@cooley.com

Dustin M. Knight
Joseph Van Tassell
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190
(703) 456-8024
dknight@cooley.com
jvantassell@cooley.com

Michelle S. Rhyu, J.D., Ph.D.
Lauren Strosnick
Alissa Wood
Angela R. Madrigal
Juan Pablo Gonzalez
Jeffrey Karr
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94305
(650) 843-5000
rhyums@cooley.com
lstrosnick@cooley.com
amwood@cooley.com
jgonzalez@cooley.com
amadrigal@cooley.com
jkarr@cooley.com

Bonnie Fletcher Price
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
(202) 776-2099
bfletcherprice@cooley.com

*/s/ Andrew E. Russell*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700a
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants*