IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SIGHT SCIENCES, INC., )
)
Plaintiff, ) C.A. No. 21-1317-JLH
)
v. )
)
IVANTIS, INC., )
)
Defendant. )

Friday, March 22, 2024
11:00 a.m.
Courtroom 6D

844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE JENNIFER L. HALL
United States District Court Judge

APPEARANCES:

YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
BY: MELANIE K. SHARP, ESQ.
BY: TAYLOR E. HALLOWELL, ESQ.
BY: JAMES L. HIGGINS, ESQ.

-and-

COOLEY LLP
BY: ORION ARMON, ESQ.
BY: MICHELLE RHYU, PhD, ESQ.

Counsel for the Plaintiff

APPEARANCES CONTINUED:

SHAW KELLER, LLP
BY: KAREN E. KELLER, ESQ.
BY: ANDREW E. RUSSELL, ESQ.

-and-

KIRKLAND & ELLIS, LLP
BY: GREGG F. LOCASCIO, ESQ.
BY: JEANNE M. HEFFERAN, ESQ.
BY: NOAH FRANK, ESQ.
BY: BRIAN A. VERBUS, ESQ.
BY: KAT LI, ESQ.

11:06:41 Counsel for the Defendant

-----------------------------------

11:08:28 COURT CLERK: All rise. Court is now in
11:08:31 session. The Honorable Jennifer L. Hall presiding.
11:08:35 THE COURT: Hi, everyone. Good morning. Please
11:08:38 be seated.
11:08:41 All right. We're here for a pretrial conference
11:08:46 and hearing on some Daubert motions. This is Sight Sciences
11:08:51 vs. Ivantis. It's civil action number 21-1317.
11:08:56 Let's a go ahead and put our appearances on the
11:09:01 record.
11:09:01 MS. SHARP: Good morning, Your Honor. Melanie
11:09:04 Sharp from Young, Conaway, Stargatt & Taylor. With me in
11:09:07 the courtroom is Jim Higgins, my partner. We're a little
11:09:11 bit heavily staffed as we try to sort through the trial
11:09:15 date. Also, my associate, Taylor Hallowell.

THE COURT: Hello.

MS. HALLOWELL: Hello.

MS. SHARP: Seated at counsel table are my colleagues, Dr. Michelle Rhyu, Orion Armon and Jeremy Hayden, Chief Legal Officer at Sight Sciences.

THE COURT: Great. Good morning to all of you.

MS. SHARP: Your Honor, we were able to reach agreement on one issue that effects two items before the Court. I'd be happy to put that on the record.

THE COURT: Sure. Why don't we let them have their appearances and then we'll see where we're at.

MS. KELLER: Good morning, Your Honor. Karen Keller from Shaw Keller. With me today is Andrew Russell from my office, and then from Kirkland & Ellis we have Greg LoCascio, Jeanne Heffernan, Brian Verbus, Noah Frank and Kat Li. And from Alcon, in the back we have Jeff Prokop, Adam Pierson and Brannon Latimer.

THE COURT: Hi. Good morning. Okay. All right. Ms. Sharp, go ahead.

MS. SHARP: Thank you, Your Honor. And I'm sorry about the late notice on this, but happy that we can shorten the hearing, so I hope the Court is happy as well.

THE COURT: Fantastic.

MS. SHARP: The parties have resolved the issue regarding the questionnaire --

THE COURT: Okay.

MS. SHARP: -- that went out to employees. This is Your Honor's issue number three in D.I. 419. We understand that that resolves the Daubert affecting Dr. Jarosz concerning the questionnaire. And again, that's your item 3.

THE COURT: Yep.

MS. SHARP: Your Honor's item 3. It also resolves an issue in the pretrial order about Mr. Armon being called as a witness in the case. So we have agreed on documents that will not be on the exhibit list, the questionnaire and the results of the questionnaire and we've also discussed and agreed that Mr. Phelps from Sight Sciences will testify as to his personal knowledge independent of the questionnaire and that will be the basis of Dr. Jarosz's testimony.

THE COURT: Great.

MS. SHARP: Thank you, Your Honor.

THE COURT: That was the main resolution?

MS. SHARP: Yes.

THE COURT: All right. Very good.

All right. So I have a really long checklist of things to discuss with everybody.

The first thing I wanted to ask is how we're doing on settlement discussions and are those ongoing?

11:11:45 DR. RHYU: Your Honor, we are discussing, but we're quite far apart.

11:11:49 THE COURT: Okay. All right. Have the decision makers been in a room together, actually in a room together talking face to face?

11:11:57 DR. RHYU: No, they have not.

11:11:59 THE COURT: Okay. Have the discussions been over the phone with the decision makers or just relayed through lawyers?

11:12:07 DR. RHYU: Relayed through lawyers.

11:12:08 THE COURT: Okay. All right. Let's see how things go today and then maybe we'll discuss how we might get everybody in a room together.

11:12:16 DR. RHYU: Thank you.

11:12:16 THE COURT: Thank you. All right. So we had a pretrial conference yesterday for the trial that was first in line for the week you originally had and it was pretty clear to us that that trial is going forward, so that's why we let you know last night. It wasn't intended to put you on a fire drill, but we wanted to ensure that trial was going forward before we made any decisions. So we looked at the calendar, and as we mentioned in the oral order, it looked like we might be able to squeeze you in in either the 22nd or the 29th of April with a Friday jury selection.

11:13:02 So let's hear from each side or a representative

11:13:07 for both the parties about where we are on that to the
11:13:10 extent you've been able to talk to the relevant people about
11:13:15 scheduling.
11:13:16 MR. ARMON: Yeah. Thank you, Your Honor. We've
11:13:19 attempted to reach out to our experts and witnesses. We
11:13:21 have one expert who is hunting with his father and has been
11:13:24 difficult to reach. With the Court's indulgence, if we
11:13:28 could have until Monday, we'd have full clarity.
11:13:31 We know at this point that it looks like the
11:13:33 week of the 29th is probably not workable. We may be able
11:13:38 to make the week of the 22nd work with jury selection on the
11:13:42 19th and we just need another day to finalize our experts
11:13:49 and witnesses' availability.
11:13:51 THE COURT: Okay.
11:13:54 MR. LOCASCIO: Good morning, Your Honor.
11:13:56 THE COURT: Good morning.
11:13:57 MR. LOCASCIO: On the Alcon side, we have done
11:14:01 the same thing. We've actually gotten a hold of all of our
11:14:04 witnesses. The week of the 22nd we have one or two
11:14:07 witnesses who might have to read transcripts and miss a day,
11:14:09 but we don't think it's a day they would have to testify, so
11:14:12 we think the 22nd would work. Counsel, as well, is clear
11:14:15 that week.
11:14:16 We have one witness, just so you know, a former
11:14:18 employee whose wife is expecting. It's high risk and it's

close. We think he can be here in person the 22nd. We sort of politely enough tried to twist that arm last night. The 29th gets a lot harder, so if it was the second week, he probably would have to testify remotely. I don't know if you've done that before, but we'd have to probably do that. The only other point, I believe on the 29th, is Ms. Heffernan and I have a jury trial that starts on the 6th in Omaha, the Monday that would be the day after trial.

So while the 22nd of those two weeks is preferable to us, it sounds like it's better for them. I just wanted to flag that, because if it ended up the 29th, we'd have to do some jockeying and one of us might have to miss a day and we'd have to ask your indulgence.

THE COURT: Okay. Great. Any issues with the remote testimony if we end up in the situation where we've got somebody who is maybe sleeping overnight in the NICU?

MR. ARMON: Yeah, Your Honor. We may be in the same situation. Our damages expert has a trial the week of the 22nd and we're holding out hope that we can find some way to manage that. I believe that trial is in Texas. So we're dealing with that issue as well as another expert who had a long-planned family trip. And we're not sure if we'll be able to find a way to curtail a portion of that so he can be here. So those are the two main issues we're working on, but we certainly wouldn't object to remote testimony. And,

11:15:46 in fact, we may need that for our damages expert.

11:15:50 THE COURT: Okay. So here's what I'll say. I know that plaintiff has been wanting to get this calendared sooner rather than later. It just was shocking to us that we could actually fit you in either of these two weeks, because we do have other hearings those weeks. So what we're doing is we're not moving another trial, but we are rescheduling all our hearings for those weeks. So we're really trying to accommodate you.

11:16:19 If we don't get you in then, plaintiff, because I know that or at least I understood it or maybe I understood it that defendant was wanting to delay longer, we're really looking at at least August. And when I say that, I mean that I have sporadic times available, not that it's opening up in August somehow.

11:17:16 MR. LOCASCIO: I'll just put on the record from the Alcon side, Your Honor, we have no agenda or incentive to delay. And insofar as we're even open to the 29th, which would be two clients really torn between Ms. Heffernan and myself, we will happy do that versus have it sort of go out into the ether.

11:17:35 THE COURT: Understood. And I appreciate it. Thank you.

11:17:38 MR. ARMON: Your Honor, only other question from plaintiff's side is are there dates in August that we could

11:17:46 consider if -- if our experts are unable to make the 22nd
11:17:50 work or are those two sporadic for you to be willing to give
11:17:55 them to us?

11:17:56 THE COURT: The problem is I'm giving those
11:17:58 dates to everybody. So you know, I can give you an
11:18:01 anecdotal example of me giving dates to people while I was
11:18:05 sitting on the bench and then when they agreed to them, I
11:18:08 looked at my calendar and they were already gone. So we're
11:18:14 looking at -- no. We're looking at mid August. The problem
11:18:20 is that on the days where I don't have trial in August,
11:18:27 those are likely going to be filled up by trials that are
11:18:31 double and triple booked in August and September. So we're
11:18:35 moving puzzle pieces around essentially. I don't have a
11:18:38 definitive date I can get you.

11:18:41 MR. ARMON: Is the Court able to indulge the
11:18:43 parties until the Monday to report back --

11:18:46 THE COURT: Yea, a hundred percent.

11:18:48 MR. ARMON: -- to report back on the 22nd and
11:18:50 the 29th?

11:18:51 THE COURT: Absolutely. We will reserve the
11:18:53 22nd for you until Monday.

11:18:56 MR. ARMON: Okay. Thank you.

11:18:57 THE COURT: Okay. The next thing I was going to
11:18:58 ask you was, it sounded like there was interest from at
11:19:02 least one side to moving forward with jury selection on the

Friday before. I'm going to have to move some stuff around anyway for the Friday before, but this would actually go a lot easier if the parties would agree to have one of our magistrate judges conduct the jury selection. They actually do it a little more than I do even these days and I've done it plenty of times myself as a magistrate judge. We'll just adopt some of the voir dire introduction speech to mention that it will be a different judge that's presiding over the trial. Can we agree to that?

MR. ARMON: Plaintiff has no objection, Your Honor.

MR. LOCASCIO: We're fine with that as well, Your Honor.

THE COURT: All right. Great.

And then what I was going to tell you is that if you agree to that and the parties agree to lunches for the jurors the week of the trial, that I would give each side 11 hours of time to do their cases instead of the 10 I was thinking of. Is that agreeable to both sides?

MR. LOCASCIO: If I'll go first on this one. When you indicated Friday jury selection, I immediately was thinking I was going to wait until we go to the point in the pretrial order of how this plays into trial time. It creates more. We of course are amenable, as we are in every case in the district, to provide lunch to the jurors. I

have questions as to 11. And I know what the practice is. Sometimes each side has 14. I understand the goal is to get in a week. I have real questions with the witness line ups absent further narrowing how it can be done in 11, to be frank, Your Honor.

THE COURT: Okay. Counsel.

MR. ARMON: Your Honor, we're motivated to go to trial. So I think we'd prefer 12 over 11, but if 11 is what we've got we would find a way to present our case in 11.

THE COURT: All right. Well, let's reserve on that. You can have the 11. We'll think about whether or not you need the 12 and maybe I won't give you a final decision on that today, but I'll hear about it at the appropriate time what we're looking at in terms of witnesses.

I have made the mistake before in giving too much time and it doesn't -- it really doesn't help anybody. I think you'd rather know ahead of time that you've got less. We end up in a situation where we're then really concerned about getting done on time and especially if folks have got other obligations in the following weeks, it's going to make it challenging.

All right. The let's talk a little bit about some of the outstanding motions and our plan for those. So I'll just put on the record, as you all know, this case was

11:22:06 reassigned to me a number of weeks ago. When I got it, there were a substantial number of motions that had been filed starting back in October that were pending, so motions pending from October of 2023. We tracked down the courtesy copies, some of the courtesy copies from the judge we got the case from. We couldn't even find some of the more voluminous volumes. This is just stacked up on the bench here what we could locate -- one copy of what we could locate. But even the incomplete set of papers we did locate, we stacked them up and measured them and for the record, there are multiple feet of papers that we have here today that we inherited a few weeks ago.

11:22:53 So we counted eight summary judgment motions, 12 Daubert motions, we have an additional six motions in limine, so we can all agree, I think, that we've got a lot of disagreements to sort through, so we're going to try to get those sorted through as efficiently as possible.

11:23:11 So I want to talk first about plaintiff's motions for partial summary judgment. So before I get to that, I'll just say that plaintiff had four motions for summary judgment. Three of the four relate to their request for either partial summary judgment or summary judgment of infringement. All of those motions are going to be denied.

11:23:36 Regarding plaintiffs motions for partial summary judgment of infringement, those motions don't seek to have

any infringement claim resolved in either use of the word claim. Rather than arguing that all of the elements for at least one patent claim of an asserted patent is met, it's a request to grant partial summary judgment that a bunch of individual elements are met over the 86 claims that were being asserted at the time plaintiff filed its summary judgment motion and I know that's been now narrowed.

But even if I thought that an individual element of a patent claim was something contemplated by the rule as being appropriate for summary judgment, and I don't, I still wouldn't grant summary judgment here. It's very unusual to proceed in this fashion in a patent case. And in this particular case I think it's inappropriate and it would prejudice the defendants.

Just as one example, plaintiff asked for summary judgment that defendants' device has a support. But the asserted claims don't just require a support, they require a support with certain claimed characteristics and plaintiff is going to need to prove to the jury that defendants' support has those claimed characteristics. Me telling the jury that I've ruled that defendants' device has the claimed support risks jury confusion, because the jury still has to find that the support has the other claim requirements.

So I also wanted to say that even without the potential for prejudice, it's not as though once I resolve

some of these elements the case is going to be narrowed in some sensible fashion that would cut down on the trial. So even if I granted summary judgment that defendants' product had a support, it's not really going to do anything to simplify the case. And I think that Judge Andrews' opinion in the Adams case, while it's not a patent case, is persuasive on this point and I agree with that. And that case is at 2020 WL 2404772.

So I'll be denying plaintiff's motions 1 and 2 for partial summary judgment of infringement.

In summary judgment motion 4, plaintiff argues that all of the elements of certain claims of the '482 patent are met. Plaintiff has not contended that it's entitled to summary judgment as to any of the other claims of the other four patents in suit. So with respect to the '482, only one of those claims for which plaintiff sought summary judgment is still in the case. That's claim 11. It depends on claim 10, which depends on claim 1.

We've looked at the record and we conclude that there are disputes of fact that preclude summary judgment. As just one example, there's a dispute of fact as to whether the "without substantial interference" element is met. So that motion will be also denied.

Next we've got plaintiff's motion for summary judgment of no invalidity based on the iStent or it's

essentially a request for a judgment that the iStent is not prior art. That motion is also going to be denied. I've looked at the record. There's a dispute of material fact as to whether the iStent was in public use before the priority date. And there's evidence in the record from which a fact finder might find that the use wasn't confidential.

Plaintiff's also got some Daubert motions. We'll hear argument on those in a minute.

Next I'm going to turn to defendants' motion for summary judgment. Before I give you my rulings on these, I want to say at the outset that even if I granted all of them, it wouldn't resolve the case because each motion only relates to a subset of the asserted patent claims. There's no motion for summary judgment on defendants' side, to my knowledge, that will would resolve the '742 or the '348 patents, so those are going to get tried no matter how I rule on defendants' summary judgment motions.

So I'll talk first about defendants' motion for summary judgment that the block limitation claims are invalid for lack of enablement. That will be denied.

So this argument is about a limitation that defendants call the "block limitation." That limitation, according to defendants' statement of undisputed facts, is only in the currently asserted claims in the '482 and '443 patents, so this motion doesn't affect the remaining

11:28:39 asserted claims of the other three patents. Nevertheless, 11:28:42 we looked at the record and while enablement is a question 11:28:44 of law, it implicates underlying factual questions and there 11:28:48 are disputes of material fact here, including disputes about 11:28:52 whether undue experimentation would be required and whether 11:28:55 this is an unpredictable art.

11:28:59 Next we have defendants' motion for summary 11:29:02 judgment that the claims containing the block limitation are 11:29:08 invalid for lack of written description. Again, this only 11:29:12 effects the '482 and '443 patents, not the others. And 11:29:15 we've looked at the record and there is a dispute of 11:29:17 material fact as to whether the inventor possessed the 11:29:20 claimed invention at the time of filing, so that motion will 11:29:24 be denied.

11:29:25 Next we have defendants' motion for summary 11:29:29 judgment that the block limitations are indefinite. And 11:29:32 again, this only effects the '482 and '443 patents. That 11:29:38 motion will also be denied. Although indefiniteness is a 11:29:42 legal question, there are subsidiary factual disputes that 11:29:46 inform the indefiniteness decision, so I'm inclined to put 11:29:50 this to the jury. And the Federal Circuit has said that 11:29:54 indefiniteness is amenable to resolution by a jury.

11:29:58 And then we have defendants' motion for summary 11:30:01 judgment on their obviousness-type double patenting defense. 11:30:07 So it looked to us that at the time these briefs were filed,

Judge Williams, who previously had this case, hadn't yet ruled on whether defendants could assert that defense, but he subsequently said they could. This defense only pertains to the '361 and '443 patents, not the other three patents. And in fairness to defendant, I would characterize this argument as somewhat of a drive-by argument in the brief, but there was an argument at the time that they shouldn't be in the case at all, so I appreciate that.

That said, I couldn't understand from the brief how claim 3 of the '361 was subject to obviousness-type double patenting. It looked to us like it had different language in the comparison claim than the claim chart attached to defendants' brief as Appendix X. So that request is denied as to claim 3 of the '361 patent.

