IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGHT SCIENCES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1317-JLH-SRF |
| | ) | |
| IVANTIS, INC., ALCON RESEARCH LLC, | ) | |
| ALCON VISION, LLC, and ALCON INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTIONS FOR JUDGMENT AS
A MATTER OF LAW UNDER RULE 50(b) AND FOR A NEW TRIAL UNDER RULE 59**

OF COUNSEL:
Gregg LoCascio
Sean McEldowney
Steven Dirks
Socrates L. Boutsikaris
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

Jeanne M. Heffernan
Kat Li
Ryan J. Melde
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX 78701
(512) 678-9100

Ryan Kane
Nathaniel DeLucia
Emily Sheffield
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants*

Brian A. Verbus
Jacob Rambeau
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000

Noah Frank
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Dated: June 25, 2024

## TABLE OF CONTENTS

I.  Nature and Stage of the Proceedings and Summary of the Argument ...................... 1

II.  Legal Standards ................................................................................................ 2

III.  Sight Failed to Prove Infringement, Requiring JMOL or a New Infringement Trial, While Also Relying on Inconsistent Theories of Infringement and Validity—at the Very Least Requiring a New Trial as to Both .................................. 2

    A.  The "Substantially Interfere" Limitations ................................................. 3

        1.  JMOL of Noninfringement Is Warranted Because Sight Failed to Offer Evidence of Actual Flow Across the Trabecular Meshwork When the Hydrus is Implanted and Offered Only Conclusory Expert Testimony ...................................................................... 3

        2.  The Incongruity in Sight's Positions Warrants JMOL of Noninfringement or a New Trial on Infringement and Validity ................ 4

    B.  The "Arcuate Member" Limitations. ......................................................... 6

        1.  JMOL of Noninfringement Is Warranted Because The Hydrus's Transition Zone Is Straight, Not Curved as Required ................................ 6

        2.  The Jury's Verdict on Infringement and Invalidity Is Against the Great Weight of the Evidence, Warranting a New Trial ........................... 7

    C.  Sight Did Not Present Sufficient Evidence of Intent to Induce Infringement of Claim 18 of the '328 Patent Requiring JMOL or a New Trial ................................................................................................ 9

IV.  JMOL of Invalidity under 35 U.S.C. § 112, or at Least a New Trial, is Warranted for Claim 11 of the '482 Patent, and Claims 8, 24, and 58 of the '443 Patent. ...................................................................................................... 10

    A.  Clear and Convincing Evidence Confirms Undue Experimentation Is Required to Make and Use the Full Scope of the Claims ................................... 10

    B.  Clear and Convincing Evidence Confirms the Badawis Did Not Describe or Invent What Is Claimed .................................................................... 14

V.  There Is No Evidence Alcon or Ivantis Acted Willfully, Compelling JMOL of No Willful Infringement, or at Least a New Trial .............................................. 15

VI.  The Jury's Damages Award Is Based on Improper and Insufficient Evidence, Compelling JMOL or a New Damages Trial ................................................... 17

    A.  The Royalty Award Is Legally Unsustainable ........................................... 18

i

1.      The Glaukos-Ivantis Settlement Is Non-Comparable, Was Not
        Apportioned, and Was Unfairly Prejudicial to Defendants. ..................... 18

2.      The Alcon-Ivantis Acquisition Model Unfairly Skewed the
        Damages Horizon for the Jury and Is Not Comparable or Properly
        Apportioned. .................................................................................................. 22

B.      The Lost-Profits Award Violates *Panduit* ............................................................ 24

C.      If the Court Grants a New Trial or JMOL as to a Subset of the Asserted
        Patents, Defendants are Entitled to a Reduction or New Trial on Damages. ....... 25

VII.    Conclusion ............................................................................................................ 25

<u>**Table of Authorities**</u>

**Page(s)**

**Cases**

*Amgen Inc. v. Sanofi,*
  598 U.S. 594 (2023)..................................................................................10, 12

*Amgen Inc. v. Sanofi, Aventisub LLC,*
  987 F.3d 1080 (Fed. Cir. 2021)..............................................................13

*Ariad Pharms., Inc. v. Eli Lilly & Co.,*
  598 F.3d 1336 (Fed. Cir. 2010) (en banc)..............................................14

*BASF Plant Sci., LP v. CSIRO,*
  28 F.4th 1247 (Fed. Cir. 2022) ...............................................................16, 17

*Baxalta Inc. v. Genentech, Inc.,*
  81 F.4th 1362 (Fed. Cir. 2023) ...............................................................12

*Bayer Healthcare LLC v. Baxalta Inc.,*
  2019 WL 4016235 (D. Del. Aug. 26, 2019) ...........................................16

*Bayer Healthcare LLC v. Baxalta Inc.,*
  989 F.3d 964 (Fed. Cir. 2021)................................................2, 15, 16, 17

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP,*
  616 F.3d 1249 (Fed. Cir. 2010)...............................................................3, 7

*Bhaya v. Westinghouse Elec. Corp.,*
  922 F.2d 184 (3d Cir. 1990)....................................................................8, 22

*Centocor Ortho Biotech, Inc. v. Abbott Lab'ys,*
  636 F.3d 1341 (Fed. Cir. 2011)...............................................................14

*Commscope Techs. LLC v. Dali Wireless Inc.,*
  10 F.4th 1289 (Fed. Cir. 2021) ...............................................................1, 5, 7, 8

*CSIRO v. Cisco Sys., Inc.,*
  809 F.3d 1295 (Fed. Cir. 2015)...............................................................18

*Data Engine Techs. LLC v. Google LLC,*
  10 F.4th 1375 (Fed. Cir. 2021) ...............................................................5

*Eaton Corp. v. Rockwell Int'l Corp.,*
  323 F.3d 1332 (Fed. Cir. 2003)...............................................................2

*EEOC v. Del. Dept. of Health & Soc. Servs.*,
    667 F. Supp. 1057 (D. Del. 1987)....................................................................5

*Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*,
    928 F.3d 1340 (Fed. Cir. 2019)....................................................................10

*Exmark Mfg Co. v. Briggs & Stratton Power Prods. Group*,
    879 F.3d 1332 (Fed. Cir. 2018)....................................................................23

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018)....................................................................20

*Garretson v. Clark*,
    111 U.S. 120 (1884)....................................................................21

*IOENGINE, LLC v. PayPal Holdings*,
    607 F. Supp. 3d 464 (D. Del. 2022)....................................................................20, 22

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
    10 F.4th 1330 (Fed. Cir. 2021) ....................................................................14

*LaserDynamics v. Quanta Computer*,
    694 F.3d 51 (Fed. Cir. 2012)....................................................................18, 20, 22

*Leader Techs., Inc. v. Facebook, Inc.*,
    678 F.3d 1300 (Fed. Cir. 2012)....................................................................2

*Liebel-Flarsheim Co. v. Medrad Inc.*,
    481 F.3d 1371 (Fed. Cir. 2007)....................................................................1, 10, 15

*McMillan v. Weeks Marine, Inc.*,
    478 F. Supp. 2d 651 (D. Del. 2007)....................................................................8

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
    851 F.3d 1275 (Fed. Cir. 2017)....................................................................17

*Mycogen Plant Sci. v. Monsanto Co.*,
    243 F.3d 1316 (Fed. Cir. 2001)....................................................................5

*Omega Patents, LLC v. CalAmp Corp.*,
    13 F.4th 1361 (Fed. Cir. 2021) ....................................................................21, 24

*Panduit Corp. v. Stahlin Bros. Fibre Works*,
    575 F.2d 1152 (6th Cir. 1978)....................................................................24

*Plastic Omnium Adv. Innovation & Rsch. v. Donghee Am., Inc.*,
    387 F. Supp. 3d 404 (D. Del. 2018)....................................................................17

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed.Cir.2010)............................................................................................23

*Rude v. Westcott*,
  130 U.S. 152 (1889)........................................................................................................20

