IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SIGHT SCIENCES, INC.,           )
                                )
          Plaintiff,            )        C. A. No.: 21-1317-JLH-SRF
                                )
     v.                         )        **PUBLIC VERSION – Filed: July**
                                )        **15, 2024**
IVANTIS, INC., ALCON RESEARCH LLC, )
ALCON VISION, LLC AND ALCON INC., )
                                )
          Defendants.           )

### SIGHT SCIENCES, INC.'S
### OPENING BRIEF IN SUPPORT OF ITS POST-TRIAL MOTIONS

YOUNG CONAWAY STARGATT & TAYLOR, LLP
James L. Higgins (No. 5021)
Stephanie N. Vangellow (No. 7277)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
jhiggins@ycst.com
svangellow@ycst.com

COOLEY LLP
Michelle S. Rhyu
Jeffrey Karr
Lauren Strosnick
Alissa Wood
Juan Pablo González
Angela R. Madrigal
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Orion Armon
Eamonn Gardner
1144 15th Street, Suite 2300
Denver, CO 80202-2686
(720) 566-4000

Dustin M. Knight
Joseph Van Tassel
Reston Town Center
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
(703) 456-8000

Bonnie Fletcher Price
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
(202) 842-7800

*Attorneys for Sight Sciences, Inc.*

Dated: June 25, 2024

## TABLE OF CONTENTS

Page

I.   NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 1

II.  SUMMARY OF THE ARGUMENT ............................................................................. 1

III. SIGHT'S MOTION FOR ENTRY OF A PERMANENT INJUNCTION OR FOR
     ALTERNATIVE RELIEF IN THE FORM OF ONGOING ROYALTIES ..................... 3

     A.   The Court Should Enter a Permanent Injunction. .................................................. 4

          1.   Sight Will Suffer Irreparable Injury Absent an Injunction. ...................... 5

               a.   The Jury Verdict and Evidence Establish Irreparable Harm. ........ 5

               b.   The Evidence Shows the Required Causal Nexus Between
                    the Infringement and Irreparable Harm. ...................................... 7

          2.   Monetary Damages Are Inadequate to Compensate Sight for
               Continued Infringement. ............................................................................. 9

          3.   The Balance of Hardships Warrants an Injunction. ................................. 10

          4.   Enjoining Continued Infringement Serves the Public Interest. .............. 12

     B.   Alternatively, the Court Should Order Ongoing Royalties ................................. 14

          1.   The Jury's Verdict Equates to a Reasonable Royalty of
               Approximately $154 Per Unit. ................................................................. 15

          2.   The Court Should Increase the Jury's Reasonable Royalty
               Calculation to Account for Sight's Lost Profit Damages and
               Changed Circumstances. ........................................................................... 15

IV.  SIGHT'S MOTION FOR ENHANCED DAMAGES BASED ON THE JURY'S
     FINDING OF WILLFUL INFRINGEMENT ................................................................. 18

     A.   Ivantis and Alcon Failed to Reasonably Investigate Sight's Patents or
          Form a Good-Faith Belief That They Were Invalid or Not Infringed (*Read*
          Factor 2) ............................................................................................................... 20

     B.   Defendants' Financial Condition Support Enhancement (*Read* Factor 4) ........... 24

     C.   Defendants' Behavior as a Party to the Litigation and Lack of Success at
          Summary Judgment and Trial Support Enhancement (*Read* Factors 3 and
          5) ........................................................................................................................... 24

D.      The Duration of Defendants' Misconduct and Absence of Remedial Actions Taken by Defendants Support Enhancement (*Read* Factors 6 and 7) ................................................................................................................ 26

E.      Defendants' Motivation for Harm Supports Enhancement (*Read* Factor 8) ....... 27

V.      SIGHT'S MOTION FOR AN AWARD OF SUPPLEMENTAL DAMAGES, PRE-JUDGMENT INTEREST, AND POST-JUDGMENT INTEREST ...................... 28

A.      The Court Should Award Supplemental Damages .............................................. 28

B.      The Court Should Award Pre-Judgment Interest ................................................. 29

C.      The Court Should Award Post-Judgment Interest ............................................... 30

VI.     CONCLUSION ............................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Amado v. Microsoft Corp.*,
    517 F.3d 1353 (Fed. Cir. 2008)...........................................................................15

*Apple Inc. v. Samsung Elecs. Co.*,
    809 F.3d 633 (Fed. Cir. 2015)..................................................................... *passim*

*ArcherDX, LLC v. Qiagen Scis., LLC*,
    C.A. No. 18-1019-MN, 2022 WL 4597877 (D. Del. Sept. 30, 2022) ....................29

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
    876 F.3d 1350 (Fed. Cir. 2017)...........................................................................23

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
    670 F.3d 1171 (Fed. Cir. 2012), *vacated in-part on reconsideration by* 682
    F.3d 1003 (Fed. Cir. 2012) .................................................................................4

*Bd. of Regents v. Boston Sci. Corp.*,
    C.A. No. 18-392, 2024 WL 2848471 (D. Del. June 5, 2024)................................29

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
    967 F.3d 1353 (Fed. Cir. 2020).............................................................................7

*Bio-Rad Lab'ys Inc. v. 10X Genomics, Inc.*,
    C.A. No. 15-cv-152-RGA, 2019 WL 3322322 (D. Del. July 24, 2019),
    *vacated in-part by* 967 F.3d 1353 (Fed. Cir. 2020) ................................................5

*Broadcom Corp. v. Emulex Corp.*,
    732 F.3d 1325 (Fed. Cir. 2013)........................................................................5, 7

*Broadcom Corp. v. Qualcomm, Inc.*,
    543 F.3d 683 (Fed. Cir. 2008)........................................................................10, 13

*Dasso Int'l, Inc. v. Moso N. Am., Inc.*,
    No. 17-cv-1574, 2023 WL 5349374 (D. Del. Slip Op. Aug. 21, 2023) ............10, 29

*Del Mar Avionics, Inc. v. Quinton Instrument Co.*,
    836 F.2d 1320 (Fed. Cir. 1987).........................................................................27

*Douglas Dynamics, LLC v. Buyers Prods., Co.*,
    717 F.3d 1336 (Fed. Cir. 2013)...........................................................................9

*E.I. DuPont de Nemours & Co. v. Unifrax I LLC*,
    C.A. No. 14-1250-RGA, 2017 WL 4004419 (D. Del. Sept. 12, 2017) .............5, 7, 28

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)..........................................................................................4, 10, 14

*Edwards Lifesciences AG v. CoreValve, Inc.*
   699 F.3d 1305 (Fed. Cir. 2012)....................................................................................3

*F'real Foods, LLC v. Hamilton Beach Brands, Inc.*,
   No. 16-41-CFC, 2020 WL 4015481 (D. Del. July 16, 2020) ....................................5

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010)..................................................................................28

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
   582 F.3d 1288 (Fed. Cir. 2009)..................................................................................14

*Gavrieli Brands LLC v. Soto Massini (USA) Corp.*,
   C.A. No. 18-462-MN, 2020 WL 1443215 (D. Del. Mar. 24, 2020)............................3

*Genband US LLC v. Metaswitch Networks Corp.*,
   861 F.3d 1378 (Fed. Cir. 2017)....................................................................................8

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   579 U.S. 93 (2016).....................................................................................................18

*I4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010)..............................................................................18, 19

*IMX, Inc. v. LendingTree, LLC*,
   469 F. Supp. 2d 203 (D. Del. 2007)......................................................................24, 27

*LG Display Co. v. AU Optronics Corp.*,
   722 F. Supp. 2d 466 (D. Del. 2010)...........................................................................29

*Lucent Techs., Inc. v. Newbridge Networks Corp.*,
   168 F. Supp. 2d 269 (D. Del. 2001)...........................................................................27

*nCUBE Corp. v. SeaChange Int'l, Inc.*,
   313 F. Supp. 2d 361 (D. Del. 2004), *aff'd*, 436 F.3d 1317 (Fed. Cir. 2006) ....................24, 27

*Novozymes A/S v. Genencor Int'l, Inc.*,
   474 F. Supp. 2d 592 (D. Del. 2007)...........................................................................24

*Odetics, Inc. v. Storage Tech. Corp.*,
   14 F. Supp. 2d 785 (E.D. Va. 1998), *aff'd*, 185 F.3d 1259 (Fed. Cir. 1999)...........................12

*Paice LLC v. Toyota Motor Corp.*,
   504 F.3d 1293 (Fed. Cir. 2007)....................................................................................4

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012)........................................................................5, 7, 13

