## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SIGHT SCIENCES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) C.A. No. 21-1317-JLH-SRF |
| IVANTIS, INC., ALCON RESEARCH | ) |
| LLC, ALCON VISION, LLC, and ALCON | ) |
| INC., | ) |
| | ) |
| Defendants. | ) |

## <u>MEMORANDUM OPINION</u>

James L. Higgins, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE; Michelle S. Rhyu, Jeffrey Karr, Lauren Strosnick, Alissa Wood, Juan Pablo González, and Angela R. Madrigal, COOLEY LLP, Palo Alto, CA; Orion Armon and Eamonn Gardner, COOLEY LLP, Denver, CO; Dustin M. Knight and Joseph Van Tassel, COOLEY LLP, Reston, VA; Bonnie Fletcher Price, COOLEY LLP, Washington, D.C.,

    *Counsel for Plaintiff*

John W. Shaw, Karen E. Keller, Andrew E. Russell, and Nathan R. Hoeschen, SHAW KELLER LLP, Wilmington, DE; Gregg LoCascio, Sean M. McEldowney, Steven Dirks, and Socrates L. Boutsikaris, KIRKLAND & ELLIS LLP, Washington, D.C.; Jeanne M. Heffernan, Kat Li, and Ryan J. Melde, KIRKLAND & ELLIS LLP, Austin, TX; Ryan Kane, Nathaniel DeLucia, and Emily Sheffield, KIRKLAND & ELLIS LLP, New York, NY; Brian A. Verbus and Jacob Rambeau, KIRKLAND & ELLIS LLP, Chicago, IL; Noah S. Frank, KIRKLAND & ELLIS LLP, Boston, MA,

    *Counsel for Defendants*

March 27, 2026

**JENNIFER L. HALL, U.S. DISTRICT JUDGE**

The Court presided over a five-day jury trial. The jury found that Ivantis, Inc., Alcon Research, LLC, Alcon Vision, LLC, and Alcon Inc. (collectively, "Defendants") infringed claims of three patents assigned to Plaintiff Sight Sciences, Inc. ("Sight"): U.S. Patent Nos. 9,370,443 (the "'433 patent"), 8,287,482 (the "'482 patent"), and 11,389,328 (the "'328 patent") (collectively, the "Asserted Patents"). (*See* D.I. 485.) The jury also found that Defendants' infringement was willful. (*See id.*) In addition, the jury found that Defendants failed to prove that any of the asserted claims are invalid. (*See id.*)

Presently before the Court are post-trial motions from both sides. From Defendants are renewed motions for judgment as a matter of law ("JMOL") and a new trial on the issues of infringement, validity, willfulness, and damages. (D.I. 512.) From Sight are motions seeking a permanent injunction, ongoing royalties, supplemental damages, enhanced damages, and pre- and post-judgment interest. (D.I. 515.) The motions have been fully briefed. For the reasons below, the Court will DENY Defendants' requests for JMOL and a new trial; DENY Sight's request for a permanent injunction; GRANT Sight's alternative request for ongoing royalties (including royalties on post-verdict sales); DENY Sight's request for enhanced damages; and GRANT Sight's request for pre- and post-judgment interest.

## I.    Background

Sight is the assignee of the Asserted Patents, which relate to minimally invasive glaucoma surgery ("MIGS") devices. Defendants market a MIGS device called the Hydrus Microstent ("Hydrus").

On September 16, 2021, Sight filed suit alleging that the Hydrus infringes the '482 and '433 patents, as well as U.S. Patent No. 9,486,361 (the "'361 patent") and U.S. Patent No.

2

10,314,742 (the "'742 patent").  (D.I. 1.)  On August 1, 2022, Sight filed a second amended complaint, which added a claim for infringement of the newly-issued '328 patent.  (D.I. 59.)  On September 15, 2022, Defendants denied the allegations and asserted counterclaims for declaratory judgments of noninfringement and invalidity.  (D.I. 77.)

On February 9, 2023, Magistrate Judge Sherry R. Fallon conducted a Markman hearing, and on March 9, 2023, issued a Report and Recommendation regarding claim construction (D.I. 134), which was adopted by District Judge Gregory B. Williams on August 17, 2023 (D.I. 273, 287 ("Claim Construction Order")).

On January 10, 2024, the Court reassigned the case to me.  I presided over a jury trial from April 22, 2024 to April 26, 2024.  (*See* D.I. 503 ("Tr.1"), 504 ("Tr.2"), 505 ("Tr.3"), 506 ("Tr.4"), 507 ("Tr.5").)  At trial, Sight asserted claim 11 of the '482 patent, claims 8, 24, and 58 of the '443 patent, and claim 18 of the '328 patent (collectively, the "Asserted Claims").[1]  The jury found that Sight proved by a preponderance of the evidence that Defendants directly infringed claim 11 of the '482 patent and claims 8, 24, and 58 of the '443 patent, and that Defendants induced infringement of claim 18 of the '328 patent.  (D.I. 485.)  The jury also found by a preponderance of the evidence that Defendants' infringement was willful.  (*Id.*)  In addition, the jury found that Defendants failed to prove by clear and convincing evidence that claim 8 of the '443 patent was anticipated or that any of the Asserted Claims were obvious.  (*Id.*)  The jury further found that Defendants failed to prove by clear and convincing evidence that claim 11 of the '482 patent or claims 8, 24, or 58 of the '443 patent were invalid for lack of enablement or inadequate written

---

[1] The claims and counterclaims pertaining to the '361 and '742 patents have been dismissed.  (D.I. 599.)

description. (*Id.*) And the jury found that Sight had proven by a preponderance of the evidence that it was entitled to lost profits of $5.5 million and a reasonable royalty of $28.5 million. (*Id.*)

On May 21, 2024, the Court entered judgment on the jury's verdict. (D.I. 509.) On June 18, 2024, the parties filed the pending post-trial motions.

## II.    Asserted Patents and Claims

The Asserted Patents describe devices that are implantable into the Schlemm's canal of the eye to reduce intraocular pressure. Claim 11 of the '482 patent depends on claim 10, which depends on claim 1:

> 1. A device comprising:
> a support having at least one fenestration that is longitudinally insertable into a lumen of Schlemm's canal, the support having a cross-sectional dimension sufficient to at least partially prop open Schlemm's canal upon insertion into the canal, and to thereby maintain patency of at least a portion of the canal so that **fluid may traverse the canal without substantial interference from the support**,
> wherein when the support is disposed within a lumen of Schlemm's canal, contact between the support and a wall of the canal is discontinuous along a perimeter of the lumen of the canal, and wherein when the support is disposed within a cylindrical section of the lumen of the canal having an internal wall surface area C, the support contacts less than 30% of C.
>
> 10. The device of claim 1, wherein the support comprises a shape memory material.
>
> 11. The device of claim 10, wherein the support comprises a nickel titanium alloy.

Claim 8 of the '443 patent depends on claim 1. Claim 24 of the '443 patent depends on claim 23, which depends on claim 21, which depends on claim 1. Claim 58 of the '443 patent is independent. Those claims provide:

> 1. A device for reducing intraocular pressure in an eye having a Schlemm's canal and a trabecular meshwork, comprising: a support

4

implantable circumferentially within Schlemm's canal and configured to maintain the patency of at least a portion thereof, wherein the support comprises an **arcuate member, wherein at least a portion of the arcuate member has a radius of curvature smaller than the radius of curvature of Schlemm's canal so that at least a portion of the arcuate member is configured to extend out of Schlemm's canal and into the trabecular meshwork** and wherein **the support does not substantially interfere with transmural flow across Schlemm's canal**, and wherein when the support is disposed within a cylindrical section of the lumen of the canal having an internal wall surface area C, the support contacts less than 30% of C.

8. The device of claim 1 wherein the support has at least one fenestration.

21. The device of claim 1 wherein at least a portion of the support is made from a shape memory material.

23. The device of claim 21 wherein the shape memory material comprises a shape memory alloy.

24. The device of claim 23 wherein the shape memory alloy comprises a nickel titanium alloy.

58. A kit for reducing intraocular pressure in an eye having a Schlemm's canal and a trabecular meshwork comprising:
a support implantable circumferentially within Schlemm's canal and configured to maintain the patency of at least a portion thereof, wherein the support comprises an **arcuate member, wherein at least a portion of the arcuate member has a radius of curvature smaller than the radius of curvature of curvature of Schlemm's canal so that at least a portion of the arcuate member is configured to extend out of Schlemm's canal and into the trabecular meshwork** and wherein **the support does not substantially interfere with transmural flow across Schlemm's canal**, and wherein when the support is disposed within a cylindrical section of the lumen of the canal having an internal wall surface area C, the support contacts less than 30% of C; and
an introducer for delivering the support.