As to the '443 patent, claims 8, 24, and 58 are being asserted from the '443. Looking at the chart provided by defendants, those claims look pretty similar to me to the reference claims in the '772. Plaintiffs point out in their brief that there might be factual disputes regarding whether the patents are patentably distinct, but they don't really flesh that out. But again, that's not really surprising given the posture of the case when the briefing happened. So I'm not sure if the parties want me to give this to the jury or not. It wasn't on your proposed verdict form, but there was an indication in the pretrial order that we're

going to try it. So I don't know where we stand here.

I will say this. I'm inclined not to render judgment on it before the trial, because as even defendants point out, the '443 is similar to other claims that are getting tried. I don't think it's going to expand the case that much and maybe we can sort out obviousness-type double patenting in the briefing if the parties don't want it to get tried to the jury.

So does anybody have anything they want to say about that while we're all sitting here? Do you all want to meet and confer?

MR. LOCASCIO: Since it's our motion, I'll go first, Your Honor. I'm going to investigate further this exhibit Appendix X question you asked with respect to the first patent to understand if it's a clerical issue or whatever guidance we can give you on that. Our expectation, and given the time limits, we certainly, the idea of trying obviousness-type double patenting is essentially a trial inside a trial on other claims and that's a big ask. So I think our expectation is if what you're suggesting is that the patents would go forward through the jury trial and then in a post trial briefing, if necessary, to the bench, we could address the obviousness-type double patenting issue. We'll confer about that if I'm understanding your suggestion right, because I think insofar as you surmised from the

11:33:31 submission, we're not planning to try it, but wanted it to still be in front of you, because it's a question of law at base and we don't believe there's really a fact issue for the jury to decide.

11:33:41 THE COURT: Okay. Counsel.

11:33:42 MR. ARMON: Yes, Your Honor. Pursuant to the Court's guidance, plaintiff narrowed to 10 claims, defendants then narrowed to six invalidity defenses per claim. And defendants did not reserve OTDP as an issue that they would try. And so the OTDP issue is only before the Court in the motion for summary judgment. And so of course we stand by our position that there are fact disputes. But given the narrowing of the case since that briefing occurred, defendants have already given up the opportunity to present that issue at trial. And therefore, of course --

11:34:18 THE COURT: And I guess here's my question for you. Your argument as to why summary judgment shouldn't be granted is because it was waived and so that argument is gone. Judge Williams ruled on that. But then you also say there's fact issues, but what are the fact issues?

11:34:35 MR. ARMON: As to the obviousness of the claims between the reference claim and the claims of the '443 patent. And those fact issues, from our perspective, are both disputed and unresolved.

11:34:48 THE COURT: Okay. All right. Well, let's just

take it out, so we can look at what we're talking about here. I'm going to look for Appendix X to defendants' opening brief.

MR. LOCASCIO: Your Honor, this issue, Ms. Li will handle argument.

THE COURT: Okay. And I understand I didn't request argument on this, so that is fine.

You ready?

MS. LI: Yes. Your Honor, in addressing your question before related to the '361 patent claim 3, if we could go to slide 5, Mr. Shlaifer. So this is the one I think that you were saying that you were not sure about what the comparison was and where it was similar in the previously presented patents. And so this is the comparison here for you, because claim 3 is the one that's still in the case. And it's the one that is related to sodium hyaluronate.

And so what I've done here is compared for you where there are prior claims related to what is being injected into Schlemm's canal and then underneath here is the specification that shows you specifically that a fluid that could be injected is sodium hyaluronate. And so this was already disclosed via the '328 patent and why the '361 claim 3 is still invalid for obviousness-type double patenting.

11:37:14 THE COURT: All right. So you're saying that I'm not supposed to be comparing the claim language, that I should be comparing the claim language to the specification?

11:37:24 MS. LI: No. I'm saying that in the claim language that is in the claim that was before the Court, it talks about injecting a fluid. And so it would be obvious to use the fluid of sodium hyaluronate as the specification itself says this is the type of fluid that you can use.

11:37:43 THE COURT: Okay. So on this one, on the '361, the request for summary judgment by defendants will be denied. Let's hear about the other one.

11:37:51 MS. LI: If we could go to slide 7, please. I believe this was the other claim that Your Honor was interested in. So claim 58 is the one that's still in the case from the '443 patent and you thought it looked similar and we were trying to find the differences.

11:38:07 So what I've done here for you is compared claim 58 to claim 19, which depends from claim 1 of the '742 patent. And plaintiffs claim that the difference here is something that is the "kit" and that's something that is different between the two. So first of all, the kit is just in the preamble. The preamble is not limiting, so that should not be the distinction between the two. Then, if you actually look at the patent itself, it describes what a kit is. A kit is a support and an introducer. In both claims

11:38:41 you have a support and you deliver it into the canal via an
11:38:47 introducer.

11:38:49 THE COURT: All right. Thanks very much.

11:38:56 MR. ARMON: Could you leave that slide out,
11:38:59 please?

11:39:04 MS. LI: I wasn't planning to present.

11:39:06 MR. ARMON: Thank you, Your Honor. A few
11:39:08 points. One, obvious-type double patenting requires an
11:39:13 obviousness comparison exclusively between the claims. Both
11:39:16 of the slides that counsel put up are relying upon the
11:39:19 specification. So at step one we have a problem with the
11:39:23 analysis, because it's dependent upon looking into the
11:39:27 patent specification to support the obviousness argument,
11:39:31 which is disallowed under Federal Circuit precedent that I
11:39:34 think is pretty clearly established.

11:39:36 There's also, with respect to claim 58, counsel
11:39:40 argued that the reference to the "kit" is non-limiting in
11:39:47 the preamble. That's not an issue that was addressed by the
11:39:50 Court and the parties have not litigated that issue.

11:39:54 And also, with respect to the introducer for
11:39:58 delivering the support, as I understand from the arrows,
11:40:02 they're relying upon reaching into the specification again
11:40:05 to support this argument, which is improper.

11:40:07 THE COURT: All right. Thanks very much. Okay.
11:40:10 So defendants' request for a judgment on the '443 patent as

invalid for obviousness-type double patenting today, that's going to be denied. I don't know what the details of your agreement with each other was. And so the posture of this is that it sounds like nobody wants this to go to the jury and so why don't you talk to each other about whether defendant has already agreed that it's going to drop it and not raise it in the post trial briefing.

I'm not holding here today that the patent is valid, but I'm just not going to grant defendants' motion. So if that is something that they haven't already dropped, there could be a potential it gets raised in the post trial briefing.

Does everybody understand where we are on that? Hopefully that made sense.

MR. ARMON: Yes, Your Honor. We'll confer with counsel and provide guidance to the Court.

THE COURT: Okay.

MS. LI: Yes, Your Honor. Thank you.

THE COURT: All right. Thank you. Okay.

All right. I appreciate that. And I appreciate everybody being prepared to talk about that even though I didn't give you advance notice that I might have questions.

All right. Let's talk about the Daubert motions. We put some of them on our list for wanting to hear argument about.

Let's start with plaintiffs. The first one I had on my list was the testimony of Dr. -- is it Iwach or Iwach?

MR. ARMON: It's Dr. Iwach, Your Honor.

THE COURT: Iwach. Regarding the "transition zone is straight" opinion. Can you walk me through that?

MR. ARMON: Yes, Your Honor. So Dr. Iwach offered an opinion based upon a single engineering drawing that was supplied by Ivantis regarding his assertion that the transition zone, which is at the proximal end of the accused Hydrus Microstent, is straight. He admitted in his deposition that that opinion is based solely upon his review of the engineering drawing and his perception that the transition zone is straight, from looking at it. Dr. Iwach is a medical doctor, he's not an engineer. And he conceded that he had not spoken with any employee of defendants regarding this issue. He also admitted that he had no evidence to support the opinion and that he is not an expert and not skilled in the art of reading engineering drawings.

And as explained in the briefing, Your Honor, there is a dual radius of curvature in the Hydrus Microstent. Defendants' witnesses testified multiple times that the smaller radius of curvature, it's up near the snorkel or proximal end, extends well into the transition zone. And Dr. Iwach ignored that testimony in evidence and

again, solely based his opinion on looking at the drawing. And under rule 702 and 703, the Court, as gatekeeper, should exclude that opinion because he's not holding himself out as an expert in biomedical engineering. He's a medical doctor, an ophthalmologist who looked at the drawing and said, to me it looks straight and therefore it is straight. It would be confusing for him to offer that argument and it's also unhelpful because he admitted he didn't have an adequate basis.

So I'll stop there unless Your Honor has any questions. I feel this one was pretty fulsomely covered in the briefing.

THE COURT: All right. Thank you very much.

MR. VERBUS: Thank you, Your Honor. So for the "transition zone is straight," I want to start with the opinion Dr. Iwach was responding to, if we go to the first slide. This is first really Sight trying to correct for its own experts mistake. What we have on the left is a call-out from Dr. Downs' opening report, paragraph 123.

THE COURT: And I apologize. We have done a whole ton of work to get prepared for this, but I'm not -- I don't have facility yet with which doctors go to which parties, so if you could just say, just break it down for me like a kindergarten teacher and this is whose expert is whose.

MR. VERBUS: Sure. So Dr. Downs is Sight's technical expert.

THE COURT: Okay.

MR. VERBUS: And offered opinions on infringement. And Dr. Downs, for purposes of opining that the inlet, which is the portion of the Hydrus, if you draw -- there's a dashed vertical line there. He said the portion to the left of that inlet is all curved to a constant curvature. And the drawing that he cites is a 2016 drawing, Revision G of the document, which we've highlighted up there on the slide. What Dr. Iwach responds with is, well, he used the wrong drawing to offer an opinion as to the shape of the device. If you look at the drawing that's actually given by Ivantis and Alcon to manufacture this device, the inlet is straight. And that's from Revision J, which is the 2019 drawing. And the inlet portion, by the way, there's that thick portion on top of, like to the top left there, and you can see on the bottom of that, there's a straight line. So there's no curvature to that portion of the inlet. So Dr. Iwach says, well, I've looked at the drawing that's used to manufacture this device and there is no curvature to it.

Now, if you go to the next slide. Dr. Iwach annotates the drawing and shows, in fact, you can see from this, there is no curvature. And on the next slide, this

11:46:50 isn't just a kind of fluke of the two-dimensional drawing.
11:46:53 The 3D model that is in the manufacturing document, likewise
11:46:58 shows that the inlet region, which is on the bottom left of
11:47:02 this image, which we've pulled from D.I. 340-39, is
11:47:08 straight. Now, Sight has argued he's not qualified to look
11:47:13 at a drawing and counter our expert's opinion that he relied
11:47:17 on the wrong document and if you look at the right document,
11:47:20 the inlet is straight. I think he certainly has the
11:47:24 experience and ability to do that.

11:47:26 If you look at our briefing, we've noted he has
11:47:29 four years of engineering education, from D.I. 298-19,
11:47:34 paragraph 5. That's Dr. Iwach, our expert's opening report
11:47:39 describing his qualifications. He also has done a variety
11:47:42 of research and development and consulting work for
11:47:46 developers of devices for treatment of glaucoma. So in
11:47:51 terms of is he qualified to look at a drawing and say the
11:47:55 drawing used to manufacture this device shows a straight
11:47:58 inlet, I submit he is.

11:48:01 THE COURT: That's helpful. Can I ask you.
11:48:03 Could you go back two slides? That's helpful to understand
11:48:06 how this arose. So with respect to the Revision J that's on
11:48:10 the right, do they have an expert or is there evidence in
11:48:14 the record that that portion is not straight, from them?

11:48:22 MR. VERBUS: So they're relying on this drawing.

11:48:25 THE COURT: They're relying on G. They're not

talking about J.

MR. VERBUS: And they rely on testimony from an Alcon employee, Dr. Hadba, who notes that on the drawing there's a radius shown on the left. But if we go to the last slide, David Kimball, he's now an engineering fellow at Alcon, he was the former Ivantis director of manufacturing. He was asked, you know, what's going on with this 0.128 radius, which is the one that they've emphasized. And what he said is, "yes, I can see that on the drawing, but it's not a continuous radius. Just mechanically speaking -- I'm looking at the bottom of his testimony, which we've pulled from D.I. 240-19, which is David Kimball's transcript 84, 18 to 85, 10. When he was asked about it he said, "when you actually make this thing, just mechanically speaking, that inlet area is a lot more rigid, so it doesn't bend." So is Dr. Iwach offering an opinion that's inconsistent with all the evidence in this case? Absolutely not.

THE COURT: Okay. Thank you very much. Go ahead, counsel.

MR. ARMON: Go back please to the slide that shows the two engineering drawings, please? Your Honor, just a couple quick points. First of all, there's admissions from defendants' employees that the two versions of the drawing are consistent, that there's no difference between them. And Dr. Downs addressed both of those

revisions in his expert report. So I want to keep the focus on the issue here, which is not the sufficiency of Dr. Downs' opinion. The question is whether Dr. Iwach, the ophthalmologist, is qualified as an expert under 702, 703 and qualified to offer an opinion here. And as we noted, the real issue here, Your Honor, if you look at the engineering drawing on the right, which is the defendants' preferred version, the R.128 is an indication of the radius of that inlet portion. And you can see here that the arrow points well into the area that they claim is straight.

So the fight between the parties on this issue, from our perspective, about the admissibility of Dr. Iwach's opinions is that he admitted that he couldn't interpret the engineering drawing's stated dimensions. And this is on page 28 of our opening brief. Again, where he said that he had the feeling it was straight and therefore he opined it was straight. But when asked about the arrow pointing to the transition zone showing a radius of curvature of 0.128 inches, Dr. Iwach could not tell one way or the other from the drawing whether the radius of 0.128 in a finished Hydrus stopped at the arrow, fell short of the arrow or continued past the arrow.

So if the ophthalmologist isn't able to interpret where the radius of curvature shown on the engineering drawing begins or ends, he's not qualified to

offer an opinion on whether or not the transition zone is straight. That's fundamentally why he's not qualified to offer the opinion.

THE COURT: Okay.

MR. ARMON: He took some engineering classes for a few years in undergrad, but he never obtained an engineering degree or practiced as an engineer, so to admit that he can't offer an opinion on what the radii of curvature means, he doesn't know where they begin and end, he shouldn't be allowed to offer an opinion that just because he sees it as straight that it is straight. That's classic ipse dixit.

THE COURT: All right. Thank you very much. I understand this dispute. This one I actually am ready to rule on day. This motion is going to be denied. I'm not seeing a reason some higher level of skill is required to analyze this. That said, it sounds like plaintiff has plenty of fodder for cross-examination, but the expert's not going to get excluded under Rule 702.

Okay. The next one is plaintiff's motion to exclude the testimony of Dr. Joseph Izatt regarding the "30% of C" limitation. Let's hear about that. If you could walk me through it or direct me to the appropriate portions, I would appreciate it.

MR. ARMON: Yep. Bear with me one moment.

THE COURT: Take your time. Let the record reflect I've got stacks and stacks of binders, so it might take me a minute to find the right portion. Can anyone tell me which exhibit is Dr. Izatt's opinion?

MR. VERBUS: Your Honor, I believe it's at D.I. 340-4.

THE COURT: Exhibit 4.

MR. VERBUS: I'm not sure if it's Exhibit 4. I have the docket citation for it.

THE COURT: I've got the tabbed exhibit binders. You know what, I actually think 340 is the one we didn't have a paper copy of. So give me a second to pull it up. Got it. Exhibit 64 to D.I. 295. Okay. Go ahead when you're ready.

MR. ARMON: All right. Thank you, Your Honor. The key of this argument is contained in the paragraph on page 31 of the opening brief.

THE COURT: Okay.

MR. ARMON: It's very short. This is based upon the Court's claim construction, what has been called the "30% of C" limitation. And the gist of the limitation, at a high level, is that one of the limitations in the asserted patents or some of the asserted patents defines the amount of contact between the support that goes into the eye and the structure called Schlemm's canal that has been

11:55:43 visualized or depicted in layman's terms as sort of a bicycle tube that surrounds the circumference of the eye. So the "30% of C" limitation, at a high level, is referring to that question of surface area contact.

11:55:57 And importantly for this motion, Your Honor, the Court defined the "30% of C" limitation consistently with the definition contained in the asserted patents. And that definition requires viewing the inside of Schlemm's canal as a slightly arcuate cylinder. So purely in layman's terms, it's a bicycle tire type shape, that aqueous humor flows through on its way out of the eye. And the requirement is that the cylinder be arcuate, has to be -- it makes a full circumference around the eye.

11:56:42 For some of Dr. Izatt's modeling, he modeled Schlemm's canal as straight. And that is the fundamental weakness in his approach, that for some of the modeling -- and again, it was for the *Grieshaber '642*, *Grieshaber '546*, *iStent* and *Gharib '478* references. He admitted in deposition and has depicted in his report that that modeling for the "30% of C" limitation, I treated those references as straight, not arcuate cylinders.

11:57:20 So the argument here is that because he disregarded the Court's claim construction, it would be confusing and unhelpful for the jury.

11:57:29 Now, I'll credit that Dr. Izatt's response is,

well, it wouldn't matter, I did it for convenience. But our understanding of the law is that an expert like Dr. Izatt is not allowed to ignore the arcuate cylinder requirement because it risks jury confusion and for him to come back afterward and say, well, it doesn't matter, I did it straight, but I got to essentially the same conclusion, it's still a flawed opinion that he took that approach. That's the basis for the deficiency and the argument for exclusion.

THE COURT: Understood. And so I just want to make sure I understand. This isn't a situation where he used the wrong claim construction and he came up with a number of, you know, 32 or 28, and it was close and then you could say, well, look, you didn't apply the Court's claim construction, your modeling was messed up. He came up with zero and then you said you used the wrong model and he's like, yeah, and it would still be zero. Is that essentially what's going on?

MR. ARMON: That's right. He said it wouldn't change. Our critique is he didn't apply the Court's claim construction that risks juror confusion among other things.

THE COURT: Okay. Understood. Thank you very much.

MR. VERBUS: So, Your Honor, our problem with their motion is it's premised on the idea that he is not applying the Court's claim construction, Dr. Izatt. And

that's incorrect. The Court's claim construction requires an arcuate cylinder, but the opinion he's offered is when you have ribs or edges that stick out, those create point contacts, meaning, when we pull up the next slide, this is an example of a straight cylinder around the iStent on the left and you can see there are just straight lines on the top of the ribs wear that cylinder contacts. And because an area needs both a length and a width to do a calculation, you get zero percent mathematically.