*Sheridan v. E.I. DuPont de Nemours & Co.*,
  100 F.3d 1061 (3d Cir. 1996) (en banc)............................................................................7

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
  14 F.4th 1323 (Fed. Cir. 2021) ......................................................................................15

*State Indus., Inc. v. A.O. Smith Corp.*,
  751 F.2d 1226 (Fed. Cir. 1985)......................................................................................15

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011)......................................................................................23

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
  503 F.3d 1295 (Fed. Cir. 2007)......................................................................................25

*ViaTech Techs. v. Adobe*,
  2023 WL 5975219 (D. Del. Sept. 14, 2023)...................................................................20

*VirnetX, Inc. v. Cisco Sys.*,
  767 F.3d 1308 (Fed. Cir. 2014)...................................................................................4, 25

*In re Wands*,
  858 F.2d 731 (Fed. Cir. 1988).....................................................................10, 11, 12, 13

*WesternGeco LLC v. ION Geophysical Corp.*,
  913 F.3d 1067 (Fed. Cir. 2019)......................................................................................25

*Williamson v. Consol. Rail. Corp.*,
  926 F.2d 1344 (3d Cir. 1991).......................................................................................2, 5

*Yoon Ja Kim v. ConAgra Foods, Inc.*,
  465 F.3d 1312 (Fed. Cir. 2006).....................................................................................3, 7

**Statutes**

35 U.S.C. § 102 ..................................................................................................... *passim*

35 U.S.C. § 103 ..................................................................................................... *passim*

35 U.S.C. § 112 ..................................................................................................... *passim*

35 U.S.C. § 284 ................................................................................................................21

**Rules**

Fed. R Civ. P. 50(b) ...................................................................................................1

Fed. R Civ. P. 59 .......................................................................................................1

Fed. R. Civ. P. 59(a)(1)(A) ........................................................................................2

**Other Authorities**

11 *Wright & Miller, Fed. Practice & Procedure* § 2806 (3d ed. June 2024).................................2

**\*All emphasis added unless otherwise noted.**[1]

---

[1]   Tr.# refers to the transcript volume, attached as Exhibits 1–5 (corresponding to volumes 1–5).

**Exhibits**

| Exhibit Number | Exhibit Description |
|---|---|
| A | *Straight* Definition, Merriam-Webster.com |
| B | Excerpt of J. Crawford Downs Demonstratives |
| C | Excerpt of Opening Expert Report of Dr. John Galanis |
| D | Excerpt of John Jarosz Demonstratives |
| E | D.I. 421, Memorandum Opinion and Order, Cause No. 6:10-cv-00521-LED, *Wi-Lan Inc. v. Alcatel-Lucent USA Inc.* (E.D. Tex. June 28, 2013) |
| F | D.I. 441, Minute Entry (Day 2 of Jury Trial), Cause No. 6:10-cv-00521-LED, *Wi-Lan Inc. v. Alcatel-Lucent USA Inc.* (E.D. Tex. July 9, 2013) |
| 1-5 | Transcript volumes 1-5, including corrections as applied by Court Reporter |

## I.  Nature and Stage of the Proceedings and Summary of the Argument

Defendants move for judgment as a matter of law or for a new trial under Rules 50(b) and 59. The jury verdict adopts Sight's view of the case, which depends on treating the claims inconsistently for infringement and invalidity; legally insufficient proof of infringement, willfulness, and damages; and a finding of enablement and written description that is entirely unsupported on the facts and law.

At the outset of this case, Sight faced a dilemma: its claims, properly read, cannot be both valid and infringed by Defendants' Hydrus. To maintain its infringement case, Sight secured broad constructions of the "support" and "substantially interfere" limitations. But those constructions were broader than the specification could support, encompassing a massive number of potential variations that required extensive and undue experimentation to confirm whether a given support substantially interferes with flow, and they ensnared prior art. The Federal Circuit has seen this problem before, cautioning "beware of what one asks for." *Liebel-Flarsheim Co. v. Medrad Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007). Sight's conflicting positions continued at trial as it applied the same claim terms broadly for infringement and narrowly for invalidity, which precedent forbids. *Commscope Techs. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1299 (Fed. Cir. 2021). For invalidity, Sight's expert distinguished prior art by contending testing is needed to show the "substantially interfere" limitations are met, and admitted he could only "guess" if any of the supports shown in the patents satisfy the "substantially interfere" limitations without such testing. But for infringement, Sight's expert never physically inspected, much less tested, the Hydrus. Sight's expert likewise asserted the Hydrus met the "arcuate member" limitation, despite **(1)** conceding that computer-aided drawing ("CAD") and master file both depict the Hydrus's relevant part as straight (not arcuate), and **(2)** the Hydrus's designer confirming the relevant part is straight. Sight's defenses to enablement and written description likewise ignore the full scope of the claims

1

and the undisputed evidence that testing millions of supports would be required—and was certainly beyond the scope of what the inventors possessed. And on top of its unsupported infringement case, Sight piled unsupported willfulness and inducement accusations. Finally, Sight's damages case depended on evidence and arguments the Federal Circuit consistently rejects, including using a non-comparable settlement for royalties, failing to apportion, and presenting irrelevant, horizon-skewing numbers to the jury to inflate damages.

The Court should grant JMOL on infringement, willfulness, and damages given Sight's failures of proof, as well as invalidity under §112 for several claims based on the undisputed evidence. At a minimum, the Court should grant a new trial on liability and damages because the weight of the evidence does not support the verdict, the validity and infringement verdicts are irreconcilable, and the damages verdict was plagued by Sight's methodological errors.

## II.    Legal Standards

JMOL is required where there is no "legally sufficient evidentiary basis" for the jury's verdict. *Bayer Healthcare LLC v. Baxalta Inc.* (*Bayer II*), 989 F.3d 964, 979 (Fed. Cir. 2021). Similarly, a new trial is appropriate "for any reason," Fed. R. Civ. P. 59(a)(1)(A), including where "the verdict is against the weight of the evidence," *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1336 (Fed. Cir. 2003), or "a miscarriage of justice would [otherwise] result." *Williamson v. Consol. Rail. Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991). For new-trial purposes, a court must "exercise[] its own judgment," and not "view the evidence in the light most favorable to the verdict winner." *Leader Techs., Inc. v. Facebook, Inc.*, 678 F.3d 1300, 1305 (Fed. Cir. 2012); 11 *Wright & Miller, Fed. Practice & Procedure* § 2806 (3d ed. June 2024).

## III.   Sight Failed to Prove Infringement, Requiring JMOL or a New Infringement Trial, While Also Relying on Inconsistent Theories of Infringement and Validity—at the Very Least Requiring a New Trial as to Both.

Sight presented legally insufficient evidence that the Hydrus **(A)** does not "significantly

2

block" fluid flow, as claim 11 of the '482 patent (JTX-1) and claims 8, 24, and 58 of the '443 patent (JTX-2) require ("substantially interfere" limitations) (D.I. 287 at 1), and **(B)** has a "portion" of an "arcuate member" that "extend[s] out of Schlemm's canal," as claims 8, 24, and 58 of the '443 patent (JTX-2) and claim 18 of the '328 patent (JTX-5) require. Sight also failed to prove indirect infringement and took inconsistent positions on infringement and validity. The Court should grant JMOL of noninfringement, or at least a new trial on infringement and invalidity.

A.      **The "Substantially Interfere" Limitations.**

The Court construed the "substantially interfere" limitations to mean "the support does not significantly block either fluid outflow from the trabecular meshwork or fluid outflow to the collector channels." D.I. 287. In turn, Sight's infringement expert, Downs, testified that proving "substantial interference" requires actual "flow . . . to occur," not just that a device has an opening that *could permit* flow. Tr.2 at 99:4–9. Yet Sight provided no evidence that actual flow occurs through the trabecular meshwork and the Hydrus's windows when the Hydrus is implanted, warranting JMOL of noninfringement. And Downs's application of the "substantially interferes" limitation is inconsistent between infringement and validity, warranting a new trial on both.