*Read Corp. v. Portec Inc.*,
    970 F.2d 816 (Fed. Cir. 1992)............................................................... *passim*

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011)........................................................................7, 10

*Sanofi–Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006)........................................................................12

*SRI International, Inc. v. Cisco Systems, Inc.*,
    254 F. Supp. 3d 680 (D. Del. 2017), *aff'd in relevant part*, 14 F.4th 1323 (Fed.
    Cir. 2021) ...........................................................................................18, 19, 24, 26

*Stryker Corp. v. Davol, Inc.*,
    75 F. Supp. 2d 746 (W.D. Mich. 1999), *aff'd*, 234 F.3d 1252 (Fed. Cir. 2000).....................29

*Sun Ship, Inc. v. Matson Navigation Co.*,
    785 F.2d 59 (3d Cir. 1986)........................................................................30

*Telcordia Techs., Inc. v. Cisco Sys., Inc.*,
    612 F.3d 1365 (Fed. Cir. 2010)........................................................................15

*Vectura Ltd. v. GlaxoSmithKline LLC*,
    C.A. No. 16-638-RGA, 2019 WL 4346502 (D. Del. Sept. 12, 2019) .....................14

*WBIP, LLC v. Kohler Co.*,
    829 F.3d 1317 (Fed. Cir. 2016)........................................................................13

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012)........................................................................28

*Wonderland Switzerland AG v. Evenflo Co.*,
    No. 1:20-cv-00727-JPM, 2023 WL 4098571 (D. Del. Slip Op. June 7, 2023) ................10, 13

*Wonderland Switzerland AG v. Evenflo Co.*,
    No. 1:20-cv-727-JPM, 2023 WL 5497918 (D. Del. July 24, 2023) .........................28

*XY, LLC v. Trans Ova Genetics, L.C.*,
    890 F.3d 1282 (Fed. Cir. 2018)........................................................................15

**STATUTES**

28 U.S.C. § 1961 ........................................................................30

35 U.S.C. § 112........................................................................25

35 U.S.C. § 271(e)(4)(B) ...........................................................................................................13

35 U.S.C § 284 ................................................................................................................18, 29

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Sight Sciences, Inc. ("Sight") filed this action against Ivantis, Inc. ("Ivantis"); Alcon Research LLC; Alcon Vision, LLC; and Alcon, Inc. ("Alcon") (collectively "Defendants") for infringement of U.S. Patent Nos. U.S. 8,287,482 ("the '482 patent"), 9,370,443 ("the '443 patent), and 11,389,328 ("the '328 patent") (collectively the "Asserted Patents").[1] D.I. 1; D.I. 59.

Following a five-day trial, the jury found that Defendants' Hydrus Microstent ("Hydrus") infringes claims 8, 24, and 58 of the '443 patent and claim 11 of the '482 patent; that Defendants induced infringement of claim 18 of the '328 patent (collectively the "Asserted Claims"); and that Defendants' infringement was willful. D.I. 485 at 2-3, 11. The jury also found that Defendants failed to prove that any of the Asserted Claims were invalid and awarded Sight $5.5 million in past lost profits damages and $28.5 million in past reasonable royalty damages for a total of $34 million in damages for the period between August 2018 and April 26, 2024. *Id*. at 4-10.

The Court entered judgment on May 21, 2024. D.I. 509.

## II.    SUMMARY OF THE ARGUMENT

The evidence showed that Sight co-founders Paul and David Badawi invented a novel way to lower intraocular pressure in the treatment of glaucoma. The Badawis' invention restores the natural outflow pathways of the eye, increasing fluid outflow by propping open Schlemm's canal while minimizing contact with the walls of the canal, so as not to interfere substantially with transmural flow across the trabecular meshwork and to the collector channels. *See, e.g.*, JTX0002[2] ('443 patent) at Abstract, 10:30-11:38, 11:62-12:22; D.I. 504 (Day 2 Tr.) ("Ex. E") at 41:7-22

---

[1] Sight also asserted infringement of U.S. Patent Nos. 9,486,361 and 10,314,742 in this action but narrowed its case and chose not to pursue claims from these patents at trial.

[2] All Exs. A – I, JTX, PTX, and DTX references are attached to the Declaration of Joseph Van Tassel in Support of Sight Sciences, Inc.'s Opening Brief in Support of Its Post-Trial Motions, unless otherwise noted.

(expert Dr. Downs's summary of disclosed invention). The Badawis started a company, Sight Sciences, which is committed to delivering improved treatments for glaucoma and a variety of other vison-related conditions and which competes with Defendants. D.I. 503 (Day 1 Tr.) ("Ex. D") at 189:13-23. The infringing Hydrus competes with Sight in the minimally invasive glaucoma surgery ("MIGS") market, resulting in lost sales for Sight's OMNI Surgical System. *See, e.g.*, Ex. D at 190:19-22, 191:10-19, 191:24-192:9 ("Alcon already has the scale advantage. They're way bigger than we are. They don't need to use our intellectual property to compete and do well."); *compare* Ex. E at 263:18-20 (testimony from Alcon executive that Alcon does not consider Sight Sciences a competitor), *with* PTX0459 at 3 (Alcon presentation identifying Sight Sciences as one of three "Key Competitors" in the MIGS market).

The jury found that Defendants' infringement was willful, crediting evidence that Defendants knowingly and intentionally infringed the Asserted Patents. The jury credited evidence that, after discovering and repeatedly evaluating Sight's pending patent application, Defendants' patent counsel, Jim Shay recommended that they should purchase the Badawis' IP rights, which they tried and failed to do. Ex. E at 119:12-19, 120:1-4. Defendants monitored Sight's patent filings, knew about Sight's issued patents-in-suit, and knowingly and intentionally commercialized the infringing Hydrus design because alternative designs were less efficacious or were less-safe. *See, e.g.*, Ex. D at 191:10-19 ("They came to us in 2008. We met in 2009. I made [it] clear what we were doing. They knew."); Ex. E at 124:4-6, 130:19-21, 130:25-131:2, 191:4-7, 198:11-14 (no one at Ivantis did anything in response to learning about the issuance of the '443 and '482 patents), 199:14-201:16 (Hydrus full profile design raised intraocular pressure, company was "near death" and adopted low-profile design to achieve efficacy), 218:11-221:3 (Ivantis went from full profile design to low profile design because full profile could not be inserted safely), 238:10-239:14

(agreeing that Badawi patent publication was submitted to Patent Office during prosecution of Ivantis patent application in 2009 (PTX0694 at 67-69)); D.I. 505 (Day 3 Tr.) ("Ex. F") at 137:11-17, 139:6-16, 139:21-140:22, 184:9-186:1 (alternative single-radius design was less safe and effective); PTX0282 at 12, 14 (Ivantis "near death" before move to low profile design); PTX0123 (showing single-radius design was 50% less effective at increasing outflow); PTX0112 at 51 (reporting safety concerns from testing of single-radius design).

Sight respectfully requests that the Court award Sight the following post-trial relief: (1) a permanent injunction against future infringement, or, in the alternative, an award of ongoing royalties for post-judgment sales of the Hydrus product; (2) enhanced past damages and enhanced ongoing royalties (to the extent an injunction is not ordered) for willful infringement; (3) supplemental damages for sales of the infringing product between April 27, 2024 and entry of a permanent injunction or final judgment; (4) pre-judgment interest at the short-term Treasury bill rate, calculated daily and compounded monthly, on the total damages awarded, including supplemental damages and enhanced damages through entry of a final judgment; and (5) post-judgment interest at the Treasury bill rate.

## III.    SIGHT'S MOTION FOR ENTRY OF A PERMANENT INJUNCTION OR FOR ALTERNATIVE RELIEF IN THE FORM OF ONGOING ROYALTIES

"A patentee's right to exclude is a fundamental tenet of patent law. . . . Absent adverse equitable considerations, the winner of a judgment of validity and infringement may normally expect to regain the exclusivity that was lost with the infringement." *Edwards Lifesciences AG v. CoreValve, Inc.* 699 F.3d 1305, 1314 (Fed. Cir. 2012) (citations omitted). Thus, the Court should enjoin Defendants from selling the infringing Hydrus and any other product that is not colorably different from it. *See Gavrieli Brands LLC v. Soto Massini (USA) Corp.*, C.A. No. 18-462-MN, 2020 WL 1443215, at *9 (D. Del. Mar. 24, 2020) ("[t]he Federal Circuit has made clear that the

'colorable differences' test is the proper one for determining whether a newly accused product violates a prohibition on continued infringement by a product already adjudged to be infringing."). Alternatively, if the Court declines to enjoin Alcon, it should award an ongoing royalty to compensate Sight for Alcon's future infringement. *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 670 F.3d 1171, 1192 (Fed. Cir. 2012) (affirming award of ongoing royalties to compensate for future infringement), *vacated in-part on reconsideration by* 682 F.3d 1003 (Fed. Cir. 2012); *see also Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314-15 (Fed. Cir. 2007) (affirming compulsory future royalties where injunction did not issue).