Claim 18 of the '328 patent depends on claim 1:

1. A method for reducing intraocular pressure in a patient using a support and an introducer comprising a cannula, comprising:

5

positioning a distal end of the cannula at or near Schlemm's canal, wherein the support is located in a lumen of the cannula; and

pushing the support distally out of the distal end of the cannula to insert the support circumferentially within Schlemm's canal,

wherein the support comprises an **arcuate member, wherein at least a portion of the arcuate member has a radius of curvature $R_{supp}$ smaller than the radius of curvature of Schlemm's canal such that at least a portion of the arcuate member extends out of Schlemm's canal**.

18. The method of claim 1, wherein the support extends about one quarter of the way around Schlemm's canal after insertion into the canal.

## III.    Legal Standards

### A.  Judgment as a Matter of Law

JMOL may be entered against a non-moving party if the Court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue." Fed. R. Civ. P. 50(a)(1). JMOL is appropriate "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

For issues on which the moving party had the burden of proof at trial, entry of JMOL after a jury verdict "is rare[] [and] reserved for extreme circumstances." *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976). To grant JMOL in favor of a party with the burden of proof, the court "must be able to say not only that there is sufficient evidence to support the finding [sought by the moving party] . . . but additionally that there is insufficient evidence for permitting any different finding." *Id.* (quoting 9 Wigmore on Evidence § 2495 at 306 (3d ed. 1940)); *see also Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1333 (Fed. Cir. 2019) ("[W]here the

6

movant b[ears] the burden of proof on an issue, JMOL is only granted where 'there is insufficient evidence for permitting any different finding.'" (quoting *Fireman's Fund*, 540 F.2d at 1177)).

### B.  Motion for a New Trial

A new trial may be granted to all or any of the parties and on all or part of the issues in an action "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  The decision of whether to grant a new trial is a question committed to the district court's discretion.  *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).  "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience."  *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).

### IV.    Defendants' Request for JMOL of No Direct Infringement

"To prove infringement, the patentee must show that an accused product embodies all limitations of the claim either literally or by the doctrine of equivalents."  *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1340 (Fed. Cir. 2013).  "A two-step analysis is employed in making an infringement determination."  *Intell. Ventures I, LLC v. Canon Inc.*, 104 F. Supp. 3d 629, 637–38 (D. Del. 2015) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)).  "First, the court must construe the asserted claims to ascertain their meaning and scope."  *Id.* at 638.  Second, the trier of fact must "compare the properly construed claims with the accused infringing product" to determine whether the product embodies the claims as construed.  *Id.*  "This second step is a question of fact."  *Id.* (citing *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998)).  The burden of proof is on the patentee to prove by a preponderance of the evidence

7

that the accused product satisfies every limitation of the patent claims.  *See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005).

The jury found that Defendants directly infringed claims 8, 24, and 58 of the '443 patent and claim 11 of the '482 patent.  (D.I. 485 at 2.)  Defendants argue that "[n]o reasonable jury could find Sight met its burden of proof for infringement."  (D.I. 518 at 3.)  I disagree.

### A.  The "Substantially Interfere" Limitations

Defendants assert that they are entitled to JMOL on the issue of infringement because no reasonable jury could find that the Hydrus meets the "substantially interfere" limitations of independent claim 1 of the '482 patent and independent claims 1 and 58 of the '443 patent.  (D.I. 518 at 3–4.)  The Court previously construed those limitations and instructed the jury as follows:

| Claim 1 of '482 patent: | Court's construction: |
|---|---|
| "fluid may traverse the canal without substantial interference from the support" | "the support does not significantly block either fluid outflow from the trabecular meshwork or fluid outflow to the collector channels" |
| **Claims 1 and 58 of '443 patent:** "support does not substantially interfere with transmural flow across Schlemm's canal" | |

(D.I. 287.)

Defendants contend that the Court should grant JMOL of noninfringement because "Sight provided no evidence that ***actual flow*** occurs through the trabecular meshwork and the Hydrus's windows when the Hydrus is implanted."  (D.I 518 at 3 (emphasis added).)  Defendants' argument essentially goes like this:  Sight's expert took the position that the "substantial interference" limitations require flow to occur (not just an opening that could permit flow).  The inventor of the Asserted Patents admitted that you can't determine whether flow is actually occurring unless you implant and test the device.  Sight's expert did no such testing, nor did he sufficiently explain his opinion that flow would occur.  Because the record lacks any evidence that flow would occur, the

Court should grant judgment as a matter of law that the Hydrus does not infringe the asserted claims of the '482 and '443 patents.

To the extent Defendants suggest that Sight needed to present *in situ* testing data to prove infringement, that is not the law. *See Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006) ("A patentee may prove direct infringement or inducement of infringement by either direct or circumstantial evidence."). In determining whether the Hydrus does not significantly block fluid outflow from the trabecular meshwork or fluid outflow to the collector channels, the jury was entitled to credit Defendants' own physician training materials and communication with the FDA, which suggested that the Hydrus enhances fluid outflow from the trabecular meshwork and to the collector channels. For example, Hydrus training materials informed surgeons that "[t]he Hydrus Microstent [] has 3 large windows that face the trabecular meshwork to allow aqueous to easily pass through the trabecular meshwork into Schlemm's canal" and that the "[o]pen-window scaffold design provides outflow pathways for aqueous." (PTX0276 at 5; Tr.2 at 51:20–52:8.) The same materials also say that the Hydrus "[a]llows for enhanced aqueous outflow through the open windows of the stent," and that the Hydrus was shaped and sized "to provide multiple inflow and outflow opportunities" and was "not dependent solely on a single bypass point to effectively reduce intraocular pressure." (PTX0276 at 12.) The training materials also contain illustrations depicting outflow. (*See, e.g.*, *id.*; *see also* PTX0240 at 5; Tr.2 at 43:21–44:13.) As another example, Defendants told the FDA that "[t]he open windows also allow natural flow through the trabecular meshwork." (PTX0092 at 29; Tr.2 at 52:9–18; *see also* PTX0196 at 26–30, 63–69; PTX0401 at 1–3; Tr.2 at 42:5–14, 43:3–44:23, 47:9–48:7, 59:9–12.)

That evidence alone is substantial enough to support the jury's determination that the Hydrus meets the "substantially interfere" limitations. But there was more. Sight's technical

9

expert, Dr. Downs, opined that the design of the Hydrus is such that it does not significantly block either fluid outflow from the trabecular meshwork or fluid outflow to the collector channels. (Tr.2 at 52:23–56:16.) Specifically, Dr. Downs testified that he performed a parametric fluid mechanics analysis showing that the Hydrus's design creates a pressure differential that drives flow through the open windows of an implanted Hydrus.[2] (Tr.2 at 54:8–11, 55:9–12, 55:21–23.)

Defendants also make much of the fact that one of the inventors of the Asserted Patents—who testified as a fact witness—stated that "to determine if an implant significantly affects outflow in humans, . . . you would have to test it and do trials." (D.I. 518 at 4 (quoting Tr.1 at 120:15–25) (emphasis omitted).) Even assuming that testimony is probative of whether the Hydrus meets the "substantially interferes" limitation, the jury was not required to credit it. Sight presented other evidence of infringement, and the jury was free to rely on it.

### B. The "Arcuate Member" Limitations

Defendants next assert that they are entitled to JMOL on the issue of infringement because no reasonable jury could find that the Hydrus meets the "arcuate member" limitations of independent claim 1 of the '328 patent and independent claims 1 and 58 of the '443 patent. (D.I. 518 at 6–7.) The Court previously construed the "arcuate member" limitation and instructed the jury as follows:

| Claim 1 of '328 patent and claims 1 and 58 of '443 patent:<br>"arcuate member" | Court's construction:<br>"a structure having one or more curved portions" |
|---|---|

(D.I. 287.) The relevant claims each require that a portion of the **arcuate member** extends out of the Schlemm's canal. Defendants argue that the Hydrus doesn't infringe because (i) Sight pointed

---

[2] Defendants say that Dr. Downs' testimony should be disregarded because it was "conclusory" and "unsupported." (D.I. 547 at 2.) I disagree. Downs sufficiently explained the fluid mechanics principle that governed his analysis.

to the Hydrus "transition zone" as meeting the "arcuate member" limitation and (ii) the evidence showed that the "transition zone" is "straight." (D.I. 518 at 6–7.)