Now, if you put an arcuate cylinder around it, that is actually -- to put it differently, the straight cylinder is more conservative because you generate more point contacts. Mathematically they don't matter, but when he's saying it doesn't change my opinion, I'm applying the Court's construction and in my opinion under the Court's construction I get zero percent, that's because whether you have a slight arc to it or whether the cylinder is straight, you're just getting point contacts.

And as Mr. Armon acknowledged, that is undisputed. Their expert doesn't come back and say, well, if you do this correctly, you get 40% percent and it doesn't meet the claim limitation. There's no real dispute that the "30% of C," as construed by the Court, is met by each of the prior art references on which they seek to exclude Dr. Izatt. Given that, I think if they feel it's a valid cross

point to try to ask Dr. Izatt, well, this cylinder is straight, so under the Court's construction you don't have any opinion, he's prepared to respond and say, I disagree, I've applied the Court's construction and in my opinion it's zero percent. If you put a slight curve on it, that doesn't impact the result.

THE COURT: All right. Thank you very much. Anything you wanted to add?

MR. ARMON: Nothing else unless you have questions.

THE COURT: No, I don't. Thank you very much.

So this one I'm actually ready to rule on today too. This motion will also be denied. I disagree that defendants' expert applied the wrong claim construction. Plaintiff's got fodder for cross-examination. And I don't think this is a 702 issue.

Okay. Let's talk about the next motion from plaintiff, which is a partial motion to exclude opinions of Dr. Becker, Dr. Iwach, and Mr. Meyer regarding non-infringing alternatives.

And it may be helpful here, my main question was about the timeline, so I really understand what's going on. And I understand in the briefing you all had limited pages, so if you could just put some details on it, it would be helpful for me.

MR. ARMON: So, thank you, Your Honor. Two key issues with respect to this motion, then I'll walk through the timeline.

First of all, we're dealing with medical devices here. The Hydrus Microstent is an implantable medical device that has to be FDA approved before it can be commercially sold. That's undisputed. And the Hydrus Microstent did receive a pre-market approval in 2018 and it's undisputed that the Hydrus Microstent was within the 271(e)(1) safe harbor prior to its commercial launch in September of 2018.

So one area of dispute between the parties, and this carries into the jury instructions, Your Honor, is that Sight Sciences' position is that 35 U.S.C. 271(e)(1) explicitly says it shall not be an act of infringement to make, use, sell, et cetera, pursuant to obtaining FDA approval. And it's of course well established that 271(e)(1) applies to medical devices.

So the genesis of one aspect of this dispute is that Sight Sciences takes the position, again, we think it should be undisputed on this record that the date of first infringement was the date of commercial launch of the Hydrus Microstent in September 2018. Now, Your Honor, the dates are about a week apart from the international first sale and the domestic first sale. Sight's seeking damages for all

12:04:11 sales because all microstents, all accused microstents are either made here or they pass through the United States for quality control, steps of the manufacturing and assembly process. So it's undisputed, as we understand the record, that the date of first infringement is when Hydrus Microstent comes out of the safe harbor in fall 2018 or late summer 2018. That matters for jury instructions and for this issue, because the defendants began developing the Hydrus Microstent initially in late 2006. They worked for years on different iterations.

12:04:55 The defendants' assertion here is that they had an alternative non-infringing design in 2011 or 2012. Now, there were multiple iterations of Hydrus Microstents that were developed and tested. The defendants are arguing that in 2011 or 2012 they could have begun implementing a non-infringing alternative that was not yet ready for the market. Now, what's significant here is that the law on non-infringing alternatives, as we understand it, again, this is the *AstraZeneca* case, the *Apple* case, et cetera, is that if you have a non-infringing alternative that's not yet ready for the market, that's really key here, we believe that the law is that if your non-infringing alternative is not yet ready for the market, that the unfinished work that you didn't do in the real world happens in the but-for world at the date of first infringement. And that's important,

12:05:59 because if every accused infringer can say well,
12:06:04 hypothetically I would have gone back in time far enough to
12:06:07 make your patent rights irrelevant, every accused infringer
12:06:10 can pick a non-infringing start date that's conveniently
12:06:16 back in the historical record to minimize the expense and
12:06:21 that's exactly what defendants' experts did here.

12:06:24 Mr. Meyer, the damages expert, costed the rest
12:06:28 of the work that needed to be done and according to
12:06:31 defendants' own assessment there were six to nine months of
12:06:34 additional development and testing work on the
12:06:37 non-infringing alternative designs. And we're accepting the
12:06:40 six to nine month representation as true for purposes of
12:06:43 this argument. Rather than starting that additional
12:06:48 development work on the date of first infringement, they
12:06:52 chose to begin that process in their hypothetical in 2011 or
12:06:58 2012.

12:06:59 Now, two things result from that. First of all,
12:07:03 they're forced to argue that the date of first infringement
12:07:05 occurred in 2012 when the first asserted patent was issued.
12:07:12 So that's error of law number one by defendants, because the
12:07:16 fact that Sight's patent issues is only one half of the
12:07:20 equation. There also needs to be infringement and under
12:07:23 271(e)(1). There wasn't infringement until August or
12:07:28 September 2018 when the first commercial sale was made.
12:07:32 That's problem number two.

12:07:34 Problem number two is that Mr. Meyer, the damages expert, and Dr. Becker, the regulatory expert, and Dr. Iwach, the non-infringement expert, have all pinned the development of the non-infringing alternative in 2011 or 2012 so that they could cost it in 2011 or 2012 dollars and so they could completely avoid all of the issues around the timing of the development that would have otherwise had them off the market for at least six to nine months versus when they launched in the real world.

12:08:12 So this is a damages minimization strategy that's problematic for two reasons. One, it relies upon completely misreading 271(e)(1), which says it shall not be an act of infringement, right? They're arguing that infringement began in 2012, but that there was no liability for damages until 2018. That's an incorrect understanding of the law.

12:08:39 The other issue is that the cases that we cited in our brief point out that it invites gamesmanship by every accused infringer if, in the but-for world, work that wasn't actually completed in the real world can be conveniently started as far back in time as you can go and tied to some real world event to ensure that the cost of the design-around is as low as possible. So that's the issue.

12:09:11 THE COURT: I understand, but it also -- if I adopt your rule, it gives an incentive to a patentee to wait

12:09:23 and see how the FDA approval process turns out and then
12:09:27 negotiate a reasonable royalty for a product that already
12:09:30 has FDA approval.

12:09:33 MR. ARMON: So, Your Honor, I suppose that could
12:09:35 be the case in some circumstances. The issue here is that
12:09:38 Mr. Meyer and Dr. Iwach and Dr. Becker had a choice. They
12:09:44 could have costed what they say is a six- to nine-month
12:09:47 period of time to do the rest of the development and
12:09:51 testing. They acknowledged that their design-around wasn't
12:09:55 finished. They had to do more internal work. They could
12:09:58 have costed that work beginning at the date of first
12:10:03 infringement, which is undisputedly in 2018, and then argued
12:10:07 that there shouldn't be any consideration of, I think what
12:10:10 your raising, is a potential hang up cost. They didn't do
12:10:13 that. They used 2012 dollars to do work way back in history
12:10:20 and said that that's the cost of the design-around, which
12:10:22 amounts to a couple million dollars by their estimation.

12:10:25 So the fundamental problem here, setting aside
12:10:28 the concern about hang up, is that they had the choice to do
12:10:30 the development work at the right point in time, because
12:10:33 they admit it wasn't finished and they needed to finish it
12:10:36 and they didn't. They didn't make that choice.

12:10:38 THE COURT: Okay. Let me back up a little bit.
12:10:48 The point of the hypothetical negotiation is to come up with
12:10:51 what the parties would have come to at the -- I know the

cases say the time of first infringement, but that wasn't really assessing the issue of whether technically the infringement was accepted by the statute that allows for FDA trials. Is there any case that talks about that?

MR. ARMON: So, Your Honor, I do want to call to your attention that this issue is live with respect to lost profits. And also with respect to --

THE COURT: Okay.

MR. ARMON: -- reasonable royalty. What you mentioned with respect to the hypothetical negotiation only applies to a reasonable royalty construct.

THE COURT: Okay.

MR. ARMON: And so we quoted and discussed cases in both the lost profits context, where you have a Panduit factor analysis that includes a consideration of non-infringing alternatives, as well as cases dealing with the reasonable royalty context.

And I would note, Your Honor, in terms of cases in the record, I'd encourage you to read the *AstraZeneca v. Apotex* case. That case was affirmed by the Federal Circuit. The Federal Circuit did not spend much time or really any on this particular issue, although the argument around hang up and around the start date was addressed -- or hold up, I should say, not hang up, with respect to regulatory approval. And so the case that I'm aware of on this record

12:12:29 I think most closely reaches the issue is *AstraZeneca v. Apotex*. And there it was noted by the district court that it contradicts settled law to consider design-arounds in that case that began three years earlier than the hypothetical negotiation. And of course we think that the rule should be applied the same way here with respect to lost profits law and also reasonable royalty hypothetical negotiation.

12:12:58 THE COURT: All right. Thank you very much. Let's hear from the other side.

12:13:08 MS. HEFFERNAN: Good morning, Your Honor. Jeanne Heffernan for Alcon. I do have some slides. May I hand up some copies? Do you prefer them --

12:13:16 THE COURT: Sure. Did you share them with the other side?

12:13:19 MS. HEFFERNAN: I will share them with the other side, yes.

12:13:22 THE COURT: Okay. Great.

12:13:35 MS. HEFFERNAN: So, Your Honor pinpointed the central issue here, which is basically a law on economics question. And where I want to start is let's go to the next slide, slide 12. Go one more slide. I wanted to sort of frame the discussion with the statute. And actually maybe -- yeah. So this is the right slide. So slide 13, this is the *Eli Lilly* case, *Eli Lilly v. Medtronic*, U.S.

12:14:08 Supreme Court case from 1990. And in that case the Supreme Court took up for the first time whether or not 35 U.S.C. 271(e)(1) even applied to medical devices. The language of the statute doesn't apply to medical devices on its face. It applies to drugs and veterinary drugs. And so the Supreme Court in 1990 took up the question of, okay, does it literally -- is it literally restricted to those two categories of pharmaceuticals or can we expand it beyond the literal language. And the Supreme Court said there are policy reasons behind 35 271(e)(1) that also apply to medical devices, so let's expand the scope of coverage for this exemption.

12:14:55 And I like this case because it speaks to what's going on here and that is the economics behind regulatory approval and how that impacts the patent term. So the Supreme Court said this case presents this question, you know, whether 271(e)(1) renders activities that would otherwise constitute patent infringement non-infringing if they're undertaken for purposes of seeking FDA approval as applied to a medical device.

12:15:24 Let's go to the next slide. And on slide 14 we're cite go *Eli Lilly* at 661-62, which is where the Supreme Court talks about the unintended economic consequences, the distortions that occur because of the FDA regulatory process. And there are two of them. There's one

that applies to the patentee who seeks its own FDA regulatory approval for its own device and in that situation there's a distortion for pre-market approval because the patentee would not, as a practical matter, be able to reap any financial rewards during the earlier years of the patent term. There's a second distortion that applies to competitors, competitors who seek regulatory approval for their competing inventions. And that distortion happens at the end of the patent term. The end of the term would effectively be extended until approval was obtained for competing inventions since competitors could not initiate the regulatory process until the term's expiration. So that's why you have an exemption from what would otherwise be infringement at the start of the patent terms, so you don't get a patent term extension at the end.

Jumping around a little bit. Let's go back to slide, I guess 12 maybe. So here's what happened in the real world. As Mr. Armon said, the actual development started way back in 2006, but the regulatory approval process started in 2010 for the accused Hydrus. It took eight years to get regulatory approval. It started in 2010, ended with FDA regulatory approval in 2018. The Single Radius Design, which is the non-infringing alternative that we're focusing on here, there are actually two, but for purposes of today's argument to simplify, that design was

developed in early 2011.

What's the conversation about 2012, then? The Court might be wondering. Let's go to, I think it's the last slide. One more up. Okay. In 2012, the '482 patent issues and the Court is going to hear more about the prosecution history of the '482 patent when we get to, I think it's Sight's motion in limine regarding drafting claims to cover a competitor's product. There is evidence in the record that Sight was monitoring the development of Hydrus, including Ivantis' patent applications on Hydrus. They draft patent -- we contend they draft patent claims to cover the Hydrus. That application issues as the '482 patent in 2012 and that is the first asserted patent in this case. The day they get the notice of allowance, the two inventors e-mail each other and say, congratulations. Good news, the Ivantis-killer has issued. The development work for the non-infringing alternative took place in the 2010-2011 time frame.

And so but for this exemption -- and there is -- Your Honor is absolutely correct. We have not identified a single case out there in the hypothetical negotiation that deals with a situation where you've got a regulatory approval process that is basically, because of its exemption from what would otherwise be infringing, is skewing what's going on in the negotiation.

12:19:07 So Mr. Meyer, under the hypothetical negotiation construct, in the reasonable royalty analysis, says, the parties, if they're negotiating in 2018, because that's the date of first compensable infringement, need to value the intrinsic value of the patents in suit, not value the, I guess, economic punishment of the FDA regulatory process. And so what they would do at the hypothetical negotiation is go back and say, well, this would be my non-infringing alternative, and this was its value at the time I locked into the accused product. You didn't tell me about your patent even though it issued. I could have made those decisions back then. What you're now valuing is the hold up that occurs, because I have locked into that design in 2012 and now in 2018 we're having this alleged hypothetical negotiation. And by the way, they don't even sue until 2021.

12:20:08 THE COURT: So I just wanted had to make sure I understand. I'll put it like a kindergartner. So you would say in 2012, if you hear about your patent, and you're using your device at that point in the testing needed for regulatory approval, you would say, had they approached you in 2012 and said, look, we've got this patent, you could have at that point negotiated a royalty that would have taken into account whether or not you had gotten approval because there would have been some risks, I guess, on both

12:20:51 sides. But you would have also said -- you could have told them to pound sand, because back in 2011 you had this alternative design and you would have pursued regulatory approval on that for the next six years instead of the one you did?

12:21:08 MS. HEFFERNAN: That's correct.

12:21:09 THE COURT: That's your argument.

12:21:10 MS. HEFFERNAN: That is the argument, Your Honor. And that whether the negotiation is happening in 2012 or in 2018, the value -- sorry, the dollars that would be required to finish the design and development and slap that into the FDA's approval process that was already under way, clinical testing, would have been, you know, 2.5 to $3.1 million dollars. I can't remember what the exact numbers are. But that's what Mr. Meyer says Ivantis would have in mind at the hypothetical negotiation, because anything over that, you're valuing the FDA regulatory process.

12:21:50 Mr. Armon is correct --

12:21:52 So that's the hypothetical negotiation reasonable royalty analysis.

12:21:57 Mr. Armon is correct that there's also a lost profits analysis and I would like to go to slide 18. And I think actually before I go -- before I talk about slide 18, Mr. Armon mentioned the *Apotex* case. And in that case there

was an ANDA filer who in reality tried and failed to implement a non-infringing alternative. We'll walk through some of the evidence with the report. There's no evidence that the alternative design would have been a failure. There's no evidence that it resulted in any complications that were more complicated than the complications that arose in the actual accused Hydrus. So *Apotex* is not applicable.

And I'll also mention the *Apple* case that Mr. Armon mentioned. There the fight was over -- and I think there are a couple of cases that are just like this. The fight was over whether, despite the date of the hypothetical negotiation being, let's say 2018, the parties in those cases wanted to go to the date of actual notice, which was later in time. And so the Court said you can't look later in time. Didn't say you can't look earlier in time where you're dealing with the regulatory context, so I just want to button that down.

So now in the lost profits analysis, the non-infringing alternative, that analysis is a bit different. *Grain Processing* says you don't need to have a non-infringing alternative that's actually sold and out there in the market. *Grain Processing*, for the same sort of law on economics policy, says you have to look at what non-infringing alternatives the alleged infringer would have had available to him. "Without the infringing product, a

12:24:00 would-be infringer is likely to offer an acceptable non-infringing alternative, if available, to compete with the patent owner rather than leave the market altogether." Their expert says, no, you would have to leave the market altogether. "Moreover, only by comparing that patented invention to its next-best available alternative, regardless of whether the alternatives were actually produced and sold during the infringement," only then can you discern what the intrinsic value is of the patented technology.

12:24:29 And if you don't do that, let's go to slide 19, *Grain Processing* says you run into these economic problems. These are two treatises that *Grain Processing* sites with authority in support of its position that you look at the next-best non-infringing alternative of the alleged infringer, even if it wasn't sold and on the market. "Obviously, if the defendant is not permitted to present evidence of this ilk, the analysis is quite skewed: only the patentee's 'best case' scenario is presented, rather than a more realistic scenario." And if you don't do that, consider this non-infringing alternative, which in this case dates back to 2012 in the lost profits context, if you don't do that, the law will systematically over-reward patented inventions.

12:25:19 So it's necessary to inquire about what's the nature and value of the product that the infringer could

have made had he not infringed. So that's the legal frame work, law on economics. If the plaintiff -- if the plaintiff's rule holds, and by the way, that rule is nowhere in the case law, you would systematically, not you, Your Honor, one would systematically over-reward the patentee here for the value of the regulatory process and the hold up that occurred because we were locked in in 2012.

Now, we also -- there are factual disputes about the clinical data. I can go there if the Court wants to hear about that.

THE COURT: I don't think I want to hear about that to the extent stuff is talked about in the brief. One question I had is, and I'm thinking out loud, you would say this isn't a situation where they had a product that had already been tested and we knew it was approved and you were presenting some hypothetical non-infringing alternative that nobody knew would work or not. You would say that nobody knew and so the redesign for all we knew could have worked just as well or worse or better than the one that we were pursuing and testing?

MS. HEFFERNAN: That's right. And we had -- Ivantis had in its hands in 2012 test results from implanting the non-infringing alternative Single Radius Design into humans.

THE COURT: Okay. Anything else you wanted to

add? I'm going to reserve on this one today, so no one needs to feel like they have to talk last to win, but if there's anything else you want to add for the record.