1.      *JMOL of Noninfringement Is Warranted Because Sight Failed to Offer Evidence of Actual Flow Across the Trabecular Meshwork When the Hydrus is Implanted and Offered Only Conclusory Expert Testimony.*

No reasonable jury could find Sight met its burden of proof for infringement. Where, as here, claims require a result (actual flow, under Sight's claim application), the patentee must provide credible evidence that the accused product produces that result. *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1257–60 (Fed. Cir. 2010) (reversing denial of JMOL: "Becton failed to produce any evidence that this posited movement ever occurred"); *Yoon Ja Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006) (affirming non-infringement where expert "did not support [infringement] with any examinations or tests of the actual accused

3

products"). Conclusory expert testimony "cannot form the basis of a jury's verdict." *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1333 (Fed. Cir. 2014).

Here, Sight relied on Downs's testimony to prove that Hydrus meets the "substantially interfere" limitation. However, Sight's inventor, David Badawi, admitted (multiple times) that one cannot know how a stent like Hydrus impacts fluid flow without testing it in live humans: "to determine if an implant significantly affects outflow in humans, . . . ***you would have to test it*** and do trials." Tr.1 at 120:15–25; *id.* at 113:11–13, 114:1–115:8, 118:20–119:10. None of Sight's experts, however, did such testing. Downs admitted that he has never seen a Hydrus—much less inspected or tested one, *infra* § III.A.2—and could give only an "educated guess" (as someone that is not a physician and has never seen a Hydrus) as to whether an implant depicted in the asserted patents would substantially interfere with flow. Tr.3 at 193:4–10 (cross testimony on enablement). Downs tried to fix this by referencing "Poiseuille's law" as an equation that ***can*** be used to calculate whether fluid flow occurs through Hydrus's "windows." Tr.2 at 52:19–55:12. But Downs never presented ***any*** analysis to the jury, much less results confirming actual flow through Hydrus windows as Downs testified is required to satisfy these limitations. Tr.2 at 99:10–100:25. Downs claimed to have done a "fluid mechanics analysis," Tr.2 at 55:17–23, but did not explain or submit any such analysis into evidence, *id.* at 101:20–102:16. That is the definition of conclusory expert testimony, which cannot support the verdict. The Court should grant JMOL of noninfringement.

### 2. The Incongruity in Sight's Positions Warrants JMOL of Noninfringement or a New Trial on Infringement and Validity

A second problem with Sight's infringement case is that Sight's application of the "substantially interfere" limitations for infringement is inconsistent with Sight's validity defenses, warranting JMOL on noninfringement or a new trial on both. Sight violated the fundamental rule that a patent "may not, like a nose of wax, be twisted one way to avoid anticipation and another to

4

find infringement.'" *CommScope*, 10 F.4th at 1299 (reversing denial of noninfringement JMOL); *Data Engine Techs. LLC v. Google LLC*, 10 F.4th 1375, 1381 (Fed. Cir. 2021) (similar).

For infringement, Downs asserted—without ever having seen or tested a Hydrus—that every Hydrus sold meets the "substantially interfere" limitations. Tr.2 at 101:20–102:16. But to avoid prior art, Downs testified that the prior-art Lynch reference did ***not*** teach the same "substantially interfere" limitations ***precisely because*** Defendants' expert had not done the very testing or calculations that Downs did not do for infringement. Tr.3 at 170:22–173:17 (Downs faulting Tanna for "[n]o analysis, no measurements, no experiments, no nothing"). And Sight's attorneys pressed this criticism in closing. Tr.5 at 124:3-14 ("He [Tanna] didn't test any of the devices disclosed in the Lynch references."). For enablement (*infra*, § IV.A), Downs dug in further, offering only an "educated guess" whether the patents described a support that does not substantially interfere with flow. Tr.3 at 193:4–10.

The jury's verdict cannot stand as to ***both*** infringement ***and*** no invalidity given the incongruity in Sight's application of the "substantially interfere" limitations. It cannot be that testing was required for Defendants to prove ***prior art*** met those limitations, but no such testing was required for Sight to prove infringement for those same limitations, and an "educated guess" about the specification was sufficient to rebut Defendants' § 112 defenses. Yet that is Sight's position, and the verdict accepts both. One or the other is necessarily against the weight of the evidence and the product of confusion. *See Williamson*, 926 F.2d at 1348; *EEOC v. Del. Dept. of Health & Soc. Servs.*, 667 F. Supp. 1057, 1068 (D. Del. 1987) (granting new trial); *cf. Mycogen Plant Sci. v. Monsanto Co.*, 243 F.3d 1316, 1325 (Fed. Cir. 2001) ("In the Third Circuit, an inconsistent verdict is grounds for ordering a new trial." (collecting cases)). As a result, the Court should grant a new trial on infringement and also invalidity under §§ 102, 103, and 112.

B.       The "Arcuate Member" Limitations.

The Court construed "arcuate member" as "a structure having one or more ***curved***

portions." D.I. 287. Sight, thus, had to prove the Hydrus has a curved portion that "***extends out of***

***Schlemm's canal***" ("arcuate member" limitation). JTX-2, cls. 1, 58; JTX-5, Cl. 1. Sight contended

the Hydrus's "*transition zone*" practiced that limitation. Tr.2 at 84:14–23. The jury verdict cannot

stand as a matter of law because no reasonable juror could have found the transition zone is curved:

The evidence showed it was straight. Sight cannot meet its burden of proof by having an expert

insist it is curved, particularly where the expert never inspected or measured it. Tr.2 at 93:1–18.

Alternatively, a new trial is warranted on infringement and invalidity under §§ 102 and 103,

because the verdict is against the weight of the evidence.

1.       *JMOL of Noninfringement Is Warranted Because The Hydrus's Transition*
         *Zone Is Straight, Not Curved as Required*

Downs based his opinion that the Hydrus practiced the "arcuate member" limitation on a

single 2D drawing of Hydrus (Revision J) (PTX-267) for which he ***twice admitted*** the Hydrus's

transition zone "appears straight." Tr.2 at 52:19–22, 58:5–19, 91:5–8. Straight is not curved. It

means "free from curves." Ex. A, *Straight*, MERRIAM-WEBSTER.COM (last visited May 28, 2024).

When confronted with the CAD ***file[2]*** on cross-examination—which contains actual measurements

of the transition zone—Downs confirmed the file ***shows the transition zone is straight***. Tr.2 at

96:7–98:10; DTX-96A. So did a former Ivantis employee, Schieber, who designed the Hydrus.

Tr.2 at 223:1–16 (testifying Hydrus CAD file "showing the transition section is straight," and

confirming it "is accurate of what is being manufactured"); *id.* at 240:17–241:17 (discussing

---

[2]    The CAD file contains the 3D model used to generate the 2D drawing Downs relied on. Tr.2
       at 222:1–9. The 3D file "is where the design starts" and "manufacturing takes it from there."
       *Id.* at 95:2–19. Despite relying on the CAD file for evidence of alleged infringement of other
       limitations, *e.g.*, *id.* at 93:1–95:1; Ex. B, PDX-6.14-06.15 (using CAD file for "30% of C"),
       Downs deemed that file irrelevant to ***the arcuate member*** limitations, Tr.2 at 95:13–98:10.

manufacturing process resulting in straight transition zone). That is the only actual evidence about the arcuate limitation and should resolve the matter; JMOL of non-infringement should be granted.

Downs tried to downplay his admissions and other evidence by insisting that a straight portion of the Hydrus is curved. No reasonable jury could rely on what Downs claimed supported his otherwise bald assertion. He pointed to an "R.128" reference on the CAD drawing (not the file) as indicating a constant curve of R.128. *E.g.*, Tr.2 at 58:5–19; PTX-267 at 2. But that "R.128" reference pointed to a dashed line ***outside*** the transition zone, not the transition zone itself. PTX-267 at 2. Downs pointed to testimony from Alcon employee Hadba, Tr.2 at 58:2–59:8, but Hadba was only asked about the meaning of "R.128," ***not*** about the shape of the Hydrus ***transition zone***. *Id.* at 35:18–36:1, 58:20–59:8. At most, there is evidence that R.128 suggests that ***something*** is curved, but no evidence it is the transition zone that is curved, as required.