### A.      The Court Should Enter a Permanent Injunction.

The decision to grant or deny injunctive relief is within a district court's discretion, which should be exercised consistent with traditional principles of equity. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006). A permanent injunction is warranted if Sight shows: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 391. Sight easily satisfies all four factors *and* the facts of this case are analogous to other cases where "[f]rom at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases." *Id*. at 395 (Roberts, C.J., concurring). That is because the patented invention *is* the entire Hydrus Microstent that is used and sold (rather than an insignificant component of a larger product), and the invention is what makes the infringing Hydrus effective in treating glaucoma. *Id*. ("When it comes to discerning and applying those standards, in this area as others, 'a page of history is worth a volume of logic.'" (citation omitted)); *see also id*. at 396 (noting that "[t]he lesson of the historical practice, therefore, is most helpful and instructive when

4

the circumstances of a case bear substantial parallels to litigation the courts have confronted before[,]" and distinguishing non-practicing entity from competitor suits, and those involving patents covering products versus components of products) (Kennedy, J. concurring).

### 1. Sight Will Suffer Irreparable Injury Absent an Injunction.

#### a. The Jury Verdict and Evidence Establish Irreparable Harm.

When there is "[d]irect competition in the same market," it "suggest[s] strongly the potential for irreparable harm without enforcement of the right to exclude." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012); *see also Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1338 (Fed. Cir. 2013) (finding irreparable harm where "Broadcom and Emulex were competitors" and "Broadcom lost market share while Emulex gained it . . ."). For this reason, this District regularly enjoins infringing competitors. *See, e.g.*, *E.I. DuPont de Nemours & Co. v. Unifrax I LLC*, C.A. No. 14-1250-RGA, 2017 WL 4004419, at *4-*6 (D. Del. Sept. 12, 2017) (finding irreparable harm where parties were "direct competitors" and infringement had led to a "reduction in sales."); *Bio-Rad Lab'ys Inc. v. 10X Genomics, Inc.*, C.A. No. 15-cv-152-RGA, 2019 WL 3322322, at *2 (D. Del. July 24, 2019) (finding irreparable harm where Plaintiffs were forced to compete with infringing products), *vacated in-part by* 967 F.3d 1353 (Fed. Cir. 2020) (affirming district court finding of irreparable harm and finding that the district court did not abuse its discretion in granting Bio-Rad an injunction).

By awarding lost profit damages, the jury necessarily found that Sight's OMNI product directly competes in the same market with Hydrus and that Hydrus caused Sight to lose sales. *F'real Foods, LLC v. Hamilton Beach Brands, Inc.*, No. 16-41-CFC, 2020 WL 4015481, at *4 (D. Del. July 16, 2020) ("And when a jury awards a patentee lost profits, the jury necessarily finds both this kind of competition and that the defendant's action caused the patentee to lose sales.").

First, Alcon's documents admit that OMNI and Hydrus compete in the MIGS market. *See, e.g.,* PTX0480 at 3, 8. Indeed, an Alcon "Competitive Landscape" presentation identified OMNI as one of three "Key Competitors" to the Hydrus. PTX0459 at 3. Alcon even developed specific talking points to "win" Sight accounts. PTX0503 at 16.

Second, third parties recognize that Hydrus and OMNI compete directly in the MIGS market. PTX0397 at 21 (identifying Hydrus as a competitor to OMNI).

Third, multiple witnesses—including Alcon's damages expert—agreed that OMNI and Hydrus compete. Ex. E at 138:21-25 (Phelps); D.I. 506 (Day 4 Tr.) ("Ex. G") at 21:24-23:11 (Jarosz), 152:20-155:10 (Meyer). And Sight's expert demonstrated that competition by testifying that Sight and Alcon have over *700 common customers*. Ex. G at 28:6-24.

Sight also proved that competition from Alcon caused it to lose sales. Sight's Eastern Area Sales Director, Christopher Phelps, testified that Sight had lost specific accounts to the Hydrus—knowledge he obtained from admissions by Alcon's own sales representatives, observations of Hydrus procedures in the operating room with physicians who had previously used the OMNI, and from surgeons themselves. Ex. E at 139:4-141:19.

Sight presented evidence that those lost sales restricted its ability to expand its business. Phelps testified that a key strategy for Sight to increase sales was "spiderwebbing." Ex. E at 135:15-136:12. According to Phelps, each surgery center may have up to twenty surgeons. If Sight develops a relationship with one surgeon, it can then seek referrals to other surgeons within the same center or referrals to surgeons outside of that center. *Id*. Thus, one lost surgeon eliminates a primary source for Sight to expand its business.

Circumstances in which Sight must compete with Alcon products that infringe Sight's patents and in which Sight has lost sales to Alcon—as found by the jury—establishes irreparable

harm. *See Presidio*, 702 F.3d at 1363; *see also Broadcom Corp.*, 732 F.3d at 1338; *Unifrax I LLC*, 2017 WL 4004419, at *4-6. *Presidio* is instructive. In that case, the Federal Circuit reversed the district court's finding of no irreparable harm. The Federal Circuit found it significant that the parties directly competed, that the two products occupied the same market, that the parties shared some of the same customers, and that the infringer considered the patentee its most significant competitor. *See Presidio*, 702 F.3d at 1363. Those same factors—direct competition in the same market, 700 common customers, and infringers that consider Sight a "Key Competitor"—are all present here and establish that Sight will suffer irreparable harm absent an injunction. *See id.; see also Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1152-53 (Fed. Cir. 2011) (reversing finding of no irreparable harm where patentee presented unrebutted evidence of, among other things, direct competition, loss of market share, and loss of access to potential customers).

### b. The Evidence Shows the Required Causal Nexus Between the Infringement and Irreparable Harm.

To establish irreparable injury, a patentee also must show "that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1377-78 (Fed. Cir. 2020). The infringing features do not need to be the "exclusive or predominant reason" that consumers buy the accused products, there only needs to be "'some connection' between the patented features and the demand for the infringing products." *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 641-42 (Fed. Cir. 2015). "When a patentee alleges it suffered irreparable harm stemming from lost sales solely due to a competitor's infringement, a finding that the competitor's infringing features drive consumer demand for its products satisfies the causal nexus inquiry." *Id.* at 641. Here, the evidence showed a sufficient causal nexus.

First, the Sight patents are directed to the entire device, as opposed to features of a multi-featured product. *See, e.g.*, Ex. E at 47:4-48:18, 62:18-64:17 (claim 8 of the '443 patent is directed

to a "device for reducing intraocular pressure in the eye" having certain recited characteristics, such as minimal wall contact (30% of C)); *see also id.* at 199:14-201:16, 218:11-221:3, 233:11-18, 234:23-235:6 (testimony that while "near death," Ivantis changed the Hydrus design from a full profile to the infringing low-profile design that minimized wall contact to achieve a workable device that could be implanted safely and lowered intraocular pressure). Causal nexus and consumer demand are apparent from the fact of infringing sales. *See Genband US LLC v. Metaswitch Networks Corp.*, 861 F.3d 1378, 1384-85 (Fed. Cir. 2017).

Second, Sight presented evidence that the "value drivers" of the Hydrus were attributable to the Sight patents. For example, Ivantis' documents, when discussing the "Product Positioning & Key Messaging" for the Hydrus, touted the "tri-modal mechanism of action" as a "differentiator" of the Hydrus. PTX0227 at 1, 4, 8. Another Alcon document identified six "value drivers" of the Hydrus that drove customer demand over the closest non-infringing product, Glaukos' iStent. PTX0517 at 25; Ex. E at 72:1-75:14 (Dr. Downs testifying that the "value drivers that Ivantis itself felt like or assessed were the reasons why surgeons might want to implant a Hydrus device over the other stents that were available in the marketplace . . . this is directly in competition with the iStent, which was the other stent that was in the market."). Dr. Downs testified that Hydrus' tri-modal mechanism of action and five of the six identified "value drivers" that differentiate Hydrus and drive customer demand versus the closest non-infringing alternative stent were attributable to the asserted claims of the Sight patents. Ex. E at 71:1-75:16. Thus, Sight presented sufficient evidence to show a causal connection between infringement and lost sales. *Apple*, 809 F.3d at 641.