The question for the Court is whether there is substantial evidence to support the jury's determination that the Hydrus has a curved portion that extends out of the Schlemm's canal. There is. A Hydrus design document describes the relevant portion of the Hydrus as curved. (PTX0446 at 1, 6 ("The inlet radius should be formed to a smaller radius than the canal so that the inlet protrudes slightly into the anterior chamber . . . ."); Tr.2 at 27:21–28:19; Tr.3 at 129:14–132:4.) The same document specifies that the "[i]nlet curvature" be radiused at 0.128 inches (less than that of Schlemm's canal), and further states that the "Hydrus inlet portion" is required to be curved with a smaller diameter/radius than that of Schlemm's canal. (PTX0446 at 6; *see also* Tr.3 at 141:21–25, 145:7–13; PTX0357 at 1 ("Essentially the curvature of the inlet is smaller than the curvature where the windows are.").)[3] An engineering drawing of the Hydrus also showed the relevant portion as curved. (Tr.2 at 30:8–16, 34:18–36:1, 57:4–60:8, 113:9–25, 114:3–16; PTX0267 at 2; *see also* Tr.2 28:20–30:7, 59:9–60:20, 230:24–231:21; PTX0196 at 63–64; PTX0120 at 1–2.)

According to Defendants, Sight presented evidence that "something is curved, but no evidence it is the transition zone that is curved, as required." (D.I. 518 at 7.) But the jury heard evidence that the transition zone is part of the inlet, and there was evidence that the entire inlet is

---

[3] Defendants alternatively request a new trial on the basis that the cited testimony from Dr. Galanis was improper rebuttal and outside the scope of his expert report. (D.I. 518 at 8.) I disagree. I ruled during trial that Dr. Galanis's testimony on the curvature is proper rebuttal testimony and within the scope of his report. (Tr.3 at 144:24–145:4.) And, as I explain later, for the same reasons I determine there is substantial evidence supporting the jury's verdict on this issue, I also conclude that the jury's verdict was not against the clear weight of the evidence.

curved.  (*See, e.g.*, Tr.2 at 59:9–62:16; PTX0240 at 49; PTX0267 at 1–2; PTX0196 at 63–64.) Based on that, the jury was free to infer that the transition zone was curved.

Defendants point to evidence in the record suggesting that the relevant portion of the Hydrus is straight.  The jury could have believed that evidence.  But they didn't.  Because substantial evidence supports the jury's implicit determination that the Hydrus satisfied the arcuate member limitation, JMOL is not warranted.

## V.    Defendants' Request for JMOL of No Induced Infringement

"A defendant is liable for induced infringement under [35 U.S.C. §] 271(b) if the defendant took certain affirmative acts to bring about the commission by others of acts of infringement and had knowledge that the induced acts constitute patent infringement."  *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1286 (Fed. Cir. 2020) (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765–66 (2011)) (internal quotation marks omitted).  "The intent element requires knowledge that the induced acts constitute patent infringement, which can be established by a proper finding of willful blindness."  *Id.* (citing *Global-Tech*, 563 U.S. at 766–71) (internal quotation marks omitted).  The burden of proof is on the patentee to prove induced infringement by a preponderance of the evidence.  *Corcept Therapeutics, Inc. v. Teva Pharms. USA, Inc.*, No. 24-1346, 2026 WL 468866, at *3 (Fed. Cir. Feb. 19, 2026).

Defendants argue that the Court should grant JMOL that it did not induce infringement of method claim 18 of the '328 patent.  According to Defendants, (i) the Hydrus doesn't satisfy the "arcuate member limitation" and (ii) Defendants lacked the "requisite knowledge" because they "learned of the patent only ***after*** litigation began and ***after*** the Hydrus design was finalized."  (D.I. 518 at 9–10.)  I reject the first argument for the reasons explained above.  As to the second, Defendants haven't cited any authority for the proposition that you can't be liable for induced

12

infringement on a go-forward basis if you "finalize" the design of your infringing product before you learn about a patent. The jury heard evidence that Defendants made no changes to the design of the Hydrus after learning of the patent and continued to instruct doctors about how to use it. (Tr.1 at 275:9–276:21, 283:14–20, 288:2–289:1; Tr.2 at 24:6–14, 124:4–6, 191:4–7; PTX0585; PTX0230.) Because substantial evidence supports the jury's determination that Defendants induced others to infringe claim 18 of the '328 patent, JMOL for Defendants is not warranted.

## VI.    Defendants' Request for JMOL of Invalidity for Lack of Enablement

A patent is enabled when its specification describes the claimed invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art to make and use the invention." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 612 (2023) (quoting 35 U.S.C. § 112(a)) (internal quotation marks omitted). "[T]he specification must enable the full scope of the invention as defined by its claims." *Id.* at 610. A patent need not "describe with particularity how to make and use every single embodiment within a claimed class." *Id.* at 610–11. But "[i]f a patent claims an entire class of processes, machines, manufactures, or compositions of matter, the patent's specification must enable a person skilled in the art to make and use the entire class." *Id.* at 610. This does not mean that "a specification necessarily [is] inadequate just because it leaves the skilled artist to engage in some measure of adaptation or testing." *Id.* at 611. "[A] specification may call for a reasonable amount of experimentation to make and use a patented invention." *Id.* at 612. "In other words, 'the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation.'" *Baxalta Inc. v. Genentech, Inc.*, 81 F.4th 1362, 1365 (Fed. Cir. 2023) (quoting *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012)). Factors that may be considered to determine whether a claimed invention requires undue experimentation include:

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

*Amgen Inc. v. Sanofi, Aventisub LLC*, 987 F.3d 1080, 1084 (Fed. Cir. 2021) (quoting *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988)); *see also Baxalta Inc.*, 81 F.4th at 1367 ("We do not interpret [the Supreme Court's decision in] *Amgen* to have disturbed our prior enablement case law, including *Wands* and its factors.").

"Enablement is a legal question based on underlying factual determinations." *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 684 (Fed. Cir. 2015). "Because patents are presumed valid, lack of enablement must be proven by clear and convincing evidence." *Baxalta Inc.*, 81 F.4th at 1365 (quoting *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010)). The Court is required to "review the factual underpinnings of enablement for substantial evidence" and "treat the jury as having made all verdict-supporting factual findings that are supported by substantial evidence." *Pac. Biosciences of Cal., Inc. v. Oxford Nanopore Techs., Inc.*, 996 F.3d 1342, 1350 (Fed. Cir. 2021) (citing cases).

The jury found that Defendants failed to prove by clear and convincing evidence that claim 11 of the '482 patent or claims 8, 24, or 58 of the '443 patent are invalid for lack of enablement. (D.I. 485 at 6.) Defendants assert that they are entitled to JMOL because the specification does not enable a skilled artisan to make and use the full scope of claimed supports that do not "substantial[ly] interfer[e] with" flow. (D.I. 518 at 11.) I understand Defendants' point to be that— while a skilled artisan could construct a physical device that meets the structural limitations of the asserted claims—the patents-in-suit do not teach which devices having those structural limitations would satisfy the functional "substantially interfere" limitation. Defendants assert that the claims

14

are broad, the art is unpredictable, and that the patents-in-suit do not disclose sufficient guidance or examples. (D.I. 518 at 10–14.) So, Defendants say, a skilled artisan would have to perform undue experimentation to understand which devices would not substantially interfere with flow. (*Id.*)

I disagree that Defendants are entitled to JMOL of invalidity for lack of enablement. As an initial matter, it is undisputed that the specifications do not disclose any working examples. And the inventors prepared no prototypes or models before filing the patent applications. (Tr.1 at 97:10–20, 98:17–100:6, 104:1–105:6, 106:12–16, 112:4–8, 120:2–121:3; *see also* Tr.3 at 50:25–51:9.) That said, the patents explain how prior art hollow tubular stents have "significant surface area contact with the trabecular meshwork and/or the collector channels, which can result in blockage of the meshwork or collector channels, substantially interfering with transmural flow" across the canal. ('443 patent, 2:43–49; '482 patent, 2:41–47.) And the patents further explain that "minimal support contact with canal walls allows a support to maintain patency of the canal without substantially interfering with transmural flow across the canal." *See* '443 patent, 11:30–33; '482 patent, 11:30–33. So, while the inventors may not have disclosed working examples in the specification, the specification does disclose a relationship between surface area contact and a propensity to not substantially interfere with flow. (Tr.1 at 73:8–74:10.)

The dispute comes down to a factual dispute over the predictability in the art and the level of experimentation required to practice the claimed invention. Defendants contend that the art is highly unpredictable, and they point to studies performed by Sight in 2010 (after the original patent application was filed in 2006) that achieved varying levels of success. (DTX0125; DTX1039; Tr.3 at 194:6–195:1; Tr.1 at 125:16–128:9, 130:2–134:7, 138:6–139:6, 256:3–258:22.) Defendants also point to witness testimony that there were no methods in 2006 to test or measure how fluid flows

across the trabecular meshwork or the collector channels in a live human eye. (DTX115 at 3 (Sight's CMO Brown: a "problem[] is that we do not understand outflow . . . . We do not know how fluid flows in the trabecular meshwork or the collector channels, and we do not have a way to follow outflow."); Tr.2 at 271:13–19 (Brown confirming that "there was no reliable way to actually look at and determine how fluid was behaving in the eye, fluid outflow"); Tr.3 at 231:21–232:2 (Parrish admitting that he was "not aware of any in vivo study for assessing flow in Schlemm's canal in 2006"); *id.* at 94:7–11 (Iwach testifying that there were no methods to show "flow across the meshwork" in 2006); *id.* at 53:5–54:12 (Tanna confirming cadaver tests are insufficient).)