MS. HEFFERNAN: I don't necessary need to be the last person to talk, because I think Mr. Armon has already stood up, but given the Court is reserving, with the Court's indulgence I would like to talk about the clinical data.

THE COURT: That's fine.

MS. HEFFERNAN: Okay. So let's go to slide 3. All right. So one of the arguments -- the main argument that Sight makes regarding the clinical data, and all of the data, is that our experts, quote unquote, ignored, failed to consider the clinical data, final results of the implantations of the Single Radius in humans. That assumes that that data is out there, that we have it and that we somehow, to quote them, suspiciously withheld it, which I take -- I take great exception to.

This testing was going on in 2011. They didn't sue until 2021. And we performed a reasonable search to find all of the clinical data we could and we produced the data we found after a reasonable search. And that data includes, for example, what you see on slide 3, which are four case studies out of 22 that Dr. Ahmed implanted this Single Radius Device into humans. That is the data that's available and that is the data that our experts considered.

This case is unlike *Pugh*, the case that Sight Sciences cites. In *Pugh* the expert was setting out to prove causation. That's not an issue here. But in *Pugh* the expert had available to her data from other scientists disputing causation. And she elected to cherry pick the data she considered and disregarded and ignored that contrary data.

That's not what's going on here. The experts considered all the data that was available to them. And of that data I want to make two points. Sight does not dispute that the non-infringing alternatives are non-infringing. Sight does not dispute that both of our experts, Dr. Iwach, the clinical expert, and Dr. Becker, the FDA expert, are both qualified to render the opinions they do render, they just dispute whether the data that they considered, that our experts considered is sufficient.

So on the sufficiency issue, all of the data supports or does not contradict the opinion that the Single Radius non-infringing alternative would have been clinically equivalent. And in essence, let's go to the next slide. I need to show the Court some of this data. Slide 4 is Exhibit 45. These are Dr. Ahmed's handwritten notes, contemporaneous notes at the time he was implanting this non-infringing alternative into humans and it talks about inlet placement, verifying the windows, the final placement

location, the incision location. So this was a well-defined clinical study in humans. We have data from that study.

Let's go to the next slide. An additional study, cadaver testing, and that testing is important to understand whether the flow, what the rate of flow is. And in the cadaver testing, Dr. Condon determined that the Single Radius non-infringing alternative had the same safety and function with respect to flow as the current Hydrus, the accused Hydrus in this case.

Let's go to the next slide. Andy Schieber actually designed the Single Radius non-infringing alternative. He was responsible for its design, its development and its clinical testing. He analyzed that against the current commercialized Hydrus and said a Single Radius "would not alter the functionality, efficacy, or safety of the existing Hydrus design in any meaningful way." Ease of implantation, no substantial difference in reliability or efficacy.

Let's go to the next slide. So that's the evidence that Dr. Iwach relies on to say, no, they're clinically equivalent. And then Dr. Becker relies on Dr. Iwach, that conclusion to say, okay, well, then, we would put this Single Radius Design into the clinical trials and it would get approval based on what I understand Dr. Iwach's opinions to be on the same timeline as the accused Hydrus.

12:31:56 Now, Sight basically says, no, that's not true, Dr. Becker says you wouldn't rely on those earlier expert opinions we just walked through. Well, they have some ellipses in their brief to this court. If you look at her actual testimony, she continues. And they're talking about the FDA and what type of data the FDA would consider. She says, expert reports, "No, that's not a thing. They don't accept -- I mean they're" -- this means the FDA -- "they're databased, data driven, so expert opinions sometimes are submitted to the agency. I wouldn't submit one." She is a regulatory expert. So she wouldn't submit one. "But a physician may." A surgeon may. And that's the type of evidence that the FDA would reasonably rely on and that Dr. Iwach and Dr. Becker reasonably rely on.

12:32:52 Next slide. I think we can continue. Now, Sight Sciences will point to some data that were produced, board of directors presentations that say the Single Radius appears to have some suboptimal outcomes, note small n, small sample size and early, it's early in the process.

12:33:15 But what we do know, next slide, is that the Single Radius, the suboptimal performance was actually better than that of the accused Hydrus. PAS is, it's something that can happen after implantation and it's not desired. In the 22 human implants to date, there was a rate of PAS of 9.1%, two out of 22 patients. And the actual

Alcon commercialized Hydrus, actually higher than that, 14.6%.

So I think I'll rest there just to say that the clinical data does support the opinions of Dr. Iwach and Becker upon which Dr. Meyer arrives at his damages conclusion.

THE COURT: And I think what I'm probably going to hear from the other side is that this is a non-predictable art, you couldn't really have predicted what the FDA would approve and your response maybe would be that, well, we're tying to predict a hypothetical negotiation and we have to make some assumptions there.

MS. HEFFERNAN: That's right.

THE COURT: Okay. Thank you.

MR. ARMON: Your Honor, I know the day is getting away from us, but a few important things I'd like to address. First of all, Sight has a willful infringement case. You heard policy arguments from counsel with respect to how the co-inventors should have notified the defendants in 2012. I'll just briefly note that the CEO of Ivantis first came across the patent application that led to the patents-in-suit in December 2007. He came across it again in December 2008. There's disputed -- hotly disputed evidence on this, but evidence and testimony relating to Ivantis' interest in acquiring the patent application at

that point in time and then also evidence relating to Ivantis' acknowledge of the patents as they issued as well as pre-suit knowledge of the patents that had issued by that time. So there's a willful infringement issue here and I don't want the Court to think that Ivantis was completely unaware of these pending patents.

THE COURT: Understood. Was there interaction between the parties back then?

MR. ARMON: There was not with respect to the patents.

THE COURT: Okay.

MR. ARMON: One issue to note. Next, I think it's important here, that the defendants' arguments around policy issue on hold up are obscuring the core critique of our motion. The core critique of our motion was that Mr. Meyer could have approached costing the non-infringing alternative a different way. He could have costed the unfinished six to nine months of work beginning at the date of first infringement in 2018. That would have had them off the market for a period of six to nine months at least, and then we could have had a fight about whether or not the regulatory delay should be included or excluded. They didn't do that. They didn't choose to cost the design around for the work that had never been done in 2018 dollars. They did it in -- actually their experts say that

the design around would have started in 2011, before the first patent in suit even issued and then bled into 2012. Well, that's convenient for them because it allows them to keep a timeline they want and they're also using dollars from 2012.

In the briefing we note both in the *Apotex* case, the *Hanson v. Alpine Ski Valley* case and the *AstraZeneca* case. Each one of those cases notes that an accused infringer with a non-infringing alternative can't make up a completely fabricated but-for world that ignores what actually happened in the real world and what didn't.

So the fundamental critique that I suggest the Court should start with was it appropriate under existing precedent for them to cost their design around in 2012 dollars? We submit that that's inconsistent with the law. If they wanted to properly develop their non-infringing alternative, they should have done it in 2018 dollars and then we could have had a fight about whether regulatory hold up could be included or excluded in the cost. That's impossible because they didn't get the first issue right. And so this issue of regulatory hold up is really a distraction for the core weakness they've got.

THE COURT: Is what you're saying is -- and we need to take a recess soon -- that because they made an error about some of the six to nine months and how they

calculated that six to nine months of additional development costs, that they made that error, that as between talking about 2012 versus 2018 for the hypothetical negotiation, that I should go with your view that it's years later?

MR. ARMON: Correct.

THE COURT: Okay.

MR. ARMON: And Your Honor, we'll acknowledge, as Ms. Heffernan did, that this issue of alleged regular story hold up is an unresolved and gray area that not even the Federal Circuit has fully addressed. But Sight's damages experts do not offer any damages opinion that's based upon regulatory hold up. Their argument is that we're improperly interfering with their non-infringing alternative design around costing structure because of hold up. Fundamentally, that's not the problem for them. The problem for them is that they started six years too early on their design around work in the but-for world and our position on that is consistent with Federal Circuit's guidance in *Hanson, the AstraZeneca* case and again *Apple*.

Just a couple notes on the clinical data issue. First of all, the main concern or critique with respect to the alleged non-infringing design is safety and efficacy. And the parties have lots of disagreements on this issue. The evidence that's available comes from Ivantis. What the evidence shows is first, Dr. Ahmed, the physician who was

responsible for the Canadian Special Access Program or these, the Single Radius stents were being implanted, he's the one that told Ivantis it wasn't safe and that they needed to move away from the design to a different design. So Mr. Heffernan showed you examples of records of successful delivery. That's not the issue. Whether or not it can be successfully delivered is not where the parties' dispute is. A non-infringing alternative by law must be acceptable. And that means it needs to be acceptable to physicians and patients. And the question of acceptability goes to safety and efficacy. As to safety, Dr. Ahmed said, I have concerns about this, you need to change it. There were two board meetings in late 2011 and then in 2012 where the board said Dr. Ahmed has expressed concerns, we need to move away from this, and ultimately they did. And then there's even later evidence later in the record where a question was posed years later, why did we move away from that and the response was there was concerns about additional safety problems and so we moved away.

Setting aside that evidence, there's profusion data that Ivantis produced that shows that the Single Radius design was significantly inferior to the commercialized design. So there's a dispute on that I just want to note.

The critique with respect to the Daubert motion is that Dr. Becker and the other doctors who are offering

opinions about the non-infringing alternatives confidently march forward and say, no problems whatsoever, it would have been as safe, as efficacious. Now, we don't know why Ivantis doesn't have the full set of data for the 22 patients. It's not in the record. For the defendants' experts to offer the opinion that there were no safety, no efficacy concerns and that the FDA would have rubber stamped the alternative design notwithstanding the fact that the doctor sponsoring the insertion of these devices said you need to move away from it, went to the board and they did, is inconsistent with their obligation under the law, because we know that what the FDA cares most about is safety and efficacy. And rather than grappling with those different issues, they simply blew by them and said it would be fine.

THE COURT: Just to make clear for the record, there was no product approved by the FDA that had the patented design, though, at that point, right? It's not like you're in a position to say we had the approved product, we used the patented design, we know you're going to get FDA approval, and you used some alternative design, we know you're not, you can't say that or we don't know if you are or not?

MR. ARMON: Just to ensure there's no confusion, Sight Sciences has not yet commercialized it's Helix Microstent. That's still in development and that Sight

12:42:47 hopes to bring to market over the next few years. It's in animal studies, in rabbits for safety. With respect to the Ivantis Hydrus, only a single version was FDA approved and went through all of the clinical trials that led to the FDA approval. And that's the accused product in the case. There was no other product approved by the FDA in the case, only the commercialized Hydrus.

12:43:10 THE COURT: Okay.

12:43:13 MR. ARMON: Unless the Court has any other questions on that --

12:43:17 THE COURT: Well, let me just make sure I understand. And we're going to go back and carefully look at the expert reports to understand exactly what everybody is saying. I'll admit to you, they're very thick. We didn't want to read all of them to the extent that we didn't have to before hearing the argument today.

12:43:38 But your expert is going to say that there would have been a hypothetical negotiation after the FDA approved their product and that they would have paid more to you because we had an FDA approved product and because if they didn't pay you, they would have to spend another six years to redesign and get new FDA approval? Is that what he's saying?

12:44:03 MR. ARMON: Our expert's opinions don't rely upon this issue of hold up. Our expert's opinion is we're

using the market approach.

THE COURT: Okay.

MR. ARMON: For a very small percentage, six percent or so, of lost profits.

THE COURT: Okay.

MR. ARMON: And then beside that is small lost profits piece, that again is based on market share approach. The rest of the opinion is reasonable royalty and those reasonable royalty opinions are based upon the prior Glaukos Ivantis patent settlement, based upon the purchase price allocation associated with Alcon's acquisition of Ivantis and the purchase price allocation as to the Hydrus. And then third, a price difference approach between the two stents on the market, the iStent, which is the older version that I think all parties agree is inferior as in terms of safety and efficacy, and the Hydrus. So none of those opinions touch on any question of regulatory hold up.

And again, that's why, from my perspective, Your Honor, the arguments about policy concerns and regulatory hold up are really beside the point. The question for the Court is was it appropriate for Ivantis and Alcon's experts to cost design around work that admittedly needed to be done and had not been done, six to nine months worth in 2012 dollars, that's an error under *Hanson*, *AstraZeneca*, *Apple*.

THE COURT: Okay.

MR. ARMON: And of course they didn't do it any other way. I think that's implied.

THE COURT: Okay.

MR. ARMON: Thank you, Your Honor.

THE COURT: Thank you.

MS. HEFFERNAN: May I make two quick points and then I know we want to take a recess. I have a different answer to the Court's question and my answer is yes, that is exactly what their expert does. He says you look at 2018, date of the hypothetical negotiation. Ivantis would have to be off the market for six years and probably never would commercialize a device because it spent eight years pursuing FDA approval for the device it did get FDA approval for. So he absolutely is saying, you have a gun to your head, Ivantis, because you can't now, in 2018, implement your Single Radius design that you had available to you in 2011, which was actually in live clinical trials, you have to start all over again in 2018. So he does do what the Court asked. And that's a problem, because that value is not the intrinsic value of the patented technology, but the hang-ups with the regular story approval process.

On the data, what I heard is a lot of good cross points. In addition to crossing our experts on the clinical data and the date that was available, Mr. Armon and his team can also cross examine the CEO of Ivantis who was at those

board meetings, Dave Van Meter is coming live to trial, and Andy Schieber, who was the person that designed the Single Radius and oversaw the clinical testing of it.

THE COURT: Can you comment on the -- it's been a long time since I took accounting for lawyers, which was a multiple choice exam, by the way, so I wasn't all that great at it. The argument about the costing being off.

MS. HEFFERNAN: I was not aware of that argument. I didn't see that in the briefing as being their main argument.

THE COURT: Yeah.

MS. HEFFERNAN: I don't remember that at all in the briefing. I know that that is -- that may be a criticism they have of Mr. Meyer, but I did not recall that being their argument.

THE COURT: Understood. Thank you. I think I know what the argument is. You can have a seat. So we're going to take this one under consideration and we'll get you an answer before trial on it. Thank you.

MS. HEFFERNAN: And those criticisms, I think, as the Court was suggesting, are criticisms they can make of Mr. Meyer when he's on the stand on cross.

THE COURT: Thank you.

MS. HEFFERNAN: Thanks.

THE COURT: Okay. All right. Let's take a

recess.

So by my calculation we've got, when we come back, plaintiff's motion to exclude the expert testimony of Mr. Kunin. I understand that may be somehow related to defendants' motion to exclude opinions of Dr. Downs. I don't know if there was an agreement on that or if you all want to discuss that during the recess, but we'll hear about it when we get back.

And then we've got some Daubert motions from defendant and I count 1, 2, 3, 4, 5, 6, 7. I don't know if we called for argument on those. We'll double-check our notes and then we've got six MILs and then I've got a bunch of items and disputes from the pretrial order.

I don't know who is headed up to New York tonight. I see one. Anybody else for the record? Just one. Okay. All right. Good. All right. We'll take a recess and be back in 10 minutes.

COURT CLERK: All rise.

(A brief recess was taken.)

COURT CLERK: All rise.

THE COURT: All right. Please be seated. All right. We have next plaintiff's motion to exclude the expert testimony of Mr. Kunin.

MR. ARMON: Thanks, Your Honor. We worked hard during the break to try to resolve some disputes and we

failed, but I'll keep this very brief, but I think there's more fight on other issues. So Mr. Kunin is a former patent official who defendants offered a reply report from that does two things. It responds to Dr. Crawford Downs' observation that the defendants in this case, after the lawsuit was filed, filed four petitions for inter partes review that were denied institution by the PTAB and the PTAB made fact findings under 325(d) that the petition should be denied, exercising its patent office discretion, of course, because the prior art and the arguments were the same or similar as art and arguments that have been considered during prosecution. So you'll hear more about the Dr. Downs' side of it, but Dr. Downs observes that those cumulativeness findings were made and of course he's offering that opinion in rebuttal to their invalidity opinions.

Mr. Kunin comes in reply to Dr. Downs and he does two things. First -- and by the way, the governing standard for 325(d) is the *Advanced Bionics* Patent Trial and Appeal Board case. And according to the Patent Trial and Appeal Board precedent, a piece of art that was of record would have been considered if it's on an information disclosure statement, regardless whether it was the basis for an office action rejection. And that distinction is important here, Your Honor, because most or all of the art

that was considered and a basis for the cumulativeness finding was made of record on information disclosure statements and it was checked off by the examiner, but was not the basis in most or all cases for office action rejections.

And so the dispute between the parties is that Dr. Downs has observed the fact findings and the results of the denied institution PTAB proceedings. Mr. Kunin is coming back and offering opinions that notwithstanding what the PTAB did, the art wasn't substantively considered because it wasn't the basis for an office action rejection.

So there's two critiques, from our perspective, with respect to Mr. Kunin. Number one is that governing precedent is the *Advanced Bionics* case that governs how the Patent Trial and Appeal Board ALJs looked at the question of discretionary denial under section 325(d). Mr. Kunin is instead offering a substantive review standard which he defines as the claims must have been distinguished over the art in the record or the art was the basis of a rejection and where the rejection was withdrawn or overcome by amendments, was distinguished in a notice of allowance or discussed during an interview. In other words, Mr. Kunin is offering a view that's not current precedent that art needs to have been the basis of a substantive rejection to have been substantively considered. That's neither here nor

there, because Dr. Downs didn't opine that the art was substantively considered using that standard, he's just acknowledging what the PTAB said, which is we're not instituting because the art is the same or similar, right? It's cumulative.

So there's two problems here. From a fit standpoint with a compliance with governing precedence standpoint, Mr. Kunin shouldn't be allowed to get up in front of the jury and speak to a substantive review standards that reflect a proposed or considered alteration to the *Advanced Bionics* standard that has not be adopted by the patent office. So I'll credit that the patent office has considered a higher standard, but it hasn't adopted it. So he shouldn't be allowed to speak to the jury about a proposed substantive review standard that the patent office itself doesn't apply. It's confusing and it's misleading.