Downs's testimony cannot meet Sight's burden of proof, particularly where Downs provided "no measurements" of the transition zone. *Becton*, 616 F.3d at 1257–60 (reversing denial of JMOL); *Yoon Ja Kim* 564 F.3d at 1320 (affirming noninfringement). And again, Downs confirmed he never **(i)** held a Hydrus (Tr.2 at 93:9–10), **(ii)** looked at one (*id.* at 93:11–16), **(iii)** measured one or offered any measurements (*id.* at 93:5–8), or **(iv)** attempted to determine whether the transition zone is, in fact, straight based on examining the CAD ***file*** (*id.* at 98:4–10). His unsupported conclusions are not sufficient to meet Sight's burden. *Commscope*, 10 F.4th at 1297.

2.      *The Jury's Verdict on Infringement and Invalidity Is Against the Great Weight of the Evidence, Warranting a New Trial*

Alternatively, the Court should grant a new trial on infringement and invalidity under §§ 102 and 103. For infringement, Downs's conclusions from the 2D drawing and Hadba's testimony stand against the "great weight" of the evidence. *See Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1076 (3d Cir. 1996) (en banc). The evidence includes Downs's

admissions that in the 3D CAD file *and* the 2D drawing, the transition zone "appears straight."

Sight recognized the weakness in its infringement case when it tried to backfill with conclusory and vague "rebuttal" testimony from a different expert (Galanis), on matters beyond that expert's report and case-in-chief testimony. Tr.3 at 141:22–145:5; Ex. C, Galanis Opening Expert Report ¶¶ 95, 113 (referring to Downs's opinion and offering no independent analysis on the "arcuate member" limitation). During Sight's case-in-chief, Galanis explicitly testified that he offered *no opinion* on the "arcuate member" limitation and referred the jury to Downs's then-forthcoming testimony. *See* Tr.2 at 23:3–7, 24:21–25:8. But Sight's infringement case subsequently fell apart and Downs conceded that he had never seen or examined the Hydrus. *Supra*, § III.B.1. Sight improperly presented Galanis during its rebuttal case and had him contradict his earlier testimony. There, Galanis suddenly claimed to have "see[n] the curvature" *of an unspecified "part"* of the Hydrus under a microscope. Tr.3 at 145:10–16. That improper, nonspecific testimony then figured prominently in Sight's closing argument. Tr.5 at 63:2–13. To be clear, Galanis's rebuttal testimony cannot support the verdict at least because he never specified whether the *transition zone* is curved, as the claims require. *CommScope*, 10 F.4th at 1297. But at a minimum it warrants a new trial. It was improper rebuttal, beyond the scope of Galanis's report, Defendants lacked notice or opportunity to respond, and the testimony can only have confused the jury to Sight's benefit. *Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 187 (3d Cir. 1990) (affirming new trial where "erroneous admission of [] testimony" affected defendant's "substantial rights"); *McMillan v. Weeks Marine, Inc.*, 478 F. Supp. 2d 651, 659–660 (D. Del. 2007) (granting new trial: expert's testimony beyond the scope of expert report).

For invalidity, the "arcuate member" limitation was one of two limitations Downs contended were not taught by prior art ("substantially interferes" was the other, *supra* § III.A).

Although Downs asserted the Lynch-984 reference did not teach this limitation,[3] the weight of the evidence shows the opposite:

- Lynch-984 teaches a stent with a 3-10 mm radius of curvature that "***approximates***" "the radius of Schlemm's canal of a human eye" (Tr.3 at 30:5–17; DTX-142, cls. 2–3);

- Lynch-984 teaches, and Downs agrees, that the radius of curvature of a human eye is 6 mm (DTX-142 at 10:53-55 ("The distal portion 25 may have a pre-formed curve to approximate the 6.0 mm radius of Schlemm's canal in a human eye"); Tr.2 at 57:8-58:1 (Downs testifying "6 millimeters, which is the radius of curvature of Schlemm's canal"));

- Downs admitted a 3.25 mm radius of curvature is less than the radius of curvature of Schlemm's canal (Tr.3 at 196:14–17); and

- Downs admitted no human eye has a radius of curvature of Schlemm's Canal as small as the 3 mm disclosed by Lynch-984 as "approximat[ing] the radius of Schlemm's canal of a human eye" (Tr.3 at 197:3–5; DTX-142 cls. 2–3).

Downs tried to downplay Lynch-984's explicit teachings by reading Lynch-984's claims artificially narrowly. According to Downs, "[i]t can be between 3 millimeters or 10 millimeters [per claim 3], ***but it has to be 6 millimeters is basically what [Lynch-984] Claim 2 says***." Tr.3 at 166:17–168:1. But Lynch-984's claim 2 does not say that. It says the radius of curvature "***approximates*** the radius of Schlemm's canal of a human eye," which is not the exact 6mm measurement Downs imputed to it. *See* DTX-142 cl.2. Given evidence establishing Lynch-984 teaches this limitation (as well as the "substantially interferes" limitations, *supra* § III.A), including Downs's own admissions, a new trial on invalidity under §§ 102 and 103 is warranted.

### C.    Sight Did Not Present Sufficient Evidence of Intent to Induce Infringement of Claim 18 of the '328 Patent Requiring JMOL or a New Trial.

Induced infringement requires underlying direct infringement, ***and*** evidence that Defendants "knew, or showed willful blindness, that the actions of physicians would infringe claim 18 of the '328 patent." D.I. 480 § 3.5 (jury instruction). There is no direct infringement, *see supra*

---

[3]    Alcon relied on the Lynch-984 reference, DTX-142, for anticipation and obviousness of claim 8 of the '443 patent and obviousness for the remaining asserted claims.

§ III.B. There is also no evidence that Defendants had the requisite knowledge. When this litigation began, the '328 patent had not even issued yet. Sight thus admits Defendants learned of the patent only *after* litigation began and *after* the Hydrus design was finalized. *See* Tr.2 at 131:23–25; D.I. 1; *infra*, § V (Sight's "evidence" of willful infringement is legally insufficient). Defendants' documents and testimony confirm Hydrus's transition zone *is straight* when implanted according to its instructions, so there is no evidence Defendants intended or were willfully blind to instructing customers to infringe. *See* PTX-196; DTX-96A; Tr.2 at 223:1–16, 240:17–22.

## IV. JMOL of Invalidity under 35 U.S.C. § 112, or at Least a New Trial, is Warranted for Claim 11 of the '482 Patent, and Claims 8, 24, and 58 of the '443 Patent.

### A. Clear and Convincing Evidence Confirms Undue Experimentation Is Required to Make and Use the Full Scope of the Claims

"[T]he more a party claims, the broader the monopoly it demands, the more it must enable." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 613 (2023). To help its infringement case, Sight "successfully pressed" for broad constructions of the "support" and "substantially interfere" limitations. D.I. 287. The problem for Sight, however, is that the specification does not enable the broad scope it argued for. *Liebel-Flarsheim*, 481 F.3d at 1380 ("be careful what one asks for"). Enablement is a question of law for the Court. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). The specification must provide enough information to permit a POSA to make and use the full scope of the claimed invention—here, claimed "supports" ("structure[s] that prop[] something open" or "a prop") that do not "significantly block either fluid outflow from the trabecular meshwork or fluid outflow to the collector channels." D.I. 287; Tr.1 at 102:23–103:20. No reasonable jury could have found that a POSA could make and use "the full scope of the claimed invention without undue experimentation." D.I. 488 § 4.6 (jury instruction). Where practicing the full scope requires trial-and-error testing of millions of apparatuses, that is generally undue. *Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*, 928 F.3d 1340, 1345–49 (Fed. Cir. 2019) (affirming summary judgment).