### 2.     Monetary Damages Are Inadequate to Compensate Sight for Continued Infringement.

As the jury found, Defendants' willful infringement caused Sight to lose sales. The Federal Circuit has recognized than an infringer's increasing market share while infringing the patents "underscores the profitability of infringement and suggests that mere damages will not compensate for a competitor's increasing share of the market, a market in which [the patentee] competes in . . . ." *Douglas Dynamics, LLC v. Buyers Prods., Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013).

Monetary damages are inadequate because Alcon's continued infringement has prevented Sight from expanding its own market share—a harm that is very difficult to quantify. *See Apple*, 809 F.3d at 645 (holding that monetary damages are inadequate where the harm, including harm from lost sales, is difficult to quantify). Sight's strategy for growing its business is to get a foothold with one surgeon at a center and then seek referrals and "spiderweb" to go "deep and wide" within that center. Ex. E at 135:15-136:12. If Alcon's infringement causes even one active or prospective surgeon user of OMNI to instead choose Hydrus, that infringement can have a far-reaching, difficult to quantify impact by causing Sight to lose OMNI sales within the surgery center or hospital where the surgeon practices and preventing Sight from getting the referrals that would expand its business. The Federal Circuit has recognized that where such a "network effect" exists, the inadequate legal remedy factor "strongly weighs in favor" of the patentee because the extent of such "network effect" is "very difficult to quantify." *See Apple*, 809 F.3d at 645 (finding that "the loss by Apple of a single smartphone or tablet customer may have a far-reaching impact on Apple's future revenues" because of the "'network effect,' by which [a customer may] advertise Apple's products to their friends, family, and colleagues").

### 3.    The Balance of Hardships Warrants an Injunction.

The third *eBay* factor—balance of the hardships—also weighs in Sight's favor. Courts, including the Federal Circuit and courts in this District, recognize that "requiring [the patentee] to compete against its own patented invention, with the resultant harms . . . places a substantial hardship on [the patentee]." *Robert Bosch*, 659 F.3d at 1156; *see also Apple*, 809 F.3d at 646; *Wonderland Switzerland AG v. Evenflo Co.*, No. 1:20-cv-00727-JPM, 2023 WL 4098571, at *7 (D. Del. Slip Op. June 7, 2023); *Dasso Int'l, Inc. v. Moso N. Am., Inc.*, No. 17-cv-1574, 2023 WL 5349374, at *21 (D. Del. Slip Op. Aug. 21, 2023).

Alcon, on the other hand, has no basis to complain about any hardship it may suffer. The Hydrus is a miniscule part of Alcon's business. *See* Ex. E at 246:17-248:4. And Ivantis knowingly and intentionally commercialized the infringing Hydrus in August 2018, almost two years after learning of the issuance of Sight's '482 and '443 patents.  Ex. E at 130:1-131:2 (admitting knowledge of the '482 and '443 patents in 2016), 132:7-11 (admitting commercial sales in August 2018). The jury found the Defendants to be willful infringers and the Federal Circuit has repeatedly recognized that "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008) (citation omitted); *see also Robert Bosch*, 659 F.3d at 1156; *see also Wonderland*, 2023 WL 4098571, at *7; *Dasso Int'l*, 2023 WL 5349374, at *21.

The Federal Circuit's rationale is particularly apt here for two reasons. First, as mentioned above, Ivantis knowingly and intentionally brought to market an infringing product because it knew that alternative designs were less-effective and less-safe. *See, e.g.*, Ex. D at 191:10-19 ("They came to us in 2008. We met in 2009. I made [it] clear what we were doing. They knew."); Ex. E at 124:4-6, 130:19-21, 130:25-131:2, 191:4-7, 198:11-14 (no one at Ivantis did anything in

response to learning about the issuance of the '443 and '482 patents), 199:14-201:16 (Hydrus full profile design raised intraocular pressure, company was "near death" and adopted low-profile design to achieve efficacy), 218:11-221:3 (Ivantis went from full profile design to low-profile design because full profile could not be inserted safely), 238:10-239:14 (agreeing that Badawi patent publication was submitted to Patent Office during prosecution of Ivantis patent application in 2009 (PTX0694 at 67-69)); Ex. F at 137:11-17, 139:6-16, 139:21-140:22, 184:9-186:1 (testimony alternative single-radius design was less safe and effective); PTX0123 (showing single-radius design was 50% less effective at increasing outflow); PTX0112 at 51 (reporting safety concerns from testing of single-radius design). Second, Sight filed this lawsuit against Ivantis on September 9, 2021—two months before Alcon decided to exercise its option to purchase Ivantis. Ex. E at 122:12-123:19, 171:11-19; DTX0066; Ex. E at 176:11-177:21. Alcon knew of this case, had no obligation to purchase Ivantis, but went forward with the acquisition with full knowledge of the patents and infringement allegations and without taking any steps to avoid infringement. Ex. E at 177:11-21, 124:4-6 ("Q. Did Alcon consider modifying the Hydrus Microstent to avoid infringement? A. Not on my watch."). Alcon made a knowing and intentional decision to market an infringing product, likely because it had secured a $100 million escrow from which any judgment would be paid.[3] Ex. C (unredacted version of DTX0072) at 116. Alcon is the epitome of a willful infringer who built a business on an infringing product, and this Court should not hear Alcon complain about any hardship that might result from an injunction. Ex. E at 263:12-17 (Alcon is the largest eye-care company in the world and three times larger than its next three competitors combined).

---

[3] This Court excluded reference to the $100 million escrow at trial. But this Court can and should consider it in ruling on Sight's request for an injunction.

### 4. Enjoining Continued Infringement Serves the Public Interest.

The public interest is best served by having a strong patent system that protects and encourages innovation. *See Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 785, 795 (E.D. Va. 1998), *aff'd*, 185 F.3d 1259 (Fed. Cir. 1999). The right to exclude is fundamental to that interest. *Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006). Given this strong interest, "the public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions." *Apple*, 809 F.3d at 647. No other public interest here outweighs the need for protection of patent rights that are the reward for investment-based risk—especially in the medical device field where the technical and regulatory risks of such innovation are so high. *See Sanofi-Synthelabo*, 470 F.3d at 1383 ("[T]he encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude." (citation omitted)). Allowing Alcon to continue infringing to the detriment of Sight—a company founded and self-funded for years by two brothers at great risk—would discourage other innovators from taking similar risks of bringing innovative and beneficial medical treatments to market. Ex. D at 189:24-192:9.

Defendants will likely assert that the public will be disserved if the Hydrus stent is no longer available to patients. Such public interest does not outweigh the importance of protecting patent rights. The evidence at trial—including Alcon's own documents—showed that several different MIGS devices are available to meet patient demand. *See, e.g.,* PTX0480 at 8 (showing nine other MIGS devices on the market); PTX0397 at 7 (BofA market report noting that "MIGS is a competitive market currently with numerous names . . . ."). Further, Alcon acknowledged the "[b]rutal [t]ruths" that "[m]any physicians believe all MIGS work generally the same and do not recognize significant performance difference[s] between devices." PTX0480 at 5. Surgeons thus have several other MIGS devices available, including Sight's OMNI product. Indeed, the evidence

showed that Sight has always had the ability to meet increased demand for its OMNI product. Ex. D at 186:12-187:9 (noting that Sight's manufacturer is contractually obligated to provide 30% more units than Sight's forecasts); Ex. G at 27:13-28:24. The Federal Circuit has recognized that, even where a medical device may be "lifesaving," that fact does not always outweigh the public interest in a strong patent system. Here, the Hydrus is not lifesaving, and the same or similar therapeutic benefits are provided by other products, including OMNI. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1343 (Fed. Cir. 2016) (finding that district court erred in denying permanent injunction on basis that "having more manufacturers of a lifesaving good in the market is better for the public interest."); Ex. D at 83:11-84:16, 176:3-22 (both discussing clinical trial results and effectiveness of OMNI). In fact, as the Federal Circuit noted, "Congress has expressly indicated that injunctions may be granted in cases involving lifesaving goods, such as pharmaceutical drugs." *WBIP*, 829 F.3d at 1343 (citing 35 U.S.C. § 271(e)(4)(B)).

Defendants may also resort to the familiar argument that an injunction is not in the public interest because Sight does not practice its own patent. But courts do not require a patentee to practice its own patent to issue an injunction. *See Broadcom Corp.*, 543 F.3d at 703-04 (affirming permanent injunction against defendant "despite the fact that [patentee did] not . . . practice the claimed inventions"); *Wonderland*, 2023 WL 4098571, at *8 ("The fact that a patentee does not practice a patent does not prevent it from receiving injunctive relief, especially when the Parties are direct competitors in the same market." (citing *Presidio Components*, 702 F.3d 1351)). Indeed, in *Presidio,* the Federal Circuit found that the district court clearly erred in denying a permanent injunction despite the fact that the patentee did not practice its patent. *Presidio*, 702 F.3d at 1363-64. Sight directly competes with the Hydrus with its OMNI product. *See* Section III.A.1.(a) above. Nonetheless, Sight was and is developing its own stent product, the Helix. Ex. D at 78:13-79:22.