Although there may have been no method to measure flow in live eyes in 2006, Sight's expert, Dr. Downs, testified that flow could be modeled and tested several ways, such as by using long-known fluid dynamics analysis and perfusion studies. (Tr.3 at 179:15–181:22.) Defendants' experts, Drs. Iwach and Tanna, acknowledged the existence of those techniques. (*E.g.*, *id.* at 136:16–137:10 (Dr. Iwach discussing perfusion studies); *id.* at 58:4–8 (Dr. Tanna testifying that analytical and computational models such as "a fluid dynamics analysis . . . can be used to examine the flow of aqueous humor into and within Schlemm's canal when the device is present . . . ."); PTX0123.) Dr. Downs also walked through the *Wands* factors and explained to the jury that a skilled artisan could look to the structural limitations of the asserted claims and use computational and mathematical models to determine which devices having those structural characteristics will (or at least are likely to) not substantially interfere with flow. (Tr.3 at 175:13–182:25.) Dr. Downs also explained that perfusion studies may need to be performed to determine whether a certain embodiment meeting the other physical limitations of the claims does not substantially interfere

16

with flow.  But, according to Dr. Downs, such optimization is routine and not undue.  (Tr.3 at 181:23–182:10, 209:25–210:3, 211:12–19.)

Defendants point to witness testimony suggesting that some amounts of trial-and-error experimentation were necessary.  (Tr.1 at 139:15–141:6; DTX0165; *see also* Tr.1 at 120:15–25; Tr.3 at 193:3–9; DTX0136 at 3–4.)  But that evidence does not, as Defendants suggest, "overwhelmingly confirm[]" lack of enablement requiring "tremendous trial-and-error experimentation." (D.I. 518 at 11.)  Dr. Downs and Dr. Badawi testified that, if experimentation were needed, it would be limited and routine.  (*See, e.g.*, Tr.3 at 179:15–180:5; Tr.1 at 116:17–23, 164:11–165:5.)

Having carefully reviewed the record in the light most favorable to Sight, I conclude that this is not one of those "rare" or "extreme" circumstances where I must say that there is insufficient evidence to conclude anything other than a lack of enablement.  *Fireman's Fund*, 540 F.2d at 1177. Because there is substantial evidence to support the conclusion that Defendants failed to prove non-enablement by clear and convincing evidence, JMOL is inappropriate.

## VII.    Defendants' Request for JMOL of Invalidity for Lack of Written Description

To comply with the written description requirement of 35 U.S.C. § 112(a), a patent specification "must describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is claimed." *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005); *see also Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351–54 (Fed. Cir. 2010) (en banc).  "[T]he written description requirement does not demand either examples or an actual reduction to practice; a constructive reduction to practice that in a definite way identifies the claimed invention can satisfy the written description requirement." *Ariad*, 598

17

F.3d at 1352.  But "a description that merely renders the invention obvious does not satisfy the requirement."  *Id.*  Whether a specification satisfies the written description requirement is a question of fact.  *See GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*, 744 F.3d 725, 729 (Fed. Cir. 2014).

The jury found that Defendants failed to prove by clear and convincing evidence that claim 11 of the '482 patent or claims 8, 24, or 58 of the '443 patent were invalid for lack of adequate written description.  (D.I. 485 at 7.)  Defendants contend that those claims are invalid for lack of adequate written description for reasons "similar" to why they are invalid for lack of enablement. (D.I. 518 at 14.)  Specifically, Defendants assert that the patents "do not indicate which support(s) achieve the claimed function of not 'substantial[ly] interfer[ing] with' flow."  (*Id.* at 14.)

Having carefully reviewed the record in the light most favorable to Sight, I conclude that this is not one of those "rare" or "extreme" circumstances where I must say that there is insufficient evidence to conclude anything other than a lack of adequate written description.  *Fireman's Fund*, 540 F.2d at 1177.  For one thing, both sides' experts only briefly testified about written description at trial.  Defendants contend that the inventors did not actually disclose "a viable stent that practices the Asserted Claims."  (D.I. 547 at 9.)  But working examples are not required.  *See Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*, 745 F.3d 1180, 1190–91 (Fed. Cir. 2014) ("There is no requirement that the disclosure contain 'either examples or an actual reduction to practice.'" (quoting *Ariad*, 598 F.3d at 1350, 1352)).  Prophetic examples can suffice.  *Ariad*, 598 F.3d at 1357.  What's more, Sight's expert, Dr. Downs, testified that the specification discloses—not only sufficient examples to support the structural claim limitations—but also the relationship between surface area contact and the propensity not to interfere with flow, which provides support for the "substantially interfere" claim limitations.  (Tr.3 at 183:9–184:8; *see* '482 patent, 10:61–65, 11:24–38, Figs. 9A,

18

11B; '443 patent, 8:4–6, 10:49–53, 10:61–66, 11:24–38, Figs. 5B, 6C, 7B, 8A–8H, 9A, 10C, 11B, 12G, 13; D.I. 534, Ex. 7 at PDX07.31–.33.)

## VIII.   Defendants' Request for JMOL of No Willful Infringement

The jury found that Sight proved by a preponderance of the evidence that Defendants' infringement of the Asserted Claims was "willful."  (D.I. 485 at 11.)  A finding of "willful infringement" requires a showing that the defendant knew of the patent and then engaged in "deliberate or intentional infringement."  *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1296 (Fed. Cir. 2023) (citation omitted).

Technically speaking, "willful infringement" is not an independent claim for relief; rather, it is a factual finding that may support a court's decision to increase infringement damages under 35 U.S.C. § 284.  *Id.* ("[T]he court may increase the damages up to three times the amount found or assessed."); *see also Ironburg*, 64 F.4th at 1295.  For the reasons explained below, the Court will exercise its discretion not to enhance damages.  Nevertheless, Federal Circuit precedent requires district courts to "provide[] a ruling" on a party's request for JMOL that any infringement was not willful, even when the court does not increase damages.  *Ironburg*, 64 F.4th at 1295.

There is no dispute that Defendants were aware of the '443 and '482 patents at least by 2016, after Defendants had designed the Hydrus but before they started selling it, and that Defendants made no attempt to implement a redesign to get around the patent claims before they started selling the Hydrus.  (*See also* Tr.2 at 130:19–21, 130:25–131:2, 189:23–190:5; PTX0575 (knowledge of patents); Tr.2 at 123:4–124:6, 132:7–16, 191:4–7, 198:11–14 (no attempt of redesign).)  In accordance with Defendants' proposed jury instructions (which accorded with the law), I instructed the jury that they "may not find that [] infringement was willful merely because [Defendants] knew about the patent without deliberate or intentional infringement" and that they

19

"must consider all of the circumstances . . . at the time the challenged conduct occurred" in determining whether Defendants "intentionally infringed." (Tr.5 at 49:12–51:12.) The jury could infer, based on the evidence presented at trial, that Defendants acted with the requisite "intentional" state of mind. *See Purewick Corp. v. Sage Prods., LLC*, 666 F. Supp. 3d 419, 441 (D. Del. 2023); *Med-El Elektromedizinische Gerate Ges.M.B.H. v. Advanced Bionics, LLC*, No. 18-1530, 2024 WL 4371292, at *9–10 (D. Del. Oct. 2, 2024); *see also SynQor, Inc. v. Vidor Corp.*, No. 24-1879, 2026 WL 410931, at *7–8 (Fed. Cir. Feb. 13, 2026); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1329 (Fed. Cir. 2021).[4]

Thus, given the substantial evidence of willful infringement, I will deny Defendants' request for JMOL that any infringement was not willful.

## IX.    Defendants' Request for JMOL on Damages

Defendants next request JMOL on the issue of damages. Under the Patent Act, "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284.