The other problem with his opinion is that this court's precedence recognized that sometimes experts on patent office procedure will be allowed to speak about patent office procedure, but not if they cross the line into disparaging the patent office to try to undermine the presumption of validity. And we think that he falls -- he's susceptible to Daubert for that additional reason, because his reply report includes discussion about average work loads and amount of time typically afforded to examiners for

considering prior art. And from our perspective the only reason those are present is because he's trying to undermine and call into question the PTAB's fact findings and this question about whether art that was of record on an information disclosure statement or cited by the examiner, but not the basis of a rejection, was actually in front of the patent office. We don't think that's appropriate here and especially not when he's doing it through a substantive review standard that's not applied by the patent office.

THE COURT: Thank you. How much of this are you going to get into? Like, paint a picture for me of what it's going to look like when you have your expert or whoever it is on the stand and you say, and isn't it true that the expert looked at all these references? Like what are you going to say, because that's going to effect how much I let them say?

MR. ARMON: So, here's the issue --

THE COURT: The issue is the art is different art, right? Is that the issue in the IPR and what the PTO had? It overlaps?

MR. ARMON: We think the art overlaps. Now, some of the prior art is the exact same art and in some instances the prior art is in the same family with the same figures, same disclosure, but it's not identical to the art that the defendants are using. So I'd say there's -- the

issue in terms of invalidity rebuttal is, one, we think it's relevant for the jury to know if the art is cited on the face of the patent. And that goes to an issue in the jury instructions, right? Two, we think it's relevant for the jury to know that the Patent Trial and Appeal Board considered petition for inter partes review using some of the same art that they're using at trial or may use at trial given their narrowed invalidity positions. And that the PTAB made fact findings that that art is substantially the same as or similar to the art that was already considered by the patent office.

THE COURT: So if I agree with them later on, in their MIL number one, that what happened before the IPR has little to no probative value to the issues on trial here, I wonder if some of this won't get worked out. Let me think about it.

MR. ARMON: They're interrelated and we recognize that.

THE COURT: Okay.

MR. ARMON: We were unable to reach agreement on these yet.

THE COURT: All right. Thanks very much.

MR. LOCASCIO: Your last question is spot on, Your Honor. We actually proposed and it was not accepted that we take the three motions in the following order.

13:11:22 THE COURT: Right.

13:11:24 MR. LOCASCIO: Our MIL on PTAB decision institution denial at the IPR, because I was think that ripples through and probably precludes 90 percent plus of the issues.

13:11:33 The next motion we thought would be dealt with is our Daubert of Dr. Downs where -- so he does two issues, one, he essentially says well, look at this PTAB institution denial and based on that I'm going to, you know, say my assessment of it is what they say and uses it to vouch for validity. That's improper, but that would fall away if the MIL is granted.

13:11:56 The only other piece of Downs that we would take issue with, and we still have a live issue even if the MIL is granted, he sort of looks through the file history way beyond his ken and says this thing that happens in the boughs of the patent office or foreign PTC means X, which with he has no expertise on. Those two issues are resolved, then Mr. Kunin falls away because Mr. Kunin is rebutting Downs' use of the PTAB proceeding.

13:12:25 So that was our proposed recommendation of how we ought to tackle this.

13:12:30 THE COURT: Got it.

13:12:31 MR. LOCASCIO: We've now taken the last one first, as they would like to do, and the explanation we

13:12:36 heard from my opposing counsel essentially screams out for why this would be a mini trial of the interplay between different standards and what a discretionary denial means and why Kunin would have to be in here with his expertise when in our view he should probably no chance be a witness assuming Downs is adequately constrained if he's improper, which every district court case that anyone cited, 10 on our side, zero on them, from the District of Delaware says you cannot use these discretionary denials in front of a jury for 403 reasons.

13:13:07 THE COURT: Okay. Why don't you have a seat, because I don't want to make it look unfair that I'm giving you an argument on your MIL when the other side didn't get one. I am ready to rule on that MIL, because I do think that one of the ones that I don't have any questions.

13:13:21 You can of a seat. It's okay. I've read the papers.

13:13:25 I agree with defendants. Based on the papers that the failure to institute the IPR has little probative value, if any, and that any value it might have is substantially outweighed by the risk of confusing the issue and misleading the jury.

13:13:43 And I had in my notes that I should have read clearer that this would probably effect those other two and we should discuss it first. I guess it's too late for that.

The jury's got to make its own determination on obviousness, but I want to make clear to the defendants, I don't want you making a big deal with your witnesses about the fact that some of these references that you're going to say invalidate weren't disclosed on the face of the patent. Because if you do that, it's going to open the door to all the other stuff again. Does that make sense?

MR. LOCASCIO: So on this issue, Your Honor, there are two cases that touch on this. And the *Iogen* case, which is Judge Bryson's case by designation, addresses this question of, okay, if something wasn't considered by the examiner but was in the now discretionarily denied IPR and the PTAB said, well, it's close or something like that, the guidance was that you can't say to the jury the patent office never considered, because that could arguably open the door to this PTAB discussion. But the question of was something considered before the patent was issued, and that's a footnote specifically is that would be okay, no one's misleading anyone as to whether a reference was considered. We don't dispute that they can have their technical expert explain to the jury, okay, this reference we rely on here at the defense side is similar technically to something the patent office did. That's what experts do all the time. What they can't do is say the patent office found it somewhere in the PTAB proceeding. And it is a

factual matter, something either was before the office or it was not and the agreed upon jury instruction, it is number 4.1.2 specifically says that's a fact that the jury can consider. So we will not say this was never considered by the patent office, because as Judge Bryson notes, that would be on one side of the line. Was something before the examiner or considered before issuance is a question the jury is presented with.

THE COURT: Okay. So the ruling today is that the MIL is granted. I think you can work the rest of this out. If you disagree with something counsel said, try to work it out with them, but we'll take it up at some point before trial.

With respect to the question about whether their witness could walk through things that happen in the prosecution, I take your point. I don't think it's that much different than a lot of things we let witnesses do. If the prosecution history is what it is and they want to have their witness walk through it, you can cross examine him on it. But try to work that one out as well and see if we can get agreement.

That's going to resolve defendants MIL 1 and then it's going to table any lingering issues about Dr. Kunin, which hopefully will go away. And it's also going to table defendants' motion to exclude Dr. Downs and partially

resolve that motion.

Okay.

MR. LOCASCIO: Thank you, Your Honor.

THE COURT: Thank you.

All right. Let's turn now to the remainder of defendants' motions. And I do want to try to keep this moving, but I do want to give you a chance also to say what you want to say.

First we have defendants' motion to exclude Mr. Jarosz's lost profits opinions. I'll hear just a couple minutes argument for that. I just want to make sure I understand that defendants' argument here is that the underlying data is unreliable?

MR. FRANK: Good afternoon, Your Honor. Noah Frank, Kirkland and Ellis. So on the lost profits opinion, it's not so much the data as who feeds Mr. Jarosz the data. So Mr. Jarosz -- let's go to the first slide. In his opening report, this is his only line discussing incremental costs, which is what is deducted in order to get to lost profits. And he doesn't have any analysis himself, instead what he does is he relies solely on a declaration from Mark Papini. They cite sales, for lack of a better word.

Next slide. This is the footnote. This is the citation on the prior slide. This is Mr. Papini's declaration. He says there's only two incremental costs,

costs to manufacture and commissions paid to salespeople. So Mr. Papini, in his declaration, identified only two incremental costs. During his deposition, however, he admitted he's not a finance guy. Next slide.

THE COURT: But you -- by the way -- I know you have a lot of good slides, but I want to keep it moving. But you had a finance guy. You could have calculated your own incremental costs if theirs was bad, right?

MR. FRANK: So these are Sight's incremental costs.

THE COURT: I know, but you have a financial expert right that could have gotten their data and calculated their own.

MR. FRANK: So Mr. Meyer certainly offers a responsive opinion and he disagrees with what is included in incremental costs. And then in reply, Sight's expert, Mr. Jarosz puts in, I think it's eight pages of analysis why he says, no, no, no, actually it's only these two incremental costs.

THE COURT: Okay.

MR. FRANK: The issue is it's their burden and he should have done that analysis in opening and not tried to backfill in his reply. And in fact, in his deposition he says, no, no, no, I actually did all that analysis at the time of my opening report, I just didn't write it down. And

so what he relies on in his opening report is from just Mr. Papini. Mr. Papini admits that his whole understanding of what should be incremental costs came straight from counsel. And so there's no basis for Mr. Jarosz at the outset to offer an opinion on incremental costs.

THE COURT: All right. Thank you very much.

MR. ARMON: Promise we'll be fast.

THE COURT: Yeah.

MR. ARMON: Your Honor, there's a couple things I think are important as a baseline. Mr. Jarosz's lost profits opinion based on the market share approach, opines that approximately six percent more OMNI Surgical Systems would have been sold than otherwise. Okay. That's important because six percent is not a lot. And so when you're thinking about incremental costs, the question of how many or how much incremental cost you incur for each additional sale, depends upon how many additional sales you're making. Under the market share approach, an additional six percent of sales is a relatively small amount. And that's a reflection of the fact that these are two medical -- growth stage medical device companies that launched their products in 2018 and if you average that to today, they're both at 14 or 15 percent today, you end up with around six percent.

THE COURT: All right.

MR. ARMON: So why does that matter? Well, defendants are not arguing that incremental sales commissions were incorrectly calculated. They can see that the calculation of incremental sales versus commissions is correct. They also don't quibble with the cost of manufacturing the OMNI Surgical System. So there's no problem with those two pieces of data as incremental costs. And in fact, both parties agree and the experts agree, those are incremental costs.

The attack is that Mr. Jarosz came in too late. That's not a Daubert issue. That would have been a motion to strike. So the argument that Mr. Jarosz came in in his reply with more detail, that is not a Daubert question and they're not fighting over whether or not the two incremental costs that were identified are incorrect. In fact, they concede those costs are the right ones to include and they were properly calculated. The issue is whether there's other costs that should have been included too. And that's the issue that goes to weight, not admissibility. Goes to Sight as a growth stage company, the way it overbuilt its sales force for more growth than it realized. Mr. Meyer said that should have all been included, you're still a loss making company. Mr. Jarosz says that's not the way to look at it. This is an issue for cross-examination, not a Daubert issue.

THE COURT: Thank you very much. I agree with plaintiff on this one. Defendants' motion to exclude the incremental cost opinion is going to be denied.

I agree that it's an issue of weight and not admissibility. It's not unreasonable to me that an expert would rely on data provided by the VP of sales. And I also think defendants' expert had and took the ability -- took the opportunity to make his own opinion and there will be plenty of fodder for cross-examination. So that one is denied.

J -- it's listed G in my notes. The next one I have is defendants' motion to exclude the price premium analysis. This one I don't need to hear argument on. If defendant could just walk me through where it is that he was off by an order of magnitude, just so I can understand.

MR. FRANK: Certainly. So if you go to the slides of -- next slide. So this is sort of how Mr. Jarosz calculates price premium. He takes Hydrus. We have Ivantis product actual price and then he subtracts an iStent estimated price. The way he does that, next slide, is he takes Glaukos's actual revenue for a quarter and then he divides it by iStent's estimated procedures. Those estimated procedures comes from a market scope report.

Next slide. Market scope caution is that, it's a survey basically, the first line, it says this analysis of

Q1 2019 glaucoma treatments, based on surveys from 109 glaucoma specialists. So they survey the market and try to come up with estimates. And they have a disclaimer that says, subsequently, these results do not provide the precision required for exact measures market share. Essentially that the actual raw numbers are not accurate enough for that calculation.

We don't have in this case the iStent actual procedure numbers in order to make the comparison, but what we do have is the Hydrus and Sight's OMNI, we have their procedure data for that same quarter. And so if you compare, on the left this is market scope, so the survey of 109 glaucoma specialists. And if you look at their estimates for procedure numbers and then you compare them to the actual procedure numbers that the parties produced that are in the record, they're off by an order of magnitude. And this is what Mr. Jarosz was looking at in, I believe it's the next slide, when he admitted that the difference was an order of magnitude.

THE COURT: All right. Thank you very much. That's helpful. Thank you. So on this motion I understand the argument. The motion is also going to be denied.

I think that the argument goes to weight more than admissibility and there will be plenty of fodder for cross-examination on this one as well.

I do want to hear argument on this next one. And I won't be ruling on it today, but let's hear defendants' argument.

The main question I have is, does this 5/6 number, this is a required input for both the reasonable royalty and the lost profits or is it one or the other?

MS. HEFFERNAN: It's for the reasonable royalty.

THE COURT: Reasonable royalty.

MS. HEFFERNAN: Yes. And with Your Honor's permission, can't do an argument without slides. Actually I can, but I do have slides.

So let's go to slide 2. And we'll just jump right in. Dr. Downs is Sight's technical expert. He takes a look at eight documents, focuses on eight marketing documents out of hundreds that were produced by Ivantis in this litigation. And he deduces from those eight documents that there's some similarities and overlap of features or functionality that Ivantis touts of the Hydrus stent. And there are basically six that Ivantis repeatedly touts. And those are listed on slide 2.

He does not do an independent technological analysis of the Hydrus stent to determine what features in the Hydrus stent are patented versus unpatented and of those features, which are the features that drive consumer demand and are they tied closely, right, is there a nexus to the

patented technology. He does not ever do that analysis. He just looks to this marketing material that Ivantis prepared in the ordinary course that is not focused on the patented technology and is, in essence, a way to tout advantages over other MIGS devices. Dr. Downs never does the analysis to say, for example, efficacy and reduction of IOP, is that tied to the patents-in-suit. Well, yes, it is tied to the patents-to-suit, but he doesn't say, okay, all these other MIGS devices out there, they also reduce IOP. That's the whole point of a MIGS device. He doesn't do the analysis to say that the amount of the reduction that Hydrus obtains in IOP is solely attributable to the patents-in-suit over and above the amount of reduction in IOP in other MIGS devices. Never does that technological analysis for any of these factors. He simply takes them at face value and says they're related to the patented technology, adds them up and says these six are responsible for a hundred percent of the value of the Hydrus, which, by the way, is an economic conclusion, not a technological one. He is not qualified to render that opinion. One, he's not a surgeon, so he's not a user of these devices. Two, he's not an economist. He never performs any analysis, for example, using the iStent as an example, of how any of these features are obtained in the Hydrus versus the iStent. Never does that analysis.

Let's go to the, let's see -- let's go to slide

13:30:13 4. And even worse -- so basically he's taking some marketing materials and decides these represent the entire technological value. Mr. Jarosz then picks that up and says that is equivalent to the economic value. There's absolutely no rationale for doing so. He provides none.

13:30:32 But worse than that is slide 4 shows you that Dr. Downs concedes there are other technological drivers of value. The Hydrus is made of nitinol and that provides a benefit, right? And he says, well, it's one good biocompatible material. And he says, yeah, so there are lots of advantages to nitinol. He never then takes nitinol as a material of the Hydrus and goes back to the six features that he looked at to determine, well, how much does nitinol contribute to these benefits that are obtained by Hydrus. In addition -- sorry.

13:31:10 THE COURT: So part of the issue is tying the five out of the six to the patent, but also your point is why six, why pick six?

13:31:18 MS. HEFFERNAN: Especially when we know there are other features. Nitinol is one, right here on the slide. And doctor -- excuse me, Mr. Jarosz -- let's go to the next slide. And I want to keep this brief. One more slide. Slide 6. He admitted in his own report, both reports, that many factors can influence physician's choice amongst MIGS devices. And that is the question that they're

trying to answer with his values drivers, it's the drivers of value over the selection of other MIGS devices. He admits there are many other factors.

Let's go to the next slide. And he points to Mr. Meyer. And Mr. Meyer actually did the work and analyzed what are the factors, the value drivers Alcon contributes that are not patented. Its own commercialization efforts, its own investments in R&D, for example, the Horizon clinical trial, which is like a gold star clinical trial, reimbursement, the amount of pay, price of a feature. That's a differentiating feature among MIGS devices and the reimbursement for it. And in fact, Alcon and Ivantis have their own patents that cover the Hydrus. The apportionment case law is replete with instructions that the patentee must in every case apportion between the patented and unpatented features. Dr. Downs does not do a technological apportionment analysis and Mr. Jarosz doesn't do an economic one where he separates out the value of all these other drivers that everyone agrees that are out there contributing to sales of Hydrus.

So for that reason, it's been a long morning, I know, so unless the Court has further questions.

THE COURT: No questions. I'll hear from plaintiff. Go ahead.

MR. ARMON: Your Honor, a few background issues

13:33:12 and then I'll explain why defendants are incorrect on this one.

First of all, defendants have not offered their own apportionment in this case. So they're only offering critiques of the approach that Mr. Jarosz and Dr. Downs took.

The other thing that I want to note that's important, I think, is that the Daubert motion is framed as a Daubert attacking Dr. Downs and Mr. Jarosz's apportionment opinions. I want to note, however, that there was no opening motion or argument with respect to Jarosz's second step apportionment that is addressed in paragraph 189 at tab 20 of his opening report as well as his reply report. So I'm going to focus my argument on the attacks on Dr. Downs' apportionment. And I'll explain why the methodology is sound and consistent with case law.

The point I'd like to make for the Court is because there was no opening brief argument and no motion to exclude Jarosz's apportionment analysis, again, at paragraph 189 of his opening at tab 20, that apportionment analysis stands. We got two or three sentences in their reply brief saying, oh, that analysis that Jarosz did is no good either, but from our perspective there has not been a proper Daubert motion.

THE COURT: Is that the 90% percent figure or am

I --

MR. ARMON: He reached, using his approach, 90% percent and then said to be conservative, I'll use the Downs apportionment of 83%.

THE COURT: And his approach was also to count words --

MR. ARMON: He looked across I believe 25 or 30 pieces of internal documents from Ivantis and Alcon and looked at how features were characterized between the iStent and for benefits between Hydrus over iStent.

THE COURT: Okay.

MR. ARMON: So just as a note, there has not been a proper Daubert motion on the Jarosz apportionment, at paragraph 189 in tab 20. That should not be effected by the Court's decision here.

Now, number two, and more importantly, each of the apportionment approaches that Mr. Jarosz ultimately uses are multi-step apportionment approaches. And those approaches are fully and solidly endorsed by the Federal Circuit and district courts. And it's critical that the court understand that it's a multi-step apportionment. The defendants are, I think, inaccurately implying that the Downs piece is the only apportionment that was done and that's just flat wrong. It's 100% wrong. The iStent incremental benefits approach begins with the approach that

is described in *Apple v. Motorola* and other cases. I'll just quote from *Apple v. Motorola*. "A party may use the royalty rate from sufficiently comparable licenses" -- let me set that aside. It's not relevant here. "Value of the infringed features based upon comparable features of the marketplace, or estimate the value of the benefit provided by the infringed features by comparing the accused products to non-infringing alternatives."