10

Judgment as a matter of law is warranted under §112 because the specification does not enable a POSA to make and use the full scope of claimed supports within the '482 and '443 patents that do not "substantial[ly] interfer[e] with" flow. The undisputed facts confirm Sight's functional claims from the '483 and '443 patents are extremely broad (*Wands* factor 8) and seek to cover so "many variations" of "support[s]" that even Downs conceded that it could be more than 1 million. Tr.3 at 207:9–13; *see also* Tr.1 at 112:11–16 (inventor D. Badawi confirming "many variations"); *id.* at 103:3–113:3 (similar); Tr.3 at 47:8–50:25 (Tanna confirming patents disclose broad range).

The trial evidence also overwhelmingly confirms that the specification does not enable that scope without tremendous trial-and-error experimentation. Tr.1 at 120:15–25 (inventor D. Badawi: "to determine if an implant significantly affects outflow in humans, . . . you would have to test it and do trials."); Tr.3 at 193:4–10 (Downs could give only an "educated guess" on whether a support described in the asserted patents will substantially interfere with flow). The named inventors did not know whether it was even possible to make the stents shown in Figures 8E–F of the patents in *2011* (5 years after filing), let alone know whether those stents would "substantially interfere" with flow. Tr.1 at 139:15–141:6; DTX-165; *see also* DTX-136.3–4 (Sight's NIH grant application rejected in part due to the lack of information on how the stent will be optimized "in terms of manufacture, material, configuration," and "lack of evidence[] and well planned approach[] for testing the feasible biological effects of the proposed stents").

As Downs confirmed, making and using the full scope of these claims requires an iterative trial-and-error process (*Wands* factor 1). He testified that POSAs must conduct a "winnowing process" (not described in the specification) to arrive at potential "support[s]" that do not substantially interfere with flow. Tr.3 at 176:9–18, 206:7–210:21; *id.* at 51:11–52:18 (Tanna: Downs's "winnowing process" is undue experimentation). In other words, one would not know if

11

any one of the millions of claimed supports would work until it was tested, consistent with D. Badawi's testimony following repeated impeachment at trial. Tr.1 at 118:20–120:25.

Downs's testimony on anticipation and obviousness further supports non-enablement. Downs testified that a POSA would ***need test data*** to know whether the prior-art Lynch-984 support substantially interferes with flow (*supra* § III.A), despite Lynch-984 teaching that the invention is for "decompressing elevated intraocular pressure." DTX-142 at 1:10-17; Tr.3 at 170:22–173:17; Tr.1 at 113:11–13, 114:1–115:8, 118:20–120:25 (D. Badawi confirming, after impeachment, that test data is necessary). Downs admitted he could give only an "educated guess" whether a disclosed support would substantially interfere with flow. Tr.3 at 193:4–10. The need to model and test millions of claimed supports is plainly "unreasonable experimentation" *Baxalta Inc. v. Genentech, Inc.*, 81 F.4th 1362, 1367 (Fed. Cir. 2023) (affirming summary judgment); *Amgen*, 598 U.S. at 614 ("painstaking experimentation . . . is not enablement").

Other *Wands* factors further confirm invalidity. ***First***, the art was highly unpredictable as of the 2006 priority date (*Wands* factors 4, 5, and 7). Every medical doctor—on both sides—agreed there were no methods in 2006 to test or measure how fluid flows across the trabecular meshwork or the collector channels in a live human eye (as opposed to a cadaver) (*Wands* factor 6). DTX-115 (Sight's CMO Brown: a "problem[] is that we do not understand outflow. . . . We do not know how fluid flows in the trabecular meshwork or the collector channels, and we do not have a way to follow outflow."); Tr.2 at 271:13–19 (Brown: "there was no reliable way to actually look at and determine how fluid was behaving in the eye, fluid outflow"); Tr.3 at 231:22–232:3 (Sight's expert Parrish confirming no "in vivo stud[ies] for assessing flow" in 2006); *id.* at 94:8–12 (Defendants' expert Iwach confirming no methods to show "flow across the meshwork" in 2006); *id.* at 53:6–54:9 (Tanna confirming cadaver tests are insufficient). The test data introduced at trial for Sight's

12

2010 perfusion study on cadaver eyes (four years *after* the priority date) for Sight's Helix stent confirms the unpredictability. The results for the four cadaver eyes were wildly different, causing the expert who conducted the study to report the result as "even more confusing" because the "[*eye*] *pressure went up quite rapidly*," although the desired outcome is for it to go down. DTX-1039.2 (Eye #3); Tr.3 at 194:7–195:2 (Downs confirming results varied); Tr.1 at 125:16–128:9, 130:2–134:7, 138:6–139:6 (D. Badawi, similar); Tr.1 at 256:3–258:22 (P. Badawi, similar).

*Second*, the patents themselves give no guidance on how to make and use a "support" that does not "substantially interfere" with flow (*Wands* factors 2 and 3). There are no working examples in the specification that would teach a POSA how to make and use the full scope of the claims. *See generally, e.g.*, JTX-1; *see also* Tr.3 at 207:9–208:10 (Downs confirming no working examples); Tr.3 at 50:2–25 (Tanna confirming no guidance in specification). Undisputed evidence confirmed that the Badawis did no modeling or testing and prepared no prototypes or models before filing their applications. Tr.1 at 97:11–21, 98:18–100:7, 104:2–105:7, 106:13–17, 112:5–9, 120:2–121:3; *see also* Tr.3 at 51:1–10 (Tanna testimony). In other words, the Badawis did not undertake *any* steps in the "winnowing process" Sight's expert Downs says is required.

Given Sight's admissions on the degree of experimentation required, the absence of working examples, the claims' breadth, and the unpredictability of the art, no reasonable juror could find the claims are not invalid under §112. The Court should grant JMOL or at least a new trial. *Amgen Inc. v. Sanofi, Aventisub LLC*, 987 F.3d 1080, 1085–88 (Fed. Cir. 2021) (affirming JMOL), *aff'd* 598 U.S. 594 (2023). Moreover, the inconsistency in Sight's evidence means the verdict cannot stand as to both infringement and § 112, further requiring a new trial: Sight cannot prove infringement without testing while also rebutting non-enablement with an "educated guess." The jury's question, Tr.5 at 143:17–22 ("explain more clearly 'invalid for lack of enablement (in

layman's terms)'"), suggests the enablement verdict is the product of confusion.

**B.    Clear and Convincing Evidence Confirms the Badawis Did Not Describe or Invent What Is Claimed**

For similar reasons as in § IV.A, no reasonable jury could have found that a POSA "would recognize, from reading the patent specification, that the inventor possessed the subject matter finally claimed in the patent." D.I. 488 § 4.7 (jury instruction); *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). As construed, "support" encompasses a broad range of structures. D.I. 287. The patents explain the support can have numerous shapes, materials, sizes, lengths, and structural features (Tr.1 at 103:3–113:3), but do not indicate which support(s) achieve the claimed function of not "substantial[ly] interfer[ing] with" flow. And where, as here, the claims use broad functional language, "the written description must demonstrate that the [patentee] has made a generic invention that achieves the claimed result." *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1335 (Fed. Cir. 2021) (cleaned up). But here, the patents at most provide a "mere wish or plan for obtaining the claimed invention," offering a host of options and leaving the public to figure out which combination(s) will meet the claimed function. *Supra*, § IV.A (Badawis did no modeling or testing and prepared no prototypes or models before filing their patents). That "is not adequate written description." *Centocor Ortho Biotech, Inc. v. Abbott Lab'ys*, 636 F.3d 1341, 1348 (Fed. Cir. 2011) (reversing denial of JMOL).