13

Sight had legitimate reasons for pausing development of the Helix. As Mr. Badawi testified, while developing the Helix, Sight invented the OMNI system, which Sight could commercialize more quickly given different regulatory requirements, and the company only had the capital to develop one product at that time. Ex. D at 180:10-182:22. Sight has now restarted development, which is in "design freeze," is conducting pre-clinical safety studies and actively discussing the clinical regulatory pathway with the FDA. Ex. D at 182:5-10. In these circumstances, denying an injunction simply because Sight only has one competing product (instead of two) is not in the public interest. The fact that this case involves medical devices is not a "get out of jail free" card for Alcon given the alternative MIGS treatments available, Sight's ability to meet increased demand for OMNI, and the Defendants' willful infringement. All four *eBay* factors weigh heavily in Sight's favor and the Court should enjoin Alcon from selling the Hydrus and any product that is not colorably different from it.

## B.    Alternatively, the Court Should Order Ongoing Royalties

"While an ongoing royalty is not automatic, 'the Federal Circuit has indicated that a prevailing patentee should receive compensation for any continuing infringement.'" *Vectura Ltd. v. GlaxoSmithKline LLC*, C.A. No. 16-638-RGA, 2019 WL 4346502, at *6 (D. Del. Sept. 12, 2019) (citation omitted). Absent an injunction, ongoing royalties are appropriate because "'[a] damages award for pre-verdict sales of the infringing product does not fully compensate the patentee because it fails to account for post-verdict sales . . . .'" *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1303 (Fed. Cir. 2009). If the Court does not grant an injunction, the Court should alternatively order Alcon to pay ongoing royalties for all post-judgment sales of the Hydrus and any product that is not colorably different from it.

The jury's damages award is "a starting point for evaluating ongoing royalties." *Vectura Ltd.*, 2019 WL 4346502, at *7. But there is a "fundamental difference" between "a reasonable

royalty for pre-verdict infringement and damages for post-verdict infringement." *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361 (Fed. Cir. 2008). "When patent claims are held to be not invalid and infringed, this amounts to a 'substantial shift in the bargaining position of the parties.'" *XY, LLC v. Trans Ova Genetics, L.C.*, 890 F.3d 1282, 1297 (Fed. Cir. 2018). Accordingly, "the district court should consider the 'change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability." *Id.* (citation omitted). Here, the Court should award an ongoing royalty consistent with the jury's findings, but enhanced—to $231 per unit—to reflect the changed circumstances post-verdict.

### 1. The Jury's Verdict Equates to a Reasonable Royalty of Approximately $154 Per Unit.

Sight sought and the jury awarded lost profit and reasonable royalty damages. The jury awarded lost profits of $5.5 million and reasonable royalties of $28.5 million for a total award of $34 million. D.I. 507 (Day 5 Tr.) ("Ex. H") at 147:13-148:3. The evidence presented was that, through the date of the verdict, Defendants sold 184,993 infringing Hydrus products that were not the subject of the lost profits analysis. Ex. G at 46:22-47:17. That equates to a reasonable royalty of just over $154 per unit—virtually identical to the $155 per unit suggested by Sight's expert, and supported by the 10% royalty indicated by the Glaukos license agreement and the Alcon acquisition approach used by Mr. Jarosz. Ex. G at 46:15-21, 43:18-44:2.

### 2. The Court Should Increase the Jury's Reasonable Royalty Calculation to Account for Sight's Lost Profit Damages and Changed Circumstances.

While the jury's verdict is a starting point for calculating an ongoing royalty, the Court can increase that amount. As the Federal Circuit has stated, a patentee is entitled to compensation for any continuing infringement. *See Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1378-79 (Fed. Cir. 2010). Here, the jury found that Sight lost profits from Defendants' infringement.

Sight presented undisputed evidence using the market share approach that it had lost a total of 13,736 sales. Ex. G at 31:5-19; PTX0709. The jury's verdict, awarding $5.5 million in lost profits, equates to lost profits suffered by Sight for each sale of over $400 per unit. The reasonable royalty calculated by the jury does not account for those lost profits. Sight—or any licensee—would not agree to a license that did not provide it adequate compensation for the harm done to its own business, particularly having just won a jury verdict that the patents are not invalid, were willfully infringed, and that Sight has suffered lost profits. Indeed, *Georgia Pacific* factor 5 looks at the relationship of the parties—here, competitors—and a license to a competitor requires a higher royalty than a license to a non-competitor. Ex. G at 45:24-46:14. A combination of the lost profit damages and the reasonable royalty damages divided by the total sales of the Hydrus (*i.e.,* $34,000,000 divided by 199,164 infringing sales) equates to a blended per-unit royalty of over $170 per unit. That amount should be the bare minimum ongoing royalty for Alcon's continued infringement.

However, even that amount should be enhanced for two reasons. First, the lost profit award only accounts for actual lost sales that Sight was able to prove in a multi-competitor market using the market share approach. It does not include damages for lost market share resulting from Sight's inability to penetrate certain accounts and obtain referrals necessary to obtain customer accounts and expand efficiently. The fact that such market expansion is impossible to calculate shows why a permanent injunction is necessary. But if the Court declines to issue an injunction, the Court should exercise its discretion and enhance the ongoing royalty to account for both actual lost profits and for the lost opportunity to increase Sight's market share.

Second, a hypothetical negotiation today is different than a hypothetical negotiation in August 2018. The hypothetical negotiation in August 2018 would have been between Ivantis and

Sight. Ex. G at 35:13-18. A hypothetical negotiation today would be between Sight and Alcon. *Georgia Pacific* factors 5 and 6 are far more important today than in August 2018.

Factor 5 is the relationship between the parties. Today, Sight is being asked to license not only a competitor, but the largest eye-care company in the world—a company that is larger than its next three largest competitors combined. Ex. E at 263:12-17. Alcon is in a far better position to take sales from Sight than Ivantis was. *See* Ex. D at 190:23-191:9 (Mr. Badawi noting that Alcon's size has made competition with Hydrus "that much more challenging."). Any ongoing royalty must account for the fact that today, Alcon can harm Sight far more than Ivantis could have harmed Sight in August 2018.

Similarly, *Georgia Pacific* factor 6, which is the ability to make collateral sales, weighs in favor of an enhanced ongoing royalty. Ivantis only commercialized one product, the Hydrus. Ex. E at 201:14-16. Ivantis, in August 2018, was in no position to make collateral sales. Alcon, on the other hand, is. Again, Alcon is the largest eye-care company in the world with a "broad" and "rich portfolio" of products. Ex. E at 245:13-248:4. Alcon's continued infringement could lead to collateral sales of its other products—a fact that warrants a higher reasonable royalty. Ex. E at 247:3-20 (describing Alcon's sale of eye drops for glaucoma and cataract surgery equipment and intraocular lenses that can be used along with the Hydrus, which is implanted at the time of cataract surgery).

Given the changed circumstances and the fact that the jury awarded Sight lost profit damages in addition to reasonable royalties, the Court should require Alcon to pay an ongoing royalty of at least $231 ($154 * 1.5 = $231) per unit—a 50% enhancement to the 10% royalty rate implicit in the jury's award and the 10% license agreed to by Ivantis in the comparable Glaukos agreement that Alcon considered a "win." PTX0418; Ex. G at 181:8-182:4.

If the Court awards ongoing royalties, Sight respectfully requests that it order Alcon and Ivantis to: (i) pay ongoing royalties quarterly, within 14 days after the end of each quarter, (ii) provide a detailed accounting of the calculation of royalties, including by providing quarterly financial reports of sales revenues and unit sales of Hydrus in the U.S. and, separately, O.U.S., as well as customer-level Hydrus sales, and (iii) allow Sight to audit Alcon's and Ivantis's financial reports and royalty payments once per year, at its own expense, if Sight deems it necessary.

## IV.    SIGHT'S MOTION FOR ENHANCED DAMAGES BASED ON THE JURY'S FINDING OF WILLFUL INFRINGEMENT

Following a finding of willfulness, the Court has discretion to award damages over and above the amount awarded by the jury. *I4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 858 (Fed. Cir. 2010). The Court is permitted to enhance damages "up to three times the amount found or assessed." 35 U.S.C § 284. In exercising this discretion, "courts should continue to take into account the particular circumstances of each case in deciding whether to award [enhanced] damages, and in what amount." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 105-06 (2016) ("The subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless" and emphasizing that "Section 284 allows district courts to punish the full range of culpable behavior").