"To recover [damages in the form of] lost profits, the patent owner must show 'causation in fact,' establishing that 'but for' the infringement, he would have made additional profits." *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999) (quoting *King*

---

[4] Defendants cite *Plastic Omnium Advanced Innovation & Rsch. v. Donghee Am., Inc.*, 387 F. Supp. 3d 404, 421–22 (D. Del. 2018), for the proposition that evidence of failure to design around is insufficient to support the jury's verdict. (D.I. 518 at 16–17.) That case had granted summary judgment of no willfulness in part because it found "no evidence of record from which a reasonable jury could find egregious conduct." *Plastic Omnium*, 387 F. Supp. 3d at 421–22 (citing cases assessing egregious, deliberate, or wanton conduct). But the Federal Circuit has since clarified that the standard for finding willful infringement is not the same standard for an award of enhanced damages, and willfulness only "requires a jury to find no more than deliberate or intentional infringement." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1329–30 (Fed. Cir. 2021).

*Instruments Corp. v. Perego*, 65 F.3d 941, 952 (Fed. Cir. 1995)).  One test for establishing lost profits is the *Panduit* test, which says that "a patentee is entitled to lost profit damages if it can establish four things: (1) demand for the patented product; (2) absence of acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made."  *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1285 (Fed. Cir. 2017) (quoting *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)).

A "reasonable royalty" award "must reflect the value attributable to the infringing features of the product, and no more."  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).  "Where the accused product incorporates components beyond the patented technology, damages expert opinions must apportion, or separate, 'the value of the allegedly infringing features from the value of all other features.'"  *Willis Elec. Co., Ltd. v. Polygroup Ltd.*, 166 F.4th 1363, 1376 (Fed. Cir. 2026) (quoting *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015)).  One method for establishing the amount of a reasonable royalty is the "hypothetical negotiation" method: it requires the fact finder to determine the royalty that would have been agreed to in a hypothetical negotiation between a willing licensee and a willing licensor at the time infringement began.  *Id.* at 1374.  Federal Circuit precedent provides guidance for making this determination in the form of the so-called *Georgia-Pacific* factors, which are a "structured framework for evaluating economic and commercial considerations relevant to the [hypothetical] negotiation."  *Id.* at 1374–75 (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)).

21

The amount of damages for patent infringement—whether those damages are based on lost profits or a reasonable royalty—is an issue of fact to be decided by the jury. *See Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362 (Fed. Cir. 2017).

This case, like most patent cases tried in this district court, "is a classic example of competing experts." *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1394 (Fed. Cir. 2003). At trial, each side's experts had the opportunity to present their theories. Sight's damages expert, Mr. Jarosz, presented two alternative damages theories: (1) lost profits for some Hydrus sales, and a reasonable royalty for the remainder, or (2) a reasonable royalty for all Hydrus sales. (Tr.4 at 19:11–48:24.) Mr. Jarosz explained to the jury that his analysis of lost profits took into account the *Panduit* factors. He relied on (among other things) evidence and testimony suggesting the lack of an acceptable non-infringing alternative, and he opined that Sight had suffered lost profits of $11 million due to Defendants' infringement. (Tr.4 at 21:20–33:23; PTX0346; PTX0466; PTX0480; PTX0397.) Mr. Jarosz further explained that he had applied the hypothetical negotiation method to his assessment of a reasonable royalty, and he opined that Sight was entitled to a reasonable royalty of $27–33 million for the remainder of Defendants' sales not accounted for by lost profits. (Tr.4 at 33:24–48:24; DTX0072; PTX0418; PTX0402; *see also* Tr.4 at 81:16–82:14.)

Defendants cross-examined Mr. Jarosz about his opinions. (Tr.4 at 49:10–81:10; DTX1027; DTX0867.) Defendants also put on their own contrary evidence. Defendants' expert, Mr. Meyer, opined that a lost profits award was inappropriate for several reasons, including because (in his view) there was an available and acceptable non-infringing alternative. Mr. Meyer also opined that a $2.8 million reasonable royalty was appropriate. (Tr.4 at 117:11–143:16; DTX0331; DTX1351; DTX1357; DTX0711; DTX0118; DTX0793; DTX0066.)

At the end of the day, each side's expert supported his opinions "with an analysis of relevant factors based on his client's view of the disputed facts." *Micro Chem.*, 317 F.3d at 1394. For my part, I instructed the jury on the legal standards governing an award of lost profits—including that a non-infringing product can be "available" as a potential substitute even if it was not on the market. (Tr.5 at 35:9–20, 36:3–41:15, 48:12–49:11.) I also instructed the jury on the legal standard governing the award of a reasonable royalty—including the *Georgia-Pacific* factors for assessing the hypothetical negotiation and the requirement for apportionment. (Tr.5 at 35:21–36:2, 41:16–49:11.) Ultimately, the jury's damages award "depended to a large extent upon which predicate facts the jury believed, and then on which expert's analysis they believed." *Micro Chem.*, 317 F.3d at 1394. The jury largely sided with Sight, finding that it had proven by a preponderance of the evidence that it was entitled to lost profits of $5.5 million and a reasonable royalty of $28.5 million. (D.I. 485 at 9–10.)

Defendants' JMOL motion argues that there was insufficient evidence supporting the jury's lost profits award because there was an available non-infringing substitute. (D.I. 518 at 24–25.) But the record contains substantial evidence supporting a finding that there was not, including evidence that Defendants' proposed non-infringing substitute lacked FDA approval at the relevant time—and might never have been approved—and evidence that it was not an acceptable alternative. (Tr.4 at 94:5–95:5, 98:4–18, 122:23–123:13, 145:5–10, 190:9–195:25; Tr.3 at 139:6–147:4, 184:9–186:8; PTX0112; PTX0357; PTX0123.)

Defendants' JMOL motion also challenges the jury's reasonable royalty determination. Defendants argue that Mr. Jarosz's royalty assessment inappropriately relied on (i) a royalty rate set forth in a settlement agreement entered into between Defendant Ivantis, Inc., and its direct competitor, Glaukos, and (ii) an Alcon-Ivantis acquisition model. (D.I. 518 at 18–24.) Mr. Jarosz

23

explained, however, that his analysis took into account the technological and economic differences between the situation leading to the Alcon-Ivantis agreement and the hypothetical negotiation over the patented technology.  (Tr.4 at 38:17–41:4; DTX0072; PTX0418.)  Likewise, Mr. Jarosz explained that he considered the technical comparability between the Glaukos-Ivantis license agreement and the hypothetical license. (Tr.4 at 42:10–46:14; PTX0402.)  He further testified that his assessments of the Glaukos-Ivantis agreement and the Alcon-Ivantis acquisition model were designed to apportion only the value of the patented technology.  (Tr.4 at 41:5–42:9 (Alcon-Ivantis model); Tr.4 at 44:3–11 (Glaukos-Ivantis agreement); PTX0402.)  Defendants may disagree with his opinions, but the jury heard them at trial and was entitled to credit them.  *See Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1372–76 (Fed. Cir. 2020) (concluding degree of comparability "was appropriately left for the jury to decide," and separately concluding the jury's damages award was supported by substantial evidence); *see also Micro Chem.*, 317 F.3d at 1394. And those opinions are substantial evidence supporting the jury's finding on what royalty was reasonable.  Defendants' request for JMOL will therefore be denied.[5]

---

[5] The thrust of Defendants' post-trial challenge to the reasonable royalty award seems to be that I should not have allowed the jury to hear Mr. Jarosz's opinions on reasonable royalty.  But that is a separate question from whether substantial evidence supported the jury's determination of what royalty was reasonable. *Cf. Willis Elec.*, 166 F.4th 1372–77.  Indeed, before trial, Defendants filed a *Daubert* motion under Federal Rule of Evidence 702 to exclude the testimony of Sight's damages experts insofar as their opinions relied on the Glaukos-Ivantis agreement or the Alcon-Ivantis acquisition model (D.I. 294 at 15–21), and insofar as their opinions were not supported by apportionment analyses (*id.* at 9–15).  I denied Defendants' *Daubert* motion.  (D.I. 501 at 93:11–18; D.I. 433.)  Underlying my ruling was my finding under Rule 702 that Sight had demonstrated by a preponderance of the evidence (a) that Sight's experts had specialized knowledge that would help the jury determine what royalty was reasonable; (b) that Sight's expert opinions relevant to the "hypothetical negotiation" (an "inherently counterfactual" determination) were based on sufficient facts; (c) that the testimony was the product of reliable methods, as the methods used by Sight's experts attempted to apportion for the value of the patented technology and took into account technological and economic differences from the Alcon-Ivantis agreement; and (d) the expert opinions (as stated in the reports) reflected a reliable application of the principles and methods to the facts of the case.  *Willis Elec.*, 166 F.4th at 1373–74 (citing Fed. R. Evid. 702).