Okay. First step here is that Jarosz took the iStent and its price and the Hydrus and its price and he subtracted them and identified the price premium that Hydrus reached. All Glaukos' iStent and Ivantis' Hydrus have marketing, both of them do R&D, both of them of sales people. All of that stuff that Ms. Heffernan just mentioned gets wiped out when you take the first apportionment step of calculating the profit premium. Mr. Jarosz did a two-step apportionment for every one of his approaches.

And Your Honor, I recognize, if you only look at the Downs apportionment in isolation, you might have questions about what happened to everything else. Well, the question, Your Honor, is that everything else was apportioned out in step one. So their attack is sort of like the point we discussed this morning where the defendants argued you can't grant partial summary judgment on an element, you have to look at the whole claim.

13:37:37 Well, Your Honor, with respect to Mr. Jarosz's
13:37:39 apportionment and his damages opinions, defendants have
13:37:42 never grappled with the entirety of any single opinion.
13:37:46 They're diving in and focusing on one piece and saying,
13:37:49 well, that doesn't comply with apportionment requirements.
13:37:52 That's because they're overlooking the first step of the
13:37:55 apportionment.

13:37:55 Now, in the briefing we explained what the first
13:37:58 step was for each of his three approaches. Mr. Jarosz has
13:38:02 been doing this for decades. He's one of the most, you
13:38:05 know, widely recognized patent damages experts in the
13:38:08 country. He's been doing this for 30 years and doesn't have
13:38:13 a history of being Dauberted on these issue. So the
13:38:16 suggestion that somehow Mr. Jarosz and Dr. Downs got it
13:38:19 totally wrong is just incorrect. What we have here is a
13:38:22 disagreement, one, an overlooking of this two-step
13:38:26 apportionment that's absolutely critical and second, a
13:38:29 disagreement about whether Dr. Downs fairly took Alcon's own
13:38:35 assessment of the six factors that Alcon assessed after it
13:38:44 bought Ivantis drove the success of Hydrus over its
13:38:47 competitors in the marketplace and used that own self
13:38:50 assessment as a basis for comparing against the patent
13:38:53 claims, saying, okay, here's the claims, here's your
13:38:56 identifier of drivers of demand in the marketplace and
13:38:59 success and how did the claims map on to those

self-identified drivers. And the reason that's important for the second step is because even after you flesh out all of the other stuff, you still have to isolate, in the price premium or the other approaches, what's attributable to the patents-in-suit versus everything else.

Now, once you recognize that the second step is only about that, there's absolutely nothing wrong with the approach that Dr. Downs took or separately the non-challenged approach which Mr. Jarosz took as a second step approach.

Now, this is an issue that apportionment is always contested, hotly contested in damages cases. You might notice they've attacked, under Daubert, every single one of Mr. Jarosz's opinions, right? Nothing is spared from criticism. If they disagree with his approach to apportionment, of course that's a basis for cross-examination. If their experts, if it's within the scope of their reports, want to identify what they believe to be other drivers of value, Mr. Jarosz, their experts can have a debate about whether that was fully accounted for in the first step as we contend it was. That's not an issue of admissibility. And Your Honor, I could go through the other cases. We cited case after case.

THE COURT: We'll take a look. And as I said --

MR. ARMON: Those approaches are approved.

THE COURT: -- we're going to reserve on the issue and carefully examine it, including the first part of the analysis you mentioned.

Can you just -- preparing for today, it just seems strange to say there are six most important things and so we're just going to lop off one and we're just going to take five, six. That just -- it doesn't sound right. How do you know they all should be given equal weight or has that all be taken into account?

MR. ARMON: So, Dr. Downs took defendants' own admissions about the key value drivers for Hydrus over its competitors. Why does Hydrus success in the marketplace? They told us those admissions are their distilled view of why Hydrus succeeds. That's an admission by the defendants. They could have put a thousand factors in there and he would have considered the thousand if that was -- again, we took the most current assessment by Alcon after the acquisition. That's an admission by the defendants that those six factors are the key value drivers that drive demand and success of Hydrus. Now, they attack and say, well, why did you rely upon what we said that makes Hydrus successful? It's because they admitted it, that those are the things that drive. Again, this is only the second step after you've already wiped out, through the first step of the apportionment, all of these other things Ms. Heffernan

mentioned. We agree, everybody has a sales force. That was taken care of. Everybody has R&D, et cetera.

THE COURT: Yep. That's helpful. I appreciate it. Thank you very much.

MS. HEFFERNAN: May I correct the record on something?

THE COURT: Sure.

MS. HEFFERNAN: Mr. Armon said that Alcon never challenged this profit premium analysis where the delta is what Mr. Jarosz takes and then does the apportionment on it. That was challenged and it was challenged in our Daubert motion at page 8. Mr. Jarosz assumes, without the support of a technical expert, that Glaukos' market leading iStent does not practice the asserted patents. He then theorizes that any purported price premium Hydrus commands over iStent is as a result of Hydrus practicing the asserted patents. And solely for that reason, that unsupported opinion should be excluded. He has that opinion as an economist. He doesn't rely on a technical expert who actually analyzed iStent versus the asserted patents to support the notion that the only material difference is attributable to the patents-in-suit. So that first step was challenged and should be excluded.

As for this notion that we didn't challenge this alternate apportionment that Mr. Jarosz has without relying

13:43:16 on Dr. Downs, Mr. Armon sites to paragraph 189 of Mr. Jarosz's report. And that report, this is what he does. "To determine a quantitative measure of the relevant importance of the six advantages that were focused on by Dr. Downs, I analyzed the number of times each advantage is mentioned in the Ivantis internal documents, similar to a patent citation analysis, which is described" -- and he talks about where it is. "Across the documents I reviewed, there were 74 mentions of the six Hydrus value drivers." That's the same document we were talking about with Dr. Downs as being Hydrus' advantage over iStent. "Of those mentions, a total of 67 were for the Hydrus value drivers." As such, that's where he gets his 90% opinion that Mr. Armon says is not challenged. It was challenged. It's challenged via the notion you can even use those value drivers. And it's not Mr. Jarosz's opinion. He doesn't use the 90% to do anything in this case.

13:44:20 Now, I will wrap up.

13:44:22 THE COURT: He uses a number smaller than the 90%, which helps you.

13:44:26 MS. HEFFERNAN: Well, they're both unreliable. The 83% is just as unreliable as the 90%. Excuse me. Apportionment is the patentee's burden and it always stays the patentee's. It's not the defendants' burden to come forward with a different apportionment opinion.

13:44:45 And on the notion that the Court should just let this roll because Mr. Jarosz testifies a lot, he also happens to be among the most successfully Dauberted damages experts out there. And I would direct the Court to *Wi-Lan v. Alcatel-Lucent* in the Eastern District of Texas in 2013. I successfully Dauberted him twice on the apportionment issue, so I would encourage the Court to take a close look at how Mr. Jarosz does the apportionment in this case, because it is equally unreliable.

13:45:19 THE COURT: Thank you very much.

13:45:20 All right. The next one is defendants' motion to exclude Mr. Jarosz's and Dr. Downs opinions regarding the Glaukos settlement agreement. This one we have taken a look at. I don't have any more questions on it. This once is going to be denied. I think this goes to weight, not admissibility. Defendants are free to cross examine the witnesses about the differences between the Glaukos litigation and this litigation.

13:45:48 We already talked about defendants' motion to exclude opinions outside Dr. Downs' expertise. That got tabled.

13:45:56 Then we have the claim construction issues. So there's one about not block flow from either the trabecular meshwork or the channels and then there's one about the arcuate member, one about the -- then there were three other

ones. So maybe we should -- maybe we should just start going through them.

Counsel.

MS. HEFFERNAN: May I ask the Court for a clarification on the Glaukos settlement agreement? I'm not going to argue the motion.

THE COURT: Yes.

MS. HEFFERNAN: The clarification is there was a finding of adverse inference in that case that led to the settlement. Are the -- is it the case that the plaintiff is free to talk about the adverse inference in the spoliation finding that was present and that led to the settlement agreement in that case?

THE COURT: Well, you would -- right. So that's going to be a side show, but doesn't that help you because that made the settlement higher than it otherwise would have been?

MS. HEFFERNAN: It paints us as a spoliator and destroyer of evidence and in this case they're saying where's the clinical data. This -- Judge Fallon was presented with an argument by the plaintiff in this case that there was spoliation here and she found there was no evidence of it. They didn't prove that. And so for them to now, via the Glaukos litigation, paint us as a spoliator and say there's evidence missing in this case too, and by the

way, you were an infringer in that case, you're an infringer in this case. I mean, hugely prejudicial and not probative.

THE COURT: That sounds new to me from what I remembered from the briefing. Maybe it was in there somewhere. But why don't you try to work out -- I'm inclined -- as I understood it, the opinion or the motion was based on the fact that there were different things going on and that was a litigation settlement. And I thought that could be dealt with with the cross-examination. With respect to the rest of it, I'm not prepared to give you a ruling on that today. Why don't you work out, in light of the guidance I've given you, on the fact that the settlement in its entirety won't be excluded and see if you can come up with some kind of resolution.

MS. HEFFERNAN: Thank you, Your Honor.

THE COURT: Thank you.

MR. VERBUS: Hi, Your Honor. Brian Verbus from Kirkland & Ellis. I have a few slides for this one.

THE COURT: Okay.

MR. VERBUS: Would you like me to hand them up?

THE COURT: Sure.

MR. VERBUS: So as Your Honor noted, there are five instances where Dr. Downs has either deviated from the Court's claim construction or offered new constructions in an effort to try to avoid the prior art. I'm happy to

address any Your Honor likes or we can go through all of them. I've only got a few slides on each.

THE COURT: Well, let me ask you. There were 1, 2, 3, 4, 5 of them, right?

MR. VERBUS: Yes, that's right.

THE COURT: Four of them, the last four, there was no claim construction by the Court. That's right?

MR. VERBUS: The last three.

THE COURT: The last three.

MR. VERBUS: The first two there is a claim construction.

THE COURT: Okay. So with respect to the ones where the Court never had a claim construction, you don't like what opinion their expert's given, but it's raising a claim construction issue, right?

MR. VERBUS: Not necessarily. I think there are some nuances for each of those. Some potentially raise a claim construction issue, others get into a waiver issue.

THE COURT: All right. Why don't you start going through your presentation then.

MR. VERBUS: Sure. So let's go to the first slide. There's not dispute here, if you deviate from the Court's construction, that is unhelpful, unreliable. So let's talk about substantial interference. And where I want to focus the Court here, I've got the construction on the

slide from D.I. 287, the Court's claim construction order. But when Judge Williams adopted Judge Fallon's Report and Recommendation, what he said was, "the Court agrees with plaintiff that a skilled artisan would evaluate whether a support 'substantially interferes' or 'significantly blocks' fluid flow in the eye 'by determining whether an increase in aqueous outflux (and therefore a decrease in IOP) has been achieved by the support.'" That's D.I. 273 at 6 to 7.

Now, if you go to the next slide, our invalidity expert, Dr. Tanna, reviewed the prior art and identified that the prior art is described as reducing IOP. Now, in response, Dr. Downs injects this new requirement that there must be flow across the meshwork. He says, "Dr. Tanna completely ignores the path of fluid out flow from the trabecular meshwork and proposes only that this limitation will necessarily be met if a prior art device would increase net efflux of aqueous humor." But from the prior slide, that's exactly how the Court said an ordinarily skilled artisan would look at this issue.

THE COURT: But the construction was --

MR. VERBUS: If we go back --

THE COURT: The construction was, "the support does not significantly block either fluid outflow from the trabecular meshwork or fluid outflow to the collector channels." Isn't the most reasonable reading of what the

court said, it doesn't block flow from the trabecular meshwork and it doesn't block flow to the collector channels or do you read it as something different? But I know the reasoning doesn't match up with that, but that's what it says.

MR. VERBUS: So I think there's a distinction between "is there flow" and "is flow blocked." So what Dr. Downs is doing is saying, if we jump ahead two slides.

So our invalidity expert, Dr. Tanna, opines, well, there's going to be flow -- let me take a step back. He says the prior art either has openings or windows or you can put openings or windows in the prior art and that would be an obvious design choice. And Dr. Downs says, that's not enough. If you look at his expert report, D.I. 298-15, paragraph 173, he says "mere inclusion of pores or fenestrations would not, as Dr. Tanna's report appears to assume, necessarily produce flow through the trabecular meshwork." So he's saying even if a device reduces IOP, which is how the Court said a person of skill in the art would examine this limitation, and even if you have openings that are facing the meshwork, that's not enough. You have to show that there's actually fluid that's traveling across the meshwork through those holes and across the canal. And that is both not supported by the Court's construction, not supported by how the Court says you would analyze that

issue, and inject a new requirement into the Court's construction.

THE COURT: All right. Thank you very much.

Here's what I'm going to say about all these. I'm going to say that I've read these portions of the brief and I'm not persuaded that plaintiff's expert has misapplied the claim constructions or otherwise not applied the law.

That said, if there is an underlying claim construction dispute that arises about the meaning of a claim term that hasn't already been resolved by Judge Williams or Judge Fallon, that that needs to get brought up so that I can properly instruct the jury. And that's how we're going to leave this one.

MR. VERBUS: Understood, Your Honor.

THE COURT: Okay. Finally we've got defendants' motion to exclude Dr. Downs strain analysis.

MR. VERBUS: I have a few slides for this one as well, Your Honor. May approach?

THE COURT: Great. Your visual person has been working overtime.

MR. VERBUS: For sure. I'll keep this one short. On the first slide, it's black letter Federal Circuit law that you cannot rely on the proportion of a drawing for purposes of an analysis. We cited the *Nystrom* and the *Hockerson-Halberstadt* case in our brief.

If we go to the next slide. There is no real dispute that that is exactly what Dr. Downs did in this case, on the slide I have, D.I. 298-15, which is the Downs rebuttal report. And I'll focus you on paragraph 208. What Dr. Downs says is, "Accordingly, a device proportioned according to *Gharib* Figure 5A results in a maximum strain of 37% percent." So what he's done is kind of eye-balled the proportions of the drawing and used those proportions that he's determined, plugged them into a strain equation that I take issue with, but I don't even know that we need to get to that, and comes out with a 37% number. And he says, well, based on that, I don't think this prior art would work, because it would fail.

If you go to the next slide, he confirms that's exactly what he did at his deposition. This is D.I. 298-24 at 170, 8 to 23. And we were asking Dr. Downs, well, you used the proportions from *Gharib '478* of the prior art for purposes of your maximum strain calculation. And he answers, "Yes. Just assuming that the device -- that the image provides the proportions of this device, and it's the proportion that is important here." So he's literally done what the Federal Circuit has said you cannot do, which is rely on the proportions of drawings that are not described in the specification as "to scale."

THE COURT: But is the question here -- and I

just want to make sure I understand. The question is what does this prior art disclose to one of person of skill. And if the prior art doesn't have some express statement about what the strain is and an expert says I understand it would inherently be disclosing this amount of strain, isn't that okay, or is that not what's happening here?

MR. VERBUS: So what's actually happening here is he says the prior art is not enabled because it wouldn't work. So even though the reference describes the device as functioning in a certain way, and even though the reference says the device reduces IOP, what Dr. Downs says is, well, a person of ordinary skill in the art could never do this because based on the proportions in the drawing, I conclude that the device would mechanically fail when I run it through this equation, these proportions that I've eye-balled through this equation.

THE COURT: Understood. Thank you very much. Let's hear responsive argument on this one.

DR. RHYU: Your Honor, I think you hit it just right when you said that the person of ordinary skill in the art will approach a prior art disclosure and determine what it says to that person of ordinary skill in the art. That's precisely what Dr. Downs did when Dr. Tanna, defendants' expert, took prior art drawings and actually modified them. For instance, these lines that were put in, this dotted

line, this change in the angle, all of these changes were alterations to the prior art drawings that were made by Dr. Tanna. And what Dr. Tanna was trying to do was to say that when you have this piece of prior art that has a bifurcatable element, so it's like a T-shirt, it comes out of the introducer and then has to split into two different directions, go bi-directionally within the canal. And Dr. Tanna's saying that that's possible to do with a device that's made out of nitinol, which is a flexible metal, but a metal. And Dr. Downs is saying, when you look at the properties of nitinol, this just wouldn't work. And that's the opinion that he presented as a person of ordinary skill in the art as a bioengineer. And to the extent that they have any complaints about his analysis, that goes to weight.

THE COURT: All right. Thank you very much. That was very helpful from both sides. And well argued.

This one is also going to be denied. Defendants' motion will be denied. Defendant can cross examine the expert. But I do think it's an appropriate opinion of what the reference discloses to a person of skill.

All right. Plaintiff's motion in limine number 1. Here was my thinking on this. My thinking was that it would be denied, but depending on how the evidence comes in of defendants' patents, we might be inclined to issue a

curative instruction that tells the jury that the existence of one's own patent is not a defense to infringement of somebody else's patent.

In the particular circumstances of this case, where the plaintiff is alleging that defendant copied, but that plaintiff's patent was not published until after defendant had developed their product, it does seem to me that defendant should be able to point out that its got its patents. Are you okay with seeing how it goes and issuing a curative instruction?

DR. RHYU: Actually, we were prepared to let the Court know that we're not planning to put in a copying case, so absent the copying case, we don't think there's any reason to introduce the defendants' patents.

THE COURT: Are you putting in a willfulness case, though?

DR. RHYU: We're putting in a willfulness case, yes, but that has to do with willful and reckless disregard of patent rights of Sight Sciences. To the extent that they want to tell their independent or simultaneous invention story, they have technical documents and those are in the Iwach report, Exhibit D at pages 46, 47 and 66. This district has multiple times ruled that it can be greatly prejudicial to have patents of the defendants in the record. It's confusing, it's grounds for mischief. The probative

value in the absence of a copying case would be outweighed by the prejudicial harm.