Furthermore, the evidence at trial confirms that the Badawis invented more narrowly than they claimed. The patents focused narrowly on stents that pass through the central core of Schlemm's canal, going so far as to ***criticize bypass stents*** like the Hydrus. *See* JTX-1 at 2:22–33; Tr.1 at 101:11–102:14 (D. Badawi testimony confirming patents criticize bypass stents); DTX-821 (Sight document distinguishing Hydrus as wall-based and bypass stent); Tr.1 at 230:7–22, 231:5–235:7 (P. Badawi: core design is "better and different than the wall-based stent like

Hydrus"). Tellingly, Sight's first patent was directed to core-designed stents that "occup[y] at least a portion of the central core." Tr.1 at 141:19–143:1. That requirement was eliminated in an attempt to cover the Hydrus. Instead, Sight stretched its claims beyond what they disclosed—referring internally to the asserted '482 patent as the "Ivantis killer," DTX-167 (P. Badawi); Tr.1 at 145:18–146:22 (D. Badawi confirming claims were drafted to attempt to cover the Hydrus), 235:23–236:5 (P. Badawi, similar)—rendering them invalid for lack of written description as a matter of law. *Liebel-Flarsheim*, 481 F.3d at 1380. The Court should grant JMOL or a new trial.

## V.     There Is No Evidence Alcon or Ivantis Acted Willfully, Compelling JMOL of No Willful Infringement, or at Least a New Trial

Sight alleged willfulness, which requires proof of "deliberate or intentional infringement." *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021); D.I. 488 § 6 (willfulness instruction); Tr.3 at 246:9–248:5 (Court rejecting Sight's request for a "deliberate recklessness" instruction). Nothing supports that conclusion here. Sight has pointed only to the following, which is insufficient as a matter of law: **(1)** Ivantis's knowledge of a priority patent *application* publication, whose claims—both at publication and as issued—admittedly do not read on the Hydrus; **(2)** Ivantis's knowledge in 2016 of the *existence* of two asserted patents; and **(3)** that neither Ivantis nor Alcon attempted to design around the asserted patents after learning of them.

**First**, knowledge of an *application* that did not include claims covering the accused product cannot support a finding of willful infringement. Prior knowledge of even the *asserted* patent is insufficient. *Bayer II*, 989 F.3d at 988. Knowledge of a mere application is irrelevant, as "[t]o willfully infringe *a patent*, the patent must exist[.]" *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) (original emphasis). "Filing an application is no guarantee any patent will issue[,] and a very substantial percentage of applications never result in patents." *Id.* (reversing willfulness). On that score, Sight's evidence, admitted over Defendants' objection

15

(Tr.1 at 4:8–5:17, 12:11–15:12), showed only that **(1)** Ivantis's President and CEO Van Meter read the publication in 2008 but believed (correctly, as Sight does not dispute it) the publication did not cover the Hydrus (PTX-49; Tr.2 at 179:8–12); and **(2)** a January 2009 discussion between Ivantis board member Roeder, and Sight CEO, P. Badawi (Tr.2 at 182:11–24, 184:10–16).[4] That is not evidence of willfulness. Indeed, the resulting patent (*see* DTX-1406; Tr.1 at 142:13–15) undisputedly does not even cover the Hydrus because its claims require stents occupying "at least a portion of a ***central core*** of Schlemm's canal," PTX-46 at 28 (cl.1); Tr.1 at 141:19–143:1, 233:15–235:7, which the Hydrus does not do, Tr.2 at 208:24–209:1; *see also* Tr.1 at 230:17–22, 235:1–6 (P. Badawi agreeing Hydrus is wall stent that does not go through central core). Sight has ***never*** asserted any "central core" claims against Ivantis or Alcon. Tr.1 at 142:16–143:1.

***Second***, Ivantis's mere knowledge of the '482 and '443 patents in 2016 and Defendants' *post*-lawsuit knowledge of the '328 patent cannot support willfulness for those patents. *See* Tr.2 at 130:19–131:2, 131:23–25. "Knowledge of the asserted patent . . . is necessary, ***but not sufficient***, for . . . willfulness." *Bayer II*, 989 F.3d at 988 (affirming JMOL of no willfulness); *Bayer Healthcare LLC v. Baxalta Inc.* (*Bayer I*), 2019 WL 4016235, at *8 (D. Del. Aug. 26, 2019) (JMOL of no willfulness); *BASF Plant Sci., LP v. CSIRO*, 28 F.4th 1247, 1274–75 (Fed. Cir. 2022) (knowledge of patent insufficient); *see also* D.I. 488 § 6.

***Finally***, that Defendants did not modify the Hydrus "to avoid infringement" is insufficient to support the jury's verdict. Tr.2 at 124:4–6. Referring to what Defendants *did not* do is not evidence of intent. It is inaction, and it adds nothing to Sight's reliance on Defendants' mere knowledge of **(1)** an application that never covered Hydrus, and **(2)** two patents mere existence—

---

[4]   Sight confirmed to the Court it was not pursuing copying at trial. D.I. 501 at 103:11–14. And the uncontroverted evidence established Ivantis independently developed the Hydrus. Tr.3 at 115:4–118:20; DTX1184; DTX1196.

which, again, is insufficient as a matter of law for willfulness. *BASF*, 28 F.4th at 1274–75; *Bayer II*, 989 F.3d at 988; *State Farm*, 751 F.2d 1236. Courts, thus, reject arguments like Sight's, that inaction—or so-called "failure" to design around—is evidence of willfulness. *E.g.*, *Plastic Omnium Adv. Innovation & Rsch. v. Donghee Am., Inc.*, 387 F. Supp. 3d 404, 421–22 (D. Del. 2018) (Stark, J.) (summary judgment of no willfulness despite evidence defendant "fail[ed] to engage in a process to design around the patent" after learning of it). "Failure" to design around is insufficient where Sight introduced no evidence indicating Defendants even believed they infringed, and trial evidence confirms Defendants had a good faith belief they did not. *Supra* § III.

The Court should grant JMOL of no willful infringement because the evidence is legally insufficient, or at least a new trial because the verdict is against the weight of the evidence.

## VI.   The Jury's Damages Award Is Based on Improper and Insufficient Evidence, Compelling JMOL or a New Damages Trial

At trial, Sight pressed two alternative damages theories: **(1)** lost profits for some Hydrus sales, and a reasonable royalty for the remainder, or **(2)** a reasonable royalty for all Hydrus sales. The jury adopted Sight's first theory in part and awarded $5.5 million in lost profits for a subset of Sight's claimed lost sales and $28.5 million in royalties for the remaining Hydrus sales. D.I. 485. Both components of the award rest on legal errors. The lost-profits award cannot stand given evidence of an available, non-infringing alternative (the single-radius Hydrus). The royalty award relies on the ***non-comparable, unapportioned*** Glaukos-Ivantis settlement. *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1287 (Fed. Cir. 2017). At the same time, Sight skewed the damages horizon through its use of irrelevant evidence of a corporate valuation indicating a $1.5 billion net present value of Ivantis. Sight's damages theories run afoul Federal Circuit precedent multiple times over. As a matter of law, no reasonable jury could have awarded more than the $2.8 million in damages supported by Defendants' theory. The Court should reduce the damages

judgment to that amount or order a new damages trial.

**A.      The Royalty Award Is Legally Unsustainable**

1.      *The Glaukos-Ivantis Settlement Is Non-Comparable, Was Not Apportioned,
and Was Unfairly Prejudicial to Defendants.*

The $28.5 million royalty award is based on legally insufficient evidence because it is
predicated on the Glaukos-Ivantis settlement. Federal Circuit precedent recognizes the danger of
importing royalty rates from past licenses—particularly settlement agreements—that have a
different scope or were entered under different circumstances. For royalties, the question is to
determine what rate the parties would have agreed to for ***the asserted patents and the accused
products***, had they negotiated willingly. Past licenses with other parties, to other patents, for other
products, are of limited value. The proponent must "account[] for differences in the technologies
and economic circumstances" between the license and the case before the court. *CSIRO v. Cisco
Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015). Past ***settlements*** are especially fraught, because
they "are tainted by the coercive environment of patent litigation [and] are ***unsuitable*** to prove a
reasonable royalty[.]" *LaserDynamics v. Quanta Computer*, 694 F.3d 51, 77 (Fed. Cir. 2012).