As described in Sections II and III(A)(3) above, the evidence at trial showed and the jury found that Ivantis and Alcon were aware of their infringement of Sight's intellectual property rights, and knowingly and intentionally chose to infringe and to induce others to infringe Sight's patent rights. Enhancement of the jury's damages award is therefore appropriate. The circumstances here are particularly akin to those in *SRI International, Inc. v. Cisco Systems, Inc.*, 254 F. Supp. 3d 680, 721-24 (D. Del. 2017), *aff'd in relevant part*, 14 F.4th 1323, 1329-31 (Fed. Cir. 2021). In *SRI*, the jury found that defendant's infringement was willful and the district court

18

awarded enhanced damages, finding enhancement appropriate in view of defendants' aggressive litigation strategies, defendant's "status as the world's largest networking company, its apparent disdain for [plaintiff] and its business model, and the fact that [defendant] lost on all issues during summary judgment and trial, despite its formidable efforts to the contrary." *Id*. On (a second) appeal, the Federal Circuit affirmed that the finding of willful infringement was supported by substantial evidence, including evidence that defendant did not have any reasonable basis for non-infringement and evidence that its invalidity defenses were unreasonable, where its "only assertion of invalidity over the prior art was based on anticipation by a reference that was twice considered and twice rejected by the Patent Office," and restored the award of enhanced damages. *SRI*, 14 F.4th at 1328-31.

When determining the propriety and amount of enhancement, courts typically consider the factors set forth in *Read Corp. v. Portec Inc.*, 970 F.2d 816 (Fed. Cir. 1992). These factors include: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) Defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by the defendant; (8) Defendant's motivation for harm; and (9) whether the defendant attempted to conceal its misconduct. *Id*. at 826-27. Not all of the *Read* factors need to be present to award enhanced damages. *See, e.g.*, *i4i Ltd.*, 598 F.3d at 858-59 (affirming award of enhanced damages based on trial court's finding that factors 2, 4, 6, 7, and 8 supported enhancement, while factors 1 and 9 and others weighed against); *SRI Int'l*, 254 F. Supp. 3d at 723-24 (enhancing damages based on Defendant's litigation conduct, size and financial condition, "its apparent disdain for [plaintiff]

and its business model," and "the fact [defendant] lost on all issues"). The jury's finding of willful infringement, along with the *Read* factors discussed below, supports enhancement.

### A.    Ivantis and Alcon Failed to Reasonably Investigate Sight's Patents or Form a Good-Faith Belief That They Were Invalid or Not Infringed (*Read* Factor 2)

The evidence at trial showed that Ivantis and Alcon were dismissive of Sight's patent rights. Despite knowing of the Asserted Patents (and the parent application that led to the Asserted Patents) for years prior to the commercial launch of the Hydrus in 2018, Ivantis and Alcon failed to reasonably investigate the scope of the disclosure and of the Asserted Claims and form a good faith belief that the issued claims were invalid or were not infringed. This disregard of Sight's patents rights formed a basis for the jury's willful infringement finding.

Ivantis first learned of the parent application to the Asserted Patents in December 2007, shortly after it was published. Ex. E at 185:19-24; *see also* PTX0036 (Badawi patent application publication). Ivantis's then-CEO, Dave Van Meter, wrote after he was sent Sight's published patent application again in November 2008: "Now that I have opened this and read it, I recognize it. It issued 10 days after I left Abbott, and, trust me, for about 2 hours, I wondered if I had just made a big mistake." PTX0049. Mr. Van Meter testified that during those two hours in December 2007, his concerns were alleviated based on discussions with Jim Shay, Ivantis's patent counsel, and Andy Schieber, one of the engineers who developed the Hydrus. Ex. E at 186:13-187:2, 189:12-18. At trial, Defendants attempted to frame this episode as Mr. Van Meter and Ivantis forming a reasonable belief that the inventions disclosed in the Badawi's patent application were different from Hydrus and did not pose a competitive threat. *See id.* at 188:23-189:3 (Ivantis technical team was "dismissive of the technical promise of the concept . . . .").

However, in finding willfulness, the jury rejected Defendants' insinuation that Ivantis had a reasonable, good-faith belief of non-infringement. Rightly so, because the evidence showed that

any such belief had no reasonable basis, but rather was based only on a cursory review of the

Badawi patent application that led to an incomplete and incorrect understanding of what it

contained. *See, e.g.*, Ex. E at 180:11-24 (implying that the application was limited to "the beads

concept"). Mr. Van Meter admitted that he did not discuss the entire application nor any specific

disclosure of the application with the Ivantis technical team—including Figure 11B, which shows

a support that does not use beads and has a profile similar to the Hydrus. *Id*. at 187:9-12, 189:8-

18, 191:8-19 (did not discuss Fig. 11B), 194:11-14; JTX0002 at Fig. 11B. Indeed, Mr. Van Meter

admitted that he did not read the patent application in December 2007 and still had not read it as

of the time Ivantis first sold the Hydrus in 2018. Ex. E at 187:3-8, 189:16-22, 194:8-10. Ivantis

dismissed Sight's patent application and the technical concepts therein without ever considering

the details of the disclosure.

Defendants' willfulness and lack of a good faith belief of non-infringement or invalidity

was further evidenced by the fact that Ivantis's patent attorney Mr. Shay advised the company to

buy the rights to the Badawis' application and reached out to Sight's patent counsel on behalf of

Ivantis in an attempt to connect the businesspeople for such discussions. PTX0053; Ex. E at

119:12-19 ("But my business advice, if you will, on this patent application was to have Ivantis

possibly augment its patent portfolio by adding something that is different than but in the same

general field as their own technology."), 120:1-4 ("Q. So it's your understanding that Ivantis was

interested in potentially acquiring rights to the '068 publication referenced in this email, right? A.

Yes."). Business representatives from Sight and Ivantis met in early 2009 to discuss Ivantis's

proposal, but no deal was reached, as Sight was not interested in selling its IP rights and Ivantis's

strategy was to purchase the rights for a low price by downplaying and masking its interest. *See*

Ex. D at 179:6-180:7; Ex. E at 120:15-121:1; PTX0060; PTX0062 ("That's pretty funny. You

were going to first act clueless, and now disinterested and clueless. This guy will not know what hit him!").

Mr. Shay's advice and Ivantis's steps to approach Sight regarding its patent application is a recognition that the Badawis' patent application disclosed valuable intellectual property. Indeed, Ivantis described was "near-death" in early 2009 before it made rapid progress on the Hydrus design concept. To make this progress, Ivantis moved from a full-profile design that had far more surface contact with the interior walls of Schlemm's canal to the infringing low-profile design that has far less surface contact. This change greatly increased Hydrus' effectiveness—but also led to Hydrus' infringement of the patents-in-suit. PTX0282 at 12, 14 (Ivantis "near death" before move to low profile design); Ex. E at 199:14-201:13, 233:14-18, 235:1-6 (low profile version came after 2008 studies showed high profile version did not lower IOP). The Badawis' patent application disclosed (and the Asserted Patents claim) devices and methods that restore and promote outflow through the eye's natural outflow pathways by propping open Schlemm's canal while minimizing contact with the walls of the canal (*e.g.*, by having less than 30% wall surface contact) so as not to substantially interfere with transmural flow from the trabecular meshwork and to the collector channels. *See, e.g.*, PTX0036 (Badawi patent application publication) at Abstract, [0040], [0050]-[0052], [0054], Fig. 11B; JTX0002 ('443 patent) at cls. 1, 8; Ex. E at 41:7-22. The technical concepts disclosed and claimed in Sight's patents—which Ivantis initially dismissed—ended up being critical to the design of the Hydrus. The low-profile, commercial Hydrus, in contrast with the version Mr. Shay was evaluating in 2008, was no longer "different than" the Badawis' patent disclosure. But Defendants still ignored Sight's patents.