### X.    Defendants' Requests for a New Trial

Defendants request a new trial on the basis that Sight's infringement and validity expert, Dr. Downs, applied the "substantially interferes" limitation inconsistently in his opinions on infringement and validity with respect to the '482 and '443 patents.  According to Defendants, Dr. Downs opined that the Hydrus met the "substantially interfere" limitations "without ever having seen or tested a Hydrus[,] . . . [b]ut to avoid prior art, Downs testified that [a prior art reference] did not teach the same 'substantially interfere' limitations precisely because Defendants' expert had not done the very testing or calculations that Downs did not do for infringement."  (D.I. 518 at 5 (emphases omitted).)  Therefore, Defendants say, "the jury's verdict cannot stand as to **both** infringement **and** no invalidity" with respect to the '482 and '443 patents.  (D.I. 518 at 5.)

I disagree that the jury's verdict is necessarily inconsistent or even against the clear weight of the evidence.  I instructed the jury on the meaning of the "substantially interferes" limitations, and I instructed them to use that construction to assess both infringement and validity.  (Tr.5 at

---

Estimating a reasonable royalty "necessarily involves an element of approximation and uncertainty," *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1340 (Fed. Cir. 2025) (en banc), and I concluded that Defendants' criticisms of Sight's expert opinions relevant to the question of what royalty was reasonable could be addressed through cross-examination and the presentation of contrary evidence.  (D.I. 501 at 93:11–18; D.I. 433; D.I. 470.)  *See EcoFactor*, 137 F.4th at 1340 ("Indeed, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (cleaned up) (quoting *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015))).

Defendants cite to *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) in support of their argument that they were prejudiced by the introduction into evidence of a document prepared by Mr. Jarosz, which listed (among many other things) a $1.5 billion "NPV" (net present value) of Ivantis.  (D.I. 518 at 23.)  I already ruled against Defendants on this issue at trial (Tr.4 at 11:6–15) and allowed the document into evidence.  *Uniloc* is inapposite because it related to the entire market value rule.  *Uniloc*, 632 F.3d at 1320–21.  And I do not read *Uniloc* to stand for the proposition that it is always unduly prejudicial for the jury to be exposed to a big number, especially where, as here, the expert did not mention or otherwise direct the jury's attention to the number in his testimony.  (Tr.4 at 11:6–9.)

13:14–19.)  As explained above, the jury was entitled to find that the accused Hydrus device met the Court's construction of the "substantially interferes" limitations based on Defendants' own internal and marketing documents.  Furthermore, the jury was entitled to credit Dr. Downs's fluid mechanics analysis, and as explained above, Dr. Downs was not required to present *in situ* testing to prove infringement.  As for invalidity, Defendants presented expert testimony that the prior art disclosed those limitations, but the jury was not required to credit Defendants' expert testimony.  There was nothing inappropriate about Dr. Downs commenting on Defendants' experts' lack of testing of prior art devices, especially since Defendants (not Sight), had the burden to prove invalidity, and that burden of proof is higher than the burden to prove infringement.  (*See* Tr.3 at 170:21–171:20 (Dr. Downs commenting on Defendants' burden.)

Defendants also request a new trial on the issues of direct infringement, induced infringement, validity, willful infringement, and damages on the basis that the jury's verdict was against the weight of the evidence.  I determined above that substantial evidence supports the jury's verdict on each of those issues.[6]  For the same reasons, I conclude that the jury's verdict was not against the clear weight of the evidence, even without viewing the evidence most favorably to Sight.  A different jury might have returned a different verdict, but I cannot say that it would be a "miscarriage of justice" to let this jury's verdict stand.  *Williamson*, 926 F.2d at 1352.  Nor can I say that the verdict "cries out to be overturned" or "shocks [my] conscience."  *Id.* at 1353.  I exercise my discretion to decline to order a new trial.

---

[6] Defendants did not move for JMOL of invalidity with respect to the "arcuate member" limitation, but they argue that the jury verdict of invalidity is against the clear weight of evidence due to Dr. Downs "downplay[ing]" a prior art's "explicit teachings." (D.I. 518 at 7–9.)  I disagree. Dr. Downs testified that the prior art reference, Lynch-984, "does not teach and actually does not allow" the limitation because the art's claims require a radius that "approximate[s] the curvature of Schlemm's canal." (Tr.3 at 168:8–169:3.)  The jury was entitled to credit that evidence and conclude that Defendants failed to meet their burden of proof.  A new trial is not warranted.

26

**XI.  Sight's Requests for an Injunction Barring Future Sales or, in the Alternative, for an Order Imposing Ongoing Royalties**

Sight requests a permanent injunction against Defendants that would prohibit them from further infringing sales or, in the alternative, an order requiring Defendants to pay an ongoing royalty in the form of a percentage of the sales price for any infringing sales made in the future.

Under the Patent Act, courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  35 U.S.C. § 283.  It seems to me that both alternative forms of relief proposed by Sight—(i) an injunction against sales or (ii) an order for ongoing royalties—are forms of equitable injunctive relief.  It would therefore make logical sense for a court to assess both requests together to figure out which form of equitable relief (if any) is appropriate.  Unfortunately, that's not how most courts proceed with the analysis.  I will follow their lead and first assess whether an injunction against sales is appropriate.  I will then assess whether ongoing royalties are appropriate.

**A.  Injunction Against Sales**

A patentee seeking to enjoin future infringing conduct "must satisfy a four-factor test before a court may grant such relief."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Id*.  Having considered all four factors, and for the reasons below, I conclude that an injunction against future infringing conduct is not appropriate.

The parties hotly dispute whether Sight would be irreparably harmed absent an injunction and whether remedies available at law are adequate to compensate for that injury.  For purposes of

the argument only, I will assume that Sight would be irreparably harmed and that there are no adequate remedies at law.

The third factor, the balance of the hardships, favors Defendants. Sight's founders, brothers David and Paul Badawi—the named inventors of the Asserted Patents—were aware as early as 2009, but no later than 2011, that Defendant Ivantis was developing and testing a MIGS device now sold by Defendants as the Hydrus. (Tr. 143:10–148:5; DTX1400; DTX1212; DTX0194.) On June 11, 2012, the Badawi brothers' '482 patent issued, enthusiastically dubbed by Paul Badawi at the time as the "Ivantis-Killer." (Tr.1 at 145:12–146:22; DTX0167.) Yet despite the Badawi brothers' belief—then and now—that the '482 patent covered the Hydrus (Tr.1 at 146:20–22), Sight did not tell Ivantis that it believed it infringed (Tr.1 at 235:8–237:2). Instead, Sight waited for nearly a decade while Ivantis invested significant additional resources obtaining regulatory approval for the Hydrus, including tens of millions of dollars and years of clinical trials involving hundreds of patients. (Tr.2 at 164:17–165:22; DTX0419.) Even after Ivantis received final FDA approval for the Hydrus in August 2018 (Tr.2 at 171:10–13), Sight still sat silent. It wasn't until September 16, 2021, after there had been rumors in the market that Ivantis might be acquired by Defendant Alcon, did Sight file this suit and reveal its belief that the Hydrus infringed. (Tr.1 at 193:9–194:8; Tr.4 at 113:1–5.)

In short, the record reflects that Sight lay in wait for nearly a decade after the 2012 issuance of the '482 patent (the earliest-issued Asserted Patent) before approaching Defendants. By the time this suit was filed in 2021, Ivantis had sunk years and tens of millions of dollars into obtaining FDA approval for the Hydrus. I can't say with any certainty that Ivantis would have in 2012 been able to pivot to a non-infringing design that would have ultimately been approved by the FDA. But the record suggests that it was certainly possible, as Ivantis had tested a non-infringing design

28

in humans as of December 2011.  (Tr.2 at 162:22–163:19; Tr.3 at 113:4–24; DTX0778.)  What I can say with certainty is that Sight's conduct deprived Ivantis of any reasonable opportunity to try.

In considering the balance of the hardships, I have also considered evidence that Defendants' Hydrus is sold by a dedicated Alcon sales force of 60 employees who sell only the Hydrus, such that an injunction would likely result in lost jobs and years of working relationships with doctors, hospitals, and staff.  (D.I. 535 at 11; D.I. 535, Ex. 1 at ¶¶ 26–27.)  Sight argues that one cannot complain of an injunction destroying its infringing business (D.I. 516 at 10 (citing *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008))), but I agree with Defendants that they would not have faced the same hardship had they been sued earlier.  In any event, Sight does not practice its patents now, nor is there any suggestion in the record that it will in the future.  Taking into account all of the circumstances, I determine that the balance of hardships weighs against an injunction.

The fourth factor, the public interest, strongly favors Defendants.  Sight argues that "[t]he public interest is best served by having a strong patent system that protects and encourages innovation."  (D.I. 516 at 12 (citing *Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 785, 795 (E.D. Va. 1998), *aff'd*, 185 F.3d 1259 (Fed. Cir. 1999)).)  However, courts regularly deny injunctions that would "injure the public health."  *Cordis Corp. v. Boston Sci. Corp.*, 99 F. App'x 928, 935–36 (Fed. Cir. 2004).  For instance, courts have declined to issue injunctions due to the strong public interest in access to medical devices based on record evidence that some doctors prefer the infringing devices over others, even if they are not superior.  *Id.*; *see also Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 561 (D. Del. 2008) (similar).  Here, the record evidence shows that this factor strongly weighs against a permanent injunction.