THE COURT: All right. Thank you very much. So I do think there is some value here to allowing defendants to introduce this evidence. I've analyzed it under the standard of Rule 403. And again, I think that if there is prejudice, it can be cured with a curative instruction, so you can request that at the appropriate time. Any questions about that ruling? Seeing no response. All right.

Motion in limine number 2 is plaintiff's motion to preclude defendants from suggesting that it would have been improper to draft claims to cover the Hydrus Microstent.

This one is going to be essentially the same as the last one. This is going to be denied. I do think that evidence of plaintiff's claim drafting is relevant to 112 and willfulness and damages. And depending on how it comes in, I will entertain providing the jury with a curative instruction, but I've analyzed that under 403 as well.

That curative instruction has to be requested at the appropriate time, though, otherwise it will be waived.

Okay. Plaintiff's motion in limine number 3, I'm inclined to grant this one, so I'll hear from defendants as to how this is relevant that a government contractor made a coverage determination that later got withdrawn.

MR. FRANK: Thank you, Your Honor. If you could give me a moment.

THE COURT: Take your time.

MR. FRANK: May I approach?

THE COURT: Yes.

MR. FRANK: There's some extra slides in there as well.

Sight Sciences' argument is premised on the assumption that because these determinations did not ultimately get enacted, that they're irrelevant. And that's not the case. So these are Sight's third quarter 2023 financial results, which is during the damages period. And they cited the uncertainty resulting from these proposed LCDs, these are local coverage determinations, as one of the primary drivers of relatively flat utilization and lower newer account additions. So the fact that they're ultimately withdrawn doesn't mean that they didn't effect the market, doesn't mean that they didn't effect purchasing decisions and what would happen in the sort of but-for world with relation to lost profits. And Alcon's experts did, in fact, discuss them.

So next slide, please. Sight, in reply, says defendants' experts never opined that these were relevant. Mr. Meyer actually does talk about it, talks about how reimbursement effects sales. It's one of the things related

to apportionment that Ms. Heffernan spoke about earlier. And this determination was an issue with reimbursement. And really it's evidence of sort of the outsized effect that reimbursement has on purchasing decisions. And so, in fact, Sight has no dispute that reimbursement is a factor.

Next slide. One more. The issue that they take with it is that they say, well, reimbursement may be a consideration, but it's not a big consideration. Well, that's contradicted by these determinations where Sight, because of them, that were not actually entered, they were processed determinations, they didn't go into effect, so Sight never lost its reimbursement for OMNI. But they're directly contradictory to Mr. Jarosz's opinion that, yeah, reimbursement may be a consideration, but it's not that important. Sight withdrew its revenue guidance based on these determinations. And so the fact that they were subsequently not entered, it frankly doesn't matter, because they were proposed, they caused uncertainty in the market during the damages period.

THE COURT: But -- maybe break it down a little bit more simple for me. You've got a doctor that's thinking about doing an eye surgery and he says I'm not going to buy the products today because it might not be covered next year?

MR. FRANK: So that -- that's actually what

Sight said. They said, we're not selling as many of these devices because the market is uncertain about the future of the device. And so for the period of time when these --

THE COURT: I see -- so they're saying we have lost some accounts because -- what does that mean, lower new account additions, flat utilization? They're saying we're not growing as much as we thought we would.

MR. FRANK: Exactly. Correct.

THE COURT: Okay.

MR. FRANK: And so when we're talking about lost profits in the but-for world, in the case where Hydrus isn't on the market, this rebuts the idea that these physicians would have gone and purchased Sight's OMNI. And so it's relevant to lost profits during the damages period and it's certainly relevant to apportionment.

THE COURT: But is this going to open up a big thing where you're going to talk about why the MAC made the decision they did. And that's -- I've had experience with these MACs before, and they've got physicians that work for them and decisions get made. Can we somehow cabin this so you can talk about what you want to talk about but not make it look like there's a problem with their product that was decided on by the MAC?

MR. FRANK: Certainly we don't need to discuss the underlying reasons for the proposal and disparage Sight.

We're not intending to. That would seem to me like their biggest concern in their brief.

THE COURT: Okay. Great. Any problem with that?

MR. ARMON: Yes, we disagree with that. Let me explain why.

THE COURT: Okay.

MR. ARMON: First of all, Your Honor. The MAC coverage determinations are a result of competitive activity. Private company players in the market petition the MACs for changes in reimbursement. That's what was going on here. That's the back story. It would be confusing and a waste of time for the jury to hear about a change in coverage that never happened. And there's better evidence in the record that will address whatever happened in the last quarter or the last year with Sight's sales. The company stipulated to supplement their financial data. That happened this past week. Sight provided updated data regarding OMNI sales. Defendants provided that data. What actually happened in the real world will be reported, was reported on that financial data. And Your Honor, the reason that Sight -- that we argued that defendants' experts have not shown any relevance to the revoked determinations is of course when expert reports were served last fall, they hadn't yet been revoked or withdrawn. And Dr. Iwach and Mr.

14:11:02 Meyer only offered speculative opinions that if the determinations were implemented, that the proposed determinations could then result in bad things. So it's not at if defendants' experts did an analysis about harm from the pending potential MAC LCDs. They only said, if they're implemented, bad things will happen to Sight. We don't dispute that bad things would have happened if OMNI lost coverage. It didn't lose coverage.

14:11:33 THE COURT: But they're saying bad things actually did happen, though, also.

14:11:37 MR. ARMON: To the extent anything bad happened, it's in the financial numbers. We don't need to have a mini trial on what the MAC LCDs competitor driven consideration of a change in reimbursement means for safety or efficacy of OMNI. That's just a side show and a waste of time.

14:11:55 THE COURT: All right. Thank you.

14:11:59 MR. FRANK: So Mr. Armon referred to better evidence in the record. The MAC, it's a third party neutral. So it is the best evidence in the record. It's not influenced by either party. They're medicare administrative contractors, and it's an independent determination. The idea that Mr. Meyer didn't talk about or only speculated. First of all, we don't intend to speculate. As you referenced earlier, these did have an effect and we intend to speak about that. And we should

14:12:37 still be able to cross their damages expert about this
14:12:40 regardless of what Mr. Meyer said about it.
14:12:43 THE COURT: Okay. Thank you very much.
14:12:51 All right. This is an interesting one. This
14:12:54 one I am going to grant after all. Defendants made some
14:13:01 persuasive arguments, but on balance I think that the
14:13:05 evidence about the coverage determination that never went
14:13:07 into effect at the end of the day it's cumulative to
14:13:12 evidence that is going to get in, which is the actual
14:13:15 financial effect. And I do think its prejudicial and of
14:13:19 course even if I had allowed it in, I wasn't going to let
14:13:22 defendants talk about the reasons for the coverage
14:13:24 determination, because I do think that prejudice outweighs
14:13:27 the probative effect. So that's number 3.
14:13:33 We already dealt with defendants motion in
14:13:37 limine number 1.
14:13:39 Defendants' motion in limine number 2 is
14:13:44 granted. I don't need to hear argument on that.
14:13:49 MR. LOCASCIO: From a number clarification, I
14:13:52 had our MILs differently numbered on my sheet. Are you
14:13:55 talking about escrow or freedom to operate?
14:13:58 THE COURT: No. Number 2 is to preclude
14:14:00 plaintiff from referencing defendants' lack of an opinion of
14:14:04 counsel or freedom to operate.
14:14:07 MR. LOCASCIO: Thank you.

THE COURT: That's very clear to me under the law, which by the way got cast while I was prosecuting a cocaine distributor, so this one was a surprise to me, but sometimes they still pop up where something changed while I was doing something else. So that's number 3.

Number 3 is defendants' motion to preclude evidence, argument and testimony regarding the escrow fund. That one is also granted. I think it's highly prejudicial for the jury to hear that this there's a hundred million dollar pot, not all of which is allocated to patent stuff. I don't want to have a mini trial within this trial about the *Glaukos* litigation. I don't think it's relevant to issues in the case. I think it's confusing to the jury. We can have that settlement agreement in here. As we already talked about, the parties should work together to see if they can redact whatever portion this is so the jury doesn't get something that talks about a hundred million dollars in it.

All right. Let's talk about some other items in the pretrial order and at the end I will remind everyone whatever rulings that I make today I'd like the parties to resubmit the pretrial order and incorporate what I've said so we can of a document that reflects what we're going to be doing here at the trial.

Dispute number one is in paragraph 32. These

14:15:26 are my own numbering, by the way, and they go out of order.

14:15:29 Paragraph 32, defendants -- no, plaintiffs wanted to be able to publish your exhibits to the jury for purposes of impeachment that haven't yet been admitted into evidence. I have played around with different ways of trying to make sure that counsel does proper impeachment and none of them have worked so far. So we're going to try a new way this time, which is that, you could throw it up there for purposes of impeachment if it hasn't been admitted, but you get one shot and it better be inconsistent with what the witness just said. This happens to me every trial. I can't figure out a way to deal with it. Everybody should review a video on how to impeach by prior inconsistent statement before trial. I'm going to give the parties a little leeway at the beginning of the trial. If somebody screws up and puts up something that's not inconsistent, then I'm going to start making people check with me before they try to impeach and it's going to take the steam out of your impeachment. Or I might tell the jury it's improper cross. I don't know how else to deal with it. Just do it correctly. But you can throw it up there.

14:16:43 All right. Then we've got discussions and disputes among the parties when they're going to exchange the demonstratives.

14:17:08 MS. SHARP: Your Honor, would you allow me to

make a brief statement about this?

THE COURT: Here's what I'll say and then I'll let you talk, Ms. Sharp.

So for demonstratives, why don't you exchange them two days before the opening statements. The main thing for demonstratives is that I need to have any disputes over the opening demonstratives raised with the Court 7 a.m. the day that the demonstrative is going to be used. And it needs to be raised by sending a copy of the objected to slides and a one- or two-sentence statement about what the dispute is to the Court's new civil e-mail address, which I think is jlh_civil -- I see folks that know nodding in the gallery, so we'll go with that -- @ded.uscourts.gov. And then we will resolve any objections before the opening statements start.

So trial is going to start every day at 9 a.m. with the jury, but I'll take the bench at 8:30 to resolve any disputes. Any disputes that need to get argued are going to be on the clock and I will charge the time to whichever side I think is most appropriate.

MS. SHARP: Your Honor, could I just make just one comment not on the rule you just made but in connection with the other exchanges?

THE COURT: Yes.

MS. SHARP: So there's the issue with openings

that I understand is resolved. But the overarching issue with these exchanges is that where there is a 7 a.m. deadline, the meet and confer is at 9. That ends at 10. People are going to get back to each other and the fights last until sunrise. And what we're trying to avoid is having that happen.

Now, with the opening I think it's difficult, but during the trial week we're wondering if the submission could be at midnight, for example, so the parties are incentivized to take their list of 12 disputes, narrow it to what they actually want to fight before the Court about and get that submitted at an hour that doesn't leave the more junior members of the team up all night fighting about something that doesn't make the 7 a.m. letter.

THE COURT: Okay. All right. So we've got a dispute that has to do with paragraph 44, which is demonstratives for direct examinations as well as I think we're talking about trial exhibit exchanges. Is that right, Ms. Sharp?

MS. SHARP: Yes. Anything that could come up with the Court the next morning. And it's simply to not spend all night on fights that are never going to hit your desk.

THE COURT: So what is your proposal, just so I can understand, if we do it the day before or you still want

to do it two days before?

MS. SHARP: I want to do it two days before so that the meet and confer the night before is meaningful and results in resolution and true narrowing of the disputes that will actually come to the Court. And I'm wondering if the Court would entertain a submission at midnight so that the parties solidify their disputes and are incentivized to make that decision earlier than three in the morning.

THE COURT: I got ya.

MS. KELLER: Your Honor, if I could just real quick. I think the two-day issue is a problem for us for this reason. We're going to be disclosing, for example, our technical experts' demonstratives potentially before we've even seen their technical expert take the stand. So it makes it a little difficult in the sense that slides may be changing, we may be narrowing issues, because we're running out of time, for example, or we're maybe not going to address something. Two days is hard. I'm not necessarily against the midnight situation. I think that's fine. It benefits everybody. But the two days is really problematic, given how quickly things are going to be happening and the fact that we're not going to be seeing some witnesses prior to our having to disclose slides.

THE COURT: Right. So here's what I'm thinking. What if we do the demonstratives the night before. And for

14:21:53 the exhibits, why don't you do a good faith disclosure two days before and then if there's a couple exhibits that get added, which I don't imagine any will get dropped, I imagine they're probably going to be over-inclusive, you can deal with that and if you've got some reason, you'd be able proffer. You should have some reason why this got added because of something that happens during the trial. Does that make sense?

14:22:14 MS. KELLER: Yes. That works, Your Honor. The only other issue we had was with closing demonstratives. We typically or at least in my experience in this district we don't even disclose them. Sight has proposed disclosing them at 9 o'clock the day before they're going to be used. My experience is people are working on them until the minute they walk into the courtroom for closing arguments. So if they're going to be disclosed, there's no way it's going to happen at 9 p.m. the night before. We don't think they should be disclosed at all. You can only use evidence and rely on evidence in your closing arguments so people know the universe of what's coming in at that point.

14:22:52 THE COURT: Okay. Here's what I'll say about those. To the extent that demonstrative slides are just citing to a portion of an exhibit and listing the exhibit number without any real argument up there, I think that's fine if they don't get exchanged. But if there's text on

14:23:16 there or, I don't know how the evidence is going to come in,
14:23:21 diagrams that they've got arrows on them, maybe we should
14:23:25 disclose those the night before, don't you think?

14:23:28 MS. SHARP: May I be heard for just a minute on
14:23:31 that?

14:23:31 THE COURT: Yeah.

14:23:32 MS. SHARP: My experience is different, that in
14:23:35 most cases we do exchange closings. In the situations where
14:23:38 we don't, something invariably goes wrong and this happened
14:23:43 in the last trial I was in. The closing slides included
14:23:48 slides that were about exhibits that were excluded in an
14:23:52 MIL. Then you're in front of the jury, at the end of the
14:23:56 trial and you're confronted with having to get up and object
14:24:00 and disrupt everything. So I'd like it if we could separate
14:24:04 the two concepts. One is exchange them so we're sure
14:24:09 everyone is on the same page. The second is a fair point
14:24:13 that Ms. Keller has made about timing. That's hard to judge
14:24:18 given the way that the trials go and I think the parties
14:24:21 could work that out as we see how the trial goes, but
14:24:25 exchanging prevents a lot of mischief or just errors.
14:24:31 People may take slides from a mock and use them without
14:24:35 adjusting them and may not even realize the error until the
14:24:39 problem occurs or just trying to avoid those kind of
14:24:42 problems.

14:24:42 THE COURT: All right. My recollection is that

that I'm usually sitting up here on the bench the morning of closings going through closing slides with folks. So I'm going to ask that they be exchanged. Why don't you work together and see if you can figure out some timing for it.

MS. SHARP: And Your Honor, if I may, I just want to thank Ms. Keller for helping out on the midnight issue. I think it is good for everyone.

THE COURT: Okay. So in general -- I've got a couple other notes to myself in here, but in general, to the extent something needs to get raised with the Court, it should come to that e-mail address on 7 a.m. the day it's going to happen.

All right. There was a paragraph in there about including demonstratives in the record for appeal. Demonstratives are not going to be included in the record for appeal unless the demonstrative is allowed over the party's objection. We have never had demonstratives come into evidence here in any of the trials that I've done, but if there's an objection to the Court allowing the jury to see a demonstrative, then after the trial and I overrule it and the jury sees it and you want to argue to the Federal Circuit that it was prejudicial for the jury to see it, then you can submit it to the Court after trial with a cover letter that says where you made the objection in the transcript and where the Court overruled it and then it will

be on the docket and you can argue about what you want to argue about.

Dispute on paragraph 55 about live versus -- sorry, a dispute in paragraph 55 about, it says a listing of the party's pretrial witness list does require a party to call that witness to testify. Maybe some of this should get discussed by everybody when you're figuring out the trial dates about who is actually going to come. Maybe we can just of a little more specificity on what this dispute is if there's something particular we're worried about.

MS. SHARP: I think that makes sense, Your Honor. This really has to do with pulling live witnesses at the last minute, but I agree, the parties can work together on this as we sort out how the trial is going to play out. And they've already represented that Mr. Van Meter will be at the trial, which is one of our concerns.

MR. LOCASCIO: I'm not sure. We've never understood what this one is all about. It essentially says if a witness wasn't, I gather, on their list, but was on ours, and we yanked them, they'd want the ability to call them. I don't know who that would be given we expect them to come. I also think, to be honest, all of our people are also on their witness list.

THE COURT: All right. Great. Sounds like we'll be able to work that out.

Paragraph 68. I'm okay if before a live witness is brought to the stand that somebody makes a brief one-sentence transition statement that says now we're going to call so and so and this is our damages expert or this is our CEO or whatever it is. So that's fine. Is that what the dispute was between a deposition witness and a live witness?

MS. SHARP: Yes, Your Honor.

MS. KELLER: Your Honor, I think our concern was we have limited trial time already, if we keep them short and very factual, there's not going to be issue. I've seen in the past it become another issue to fight about at night because you're exchanging to get agreement on them. I think if we can keep it to this is so and so, he's the damages expert, you can use your Q and A on direct to do any kind of further introduction about what they're going to testify about.

MS. SHARP: We agree.

THE COURT: All right. Perfect. Thank you very much.

Then we've got paragraph 96. All right. We tabled this a few hours ago and now I can't remember where we left it because it's been a long day.

MR. ARMON: Your Honor, I asked for 12. I think counsel for defendants was interested in 12 perhaps as well

and you said you'd consider it.

THE COURT: I'd think about it. Okay. Ms. Keller.

MS. KELLER: Our biggest concern at this point, it's very hard for us to judge. They have eight witnesses live on their list, as we'll call, and eight live for deposition. That's 16 witnesses just on their side. They said in the pretrial that they would narrow based on SJ and Daubert, but frankly based Your Honor's rulings today, you denied all the SJs and for most of the Dauberts, they were denied, so I'm not sure how that narrows any issues heading into the trial. What we really need, regardless of what hours you set, is more definitive identification of who they're actually bringing to trial and some of that, again, may rest on what the trial date is going to be.

THE COURT: Okay.

MR. ARMON: Your Honor, we're happy to work together on that.