Here, Sight did what precedent forbids—it asked the jury to take the 10% royalty rate from
the Glaukos-Ivantis settlement and blindly adopt it here. And to be clear, that is what the jury did.
In Jarosz's reasonable-royalty-only theory, Sight contended it was entitled to a 10% royalty for all
Hydrus sales ($29.6 million). PTX-711 ([J13]); Tr.4 at 43:18–44:2; Ex. D, PDX10.32.
Alternatively, Sight contended it was entitled to lost profits for 14,171 Hydrus sales ($11 million),
plus a 10% royalty on the remaining sales ($27.4 million). PTX-709 ([J5]+[J16]); PTX-711
([J14]); Ex. D, PDX10.32. The jury's award splits the difference exactly, reflecting lost profits for
half of the 14,171 units Sight claimed it lost ($5.5 million), and a 10% royalty for the remainder
($28.5 million). Only the Glaukos-Ivantis settlement supported the 10% royalty rate. But Sight

provided no evidentiary basis for it. At most, Sight told the jury that Ivantis *in 2021* purchased a litigation resolution and a license to hundreds of Glaukos patents for a 10% royalty rate. This tells the jury nothing about the appropriate amount of royalty damages here: what Ivantis would have paid Sight *in 2018*—outside of litigation—for a license to ***Sight's three patents***. The jury's damages award runs afoul of Federal Circuit precedent, which requires patentees to prove technological and economic comparability, requires apportionment in all cases, and holds that settlements are unsuited for that task. JMOL or a new damages trial is warranted.

   ***First***, Sight's experts provided no evidence that the Glaukos-Ivantis settlement is technologically comparable (it is not)—which is a failure of proof on its own and led to a further failure to apportion. In this case, Sight asserted five claims of three patents. The Glaukos-Ivantis settlement, however, licenses more than ***300 foundational bypass stent patents***, in exchange for a $60 million payment, a 10% running royalty, and dismissal of litigation two weeks prior to trial. Tr.4 at 78:21–24; *id.* at 42:10–22, 138:10–139:13 (many of the 300 patents name Dr. Brown as an inventor and are foundational); Tr.1 at 149:16–150:20 (D. Badawi: Dr. Brown is a "prolific" and "original inventor" of bypass stenting); DTX-893. The Glaukos-Ivantis settlement is not comparable to the hypothetical license, and should not have been considered.

   At trial, Sight did not introduce as evidence or show the jury ***a single Glaukos patent*** that was licensed under the Glaukos-Ivantis settlement. Instead, Sight's only attempt to account for the vast difference in licensed patents was Downs's assertion—without support and again without showing a single Glaukos patent to the jury—that "most of the licensed Glaukos patents . . . were expired or they weren't related to the Hydrus at all" and that the non-expired Glaukos patents were "much narrower than the scope of the asserted patents." Tr.2 at 75:17–76:7. In contrast to Downs's conclusory testimony, Defendants' expert Iwach compared Sight's asserted patents to an

exemplary licensed Glaukos patent and ***showed***—without rebuttal—that Sight's patents are ***narrower***. Tr.3 at 102:19–104:16. No other evidence or testimony substantively compared the Glaukos patents to the asserted patents; Downs's testimony was *ipse dixit*. Moreover, Downs never explained how Sight's three ***later-filed*** patents could be broader than the entire Glaukos portfolio (unexpired or otherwise). Downs's conclusory assertions cannot support the damages award. *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1312 (Fed. Cir. 2018); *LaserDynamics*, 694 F.3d at 79 ("When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice.").

***Second***, for economic comparability, Jarosz blindly contended that the 10% rate from the Glaukos-Ivantis settlement also would be an appropriate royalty to pay Sight for its three patents. Tr.4 at 43:18–44:2. Undisputed evidence showed otherwise. The Glaukos-Ivantis settlement is a quintessential non-comparable license tainted not only by pending litigation but an acquisition option contingent on the litigation outcome. *Rude v. Westcott*, 130 U.S. 152, 164 (1889); *LaserDyanamics*, 694 F.3d at 77; *ViaTech Techs. v. Adobe*, 2023 WL 5975219, at *15 (D. Del. Sept. 14, 2023); *IOENGINE, LLC v. PayPal Holdings*, 607 F. Supp. 3d 464, 505 (D. Del. 2022). The 10% royalty rate was influenced by numerous factors that cannot be relevant to the royalty analysis. These include an impending trial, *e.g.*, Tr.4 at 140:11–141:7, rulings adverse to Ivantis, and negotiations for Alcon to acquire Ivantis. Just before Glaukos sued Ivantis in 2017, Alcon was poised to acquire Ivantis for $445 million. Tr.2 at 169:20–170:5. After Glaukos sued, Alcon notified Ivantis the deal was off. *Id.* at 170:6–171:6. But when Ivantis received FDA approval for the Hydrus, Alcon and Ivantis re-engaged, and agreed to an "option" for Alcon to acquire Ivantis—subject to resolution of the Glaukos litigation, and for a price that depended on contingencies in the litigation. *Id.* at 171:10–172:10. Until the litigation was resolved, Ivantis was in limbo. Tr.4 at

140:11–141:21 (Meyer testimony). Trial evidence confirmed that positioning Ivantis for sale to Alcon was a driving factor in the Glaukos settlement decision, with Ivantis agreeing to a "high" royalty rate to trigger the acquisition. *E.g.*, Tr.2 at 172:14–173:17; Tr.4 at 138:10–142:10. This 10% royalty rate significantly exceeded typical "single digit[]" royalty rates in the industry—it was 10 times what a different company, Transcend, agreed to pay Glaukos for the same Glaukos patents. Tr.2 at 173:22–174:15. And, as discussed *infra*, the settlement was tainted by a spoliation finding and adverse inference. Ivantis's willingness to pay a high royalty to hasten its acquisition by a third party has nothing to do with the proper royalty analysis in this case.

**Third**, Sight failed to present any evidence of apportionment. Patentees are only entitled to damages "for the infringement," measured by "the use made of the invention by the infringer." 35 U.S.C. § 284. When a patent covers only a feature of a product, Supreme Court precedent holds that patentees "***must in every case*** give evidence tending to separate or apportion [damages] between the patented feature and the unpatented feature." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). Similarly, patentees cannot simply import royalty rates from other licenses without apportioning to account for the difference in scope between the past license and the present infringement claim. *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1380–81 (Fed. Cir. 2021) (new trial warranted where patentee failed to apportion: "comparable" license covered "numerous patents," and hypothetical negotiation was "for a single-patent license"). Sight's damages expert Jarosz skipped over this requirement. He relied on Downs's comparability testimony to excuse himself from apportioning the Glaukos royalty rate ***at all*** to account for the technical and economic differences between the 300-patent Glaukos license and the 3-patent hypothetical license here. Tr.4 at 43:2–44:2, which further warrants JMOL or a new trial.