The evidence at trial further showed that Ivantis became aware of the issued '443 patent and '482 patent in August and November 2016, about two years before commercial launch of the

22

Hydrus in 2018. Ex. E at 130:19-21, 130:25-131:2, 132:7-16, 189:23-190:5. Ivantis did nothing to avoid infringement after learning about the issuance of Sight's patents. *See, e.g.*, Ex. E at 198:11-14 ("Q. But as far as you know, no one did anything in response to learning about the issuance of the '443 and '482 patents in 2016, correct? A. ***Correct***." (emphasis added)). Further, Mr. Van Meter admitted that no one at Ivantis at any time attempted to design around that '443 patent or the '482 patent. *Id.* at 191:4-7 ("Q. Let me just ask the question again. No one at Ivantis, at any time, designed around the '443 patent or the '482 patent, correct? A. Correct."). Similarly, when asked whether "Alcon consider[ed] modifying the Hydrus Microstent to avoid infringement," Ms. Cari Stone, an Alcon executive who was responsible for leading the Ivantis acquisition, responded "[n]ot on my watch." *Id.* at 122:15-124:6.

Despite first learning of the Sight patent application that led to the Asserted Patents and seeking to purchase this application nearly a decade earlier, Defendants offered no evidence that Ivantis or Alcon ever investigated the scope of Sight's patents or formed a good faith belief that they were invalid or not infringed. *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017) (finding substantial evidence, including evidence that defendant knew of the patents before they issued, conducted only a cursory analysis of them, waiting years to seek advice of competent counsel and unsuccessfully trying to buy the asserted patents, supported verdict of willfulness and district court's treble damages enhancement). And, as discussed below, following commencement of the case, Defendants could not have reasonably believed the patents were invalid, as their invalidity theories were based on cumulative prior art that had already been considered by the Patent Office. Ex. F at 161:12-162:3 (all of the prior art was considered by the examiner); D.I. 405-1, Exs. A, C-E to Opp. to Defs' MIL No. 1 (PTAB decisions denying institution of *inter partes* review of challenged Sight patents based on finding

that the same art was considered or cumulative of art considered during prosecution). This factor

favors enhancement. *See, e.g.*, *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 611

(D. Del. 2007) (*Read* factor 2 was the "most relevant" in supporting enhanced award).

### B.    Defendants' Financial Condition Support Enhancement (*Read* Factor 4)

Alcon "is the largest eye care company in the world" and "is larger than its next three

largest competitors combined[.]" Ex. E at 263:12-17. Ivantis is a subsidiary of Alcon, which "is

the global leader in eye care with $9.4 billion in net sales during the year ended December 31,

2003." Exhibit A (Alcon SEC Form 20-F: Annual Report for the fiscal year ended December 31,

2023 (excerpted)) at 29, 31, 60-63. Alcon is by far the largest competitor in the relevant market,

with revenues and resources several orders of magnitude greater than Sight's. *See, e.g.*, Ex. D at

190:23-191:9 ("Q. How has Alcon's acquisition of Ivantis in early 2022 impacted Sight Science's

ability to build a successful company? A. It's gotten a lot harder. They're massive. They're the

number one player in ophthalmology and surgery. They have probably 25,000 employees,

compared to our 200. That's over 100 times of our employees. They have probably 10 billion of

revenue. That's over 100 times more revenue. We're under a hundred million. They're

everywhere; they're in every operating room.").

Because of its size and the fact it "will not be materially impacted by an award of enhanced

damages" this factor also favors enhancement. *nCUBE Corp. v. SeaChange Int'l, Inc.*, 313 F.

Supp. 2d 361, 390 (D. Del. 2004), *aff'd*, 436 F.3d 1317 (Fed. Cir. 2006); *IMX, Inc. v. LendingTree,*

*LLC*, 469 F. Supp. 2d 203, 222 (D. Del. 2007).

### C.    Defendants' Behavior as a Party to the Litigation and Lack of Success at Summary Judgment and Trial Support Enhancement (*Read* Factors 3 and 5)

At every stage of the case, Defendants aggressively pursued every line of defense available,

regardless of its repetitiveness or (lack of) merit. *SRI Int'l*, 254 F. Supp. 3d at 722-23. For example,

Defendants' voluminous prior art-based invalidity arguments (the vast bulk of which were dropped immediately prior to or during trial) were premised on references that were already considered by (or cumulative of references considered by) the Examiner during prosecution, as recognized by the PTAB in its decisions denying *inter partes* review of the challenged Sight patents. *See, e.g.*, JTX0007 at 140, 238-80, 853 ('443 patent prosecution file history showing references were considered by the Examiner); Ex. I, PDX12.170-12.176 (summarizing the evidence showing consideration of the asserted reference during prosecution); Ex. F at 161:12-162:3 (all of the prior art was considered by the examiner); D.I. 405-1, Exs. A, C-E to Opp. to Defs' MIL No. 1 (PTAB decisions denying institution of *inter partes* review based on finding that the same art was considered or cumulative of art considered during prosecution). Indeed, Defendants' technical expert Dr. Tanna opined at trial that the closest prior art was Lynch-984. Lynch-984 was considered by the patent examiner in every one of the patents-in-suit, as it was expressly brought to the examiner's attention by Sight. Ex. F at 73:5-17, 74:25-77:2 (agreeing that Lynch-393 was physically part of the file history and it had the same disclosure as Lynch-984); *compare* DTX0142 (Lynch-984), *with* JTX0007 at 238-80 (Lynch-393).

Defendants also persisted with their 35 U.S.C. § 112-based arguments—including raising them in their motion for summary judgment and at trial—despite Judge Fallon's finding in her Report and Recommendation on claim construction that "[a] person of ordinary skill would be able to distinguish between supports that substantially interfere and those that do not based on a review of the Asserted Patents' written description." D.I. 134 at 23. Defendants objected to the Report and Recommendations and reargued the issue, but Judge Williams affirmed and adopted Judge Fallon's findings and constructions. D.I. 273 at 6-7, 11. Defendants' § 112-based arguments thus

have already been raised to and rejected by Magistrate Fallon and Judge Williams during claim construction, and Judge Hall during summary judgment, as well as the jury.

Further, Defendants' JMOL for noninfringement of the Asserted Claims—which they intend to renew in their post-trial motions (*see* D.I. 498)—was and is baseless, as it is contrary to the overwhelming weight of the evidence that supports the jury's infringement verdict. *See* Ex. G at 215:11-219:6 (summarizing the evidence of infringement). Defendants' scorched-earth litigation strategy needlessly multiplied the work in this case for Sight and for the Court. *SRI Int'l*, 254 F. Supp. 3d at 722-23. And, "despite [their] formidable efforts to the contrary," Defendants "lost on all issues during summary judgment and trial," further supporting an enhancement. *Id.*; D.I. 485 (verdict for Sight and against Defendants on all issues). *Read* factors 3 and 5 thus also favor enhancement.

### D.   The Duration of Defendants' Misconduct and Absence of Remedial Actions Taken by Defendants Support Enhancement (*Read* Factors 6 and 7)

Defendants have been selling the infringing Hydrus product since its commercial launch in August 2018 (years after Defendants learned of the issuance of the '443 and '482 patents in 2016). Defendants further continued to sell the Hydrus after Sight filed its suit against Defendants in September 2021 and after the issuance of the '328 patent in July 2022. *See, e.g.*, PTX0711 (showing Hydrus sales from August 2018 through April 2024).

Ivantis and Alcon took no remedial action to modify the Hydrus to avoid infringement of Sight's patents prior to Hydrus's launch or after this suit was filed, as discussed above, despite their claims that their non-infringing alternative designs would have been acceptable and could have been brought to market in short order. *See* Ex. E at 123:15-124:6, 191:4-7 (testimony that neither Ivantis nor Alcon sought to avoid infringement). They further have given no indication of any plans to modify the Hydrus to avoid infringement following the jury's verdict. Defendants'

"failure to discontinue [their] infringement once notified of [the] suit, and [their] failure to take remedial action to remedy [their] alleged infringement" are "aggravating factors weighing in favor of enhanced damages . . . ." *Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 269, 275 (D. Del. 2001) (citing *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1328 (Fed. Cir. 1987)); *IMX*, 469 F. Supp. 2d at 222-23 (absence of remedial action supported enhancement). *Read* factors 6 and 7 favor enhancement.

### E.    Defendants' Motivation for Harm Supports Enhancement (*Read* Factor 8)

Sight and Ivantis/Alcon are direct competitors in the minimally invasive glaucoma surgery market, and the jury found that Sight has lost sales of its competing OMNI product due to Defendants' infringement. *See* Section III, *supra*. Sight has been forced to compete against Ivantis and Alcon, who have unfairly gained and expanded market share using Sight's intellectual property. *See, e.g.*, Ex. D at 190:19-22, 191:10-19 ("They came to us in 2008. We met in 2009. I made [it] clear what we were doing. They knew."), 191:24-192:9 ("[T]hey knew what we were doing. They disregarded [Sight's IP rights]. I don't know if they didn't think we mattered or what the rationale was, but they disregarded it. They went ahead; they developed [the Hydrus]. They sold it; they're selling it."). Accordingly, this factor also favors enhancement. *See nCUBE*, 313 F. Supp. 2d at 390 (fact that parties "are direct competitors" in the relevant industry supports enhancement).