For context, the MIGS market is differentiated into three categories of surgical interventions: stents, canaloplasty devices, and goniotomy devices. (Tr.3 at 96:16–97:23; *see also* D.I. 535, Ex. 1 ¶ 11.) The Hydrus generally falls in the stents category (alongside Glaukos' iStent infinite and inject); Nova's iTrack, Sight's OMNI, Glaukos' iPrime, and New World Medical's Streamline fall in the canaloplasty category; and New World Medical's Kahook Dual Blade, Glaukos' iAccess, and MSD's Travets fall in the goniotomy category. (Tr.3 at 96:16–97:23; *see also* Tr.1 at 196:7–19.)

An eye surgeon picks his or her procedure of choice based on various considerations, such as the underlying diagnosis, anatomy, clinical data, physician's preference, and safety and efficacy in light of long-term symptoms. (*See* Tr.3 at 97:24–98:25.) For instance, stents are inserted through the trabecular meshwork and allow fluid to flow through the stent into the Schlemm's canal. (D.I. 535, Ex. 1 ¶ 11.) Canaloplasty devices inject viscoelastic into the Schlemm's canal with the goal of opening the canal and flushing out the collector channels. (*Id.*) Goniotomy or trabeculotomy excise a portion of the trabecular meshwork, allowing for fluid to flow into the Schlemm's canal. (*Id.*) For an elderly patient, who takes blood thinners, something like a trabeculotomy procedure that is more tissue destructive and presents a higher risk of bleeding, poses a higher risk to that patient and is thus less desirable to the treating physician. (*See* D.I. 535, Ex. 4 ¶ 8.) Tearing the trabecular meshwork when performing a goniotomy or trabeculotomy takes away a treating physician's ability to perform other procedures for the same patient in the future (such as canaloplasty and goniotomy) to lower intraocular pressure as the glaucoma progresses. (*See* D.I. 535, Ex. 6 ¶ 8.) However, in a patient with pseudo-exfoliation, a goniotomy device may be best because the trabecular meshwork has an excessive amount of debris. (*See* D.I. 535, Ex. 7 ¶ 6.)

30

Even between specific devices, the mechanisms differ such that a physician could choose one device for a particular use case over the other.  For example, while canaloplasty devices like the OMNI dilate Schlemm's canal similar to the Hydrus, the OMNI does not provide a bypass across the trabecular meshwork like Hydrus.  (D.I. 535, Ex. 9 ¶ 8.)  And while the iStent, another stent device, bypasses the trabecular meshwork, it does not scaffold the Schlemm's canal the way the Hydrus does.  (*Id.*; D.I. 535, Ex. 6 ¶ 11.)

But the Hydrus is not just unique in how it allows physicians to treat particular use cases. It also is the only MIGS device that underwent a five-year, prospective, randomized clinical trial showing that it is more effective than cataract surgery alone.  (Tr.2 at 165:4–19, 252:3–17; D.I. 535 Ex. 1 ¶¶ 19–25, Ex. 4 ¶ 6, Ex. 5 ¶¶ 5–8, Ex. 6 ¶¶ 9–10, Ex. 7 ¶ 8, Ex. 8 ¶ 9, Ex. 9 ¶ 8, Ex. 10 ¶ 6, Ex. 11 ¶ 5.)  That clinical data is one reason physicians choose Hydrus.  (D.I. 535, Ex. 1 ¶¶ 19–24, Exs. 4–12.)  In addition, the American Academy of Ophthalmology gave the Hydrus a high designation and strong recommendation.  (Tr.3 at 120:21–122:7; DTX0626.)  No other MIGS device received the same level of quality rating.  (Tr.2 at 169:1–9.)

This case does not involve bioequivalent generic drugs or interchangeable medical devices. This record demonstrates that some physicians prefer the Hydrus device in situations where they believe it best meets their patients' needs.  That weighs heavily against an injunction.  *See Advanced Cardiovascular*, 579 F. Supp. 2d at 561; *Cordis Corp.*, 99 F. App'x. at 935–36.  I find that the public interest, even just within the United States, of having Hydrus remain on the market strongly outweighs the public interest in enforcing Sight's patent rights.

31

In sum, even assuming factors 1 and 2 favor Sight, factors 3 and 4 nevertheless strongly favor Defendants. After considering all of the factors, I exercise my discretion to deny Sight's request to enjoin sales of the Hydrus.[7]

### B. Order for Ongoing Royalties

Next, I will assess whether ongoing royalties are appropriate. "Under some circumstances, awarding an ongoing royalty for patent infringement in lieu of an injunction may be appropriate . . . [b]ut, awarding an ongoing royalty where 'necessary' to effectuate a remedy . . . does not justify the provision of such relief as a matter of course whenever a permanent injunction is not imposed." *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314–15 (Fed. Cir. 2007). In opposing Sight's request for a permanent injunction, Defendants argued that "[t]o the extent the verdict is upheld, an ongoing royalty is more than sufficient to make Sight whole." (D.I. 535 at 2.) Because the parties do not appear to dispute that an ongoing royalty is appropriate to compensate Sight for any ongoing infringement, I will exercise my discretion to grant an ongoing royalty.

The parties do dispute the specific rate. To start, I decline to defer determination of the ongoing royalty rate. Determining the ongoing royalty rate now without instructing the parties to negotiate a license is within my discretion, *see Paice LLC*, 504 F.3d at 1315, and delaying would

---

[7] Sight has not identified a single case in which a court entered an injunction under these circumstances—that is, a request to enjoin sales of a unique, FDA-approved medical device that infringes a patent not practiced by the patentee, where there is no identical or substantially identical substitute product on the market. Sight cites *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1342–43 (Fed. Cir. 2016), where the Federal Circuit held that a "categorical rule denying permanent injunctions for life-saving goods" is inappropriate. Of course that's true, but I am still hard-pressed to envision any circumstances where enjoining sales of a unique, FDA-approved medical device widely used and recommended by physicians and the relevant scientific community would ever be appropriate. In any event, I have assessed the record in this particular case, and it shows that some physicians prefer Hydrus over other similar products for specific use-cases. I determine that the public interest factor thus strongly weighs against an injunction, and that, after considering all four factors, an injunction is not appropriate.

delay the entry of final judgment, *see Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 515 F. App'x 882, 882 (Fed. Cir. 2012). Furthermore, I previously ordered the parties to engage in mediation after the post-trial motions hearing, and they were unable to resolve their disputes. (D.I. 582 at 125:10–18; D.I. 587.) I find that the parties are unlikely to agree to an ongoing royalty rate, and so I will exercise my discretion to determine that rate now.

The Federal Circuit has held that "[t]here is a fundamental difference . . . between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement," "because different economic factors are involved." *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361–62 (Fed. Cir. 2008) (citing *Paice*, 504 F.3d at 1315, 1317). But consistent with the views of other courts, I am not sure what those different factors would be given that the jury was instructed to assume that the parties to the hypothetical negotiation understood that the patent was valid and infringed and were willing to enter into a license. (Tr.5 at 42:22–25.) *See Vectura Ltd. v. GlaxoSmithKline LLC*, No. 16-638, 2019 WL 4346502, at *7 n.10 (D. Del. Sept. 12, 2019); *Purewick*, 666 F. Supp. 3d at 449 n.23; *see also* Mark A. Lemley, *The Ongoing Confusion over Ongoing Royalties*, 76 MO. L. REV. 695, 704 (2011).

In any event, the Federal Circuit requires that I consider, relevant here: (1) "the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability," *Amado*, 517 F.3d at 1362; (2) "changed economic circumstances, such as changes related to the market for the patented products," *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1297 (Fed. Cir. 2018); (3) "post-verdict factors" that would impact "what a hypothetical negotiation would look like ***after*** the prior infringement verdict," *id.*; and (4) the Georgia-Pacific factors, *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1370 (Fed. Cir. 2017) (citing *Georgia-Pac.*, 318 F. Supp. at 1120).

33

Considering all of those factors, I exercise my discretion to set the ongoing royalty rate as 10%. First, the parties do not dispute that the jury's award of $34 million equates to a rate of $154 per unit, approximately equivalent to a 10% reasonable royalty rate. (D.I. 516 at 15; D.I. 535 at 17 & n.11.) Defendants argue that I should not start with a 10% figure "because the most appropriate, evidence-supported rate for an ongoing royalty is the 0.43% rate [Defendants' expert] Meyer calculated as the ongoing cost to implement Defendants' non-infringing single radius Hydrus." (D.I. 535 at 17.) I disagree because, as already discussed, the jury rejected Mr. Meyer's theory. Accordingly, I use the 10% rate as the "starting point for evaluating ongoing royalties." *Vectura*, 2019 WL 4346502, at *7.