THE COURT: The problem for me is just especially if we go on April 29th, I've got a trial that starts Monday morning, that Monday morning, right. So we just can't run over. So if anything goes wrong, a lot of things could go wrong when you have a jury trial, and we end up needing to do closings on Monday, I'm just -- I'm really worried about that, right? And I don't want to be here on a

Friday night with a jury sitting here at 8 o'clock at night. So I'm going to say 11 for sure and we'll think about a little bit more. Okay?

MS. SHARP: So, Your Honor, if I may. The last one by my count was paragraph 106 that has to do with sequestration. And plaintiff's application was to sequester fact witnesses from the openings as is traditionally done and I understand defendants' application was not to include the openings.

THE COURT: Yep. So I polled the court, because no one had ever asked me this before and learned that there's a history of judges like Judge Stark sequestering witnesses for the opening, but yet other judges that are currently sitting not doing that. I mean, let me just ask you this. Do you not go to your witness after the opening and say, here's what their theme is going to be? I mean, isn't that what's going on anyway? I'm trying to figure out what the harm is.

MS. KELLER: Your Honor, if they're sequestered obviously you can't do that. But typically in practice, and I'm going to be very honest with, Your Honor, we all mock these in front of the witnesses prior to coming in to court that day, so they typically see them. But regardless, obviously if they're going to be sequestered we can't do that. I think the other thing is there's not -- the concern

14:32:09 is that they hear the testimony of other witnesses, right? And typically an opening that's not a concern.

14:32:15 THE COURT: They've read all the deposition transcripts, correct, for example?

14:32:19 MS. KELLER: Correct.

14:32:20 THE COURT: All right. So no one's ever asked me this, which makes me think that we haven't done it before and I actually am not seeing the harm, so we're not going to sequester the witnesses, the fact witnesses from opening statements.

14:32:38 All right. So just for deposition designations, I just want to make sure that this is clear, that the pretrial order, in my view, is the maximum universe of deposition designations and counter designations and objections. And it's not going to get changed except for good cause shown.

14:33:07 Those you can work out, I would think, more than the night before they come in. So I don't care when you all exchange those with each other. Sounds like you've worked something out. But if you do have procedures in here that conflict with what I'm about to say, those need to get modified. And that is that the party calling the witness by deposition needs to, 6 p.m. the day before the witness is going to be called, submit an entire copy of the deposition transcript with all the highlights for the designations and

counter designations and objections right on there. And then a cover letter that identifies the pending objections and just a sentence of the basis for the objection and a sentence with the response to the objection. And we need to have that by 6 p.m. the night before so we can take a look at them.

MS. KELLER: Your Honor, just real quickly, you want those also by e-mail, not hard copy?

THE COURT: E-mail, yes. And I understand that if the parties need time to get the videos together based on the Court's ruling, we can do it two days before at 6 p.m. or we can do it a day and a half before, but it needs to be done no later than 6 if you want me to rule on it by the next morning.

And also if there are going to be depositions played at trial, whoever is calling the witness should provide us with two copies of the full transcript with the designations and counter designations that are going to be read or played and we also need an additional copy for the court reporter.

And I think you all know the parties are going to be charged for time for the designations and you should let Mr. Koehler know how the time should be split up for the witnesses at the next break.

The Friday before the trial we need the parties

to provide by noon or earlier, electronic versions of all trial exhibits that are on the exhibit list in a single folder. How you want to get that to us is up to you. It can be on a flash drive or a shared link, doesn't matter, but work with your IT departments and accordingly with Mr. Koehler, if you need to, so we can have them all the Friday before. They should be named with their exhibit number, JTX, PTX, DTX, and you will be in the same folder.

It looks like this is already in your pretrial order, but just to confirm, any exhibits that you want in evidence need to be formally moved into evidence during the questioning of a witness, except for the impeachment exception that we discussed earlier. You can't put exhibits up on the Elmo or otherwise publish them until after they've been admitted. Once they've been admitted, you can publish them freely without requesting to do so.

If there's something you want the jury or me to look at in your JMOL motions, you need to walk through it with the witness as well. I don't know if we're going to have this situation in this case, but we don't want a 2,000-page exhibit getting admitted and then you point to me something in the JMOL that nobody talked about in front of the jury. I certainly don't want to see that in an appeal brief. Some day I'd like to look at it if we're going to argue about it.

14:36:51 If you have duplicates of exhibits, I'll urge you to work together to get them narrowed down to one version so it will be easier for the jury.

14:37:00 If you're giving any notebooks to the witness, I don't know if you've agreed on those, but we'd request to have two copies here for me and the law clerk. We'll give them back to you at the end of the trial today, but we like to read along.

14:37:15 Paragraph 30, the pretrial order should have the maximum universe of exhibits to be used by either party other than for impeachment as well as the objections. So exhibits not listed are not going to be admitted unless good cause is shown.

14:37:42 MR. ARMON: Your Honor, if I may on that issue, the parties submitted a joint stipulation to supplement financial documents that occurred earlier this week and both parties have been adding onesie twosie things. And at the very least request that both parties have a chance to add the things that have already been exchanged.

14:38:01 THE COURT: Absolutely you can do that. But let's put a deadline in there.

14:38:05 MR. ARMON: Okay.

14:38:06 THE COURT: Set a deadline and put it in there, but I don't want to be having issues with new documents coming out at trial, because it looked like that was going

to be allowed under paragraph 30 as it reads now.

MS. SHARP: Understood, Your Honor.

THE COURT: For the jury binders, just out of curiosity, is that done where the juries have got a little picture of the experts picture on there.

MS. SHARP: I've seen that done in trial.

MR. LOCASCIO: Yeah. It typically allows them to put a face with a name and they put their notes on that testimony right under that person's face. And the party proposes it, so there's none of this like you found the worst photo.

THE COURT: It will be a different one than we see in closing, I'm sure. Okay. So that's great. If you all agree on that, that's fine with me, but you need to agree on the set of documents that should go in there or we're not going to give the jury any binders. We don't have time to worry about what documents are going in the jury binders. We're not going to collect those at the end of the day. They're going to stay in the jury room.

I need the parties to work together to get a binder of only the admitted exhibits that will go back to the jury room. We will need to have those by the end of the jury instructions. If there are videos or native files that got admitted, we'll need them loaded on a clean laptop to go back to the jury or you can have it on a flash drive with a

laptop to go back to the jury.

Jury selection process. Does anybody want to go over that now or do we have any questions? I'm happy to give you a brief overview if you need it.

MR. LOCASCIO: I'd like to understand Your Honor's practice. Everybody's got a little nuance on that.

THE COURT: Okay. Great. So its changed a little bit over time with the use of the new computerized random ordering. So you, at the beginning of the day, are each going to get an alphabetical list of the jurors that showed up. I'm also going to have a randomized list, but you won't have that randomized list. And so my list, the computer will have already done the randomizing that we would have normally done by drawing numbers out of a hat. The prospective jurors are going to be assigned a number one through whatever number of jurors we have in their randomized order and they're going to sit in seats that are corresponding to the number that they've been given. The jurors are each going to wear their numbers. We're going to have them all in here and we're going to provide each juror with a sheet that includes the voir dire questions and a pencil so that it can keep track of any yes answers when I read the questions allowed.

And then after we're done with that, we're all going to move back to the jury room, which is right behind

this door, where we're going to do the voir dire. Mr. Koehler is going to come out to the courtroom and start with juror number 1 and ask them if they've answered yes to any of the questions. And then he's going to make a note of which questions they had a yes answer to. Then he's going to come back to the jury room where you're going to find out their name. Usually I know the next couple that are coming and I'll let you know so you're not totally surprised and we can keep things moving, but you're going to hear who they are at that point. And then if there are yes answers, I will ask them a couple follow up questions, I'll give the parties each a chance to ask follow up questions about their yes answers. That will be a limited opportunity. And if it starts to drag things out, we may cut it off or we may dock it against your time, so it just needs to get going.

Following the questioning, that juror is going to leave the room and I will entertain applications to strike for cause or to excuse for undue hardship. If Mr. Koehler comes out and asks juror number 1 if they had any yes answers and the answer is no, I didn't have any yes answers, then juror number 1 is going to be the first of 14 that we're going to figure out.

So I think you all -- is everybody tracking so far? It's late in the day and I'm not as articulate as I wish I was. Okay.

We're going to keep going that way until we've reached a total of 14 jurors who either haven't been questioned because they don't of yes answers or who have been questioned and have not been struck or excused. And then at that point we're going to have 14 on the clipboard and we're going to proceed to the peremptory strikes. Mr. Koehler is going to proceed back and forth between counsel table. Each side will have their chance to make their three peremptory strikes and at the end of that process we're going to get rid of up to 6 and we'll be left with 8. And then I will -- we'll put the 8 in the box.

We're going to take a sidebar and give anyone a chance to make an objection for the record about how I have conducted the process and then we will excuse the rest of the venire and we will swear in the 8 members of the jury. Make sense?

MS. KELLER: I have two questions, Your Honor. One, you mentioned the voir dire and the pencils for the jury. In some other courts here the parties have provided those copies. Do you want us to do that here?

THE COURT: Yes. So plaintiffs should provide enough copies and we'll need approximately 40 and pens for the jury.

MS. SHARP: Understood.

MS. KELLER: And then separately, when you do

peremptories, does Your Honor follow the procedure if you sit content you are finished? So for example, if you get the chart and you don't cross anybody, you're done. I've done it both ways.

THE COURT: I don't think anyone's asked me that before. Do you have a view as to how it should be done?

MS. KELLER: I think if you sit content, you should be finished. I've done it both ways.

THE COURT: Why don't you work together with the other side and see if you can agree on a procedure. That hasn't come up because everybody has always had six that they want.

MS. KELLER: Okay.

THE COURT: But I will say this, if we end up with less than 6, we're going to take the first 8 from the list because those have already been randomized.

Okay. We got your proposed voir dire and preliminary jury instructions. We'll get you edits on those hopefully soon. It probably won't be next week, but it will be shortly thereafter.

One thing we noticed is the start and end times for trial and breaks and the length of lunch are included. They should reflect the times that I'm going to tell you, which are we're going to go from approximately 9 a.m. to 4:30 each day. We'll take a 15-minute break in the morning,

between 30 and 60 minutes for lunch and a 15-minute break in the afternoon.

And I had on my notes to have plaintiff deliver the voir dire, but we can take that the morning of. We don't need that the Friday before. No, we do. We do need it the Friday before because we're going to pick the jury, so bring it the Friday before so we can give it to the jury.

We saw in the preliminary instructions, though, that you all want to play the FJC video. And that's fine. One thing that has happened to me before that I don't want to have happen is the part of the video where they talk about the sample patent that you've all been given and everyone is looking at each other wondering where's the sample, so plaintiff needs to bring the sample patent for that.

MS. SHARP: Understood.

THE COURT: And we have to have enough copies so the jurors can follow along.

I mentioned this already. If we're in the courtroom, in general time is going to be charged. Counsel should be here at 8:30. I don't know if any party is going to ask to seal the courtroom, but in general I'm disinclined to close the courtroom. If any party anticipates needing to seal the courtroom it needs to be kept to an absolute bare minimum and there has to be advance notice to the other side

14:47:12 and to the Court. We don't just want to all of a sudden in the middle of the trial today have a request to seal the courtroom, so I need to understand that so we can get that all hashed out in the morning. To the extent we can proceed with the testimony without sealing the courtroom, for example, just having the witness and the jury look at documents that aren't put up on the screen, I prefer that, because we need to keep it to a minimum in accordance with the third circuit's guidance.

14:47:41 Regarding move for judgment as a matter of law, you don't have to do it as soon as the other side rests, you can wait until the next break. So if we're continuing moving on, you can wait until the next break. You can make that as an oral motion. I don't need papers filed, but you should be prepared to state the grounds for the motion. But we're not going to likely hear lengthy argument.

14:48:13 If you need to access the courtroom to work on the technology, talk to Mr. Koehler.

14:48:23 I'm starting to have déjà vu because I just did all this yesterday afternoon, so if I'm repeating something, I apologize.

14:48:32 But the Friday before the testimony begins I'm going to need the parties to file a letter that includes a list of the witness names and a glossary of the terms for the court reporter.

14:48:49 And then after the trial, I'm going to need any corrections to the trial transcript or any finalization of what portions need to be sealed no later than two weeks after the trial concludes. And the issue here is we don't want to have a bunch of corrected post trial briefs and I don't want to let disputes over sealed portions linger any longer than they have to.

14:49:16 And so I'll hear from you on Monday about whether the trial day works. Anything else we need to address?

14:49:30 MS. KELLER: I was just going to ask Your Honor, on Monday how would you like us to communication with Your Honor, via e-mail to your civil? Want us to file something?

14:49:38 THE COURT: I think if you could just send an e-mail to me, to the civil e-mail.

14:49:45 MR. LOCASCIO: Nothing else on the other side, I have one or two items that were on my list, if I may.

14:49:50 THE COURT: Sure.

14:49:50 MR. LOCASCIO: First off was just the video shown to the jury on the patent video. I've had one judge say they wanted to use the whole venire and I thought why don't we just show it to the 8 that are empaneled.

14:50:02 THE COURT: Yes. And I haven't looked at the preliminary instructions in detail, but there's some version of them where I say and now we're going to show you this

video and we do it.

MR. LOCASCIO: We'll make sure that's cued up.

My other two questions are in the section on closing arguments and the time for trial. Both sides said reserve time for closing and rebuttal. And I have two questions. My first is, and I saw this in another courtroom the other day, which is the reserving time for closing sort of carves that out so you don't sort of run out of time for closings. If you're going to run out, you run out on a rebuttal witness, you don't run out without time for closings.

THE COURT: Yes. And I don't know why that didn't make it in my notes or maybe I skipped over it. Yes, everyone needs to reserve one hour for closing arguments so you cut off with the witness once you get to an hour left so at least you have an hour for your closing. Yes. Thank you.

MR. LOCASCIO: Sure. On that score and I don't imagine this given the 11 or 12 hours conversation. If you had an hour and 20 left on the clock, is it closings are an hour or it's whatever you have left?

THE COURT: It's what you have left. I said this the other day. Nobody wants to do that.

MR. LOCASCIO: And this goes to a second question I have, which is the FJC provides for it, because

there's differences of burdens of proof in a patent case. Judge Jordan, I was just in his courtroom for closings in the *Dexcom* case and I want to understand what your view is on this, because ours is the plaintiffs would do the first closing, they have burdens on infringement and damages, willfulness, we would do a closing on responding to that and our issue of burden, which is validity, they could rebut on all three and then we would have the ability to have rebuttal closing only on invalidity. And I can give Your Honor the transcript from Judge Jordan with respect that's his practice, but also I have the FJC --

THE COURT: Yeah, didn't you all agree on this in the pretrial order?

MR. LOCASCIO: We said both sides could reserve, but I wanted to be abundantly clear that that was the plan.

MS. SHARP: It's not anything we've discussed yet and not something I've seen done. It may well be what one of the judges is now doing, but I've never seen it done in that order.

THE COURT: Where is that portion of the pretrial order?

MR. LOCASCIO: That is on -- it's under the time for trial, so it's of paragraph 96 and then if I could approach for a second, Your Honor.

MS. SHARP: So what the parties have stipulated

14:52:43 is that each side will reserve no more than one hour.

14:52:47 MR. LOCASCIO: And then it says right after that, I believe, if my recollection serves, each side may reserve no more than one hour for time of closing inclusive of any rebuttal. And both sides had the same language, so that each side had both -- what I've handed Your Honor is the FJC which on page 8-15 with respect to closing, it's the numbering in the FJC is a little bit much, 8.1.2.2.2.

14:53:20 THE COURT: I see it. I appreciate it.

14:53:23 MR. LOCASCIO: And Judge Jordan's transcript has -- its limited to rebuttal, but in this case -- pardon me, it's limited to invalidity, because it's our burden, and so where we presented our closing on invalidity and they've responded, we have to have, under the burden, the opportunity to address that, but recognizing the constraints on that.

14:53:41 THE COURT: Okay. Understood. So that request is actually going to be denied. It's my practice to have plaintiff go last. I know that's consistent with Judge Noreika's practices as well. This has come at a couple trials before. I appreciate the request. You have the opportunity to put forth that argument that you want to put forth when it's your turn to go, but plaintiff is going to have the last word.

14:54:08 MR. LOCASCIO: Then my only other question then

14:54:10 is on the closing slides. I take it, we'll work at the timing of closing slide exchange, their rebuttal slides would also be disclosed?

14:54:21 THE COURT: Oh, sure. They need to give you whatever slides they're going to give you.

14:54:25 MR. LOCASCIO: Thank you, Your Honor.

14:54:27 THE COURT: Uh-huh. Anything else?

14:54:29 MR. LOCASCIO: Oh, I have one other. Sorry. The narrowing of claims. In the disclosures it was said there was going to be further narrowing. They told us there would be. I guess my question is when? Summary judgment you've now given your guidance on that. Our expectation and hope is that this doesn't just make us have to do all the work and say on the eve of trial, oh, it's four.

14:54:55 THE COURT: You've done such a persuasive job explaining how all their claims are actually the same, though, so it's a hard argument for you to make.

14:55:03 MR. LOCASCIO: As if you can imagine, the amount of work for each expert to walk with through all the claims and which patents are in issue and the time constraints, Your Honor.

14:55:09 THE COURT: I understand.

14:55:10 MR. LOCASCIO: Thank you.

14:55:11 THE COURT: I understand. Let me ask plaintiff, surely you're not going to try 10 claims. I mean, I

understand Ms. Keller's point about the summary judgments were denied, but I suppose some of these you were hanging onto just in case some patents dropped out with the summary judgment motions, so maybe now you can pick which ones you want to go forward with?

MR. ARMON: Your right, Your Honor. And we'll work with them on an exchange schedule for that further narrowing.

THE COURT: Okay. Great.

MS. SHARP: The only thing I had to add was to thank you, Your Honor, for keeping this case moving.

THE COURT: You're welcome. All right. Are we good?

MR. LOCASCIO: Thank you, Your Honor.

THE COURT: Maybe I'll see some of you tonight up in New York. We'll be in a recess.

(Court adjourned at 2:55 p.m.)

---------------------------------

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceedings.

/s/ Stacy M. Ingram, RPR
Official Court Reporter
U.S. District Court