**Fourth**, the Court should at least grant a new trial for the further reason that the Glaukos-

Ivantis settlement should not have been before the jury in the first place—as explained in *Daubert* briefing. D.I. 293–294, 357. Its non-comparability means that the jury's award is unsupported or at least against the weight of the evidence. But more than that, Sight's use of the Glaukos-Ivantis settlement with the jury unfairly prejudiced Defendants. At trial, Jarosz dismissed the coercive nature of the Glaukos-Ivantis settlement as mattering only a "little bit." Tr.4 at 44:12–45:7. Defendants tried to probe the unreliability of that testimony on cross-examination, but as explained (D.I. 475), that is not fully possible here without unfair prejudice. The settlement royalty rate was inflated by unique circumstances in the *Glaukos* litigation, such as the fact that Ivantis faced an adverse inference as a court-imposed spoliation sanction. D.I. 475 at 3 ¶ 2. Defendants, however, could not present that fact to the jury because—although it would have made clear to the jury why a 10% royalty rate was inappropriate here—it would have severely and unfairly prejudiced Defendants by explaining to the jury that a court had found Ivantis destroyed evidence in another case. *IOENGINE*, 607 F. Supp. at 506 (considering prejudice of admitting settlement agreement when excluding expert testimony under *Daubert*). Sight unfairly exploited Defendants' dilemma: it used an inflated 10% royalty rate by injecting the topic of past litigation into this case, knowing that Defendants could not explain ***why*** the rate was inflated without risking prejudice and jury confusion. Sight's tactics succeeded in a way that confirms the reasoning of Federal Circuit precedent disfavoring the use of settlements to determine royalty rates. *LaserDynamics*, 694 F.3d at 77; *Bhaya*, 922 F.2d at 187 (affirming grant of new trial where "erroneous admission of [] testimony" affected defendant's "substantial rights").

        2.     *The Alcon-Ivantis Acquisition Model Unfairly Skewed the Damages Horizon for the Jury and Is Not Comparable or Properly Apportioned.*

Should Sight point to the Alcon-Ivantis acquisition model, that cannot support the damages verdict. Alcon developed the acquisition model to project Ivantis's future cash flow ***in perpetuity***,

to assist Alcon in deciding whether and for what price to purchase the ***entire Ivantis company***. It was not a valuation of patents, and certainly not a valuation of ***Sight's*** patents asserted here, limited to their expiration dates. *See* Tr.4 at 65:7–69:23, 70:4–21.

The jury's damage award is based on the Glaukos-Ivantis settlement, *supra* § VI.A.1, not the acquisition model, so Sight has no conceivable basis to rely on that model to support the verdict. Indeed, the only purpose the acquisition model served was to show the jury an artificially large number to "skew the damages horizon." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011). The Federal Circuit has seen this tactic before and cautioned about the dangers of putting minimally-relevant large numbers in front of the jury—whether as a "check" or otherwise. *Id.* Here, the acquisition model generated a ***$1.5 billion*** net present value of Ivantis ***through eternity*** (which is, of course, well after all the asserted patents expire). That number is irrelevant to the damages analysis, yet it appeared, prejudicially, as the first line item of Jarosz's analysis. PTX-713. This schedule was admitted into evidence in unredacted form over Defendants' objection (Tr.4 at 9:12–11:15), allowing Sight to put before the jury a billion-dollar figure that "was never put back into the bag," *Uniloc*, 632 F.3d at 1320, warranting a new trial.

The model is also non-comparable because it concerns Ivantis's value as a company and is not a valuation of Sight's patents or an assessment of a reasonably royalty for a license to these claims, and not supported by any apportionment analysis. Again, apportionment requires an analysis of which patented and unpatented features drive sales and profits of the accused product. *Exmark Mfg Co. v. Briggs & Stratton Power Prods. Group*, 879 F.3d 1332, 1348 (Fed. Cir. 2018); *see ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed.Cir.2010) (vacating damages award for failure of apportionment). What Jarosz called "apportionment" was his simple reliance on conclusory testimony from Downs about "value drivers" which Downs admitted are not required

by the asserted claims. Tr.2 at 111:23–113:4. Moreover, Jarosz admitted "there were other contributors besides just the patents" to Hydrus's sales. PDX10.7; Tr.4 at 71:9–24. Because neither Downs nor Jarosz properly apportioned (an issue Jarosz has had trouble with in the past, *see* Ex. E at 3–8; Ex. F (9:17 AM Minutes); Tr.4 at 71:25–72:8), the Court should grant JMOL that the jury's reasonable royalty award is unsupported by legally sufficient evidence. Alternatively, the Court should grant a new trial on damages. *Omega*, 13 F.4th at 1377–78.

### B.    The Lost-Profits Award Violates *Panduit*

The $5.5 million lost profits award cannot stand because Sight failed to prove the absence of acceptable, available non-infringing alternatives. That is "*Panduit* factor" #2, a prerequisite to obtaining lost profits. *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978); D.I. 488 § 5.3.2 (jury instruction). Trial evidence showed that Defendants' single-radius stent design was an available, acceptable non-infringing alternative. The single-radius stent was implanted in approximately 20 to 25 live patients. Tr.2 at 162:22–163:19. It was non-infringing. Tr.5 at 76:8–15 (Sight's closing); Tr.3 at 184:11–185:20. Sight failed to show otherwise. Sight contended it was not available or "acceptable," but the evidence confirmed it was both.

*First*, the single-radius stent was available. Defendants conclusively showed Ivantis had the "equipment, materials, know-how, and experience to design and manufacture the" single-radius design, D.I. 488 § 5.3.2(b) (jury instruction on acceptable non-infringing substitutes), and *it was actually implanted in live patients* in December 2011, Tr.2 at 162:22–163:19; Tr.3 at 113:5–25; DTX-778. No reasonable jury could have found otherwise.

*Second*, the single-radius stent was acceptable. Sight's expert, Galanis, relied on the rate of peripheral anterior synechiae ("PAS") to contend the single-radius stent was unacceptable. Tr.3 at 139:7–141:7. But Galanis and other witnesses confirmed the PAS percentage for the single-radius design was comparable to (indeed, *lower* than) the PAS percentage for the accused Hydrus

(Tr.3 at 147:10–148:21; Tr. 162:22–163:19 (Van Meter testimony on PAS associated with single-radius design); DTX-218; Tr.3 at 111:13–114:4 (Iwach testifying the single-radius design was acceptable)). Indeed, Galanis admitted he implants the accused Hydrus despite its known risk of PAS. Tr.3 at 148:18–21. During Sight's case-in-chief, the only other testimony Sight introduced on non-infringing alternatives was Downs's conclusory assertion that he was not aware of any non-infringing alternatives. Tr.2 at 71:11–17 (Downs's direct), 105:6–19 (Downs's cross). But "conclusory assertions cannot form the basis of a jury's verdict." *Virnetx*, 767 F.3d at 1333.

The Court should grant JMOL and vacate the jury's lost profits damages award, or alternatively order a new damages trial because the verdict is against the weight of the evidence.

### C. If the Court Grants a New Trial or JMOL as to a Subset of the Asserted Patents, Defendants are Entitled to a Reduction or New Trial on Damages.

Where, as here, a jury's damages verdict is based on multiple claims and does not "break[] down the damages attributable to each patent," then the "normal rule" is that a new trial on damages is required if any of the underlying claims are eliminated as a basis for the verdict. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310 (Fed. Cir. 2007); *WesternGeco LLC v. ION Geophysical Corp.*, 913 F.3d 1067, 1073–75 (Fed. Cir. 2019). There is no reason to depart from that rule here. If the Court orders JMOL or a new trial on infringement or validity as to any asserted claim—regardless of whether it agrees with Defendants' arguments of error in the damages award itself—then damages should be reduced or retried.[5]

## VII. Conclusion

Defendants respectfully request that the Court grant judgment as a matter of law on non-infringement, invalidity, willfulness, and damages or, in the alternative, a new trial on these issues.

---

[5]   For example, if only the '328 patent verdict remains, it issued during this litigation in July 2022, and the damages verdict would impermissibly cover sales occurring before issuance.

_/s/ Andrew E. Russell_

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
_Attorneys for Defendants_

OF COUNSEL:
Gregg LoCascio
Sean McEldowney
Steven Dirks
Socrates L. Boutsikaris
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000

Jeanne M. Heffernan
Kat Li
Ryan J. Melde
KIRKLAND & ELLIS LLP
401 Congress Avenue
Austin, TX  78701
(512) 678-9100

Ryan Kane
Nathaniel DeLucia
Emily Sheffield
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Brian A. Verbus
Jacob Rambeau
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000

Noah Frank
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Dated: June 25, 2024