*    *    *

In sum, the balance of the *Read* factors and the totality of the circumstances in this case support the exercise of the Court's discretion to enhance damages up to two times Sight's damages ($308 per unit), and, at minimum, 1.5 times the damages awarded by the jury ($231 per unit).

## V.    SIGHT'S MOTION FOR AN AWARD OF SUPPLEMENTAL DAMAGES, PRE-JUDGMENT INTEREST, AND POST-JUDGMENT INTEREST

### A.    The Court Should Award Supplemental Damages

Sight respectfully requests an award of supplemental damages for infringement of Sight's patents that occurred after the jury verdict and before the Court's entry of a permanent injunction. "District courts have discretion to award damages for periods of infringement not considered by the jury." *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 38 (Fed. Cir. 2012). Generally, "supplemental damages are calculated based on the jury's damages verdict." *Unifrax I LLC*, 2017 WL 4004419, at *7 (citation omitted), *aff'd*, 921 F.3d 1060 (Fed. Cir. 2019). Here, the jury returned a verdict of infringement and an award of damages that only compensated Sight for Defendants' infringement through April 26, 2024. D.I. 485. Accordingly, Sight requests supplemental damages spanning the period of April 27, 2024 through the Court's entry of a permanent injunction. *See Wonderland Switzerland AG,* No. 1:20-cv-727-JPM, 2023 WL 5497918, at *2 (D. Del. July 24, 2023) ("An award of damages for post-verdict sales should provide compensation for any sales made prior to the entry of an injunction, and the Federal Circuit has held in similar circumstances that it would be error to award damages only up until the date of entry of judgment." (citing *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010))). In order to calculate supplemental damages, Sight requests that the Court order Defendants to provide Sight, within one week, an accounting of sales revenues and unit sales of Hydrus in the U.S. and, separately, O.U.S., as well as customer-level Hydrus® sales for the period between April 27, 2024 and the date of entry of the Court's decision of this post-trial motion. Sight will provide an accounting of the supplemental damages amount to be included in the final judgment within one week thereafter.

In this case, it is appropriate to award supplemental damages plus an enhancement based on the jury's verdict of willful infringement ($308 per unit), or, at a minimum, at the rate requested

for ongoing royalties ($231 per unit). Courts have enhanced supplemental damages based on a finding of willful infringement and an award of enhanced damages. *See Dasso Int'l*, 2023 WL 5349374, at *26 ("This supplemental award is likewise to be enhanced by fifty percent, consistent with the Court's ruling on enhancement of damages under the Patent Act."); *Stryker Corp. v. Davol, Inc.*, 75 F. Supp. 2d 746, 748 (W.D. Mich. 1999) ("Considering the weakness of Davol's arguments justifying its continuing infringing conduct, Davol's culpability is adjudged to warrant doubling of the supplemental damages to which Stryker is entitled."), *aff'd*, 234 F.3d 1252 (Fed. Cir. 2000). Accordingly, Sight requests that the Court award supplemental damages of $154 per unit, doubled for willful infringement to $308 per unit, or, at a minimum a royalty of no less than $231 per unit (a 50% increase) for the reasons discussed above in Section III(B).

**B.      The Court Should Award Pre-Judgment Interest**

The Court should also award Sight prejudgment interest under 35 U.S.C. § 284 to afford Sight complete compensation for Defendants' infringement. In patent cases, "prejudgment interest should be awarded . . . absent some justification for withholding such an award." *Bd. of Regents v. Boston Sci. Corp.*, C.A. No. 18-392, 2024 WL 2848471, at *15 (D. Del. June 5, 2024). "Prejudgment interest is awarded to restore a plaintiff to the position it would have been in had there been no wrongdoing." *ArcherDX, LLC v. Qiagen Scis., LLC*, C.A. No. 18-1019-MN, 2022 WL 4597877, at *18 (D. Del. Sept. 30, 2022); *LG Display Co. v. AU Optronics Corp.*, 722 F. Supp. 2d 466, 475 (D. Del. 2010) ("[P]rejudgment interest should ordinarily be awarded in patent cases to provide patent owners with complete compensation.").

As described in Mr. Jarosz's, Sight's damages expert's, report, the appropriate interest rate due after judgment has been entered in this case is the short-term Treasury bill rate. *See* D.I. 406-1, Ex. 11 to Defs' Reply to MIL No. 3, Jarosz Opening Rep. ("Ex. J") at 125. As described by Mr. Jarosz, this rate is appropriate "because it conforms to the fundamental tenet of finance that

investors who bear less risk should earn lower profits, or returns," and "[s]ince Sight bears virtually no risk that Alcon cannot pay the judgment at issue here, the correct interest rate is a low, relatively risk-free rate." *Id.* Applying the Treasury bill rate, Sight requests $2,661,560 in pre-judgment interest as calculated in the attached Exhibit B.

### C. The Court Should Award Post-Judgment Interest

Finally, the Court should award Sight post-judgment interest as required by statute. Pursuant to 28 U.S.C. § 1961, post-judgment interest on a money judgment "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961 (footnote omitted). Post-judgment interest accrues on the damages awarded by the Court, plus the amount of pre-judgment interest. *See Sun Ship, Inc. v. Matson Navigation Co.*, 785 F.2d 59, 63 (3d Cir. 1986). Applying the statutory rate and for the time elapsed since judgment, Sight requests $178,770 in post-judgment interest as calculated in the attached Exhibit B. Sight additionally requests that the Court order Defendants to pay additional post-judgment interest between June 26, 2024 and Defendants' full payment of the judgment.

## VI. CONCLUSION

Sight respectfully requests that the Court award Sight a permanent injunction against the infringing Hydrus product, or, in the alternative, ongoing royalties on future sales of the Hydrus; enhanced damages due to Defendants' willful infringement; supplemental damages; and pre- and post-judgment interest.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ James L. Higgins*

_____

James L. Higgins (No. 5021)
Stephanie N. Vangellow (No. 7277)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
jhiggins@ycst.com
svangellow@ycst.com

COOLEY LLP
Michelle S. Rhyu
Jeffrey Karr
Lauren Strosnick
Alissa Wood
Juan Pablo González
Angela R. Madrigal
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Orion Armon
Eamonn Gardner
1144 15th Street, Suite 2300
Denver, CO 80202-2686
(720) 566-4000

Dustin M. Knight
Joseph Van Tassel
Reston Town Center
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
(703) 456-8000

Bonnie Fletcher Price
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
(202) 842-7800

Dated: June 25, 2024                    *Attorneys for Sight Sciences, Inc.*

31786559.1

## <u>CERTIFICATE OF SERVICE</u>

I, James L. Higgins, Esquire, hereby certify that on June 25, 2024, I caused to be electronically filed a true and correct copy of Sight Sciences, Inc.'s Opening Brief in Support of its Post-Trial Motions with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

John W. Shaw
Karen E. Keller
Andrew E. Russell
Nathan R. Hoeschen
Shaw Keller LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com

I further certify that on June 25, 2024, I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**<u>BY E-MAIL:</u>**

Gregg LoCascio
Sean M. McEldowney
W. Todd Baker
Steven Dirks
Socrates L. Boutsikaris
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC  20004
gregg.locascio@kirkland.com
sean.mceldowney@kirkland.com
justin.bova@kirkland.com
steven.dirks@kirkland.com
socrates.boutsikaris@kirkland.com

Jeanne M. Heffernan
Kat Li
Austin C. Teng
Ryan J. Melde
Lydia B. Cash
Julie Metkus
Kirkland & Ellis LLP
401 Congress Avenue
Austin, TX  78701
jheffernan@kirkland.com
kat.li@kirkland.com
austin.teng@kirkland.com
ryan.melde@kirkland.com
lydia.cash@kirkland.com
julie.metkus@kirkland.com

Ryan Kane
Nathaniel DeLucia
Emily C. Sheffield
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
ryan.kane@kirkland.com
nathaniel.delucia@kirkland.com
laura.zhu@kirkland.com
emily.sheffield@kirkland.com

Brian A. Verbus
Jacob Rambeau
300 N. LaSalle
Chicago, IL 60654
brian.verbus@kirkland.com
jake.rambeau@kirkland.com

Noah S. Frank
200 Clarendon Street
Boston, MA 02116
noah.frank@kirkland.com

_/s/ James L. Higgins_
James L. Higgins (No. 5021)

31786567.1