Sight requests that I increase the jury's rate by 50% to $231 per unit, "to account for [Sight's] lost profit damages and changed circumstances." (D.I. 516 at 15–17.) In support of the increase, Sight cursorily argues that: (1) the jury's award is lower than the "blended per-unit royalty" of the lost profit and reasonable royalty damages equaling $170 per unit, which should serve as the minimum; (2) the jury's lost profits award does not account for "lost market share resulting from [Sight's] inability" to expand, so the rate should be increased to account for that loss; (3) today's hypothetical negotiation would be "different" than in 2018 because Alcon "is in a far better position to take sales from [Sight] than Ivantis was"; and (4) Alcon's continued infringement "could lead to collateral sales of its other products." (D.I. 516 at 15–17.)

As an initial matter, Sight cites no authority for the proposition that a jury award of lost profits entitles the patentee to an enhanced royalty rate. *See ArcherDX, LLC v. Qiagen Scis., LLC*, No. 18-1019, 2022 WL 4597877, at *16 (D. Del. Sept. 30, 2022). More importantly, none of Sight's arguments provide any substantive mathematical analysis for the 50% increase, such as how the loss of market share specifically accounts for the increase. And while Sight cites the

34

*Georgia-Pacific* factors (such as the ability to make collateral sales), it does not provide any other analysis, evidence, or expert testimony. *See Purewick*, 666 F. Supp. 3d at 449. Even assuming for the sake of argument only that Defendant Alcon "is in a far better position to take sales from [Sight]" post-verdict, Sight fails to articulate how any improved bargaining position translates into a 50% increase.

Given all of the relevant post-verdict considerations, I grant Sight's request for ongoing royalties on Hydrus sales at a rate of 10% of revenue to compensate Sight for the continued infringement. (*See* D.I. 535 at 17 n.11 (Defendants' request that, if the Court adopts a 10% royalty rate, the Court "should award ongoing royalties at the rate of 10% of revenue, not a per-unit amount.").) The parties will be directed to meet and confer and submit a proposed Order governing the payment of ongoing royalties.

## XII.    Sight's Request for Enhanced Damages

Sight requests that the Court award enhanced damages under 35 U.S.C. § 284. Whether to award enhanced damages is a matter committed to the discretion of the district judge. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103 (2016). The Supreme Court has explained that "[a]wards of enhanced damages under the Patent Act . . . are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior." *Id.* at 103–04 (explaining that enhanced damages "are generally reserved for egregious cases of culpable behavior"). "A jury's finding of willful infringement is a prerequisite to enhancement of damages but is not by itself sufficient." *Nox Med. Ehf v. Natus Neurology Inc.*, No. 15-709, 2018 WL 6427686, at *1 (D. Del. Dec. 7, 2018) (citing *Halo Elecs*, 579 U.S. at 103–04). "A district court is not required to analyze the *Read* factors in making an enhancement determination," but the Federal Circuit has explained that the *Read* factors are

nevertheless "an appropriate method of weighing the particular circumstances of the case to determine whether the relevant conduct is sufficiently egregious to warrant enhanced damages." *Trs. of Colum. Univ. in City of N.Y. v. Gen Digit. Inc.*, No. 24-1243, 2026 WL 679620, at *13 (Fed. Cir. Mar. 11, 2026) (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992)).  The *Read* factors are: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by the defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct. *Read*, 970 F.2d at 827.

The *Read* factors do not support enhancing damages in this case.  I'll assume—for the sake of argument only—that factors four and seven support enhanced damages.  The rest of the factors do not.  Factor one supports Defendants because there was no evidence of copying.  As for factor two, I agree with Defendants that the evidence showed that the relevant entities believed that the original Sight patent application did not cover Hydrus.  (Tr.1 at 141:19–143:1, 230:11–22, 233:15–235:7; Tr.2 at 119:6–25, 208:24–209:1.)  By the time the Asserted Patents issued, the design of the Hydrus had been finalized and it had been submitted for FDA approval.  To the extent that *Read* factor two is still relevant after the enactment of 35 U.S.C. § 298,[8] the Court concludes that the record contains insufficient evidence to conclude that Defendants did not have a good-faith belief

---

[8] Section 298 provides that "[t]he failure of an infringer to obtain the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not be used to prove that the accused infringer willfully infringed the patent or that the infringer intended to induce infringement of the patent."

that it was invalid and not infringed.  Factors three and five favor Defendants.  The case was close, and Defendants litigated it appropriately.  Factor six also favors Defendants.  As discussed above, it was Sight's strategy to delay almost a decade before alerting Defendants of its infringement allegations.  I agree with Defendants that "Sight's strategic delay sanctioned the 'duration' of any alleged misconduct" and prevented Defendants from having a reasonable opportunity to design around.  (D.I. 535 at 28.)  Regarding factors eight and nine, there is no evidence that Defendants acted with the specific intent to harm Sight or that Defendants did anything to conceal their actions.

Finally, Sight has not pointed to any evidence of "egregious" conduct by Defendants that would support an award of enhanced damages.  The Court will exercise its discretion not to enhance damages under § 284.

## XIII.  Supplemental Damages

Sight requests "supplemental damages" spanning the period of April 27, 2024, through the Court's entry of a permanent injunction.  (D.I. 516 at 28–29.)  The Court is denying Sight's request for a permanent injunction.  Nevertheless, Defendants do not dispute that, in light of the Court's other rulings, Sight is entitled to a reasonable royalty for Defendants' sales made between April 27, 2024, and the date of entry of judgment.  (D.I. 535 at 3 n.2.)  The Court determines that a royalty rate of 10% is appropriate, for the reasons previously stated.  The parties will be directed to meet and confer and submit a proposed Final Judgment that includes reasonable royalty damages for sales made after April 27, 2024.

## XIV.  Prejudgment Interest

Sight asks the Court to award prejudgment interest under 35 U.S.C. § 284 to afford Sight complete compensation for Defendants' infringement.  (D.I. 516 at 29–30.)  The Supreme Court instructs that "prejudgment interest should ordinarily be awarded where necessary to afford the

37

plaintiff full compensation for the infringement." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654 (1983).

The district court has discretion in awarding prejudgment interest. "[I]t may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit." *Id.* at 656–57. However, the Federal Circuit has explained that "delay by [the patentee] does not support the denial of prejudgment interest" unless there has been prejudice to the defendants. *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1361–62 (Fed. Cir. 2001) (quoting *Lummus Indus., Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 275 (Fed. Cir. 1988)). Prejudice is not shown where a defendant "merely argues that its damages are higher due to the delay in filing the suit." *MHL Custom, Inc. v. Waydoo USA, Inc.*, No. 21-91, 2023 WL 5805889, at *7 (D. Del. Sept. 7, 2023). And prejudice is not shown by evidence that the accused infringer "*could* have" redesigned its product "without 'evidence that it *would* have' done so." *Roland Corp. v. inMusic Brands, Inc.*, No. 23-1327, 2025 WL 926703, at *17–18 (Fed. Cir. Mar. 27, 2025) (citing *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1375 (Fed. Cir. 2022)).

Defendants argue that the Court should deny prejudgment interest because Sight unduly delayed in filing suit. (D.I. 535 at 29–30.) Specifically, Defendants argue that damages are higher not only because Sight delayed in filing suit, but because Sight deprived Defendants of the opportunity to come up with a non-infringing design prior to FDA approval and significant financial investment. However, the Federal Circuit requires Defendants to provide sufficient evidence that they "would have"—not just "could have"—redesigned the Hydrus. *Roland Corp.*, 2025 WL 926703, at *18. I cannot make that finding based on the record before me.

Accordingly, I will grant Sight prejudgment interest at the United States Treasury bill rate, compounded monthly. The parties will be directed to submit a proposed Final Judgment that includes the appropriate pre-judgment interest.

## XV. Post-Judgment Interest

"Post-judgment interest is mandatory for damages awarded in civil cases." *ArcherDX*, 2022 WL 4597877 at *19; *see also* 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."). Post-judgment interest is awarded at the rate "equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a). The parties will be directed to submit a proposed Final Judgment that includes the appropriate post-judgment interest.

## XVI. Conclusion

For the foregoing reasons, Defendants' requests for JMOL and a new trial will be DENIED. Sight's requests for enhanced damages and a permanent injunction will be DENIED. Sight's request for pre- and post-judgment interest and ongoing royalties (including royalties for post-verdict sales) will be GRANTED. A separate Order will be entered.